# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : : : |
| Plaintiff, | : : |
| vs. | : : |
| STEFAN QIN, VIRGIL TECHNOLOGIES LLC, MONTGOMERY TECHNOLOGIES LLC, VIRGIL QUANTITATIVE RESEARCH, LLC, VIRGIL CAPITAL LLC, and VQR PARTNERS LLC, | : : : : : : |
| Defendants. | : : : |

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS *EX PARTE* EMERGENCY MOTION FOR AN ASSET FREEZE AND OTHER RELIEF

Fitzann R. Reid (N.Y. Bar No. 5084751)**\***
Amanda Straub (AS0516)
Susan F. LaMarca**\***
Steven Buchholz**\***
Counsel for the Plaintiff
Securities and Exchange Commission
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2458 (Reid)

**\*** Motion for *pro hac vice* pending

December 22, 2020

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................... 1

II.     STATEMENT OF FACTS........................................................................................ 2

        A.    The Structure and Management of Entity Defendants and the
              Investor Funds.................................................................................................. 2

        B.    Missing Investor Assets .................................................................................. 4

        C.    Qin Provides False Information to Investors, and Then
              Attempts to Withdraw Investor Assets......................................................... 5

III.    ARGUMENT............................................................................................................ 8

        A.    The Standard for Ordering a Freeze Over Entity Defendants'
              Assets and Accounts ....................................................................................... 8

        B.    The Commission Is Likely to Succeed on Its Claims Under
              Exchange Act Section 10(b) and Rule 10b-5, and Securities Act
              Section 17(a) .................................................................................................... 9

              1.    Defendants, Through Qin, Engaged in Deceptions and
                    Made False Statements.................................................................... 10

              2.    Qin, Defendants' Agent, Acted With Scienter ............................... 12

              3.    The Final Materiality and In Connection With Elements
                    Are Satisfied.................................................................................... 13

        C.    The Court Should Freeze Assets Under the Control of the
              Entity Defendants ......................................................................................... 14

        D.    The Court Should Order Entity Defendants to Complete an
              Accounting ..................................................................................................... 15

        E.    The Court Should Order Entity Defendants Not To Alter,
              Destroy, Or Conceal Documents ................................................................. 15

IV.     CONCLUSION ...................................................................................................... 16

## TABLE OF AUTHORITIES

<u>**CASES**</u>

*Basic Inc. v. Levinson,* 485 U.S. 224 (1988) ................................................................................. 13

*Braswell v. United States*, 487 U.S. 99 (1988) .............................................................................. 13

*Cromer Finance Ltd. v. Berger,* Nos. 00 Civ. 2284 (DLC) & 00 Civ. 2498
  (DLC), 2002 WL 826847 (S.D.N.Y. May 2, 2002) ................................................................. 10

*De Beers Consolidated Mines, Ltd. v. United States,* 325 U.S. 212 (1945) ................................. 14

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ....................................................................... 12

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999) ................................................... 14

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ............................................................ 12

*In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547 (S.D.N.Y. 2007) ............................................... 10

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) ....................................................................................... 11

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71 (2006) ................................... 14

*SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987) ........................................................... 8

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ................................................................................ 12

*SEC v. Bremont*, 954 F. Supp. 726 (S.D.N.Y. 1997) .................................................................... 15

*SEC v. DiBella,* 587 F.3d 553 (2d Cir. 2009) ............................................................................... 11

*SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ........................................................ 9

*SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402 (S.D.N.Y. 2001) ........................................... 14

*SEC v. Haligiannis,* 470 F. Supp. 2d 373 (S.D.N.Y. 2007) .......................................................... 13

*SEC v. Hedén*, 51 F. Supp. 2d 296 (S.D.N.Y. 1999) ...................................................................... 8

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) ........................................................................... 11

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) ................................................................... 8

*SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272 (9th Cir. 1990) .................................................... 15

*SEC v. Landberg*, 836 F. Supp. 2d 148 (S.D.N.Y. 2011) ............................................................. 12

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972) .............................................8, 13

*SEC v. Materia*, 745 F.2d 197 (2d Cir. 1984) ........................................................................ 8

*SEC v. Musella*, 748 F. Supp. 1028 (S.D.N.Y. 1989) ............................................................ 13

*SEC v. Norstra Energy Inc.*, 202 F. Supp. 3d 391 (S.D.N.Y. 2016) ...................................14 n.2

