UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : : : |
| Plaintiff, | : : |
| vs. | : : |
| STEFAN QIN, VIRGIL TECHNOLOGIES LLC, MONTGOMERY TECHNOLOGIES LLC, VIRGIL QUANTITATIVE RESEARCH, LLC, VIRGIL CAPITAL LLC, and VQR PARTNERS LLC, | : : : : : |
| Defendants. | : : : |

## DECLARATION OF ANTONIO HALLAK

I, Antonio Hallak, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. §1745, that the following is true and correct, and that I am over 18 years of age and I am competent to testify to the matters stated herein:

1. I reside in the USA.

2. In or around December 2018, I was hired at Virgil Capital LLC ("Virgil Capital") as the Head of Proprietary Trading to launch a quantitative proprietary trading firm with the goal of potentially creating an investment management firm if the proprietary trading firm was successful. Decibel18 LLC (after August 2019 d/b/a as VQR and Virgil Quantitative Research ("VQR") was incorporated in Delaware in or around February 2019. All proprietary trading employees were moved to the new entity and all new hiring was done under this new entity.

3. The investment management firm and all of its entities include VQR Partners LLC ("VQR Partners"), VQR Multistrategy Fund LP, VQR Multistrategy US Feeder LP, and VQR

1

Multistrategy Cayman Feeder Fund Ltd. These entities were setup in or around May 2019, an initial fund class launched on or around August 1, 2019, and VQR was the investment manager. VQR Multistrategy Fund LP ("VQR Fund"), an Exempted Limited Partnership registered in the Cayman Islands, is a New York-based investment fund that pools investments from customers, including U.S. investors, and then invests in cryptocurrencies and other digital assets. As Head of Trading at VQR, I manage VQR Fund's trading of cryptocurrencies and other digital assets and as such I have knowledge of the VQR Fund's strategies, positions, risk, profitability, operations, and infrastructure.

4.   My career spans over 25 years in the investment banking industry, serving in critical management leadership roles in capital markets, trading, and technology innovation.

5.   I make this Declaration based upon my personal knowledge, and based on information provided to me by Stefan Qin.  Sources of my information include online messages from various platforms, as well as personal and online conversations.  Because I am submitting this Declaration for the limited purpose of supporting the U.S. Securities and Exchange Commission's emergency *ex parte* application, I have not set forth each and every fact that I know about this matter.

**Structure and Management of Sigma Fund and VQR Fund**

6.   Stefan Qin ("Qin") is the sole owner of Virgil Technologies LLC, a Limited Liability Company registered in the Cayman Islands. Virgil Technologies LLC is the parent company of two investment managers, which each have an investment fund that pools investor money and then invest in cryptocurrencies or other digital assets: Virgil Sigma Fund, LP ("Sigma Fund") and VQR Fund.

2

7. The two Funds are separately managed, as follows: First, Virgil Capital is the general partner to the Sigma Fund, and Montgomery Technology LLC is the fund's investment manager. Second, VQR Partners LLC ("VQR Partners"), a limited liability company registered in the Cayman Islands, is the general partner of VQR Fund, and VQR is the fund's investment manager. Qin is principal of Virgil Capital and VQR Partners.

8. The Sigma Fund and VQR Fund operate as separate entities. Each Fund has its own employees, trading strategies, infrastructure, exchange and counterparty relationships, trading accounts, auditor, and fund administrator, as well as separate books and records.

9. To the best of my knowledge, Qin executes trades for the Sigma Fund and manages its assets. To the best of my knowledge, Qin only employs two individuals who work for Virgil Capital LLC, an operations manager and an investor relations representative. I am not aware of any individuals who trade or manage assets for the Sigma Fund other than Qin. Qin has represented to me that he has employees who work in the capacity of personal assistants whom he has used for Virgil Capital related administrative tasks.

**The Sigma Fund's Investment in Initial Coin Offerings**

10. Since its inception, which I understand from Qin and from marketing materials was in or around August 2016, the Sigma Fund's announced and marketed investment strategy has been an arbitrage approach to the cryptocurrency market. The Sigma Fund's marketing materials state that the Fund uses a proprietary algorithmic trading system that scans for asset price differences among more than forty different cryptocurrency exchanges. The Sigma Fund has reported impressive, almost uniformly positive returns to investors. A true and correct copy of the Sigma Fund's marketing tear sheet is attached hereto as Exhibit 1.

11. Recently, Qin has indicated that he has not always adhered to the Sigma Fund's stated strategy. For example, Qin stated in a discussion with me on or about December 15, 2020 that Sigma has made investments in several other cryptocurrency funds and has provided capital to traders in a managed account structure.

