UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

      Plaintiff,

vs.

STEFAN QIN, VIRGIL TECHNOLOGIES LLC,
MONTGOMERY TECHNOLOGIES LLC, VIRGIL
QUANTITATIVE RESEARCH, LLC, VIRGIL
CAPITAL LLC, and VQR PARTNERS LLC,

      Defendants.

---

## DECLARATION OF MELISSA FOX MURPHY

I, Melissa Fox Murphy, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. §1745, that the following is true and correct, and that I am over 18 years of age and I am competent to testify to the matters stated herein:

1. I reside in Austin, Texas, and I am 48 years old.

2. I was the Head of Investor Relations for Virgil Quantitative Research LLC ("VQR"), the investment manager to VQR Multistrategy Fund LP ("VQR Fund"), from October 2019 until December 2020. VQR Fund is a New York-based investment fund that pools investments from investors, including U.S. investors, and then invests in cryptocurrencies. As Head of Investor Relations at VQR, I managed relationships with the fund's investors and as such I communicated with investors on a regular basis about their investments in the VQR Fund.

3. I have over ten years of experience working in investor relations for hedge funds.

4. I make this Declaration based upon my personal knowledge, and based on information provided to me by investors in the VQR Fund. Sources of my information include electronic messages.

1

Because I am submitting this Declaration for the limited purpose of supporting the U.S. Securities and Exchange Commission's emergency *ex parte* application, I have not set forth each and every fact that I know about this matter.

**Structure and Management of Sigma Fund and VQR Fund**

5. Stephen Qin ("Qin") is the sole owner of Virgil Technologies LLC which is a limited liability company headquartered in New York City. Virgil Technologies LLC is the parent company of two investment funds: Virgil Sigma Fund, LP ("Sigma Fund") and VQR Fund. The VQR Fund's purpose is to pool investor money and then invest in cryptocurrencies. It is my understanding from Qin that the Sigma Fund's purpose is to pool investor money and look for arbitrage opportunities in cryptocurrencies.

6. The two funds are separately managed, as follows: First, Virgil Capital LLC is the general partner to the Sigma Fund, and Montgomery Technology LLC is the fund's investment manager. Second, VQR Partners LLC is the general partner of VQR Fund, and VQR is the fund's investment manager. Qin is principal of Virgil Capital LLC and VQR Partners LLC.

7. The Sigma Fund and VQR Fund operate as separate entities. Each Fund has its own employees, trading strategies, and fund administrator, as well as separate books and records.

8. Qin represented to me that he writes code for the Sigma Fund's algorithmic trading strategy, executes trades for the Sigma Fund, and manages its assets. Based on my interactions with Virgil Capital LLC, I am only aware of two individuals who work for that entity, an operations manager and an investor relations representative. I am not aware of any individuals who trade or manage assets for the Sigma Fund other than Qin.

9. I understand from the Sigma Fund marketing materials, provided to me on or around November 4, 2019, from the investment relations manager for the Sigma Fund, that the Sigma Fund began operating around August 2016. The Sigma Fund's marketing materials state that the Fund uses a proprietary algorithmic trading system that scans for asset price differences among more than forty

different cryptocurrency exchanges. A true and correct copy of the Sigma Fund's marketing tear sheet is attached hereto as Exhibit 1.

**"In-Kind" Transfers of Investor Assets From Sigma Fund To VQR Fund**

10. Occasionally investors in the Sigma Fund would ask to invest in the VQR Fund. The investment relations manager for the Sigma Fund or Qin would typically introduce the investor to me so I could onboard the investor into the VQR Fund. To execute transfers from the Sigma Fund to the VQR Fund, investors were required to complete VQR subscription documents ("subdocs") and enhanced KYC ("eKYC") documents for an "in-kind" transfer between the two firms. Additionally the Sigma Fund was to provide an executed Exchange Agreement and copy of the original wire. If the Sigma Fund did not provide a copy of the original wire, a Bank Reference Letter was required. This process was agreed to by VQR's fund administrator, MG Stover. A true and correct copy of an Exchange Agreement provided to me is appended hereto as Exhibit 2.

11. These transfers were called "in-kind" because they were to be transferred in Bitcoin ("BTC") between the two funds: in this case from the Sigma Fund to the VQR Fund.

12. Although I received a total of nine (9) Exchange Agreements from the Sigma Fund on behalf of investors, the money from the transfers never arrived in the VQR Fund's accounts. On August 17, 2020, I contacted the investment relations manager at the Sigma Fund about the status of four (4) pending transfers and copied the investors on the correspondence upon learning that the Sigma Fund had not notified investors that the VQR Fund had not received their capital to complete their subscription to the VQR Fund. A true and correct copy of an e-mail I sent to the Sigma Fund investment relations manager is appended hereto as Exhibit 3. I sent similar e-mails to other investors. From that point on, I added a line in my eKYC document request to investors that the VQR Fund would confirm receipt of capital and the date of the subscription.

