# Exhibit A



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

January 26, 2021
FSD CAUSE NO. 20 OF 2021 (MRHJ)

IN THE MATTER OF SECTION 36(3) THE EXEMPTED LIMITED PARTNERSHIP ACT (2018 REVISION)

AND IN THE MATTER OF SECTION 92(d), (e) OF THE OF COMPANIES ACT (2021 REVISION)

AND IN THE MATTER OF VIRGIL SIGMA FUND, LP

## WINDING UP PETITION

**To the Grand Court of the Cayman Islands**

The humble petition of Yellow River Delta Fund, Ltd whose registered office is at Mourant Corporate Services, 94 Solaris Avenue, Camana Bay, Grand Cayman KY1-1108, Cayman Islands (the **Petitioner**) shows that:-

**A.     Introduction**

1. The Petitioner seeks the winding up of Virgil Sigma Fund, LP (**Fund**) on the grounds that it is unable to pay its debts, pursuant to section 92(d) of the Companies Act (2021 Revision) (**Companies Act**), as applicable to limited partnerships by section 36(3) of the Exempted Limited Partnerships Act 2018 (as revised) (**ELP Act**).

2. In the alternative, the Petitioner seeks the winding up of the Fund on the grounds that it is just and equitable for the Fund to be wound up under the jurisdiction of the Grand Court of the Cayman Islands pursuant to section 92(e) Companies Act as applicable to limited partnerships by section 36(3) of the ELP.

**B.     The Petitioner**

3. The Petitioner is a fund of funds, and was duly incorporated on 26 January 2018 as a company with limited liability under the laws of the Cayman Islands, bearing registration number 332242.

**C.     The Fund**

4. The Fund was registered in the Cayman Islands on 2 February 2018 as an exempted limited partnership with registration number 94603 pursuant to the ELP Act. The

registered office of the Fund is Ogier Global (Cayman) Limited, 89 Nexus Way, Camana Bay, Grand Cayman KY1-9009, Cayman Islands.

5. The General Partner (**GP**) of the Fund is Virgil Capital LLC, a Limited Liability Company registered in the Cayman Islands on 18 January 2018, with registration number 979. The GP has the same registered office as the Fund.

6. The Fund and the GP are both part of the Virgil Technologies group which is under the control and indirect ownership of Mr Stefan Qin, an Australian national who resides part-time in New York. Mr Qin is the Managing Member of the GP, which in turn controls the Fund. The GP is a wholly-owned subsidiary of Montgomery Technologies Limited (**Montgomery Tech**), a limited company domiciled and headquartered in the State of Delaware. In turn, Montgomery Tech is a wholly-owned subsidiary of Virgil Technologies LLC (**Virgil Tech**) a limited liability company domiciled in the Cayman Islands and headquartered in New York. Mr Qin is the sole owner and controller of Virgil Tech.

7. At all material times the Theorem Fund Services LLC has been the appointed administrator of the Fund (**Administrator**).

8. The offering documents of the Fund state that the Fund would use a proprietary arbitrage trading strategy to trade cryptocurrencies or digital assets on liquid platforms around the world, primarily using a market-neutral strategy. The Fund's objective was to provide *"attractive returns on invested capital in the digital currency and digital assets markets"*. The Fund was to adopt two investment strategies, each strategy would be applied to two different classes of shares:

    a. Class A shares were to be invested according to a Market Neutral Strategy, which was to use a proprietary algorithmic statistical arbitrage approach to the cryptomarket. This would have included investments in digital coins, digital currencies, altcoins, protocol tokens and other various digital currencies.

    b. Class B shares were to be invested in accordance with a Non-Neutral Strategy, which was described in the PPM as *"experimental"* and focused on short term strategies.

