**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>    v.<br><br>STEFAN QIN, VIRGIL TECHNOLOGIES LLC, MONTGOMERY TECHNOLOGIES LLC, VIRGIL QUANTITATIVE RESEARCH, LLC, VIRGIL CAPITAL LLC, and VQR PARTNERS LLC,<br><br>                Defendants. | Case No.: 20-cv-10849 (JGLC) |

**MEMORANDUM OF LAW IN SUPPORT OF RECEIVER'S MOTION TO COMPEL TURNOVER OF ASSETS**

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Receiver Robert A. Musiala, Jr.*

## <u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT .................................................................................1

II.   FACTS .................................................................................................................4

    A.   The Receiver's Mandate Is to Identify, Preserve, and Marshal Receivership
    Property for Distribution to the Receivership Estate .................................................4

    B.   The Receiver's Ongoing Investigation Has Identified Receivership Property
    Valued at Approximately $3.5 Million that Adaya Diverted to the Adaya
    BTC Wallet and the Nguyen Account .....................................................................5

        1.   Adaya and Nguyen Control the Disputed Assets.........................................6

            a.   The Nguyen Account ........................................................................6

            b.   The Adaya BTC Wallet ....................................................................7

        2.   The Nguyen Account and Adaya BTC Wallet Received Receivership
        Property Valued at Approximately $3.5 Million .......................................8

            a.   The Sigma Assets................................................................................8

                 i.   100 BTC ................................................................................9

                 ii.   1,588.88 USDT and 378.67 BCH .......................................9

                 iii.   32,04480 USDC....................................................................10

                 iv.   Assets in the Nguyen Account Likely Derive Directly
                        or Indirectly from the Sigma Assets .................................11

             b.   The VQR Assets ................................................................................12

                 i.   Adaya Diverted the VQR Assets from VQR .....................12

                 ii.   Assets in the Nguyen Account Likely Derive Directly
                        or Indirectly from the VQR Assets ....................................13

                 iii.   Adaya's Testimony about the VQR Assets Was Not
                        Credible................................................................................14

    C.   The Receiver Requires Judicial Intervention to Preserve and Marshal This
    Receivership Property for Distribution to the Victims of Qin's Fraud.................16

III.   ARGUMENT ....................................................................................................17

    A.    This Court Has the Power to Order Adaya and Nguyen to Turn Over Receivership Property to the Receiver ................................................................17

    B.    The Disputed Assets Are Receivership Property ....................................................19

          1.    The Sigma Assets and Their Proceeds Are Receivership Property ...........20

          2.    The VQR Assets and Their Proceeds are Receivership Property .............21

    C.    Judicial Intervention Is Needed Now Due to Significant Risk of Dissipation of the Disputed Assets ............................................................................................23

IV.    CONCLUSION ....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   352 F.Supp.2d 429 (S.D.N.Y. 2020) ........................................................................22

*SEC v. Antar*,
   831 F. Supp. 380 (D.N.J. 1993) ...............................................................................17

*SEC v. Binance Holdings, Ltd.*,
   No. 23-1599, ECF No. 71 (D.D.C. June 17, 2023) ...................................................24

*SEC v. Infinity Grp. Co.*,
   27 F. Supp. 2d 559 (E.D. Pa. 1998) ..............................................................17, 18, 19

*SEC v. Stanford Int'l Bank, Ltd.*,
   551 F. App'x 766 (5th Cir. 2014) .......................................................................17, 18

*SEC v. Telegram Group Inc. and TON Issuer Inc.*,
   448 F.Supp.3d 352 (S.D.N.Y. 2020) .......................................................................22

**Statutes**

15 U.S.C. § 77b(a)(11)................................................................................................22

15 U.S.C. § 77v .....................................................................................................17, 18

15 U.S.C. §§ 78u(e) and 78(aa) ............................................................................17, 18

Robert A. Musiala Jr., as Court-appointed receiver ("**Receiver**") in the above-captioned action, by and through his undersigned counsel, respectfully submits this memorandum of law in support of his motion ("**Motion**") seeking an order directing Nasir Adaya and Phuong Nguyen to turn over assets with a value of $3,590,255.36 ("**Disputed Assets**") to the Receiver's insured institutional cryptocurrency account because the Disputed Assets are Receivership Property, as defined by the Order Appointing Receiver ("**Receiver Order**").[1]

## I. PRELIMINARY STATEMENT

In execution of his duties under the Receiver Order, the Receiver has been engaged in an ongoing effort to identify, locate, marshal, and preserve all assets belonging to Defendants Virgil Capital LLC, Montgomery Technologies, LLC, Virgil Technologies, LLC, Virgil Quantitative Research LLC (with predecessor Decibel18, LLC, "**VQR**"), and VQR Partners, LLC, including, without limitation, the assets of Virgil Sigma Fund, LP ("**Sigma Fund**") and VQR Multistrategy Fund, LP ("**VQR Fund**," and together with Sigma Fund, "**Funds**") (collectively, the "**Receivership Entities**"). These efforts are critical for the Receiver to be able to make timely distributions to defrauded investors of the Funds formerly controlled and operated by Defendant Stefan Qin. Over the course of his investigation, the Receiver has learned that Adaya, a former VQR trader, improperly diverted digital assets worth approximately $3.5 million from the Receivership Entities to: (i) a cryptocurrency account at Binance Holdings Ltd. ("**Binance**") that Adaya controls and that is registered in the name of his wife, Nguyen ("**Nguyen Account**"); and (ii) an unhosted cryptocurrency wallet that Adaya created ("**Adaya BTC Wallet**").[2]

---

[1] Order Appointing Receiver, *U.S. Securities and Exchange Comm'n v. Qin*, No. 20-cv-10849 (S.D.N.Y. Jan. 21, 2021), ECF No. 31 (hereinafter "Receiver Order") §§ I.7.B, I.7.I, and I.7.K.