*SEC v. Oxford Capital Secs., Inc.*, 794 F. Supp. 104 (S.D.N.Y. 1992) ................................ 15

*SEC v. Riel*, 282 F. Supp. 2d 499 (S.D.N.Y. 2017) ............................................................ 10

*SEC v. Spongetech Delivery Sys., Inc.*, No. 10-cv-2031,2011 WL 887940
  (E.D.N.Y. Mar. 14, 2011) ...........................................................................................15, 16

*SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...............................10 n.1

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) .........................................................8, 16

*SEC v. W.J. Howey & Co.*, 328 U.S. 293 (1946) ..............................................................10 n.1

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011) .......................................................................8, 15

*Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87 (2d Cir. 2001) ................ 13

*United States v. Peoni,* 100 F.2d 401 (2d Cir.1938) .............................................................. 12

## **STATUTES AND REGULATIONS**

15 U.S.C. § 77q(a) ............................................................................................................... 9

15 U.S.C. § 78j(b) ............................................................................................................... 9

17 C.F.R. § 240.10b-5 ......................................................................................................... 9

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this memorandum of law in support of its *ex parte* emergency motion, by proposed order to show cause, against defendants Virgil Capital LLC, Montgomery Technologies, LLC, Virgil Technologies, LLC, Virgil Quantitative Research, LLC and VQR Partners, LLC, (collectively, "Entity Defendants"). The Commission seeks an order (1) freezing the assets that are owned, under the control of, Entity Defendants, (2) requiring an accounting by Entity Defendants of investor assets, (3) permitting immediate discovery of documents from Entity Defendants and from third parties, and (4) preventing Entity Defendants from destroying or altering documents.

## I.       PRELIMINARY STATEMENT

The Commission seeks emergency *ex parte* relief to halt a fraudulent scheme and to prevent the dissipation of investor assets by the Entity Defendants, including the movement of assets belonging to investors to foreign accounts. In December 2020, Defendant Stefan Qin, an Australian national who founded the Entity Defendants, sought from other employees of the Entity Defendants the means to remove more than a million dollars from one of two investor Funds under the control of defendants, the VQR Multistrategy Fund LP, claiming to his colleague that Qin was facing "liquidity issues." *See* Declaration of Antonio Hallak, ¶ 31 ("Hallak Decl."). When Qin was informed by his colleague, who is the Head Trader of the Fund, that he could not borrow or remove investor assets from the Fund, Qin informed the Head Trader that Qin would assert control over investor Fund assets. Before Qin was able to do so, the Commission's staff contacted U.S.-based digital asset trading platforms where most VQR Fund assets currently reside, and those third parties agreed to maintain a compliance hold on withdrawal of the assets until December 23, 2020. *See* Declaration of Amanda L. Straub ¶ 6 ("Straub Decl.").

The two investor Funds operated by Entity Defendants – VQR Multistrategy Fund, LP ("VQR Fund") and Virgil Sigma Fund, LP ("Sigma Fund") – are separate entities with different

investors, different investment strategies, and different employees at the Entity Defendants who manage them and trade on their behalf.  Defendant Qin, through Defendants Virgil Capital and Montgomery Technology, is the portfolio manager of the Sigma Fund. Recently, it has become apparent that Defendant Qin has not been operating the Sigma Fund in the manner described to investors; that Sigma Fund assets and accounts that were supposedly held at U.S.-based platforms were never there; and that transfers Qin told investors he was making on their behalf to move their investments in the Sigma Fund to the VQR Fund were never completed. The uncompleted transfers alone represent approximately $3.5 million in missing and unaccounted-for investor assets. The assets that were supposedly housed at U.S. trading platforms, but were not, represent another several million dollars' worth of unaccounted-for investor assets.

To preserve the *status quo* and ensure that investor funds are not further dissipated or expatriated, the Commission seeks an order freezing the Entity Defendants' assets. Specifically, the Commission seeks an order freezing a VQR Fund account at Payward Ventures, Inc., d/b/a Kraken, containing approximately $21 million in digital assets; a VQR Fund account at Coinbase, Inc. containing approximately $4 million in digital assets, and any other assets of, or controlled by, the Entity Defendants that may be identified.