12. During the past 10 months, Qin has asked me to perform trading and operations due diligence on multiple cryptocurrency investment funds which had an arbitrage strategy, a market neutral strategy, or an overall market neutral portfolio with the supposed goal of finding investment managers whom VQR may be interested in extending an offer to join the VQR team, or to supposedly do a favour for Sigma Fund investors who were considering investing in these funds. I explained to Qin that every fund I had reviewed is looking for investment and not to be hired or acquired, and that the due diligence process is not a productive exercise for VQR. He further told me that it will be good to allocate some capital to some of these funds from VQR to "test them out". This did not align with VQR's processes nor VQR's investment philosophy so I did not progress it or pursue it further on the VQR side. I later learned from Qin that he had invested in some of these investment funds to "appease" Sigma investors or to fulfill a commitment that he had supposedly made to reciprocate investment with Sigma investors' investment vehicles or fund of funds. A true and correct copy of an example of one of these scenarios is appended hereto as Exhibit 9.

13. In addition, on or about December 15, 2020, Qin told me during a call, that he had invested some of Sigma Fund's investor capital in initial coin offerings (ICOs) in 2018.

14. The Sigma Fund generates its own statements to investors and has not completed an audit in the past two years. Qin recently told me that he could do whatever he wants with the accounts

4

in the Sigma Fund and that the Sigma Fund does not have as many controls as the VQR Fund. Specifically, during a telephone call on or about December 10, 2020, Qin said:

      a. "We don't have as many controls as you guys have. Let me just make that clear, right?"

      b. "I can log into the accounts and do whatever I want, right? Do you know what I mean?"

15. During a telephone call on December 10, 2020, Qin told me that he has told "white lies" to at least one investor. During this call Qin said:

      a. "I ended up telling like another white lie just to make sure that things -- I shouldn't have doubled down to begin with like when [the investor] confronted me about it…it doesn't really matter, man. The thing is I made a big mistake in misleading him on that and just never telling him the truth. And I paid the consequences for that, so it's my fault, right?"

**The VQR Fund's Loans to Qin**

16. In or around 2020, Qin began asking me and our director of finance to borrow funds from VQR Partners LLC, stating that Qin personally needed capital.  On or around August 20, 2020, VQR Partners LLC loaned Qin $275,000. The loan was collateralized against VQR's proprietary trading fund account and the maturity date was November 1, 2020. A true and correct copy of the promissory note is appended hereto as Exhibit 2.

17. In or around October 8, 2020, Qin requested another personal loan, and VQR Partners LLC loaned him $75,000. This loan was collateralized against VQR's Q3 performance fees, and the maturity date was December 1, 2020. A true and correct copy of the promissory note is appended hereto as Exhibit 3.

5

18. To date, Qin has not repaid the August 20, 2020 nor the October 8, 2020 loans. The collateral for the August 20, 2020 loan was also withdrawn by Qin and used to pay VQR operating expenses.

19. In or around December 10, 2020, Qin told me the Sigma Fund was having "liquidity issues," and he said:

> a. "… I wanted to like personally loan myself out, personally loan the fund, Sigma fund money, so that I could pay a set of redemptions back, if that makes sense because of the liquidity issues…"

## "In-Kind" Transfers of Investor Assets From Sigma Fund To VQR Fund

20. During the last few months of 2020, investors in the Sigma Fund began contacting me and our Head of Investor Relations about the status of the transfer of their investor assets out of the Sigma Fund and into the VQR Fund. Investors inquired why the transfers, which they had approved, were not completed and asked why the transfers were not reflected on their statements. Over the course of the past few months I have had multiple discussions with Stefan wherein I inquired about the cause of the delay of the funds transfer from the Sigma Fund.  In or around December 2020, I spoke with Qin about the investors' questions in order to understand what had happened.  During this time, Qin also informed me that he was in South Korea.

21. In response to my questions about investors' transfers from the Sigma Fund to the VQR Fund over the past few months, Qin gave answers to me on various occasions which contradicted previous statements that he had given to investors and statements he had provided to other employees in the firm, including VQR's Head of Investor Relations and Director of Finance. Qin told me that he had informed investors who had requested to redeem their investments from

the Sigma Fund, that he will transfer their funds directly to VQR Fund. Qin preferred to make these transfers "in-kind" (transfer in crypto-currency).

22. The VQR Fund made adjustments and we updated our fund documents to allow subscriptions in kind, and developed a process with our fund administrator to conduct an enhanced KYC process on all capital and investors whose capital will be transferred "in-kind". Based on my conversations with Qin, I understand that Qin did not want to redeem the investors, and allow then to subscribe to the VQR Fund independently. He expressed to me that he was worried that investors will change their mind and not invest in the VQR Fund if he redeems investors directly. During the latter months of 2020, I, along with VQR's Director of Finance, attempted to convince Qin that it is crucial that he redeem the investors and allow them to subscribe directly to the VQR Fund to maintain our fund's independence and eliminate the problem he was experiencing with transferring capital. Qin insisted on continuing to transfer directly to the VQR Fund from the Sigma Fund.