13. On August 26, 2020 I notified the investment relations manager at the Sigma Fund that the VQR Fund needed updated Exchange Agreements and that once the capital was received, VQR's fund

administrator, MG Stover, would be able to update all subdocs for each investors' investment in the VQR Fund. From time to time investors continued to inquire as to whether their transfers had been received by the VQR Fund, and I continued to tell investors that transfers were not received by the VQR Fund. When I asked the investment relations manager at the Sigma Fund about the transfers, I was either told that the funds had been transferred or were in the process of being transferred to the VQR Fund.

14. Notwithstanding the agreement to transfer assets in BTC, which did not occur, I was notified by Qin on or around September 1, 2020 that these outstanding transfers (valued at approximately $2,794,766.99) would now occur through a bank transfer in fiat as opposed to an "in-kind" BTC transaction. Copies of purported wires corresponding to these transfers were sent to me, which are appended hereto as Exhibit 4.

15. Based on my conversations with Qin and the investment relations manager for the Sigma Fund, I communicated to investors that transfers were expected by bank transfer. A true and correct copy of an e-mail I received from an investor inquiring about the status of the transfer of funds from the Sigma Fund to the VQR Fund is appended hereto as Exhibit 5.

16. None of these transfers were ever received, including the transfer to the investor referenced in Exhibit 5. Qin and the investor relations manager for the Sigma Fund provided me with various excuses for why the transfers were not completed, including, among other things, that mid-month transfers could not be completed, and that wires got stuck in an intermediary bank. A true and correct copy of an e-mail I received from the Sigma Fund's investment relations manager explaining that a transfer was delayed because the Sigma Fund was waiting on a compliance issue is appended hereto as Exhibit 6.

17. On October 29, 2020, Qin e-mailed me and an investor stating that the VQR Fund would credit the investor's account for the gains it would have incurred if the investor's capital had been transferred from the Sigma Fund to the VQR Fund at the date initially promised, even though the

4

VQR Fund had not received the investor's capital. A true and correct copy of the e-mail correspondence is appended hereto as Exhibit 7.

18. Since on or around July 2020, nine (9) such investor transfers totaling approximately $3,532,869.53 were supposed to have been completed. Each of the nine (9) transfers should have been sent, by Qin, "in-kind" as agreed with MG Stover. However, as time passed, Qin would change the plan from "in-kind" BTC transfers to fiat transfers, back to "in-kind" Stablecoin transfers. Regardless, none of these transfers in any currency were received by VQR or the VQR Fund.

19. Based on e-mails I received from investors, some investors became increasingly upset that the transfers were not completed and the investor assets appeared to be missing. Qin was copied on some of the e-mails from investors. A true and correct copy of an e-mail from an investor specifically stating "my MILLION DOLLARS IS NOWHERE TO BE SEEN" copying myself and Qin is appended hereto as Exhibit 8.

20. Based on my concern for investors' assets, in or around September 2020, when investors inquired about transferring additional assets from the Sigma Fund to the VQR Fund, I recommended that the investor request for a redemption to be returned to the investor directly. Then the investor could reinvest their assets into the VQR Fund themselves instead of executing a transfer between the Sigma Fund and the VQR Fund. A true and correct copy of an e-mail correspondence I had with an investor recommending that they request a redemption directly is appended hereto as Exhibit 9.

21. Based on my conversations with investors, it is my understanding that two investors requested a redemption from the Sigma Fund instead of a transfer between the funds. On or around December 10, 2020, in my conversations with a colleague at the VQR Fund, it was relayed to me that Qin appeared concerned about a redemption request by an investor in the Sigma Fund of approximately $1,300,000 due on or around December 31, 2020.

22. In what I believe was an effort to stop my open and honest communications with investors, on or around December 2, 2020, the investment relations manager at the Sigma Fund emailed me stating that "the contradicting messages is alarming" the investor and that "we could have jumped on a call

with Stefan and sorted this in advance prior to an investor being involved with the miscommunication." On December 7, 2020 the investment relations manager at the Sigma Fund wrote to me to "confirm you have been receiving my emails" forwarding the December 2nd email about "contradicting messages" and "miscommunications". A true and correct copy of the e-mail correspondence is appended hereto as Exhibit 10.

23. At the time of my departure from VQR on December 10, 2020, the VQR Fund had not received any of the $3,532,869 in transfers from the Sigma Fund.

Executed on **12.22.2020**

Location: Austin, Texas

*/s/ Melissa Murphy*

Melissa Fox Murphy

## INDEX OF EXHIBITS TO DECLARATION OF MELISSA FOX MURPHY

1. Sigma Fund marketing tear sheet

2. Sigma Fund Exchange Agreement dated September 30, 2020

3. E-mail dated August 17, 2020

4. Purported wires transfers dated September 2, 2020

5. E-mail dated September 2, 2020

6. E-mail dated November 16, 2020

7. E-mail dated October 29, 2020

8. E-mail dated December 7, 2020

9. E-mail dated October 23, 2020

10. E-mail dated December 2, 2020