9. The Petitioner invested in the Fund by subscribing for Class A Shares.

10. The Fund has previously filed a Form D with the SEC, and Montgomery Tech, has filed a Form ADV in March 2020 stating that $92.4 million was held in the Fund. As of May 2020, the Fund's records reflect that there were approximately 110 investors in the Fund, including approximately 50 from the U.S., with account balances ranging from $100,000 to $16 million. These records also reflect that the Fund has received new investments since January 2019 totalling approximately $19 million. However, it appears from investigations conducted by the SEC that the Fund did not in fact hold the assets it was reported to have held.

11. Through the Virgil Tech structure (outlined in paragraph 6 above), Mr Qin also controls and indirectly owns VQR Multistrategy Fund LP (**VQR Fund**). VQR Fund is the master fund in a master-feeder structure having both an onshore US- based feeder fund and an offshore Cayman feeder fund, VQR Multitrategy Cayman Feeder Fund Ltd (**VQR Feeder**). VQR Feeder invested substantially all of its assets in VQR Fund. The general partner of the VQR Fund is VQR Partners LLC (**VQR GP**).

12. The VQR Fund has its principal place of business in New York, NY. The offering documents of the VQR Fund state that the fund invests in cryptocurrencies and other digital assets, and that it holds assets valued at approximately US$25,000,000. The recent Form D filings lodged with SEC show that the VQR Fund has circa. 40 investors and that approximately half of those investors are US-investors.

13. On 22 December 2020 the SEC filed a complaint against Mr Qin and certain entities within the Virgil Technologies Group (**Virgil Defendants**), including the GP and VQR GP (**SEC Complaint**). At the same time, the SEC obtained a temporary restraining order (**TRO**) against the monies assets of the Virgil Defendants, including all digital assets and cryptocurrencies. As a consequence of the TRO all assets of the Fund and VQR Fund within the US are currently subject to a TRO.

## D. The Debt

14. The debt due to the Petitioner comprises unpaid redemption proceeds in the amount of **US$5,199,657.07** (**Petition Debt**), comprising:

    a. US$4,238,451.07 being the Capital Account balance as at 30 November 2020; and
    b. US$961,206, being unpaid partial withdrawal proceeds.

    *Investment in the Fund*

15. The Petitioner was an investor in the Australia-based Virgil Capital Crypto-Fund, LP (**VCCF**). In March 2018 the GP wished to transition investors from VCCF to the Fund. The Petitioner agreed to take up an investment of Class A shares in the Fund.

16. Between March 2018 and January 2020, pursuant to a subscription agreement provided pursuant to an dated 15 March 2018 (the **Fund Agreement**), the Petitioner made capital contributions to the Fund thereby becoming a Limited Partner of the Fund. The aggregate amount of subscriptions paid by the petitioner were in the amount of US$3,140,014.23. The terms of the Petitioner's investment in the Fund were set out in the Limited Partnership Agreement dated 27 February 2018 (**LPA**).

17. The capital contributions made by the Petitioner to the Fund were made in four instalments, as follows:

| DATE | USD |
|---|---|
| **2018** | |
| 2 March | 200,000 |

|  |  |
|---|---|
| 4 April | 190,014.23 |
| 17 July | 270,000 |
| 14 August | 100,000 |
| 4 September | 120,000 |
| 4 October | 260,000 |
| 5 November | 100,000 |
| **2019** |  |
| 3 January | 300,000 |
| 8 February | 150,000 |
| 2 March | 150,000 |
| 4 April | 150,000 |
| 1 May | 390,000 |
| 3 June | 110,000 |
| 1 December | 200,000 |
| **2020** |  |
| 3 January | 450,000 |
| **TOTAL** | **3,140,014.23** |

*Payment of withdrawals under the LPA*

18. The terms of the LPA provide that the Petitioner, being a limited partner of the Fund may withdraw its capital on giving 15 Business Days, written notice to the GP. The withdrawal notice requirement may be waived at the discretion of the GP (section 8.02, LPA).

19. In the normal course withdrawals of capital would take place on the last Business Day (as defined in the LPA) of the calendar quarter in which the withdrawal request was made. However, the GP again had a discretion to permit withdrawals at other times.