[2] A wallet address, also known as a public key, is an alphanumeric string from and to which cryptocurrencies can be sent. It can be shared with different contacts like an email address. Wallets can be hosted or unhosted. An unhosted wallet is one for which the funds within are controlled and custodied by the user only and not a third-party

The assets Adaya improperly diverted from the Receivership Entities consist of: (i) 20.03 Bitcoin ("**BTC**") that Adaya transferred to the Adaya BTC Wallet in mid-December 2020, just days before this action commenced; and (ii) other digital assets that Adaya misappropriated from the Receivership Entities, which had a combined, last-known value of approximately $3 million, as set forth in the table below. These diverted assets, or the assets that were traded for those assets, are the Disputed Assets at issue here.

| Assets | Where These Assets, or Their Proceeds, Are Located | Last-Known Value[3] (USD) |
|---|---|---|
| 20.03 BTC | Adaya BTC Wallet | $589,592.40 |
| 100 BTC | Nguyen Account | $410,665.92 |
| 1,588.80 USDT | Nguyen Account | $1,591.00 |
| 378 BCH | Nguyen Account | $84,829.65 |
| 32,044.806 USDC | Nguyen Account | $32,115.59 |
| 118,671.75 INJ | Nguyen Account | $534,721.49 |
| 100,000 INJ | Nguyen Account | $392,187.30 |
| 323,544.70 USDT | Nguyen Account | $323,711.01 |
| 25,000 INJ | Nguyen Account | $136,876.65 |
| 75,000 INJ | Nguyen Account | $410,629.95 |
| 100,000 INJ | Nguyen Account | $673,334.40 |
| | **Total Value (USD)** | **$3,590,255.36** |

The Receiver's forensic accountant, Mark Porter, a Director at Ankura Consulting Group, LLC, confirms that the 20.03 BTC are still in the Adaya BTC Wallet. Porter also confirms that: (i) the assets that Adaya diverted from the Receivership Entities have since been commingled with and traded for other digital assets; and (ii) it is likely that as of the date of this Motion some, if not all, of the commingled proceeds from those trades are in the Nguyen Account. Porter's conclusions are based on transactional records corresponding to the Nguyen Account as well as

---

intermediary.  Examples include Metamask, Electrum, or MyEtherWallet. A hosted wallet is controlled or hosted by a centralized exchange such as Coinbase or Binance.

[3] These figures indicate the most recent value the Receiver's forensic accountant can ascribe to the Disputed Assets. Because most of the Disputed Assets were traded for other digital assets after being diverted from the Receivership Entities, it is impossible at this time for the Receiver's forensic accountant to ascribe them a value beyond their value as of the time that they were diverted from the Receivership Entities. For those Disputed Assets, the Receiver seeks turnover of digital assets from the Nguyen Account that have an equivalent value to the Assets' last-known value, as further explained in this Motion.  The value of the BTC is based on CoinMarketCap's valuation of the asset as of August 2, 2023 (~$29,435.47)

the Receivership Entities' internal records, deposition testimony and/or information from Adaya, and statements from Nguyen and other parties to the Receiver and the United States Securities and Exchange Commission ("**SEC**"). The Disputed Assets are Receivership Property as defined under the Receiver Order.

The Disputed Assets are at serious risk of dissipation. As to the Disputed Assets in the Nguyen Account, there are significant concerns about Binance's continued financial health and viability given that both the SEC and the United States Commodity Futures Trading Commission ("**CFTC**") have charged Binance with having operated as an illegal exchange in violation of federal law. Further, although Binance has previously told the Receiver that it froze the Nguyen Account (at the Receiver's request), the Receiver has since learned that trading on that Account remains ongoing, thus increasing the risk that any Receivership Property in that Account will be moved beyond the Receiver's reach. And because Adaya and Nguyen are both on notice of the Receiver's claims regarding the Disputed Assets, there is a risk that these individuals may try to move the Disputed Assets in the Nguyen Account and the Adaya BTC Wallet out of the Receiver's reach, particularly because they have taken the position in prior communications with the Receiver that the Disputed Assets do not belong to the Receivership Entities.

For these reasons and those set forth below, the Receiver seeks an order confirming that the Disputed Assets are Receivership Property and requiring Adaya to turn over the 20.03 BTC in the Adaya BTC Wallet and Nguyen to turn over digital assets from the Nguyen Account equal to $3,000,662.96, *i.e.*, the last-known value of the misappropriated Receivership Property. Given the serious risk of asset dissipation, should this Court conclude that more information is needed before it can determine if the Disputed Assets are Receivership Property, the Receiver requests

that this Court order Adaya and Nguyen to turn over the Disputed Assets to an escrow account

where these Assets can be safeguarded until this threshold determination can be made.

## II.    FACTS

On December 22, 2020, the SEC commenced this action against Qin and entities that he

owned and/or controlled.[4] As the SEC alleges, Qin improperly used the Receivership Entities to

execute a scheme that lured investors into investing in the Funds to allow Qin to misappropriate

the invested assets.[5] On January 21, 2021, upon stipulation,[6] the Court executed the Receiver

Order, which appointed the Receiver and set forth his mandate.[7] In February 2021, Qin pleaded

guilty to one count of securities fraud in connection with his scheme.[8] In September 2021, he

was sentenced to 90 months in prison.[9]

### A.    The Receiver's Mandate Is to Identify, Preserve, and Marshal Receivership Property for Distribution to the Receivership Estate

Among other things, the Receiver Order tasks the Receiver with identifying, preserving,

and marshaling assets owned by the Receivership Entities so that he may liquidate and distribute

those assets to the victims of the fraud perpetrated by Qin.

Specifically, that Order authorizes the Receiver to "use reasonable efforts to determine

the nature, location, and value of all property interests of the Receivership Entities[.]"[10] The

---

[4] Complaint, *U.S. Securities and Exchange Comm'n v. Qin*, No. 20-cv-10849 (LGS) (S.D.N.Y. Dec. 22, 2020), ECF No. 01.

[5] *Id*.

[6] Stipulation to the Entry of Order Appointing Receiver, *U.S. Securities and Exchange Comm'n v. Qin*, No. 20-cv-10849 (LGS) (S.D.N.Y. Jan. 20, 2021), ECF No. 29.

[7] Receiver Order at §§ 2 and I.7.I.

[8] Press Release 21-022, Dept. of Justice, U.S. Attorney's Off., S.D.N.Y., *Founder Of $90 Million Cryptocurrency Hedge Fund Charged With Securities Fraud And Pleads Guilty In Federal Court* (Feb. 4, 2021), https://www.justice.gov/usao-sdny/pr/founder-90-million-cryptocurrency-hedge-fund-charged-securities-fraud-and-pleads-guilty.

[9] Press Release 21-239, Dept. of Justice, U.S. Attorney's Off., S.D.N.Y., *Founder Of $90 Million Cryptocurrency Hedge Fund Sentenced To More Than Seven Years In Prison* (Sept. 15, 2021), https://www.justice.gov/usao-sdny/pr/founder-90-million-cryptocurrency-hedge-fund-sentenced-more-seven-years-prison.

[10] *Id.* at § I.7.A.