## II.      STATEMENT OF FACTS

### A.  The Structure and Management of Entity Defendants and the Investor Funds

Defendant Stefan Qin, age 23, is an Australian national, and a part-time resident of New York, NY.  *See* Declaration of Fitzann Reid ¶ 13 ("Reid Decl."). Most recently, Qin has been staying in South Korea.  Hallak Decl. ¶ 20. Qin is the sole owner of Virgil Technologies LLC, which is the parent company of Defendants Montgomery Technologies LLC and Virgil Quantitative Research, LLC. Reid Decl., Exs. 1, 2. Montgomery Technologies LLC, a limited liability company domiciled in Delaware and headquartered in New York, wholly owns and controls New York-headquartered

2

Virgil Capital LLC. *Id.*, Exs. 2, 5. Virgil Capital LLC is the General Partner of the Sigma Fund, and Qin is the General Partner's Managing Member. *Id.*, Exs. 3, 5.

In a similar structure, Virgil Quantitative Research, LLC is a limited liability company domiciled and headquartered in New York, NY, which wholly owns and controls the New York-headquartered General Partner of the VQR Fund, VQR Partners LLC. *Id.*, Ex. 5. Qin is also the Managing Member of VQR Partners LLC. *Id.*, Ex. 6.

However, as a practical matter, the two investor Funds have been managed quite differently. The Sigma Fund generates its own account statements for investors, does not have an active fund administrator, and does not appear to have traders other than Qin.  Hallak Decl. ¶ 8.  There are two employees other than Qin who work on behalf of the Sigma Fund, an investor relations ("IR") representative and an operations employee, both of whom reside in the United States. *Id.* ¶ 9.

In marketing materials, the Sigma Fund purports to take a market-neutral "arbitrage approach to the cryptocurrency market," utilizing "a proprietary algorithmic trading system that continually scans for price differences between cryptocurrency markets." Declaration of Melissa Fox Murphy, Ex. 1. A December 15, 2020 press article for which Qin was interviewed states that the Sigma Fund has $112 million in assets under management. Reid Decl., Ex. 13. In Sigma Fund records dated May 31, 2020, there are at least 50 investors identified as U.S. persons, in addition to investors from Australia, China, and Europe. Reid Decl., Ex. 14.

The VQR Fund is a multi-strategy quantitative fund that is operationally separate from the Sigma Fund, with different systems, books, and employees.  Hallak Decl. ¶ 8.  The VQR Fund uses a traditional third-party fund administrator that calculates net asset value daily and issues investor statements.  The VQR Fund has approximately $25 million in assets under management, the vast majority currently hosted at two U.S.-based digital asset trading platforms. Straub Decl. ¶¶  6, 8. The

VQR Fund investors predominately reside in the United States, Australia, China, and Europe.  Reid Decl. ¶ 11.

**B.  Missing Investor Assets**

Until mid-December 2020, Melissa Fox Murphy was the Investor Relations Representative for the VQR Fund. Murphy Decl. ¶ 23.  In mid-2020, Murphy began receiving Exchange Agreements for investors who wished to transfer their investments from Sigma Fund to VQR Fund however the money from the transfers never arrived. *Id.* ¶ 12. These transfers were initially planned as "in-kind" transfers of digital assets, Murphy Decl. ¶ 11, but Qin later changed them to fiat bank transfers. Murphy Decl. ¶ 14. These fiat transfers, some of which were initiated in July 2020, should have been sent by Qin from the Sigma Fund's bank accounts, held at Commonwealth Bank of Australia, to VQR Fund's bank accounts, at Silvergate Bank in California.  *See* Reid Decl., Ex. 8 (two examples). In total, nine investors received Agreements describing transfers of their interests from the Sigma Fund to the VQR Fund, and their interests total approximately $3,500,000. Murphy Decl. ¶¶ 12, 18, 24.

In December 2020, Antonio Hallak, the Head Trader for the VQR funds, asked Qin why the VQR Fund had not yet received any money for the investor transfers from the Sigma Fund.  Hallak Decl. ¶ 23.  Qin told Hallak that the money had been held up by Commonwealth Bank of Australia, and that he would talk to the bank's Chief Financial Officer to get things cleared up. *Id.* Qin then provided Hallak with records of wire transfers from the Sigma Fund's account at Commonwealth Bank to a VQR Fund account at Silvergate Bank. *Id.* ¶ 24. Silvergate Bank, however, has since confirmed that no such wire transfers exist in their records. Reid Decl. ¶ 22 and Ex. 9. Additionally, Commonwealth Bank of Australia has confirmed that although the wire transfers were initiated, the transactions were declined due to insufficient funds. Reid Decl. ¶ 25 and Ex. 11.