23. When I asked Qin on or about December 2020 why the VQR Fund had not yet received any money from the in-kind transfers Qin said that the money was being held up by an Australian bank and that he would talk to the bank's Chief Financial Officer to get things cleared up. In particular, Qin stated:

      a. "the money that we sent over to the intermediary [bank] never got recorded either... So I don't know if it's all related or the funds [are] on some black list or [something]... I don't even want to look into that, but we actually got connected with the CFO [of Commonwealth Bank of Australia], so I'm actually speaking with him as well to get everything resolved"

24. Since on or around July 2020, nine such investor transfers totaling approximately $3.5 million were supposed to have been completed. Each of the nine transfers should have been sent, by Qin, from the Sigma Fund's bank accounts at Commonwealth Bank of Australia to the VQR Fund's Bank accounts at Silvergate Bank. At Silvergate Bank an account named VQR Multistrategy US Feeder LP holds assets for the VQR Fund investors, and it is my understanding that at Commonwealth Bank of Australia an account named Virgil Capital PTY LTD holds assets for the Sigma Fund investors.

25. On or around September 2020, Qin provided me with copies of confirmations of purported wire transfers from Commonwealth Bank of Australia for USD transfers. One wire transfer is in the amount of $2,394,766 and the other wire transfer is in the amount of $400,000. Together the wires represent approximately $2.7 million in investor funds that were sent from the Sigma Fund to the VQR Fund. True and correct copies of the wire transfer confirmations that Qin provided to me is appended hereto as Exhibit 4.

26. Qin has provided contradicting accounts to me regarding the cause of delay for the purported funds transfer, as well as the currency and supposed mode of transfer of the funds to the VQR Fund. In one account, he explained to me that QCP, an over-the-counter ("OTC") liquidity provider to the Sigma Fund, had implemented a new compliance process which is requiring him to provide more KYC and AML documentation which is causing the delay of the supposed transfers. In another account, QCP's supposed process required whitelisting source wallets which was the cause of the delay. In my experience, whitelisting of wallets has never taken more than 72 hours with any liquidity partner, and is often handled within 24 hours. In another account, he told me he wired the capital from the Commonwealth Bank of Australia to VQR Fund's Silvergate Bank account, which had since been supposedly held up at an

8

intermediary bank for months. He had also told me and VQR's Director of Finance that he was flying one of Virgil Sigma's employees to meet with the intermediary bank officers to address the delay issue. He also told us in contradicting accounts that he had launched a law suit against the bank related to the delay, and later that he was going to launch a law suit against the bank related to the delays.

27. On or around the last few months of 2020, Qin has further requested that the VQR Fund's Head of Investor Relations include the investor funds, which were supposed to have been transferred and subscribed in the VQR Fund, in the VQR Fund's monthly letter which includes estimated performance to investors (until the VQR Fund admin sends out the official performance and NAV reports to investors). However, the VQR Fund had not received the transfers. When the Head of Investor Relations refused to accommodate the request, Qin contacted me and pleaded the importance of keeping investors happy and not causing them to panic. He asked me, in multiple conversations, to convince the VQR's Head of Investor Relations to represent that the capital is already in the VQR Fund. He also asked me to estimate returns on that capital for each month in each investor's end of month estimates, as if the capital had been received and is trading in the VQR Fund. He expressed to me that his efforts were to reduce "investor's anxiety" and to reduce the amount of time he supposedly has to spend on calls with investors. He contrasted, to me, messaging from the VQR Head of Investor Relations with messaging from Virgil Sigma's Head of Investor Relations who understands how to "comfort" investors. I understand that to mean, to misrepresent factual matters to investors and perpetuate a possibly false narrative that Qin is communicating to investors directly.

28. To date, the VQR Fund has not received the approximately $3.5 million from the in-kind transfers from the Sigma Fund. Additionally, VQR Fund has not received the approximately $2.7

million in investor funds from the wire conformations provided to me by Qin. When I discussed this fact with Qin on or around December 2020, Qin told me not to worry, that he is handling investor communications, and to tell investors that the transfers are complete from Sigma Fund's perspective.

**Qin Seeks Access to VQR Fund's Investor Assets**

29. In December 2020, Qin requested a $1.7 million uncollateralized loan from VQR. In a conversation with Qin, he told me and our Director of Finance, that he needed the money within a few hours because he borrowed money from loan sharks in China to invest in his fund (which I understood to be the Sigma Fund), and he needed to repay the loan. Qin said:

    a. "They were the only ones who were going to loan me money when I was...19"

    b. "... they've been patient for three months... they might do anything to collect on the debt."

    c. "I use them to borrow money to invest in my own fund."