20. Any investment made in the Fund the Petitioner was subject to a one year Lock Up Period which ran from the date of the initial investment of the Petitioner. A withdrawal requested within the Lock-Up Period, would be subject to a withdrawal fee of 6% of the capital being withdrawn, unless that fee was waived by the GP (Section 8.02(a), LPA).

21. In accepting a withdrawal request, the GP has a discretion to withhold up to 5% of the net asset value of the capital account from which funds were withdrawn. That hold back could be retained for a period of up to 30 days after the completion of the year-end audit of the Fund (Section 8.04, LPA). This hold back could be waived by the GP.

22. Payments of withdrawal requests were due and payable on being accepted and would *"normally be paid within 30 calendar days of an authorised Withdrawal Date"*, being the last business Day of any calendar quarter in which the withdrawal request was made and providing that the GP had received all documents necessary to made the payment (Section 8.04, LPA).

*Withdrawal from the Fund by the Petitioner*

23. On or around 24 July 2020 the Petitioner issued written notice to withdrawal approximately 20% of its investment in the Fund (**Partial Withdrawal**).

24. The Partial Withdrawal notice was confirmed by Ms Fae Hansen of the GP who, by email timed at 5:27 pm on 24 July 2020, advised that the Partial Withdrawal being 20% of the total capital of the Petitioner's account would be approximately $961,206.95. The Partial Withdrawal was requested after the expiry of the Lock Up Period was not subject to a 6% withdrawal fee.

25. In the normal course, the Partial Withdrawal was immediately due and payable and to be paid before 30 September 2020, being the last Business Day of the quarter in which the withdrawal was requested.

26. The Petitioner directed that US$561,206.95 of the Partial Withdrawal be paid in cash to the Petitioner's account (**Cash Withdrawal**), and that US$400,000 be reinvested into another fund under the ultimate direction and control of Stefan Qin, namely VQR Fund (**VQR Investment**).

*Cash Withdrawal*

27. On 11 August 2020, the GP requested that the Petitioner complete and return a mandatory distribution form, setting out the bank account details to which the Cash Withdrawal should be paid, and the amount to be paid (**Withdrawal Form**). The Petitioner duly completed the Withdrawal Form, and requested that the Cash Withdrawal be processed immediately. This was the only documentation requested by the GP to process the Cash Withdrawal.

28. The GP represented to the Petitioner that payment of the Cash Withdrawal could be processed as of 12 August 2020 and advised that it would *"take two to ten business days to post to* [the Petitioner's] *capital account"*. The wire payment was not subsequently processed, despite repeated representations by the GP between mid-August and late November that the Cash Withdrawal payment would be processed within the coming days.

29. On 6 December 2020, and following the repeated failure of the Fund to pay the Partial Withdrawal, the Petitioner requested withdrawal of its entire investment with the Fund in the amount of US$5,082,170 being the capital account balance as at 31 October 2020, plus estimated earnings for November 2020 (**Full Withdrawal**). This request was communicated in writing to the GP as required by the LPA (Section 8.02), and was made in addition to the Partial Withdrawal which remained outstanding.

30. On 8 December 2020, the Administrator confirmed to the Petitioner that a *"Full redemption for Yellow River Delta fund has been recorded on our end with an effective date of November 30, 2020"*. As of 8 December 2020, the Petitioner was no longer an investor, but a withdrawal creditor of the Fund.

31. Prior to issuing this confirmation the GP had instructed the Administrator on 7 December 2020 to arrange for a wire transfer to the Petitioner in the amount of US$780,000 in respect of both the Partial Withdrawal and the Full Withdrawal. The GP further represented to the Administrator that the GP would *"submit a further request to make up for the remainder of the total amount due resulting from the November 30th request"* being the Full Redemption

32. The Petitioner was subsequently informed by the Administrator that it had not processed the payment as requested by the Fund, but had made enquiries regarding the requested payment to Mr Qin. The Petitioner continued to seek payment of the Full and Partial Withdrawals, but without success.