Receiver Order defines these property interests as "**Receivership Property**," which includes but is not limited to, "monies, funds, digital assets, credits, effects, goods, chattels, lands, premises, leases, claims, rights, and other assets, together with all rents, ***profits, dividends, interest, or other income attributable thereto, of whatever kind***, which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly."[11] The Receiver Order tasks the Receiver to "take custody, control, and possession" of Receivership Property.[12] If the Receivership Property is in the custody of a third party, the Receiver Order requires that party to "[n]ot liquidate, transfer, sell, convey, or otherwise transfer" that Property, "except upon instructions from the Receiver."[13] The Receiver Order further requires that party to "[c]ooperate expeditiously in providing information and transferring funds, assets, and accounts to the Receiver."[14] If, for whatever reason, the third party refuses to turn over Receivership Property to the Receiver, the Receiver Order authorizes the Receiver to take any "necessary and appropriate" actions to preserve, and otherwise "prevent the dissipation or concealment[,]" of that Property, including by "bring[ing] such legal actions based on law or equity" that he "deems necessary or appropriate."[15]

> **B.    The Receiver's Ongoing Investigation Has Identified Receivership Property Valued at Approximately $3.5 Million that Adaya Diverted to the Adaya BTC Wallet and the Nguyen Account**

Over the course of his ongoing investigation, the Receiver has traced approximately $3.5 million in digital assets that Adaya diverted from the Receivership Entities and transferred to the Adaya BTC Wallet or the Nguyen Account. As detailed below and in Porter's accompanying

---

[11] *Id.* (emphasis added).

[12] *Id.* at § I.7.B.

[13] *Id.* at § III.13.A.

[14] *Id.* at § III.13.D.

[15] *Id.* at § I.7.G and § I.7.I.

declaration, Adaya has neither traded nor transferred the assets in the Adaya BTC Wallet but has extensively traded the assets that he diverted to the Nguyen Account for other digital assets. This extensive trading activity has made it impractical – if not impossible – to discern exactly which assets currently frozen in the Nguyen Account derive directly or indirectly from the digital assets that Adaya previously diverted from the Receivership Entities.

### 1.    Adaya and Nguyen Control the Disputed Assets

As described below, Nguyen and Adaya control the Disputed Assets in the Nguyen Account and Adaya controls the Disputed Assets in the Adaya BTC Wallet.

#### a.   The Nguyen Account

The Nguyen Account refers to a Binance master account with User ID ending in 8310 and its subaccounts, which Nguyen, a Vietnamese citizen, opened under her name on January 6, 2021.[16] Nguyen opened this Account for Adaya, her then-boyfriend and now-husband.[17] Because Adaya is a U.S. citizen living in the United States, he could not open a Binance account under his name, as doing so would have resulted in a violation of Binance's Terms of Use.[18] Adaya knew this fact and asked Nguyen to open the Account in order to circumvent this restriction.[19]

Although the Nguyen Account is under her name, Nguyen has never transferred or traded any of the assets in the Account. And she does not know to whom those assets belong. Adaya is the only individual who trades assets in the Account.[20]

At his deposition, Adaya testified that the assets in the Nguyen Account do not belong to the Receivership Entities.[21] The Receiver's ongoing investigation, however, has uncovered that

---

[16] *See* Molina Decl. at ¶ 2.
[17] *See* Dep. of Adaya, Mar. 7, 2023 ("Adaya Dep."), 139:8 – 140:19, attached as Ex. 2 to Molina Decl.
[18] *See* Molina Decl. at ¶ 4; *see also* Adaya Dep. 140:15 – 17.
[19] *See* Adaya Dep. 141:23 – 143:2.
[20] *See id*. 139:8 – 141:21.
[21] *See id*. 151:20 – 152:10.

Adaya transferred Receivership Property to the Nguyen Account that had a combined last-known value of $3,000,662.96.[22] In other words, this is the value these assets collectively had when they were taken from the Receivership Entities and before Adaya traded them for other digital assets. Upon this finding, the Receiver worked with Binance to freeze the Nguyen Account.[23] In January 2023, Binance communicated to the Receiver that the Nguyen Account had digital assets valued at approximately $6,061,731 and that Binance had frozen those assets.[24] This freeze, however, is temporary and subject to Binance's sole discretion because there is no court order compelling Binance to keep this asset freeze in place.

b. The Adaya BTC Wallet

The Adaya BTC Wallet is an unhosted cryptocurrency wallet created by Adaya with an address ending in vwca, which VQR's internal records confirm Adaya created to receive the 20.03 BTC that are part of the proceeds of the "VQR Assets" defined and described below.[25]

At his deposition, Adaya tried distancing himself from the Adaya BTC Wallet. He said he could not confirm if he created or controlled the Wallet, even after he was shown chat transcripts demonstrating that he created this Wallet and arranged for the transfer of 20.03 BTC from VQR to that Wallet.[26] Adaya also testified that the 20.03 BTC were the property of Injective Labs, Inc. ("**Injective**"), a firm for which he performed myriad services from 2020 to 2022, and that he was sure that he would have returned those assets to Injective before their professional relationship ended.[27] Yet, the co-founder and CEO of Injective, Eric Chen, confirms in a sworn declaration – included with this Motion – that Injective has never owned or controlled the Adaya BTC Wallet,

---

[22] *See* Porter Decl. at ¶¶ 38, 39, 49, 98, 113, and 114.

[23] *See* Molina Decl. at ¶ 5.

[24] *See id*; *see also* Porter Decl. at ¶ 118.

[25] *See* Porter Decl. at ¶¶ 6 and 109.

[26] *See* Adaya Dep. 129:5 – 131:5.

[27] *See id.* at 131:16 – 25.

and that Injective has no claim to the 20.03 BTC that Adaya diverted to that Wallet.[28] Further, the Receiver's ongoing investigation has confirmed that the 20.03 BTC in that Wallet have not been transferred since they were initially deposited, belying Adaya's testimony that he returned the 20.03 BTC to Injective.[29] In sum, Adaya's testimony is not credible and is contrary to the documentary evidence that demonstrates he transferred the 20.03 BTC from VQR to the Wallet. Since Adaya does not claim ownership to the 20.03 BTC and the Receiver's tracing analysis confirms that these BTC were acquired using Receivership Assets, the Receiver requests that the Court order Adaya to transfer the 20.03 BTC to the Receiver immediately.

### 2. The Nguyen Account and Adaya BTC Wallet Received Receivership Property Valued at Approximately $3.5 Million

The Adaya BTC Wallet and Nguyen Account received Receivership Property consisting of: (i) assets with a last-known value of approximately $500,000 that have been traced to Sigma Fund investor dollars Qin stole ("**Sigma Assets**"); and (ii) assets with a last-known value of approximately $3 million that have been traced to INJ tokens that VQR owned and controlled in 2020 prior to this Receivership ("**VQR Assets**"). Except for the 20.03 BTC (which are part of the VQR Assets), Adaya traded the Sigma Fund and VQR Assets for other digital assets, the proceeds of which, according to Porter, are likely still in the Nguyen Account as of the date of this Motion.