4

**C. Qin Provides False Information to Investors, and Then Attempts to Withdraw Investor Assets**

Carey Harrold is the Chief Financial Officer of Virgil Quantitative Research LLC ("VQR"). *See* Harrold Decl. ¶ 2. During 2020, Qin had asked Harrold to prepare financial books and records of the Sigma Fund so that they could be audited for the years 2018 and 2019, and he had provided Harrold with access to the Sigma Fund's financial records contained in QuickBooks. *Id.* ¶ ¶ 7, 8. Harrold found the information in QuickBooks to be unusually sparse. *Id.* There was no monthly trade detail in the general ledger by asset trading exchange. *Id.* ¶ 8. Qin also provided no documentation from exchanges, something that Harrold knew any outside auditor would require. *Id.* When Harrold asked Sigma Fund's operations employee who was responsible for creating and maintaining accounting and tax information, the operations employee informed him it was Qin. *Id.*

To aid in conducting the audit, the Sigma Fund operations manager forwarded Harrold a file of Excel spreadsheets via email, copying Qin, and stated: "Stefan asked me to pass along the attached files that were all put together as part of the K-1 process for our investors."  *Id.* ¶ 9, Ex. 2. One of the spreadsheets is labeled "Exchange Balances 1 Jan – 31 Dec 2019." *Id.* It lists thirty-nine cryptocurrency and digital asset trading platforms, including several in the United States, with columns for each month of 2019, reflecting a balance, by month, for each trading platform. *Id.* The "Exchange Balances" spreadsheet is an apparent accounting of the balances at each trading platform on which Sigma Fund purportedly has assets.

One of the digital asset trading platforms listed on the Exchange Balances spreadsheet is Kraken. Straub Dec. ¶¶ 11. The balances shown on the spreadsheet for Kraken values throughout 2019 range from several hundred thousand dollars to several million, averaging approximately $2 million per month. *Id.* ¶ 12. In contrast, Kraken's records for the Sigma Fund's account at the trading platform reveal that no assets were ever traded in the account, and indeed, the Sigma Fund's

own records show that there has not even been a log-in to the Sigma Fund's account since November 2018. *See id.* ¶¶ 15-17 (summarizing records from Kraken).

Another digital asset trading platform listed on the Exchange Balances spreadsheet is Coinbase. *Id.* ¶ 11. The Exchange Balances spreadsheet reports balances for Coinbase for each month of 2019 averaging $2.29 million. *Id.* ¶ 13. In contrast, Coinbase's records show no account or trading activity for the Sigma Fund. *See id.* ¶¶ 18-20 (summarizing records from Coinbase).

Finally, a digital asset trading platform listed on the Exchange Balances spreadsheet is Gemini. *Id.* ¶ 11. The Exchange Balances spreadsheet reports balances for Gemini for each month of 2019 averaging $2.15 million. *Id.* ¶ 16. In contrast, Gemini's records show two accounts potentially related to Virgil Capital LLC and neither account showed any deposits, withdrawals, or any trading activity. *See id.* ¶¶ 21-22 (summarizing records from Gemini).

In early December 2020, Qin contacted Hallak, the Head Trader of the VQR Fund, asking for him to help Qin to withdraw $1.7 million from the VQR Fund, that is, from investor assets. Hallak Decl. ¶ 29. Qin had earlier in the year borrowed a total of $350,000, in two collateralized loans (dated August 20, 2020 and October 8, 2020), from defendant Virgil Quantitative Research, LLC, which is the entity that controls the General Partner of the VQR Fund (defendant VQR Partners, LLC) and employs the persons who manage the VQR Fund. *Id.* ¶¶ 16, 17. The first loan was due to be paid in full on November 1, 2020, and the second on December 1, 2020, but neither, to date, has been repaid. *Id.* ¶ 18.

Hallak told Qin he could not take the money from the VQR Fund. Hallak Decl. ¶ 32. In a telephone call that Hallak recorded, Qin told Hallak that loan sharks in China were demanding payment from him, and that he needed the money within hours because "they might do anything to collect on the debt.  Do you know what I mean?" *Id.* ¶ 14. Qin also told Hallak that Qin had used

the money he had borrowed from the loan sharks for the Sigma Fund, and now had no means to repay the debt. *Id.* ¶ 29.