30. In the same telephone call, Qin said he had a "liquidity issue" that prevented him from replaying the loan with his own capital. Qin said:

    a. "... it's literally like... 1.7 million. It's not like... I don't have that...It's just the liquidity issue..."

    b. "I just think that I am not liquid, like, I have money, but I am not liquid"

    c. "I just had such poor cash flow management to be honest with you..."

    d. "I don't have money right now, dude. It's so sad."

31. During the call, Qin requested that I liquidate fund positions and withdraw the funds against investor capital, and he promised to disclose the loan to investors after he withdrew the money. Qin stated:

a. "Given all these protections and the I guess like 12 times collateralization ratio on top of this, if we also add an interest amount that's justifiably higher to do this, right, which I'm willing to pay, I feel like most investors may accept this, if I write this in a letter as a disclosure to the investors as well….And at the end of the day, I think most investors, they invest because of me. And I think I'll be able to push it through, to be honest with you, but that portion of the like transaction will take time versus the urgency that I have now."

b. When I and the Director of Finance compelled him to start the process of disclosure composition with VQR Fund's legal counsel and communications with investors to seek approval he was not interested in attempting this; among his replies, "… but the [investors] approval is not going to come back in two hours… Let's figure that out later…"

c. "… the plan for me right now is to get me the liquidity, and then the second thing is to work… to get the appropriate disclosures and disclaimers…"

32. When I informed Qin that VQR could not just give him the investors' capital as a loan, he increasingly began demanding access to VQR Fund's Investor Assets, which totals approximately $24 million. As the Head of Trading for the VQR Fund, I have master access to all accounts in the fund and I have the ability withdraw or move investor capital. On or about December 14, 2020, Qin threatened to take control of VQR and the VQR Fund. Qin also suggested that, given his fiduciary duty, he had the power to act, stating:

a. "I'm going to make an executive decision to be honest with you, Antonio. And I will assume all responsibility on this -- for this, to be honest with you. I will over collateralize the loan, and I will make the interest rate incredibly high. We'll talk

to lawyers, do whatever's needed, talk to admins that manage my funds... And this will all happen..."

b. "At the end of the day... the investors have ultimately entrusted me to manage their money in a fiduciary duty... I cannot in good conscience justify doing any of this stuff if I'm not able to manage their money in a very fiduciary manner..."

c. "I have made a decision as the fiduciary on whether or not this is justifiable and also hold myself accountable to the steps that we need to take..."

d. "Could you please give me access to the accounts as the DP?... and I promise you, like, from the bottom of my heart the most I'll liquidate is 1.7 million in Bitcoin."

33. On or around December 15, 2020, Qin began messaging me stating that he was "asserting his ownership". He said:

a. "If I am unable to see the progress on the funds, etc I will be asserting my ownership of the firm and taking control. As you know I would like to do everything possible to protect us – and even though this will ultimately benefit me as well, the fate of the firm is intricately tied to this situation."

A true and correct copy of Qin's message to me is appended hereto as Exhibit 5.

34. Qin also asked for master access to VQR Fund investors' accounts:

a. "please give me full access to the master accounts. I know you are tired, and this is a screwed up situation... but I can take over in the event you are unreachable... as it stands right now – I am the 100% owner, and I have a right to control access to my own firm... I understand the policy around risk management but at the end of the day I am taking things off your plate here mate"

A true and correct copy of Qin's message to me is appended hereto as Exhibit 6.

35. Shortly after Qin received access to one of the VQR exchange accounts, the Kraken

master account, Qin added a Sigma Fund account as a Kraken withdrawal account

(Kraken classifies it as a "Transfer out" account).  A true and correct copy of the Kraken

account Withdraw online page is appended hereto as Exhibit 7.

36. Lastly, Qin stated:

a.   "…So if I or you need to go in, and market sell the positions – we will do so"

A true and correct copy of Qin's message to me is appended hereto as Exhibit 8.

37. Currently, the VQR Fund's Investor Assets are located at Coinbase, Kraken, and the

following decentralised wallets: ███████████████

███████████████████████████████████████

████████████████████████

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___Dec 22, 2020___
USA

_____
Antonio Hallak

13

## INDEX OF EXHIBITS TO DECLARATION OF ANTONIO HALLAK

1. Sigma Fund's marketing tear sheet

2. $275,000 promissory note

3. $75,000 promissory note

4. Confirmations of purported wire transfers from Commonwealth Bank of Australia

5. December 15, 2020 message from Stefan Qin

6. December 15, 2020 message from Stefan Qin

7. Kraken account Withdraw online page

8. December 15, 2020 message from Stefan Qin

9. May 2020 letter re Investment in SureFire Digital Arbitrage, LP BareBot Side Pocket