33. In the absence of any redemption proceeds being paid over to the Petitioner, Campbells, as prior legal counsel to the Petitioner, issued a letter of demand dated 10 December 2020 in the amount of US$5,205,798 (**Demand** and **Demand Sum** as the context requires). By the terms of the Demand the Fund was put on notice that *"In the event that that payment of the Demand Sum is not received in full, without set-off or netting of any kind by the above deadline, we are instructed to present a petition for the winding up order and the appointment of official liquidators over the Fund immediately thereafter and without further notice, on the basis that it is unable to pay its debts"*.

34. The Demand Sum included an estimated return for the month to 30 November 2020 in the amount of US$123,628. Since the Demand was issued the Petitioner has been provided with a Capital Account Summary for the period 1 – 30 November 2020 showing earnings for the month in the lower amount of US$117,486.99. Accordingly the Petition Debt is lower than the Demand Sum, in the amount of **US$5,199,657.07**.

    *VQR Investment*

35. The Petition Debt includes the full amount of the Partial Withdrawal. This is due to the failure of the VQR Investment, as set out in paragraphs 36 to 39 below.

36. The VQR investment was documented in an Exchange Agreement dated 30 June 2020 between the Petitioner and others including the Fund, the GP, VQR Fund and VQR Feeder (**Exchange Agreement**).

37. By the terms of the Exchange Agreement US$400,000 of the VQR Investment, was to be taken from the Partial Withdrawal amount and applied by the Fund to VQR Feeder on behalf of the Petitioner. The Exchange Agreement provides for the subscription to VQR Feeder to be effective as of 1 August 2020.

38. The Fund did not apply the VQR Investment in accordance with the Exchange Agreement. The Petitioner did not therefore assume a subscription in the VQR Feeder for the amount of the VQR Investments. Consequently, on 13 December 2020 the Petitioner cancelled the VQR Investment with immediate effect.

39. As a result of the VQR Investment failing, the total amount of the Partial Withdrawal in the amount of US$961,206.95 remained due and payable by the fund to the Petitioner.

E. **SEC Investigation**

40. On 23 December 2020, the Petitioner received notice that the SEC had filed the SEC Complaint against the Virgil Defendants and obtained the TRO.

41. The terms of the SEC Complaint alleged that in December 2020 Mr Qin had sought to remove in excess of one million dollars from the VQR Fund to resolve personal liquidity issues. The SEC is of the view that Mr Qin has perpetrated a fraudulent scheme which exposes investors to the VQR Fund and the Fund to the risk of assets being dissipated from these funds. It is on this basis that the SEC obtained the TRO.

42. The terms of the SEC Complaint indicate that:

    a. The Fund has not been operated in the manner represented to investors of the Fund;
    b. Assets of the Fund that were reportedly held at US-based platforms did not in fact exist and the purported account balances represented to investors of the Fund were fabricated;
    c. Transfers represented by Mr Qin to be made in respect of withdrawals from the Fund to the VQR Fund were never completed. These incomplete transfers alone represent approximately US$3,500,000 of missing and unaccounted for investor assets;
    d. The Fund does not have sufficient cash or liquidity to meet its liabilities.

F. **Grounds for Winding Up**

43. The Petition Debt is not in dispute.

44. The Fund has failed to pay any part of the Petition Debt, which remains due and payable to the Petitioner in full.

45. The Fund does not have the ability to satisfy the sums due to the Petitioner.

46. In the premises, the Fund is unable to pay its debts and should be wound up pursuant to section 92(d), of the Companies Act, as applicable to the Fund by reason of section 36(3) ELP Act.

47. Furthermore, and in the alternative, having regard to the matters set out in the SEC Complaint it is no longer possible for the Fund to achieve the purpose for which is was formed of maximizing shareholders' investments.