#### a.   The Sigma Assets

The Sigma Assets consist of 100 BTC, 378.67 Bitcoin Cash ("**BCH**"), 1,588.88 Tether ("**USDT**"), and 32,04480 USD Coin ("**USDC**").[30]

---

[28] *See* Chen Decl. at ¶¶ 1 and 12.m, attached as Ex. 5 to Molina Decl.
[29] *See* Porter Decl. at ¶111.
[30] *See id*. at ¶10.

### i.    100 BTC

On March 11, 2019, Qin wired $3 million of Sigma Fund investor dollars into an account under his name at the cryptocurrency firm, QCP Capital, and directed Adaya to use those dollars to purchase digital assets on Qin's behalf.[31] On March 29, 2019, Adaya bought 100 BTC using $409,270.62 from this account.[32] Adaya subsequently transferred the BTC to a Binance account he controlled and that had been opened in the name of Adaya's personal acquaintance, Srihari Yenamandra ("**Yenamandra Account**").[33] Binance records confirm that, from March 2019 to January 2021, these 100 BTC were traded for other digital assets at a high frequency, and the resulting assets were kept in the Yenamandra Account during that period.[34] Between January 2021 and February 2021, Adaya transferred all the assets from the Yenamandra Account into the Nguyen Account, where he continued to extensively trade the assets in the Nguyen Account at a high frequency.[35]

### ii.    1,588.88 USDT and 378.67 BCH

Between June 2018 and March 2019, Qin funded his Binance account ("**Qin Binance Account**")[36] with approximately $1.5 million of digital assets that are directly traceable to Sigma Fund investor dollars that Qin stole from the Receivership Entities.[37] In August 2019, 1,588.88 USDT were transferred from the Qin Binance Account to the Yenamandra Account.[38] The value

---

[31] See id. at ¶¶ 45-47.

[32] See id. at ¶47; see also Adaya Dep. 143:4 – 145:4.

[33] See Porter Decl. at ¶¶ 48–49. The Yenamandra Account refers to the Binance master account with User ID ending in 9897 and all related subaccounts.

[34] See id. at ¶50.

[35] See id. at ¶¶ 51 and 116-118.

[36] The Qin Binance Account refers to the Binance master account with User ID ending in 3517 and any related subaccounts.

[37] See Porter Decl. at ¶¶ 15, 24-37 .

[38] See id. at ¶38.

of the USDT as of this transfer was $1,591.[39] In April 2020, 378.67 BCH were transferred from the Qin Binance Account to the Yenamandra Account.[40] The value of the BCH as of this transfer was approximately $84,830.[41] After the USDT and BCH assets were deposited in the Yenamandra Account, Adaya traded them for digital assets at a high frequency.[42] Adaya kept the resulting assets in the Yenamandra Account through 2020.[43] In early 2021, Adaya transferred all of the assets from the Yenamandra Account to the Nguyen Account, where he continued to extensively trade the assets in the Nguyen Account at a high frequency.[44]

### iii.  32,04480 USDC

As part of his fraudulent scheme, Qin misappropriated Sigma Fund investor dollars by, among other things, commingling them with assets in a proprietary trading portfolio that VQR managed (**"VPFA"**).[45] In June 2020, 32,044.80 USDC were transferred from a Coinbase account registered to VPFA to the Yenamandra Account.[46] The value of the USDC at the time of this transfer was $32,044.80.[47] Adaya subsequently traded the USDC for other digital assets at a high frequency.[48] Adaya kept related proceeds in the Yenamandra Account through 2020.[49] In early 2021, Adaya transferred the proceeds from the Yenamandra Account to the Nguyen Account, where he continued to extensively trade the proceeds at a high frequency.[50]

---

[39] *See id.*
[40] *See id.* at ¶39.
[41] *See id.*
[42] *See id.* at ¶40
[43] *See id.* at ¶41.
[44] *See id.* at ¶¶41, 116-118.
[45] *See id.* at ¶¶ 52-94.
[46] *See id.* at ¶¶ 95-98.
[47] *See id.* at ¶98.
[48] *See id.* at ¶99.
[49] *See id.* at ¶100
[50] *See id.* at ¶¶ 100, 116-118.

### iv.  Assets in the Nguyen Account Likely Derive Directly or Indirectly from the Sigma Assets

Because of Adaya's extensive trading and commingling of the assets in the Yenamandra and Nguyen Accounts, it is impractical – if not impossible – for the Receiver to discern exactly which assets in the Nguyen Account derive directly or indirectly from the Sigma Assets that Adaya received in the Yenamandra Account years ago.[51] However, based on his review of transactional records and his tracing of Receivership Property to the Accounts, Porter believes that certain of the assets currently in the Nguyen Account derive directly or indirectly from the Sigma Assets.[52] As set out in the accompanying Porter declaration, this belief is based, at least in part, on the following: (i) the Sigma Assets were deposited into the Yenamandra Account; (ii) Adaya never transferred the Sigma Assets from the Yenamandra Account to Qin or to any of the Receivership Entities; (iii) in early 2021, Adaya transferred all of the assets in the Yenamandra Account to the Nguyen Account; (iv) Adaya never transferred any of the assets from the Nguyen Account to Qin or to the Receivership Entities; (v) based on Porter's review of Binance records, there is no direct evidence that Adaya has withdrawn or transferred the Sigma Assets, or their trade proceeds, from the Nguyen Account; and (vi) from the time the Sigma Assets were taken from the Receivership Entities to the present, the assets within the Nguyen Account have appreciated and are currently valued well in excess of the value of the Sigma Assets.[53] To the extent the trade proceeds from the Sigma Assets are not in the Nguyen Account, the only other plausible outcome at this time is that Adaya and/or Nguyen converted those assets.

---

[51] *See id*. at ¶118.

[52] *See id*. at ¶¶101.

[53] *See id*. at ¶¶ 101 and 118.