Prior to the request from Qin, Hallak learned of the investors who were seeking to confirm transfers of their interests from the Sigma Fund to the VQR Fund, which were supposed to have been made by Qin on their behalf in lieu of requested redemptions, but which were still not completed. *Id.* ¶ 20. Additionally, Hallak, who has significant experience with digital assets and as a trader, noted that the Sigma Fund has reported uniformly positive return to investors. *Id.* ¶ 10. During a December 15, 2020 call with Hallak, Qin also stated that he had invested Sigma Fund assets in a number of initial coin offerings ("ICOs") in 2018. *Id.* ¶ 13. If true, such investments would mark a material departure from the stated arbitrage strategy for the Sigma Fund. *See* Murphy Decl., Ex. 1 (Sigma Fund marketing brochure).

In response to Hallak's refusal to permit the withdrawal of money from the VQR Fund, Qin told Hallak, in phone calls and in messages, that Qin was prepared to seize control of the VQR Fund. Qin thus stated in one message that he had a "liquidity issue" that prevented him from repaying the loansharks with his own capital. Hallak Decl. ¶ 30. Qin urged Hallak to help Qin withdraw the money he sought from investor capital, suggesting that Qin would later disclose the loan to the investors after he withdrew the money. *Id.* ¶ 31.

Currently, the investor assets of the VQR Fund reside primarily in the accounts at Kraken and Coinbase, and total approximately $25 million. Kraken and Coinbase have maintained compliance holds on the funds to prevent their removal, but those holds expire on December 23, 2020. Straub Decl. ¶¶ 6, 8. Since the second week of December 2020, Qin has been in very frequent contact with Kraken, seeking to take measures to remove investor funds. *Id.* ¶ 7.

### III.   ARGUMENT

#### A.  The Standard for Ordering a Freeze Over Entity Defendants' Assets and Accounts

Section 22(a) of the Securities Act and Section 27 of the Exchange Act "confer general

equity powers upon the district courts" that are "invoked by a showing of a securities law violation."

*Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011) (*citing SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082,

1103 (2d Cir. 1972); *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984); and *SEC v. Am. Bd. of Trade,*

*Inc.*, 830 F.2d 431, 438 (2d Cir. 1987)). A freeze of assets is an ancillary remedy that is available once

the Court's equity powers are invoked, the purpose of which is "to preserve the status quo by

preventing the dissipation and diversion of assets," *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 197 (3d

Cir. 2000). An asset freeze assures that funds that are due upon judgment, including disgorgement,

prejudgment interest, and penalties, can be collected. *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d

Cir. 1990). An asset freeze simply "functions like an attachment." *Unifund*, 910 F.2d at 1041.

In the Second Circuit, the Commission may obtain an asset freeze on a lesser showing than

that required of a preliminary injunction.  *Unifund*, 910 F.2d at 1041 ("an ancillary remedy may be

granted, even in circumstances where the elements required to support a traditional SEC injunction

have not been established") (citations omitted). *See SEC v. Hedén*, 51 F. Supp. 2d 296, 298 (S.D.N.Y.

1999) (holding that an asset freeze requires "a lesser showing" than a preliminary injunction against

future securities law violations). "Where an asset freeze is involved, the SEC must show either a

likelihood of success on the merits, or that an inference can be drawn that the party has violated the

federal securities laws."  *Smith v. SEC*, 653 F.3d at 128 (internal quotation marks and citations

omitted).

As set forth below, the Commission's evidence demonstrates that it is likely to succeed on

the merits of claims against the Entity Defendants under Section 17(a) of the Securities Act, Section

10(b) of the Exchange Act, and Rule 10b-5 thereunder. At a minimum, an inference can be drawn

that Entity Defendants were participants in a scheme to defraud investors, and made materially misleading statements of fact, or omissions of fact, in the sales of securities to investors.  In either event, an asset freeze is appropriate, particularly to prevent the dissipation or removal of investor funds to foreign accounts or elsewhere, which would also thwart satisfaction of an eventual monetary judgment.