48. In the premises, it is no longer possible for the Fund to achieve its purpose and it should therefore be wound up on a just and equitable basis pursuant to section 92(e) of the Companies Act, as applicable to the Fund by reason of Section 36(3) the ELP.

G.  **Nomination of Joint Official Liquidators**

49. The Petitioner nominates David Griffin and Andrew Morrison of FTI Consulting (Cayman) Limited, Suite 3212, 53 Market Street, Camana Bay, Grand Cayman KY1-1203, Cayman Islands to act as joint official liquidators (**JOLs**) of the Fund.

**Your Petitioner therefore humbly prays that:**

(1) The Fund be wound up in accordance with the Companies Act as applied by the ELP Act.

(2) David Griffin and Andrew Morrison of FTI Consulting (Cayman) Limited, Suite 3212, 53 Market Street, Camana Bay, Grand Cayman KY1-1203, Cayman Islands be appointed as JOLs of the Fund.

(3) The JOLs be authorised to act jointly and severally in their capacity as liquidators of the Fund.

(4) The JOLs shall not be required to give security for their appointment.

(5) The JOLs be authorised to exercise any of the powers listed in Parts I and II of Schedule 3 to the Companies Act and section 110(2) thereof, without further sanction or intervention of the Court.

(6) The JOLs be authorised to carry out any act or exercise any power considered by them to be necessary or desirable in connection with the liquidation of the Fund and the winding-up of its affairs and to prevent the dissipation of the assets of the Fund and its subsidiaries in any jurisdiction.

(7) The JOLs be authorised to take any such action as may be necessary or desirable to obtain recognition of the JOLs and/or their appointment in any other relevant jurisdiction and to make applications to the Courts of such purpose, including but not limited to the United States of America pursuant to Chapter 15 of the United States Bankruptcy Code.

(8) The JOLs have the power to appoint agents in the Cayman Islands, the United States of America and elsewhere to do any business contemplated by this Order which they are unable to do themselves or which can more conveniently be done by an agent.

(9) The JOLs be at liberty to appoint counsel, attorneys, and/or any other professional advisors, whether in the Cayman Islands or elsewhere as they may consider necessary to advise and assist them in the performance of their duties and on such terms as they may think fit and to remunerate them out of the assets of the Fund.

(10) The JOLs have authority and are directed to take all necessary steps to take control of the Fund's subsidiaries, if any, including by exercising voting or other rights attached to the shares in the Fund's subsidiaries and/or by causing themselves to be

registered as holders of the Fund's shares in their subsidiaries in place of the Fund.

(11) No disposition of the Fund's property by or with the authority of the JOLs in carrying out their duties and functions and exercise of their powers under this Order shall be voided by virtue of section 99 of the Companies Act.

(12) The JOLs' remuneration and expenses be paid out of the assets of the Fund in accordance with the Companies Winding Up Rules 2020 and Part III of the Insolvency Practitioners' Regulations 2018.

(13) The Petitioners' costs of and incidental to this Petition be paid out of the assets of the Fund as an expense of the liquidation, such costs to be taxed on an indemnity basis if not agreed with the JOLs.

(14) Such further orders or directions as the Court deems appropriate.

Dated this 22nd day of January 2021

*Collas Crill*

**COLLAS CRILL**
Attorneys-at-law for the Petitioner

**Note:** This petition is intended to be served on the Fund.

## NOTICE OF HEARING

This Petition having been presented to the Court on 26th Jan 2021 will be heard at the Law Courts, George Town, Grand Cayman on 3 March 2021 at 9.30 a.m./p.m. or as soon thereafter as the Petition can be heard.

This Petition was presented by Collas Crill, attorneys-at law for the Petitioner, Yellow River Delta Fund Ltd, whose address for service is Floor 2, Willow House, Cricket Square, PO Box 709, Grand Cayman, KY1-1107, Cayman Islands.