Notably, on June 23, 2023, Adaya and Nguyen admitted in a joint letter to this Court that the Sigma Assets, or their proceeds: (i) were, in fact, transferred to the Nguyen Account; (ii) had or have an approximate value of $529,000; and (iii) "may well be receivership property."[54]

  b. The VQR Assets

    i. *Adaya Diverted the VQR Assets from VQR*

The VQR Assets originate from 990,726.23 INJ tokens that VQR received on October 20, 2020.[55] VQR received these INJ tokens during the initial exchange offering ("**IEO**") for the INJ token, which occurred on October 21, 2020.[56] VQR's mandate was to sell the just-launched INJ tokens to the public in exchange for other established digital assets in an automated, algorithmic fashion in order to help set the token's market price.[57] VQR would be able to keep the proceeds of its trades, as well as untraded INJ tokens (if any), less a dollar amount that represented its payment for the INJ tokens (which had no market price prior to the IEO).[58]

VQR fulfilled its mandate. VQR conducted market research on the INJ token as well as that token's potential to be traded for other digital assets.[59] VQR wrote the trading scripts that enabled automated algorithmic sales of the INJ token on Binance.[60] VQR created a subaccount in its master Binance account – which came with high transaction limits and low trading fees – and generated application programming interface ("**API**") keys to link that subaccount to the trading scripts.[61] Once the INJ token was listed on Binance (the exchange used for this IEO), VQR used

---

[54] Third-Party Response to Letter filed by Receiver's Counsel, ECF No. 214 (June 23, 2023).

[55] On October 20, 2020, VQR received 1,000,001 INJ tokens and, in the following weeks VQR returned 9,274.37 INJ tokens to the issuer, resulting in a net receipt of 990.726.23 INJ tokens. *See* Porter Decl. at ¶102.

[56] *See* Section III.B.2, *infra*; *see also* Porter Decl. at ¶106; Chen Decl. at ¶ 3.

[57] *See* Section III.B.2, *infra*.; *see also* Chen Decl. at ¶¶ 3, 5; Adaya Dep. 114:11 – 17.

[58] *See* Chen Decl. at ¶10.

[59] *See* Molina Decl. at ¶7.

[60] *See* Molina Decl. at ¶8; *see also* Adaya Dep. 94:15 – 99:13

[61] *See* Molina Decl. at ¶9; *see also* Adaya Dep. 94:2 – 13.

these resources to sell INJ tokens to purchasers.[62] In the ensuing months, VQR sold more than half of the INJ tokens in exchange for other digital assets, specifically, USDT and BTC.[63]

In December 2020, Adaya caused VQR to transfer the VQR Assets from VQR's Binance account to two unhosted cryptocurrency wallets he controlled.[64] On December 12, 2020, VQR moved the following Assets to an unhosted wallet address ending in Deefa ("**Adaya Deefa Wallet**"): (i) 418,671.75 INJ; and (ii) 323,544.70 USDT.[65] On December 14, 2020, VQR transferred the remaining VQR Assets (20.03 BTC) to the Adaya BTC Wallet.[66] As of the date of this Motion, the 20.03 BTC remain in the Adaya BTC Wallet.[67]

> ii.  *Assets in the Nguyen Account Likely Derive Directly or Indirectly from the VQR Assets*

Adaya transferred the VQR Assets from the Adaya Deefa Wallet to the Nguyen Account between January 2021 and February 2021.[68] Adaya then extensively traded the VQR Assets at a high frequency for other digital assets.[69] Because of Adaya's extensive trading and commingling of the assets in the Nguyen Account, it is impractical – if not impossible – for the Receiver to discern exactly which assets in the Nguyen Account derive directly or indirectly from the VQR Assets that Adaya diverted from VQR years ago.[70] Based on his review of transactional records and its tracing of Receivership Property to the Account, Porter believes that certain of the assets currently in the Nguyen Account derive directly or indirectly from the VQR Assets. As set out in the accompanying Porter declaration, this belief is based, at least in part, on the following: (i)

---

[62] *See* Porter Decl. at ¶107.

[63] *See id.*

[64] *See id.* at ¶¶ 108-111.

[65] *See id.* at ¶¶ 108-110.

[66] *See id.*

[67] *See id.* at ¶111.

[68] *See id.* at ¶¶ 112-117.

[69] *See id.* at ¶118.

[70] *See id.*

Adaya transferred VQR Assets with an approximate value of $2.5 million into the Nguyen Account; (ii) Adaya has never transferred any assets from the Nguyen Account to Qin or to the Receivership Entities; (iii) other than using certain of the proceeds generated by his trading of the VQR Assets to pay for the INJ tokens, there is no direct evidence that Adaya has withdrawn or transferred the VQR Assets, or their trade proceeds, from the Nguyen Account; and (iv) from the time the VQR Assets were taken from the Receivership Entities to the present, the assets within the Nguyen Account have appreciated and are currently valued well in excess of the value of the VQR Assets.

### iii.  Adaya's Testimony about the VQR Assets Was Not Credible

Adaya has taken the untenable position that the proceeds generated from the trading of the VQR Assets belong to him and not to the Receivership Entities. Specifically, Adaya claims that he purchased the original 990,726.23 INJ tokens from their issuer Open DeFi Foundation ("**ODF**"), that this was his personal business venture, and that VQR's involvement was merely incidental.[71] None of this is true. Adaya did not pay for the tokens with personal funds; he paid for the tokens using a portion of the proceeds derived from VQR's trading of the VQR Assets.[72] Also, Adaya cannot claim this business venture for himself because his employment agreement with VQR precluded him from competing with VQR without prior written consent,[73] and there is no evidence that such consent was ever given here. VQR's involvement was not incidental; VQR did everything with respect to the trading of the VQR Assets. VQR researched INJ tokens, engineered customized trading scripts, created a subaccount in its master Binance account, generated API keys linking the subaccount to these scripts, and executed and monitored the

---

[71] *See* Adaya Dep. 108:13-25, 109:20–110:24.
[72] *See* Chen Decl. at ¶11; Adaya Dep.138:2-24.
[73] *See* Molina Decl. at ¶12.

trades generated by those scripts.[74] These tasks were conducted mostly by VQR personnel other than Adaya. VQR interns conducted the research that informed the scripts.[75] Another VQR trader used that research to code the scripts.[76] And the head trader at VQR created the subaccount, linked it with these scripts, and helped Adaya monitor the trades.[77]

Lastly, it should be noted that the Receiver has not found Adaya to be credible with respect to this matter. Indeed, the Receiver's investigation uncovered that Adaya misrepresented the nature of this business opportunity at every turn. Before the IEO, Adaya misrepresented to Chen – who advised ODF with respect to the IEO – that VQR would not be involved in the trading of the INJ tokens, notwithstanding the documented fact that Adaya was working with VQR employees at that time to prepare the trading scripts and to set up the Binance subaccount at VQR to conduct those trades.[78] Adaya similarly misrepresented to Chen that VQR was not involved in the post-IEO trading, despite the documented fact that VQR had conducted all the trading activity in the months following the IEO.[79] Adaya's dishonesty continued when, in order to evade the Court's asset freeze in this action, he caused his then-girlfriend to open a Binance account under her name (*i.e.*, the Nguyen Account), in violation of Binance's Terms of Use, so he could transfer the VQR Assets and continue trading them for his personal gain.[80] And when Adaya paid the purchase price for the INJ tokens, he represented in the purchase agreement that these tokens were acquired by his firm, Antifragile Management LLC ("**Antifragile**").[81] That representation is not only false (since VQR acquired the tokens and conducted the trades) but

---

[74] *See id.* at ¶¶ 7-12.