### B. The Commission Is Likely to Succeed on Its Claims Under Exchange Act Section 10(b) and Rule 10b-5, and Securities Act Section 17(a).

Exchange Act Section 10(b) and Rule 10b-5—anti-fraud provisions—prohibit any person, in connection with the offer or sale of a security, from employing "any device, scheme, or artifice to defraud"; from "making an untrue statement of material fact" or "omit[ting] to state a material fact necessary to make statements made not misleading"; or, from engaging in any "act, practice, or course of business" which operates as a fraud or deceit.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Similarly, Securities Act Section 17(a) makes I unlawful, in the offer or sale of securities, "to employ any device, scheme, or artifice to defraud"; to obtain money by means of any untrue statement of a material fact or a material omission of fact; or, "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

"In order to establish primary liability under § 10(b) and Rule 10b–5, a plaintiff is required to prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) (citations omitted). To prove a violation of Securities Act Section 17(a), the Commission must establish elements that are "essentially the same" as those that must be proven for an Exchange Act Section 10(b) and Rule 10b-5 violation, except that Section 17(a) prohibits fraud in the "offer or sale" of a security, rather than in connection with the purchase or sale. *See id.* ("Scienter, however,

need not be established for the SEC to obtain an injunction under of §§ 17(a)(2) or (3)." (citations omitted)).

1. *Defendants, Through Qin, Engaged in Deceptions and Made False Statements*

Defendant Qin, acting on behalf of the Entity Defendants, engaged in several deceptive devices, including making false and misleading statements, all intended to deceive the investors who purchased limited partnership interests—that is, securities—in the Funds.[1] Qin's actions, taken on behalf of the Entity Defendants, are attributable to those entities. *See, e.g., SEC v. Riel*, 282 F. Supp. 2d 499, 524-25 (S.D.N.Y. 2017) (limited liability company was liable for actions of owner and sole employee); *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550 (S.D.N.Y. 2007) (securities law violations of agent have long been attributed to principal under *respondeat superior*). *Cf. Braswell v. United States*, 487 U.S. 99, 110 (1988) ("Artificial entities such as corporations may act only through their agents").

Most obviously, at least nine investors who sought to redeem their shares from the Sigma Fund beginning in mid-2020, were told by Qin that, instead, through "in-kind" transfers, they would be invested in the VQR Fund. Indeed, the nine investors, whose interests totaled approximately $3.5 million, received Agreements promising the transfers. To date, the transfers have not been completed. When quizzed by the Head Trader of the VQR Fund who asked Qin where the investors' funds were, Qin attempted to deceive his colleague by supplying copies of wire transfers

---

[1] The limited partnership interests in the Sigma Fund and the VQR Fund are securities satisfying the three-part test for investment contracts outlined in *SEC v. W.J. Howey & Co.*, 328 U.S. 293 (1946). Under *Howey*, an investment contract is a security if it involves (1) an investment of money (2) in a common enterprise (3) with profits derived from the efforts of others. *Id.* at 301.  Here, there were investments of money to purchase limited partnership interests in the Sigma Fund and the VQR Fund, there was a common enterprise with horizontal commonality because the investments were pooled into each Fund's investment accounts and the investors shared pro rata in any returns of each Fund, and the profits were to be derived from the efforts of the investment managers, including Qin, Virgil Capital, and VQR Partners, in selecting investments for the Funds.  *See SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 369-73 (S.D.N.Y. 2020).

that had been rejected for insufficient funds. Qin and the Sigma Fund operations manager also supplied information to Sigma Fund investors for their limited partnership tax information (on IRS Form K-1) that was based on false trading balances.  In particular, the "Exchange Balances" spreadsheet purports to account for the balances held at trading platforms on which Sigma Fund has assets. However, the Exchange Balances spreadsheet falsely lists assets at three U.S.-based exchanges, described as averaging approximately $2 million monthly at each, although the exchanges—Kraken, Coinbase, and Gemini—have no record of such assets or trading. Such extraordinary measures to keep current investors from understanding the true nature of the fraud are typical of a scheme that depends on further deceptions of additional investors. *See SEC v. Holschuh*, 694 F.2d 130, 144 n.24 (7th Cir. 1982) ("Avoidance of detection and prevention of recovery of the money lost by the victims are within, and often a material part of, the illegal scheme.").