[75] *See id.* at ¶¶ 7, 10, and 11.

[76] *See id.* at ¶8.

[77] *See id.* at ¶9.

[78] *See* Chen Decl. at ¶8.

[79] *See id*.

[80] *See* Adaya Dep. 139:8-143:2; *see also* Molina Decl. at ¶4.

[81] *See* Chen Decl. at ¶11.

also impossible given that Antifragile was not founded until 2021, *i.e.*, several months **after** the IEO took place.[82]

C.      <u>The Receiver Requires Judicial Intervention to Preserve and Marshal This Receivership Property for Distribution to the Victims of Qin's Fraud</u>

The Receiver has exhausted the remedies available to him to recover the Receivership Property identified in this Motion. The Receiver obtained a temporary freeze of the Nguyen Account (that Binance can lift at any time in its sole discretion) and records for the accounts and wallets at issue. Porter has reviewed these records and concluded that, while a direct trace of original to present assets is virtually impossible given the volume and frequency of trading conducted, it is likely that the Nguyen Account currently holds millions of dollars of Receivership Property, specifically in the form of trading proceeds. Based on Porter's review, the Receiver asked Adaya and Nguyen to turn over the Disputed Assets as well as documentation concerning the Nguyen Account, so that the Receiver may continue his investigation.[83] But, to date, Nguyen and Adaya have refused to turn over these Assets or provide additional documentation.[84] Accordingly, should this Court require additional information to determine if the Disputed Assets are Receivership Property, the Receiver asks that this Court order Nguyen and Adaya to turn over all relevant documentation regarding the Assets, in addition to the Assets themselves, for safeguarding until said determination can be made.

Further, as detailed in Section III.C, *infra*, immediate judicial intervention is necessary here given extraordinary circumstances that make it highly likely that the Assets in the Nguyen Account and the Adaya BTC Wallet will be imminently dissipated or lost. For these reasons, the Receiver seeks the immediate control of the Disputed Assets.

---

[82] *See* Molina Decl. at ¶14; *see also* Adaya Dep. 59:13–14.
[83] *See* Molina Decl. at ¶16.
[84] *See id.* at ¶17.

III.   **ARGUMENT**

A.   <u>**This Court Has the Power to Order Adaya and Nguyen to Turn Over Receivership Property to the Receiver**</u>

This Court should order Nguyen and Adaya to turn over any Receivership Property in their control to the Receiver. This Court has subject matter jurisdiction here because this Motion concerns the preservation of assets belonging to the Receivership Entities. *See* Receiver Order at § 2. ("This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated" belonging to the Receivership Entities); *see also* 15 U.S.C. § 77v; 15 U.S.C. §§ 78u(e) and 78(aa). Also, it is well-settled that courts overseeing SEC receiverships have "authority to grant the full panoply of equitable remedies so that the [victims] can obtain complete relief." *SEC v. Antar*, 831 F. Supp. 380, 398 (D.N.J. 1993) (citing *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984)). These remedies include the turnover of receivership assets held by third-party non-defendants. *See, e.g., SEC v. Infinity Grp. Co.*, 27 F. Supp. 2d. 559, 561-562 (E.D. Pa. 1998) (citing cases); *see also SEC v. Stanford Int'l Bank, Ltd.*, 551 F. App'x 766, 769-772 (5th Cir. 2014) (affirming order granting an SEC receiver's motion for turnover of receivership property from non-defendant).

For example, in *Infinity*, an SEC receiver was tasked with remediating a fraud by bringing actions he deemed "necessary and appropriate and in the interests of the estate to recover assets" of the receivership entity. 27 F. Supp. 2d at 561. Under that mandate, the SEC receiver brought a motion against a non-defendant "to compel turnover of assets held" by that individual. *Id.* The court held that it had subject matter jurisdiction because it concerned receivership property and because the securities statutes vest federal courts with such jurisdiction over motions "seeking relief from a non-party who held funds sought by the" receiver. *Id.* at 562 (citation omitted). The court also held it had personal jurisdiction over the non-defendant in

possession of receivership property. *Id.* at 562-564. Based on these findings, the court granted the motion and ordered the non-defendant to turn over the receivership property to the receiver. *Id.* at 565.

Similarly, in *Stanford*, an SEC receiver was appointed to remediate a fraud. 561 F. App'x at 768-770. In furtherance of his mandate, the receiver moved the court to order a non-defendant bank to turn over receivership property contained in one of its bank accounts. *Id.* at 770. The receivership court granted the motion and ordered the non-defendant bank "to turnover [*sic*] the contents of the Account to the Receiver within seven (7) days." *Id.* On appeal, the Fifth Circuit Court of Appeals affirmed the order on the ground that the assets in question were assets owed to the receivership estate and, thus, subject to being turned over to the SEC receiver tasked with the orderly liquidation of that estate. *Id.* at 770-772.

The same result should occur here. As argued more fully below, the Disputed Assets are Receivership Property and, thus, belong to the Receivership Entities. Further, this Court has subject matter jurisdiction over those Assets pursuant to the federal securities laws that this enforcement action is seeking to remedy. *See Infinity*, 27 F. Supp. 2d at 561-564; 15 U.S.C. § 77v; 15 U.S.C. §§ 78u(e) and 78(aa). And this Court has personal jurisdiction over each of the non-party defendants implicated, such that it can order each of them to turn over the Disputed Assets. This Court has personal jurisdiction over Adaya because he consented to jurisdiction when he filed a personal claim in this receivership. *See id.* at 562 (claimants in receiverships are subject to personal jurisdiction of the receivership court). Further, this Court has personal jurisdiction over Adaya and Nguyen because they each have minimum contacts with the United States since they created and operated the Nguyen Account from their shared residence in

Texas.[85] *See id.* at 563 (since SEC receiverships are brought under federal securities laws, a receivership court has jurisdiction over a person if that person has minimum contacts with the United States).

Accordingly, should this Court find that the Disputed Assets are Receivership Property, it has the requisite authority to grant the relief requested herein.