Repeated, false and misleading statements directed to investors (such as the nine transfers), or which form the basis of information provided to investors (such as the false Form K-1 information), violate the prohibitions in Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5 against making false and misleading statements, as well as the prohibitions against engaging in deceptive courses of conduct. *See Lorenzo v. SEC*, 139 S.Ct. 1094, 1100-01 (2019) (making and distributing false and misleading information to persons in the sale of securities may violate each subsection of Securities Act Section 17(a) and Exchange Act Rule 10b-5).

Entity Defendants are also liable as aiders and abettors to Qin's fraud. As the Second Circuit held:

> In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *SEC v. DiBella,* 587 F.3d 553, 566 (2d Cir.2009) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 (2d Cir.1985)).

*SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012). Each of the Entity Defendants substantially assisted Qin in his fraudulent conduct, as each "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *Id.* (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938). Thus, Montgomery Technologies and its wholly-owned subsidiary, Virgil Capital (the General Partner of the Sigma Fund), managed the Sigma Fund. They became the vehicles that Qin used to mislead investors, by among other things, disseminating K-1 information based on false information about where investor assets were held and in what amounts.  Likewise, Virgil Quantitative Research and VQR Partners helped Qin bring about his fraud upon the nine former Sigma Fund investors who are still awaiting confirmation of their ownership interests in the VQR Fund.  Finally, Defendant Virgil Technologies is the ultimate parent and source of corporate control over the entities and the Funds.  Hallak Decl. ¶ 6.

### 2. *Qin, Defendants' Agent, Acted With Scienter*

In making the false and misleading statements, and engaging in deceptive courses of conduct, Qin acted intentionally and therefore with scienter—a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Scienter may also be established through recklessness. "Reckless conduct is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that danger was either known to the defendant or so obvious that the defendant must have been aware of it." *SEC v. Landberg*, 836 F. Supp. 2d 148, 154-55 (S.D.N.Y. 20110 (internal quotations and citations omitted). In securities fraud cases like this one, "circumstantial evidence can be more than sufficient" to prove scienter, particularly given "the difficulty of proving the defendant's state of mind." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 391 n.30 (1983).

Qin admitted to his colleague, the Head Trader of the VQR Fund, that he told "white lies" to investors, in a discussion about excuses he made regarding the "in-kind" transfers that were not completed.  Hallak Decl. ¶ 15. Qin further suggested to the same colleague that Qin should first withdraw investor funds, and only later reveal to investors that he did so, as he knew that full disclosure would be met with resistance.  Such efforts to conceal one's actions, or to provide false explanations, show consciousness of guilt, a classic hallmark of scienter. *See SEC v. Musella*, 748 F. Supp. 1028, 1041 (S.D.N.Y. 1989).

Qin's scienter should also be imputed to each of the Entity Defendants, based on his control of them. *See SEC v. Haligiannis,* 470 F. Supp. 2d 373, 381-82 (S.D.N.Y. 2007) (imputing individual defendant's scienter to each entity that he controlled, and the downstream entities) (*citing Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 100–01 (2d Cir. 2001); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1089 n. 3 (2d Cir.1972); *Cromer Finance Ltd. v. Berger,* Nos. 00 Civ. 2284 (DLC) & 00 Civ. 2498 (DLC), 2002 WL 826847, at *7–8 (S.D.N.Y. May 2, 2002).  Here, Qin himself acted, or purported to act, on behalf of the various Entity Defendants when he engaged in his knowing deceptions and made false and misleading statements, including "white lies" to investors.

### 3.   *The Final Materiality and In Connection With Elements Are Satisfied*

Qin's falsehoods were also "material" and he made them in connection with the sale of securities, the final elements for establishing the likely violations of the securities laws. Thus, for the nine investors whose interests in the Sigma Fund were supposed to transferred to the VQR Fund, but were not, Qin's and the Entity Defendants' false assurances were clearly material, as any reasonable investor would want to know that his or her investment was secured, accounted for, and had not been dissipated.  *See Basic Inc. v. Levinson,* 485 U.S. 224, 238 (1988) (adopting the standard for materiality as whether a "reasonable investor" would consider the information significant in making an investment decision). Further, Qin's lies and deceptions "coincided" with the sale of securities;

most notably, he deceived several investors regarding the so-called "in-kind" transfers, and where

their investments were. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 85 (2006)

("It is enough that the fraud alleged 'coincide' with a securities transaction.") (citation omitted).[2]