**B.**     **The Disputed Assets Are Receivership Property**

This Court should find the Disputed Assets constitute Receivership Property. As detailed above, the Receiver Order defines Receivership Property very broadly to include all "property interests" that the Receivership Entities "own, possess, or have a beneficial interest in, or control directly or indirectly[.]" Receiver Order at § 7.A. These interests include "funds," *i.e.*, Sigma Fund investor dollars that were used to purchase the Sigma Assets. *Id.* These interests also include "digital assets," *i.e.*, the Sigma Assets and VQR Assets that Adaya diverted from the Receivership Entities to the Nguyen Account and Adaya BTC Wallet. *Id.* If those Assets are no longer in the Nguyen Account because they were traded by Adaya for other assets, the resulting assets (which Porter concludes are likely still in the Nguyen Account) are Receivership Property because they are "profits, dividends, interest, or other income attributable thereto, of whatever kind," of the original assets. *Id.* For these reasons, the Receiver seeks the turnover of the assets that were taken from the Receivership Entities or their trade proceeds. If the diverted assets or their proceeds are no longer in the Nguyen Account or Adaya BTC Wallet, the Receiver requests turnover of digital assets located in the Nguyen Account or Adaya BTC Wallet that are equivalent in value to the last-known value of the original assets.

---

[85] *See* Adaya Dep. 10:2 – 12.

### 1.  The Sigma Assets and Their Proceeds Are Receivership Property

As explained in Section II.B.2, *supra*, the Sigma Assets consist of digital assets that were purchased using dollars belonging to investors in the Sigma Fund. Porter's tracing has confirmed that Qin misappropriated these dollars and used them to purchase the Sigma Assets.[86] For example, Adaya purchased 100 BTC with money in Qin's QCP Capital account that consisted entirely of funds Qin had stolen from investors in the Sigma Fund.[87] Similarly, the USDT and the BCH, proceeds of which were ultimately transferred to the Nguyen Account, were purchased using stolen Sigma Fund investor dollars.[88] And the USDC at issue was purchased using VPFA Ltd. funds, which also consisted of stolen Sigma Fund investor dollars.[89]

It is inconsequential that Adaya traded the Sigma Assets for other assets (first, through trades in the Yenamandra Account and, later, through trades in the Nguyen Account). Income, profit, or property interest, of any kind, resulting from the sale or trade of Receivership Property is, in and of itself, Receivership Property. *See* Receiver Order at § 7.A. And while it currently is impracticable, if not impossible, for the Receiver's team to reverse engineer every trade Adaya made, given the extensive volume and frequency of those trades, there is nothing to indicate that proceeds of the Sigma Assets are no longer in the Nguyen Account. If anything, as Porter opines in his declaration, all signs point to the likelihood that some assets in the Nguyen Account derive, directly or indirectly, from the Sigma Assets.[90] Adaya and Nguyen have largely adopted Porter's conclusions, recently confirming in a letter that the Sigma Assets or their trade proceeds were transferred to the Nguyen Account and "may well be receivership property."[91]

---

[86] *See* Porter Decl. at ¶¶ 10-101.

[87] *See id.* at ¶¶ 42-47.

[88] *See id.* at ¶¶ 13-41.

[89] *See id.* at ¶¶ 52-90.

[90] *See id.* at ¶101.

[91] Third-Party Response to Letter filed by Receiver's Counsel, ECF No. 214 (June 23, 2023).

For these reasons, the Receiver requests that this Court order Adaya and Nguyen to turn over to the Receiver assets in the Nguyen Account with a corresponding value of $529,202.16, which was the value of the Sigma Assets when they were taken from the Receivership Entities and deposited into accounts controlled by Adaya.

### 2.    The VQR Assets and Their Proceeds are Receivership Property

The VQR Assets and their proceeds belong to VQR and, thus, constitute Receivership Property. As explained earlier, the VQR Assets consist of the 990,726.23 INJ tokens that VQR received on October 21, 2020 in connection with INJ token's IEO.[92] VQR obtained the newly launched tokens for the purpose of trading them for other more established digital assets in order to help set a market price for the INJ token.[93] From the date of the IEO until mid-December 2020, VQR traded these assets using its infrastructure, personnel, and proprietary resources, which had the effect of increasing the token's market price.[94] A portion of these proceeds were used to retroactively purchase the INJ tokens that VQR received during the IEO. In other words, without VQR's efforts, there would be no trade proceeds, the original 1 million INJ tokens would not have been purchased from the issuer, and the INJ tokens would have no market value. The balance of the proceeds generated by VQR's trading of the VQR Assets, therefore, belongs to VQR. And because the Receiver Order classifies these proceeds as Receivership Property, they must be returned to the Receiver.[95]

This situation is akin to that of an underwriter who buys a newly offered security from its issuer with the intent to distribute that security to the public at a profit. The Securities Act of 1933 defines an underwriter as "any person who has purchased from an issuer with a view to, or

---

[92] *See* Section II.B.2.b.i, *supra.*

[93] *See* Chen Decl. at ¶5.

[94] *See* Section II.B.2, *supra.*

[95] *See* Receiver Order at § 7.A.

offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking." 15 U.S.C. § 77b(a)(11); *see also SEC v. Telegram Group Inc. and TON Issuer Inc.*, 448 F.Supp.3d 352, 381 (S.D.N.Y. 2020) ("The Initial Purchasers bought Grams from Telegram, the issuer, with an intent to resell them for profit in the secondary market soon after launch of the TON Blockchain. The Grams would not and were not intended to come to rest with the Initial Purchasers but instead were intended to move from the Initial Purchasers to the general public. Therefore, this two-step process represents a public distribution and the Initial Purchasers, who acted as mere conduits to the general public, are underwriters.") This Court has held that an underwriter gains legal title to the assets it purchases and, by extension, to any proceeds generated by the trading of those assets. *See, e.g., In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F.Supp.2d 429, 469 (S.D.N.Y. 2020). The same rationale should apply here where the INJ tokens were provided to VQR so that that it could establish a market for the tokens by selling to third parties and keeping sale profits.[96]

Further, Adaya cannot convincingly argue – as he has tried to argue in his dealings with the Receiver[97] – that he should keep proceeds of the VQR Assets because Injective and ODF were his personal clients. Under his employment agreement with VQR, Adaya was prohibited from competing against VQR in this capacity absent VQR's prior written consent, which he never obtained.[98] Moreover, it was not possible for Adaya to trade the INJ tokens without the use of VQR, its technology, personnel, and infrastructure. For these reasons, compensation gained by Adaya as a result of his trading of the VQR Assets after VQR entered into receivership have to be returned to VQR.