### C. The Court Should Freeze Assets Under the Control of the Entity Defendants.

A freeze on the assets that are under the control, or held in the name of, the Entity

Defendants, is therefore both necessary and appropriate. Without such a freeze, based upon Qin's

own actions and words, it is highly likely that investor assets in the VQR Fund will fall victim to the

same dissipation as those that were supposed to be in the Sigma Fund. Straub Dec. ¶ 7 (Qin still

actively attempting to remove assets from Kraken). Further, Qin's use of foreign bank accounts and

foreign trading platforms in managing the Entity Defendants' funds and the assets of the two

investor Funds, as well as his status as an Australian national, makes it likely that, without a freeze,

the investor funds will be expatriated. *See, e.g., SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 420

(S.D.N.Y. 2001) (granting asset freeze where defendant's "status as a citizen and resident of Mexico

with accounts at Mexican banks raises a danger that the funds would be dissipated or transferred

beyond this Court's jurisdiction if his account did not remain frozen") (citing *De Beers Consolidated*

*Mines, Ltd. v. United States,* 325 U.S. 212, 215–16 (1945) (holding, in antitrust action, that

"sequestration of [defendants'] property is the only means of enforcing this Court's orders or decree

against said foreign corporate defendants. The principal business of said defendants is carried on in

foreign countries and they could quickly withdraw their assets from the United States and so prevent

enforcement of any order or decree which this Court may render.")). *See also FTC v. Affordable Media,*

---

[2]  Qin and the Entity Defendants communicated with investors and internally by means of interstate communications, including by overseas telephone calls, email, and Internet sites, satisfying the use of "instrumentalities" of interstate commerce. *See SEC v. Norstra Energy Inc.*, 202 F. Supp. 3d 391, 398-399 (S.D.N.Y. 2016).

*LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999) (upholding district court's freeze where defendant's prior conduct included "history of spiriting their commissions away to a Cook Island trust").

As a practical matter, the investor assets of the two Funds—the Sigma Fund and the VQR Fund—should be frozen. Because they are organized as limited partnerships that act only through their respective general partner (Defendants Virgil Capital and VQR Partners), their assets are under the control of the Entity Defendants. The Court's equity powers include the power to freeze a non-party's assets. *Smith v. SEC*, 653 F.3d at 128. Here, the Court would be doing so consistent with the goal of maintaining the *status quo*, and simply to prohibit the Entity Defendants from further dissipation or expatriation of the assets held by and belonging to the Funds.

**D. The Court Should Order Entity Defendants to Complete an Accounting.**

Where, as here, the Court has the authority to freeze assets, it also has the authority to order an accounting of assets, both residing in the U.S. and abroad. *See SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v. Spongetech Delivery Sys., Inc.*, No. 10-cv-2031,2011 WL 887940, at *5 (E.D.N.Y. Mar. 14, 2011) (noting that ordering an accounting is "minimally intrusive") (citing *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997)); *SEC v. Oxford Capital Secs., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992). Such an accounting would aid in the freeze of assets and assure that any further dissipation of investor funds is halted. It would also prove important in determining the extent to which frozen funds might be subject to a later disgorgement order, and ultimately returned to harmed investors.

**E. The Court Should Order Entity Defendants Not To Alter, Destroy, Or Conceal Documents.**

To preserve documents that the Commission may later seek through discovery requests, the Commission seeks an order prohibiting Entity Defendants from altering, destroying, or concealing documents, including documents concerning the allegations of the Complaint or the assets or finances of the Entity Defendants or of, or regarding, the Sigma Fund and the VQR Fund. Such orders are

15

routinely granted "to preserve the status quo until a final resolution of the merits." *SEC v. Spongetech Delivery Sys., Inc.*, 2011 WL 887940, at *5 (E.D.N.Y. Mar. 14, 2011) (citing *Unifund*, 910 F.2d at 1040 n. 11).

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant the Commission's emergency motion for an asset freeze and related relief.

Dated:  December 22, 2020

/s/ Fitzann R. Reid
_____
Fitzann R. Reid (N.Y. Bar No. 5084751)
Amanda Straub (AS0516)
Steven Buchholz
Susan F. LaMarca
Counsel for the Plaintiff
Securities and Exchange Commission
San Francisco Regional Office
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
(415) 705-2458 (Reid)

16