---

[96] For the avoidance of doubt, the Receiver is not taking the position in this Motion that the INJ token is a "security" as defined under the federal securities laws.

[97] *See* Molina Decl. at ¶15.

[98] *See id.* at ¶13.

**C.**   **Judicial Intervention Is Needed Now Due to Significant Risk of Dissipation of the Disputed Assets**

Should this Court find that more information is needed to determine whether the Disputed Assets are Receivership Property, the Receiver requests that this Court order the turnover of these Assets to be held in an escrow account, given the extremely high risk that these Assets will be dissipated in the immediate future. The extraordinary circumstances that militate immediate judicial intervention to ensure the safeguard and preservation of the Disputed Assets, which constitute Receivership Property, are as follows:

*First*, there are grave concerns about Binance's continued financial health and viability. Since the Receiver worked with Binance to freeze the Nguyen Account, the cryptocurrency market has plummeted, and some cryptocurrency exchanges, lenders, hedge funds, and even banks that service the cryptocurrency industry, have filed for bankruptcy or been forced into receivership, including major companies in the crypto space such as: FTX, Genesis, Three Arrows Capital, Alameda Research, Babel Finance, Hodlnaut, Zipmex, Voyager Digital, BlockFi, Celsius Network, Silvergate Bank, Silicon Valley Bank, and Signature Bank.[99] While Binance is still operational, it has been cited by a group of U.S. Senators as posing a risk to the financial system due to its opaque financial condition, allegations of ongoing criminal

---

[99] *See, e.g., Babel Finance Files Moratorium Application in Singapore High Court*, BABEL FINANCE (Mar. 6, 2023); Anthony Tellez, *Crypto Lender Genesis Files For Bankruptcy: Here Are The Companies That Have Collapsed So Far*, FORBES (Jan. 21, 2023, 12:19 PM); Hannah Lang et al., *Crypto Lender Blockfi Files For Bankruptcy, Cites FTX Exposure*, REUTERS (Nov. 29, 2022, 1:59 AM); David Yaffe-Bellany, *Embattled Crypto Exchange FTX Files for Bankruptcy,* N.Y. TIMES (Nov. 11, 2022); Joanna Ossinger, *Crypto Lender Hodlnaut Seeks Creditor Protection in Singapore*, BLOOMBERG (Aug. 16, 2022, 1:03 AM); Zinnia Lee, *Crypto Exchange Zipmex Seeks Bankruptcy Protection In Singapore As Crypto Crisis Spreads*, FORBES (July 29, 2022, 7:10 AM); Olga Kharif & Joanna Ossinger, *Crypto Lender Celsius Files for Bankruptcy After Cash Crunch*, BLOOMBERG (July 14, 2022, 3:21 PM); Shivam Patel et al., *Crypto Lender Voyager Digital Files For Bankruptcy*, REUTERS (July 6, 2022, 4:51 PM); Jeremy Hill, *Crypto Hedge Fund Three Arrows Files for Chapter 15 Bankruptcy*, BLOOMBERG (July 1, 2022, 5:56 PM); Rachel Louise Ensign, *Crypto Bank Silvergate to Shut Down, Repay Deposits*, WALL ST. J. (Mar. 8, 2023, 6:45 PM).

investigations, and questions about its financial health.[100] On March 27, 2023 and June 5, 2023, respectively, the CFTC and SEC filed complaints against Binance for myriad violations of federal laws. Among other things, the complaints allege Binance has willfully evaded U.S. law and seek monetary fines, penalties, injunctive relief, asset freezes, repatriation of assets, and the appointment of a receiver which if granted would severely restrict and potentially prevent Binance from continuing to operate its business.[101] If Binance meets the same or similar fate as the multiple cryptocurrency firms that have recently filed for bankruptcy, the Disputed Assets may be lost beyond recovery.[102]

*Second*, although Binance previously advised the Receiver that it "froze" the Nguyen Account (upon the Receiver's request), trading in that Account is still occurring.[103] Hence, the Disputed Assets remain vulnerable to loss based on the volatility of the cryptocurrency markets and the risks associated with Adaya's trading strategies.

*Third*, even the withdrawal holds that Binance has purportedly put in place are temporary and, according to Binance, may be removed at any time at its sole discretion, without notice to the Receiver, and without liability.

---

[100] Letter from U.S. Senators Elizabeth Warren, Chris Van Hollen, and Roger Marshall, M.D. to Changpeng Zhao and Brian Shroder (March 1, 2023), https://www.warren.senate.gov/imo/media/doc/2023.03.01%20Letter%20to%20Binance%20and%20Binance.US%20re%20Compliance%20and%20Risk.pdf.

[101] Press Release 8680-23, U.S. Commodity Futures Trading Commission, *CFTC Charges Binance and Its Founder, Changpeng Zhao, with Willful Evasion of Federal Law and Operating an Illegal Digital Asset Derivatives Exchange* (March 27, 2023), available at https://www.cftc.gov/PressRoom/PressReleases/8680-23; Press Release 2023-101, U.S. Securities and Exchange Commission, *SEC Files 13 Charges Against Binance Entities and Founder Changpeng Zhao* (June 5, 2023), available at https://www.sec.gov/news/press-release/2023-101.

[102] It should be noted that while the SEC and Binance recently executed a Consent Order that addresses the security of assets, that Order relates ***only*** to customer funds held on the U.S.-based Binance platform. *See SEC v. Binance Holdings, Ltd.*, No. 23-1599, ECF No. 71 (D.D.C. June 17, 2023). That Order does not reach the Disputed Assets because they are all held on the foreign-based Binance platform.

[103] *See* Molina Decl. at ¶5.

## IV.    CONCLUSION

For the foregoing reasons, the Receiver respectfully requests this Court to: (i) order that the Disputed Assets are Receivership Property; and (ii) order Adaya and Nguyen to turn over the Disputed Assets – *i.e.*, the 20.03 BTC in the Adaya BTC Wallet and assets from the Nguyen Account with an equivalent value of $3,000,662.96 – to the Receiver without further delay. Should this Court need additional information before determining that the Disputed Assets constitute Receivership Property, the Receiver respectfully requests this Court to order Adaya and Nguyen to turn over the Assets to an escrow account established by the Receiver, where these Assets can be safeguarded until this threshold determination can be made.

Dated: August 4, 2023
     New York, New York

                           */s/ Marco Molina*
                           BAKER & HOSTETLER LLP
                           45 Rockefeller Plaza
                           New York, NY 10111-0100
                           Tel.: (212) 589-4200
                           Fax: (212) 589-4201
                           Marco Molina
                           mmolina@bakerlaw.com
                           *Attorney for Receiver Robert A. Musiala, Jr.*