# Exhibit 02

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
   UNITED STATES SECURITIES  §
 3 AND EXCHANGE COMMISSION,   §
                             §
 4        Plaintiff,         §
                             §         CIVIL ACTION NO.
 5 VS.                       §         20-cv-10849 (LGS)
                             §
 6 STEFAN QIN, et al.,       §
                             §
 7        Defendants.        §

 8

 9

10

11

12

13          REMOTE VIDEOTAPED DEPOSITION OF

14                    NASIR ADAYA

15                  Houston, Texas

16                  March 7, 2023

17                    1:40 p.m.

18

19

20

21

22

23 Reported by:

24 Micheal A. Johnson, RDR, CRR

25 Job No. 18625
```

1          REMOTE VIDEOTAPED DEPOSITION OF NASIR ADAYA,

2     produced at the instance of the Receiver, in the

3     above-styled and numbered cause on the 7th day of

4     March, 2023, at 1:40 p.m., before Micheal A.

5     Johnson, RDR, CRR, reported by realtime stenographic

6     means, at the location of the witness, Houston,

7     Texas, pursuant to Subpoena, and in accordance with

8     the Federal Rules of Civil Procedure.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  REMOTE APPEARANCES

 2   ON BEHALF OF THE
     U.S. SECURITIES AND EXCHANGE COMMISSION:
 3
        Amanda L. Straub
 4      UNITED STATES SECURITIES AND EXCHANGE COMMISSION
        44 Montgomery Street, Suite 2800
 5      San Francisco, California 94104
        (415) 705-8111
 6      strauba@sec.gov

 7
     ON BEHALF OF ROBERT MUSIALA JR., IN HIS
 8   CAPACITY AS THE COURT-APPOINTED RECEIVER:

 9      Marco Molina
        BAKER & HOSTETLER LLP
10      600 Anton Boulevard, Suite 900
        Costa Mesa, California 92626
11      (714) 966-8833
        mmolina@bakerlaw.com
12
        Teresa Goody Guillen
13      BAKER & HOSTETLER LLP
        1050 Connecticut Avenue, NW, Suite 1100
14      Washington, D.C. 20036
        (202) 861-1630
15      tgoodyguillen@bakerlaw.com

16      Lauren Bass
        John J. Carney
17      Joanna F. Wasick
        BAKER & HOSTETLER LLP
18      45 Rockefeller Plaza
        New York, New York 10111-0100
19      (212) 589-4200
        lbass@bakerlaw.com
20      jcarney@bakerlaw.com
        jwasick@bakerlaw.com
21

22

23

24

25
```

1          APPEARANCES (CONT.)

2   ON BEHALF OF THE WITNESS:

3      Aviva Gilbert
       FARELLA BRAUN + MARTEL LLP
4      235 Montgomery Street, 17th Floor
       San Francisco, California 94104
5      (415) 954-4478
       agilbert@fbm.com

6

7   VIDEOGRAPHER:

8      Ken Amrhein

9

    ALSO PRESENT:
10
       Robert Musiala, Jr.
11     Andrew Sotak

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of Nasir Adaya                    United States Securities and Exchange Commission v. Stefan Qin, et al

INDEX
NASIR ADAYA
March 7, 2023

APPEARANCES                                              3

PROCEEDINGS                                              7


EXAMINATION OF NASIR ADAYA:

BY MR. MOLINA                                            7


REPORTER'S CERTIFICATION                              161

```
 1                    DEPOSITION EXHIBITS
                          NASIR ADAYA
 2                       March 7, 2023

 3
        NUMBER               DESCRIPTION              MARKED
 4
        Exhibit 1    October 2020 Chat                   95
 5                   Messages
                     Pandit_Baker_2527 -
 6                   Pandit_Baker_2581

 7      Exhibit 2    December 2020 Chat                  122
                     Messages
 8
        Exhibit 3    December 13, 2020 to               132
 9                   March 1, 2023 Blockchair
                     Wallet Statement
10
        Exhibit 4    3/5/2019 - 12/16/2020             153
11                   Short Message Report

12      Exhibit 5    March 28, 2019 to                  156
                     March 31, 2019 Blockchair
13                   Wallet Statement

14

15

16

17

18

19

20

21

22

23

24

25
```

1                            PROCEEDINGS

2                  THE VIDEOGRAPHER:   Okay.   We are now

3     on the record.   Today's date is March 7th, 2023, and

4     the time is 1:40 p.m. Central.   This is the recorded

5     video deposition of Nasir Adaya in the matter of

6     United States Securities and Exchange Commission

7     versus Stefan Qin, et al., in the United States

8     District Court for the Southern District of New

9     York, Civil Action No. 20-cv-10849 (LGS).

10                  My name is Ken Amrhein from Everest

11    Court Reporting.   I'm the video specialist.   The

12    court reporter today is Micheal Johnson, also from

13    Everest Court Reporting.

14                  All counsel appearing today will be

15    noted on the stenographic record.   Would the court

16    reporter please swear in the witness.

17                         NASIR ADAYA,

18    called as a witness, having been duly sworn, was

19    examined and testified as follows:

20                         EXAMINATION

21    BY MR. MOLINA:

22         Q.    Good afternoon, Mr. Adaya.   Can you hear

23    me?

24         A.    Yes, I can hear you.

25         Q.    Hello.   My name is Marco Molina.   I'm a

1 partner at BakerHostetler.  We're the law firm that

2 represents Robert A. Musiala, Jr., who is the

3 court-appointed receiver in this action.  I'm going

4 to be taking your deposition today.

5           I'm going to be asking you a series of

6 questions.  If at any time you don't hear or don't

7 understand my question, just ask me to rephrase

8 and -- or repeat the question.  I'll be happy to do

9 so.  Is that okay?

10      A.    Yes.

11      Q.    Okay.  If you do answer a question, I'm

12 going to assume that you've heard it, that you

13 understood it and that you answered to the best of

14 your abilities.  Is that okay?

15      A.    That's okay.

16      Q.    And if at any time you give me an answer

17 that you believe later to be inaccurate or

18 incomplete, simply just let me know and I'll be

19 happy to let you supplement or correct your earlier

20 answer.

21      A.    Okay.

22      Q.    As you can see, the -- your testimony is

23 going to be transcribed by a court reporter today.

24 The court reporter cannot record head nods or hand

25 gestures, so I'm going to ask that you answer all my

1   questions verbally.  Is that okay?

2        A.    That's fine.

3        Q.    I'm also going to ask that -- and this is

4   a -- this sometimes can be difficult, but I'm going

5   to ask that you wait till I finish with my question

6   before you provide your answer.  And likewise I'll

7   do by best to wait till you give your answer before

8   I ask my next question.  Is that okay?

9        A.    Yes.

10       Q.    From time to time you may hear your

11  counsel, Ms. Gilbert, make an objection on the

12  record, which will be noted.  After she's done

13  making her objection, please go ahead and answer my

14  question unless of course the question implicates a

15  legal privilege.  Do you understand that?

16       A.    I understand.

17       Q.    If you ever need a break, just let me

18  know.  We'll be happy to accommodate a break,

19  provided, of course, that if there's a question

20  that's pending that you have not yet answered,

21  please first answer the question and then we can

22  consider taking a break.  Does that make sense?

23       A.    Understood.

24       Q.    Mr. Adaya -- and, by the way, is Adaya,

25  am I pronouncing your last name correctly?

1      A.     You're pronouncing it correctly.

2      Q.     Great.   You said you're currently in

3  Texas.   Yes?

4      A.     That is correct.

5      Q.     And you said -- I think you said you're

6  in the city of Houston?

7      A.     Yes.

8      Q.     But where physically right now, where are

9  you physically currently located, in what location?

10      A.     I'm currently at a house in Houston.

11      Q.     Is it your house?

12      A.     Yes.

13      Q.     Is anyone else in the room with you?

14      A.     No.

15      Q.     I'm going to ask that if someone does

16  walk in the room for whatever reason that you let us

17  know so that we can take note of that before we

18  continue with the questioning.   Is that okay?

19      A.     Understood.

20      Q.     Okay.   And aside from the computer that

21  you're using right now to access this deposition, do

22  you have any other device -- electronic devices that

23  are currently on that you may be using at this time?

24      A.     I have a cell phone.

25      Q.     Okay.   I'm not sure if it's my Internet

1  connection, but I do believe that you just froze for

2  a second.  Did you say you have a cell phone?

3      A.    That's correct.

4      Q.    Okay.  Can I ask that you turn off the

5  cell phone or place it away from your person just so

6  that we can have the -- you know, have a back and

7  forth without any interruption.

8      A.    Yes, I can do that.

9      Q.    Thank you.  On your computer -- simple

10  or -- just so we can have an efficient back and

11  forth, I'm going to ask that you close any --

12              THE REPORTER:  Counsel, you're

13  breaking up.

14              MR. MOLINA:  Okay.  Give me one

15  second.  Can you guys hear me now?

16              MS. GILBERT:  Yes.

17              MR. MOLINA:  Okay.  I'm going to --

18              THE WITNESS:  Yes.

19              MR. MOLINA:  My computer likes to

20  switch to a WiFi that is not my preferred WiFi, so

21  I'm going to try to switch back.  So there might be

22  another 30-second interruption.  I apologize.  Give

23  me one second.

24              Okay.  Can -- I think I'm back.  Can

25  you hear me?

1                       THE WITNESS:  Yes.

2                       MR. MOLINA:  Great.  And you can see

3     my screen?

4                       THE WITNESS:  Yes.

5                       MR. MOLINA:  Okay.  Sorry about that.

6     My apologies.

7     BY MR. MOLINA:

8          Q.    I think as I was saying, if you -- just

9     so we can have an efficient back and forth, if you

10    could do me the favor of closing any, you know,

11    e-mail or any application that you may be using on

12    your computer at this time just so that we -- again,

13    we have no interruptions and so that we can have a

14    streamlined discussion.  Can you do that?

15         A.    I have done so already.

16         Q.    Okay.  Also going to instruct -- just

17    because we're doing this remotely, I'm going to

18    instruct as you've already heard to just try the

19    best you can to keep your face within the view of

20    the camera and then I'll try to do the same.  Is

21    that okay?

22         A.    Yes.  Is the camera okay right now?

23         Q.    Yes.

24               I may from time to time, as you've

25    already seen, look to my left, and that's because

1   that's where I have the transcript.  So just so you

2   know, in case you're distracted by that, that's all

3   I'm doing, looking over to see what the transcript

4   says.  Is that okay?

5        A.    Understood.

6        Q.    Okay.  And just similar with the other

7   questions that I asked, if -- just right now with

8   this deposition, other than the people -- I just

9   want to make sure you're not going to be

10  communicating with anyone else other than those on

11  this call at this time.  So can I just get a

12  confirmation from you that you won't be

13  communicating in any way with anyone else while this

14  deposition is ongoing?

15       A.    Confirmed.

16       Q.    And do you have any notes or any

17  documents in front of you at this time?

18       A.    I have a paper with a few notes.

19       Q.    Okay.  Are those your notes?

20       A.    They're my notes.

21       Q.    Okay.  Are they -- do they relate to this

22  matter?

23       A.    They relate to the matter.

24       Q.    Okay.

25                 MR. MOLINA:  Ms. Gilbert, if possible

1    I think that we would probably want a copy of those

2    notes.

3               MS. GILBERT:  Sure.  To the extent

4    they're not privileged, but I suspect that they

5    reflect a discussion that I had with Mr. Adaya.

6               MR. MOLINA:  I'm sorry, what -- I

7    didn't get the --

8               MS. GILBERT:  I said, sure, I haven't

9    seen the ones that he's talking about, but I suspect

10   they are largely privileged and reflect my advice to

11   him.  And so to the extent they are not privileged,

12   yes, you may have a copy.

13              MR. MOLINA:  Okay.

14   BY MR. MOLINA:

15       Q.    Mr. Adaya, I'm going to ask, though, that

16   you put the notes away and just to answer all of my

17   questions today from the best of your recollection

18   without the use of any notes or any outside

19   information.  Is that okay?

20       A.    Yes.  I will do that.

21       Q.    Okay.  Can you --

22       A.    Give me one moment.

23       Q.    Thank you.

24       A.    I have put any notes away.

25       Q.    Okay.  Do you have any questions about

1    the process here before we get going?

2         A.    No questions so far.

3         Q.    Okay.  Mr. Adaya, please state your full

4    name for the record.

5         A.    Nasir Adaya.

6         Q.    And you told -- you testified earlier

7    that you're located at your home in Houston, Texas,

8    correct?

9         A.    That's correct.

10        Q.    Have you ever been deposed before?

11        A.    I have not.

12        Q.    Have you ever testified under oath

13   before?

14        A.    I have not.

15        Q.    You understand that you're under oath

16   today.  Yes?

17        A.    I understand.

18        Q.    And you understand that this

19   deposition -- your testimony today is the same as if

20   you were in a courtroom in front of a judge.  You

21   understand that?

22        A.    I understand.

23        Q.    Okay.  And so today you're going to

24   answer my questions truthfully and to the best of

25   your ability, correct?

1    A.    That is correct.

2    Q.    Mr. Adaya, what did you do to prepare for

3  this deposition?

4    A.    I prepared for the deposition by speaking

5  with Ms. Aviva Gilbert.

6    Q.    And how many times did you speak with

7  Ms. Gilbert?

8    A.    I believe it was twice.

9    Q.    In the recent past?

10    A.    Sorry, can you clarify that?

11    Q.    In the last week?

12    A.    Correct.

13    Q.    Other than Ms. Gilbert, did you speak

14  with anyone else about this deposition?

15    A.    I do not believe so.

16    Q.    Did you speak with any of your former

17  colleagues at Virgil prior to this deposition?

18    A.    I did not.

19    Q.    Did you speak with Mr. Eric Chen in

20  advance of this deposition?

21    A.    I did not.

22    Q.    Mr. Antonio Hallak?

23    A.    I did not.

24    Q.    Mr. Rohan Pandit?

25    A.    I did not.

1    Q.    Did you review any documents in your

2    preparation for this deposition?

3    A.    I did.

4    Q.    What documents did you review?

5    A.    I believe -- I don't know if I can name

6    all of them, but I believe I have reviewed documents

7    with Ms. Aviva Gilbert including documents related

8    to Injective.

9    Q.    What documents would those be?

10   A.    I believe it was related to a market

11   making agreement.

12   Q.    Other than the market making agreement

13   you just referenced, what other documents did you

14   review?

15   A.    I believe I reviewed with Ms. Gilbert

16   documents related to prior subpoenas.

17   Q.    Could you clarify what you mean by prior

18   subpoenas?

19   A.    In the past I was subpoenaed for

20   information.

21   Q.    Are you referring to subpoenas from the

22   receiver?

23   A.    I am.

24   Q.    So you reviewed the documents that were

25   produced under the subpoenas?

1    A.    I believe I reviewed some of them.

2    Q.    Did you review any chats that you may

3 have on your electronic devices related to the

4 subject matter at issue here?

5    A.    I believe I reviewed chats that had been

6 sent to the receiver prior.

7    Q.    What else did you review that you haven't

8 already mentioned?

9    A.    To the best of my recollection, I believe

10 those are the documents.

11    Q.    Okay.  Mr. Adaya, tell me about your

12 educational background.

13    A.    Yes, sir.  My educational background, I

14 have a bachelor's in science from MIT.

15    Q.    And when did you obtain that degree?

16    A.    In 2014.

17    Q.    After you obtained that degree -- well,

18 let me ask, are there any other degrees that you

19 obtained from MIT?

20    A.    No.

21    Q.    Did you attend any other university?

22    A.    I did not.

23    Q.    After graduating from MIT, did you obtain

24 any postgraduate degrees?

25    A.    I did not.

1    Q.    So what did you do, if you can just walk

2    me through what you did after graduating from MIT.

3    A.    I worked at -- I worked in the field of

4    commodity trading after graduation.

5    Q.    Where did you work?

6    A.    I worked at Mirarc Capital Management and

7    then later on Motion Capital Management.

8    Q.    And what's Mirarc Capital Management?

9    A.    It is a commodity hedge fund.

10   Q.    So what did you do at this hedge fund?

11   A.    I did analytical work.

12   Q.    What was your title?

13   A.    Analyst.

14   Q.    And when did you start this position?

15   A.    I do not recall the exact time, but I

16   believe it would have been in July or August of

17   2014, around that time.  I can't recall

18   specifically.

19   Q.    And can you just walk me through the

20   day-to-day activities that you undertook as an

21   analyst at this entity.

22   A.    Are -- can you please potentially

23   clarify?

24   Q.    Sure.  What tasks were you assigned as an

25   analyst at this entity?

1    A.    So an example of a task?  I guess -- I

2    think it did vary day to day.

3    Q.    Yeah.  Please give me an example of a

4    task that you would handle as an analyst at Mirarc.

5    A.    An example could be modeling out supply

6    and demand of a specific commodity.

7    Q.    What were the circumstances that led you

8    to work at this hedge fund?

9              MS. GILBERT:  Objection, vague.

10             You can answer, Nasir.

11   A.    I -- circumstances?

12   BY MR. MOLINA:

13   Q.    Yeah.  How did you get to work there?

14   A.    I was interested in pursuing commodity

15   trading.

16   Q.    And why were you interested in pursuing

17   commodity trading?

18   A.    Because I am originally from Houston, so

19   I've had exposure to commodities, including oil and

20   natural gas.  That's something that interested me.

21   Q.    Did this entity perform any trading of

22   digital assets at that time?

23   A.    It did not.

24   Q.    So you were focused primarily on

25   commodities, correct?

1        A.    That is correct.

2        Q.    And how long were you an analyst at this

3   entity?

4        A.    I don't recall the exact date.  I believe

5   it was a couple years.

6        Q.    And what did you do after leaving Mirarc?

7        A.    Later on I joined Motion Capital

8   Management.

9        Q.    And what -- why did you leave Mirarc?

10       A.    Mirarc was not performing well.

11       Q.    So you -- were you -- did you leave on

12   your own volition?

13       A.    Mirarc, I believe, was shut down because

14   it was not performing well.

15       Q.    Okay.  So the company shut down and then

16   you left soon thereafter?

17       A.    That is correct.

18       Q.    And you said -- I'm sorry, could you

19   repeat, where did you go after Mirarc?

20       A.    Motion Capital Management.

21       Q.    And what's Motion Capital Management?

22       A.    It is also a commodity hedge fund.

23       Q.    Also based in Texas?

24       A.    That is correct.

25       Q.    And why did you go there?

1    A.    There was an opportunity to focus more on

2  oil specifically.

3    Q.    And were there -- did you perform any

4  trading of digital assets while at Motion Capital?

5    A.    No.

6    Q.    What was your title while -- at Motion

7  Capital?

8    A.    I don't recall exactly.  However, I

9  believe it was portfolio strategist.  But it was a

10  similar scope of work as before, where it's

11  analytical work.

12    Q.    So what were you analyzing at Motion

13  Capital?

14    A.    At Motion Capital I was analyzing the

15  supply and demand of oil across various regions.

16    Q.    And you memorialized your analysis in

17  reports.  Yes?

18    A.    Often it was reports or oftentimes it was

19  informal discussions.

20    Q.    Did you do any trading while you were at

21  Motion Capital of any kind?

22    A.    I was not in charge of trading a book.

23    Q.    I meant to ask you at Mirarc.  Did you do

24  any training while -- when you were at Mirarc?

25    A.    No.

1    Q.    So how long were you at Motion Capital?

2    A.    I don't recall the exact timeline, but I

3    believe it was around the same length, a year or

4    two.

5    Q.    Okay.  And why did you leave Motion

6    Capital?

7    A.    Motion Capital also was not performing

8    very well.

9    Q.    Did it also shut down?

10   A.    It did not shut down.  I believe it may

11   have shut down in the year or so after I left.

12   Q.    Did you leave on your own volition?

13   A.    Yes.

14   Q.    And where did you go?

15   A.    Later on I would join VQR.

16   Q.    Okay.  So, first of all, when you say

17   VQR, what is that entity?

18   A.    I know there are -- I'm not familiar with

19   the -- with all the entities affiliated with VQR.

20   Q.    Well, what do you understand VQR to stand

21   for?

22   A.    Virgil Quantitative Research.

23   Q.    I'm going to -- because I know it can get

24   confusing, as you just referenced.  I'm going to be

25   going through some of these entities and then you're

1  going to tell me to the best of your recollection

2  what you know about these entities.  Does that make

3  sense?

4              MS. GILBERT:  I think this is a good

5  time for me to just lodge a standing objection I'd

6  like to have, Marco, for the record.  We received

7  a -- a standing objection to outside the scope.  We

8  received a subpoena that didn't have any topics

9  attached and no subject matter listed.  Our

10 understanding based on our correspondence over the

11 past few months is that Mr. Adaya is here to testify

12 about a specific finance account UID███8310.  And

13 so to the extent your questions do not relate to

14 that account, we object to them as outside the scope

15 and may be prepared to answer them and may not be.

16             MR. MOLINA:  Okay.

17 BY MR. MOLINA:

18     Q.    All right, Mr. Adaya, I'm going to -- my

19 question's still outstanding.  I'm going to be going

20 through different entity names and I'm just going to

21 ask you to tell me to the -- to the best of your

22 recollection what you know about those entities.

23 Okay?

24     A.    Understood.

25     Q.    Okay.  I guess before we get to -- we get

 1   there, what -- what circumstances brought you to

 2   working at VQR?  And let me just -- let me retract

 3   that.  Let me take a step back.

 4           I want to make sure we get the timeline

 5   right.  This would be -- you started working at VQR

 6   in 2018; is that fair to say?

 7       A.   I believe it was 2018.

 8       Q.   Do you remember the month?

 9       A.   I don't recall the month specifically.

10       Q.   And what circumstances brought you to

11   working -- to work for VQR?

12           MS. GILBERT:  Mr. Molina, can you

13   agree that it's a standing objection and that I

14   don't need to keep making it?

15           MR. MOLINA:  Yeah, I agree.

16           MS. GILBERT:  Okay.  Great.  Thank

17   you.

18           Go ahead.

19       A.   Sorry, can you repeat that?

20   BY MR. MOLINA:

21       Q.   Yeah.  What circumstances led you to work

22   for VQR in 2018?

23       A.   I had an interest in digital assets.

24       Q.   And how did that interest come about?

25       A.   I would say I had exposure to digital

1 assets when I was a student and it's something that

2 I wanted to pursue, especially after focusing on

3 commodities for the first part of my career.

4     Q.    Prior to taking this job at VQR, did you

5 have any experience in cryptocurrency or digital

6 assets?

7     A.    I -- can you please clarify what you mean

8 by experience?

9     Q.    Did you have -- did you ever -- did you

10 ever have a job that was related to digital assets

11 prior to working for VQR?

12     A.    No.

13     Q.    Did you ever make money trading digital

14 assets prior to working for VQR?

15     A.    I believe in a personal capacity.

16     Q.    But not for third parties?

17     A.    I don't believe so.

18     Q.    So why VQR?

19     A.    Can you please clarify?

20     Q.    You said that you were interested in

21 digital assets.  My question is, what was it about

22 VQR that made you want to work specifically for VQR?

23     A.    I would say that I had done some research

24 regarding various hedge funds in the corporate

25 currency space and it seemed like an opportunity for

1   high growth to get in.  The small size of the team.

2        Q.    And what was your understanding at that

3   time of what VQR did?

4        A.    My understanding was that they engaged in

5   quantitative trading of cryptocurrencies.

6        Q.    Did you know anyone at VQR prior to

7   working there?

8        A.    I did not.

9        Q.    You did not meet Mr. Stefan Qin prior to

10  working there?

11       A.    I did not.

12       Q.    So when did you first meet Mr. Qin?

13       A.    I don't recall exactly.  I would guess it

14  would have been sometime in 2018.

15       Q.    After you started working at VQR?

16       A.    I believe so.

17       Q.    So like I said a few minutes ago, I'm

18  going to be naming some entities.  Mr. Adaya, what

19  is Virgil Capital?

20       A.    I believe it is an entity that engaged in

21  arbitrage strategies.

22       Q.    And what do you mean by an arbitrage

23  strategy?

24       A.    I believe that Virgil Capital was

25  involved in engaging in arbitrage, meaning --

1  meaning looking at discrepancies and prices across

2  various exchanges and closing those -- closing those

3  discrepancies.

4      Q.    And this arbitrage was done with respect

5  to digital assets, correct?

6      A.    That's my understanding.

7      Q.    Did you ever work for Virgil Capital?

8      A.    I believe that -- given that there are a

9  lot of entities, I don't recall offhand exactly

10 which entity may have formally employed me, so I --

11 I don't have that information in front of me.

12     Q.    So sitting here today, you don't know if

13 you worked for Virgil Capital.  I just want to

14 understand that that's your testimony.

15     A.    That is correct.

16     Q.    So you don't know what positions, if any,

17 you held at Virgil Capital?

18     A.    So I know the position title, however,

19 I'm not very familiar with the legal structure.

20     Q.    What was the position title?

21          MS. GILBERT:  I'm going to object --

22 excuse me.  Sorry, Nasir -- Mr Adaya, let me object.

23 This is asked and answered.  We've already submitted

24 sworn testimony to the receiver covering this exact

25 question in Mr. Adaya's declaration, which was sworn

1    last year.

2    BY MR. MOLINA:

3        Q.    You may answer, Mr. Adaya.

4        A.    Quantitative trader.

5        Q.    Quantitative trader.  And do you

6    recall -- let me ask, in the beginning when you

7    started working as a quantitative trader, who did

8    you report to?

9        A.    I would report to Stefan.

10       Q.    By Stefan, you mean Mr. Qin?

11       A.    That is correct.

12       Q.    Did you report to anyone else?

13       A.    I do not believe so.

14       Q.    Who else would you work with as part of

15   your trading activity?

16       A.    Can you clarify the timeline, please?

17       Q.    I'm asking about the -- your first --

18   your first -- you know, your first time -- first

19   time working at Virgil.

20       A.    You're asking who I worked with

21   specifically?

22       Q.    Correct.

23       A.    I -- when I first joined and -- I believe

24   when I first joined, I was primarily working on my

25   own.  Later on I worked with others, if...

1    Q.    Okay.  And you said you worked as a

2  quantitative trader.  What does that job entail?

3    A.    The job entails performing research

4  across various strategies, various quantitative

5  strategies.

6    Q.    And you're familiar with the fund Virgil

7  Sigma.  Yes?

8    A.    I've heard the name.

9    Q.    What is Virgil Sigma?

10    A.    I believe that Sigma referred to an

11  arbitrage strategy developed by Qin.

12    Q.    So when you first joined Virgil, was your

13  work being used with respect to that strategy for

14  Virgil Sigma?

15    A.    I do not believe it was.

16    Q.    For what purpose was it used?

17    A.    I believe that the research I was

18  conducting was utilized for trading a variety of

19  strategies, not necessarily related to arbitrage.

20    Q.    What other strategies, then?

21    A.    Over the course of working at VQR and I

22  guess the related entities, there have been a lot of

23  strategies so it's very difficult to name them

24  specifically.  Like they --

25    Q.    So you would just --

1      A.      Sorry.

2      Q.      Oh, I'm sorry.  No, I'm sorry.  Go ahead.

3      A.      That was it.  That was it.

4      Q.      So you were conducting research at this

5  time, correct?

6      A.      That is correct.

7              MS. GILBERT:  Vague -- objection --

8  sorry, let me -- vague as to time.  What is "this

9  time"?

10             MR. MOLINA:  We're talking about

11 the -- when he first joined Virgil.  We're talking

12 about the 2018 timeline.

13             MS. GILBERT:  Thank you.

14 BY MR. MOLINA:

15     Q.      Were you doing any trading at that time?

16     A.      Yes, there was trading.

17     Q.      And whose assets were you trading?

18     A.      I was trading Stefan -- my understanding

19 is that I was trading Stefan Qin's personal assets.

20     Q.      Were you trading anyone else's assets at

21 that time?

22     A.      I do not believe so.

23     Q.      And what was the size of the portfolio,

24 approximately, at that time?

25     A.      I don't have great recollection of the

1   size of the portfolio.

2       Q.    Millions of dollars of value?

3       A.    I -- I'm not quite sure.  I would say it

4   would be in the -- in that range.  I don't have

5   certainty.

6       Q.    What is Montgomery Technologies, LLC?

7       A.    I'm unsure.

8       Q.    Have you ever heard of that entity

9   before?

10      A.    I believe I have.  However, I'm not sure

11  in what context.

12      Q.    Do you know if you've ever worked for

13  that entity?

14      A.    I'm unsure.

15      Q.    Is the entity affiliated with Virgil

16  Capital?

17      A.    I'm unsure.

18      Q.    What do you know about the entity?

19      A.    If I had to guess from vague memory, I

20  believe it was related to some kind of technology at

21  Virgil.  However, I don't recall specific details.

22  I know there are a lot of entities, so it's

23  difficult to really remember some specifics.

24      Q.    So we just talked about how when you

25  joined in 2018 -- when you joined Virgil in 2018,

1  that you worked as a quantitative trader trading

2  assets that you thought belonged to Mr. Qin.  My

3  question is, when did that dynamic change?

4      A.    Sorry, can you please clarify?

5            MS. GILBERT:  Objection, assumes --

6  sorry, let me object if I'm going to make an

7  objection.  Assumes facts and vague.

8  BY MR. MOLINA:

9      Q.    How long -- how long did you do the

10 quantitative trading on behalf of Mr. Qin?

11     A.    I don't recall the exact timeline.

12     Q.    What else did you end up doing at Virgil

13 Capital?

14     A.    Just to clarify, are you referring to all

15 Virgil entities?

16     Q.    Maybe the easiest way of doing this is

17 just for you -- for me to ask you, walk me through

18 the evolution of your timeline working for the

19 entities affiliated with Mr. Qin.

20     A.    Okay.  So I joined initially around 2018.

21 I was trading a variety of strategies -- a variety

22 of content strategies under the proprietary trading

23 portfolio.  And then later on I kept adding more

24 strategies and continued to refine these strategies

25 throughout the years.

1    Q.    Okay.   What do you mean by the

2  proprietary trading portfolio?

3    A.    I mean -- by proprietary trading I mean

4  assets that belong to Mr. Qin.

5    Q.    Were those the only assets that were part

6  of this portfolio?

7    A.    That is my understanding.

8    Q.    Who else other than yourself was involved

9  in this proprietary trading?

10    A.    Can you clarify?   Are you speaking about

11  coworkers?

12    Q.    Correct.

13    A.    I'm unsure who else would be trading.

14    Q.    That -- for the proprietary trading, did

15  you report only to Mr. Qin?

16    A.    I reported to Mr. Qin and then I -- I

17  don't recall the exact timeline.   I believe I also

18  reported to Antonio down the line, since Antonio did

19  not work at the Virgil entities until later on.

20    Q.    Who's Antonio?

21    A.    Antonio Hallak is head of trading.

22    Q.    And what was your -- did your job title

23  change during this timeline?

24    A.    I believe there was a title change from

25  quantitative trader to portfolio manager throughout

1    the years.

2         Q.    And what responsibilities did you have as

3    a portfolio manager?

4         A.    The responsibilities entailed selecting

5    strategies and deploying them.

6         Q.    So you selected the strategies as a

7    portfolio manager?

8         A.    That's correct.  Develop the strategies,

9    select them.

10        Q.    Did you have a team of people helping you

11   execute these strategies?

12        A.    Throughout the years I worked with a

13   small team.

14        Q.    Who made up that team?

15        A.    Pandit was on the team.

16        Q.    Anyone else?

17        A.    I believe I had interns that worked on

18   strategy -- or worked on research.

19        Q.    Do you know the name of the interns?

20        A.    There have been a lot, so I don't recall

21   the names specifically.  I believe there have been a

22   handful.

23        Q.    More than five?

24        A.    I think so.

25        Q.    More than ten?

1    A.    I think somewhere between five and ten.

2    Q.    Other than the interns and Mr. Pandit,

3  did anyone else work in your team during this time?

4    A.    I believe -- I believe that was the team,

5  to my recollection.

6    Q.    And what was Mr. Pandit's title at that

7  time?

8    A.    I believe -- I don't recall specifically,

9  but he was engaged in research.  It might have been

10  quantitative researcher.

11    Q.    And when you were a portfolio manager,

12  were you trading Mr. -- let me ask.  Whose assets

13  were you trading as the portfolio manager?

14    A.    I was trading assets under the

15  proprietary trading portfolio and I believe I was

16  also trading assets under the VQR hedge fund.

17    Q.    When you say VQR hedge fund, are you

18  referring to VQR Multistrategy?

19    A.    I believe so.  I'm not super familiar

20  with the exact titles of these various entities.

21    Q.    And those assets belonging to what you

22  call the VQR hedge fund, who's -- who are the

23  ultimate beneficial owners of those assets?

24            MS. GILBERT:  Objection, calls for a

25  legal conclusion as to beneficial ownership.

1        You can answer if you know.

2        A.    Unsure.   I'm unsure.

3    BY MR. MOLINA:

4        Q.    So -- but they weren't Mr. Qin's assets,

5    correct?

6        A.    I'm -- I believe that it was capital

7    raised externally.   However, I don't have great

8    insight.

9        Q.    When you say capital raised externally,

10   can you tell me what that means?

11       A.    I believe that it was money that was

12   raised specifically for quantitative strategies.

13       Q.    You just said money, but do you mean

14   digital assets?

15       A.    I'm unsure how -- how capital is raised,

16   in what form.

17       Q.    I guess I'm just asking just -- what is

18   it -- what assets were you trading on behalf of VQR?

19       A.    I don't believe I have insight.

20       Q.    Were they digital assets?

21       A.    Yes, they were digital assets.

22       Q.    Okay.  And can you just help me

23   understand, other than the source of the assets,

24   what difference was there with respect to your prop

25   trading versus the other trading that you -- that

1   you've identified?

2       A.    I believe the difference there would have

3   been who I was reporting to.  So, for example, I

4   believe for most matters related to the

5   Multistrategy that you just described, I would

6   discuss with Antonio.  And for matters relating to

7   prop trading, I believe I mostly discussed with

8   Stefan, Mr. Qin.

9       Q.    Were the strategies similar across both

10  portfolios?

11      A.    There have been a variety of strategies,

12  so I don't recall specifically.

13      Q.    Were the day-to-day activities similar

14  across both portfolios?

15               MS. GILBERT:  Objection, vague.

16               You can answer.

17      A.    I believe they were similar, like as far

18  as research.

19  BY MR. MOLINA:

20      Q.    So other than the source of the funds and

21  who you reported to, can you identify today any

22  differences with respect to how you executed trades

23  across both portfolios?

24      A.    Sorry, can you please repeat that?

25      Q.    Sure.  We discussed earlier how the two

1  different portfolios, the assets you believe to be

2  different -- sorry, the source of the assets you

3  believe to be different.  You also testified that

4  you would have reported to different people with

5  respect to those portfolios.  My question is, is

6  there any other difference that you can remember

7  with respect to how you executed the strategies with

8  respect to those portfolios?

9       A.    I believe a difference would have been --

10 I believe they segregated assets into different

11 accounts, they meaning Antonio or Qin.

12      Q.    What is VPFA?

13      A.    I believe VPFA stands for Virgil Prop

14 Fund, and then A is just like an identifier.

15      Q.    Did you work for VPFA?

16      A.    Yes.

17      Q.    What title did you hold at VPFA?

18      A.    I believe it's the same title as what I

19 answered earlier, quant trader.

20      Q.    Quantitative trader?

21      A.    Yes.

22      Q.    Any other titles that you held for VPFA?

23      A.    I believe there was just quant trader and

24 then later on portfolio manager, just as a general

25 title throughout the organization.

1      Q.     How did you make money working for Virgil

2   for these various entities?

3                MS. GILBERT:   Objection, vague.

4   BY MR. MOLINA:

5      Q.     You can answer.

6      A.     I'm not exactly clear about how or what

7   you mean.

8      Q.     How were you compensated for your work?

9      A.     I was compensated through a base salary

10  and then I also had a P&L split agreement.

11     Q.     And this is when you were a quantitative

12  trader.  Yes?

13     A.     I believe so.

14     Q.     And the same compensation structure when

15  you were a portfolio manager?

16     A.     I believe that the compensation structure

17  was different.

18     Q.     How so?

19     A.     I believe that on the hedge fund side it

20  was half of the performance fee.  And then on the

21  prop trading side I believe there was a -- it was a

22  different percentage, but of overall profits.

23     Q.     Other than your role as a quantitative

24  trader and your role as a portfolio manager, what

25  other formal job titles did you hold for the Virgil

1  entities?

2       A.    No others.

3       Q.    And by the way, just because we're -- we

4  have various entities, I'm going to be referring to

5  them as the Virgil entities.

6       A.    Okay.

7       Q.    And when I do that, I'm referring to --

8  just for the record, I'm referring to the entities

9  that were affiliated with Mr. Qin during that time

10 period.  Does that make sense to you, Mr. Adaya?

11      A.    It makes sense.

12      Q.    What is Decibel 18?

13      A.    I believe Decibel 18 was a name used by

14 an entity prior to VQR being named.

15      Q.    So it was a predecessor to what you call

16 VQR?

17      A.    I believe so.

18      Q.    And is Virgil Quantitative Research the

19 entity that succeeded Decibel 18 as far as you can

20 recall?

21      A.    As far as I can recall.

22      Q.    Okay.  And so what is Virgil Quantitative

23 Research?

24      A.    I believe it is an entity that

25 specializes in various quantitative strategies.

1    Q.    And which assets were used to execute

2    these strategies?

3    A.    Sorry, you asked which assets?

4    Q.    I did.

5    A.    I'm unsure.

6    Q.    Were they Mr. Qin's assets?

7    A.    I believe for VQR the assets -- my

8    understanding is that the assets were -- they were

9    raised capital from outside investors.

10   Q.    Who raised the capital?

11   A.    I'm unsure.

12   Q.    Who worked at Virgil Quantitative

13   Research when you were affiliated with that entity?

14   A.    I believe the names that we mentioned

15   earlier including Rohan Pandit and Antonio Hallak.

16   Q.    Anyone else other than those individuals?

17   A.    I believe that -- I believe that Max

18   Bodoia and Nicholas Yoder also work at VQR.

19   Q.    Going back to the timeline, you mentioned

20   that you started working in 2018 as a quantitative

21   trader, then at some point you ascended to portfolio

22   manager.  Would it be fair to say that in 2020 you

23   held the role as portfolio manager?

24   A.    I would say so.  I don't recall the exact

25   timeline, but that sounds approximately correct.

1    Q.    In that 2020 time frame, were you still

2  trading Mr. Qin's assets through the proprietary

3  portfolio that we discussed earlier?

4    A.    That is correct.

5    Q.    And during that 2020 time frame, were you

6  still trading assets belonging to the VQR hedge fund

7  that we discussed earlier?

8    A.    Yes.

9    Q.    What other trading were you doing for the

10  Virgil entities during that 2020 time frame?

11         MS. GILBERT:  Objection, vague.

12    A.    To my knowledge --

13         MS. GILBERT:  Vague.

14         Go ahead.  You can answer.

15    A.    To my knowledge, I believe those were

16  the -- like the only jobs -- or entities.

17  BY MR. MOLINA:

18    Q.    Were you doing algorithmic trading with

19  respect to those strategies?

20         MS. GILBERT:  Vague as to time --

21  objection, vague as to time.

22    A.    Yes.  I would say that oftentimes

23  algorithmic and quantitative are used

24  interchangeably.

25  BY MR. MOLINA:

1    Q.    Can you just explain from your viewpoint

2  what is algorithmic trading?

3    A.    Algorithmic trading is, for example,

4  writing some codes that will execute a strategy

5  based on certain parameters and those parameters can

6  be various market variables.

7           MR. MOLINA:  I don't know if it's --

8  Micheal, I don't know if it's my realtime, but I'm

9  not getting the full transcription of what's being

10  said.  I don't know if anyone else is having that

11  issue.

12           THE REPORTER:  Do you want to go off

13  the record to look real quick?

14           MR. MOLINA:  Yeah, let's go off the

15  record.

16           THE VIDEOGRAPHER:  Okay.  Off the

17  record.  The time is 2:33 p.m.

18           (Recess taken from 2:33 p.m. to

19  2:41 p.m.)

20           THE VIDEOGRAPHER:  Okay.  Back on the

21  record, 2:41 p.m.

22  BY MR. MOLINA:

23    Q.    Okay.  Mr. Adaya, before we went on break

24  I asked you to explain what algorithmic trading is.

25  You said:  Algorithmic trading is, for example,

1  writing some codes that will execute a strategy

2  based on certain parameters and those parameters can

3  be various market variables.

4          When you say writing some codes, could

5  you flesh that out?  What do you mean by that?

6      A.    For example, writing a Python script that

7  will ingest data about the market and then place

8  trades as a function of the data it's receiving.

9      Q.    And what parameters do you input into

10 this script?

11         MS. GILBERT:  Objection, vague.

12     A.    There could --

13         MS. GILBERT:  Go ahead.  If you

14 understand the question, you can answer it.

15     A.    There could be a variety of parameters

16 and I'll give a few examples.  They could be trade

17 data, they could be data regarding the order book

18 and various other factors.

19 BY MR. MOLINA:

20     Q.    So I'm just going to have you walk me

21 through the process, just step by step.  So you use

22 Python to write the script that includes these

23 parameters, correct?

24     A.    Correct.

25     Q.    Okay.  And after the script is written,

1  what happens next?

2       A.     You -- for example, the script can ingest

3  ongoing market data and then place those trades on

4  an exchange.

5       Q.     What exchanges were you using when you

6  were a portfolio manager at VQR?

7       A.     I have used a variety of exchanges

8  throughout my time as a portfolio manager.  It's

9  difficult to name all of them.

10       Q.     And what's the benefit of having the

11  script?

12                MS. GILBERT:  Objection, vague.

13       A.     The --

14                MS. GILBERT:  Just let me finish my

15  objection before you answer.  Go ahead.

16       A.     The benefit of having the script would be

17  that the code can run 24/7.

18  BY MR. MOLINA:

19       Q.     You don't have to manually make the

20  trades, correct?

21       A.     Correct.

22       Q.     The script allows you to make the trades

23  in an automated fashion, correct?

24       A.     Correct.

25       Q.     And when you mentioned the parameters

1   just a minute ago, does that -- does coming up with

2   those parameters, does that require extensive

3   research on your part?

4                MS. GILBERT:  Objection, vague.

5   BY MR. MOLINA:

6        Q.     You can answer.

7        A.     Yes, it would require extensive research.

8        Q.     And walk me through how that research is

9   conducted.

10       A.     An example could be that -- let's say

11  that you noticed that there are certain derivative

12  positions on a certain exchange and you theorize

13  that if the open interest deviates from the mean

14  significantly, that there will be mean reverting

15  behavior in the asset price.  So one can conduct a

16  study to quantify this.  And once the study is

17  conducted, you can then deploy the strategy and test

18  results in realtime versus what you did in the

19  experiment.

20       Q.     How do you -- and this -- again, going

21  back to just step to step, just looking at sort of a

22  granular level.  How do you connect the script to

23  the exchange account that you're using to make the

24  trades?

25       A.     I believe you can do that in a variety of

1    ways.  It also depends on -- it could be exchange

2    dependent.

3         Q.    Okay.  Well, what about -- can you give

4    me one example?

5         A.    An example could be that you write some

6    code, then you generate a key to be able to conduct

7    trades, and then you're able to trade using that

8    strategy.

9         Q.    Going back to the research.  The data

10   that you're researching, does that include data

11   from -- from specific exchanges?

12        A.    Yes.

13        Q.    What other data -- groups or categories

14   of data are you reviewing as part of that research?

15        A.    I would say that the categories of data

16   would be similar to what I said before where it's

17   trades, it's order books.  It could also be

18   correlations between various assets over time.

19   There are a variety of signals that could be used.

20        Q.    Okay.  So now going back to the process.

21   So you've created the script, you've connected it to

22   the account that you're using to make the trades.

23   What else do you do in that process?  What's the

24   next step?

25        A.    The next step in the process of strategy

1    creation?

2         Q.    Of trading.  So we mentioned -- we were

3    talking about algorithmic trading.  You mentioned

4    that you write a script, you connect it to the

5    account that you're using to do the trades and that

6    these trades are happening in an automated fashion.

7              So my question is, once the script is in

8    place and the trading is occurring, what do you do

9    next?

10        A.    I would say that you can observe the

11   performance of the strategy and analyze if it fits a

12   similar profile as when you were researching, if the

13   real results match historical performance.

14        Q.    And how do you conduct that oversight?

15        A.    You can conduct that by analyzing the

16   outputs of the strategy over time in various ways.

17        Q.    All right.  And would you be --

18   undertake -- would you personally be the one

19   undertaking each of these activities we've just

20   identified in the last few minutes?

21        A.    It's hard to generalize, but not

22   necessarily, given that I had a team to help.  So

23   it's not necessarily the case that I would have done

24   each task.

25        Q.    You would rely from time to time on your

1  team members to help you execute these tasks?

2       A.    That's correct.

3       Q.    With respect to the data that we just

4  discussed for the script, do you -- can an

5  individual, anybody, just get -- access this data?

6                 MS. GILBERT:  Objection, vague.

7                 You can answer if you understand the

8  question.

9       A.    I'm a little confused by the question.

10 BY MR. MOLINA:

11      Q.    Let me see if I can rephrase it.

12            Did you have special access to that data

13 when you were at VQR?

14      A.    The data is referring to the parameters I

15 described earlier; is that correct?  So order book

16 data, trade history data and --

17      Q.    That's --

18      A.    -- signals?

19      Q.    That's correct.

20      A.    I believe that a lot of this data was

21 accessible through public endpoints.

22      Q.    You said through public --

23      A.    Yeah, sorry, endpoints.  Like a --

24      Q.    What's a -- what's a public endpoint?

25      A.    A public endpoint, for example, could be

1   you have an exchange and the exchange makes data

2   publicly available to someone who is specifically

3   querying for that data.  So an example would be

4   that, let's say you wanted the trade history of like

5   Ethereum USDT from a certain exchange, you could

6   query that public endpoint and you would get the

7   historical trades for the period you described.  And

8   then you could take that data and put it into your

9   research process.

10          Q.    Other than this public data that

11  exchanges make available, was all the other data

12  that you were reviewing at that time publicly

13  available?

14          A.    I believe so.  There have been a variety

15  of inputs to these strategies, so it's difficult to

16  generalize.

17          Q.    Going back to the process.  So now we've

18  covered that you conducted oversight over the -- to

19  make sure that the strategy was performing the way

20  you hoped it would be.  What other steps did you

21  undertake as portfolio manager with respect to this

22  trading activity -- this algorithmic trading

23  activity?

24          A.    I believe that's the majority of duties.

25          Q.    Okay.  When you -- when you wanted to

1  withdraw the assets from this algorithmic trading

2  activity, how did you go about doing that?

3            MS. GILBERT:  Objection, assumes

4  facts.

5            You can answer.

6      A.    Can you restate that one more time?

7  BY MR. MOLINA:

8      Q.    Sure.  So let's assume that the --

9  your -- the strategy's done, you've done what you

10 set out to do.  How do you go about withdrawing the

11 assets from the strategy?

12           MS. GILBERT:  Same objection.

13     A.    I believe it's hard to generalize.

14 BY MR. MOLINA:

15     Q.    Could you give me an example?

16     A.    An example could be that -- for example,

17 Antonio could, as head of trading, like cut the

18 allocation of a strategy himself, right.  So that

19 would be an example of Antonio -- Antonio's action,

20 right, that superseded mine.  And if I -- like let's

21 say I wanted to change the allocation of a strategy,

22 I would then discuss it with Antonio.

23     Q.    Okay.  So once the decision's made to cut

24 the allocation, whether it's your decision or

25 Mr. Hallak's, my question is just, again, from a

1  granular level, how do you go about withdrawing the

2  assets from that trading activity?

3       A.    I'm unsure about the question because

4  it's very difficult to generalize.  Some exchanges

5  would have subaccounts they allow you to transfer.

6  Sometimes it would make sense to transfer assets

7  between one exchange through another.  So it's very

8  difficult to generalize because it's strategy

9  dependent.

10      Q.    You mentioned earlier that there were

11 segregated accounts.  Do you remember that?

12      A.    I believe so.

13      Q.    And we were talking at that point in --

14 specifically with respect to the prop trading versus

15 the VQR hedge fund trading.  Is that a fair summary

16 of your testimony?

17      A.    Yes.

18      Q.    Okay.  And could you just explain to me

19 how the segregated accounts worked at VQR while you

20 worked there?

21           MS. GILBERT:  Objection, vague.

22      A.    I'm not familiar with the entire process

23 of how they work.

24 BY MR. MOLINA:

25      Q.    What does a segregated account mean?

1    A.   My understanding is that there were

2  certain accounts with proprietary assets that

3  belonged to Qin and there were certain accounts that

4  belonged to the hedge fund.

5    Q.   Did those assets ever get commingled?

6    A.   I'm unsure.

7    Q.   It's possible?

8    A.   I'm unsure if they would have been.

9    Q.   Who oversaw that?

10        MS. GILBERT:  Objection, vague.

11  "That"?

12  BY MR. MOLINA:

13    Q.   Let me rephrase.

14        Who oversaw the integrity of the

15  segregated accounts?

16    A.   I believe it would have been Qin or

17  Antonio Hallak.

18    Q.   Would you have a role in that process?

19    A.   Sorry, can you clarify that, a role in

20  that process?

21    Q.   As portfolio manager -- as portfolio

22  manager, was one of your responsibilities ensuring

23  that the segregated accounts stayed segregated?

24    A.   I don't believe that was a specific duty.

25    Q.   When did you stop working for VQR?

1    A.    I believe it was at the end of 2020.

2    Q.    And just for the record, what were the

3  circumstances that led you to stop working at VQR?

4    A.    The circumstances were that it appears as

5  if the fund was shutting down.

6    Q.    And how did you make that assessment?

7    A.    There was an article that said that, I

8  remember, in December.

9    Q.    So you read an article that informed you

10 that the fund was shutting down.  Is that what

11 you're saying?

12   A.    I believe so.  I don't recall the

13 specific details, but I believe it was -- I believe

14 it was related to that.

15   Q.    And what did the article say -- or what

16 was -- let me rephrase that.

17         What was the reason the article gave for

18 the company shutting down?

19   A.    I don't remember the -- exactly what it

20 said.  I believe it was related to fraud.

21   Q.    Okay.  Specifically Mr. Qin's fraud?

22   A.    Yes.

23   Q.    Okay.  And what did you -- where did you

24 go after leaving VQR in December 2020?

25   A.    After that I started to do some -- some

1    advisory for projects.

2         Q.    Well, let me -- I'll get back to that in

3    a second.  But just to be clear, before leaving VQR

4    in December of 2020, what other job titles did you

5    hold other than those that we've already covered

6    today?

7         A.    I don't believe I had other job titles.

8         Q.    So when you left VQR in 2020, you just

9    said that you -- let me look exactly what you said.

10   You said you started doing some advisory for

11   projects.  What do you mean by that?

12        A.    Yeah, so advising technology projects.

13        Q.    In what capacity were you advising these

14   projects?

15        A.    Sorry, can you clarify?

16        Q.    Were you hired as a consultant to provide

17   this advice?

18        A.    I believe so.

19        Q.    Okay.  And could you describe the

20   projects that you were advising at this time?

21        A.    Yes.  So, for example, there have been

22   projects -- or, sorry, can you -- are you asking

23   about the duties for these projects?

24        Q.    I just want to understand.  We've been

25   going through your history starting from MIT through

```
 1    VQR in 2020.  I just want to understand, to finish
 2    the history, what roles did you hold for businesses
 3    or clients after you left VQR in 2020.
 4        A.    Okay.  So advisory meaning, for example,
 5    helping projects structure their token economics.
 6    That's an example of an advisory duty.
 7        Q.    Were you working for an employer to
 8    provide that service?
 9        A.    It would have been self-employed.
10        Q.    Okay.  So you were hired as an
11    independent contractor?
12        A.    I'm not sure about the exact agreement.
13        Q.    How many clients did you have for
14    these -- for this service that you were providing?
15        A.    I don't recall the exact amount.  I would
16    say a couple.
17        Q.    And how did you get involved in these
18    projects?
19        A.    Usually it would be through referrals.
20        Q.    And when did this start, specifically?
21        A.    So I --
22              MS. GILBERT:  Objection, asked and
23    answered.
24              You can answer.
25              THE WITNESS:  Okay.
```

1        A.    Yeah, so the advisory projects started

2   primarily 2021.  I believe I was an advisory for a

3   project in 2020.

4   BY MR. MOLINA:

5        Q.    Okay.  You said you believe you were an

6   advisor for a project in 2020.  Can you identify

7   what that project was?

8        A.    Yes.

9        Q.    What is it?

10        A.    I was an advisory for Injective.

11        Q.    What's Injective?

12        A.    Injective is a decentralized protocol

13   that is built on the Cosmos blockchain.  It's its

14   own chain on Cosmos.

15        Q.    Okay.  And we'll definitely get back to

16   Injective, but I just want to finalize this

17   timeline.  So I will ask you more about those --

18   about that consulting or that relationship.

19             But just going back to the post December

20   2020 timeline, can you just walk me through the

21   various professional roles that you've held since

22   that time frame?

23        A.    Yeah, the professional roles have been

24   related to the advisory functions I described.

25        Q.    You were self-employed with respect to

1    all those ventures?

2         A.    Yes.

3         Q.    Did you work with anyone else in

4    providing those services?

5         A.    I believe I have worked with --

6                   MS. GILBERT:  Object.  Vague.  Work

7    with.

8         A.    Yeah, just a variety of projects and

9    people throughout the course of -- it's been a

10   number of years now.

11   BY MR. MOLINA:

12        Q.    Okay.  What's Antifragile Management?

13        A.    Antifragile Management is a hedge fund

14   that I set up, I believe, in 2021.

15        Q.    Do you know what month?

16        A.    I don't recall the exact month.

17        Q.    And what was the purpose of this fund?

18        A.    The purpose of the fund was to deploy

19   various strategies in the digital asset space.

20        Q.    So strategies similar to the ones you

21   were conducting for VQR?

22                   MS. GILBERT:  Objection, vague.

23        A.    So the fund --

24                   MS. GILBERT:  Just give me a second

25   to make my objection.  Go ahead.

1    A.    Okay.  The fund never launched.

2  BY MR. MOLINA:

3    Q.    Why did the fund never launch?

4    A.    The fund never launched just due to not

5  being able to raise...

6    Q.    Not being able to raise what?

7    A.    Capital.

8    Q.    So you tried raising capital from

9  third-party investors?

10    A.    Well, I had the -- we had the intention

11  to do so.

12    Q.    Were you --

13    A.    However --

14    Q.    Go ahead.

15    A.    -- I was simultaneously doing advisory.

16  So it was just a lot, so I focused primarily on the

17  advisory.

18    Q.    The advisory work that you keep

19  referencing, this is what I'm talking about, you

20  know, post VQR advisory work.  Can you just walk

21  through what that work entails?

22    A.    Yeah.  The work would entail helping

23  projects, for example, with their token economics or

24  providing expertise related to trading and other

25  market insights.

1    Q.    Are you conducting trading as part of

2    this work?

3    A.    Occasionally there's trading.

4    Q.    Can you give me an example of an instance

5    where you traded as part of this advisory work that

6    you've described?

7    A.    An example would be with Injective.  So I

8    was advising them and also helping them with market

9    making.

10   Q.    Other than Injective, which again we'll

11   get back to, did you provide market making services

12   to any other client?

13   A.    I can't recall.

14   Q.    Prior to providing market making services

15   to Injective, did you -- had you ever provided

16   market making services to any client?

17   A.    I don't believe so.

18   Q.    So just to be clear, sitting here today

19   you're self-employed?

20   A.    Yes.

21   Q.    And you've been self-employed since

22   December 2020 when you left VQR?

23   A.    Yes.

24            MS. GILBERT:  Objection, asked and

25   answered.

```
 1   BY MR. MOLINA:

 2        Q.     Going back to Mr. Qin.  You're aware,

 3   Mr. Adaya, Mr. Qin has pleaded guilty to one count

 4   of securities fraud.  Yes?

 5        A.     I'm aware.

 6        Q.     And you're aware that he's been since

 7   sentenced to prison for seven years as -- for that

 8   infraction.  Yes?

 9        A.     I wasn't aware of the timeline.

10        Q.     What do you understand that Mr. Qin has

11   been accused of doing?

12                MS. GILBERT:  Objection, outside the

13   scope entirely.

14                MR. MOLINA:  You made your objection,

15   Ms. Gilbert.

16   BY MR. MOLINA:

17        Q.     You can answer, Mr. Adaya.

18        A.     Sorry, ask that one more time, please.

19        Q.     Sure.  Sitting here today, what's your

20   understanding that Mr. Qin -- as to what Mr. Qin is

21   accused of doing?

22        A.     I believe he engaged in fraud and

23   misrepresentation of strategies that he made.

24        Q.     Specifically what's your understanding as

25   to the fraud that he is accused of having committed?
```

1          MS. GILBERT:   Objection, calls for a

2     legal conclusion.

3     BY MR. MOLINA:

4          Q.    You may answer.

5          A.    I'm not sure specifically.  I believe

6     that it's related to the misrepresentation of his

7     arbitrage strategy.

8          Q.    Are you aware now that the funds that VQR

9     was trading through the prop portfolio consisted of

10    assets from Virgil Sigma?

11         A.    I'm not aware.

12              MS. GILBERT:   Objection, assumes

13    fact -- let me make my objections.  Assumes fact.

14    BY MR. MOLINA:

15         Q.    You can answer.

16         A.    I am not aware.

17         Q.    Do you believe sitting here today that

18    the fraud that Mr. Qin committed is related at all

19    to the proprietary trading that VQR was conducting?

20         A.    I'm unsure.

21              MS. GILBERT:   Same --

22    BY MR. MOLINA:

23         Q.    You mentioned just now market making.

24    Can you just explain from your perspective what

25    market making is?

1    A.    Yeah.  So market making is providing

2  liquidity to, for example, an asset or a token,

3  meaning that you're placing bids and offers

4  simultaneously in order to facilitate the liquidity

5  in the market.

6    Q.    And could you walk me through what a

7  market maker does in the digital asset space?

8              MS. GILBERT:  Objection, vague.

9    A.    I believe I just described it.

10  BY MR. MOLINA:

11    Q.    So let me ask I guess more -- well, let's

12  take a step back.

13              How does a market maker get compensated?

14    A.    A market maker could get compensated in a

15  variety of ways.  For example, the market maker can

16  make money off the spread between the bid and the

17  ask.

18    Q.    Okay.  Could you explain what that

19  spread -- how that spread's calculated?

20    A.    You can use various formulas.  A simple

21  formula could be taking a certain percentage depth

22  of a central limit order book and then calculating a

23  weighted average price from that percentile sort of

24  like bucket.  It really depends because it -- there

25  are a variety of ways to calculate what you just

1    asked.

2         Q.    Other than the spread, how else can a

3    market maker be compensated?

4         A.    A market maker can be compensated in a

5    variety of ways.  For example, they could also be

6    given tokens or they could have a special agreement.

7         Q.    What do you mean by be given tokens?

8         A.    For example, a market maker can negotiate

9    that they will -- that in order for providing

10   services, they can receive tokens.

11        Q.    So a token would be essentially a form of

12   a fee?

13        A.    I believe so.

14        Q.    Other than this token -- other than being

15   given tokens or making money off the spread, how

16   else can a market maker be compensated?

17        A.    I believe those are the main forms.

18        Q.    Can market makers make commissions?

19        A.    They can.

20        Q.    Can market makers take a cut of the

21   profits generated by the trading activity?

22        A.    Yes, they can.

23        Q.    What's the -- what's an industry standard

24   percentage?

25        A.    The industry standard percentage of --

1  are you asking specifically for market makers or,

2  for example, a strategy that it may not be related

3  to market making?

4       Q.    I'm asking about market making.

5       A.    So the -- this -- it could be -- it could

6  be pretty wide.  It really just depends on the

7  agreement.  I don't know if there's specifically an

8  industry standard.

9       Q.    Between zero and 10 percent?

10            MS. GILBERT:  Objection, asked and

11  answered.

12  BY MR. MOLINA:

13       Q.    You can answer.

14       A.    Yeah, it can just vary.  It's very hard

15  to generalize, like, what those percentages could

16  be.

17       Q.    Who decides what the percentages should

18  be?

19       A.    It's negotiated between the parties.

20       Q.    And by the parties you mean?

21       A.    The parties in -- like let's say an

22  example could be that a token comes to a market

23  maker and then the entity who issued the token or

24  the person who issued the token will negotiate with

25  the market maker.

1    Q.    All right.  What sort of tools do you

2  need or would one need to become a market maker?

3             MS. GILBERT:  Objection, vague.

4  BY MR. MOLINA:

5    Q.    You can answer.

6    A.    Yeah, with -- I would describe it

7  similarly to what I said before, where like you can

8  have some code that is executing what you have

9  algorithmically and you can even -- it really

10  depends, right, like you can even set things

11  manually if you anticipate that there's going to be

12  high variance in market activity.  It really

13  depends.  Like it's very hard to generalize.

14    Q.    So like, for instance, just as an

15  example, the algorithmic trading that we were

16  discussing about VQR, similar trading would be

17  undertaken by a market maker.  Yes?

18    A.    It depends on the strategy.  There are

19  various market making strategies that -- I think it

20  probably makes sense to describe everything as,

21  like, within quantitative trading you could have

22  various strategies, including market making,

23  including momentum strategies, including other

24  strategies.  But the same framework applies.

25    Q.    All right.  So the work that you are

1  doing as a market maker is similar to the work that

2  you did at VQR.  Yes?

3                    MS. GILBERT:  Objection,

4  mischaracterizes his prior testimony and vague.

5  BY MR. MOLINA:

6       Q.    You can ask -- you can answer the

7  question.

8                    MS. GILBERT:  Objection.

9       A.    Not necessarily.

10  BY MR. MOLINA:

11       Q.    What do you mean by not necessarily?

12       A.    Meaning that the strategies can be

13  substantially different.

14       Q.    They could also be similar?

15       A.    I -- they could be similar, but they

16  could also be -- it really depends on the strategy.

17  It's hard to cate- -- to characterize without an

18  example.

19       Q.    How many clients do you have right now --

20  let me rephrase that.

21                    For how many clients are you currently

22  providing market making services?

23       A.    Currently none.

24       Q.    When did you stop providing market making

25  services?

1        A.     I believe in 2022.

2        Q.     And you mentioned Injective.  Other than

3   Injective, is there any other clients for whom

4   you've provided market making services?

5        A.     I don't believe so.

6        Q.     Mr. Adaya, what is an ICO?

7        A.     An ICO refers to an initial coin

8   offering.

9        Q.     If you can just generally describe what

10   is the purpose of an initial coin offering?

11        A.     I would say that it is -- a parallel

12   would be like an IPO, right, where it's the first

13   time that you could trade a publicly traded equity.

14   And the parallel to that in digital assets would be

15   an ICO, where a coin is initially offered to -- like

16   on an exchange or on chain.  Depends.  Just the

17   first time the token is there basically.

18        Q.     Right.  So if a company wants to create a

19   token and offer it to the public, an ICO would be

20   one option available to that company, correct?

21        A.     I believe so.

22        Q.     Is the point of an ICO -- you know, by

23   offering to the public this token or this coin, is

24   the point in part to have the token gain value?

25        A.     I'm unsure.

1    Q.    What -- when a coin is offered -- the

2    instant it's being offered, it has no real value,

3    right?

4    A.    Not necessarily.

5    Q.    Value's determined by the market,

6    correct?

7    A.    I would say that within tokens there are

8    different frameworks.  So it's difficult to

9    characterize and to kind of parse the word "value"

10   in this context.

11   Q.    Well, why don't you explain to me, then,

12   what the -- other than offering -- why would a

13   company want to offer its tokens to the public?

14   A.    It could be due to governance.

15   Q.    What do you mean by that?

16   A.    So various decentralized projects highly

17   value the decentralization of their project so they

18   would have an ICO or -- not necessarily an ICO, but

19   an offering of their token so that various

20   participants can govern the platform or chain.

21   Q.    Let me just read what you said.

22            MR. MOLINA:  Could we go off the

23   record?  I'm having the same issue with my realtime.

24            THE VIDEOGRAPHER:  Okay.  Off the

25   record, 3:22 p.m.

1              (Recess taken from 3:22 p.m. to

2     3:37 p.m.)

3                    THE VIDEOGRAPHER:  Back on the

4     record, 3:37 p.m.

5     BY MR. MOLINA:

6         Q.    Mr. Adaya, what is the market price of a

7     coin the moment it's offered?

8                    MS. GILBERT:  Objection, vague.

9         A.    I'm not sure what that means.

10    BY MR. MOLINA:

11        Q.    When a company offers a coin through an

12    ICO, what is the starting market price of that coin?

13                   MS. GILBERT:  Same objection.

14        A.    It depends on the specifics of the ICO.

15    BY MR. MOLINA:

16        Q.    How so?

17        A.    The team or whoever's in charge can

18    decide to sell a coin in different tranches with

19    different prices or they could sell it all at one

20    price.  Like, it varies depending on many factors.

21    It's difficult to generalize what the starting price

22    would be or what the price could be.

23        Q.    Would you -- was it fair to say that the

24    object of offering a coin is to have that coin be

25    traded by third parties?

1    A.    I don't think so.  It depends.  As I said

2  earlier, there's governance that is often the case

3  for distribution of a token, which is not

4  necessarily related to trading.

5    Q.    But one of the objectives could be to

6  have the coin traded by third parties, correct?

7    A.    It could be.

8    Q.    And if a company employs the use of a

9  market maker -- well, let me ask you, do market

10  makers -- are market makers used to provide

11  liquidity for coins after a coin offer?

12            MS. GILBERT:  Objection to --

13    A.    They can be.

14            MS. GILBERT:  Asked and answered.

15            THE WITNESS:  Sorry.  Sorry.

16            MS. GILBERT:  That's fine.  Thank

17  you.  Asked and answered.  Go ahead.

18    A.    They could be.

19  BY MR. MOLINA:

20    Q.    And what would the benefit be from the

21  company's perspective of having a market maker

22  provide liquidity?

23            MS. GILBERT:  Same objection.

24    A.    I would say it's the same answer as

25  before.  Like the objectives are varied.

```
 1   BY MR. MOLINA:

 2        Q.    What is an IEO?

 3        A.    An IEO I believe stands for an initial

 4   exchange offering.

 5        Q.    And how does an initial exchange offering

 6   work, generally?

 7                    MS. GILBERT:  Objection, vague.

 8        A.    It depends on -- depends on the exchange.

 9   They set them up different ways.  I think it's

10   actually -- it would be difficult to generalize.

11   BY MR. MOLINA:

12        Q.    Let me ask it this way.  How is an IEO

13   different from an ICO?

14        A.    An IEO would involve an exchange, whereas

15   an ICO does not necessarily need to involve an

16   exchange.

17        Q.    And what are the benefits of having an

18   exchange involved in the offering of a token?

19                    MS. GILBERT:  Objection, vague.

20                    You can answer.

21        A.    The -- I would guess some of the benefits

22   would be the network effects, if the exchange has a

23   lot of traders on it.

24   BY MR. MOLINA:

25        Q.    Could you explain what you mean by
```

1    network effect?

2         A.    So, for example, if you had an IEO on an

3    exchange that had 100 users versus an exchange who

4    had hundreds of thousands of users, then there could

5    be substantially more network effects in terms of

6    branding or other characteristics, meaning that

7    there's just more eyeballs on it.

8         Q.    And what's the benefit of having more

9    eyeballs on it?

10        A.    It could be awareness of the project.

11        Q.    And what are some of the considerations

12   in choosing the exchange through which to have an

13   initial exchange offering?

14              MS. GILBERT:  Objection, assumes

15   facts, vague.  Sorry, maybe I misheard it.  Could

16   you ask that again, please?

17              MR. MOLINA:  If the witness

18   understands, he can answer.

19        A.    You asked what are the -- like the

20   criteria for it?

21   BY MR. MOLINA:

22        Q.    Yeah.  What are the criteria for choosing

23   an exchange when undertaking an IEO?

24        A.    I'm not too sure.  I don't have an

25   immediate answer.  Not too sure what the criteria

1    would be.

2         Q.    You mentioned earlier that there's a

3    variety of exchanges through which trading of

4    digital assets can take place, correct?

5         A.    I believe so.

6         Q.    And in an initial exchange offering, I

7    think you said, correct me if I'm misrepresenting

8    it, but you said that it -- it's done through one

9    exchange, correct?

10                   MS. GILBERT:  Objection.  It will

11   speak for itself.  Or mischaracterizes.

12   BY MR. MOLINA:

13        Q.    You can answer.

14        A.    I'm not sure.  I believe that

15   historically there have been some coins that are on

16   multiple exchanges.  I don't know actually.

17        Q.    All right.  Other than the network effect

18   that you described, what are some benefits of an IEO

19   versus an ICO?

20        A.    The network effect I would say is the

21   primary factor or the primary parameter.  I would --

22   I can't immediately think of others.

23        Q.    Have you ever worked on an ICO?

24                   MS. GILBERT:  Objection, vague.

25        A.    I don't believe I've worked on an ICO.

1    BY MR. MOLINA:

2         Q.    Have you ever invested personally in a

3    token that was offered through an ICO?

4         A.    I believe I may have.

5         Q.    Have you ever worked or provided -- or

6    have you ever been involved in an initial exchange

7    offering?

8         A.    I believe that Injective did an initial

9    exchange offering with Binance.

10        Q.    Is that the only initial exchange

11   offering in which you were involved?

12        A.    I believe so.

13        Q.    What are the benefits of a token being

14   offered on an exchange versus on a chain?

15        A.    I believe it's the same answer as before.

16        Q.    You're aware that -- well, let me ask

17   you.  What -- are -- from your perspective sitting

18   here today, are initial coin offerings happening in

19   the industry?

20        A.    I don't believe so.  I believe that --

21   no.

22        Q.    And why, from your perspective, are

23   initial coin offerings no longer happening in the

24   industry?

25        A.    I'm unsure.

1    Q.    Does it have to do with the fact that

2    there have been enforcement actions from the

3    Securities and Exchange Commission with respect to

4    ICOs?

5              MS. GILBERT:  Objection, calls for a

6    legal conclusion.

7    BY MR. MOLINA:

8    Q.    You can answer.

9    A.    Can you repeat the question?

10   Q.    Could it be, again, from your perspective

11   sitting here today, that one of the reasons that

12   the -- that ICOs are no longer happening in the

13   industry, could it be that it's because the SEC has

14   taken positions that those offerings could be in

15   violation of the securities laws?

16             MS. GILBERT:  Same objection and

17   assumes facts.

18   BY MR. MOLINA:

19   Q.    You can answer.

20   A.    It may be.

21   Q.    You're aware, as someone who's been in

22   this industry for years, that companies involved in

23   ICOs have been subject to enforcement actions from

24   the SEC, correct?

25   A.    I believe I have seen some headlines

1  regarding it.

2      Q.    Are IEOs happening in the industry today

3  from your perspective?

4      A.    I believe that they have happened in the

5  industry more recently.

6      Q.    Isn't one of the benefits of an IEO that

7  there's less regulatory scrutiny?

8      A.    I'm unsure.

9              THE WITNESS:  But I think Aviva's

10  muted.

11              MS. GILBERT:  I'm sorry.  I

12  apologize.  I was muted.  I was objecting that that

13  assumes facts and is argumentative.

14  BY MR. MOLINA:

15      Q.    What was your answer, Mr. Adaya?

16      A.    Can you repeat the question just so I

17  understand it again?

18      Q.    You just told me ICOs are no longer

19  happening in the industry.  You also told me that

20  you believe that IEOs are happening in the industry.

21  We discussed that one of the reasons that ICOs may

22  not be happening is due to regulatory scrutiny.

23              So my question is, from your perspective

24  as someone in the industry, is one of the benefits

25  of an IEO versus an ICO that there's less regulatory

1   scrutiny?

2              MS. GILBERT:   Same objections.

3       A.     Yeah, I'm unsure how to comment on that.

4   I'm -- I wouldn't say I'm --

5   BY MR. MOLINA:

6       Q.     What part are you not -- what part are

7   you not sure about?

8       A.     You asked if there's less regulatory

9   scrutiny, so I don't think I've necessarily studied

10  that in depth.

11      Q.     We'll get back to this.  Let me ask you,

12  who's Eric Chen?

13      A.     Eric Chen is the founder of Injective.

14      Q.     And how did you meet Mr. Chen?

15      A.     I believe I've -- I met him through the

16  industry, just the broader crypto industry.

17      Q.     Could you give me a year where you two --

18  the year that you two met?

19      A.     I believe -- I believe -- if I had to

20  guess, I believe 2018.

21      Q.     Okay.  So you said you met him through

22  the industry.  Can you be a little more specific

23  what you mean by that?

24      A.     Just meaning that he went to various

25  digital asset events and I believe I met him through

1    these events.

2          Q.    And that was roughly in 2018.  Yes?

3          A.    I believe so.

4          Q.    And at the time that you met Mr. Chen,

5    did he -- was he affiliated at all with Injective

6    Labs?

7          A.    My understanding was that he was

8    affiliated with Binance Labs.  I don't know in

9    exactly what capacity.

10         Q.    I think you just called it Binance Labs

11   or finance labs?

12         A.    Sorry, what was the -- I --

13         Q.    I asked about -- I asked if when you met

14   Mr. Chen if he was affiliated with Injective Labs.

15         A.    Oh, okay, sorry.  Injective Labs.  Yes,

16   he was.

17         Q.    Okay.  What is Injective Labs?

18         A.    Injective Labs, I believe, is the parent

19   company of sort of Injective, which is the

20   Cosmos-based blockchain.  I'm not necessarily

21   familiar with their legal structure, so that's my

22   best guess.

23         Q.    And what's your understanding of

24   Mr. Chen's affiliation with Injective Labs?

25         A.    Injective -- or sorry.  Eric Chen is the

1    founder of Injective and likely Injective Labs, if

2    that's the formal name.

3         Q.    And did you provide any services to

4    Injective Labs?

5                   MS. GILBERT:  Asked and answered.

6                   You can answer.

7         A.    I believe so.  The Injective-affiliated

8    entities.

9    BY MR. MOLINA:

10        Q.    Okay.  And when did that professional

11   relationship begin?

12        A.    I don't remember specifically, but I

13   believe it was in 2020.

14        Q.    So when -- so prior to that moment in

15   2020 -- so from 2018 when you first met Mr. Chen to

16   2020, you had not provided any professional services

17   to Injective Labs, correct?

18                   MS. GILBERT:  Asked and answered.

19        A.    You're saying 2018-2019?

20   BY MR. MOLINA:

21        Q.    That's right.

22        A.    Yeah, I did not.

23        Q.    Okay.  Did you provide any services to

24   Mr. Chen personally in 2018 or 2019?

25        A.    I don't believe so.

1    Q.    And in what capacity were you providing

2    services to Injective Labs in 2020?

3    A.    I believe that there is a market making

4    agreement where I was providing liquidity to the INJ

5    token.

6    Q.    Okay.  So just so we have the timeline,

7    the injective token was offered to the public in

8    October 2020.  Is that fair to say?

9    A.    I don't recall the exact points, but I

10   believe it was around that time, late 2020.

11            MS. GILBERT:  You need to give me a

12   minute to make my objection.  Don't forget.

13            THE WITNESS:  Oh, sorry, sorry.

14            MS. GILBERT:  Objection, assumes

15   facts.

16   BY MR. MOLINA:

17   Q.    Okay.  So when you were brought on to

18   Injective Labs under this agreement that you just

19   referenced in 2020, it was with an eye towards

20   providing liquidity for the token that would be

21   offered in late 2020.  Is that fair to say?

22   A.    Sorry, can you say that one more time

23   about the -- can you just say it one more time?

24   Q.    Yeah.  I'm just trying to understand what

25   it is that you were brought on to do.  You mentioned

1  to provide liquidity for the token.  You also

2  testified that that token was not issued till late

3  2020.  So I'm just trying to understand when you

4  were brought on in 2020 for Injective Labs, what it

5  is that you were doing before the token was issued.

6              MS. GILBERT:  Objection --

7       A.    Yeah.

8              MS. GILBERT:  -- that

9  mischaracterizes his testimony.

10             You can answer.

11      A.    Yes.  So I -- I believe, if I recall

12  correctly, that there was market making, and then

13  there was also advisory related to their chain and

14  technology itself.  But it wasn't not necessarily

15  limited to market making and...

16  BY MR. MOLINA:

17      Q.    So help me understand.  You were not an

18  employee of Injective Labs, correct?

19             MS. GILBERT:  Objection, asked and

20  answered.

21  BY MR. MOLINA:

22      Q.    You can answer.

23      A.    No.

24      Q.    And when you started providing these

25  services to Injective Labs in 2020, you were a

1    full-time employee of VQR, correct?

2         A.    That is correct.

3         Q.    So you were doing this consulting work

4    for Injective Labs on top of or in addition to the

5    work that you were performing at VQR.  Yes?

6              MS. GILBERT:  Asked and answered.

7         A.    That's correct.

8    BY MR. MOLINA:

9         Q.    Why -- just walk me through the

10   circumstances that led you to take on this

11   consulting work for Injective Labs.

12        A.    The circumstances for market making?

13        Q.    I'm asking just the -- when you first

14   started working for them, which you said it was

15   sometime in 2020, what were the circumstances that

16   led you to start working for them?

17        A.    I don't necessarily recall something

18   specific.  I think it's the fact that they're

19   building -- they're building out like an impressive

20   chain that is on Cosmos, so it's something that

21   interested me.

22        Q.    Did you reach out to Injective Labs to

23   become involved?

24        A.    I don't recall specifically.  I don't

25   recall specifically the initial sort of like

1    engagement circumstances.

2         Q.    Was there a job interview?

3         A.    I don't believe so.

4         Q.    Did you have to submit some sort of

5    materials about your capabilities prior to being

6    engaged?

7         A.    I believe that Eric Chen was familiar

8    with my strategies performance historically.

9         Q.    And how do you believe that he was aware

10   of that?

11        A.    I believe that because -- I believe we've

12   discussed it before.

13        Q.    When you say "we," you mean you and

14   Mr. Chen?

15        A.    Yes.

16        Q.    And just so we're clear, this is the only

17   time where you were taking on consulting work

18   separate from VQR while you were employed at VQR?

19        A.    I believe so, yes.

20        Q.    Okay.  So when -- so we've established, I

21   think, that in late 2020 there was the INJ IEO,

22   correct?

23        A.    Yes.

24        Q.    And you've testified that you were -- in

25   addition to the other work that you were providing,

 1   you were being asked specifically to provide market

 2   making services with -- related to that token that

 3   was going to be offered, correct?

 4                    MS. GILBERT:  Objection,

 5   mischaracterizes.

 6                    You can answer.

 7        A.    In, yes, providing -- or, sorry --

 8   providing liquidity to INJ.

 9   BY MR. MOLINA:

10        Q.    Okay.  And you've also told us that

11   you -- prior to this market making liquidity service

12   that you were providing to -- that you provided to

13   Injective, prior to that you had no prior market

14   making professional experience, correct?

15                    MS. GILBERT:  Objection,

16   mischaracterizes prior testimony.

17        A.    I don't believe that's correct.

18   BY MR. MOLINA:

19        Q.    Remember when I asked you earlier, other

20   than Injective Labs, have you provided market making

21   services with respect -- to any other client and you

22   told me no?

23        A.    Yeah, but I -- I think what I -- like

24   within quantitative trading, as I said before,

25   there's a variety of subsectors, and market making

1  heavily overlapped with a lot of quantitative

2  trading strategies in which I do have significant

3  experience with.

4       Q.    And that quantitative trading that you

5  described, that experience came from VQR, correct?

6       A.    Not necessarily VQR.  I've also done

7  trading in my prior roles.

8       Q.    We've gone through your roles

9  exhaustively this morning -- or earlier today.

10 Could you just be clear, specific, as to which one

11 of the roles that we've described that you were

12 providing market making or -- yeah, market making

13 services?

14            MS. GILBERT:  Mis -- objection,

15 mischaracterizes.

16 BY MR. MOLINA:

17      Q.    Go ahead.

18      A.    So my understanding is that the umbrella

19 of quantitative trading includes market making.

20 Market making is a specific manifestation of

21 quantitative trading.  So one can simultaneously be

22 experiencing quantitative trading and inherit the

23 capabilities of market making, while not necessarily

24 having a formal track record of market making in the

25 prior years.

1      Q.    Right.   But I guess my question is more

2    general.   We went through all your roles since you

3    left MIT in 2014 and we talked about Mirarc, we

4    talked about the other one's alluding -- escaping

5    me.

6      A.    Yeah, Motion.

7      Q.    Motion.   And I asked you if you were

8    doing quantitative trading for Mirarc and you said

9    no.   Did I -- am I recalling your testimony

10   correctly?

11              MS. GILBERT:   Objection,

12   mischaracterizes.

13     A.    There is quantitative research that was

14   done.

15   BY MR. MOLINA:

16     Q.    All right.   But not trading, correct?

17     A.    No.

18     Q.    And then we talked about Motion.   And I

19   asked you the same question, were you involved in

20   trading -- any trading activity during your stint at

21   Motion and you said no.   Am I remembering your

22   testimony correctly?

23              MS. GILBERT:   Same objection.

24     A.    Yes.

25

```
 1   BY MR. MOLINA:
 2        Q.    Okay.  So your quantitative trading
 3   professional experience came from VQR, correct?
 4                  MS. GILBERT:  Objection --
 5        A.    Yes.
 6                  MS. GILBERT:  -- mischaracterizes --
 7                  THE WITNESS:  Sorry.  Go ahead.
 8                  MS. GILBERT:  You can answer.
 9        A.    Some of the experience came from VQR,
10   some independent.
11   BY MR. MOLINA:
12        Q.    The independent experience that you're
13   referencing here, were you -- is that independent
14   experience that you're characterizing now, were you
15   being paid by a client to perform that trade
16   activity?
17        A.    When I refer to independent, meaning
18   before I joined VQR I was already familiar with
19   providing such strategies.
20        Q.    Right.  But we discussed earlier today
21   and I asked you, other than the positions at Mirarc
22   and Motion, I asked you if you were -- if you had
23   any other professional role and you said no.  Am I
24   recalling your testimony correctly?
25        A.    That is correct.  There's no professional
```

1   experience.  However, there is experience.

2        Q.   Right.  So -- okay.  So when you -- when

3   you were -- so you don't remember if -- who

4   contacted whom with respect to your professional

5   relationship with Injective?

6        A.   I don't recall specifically.

7        Q.   Do you recall what representations you

8   made to Injective about your capabilities as a

9   market maker?

10              MS. GILBERT:  Objection, assumes

11   facts.

12              You can answer.

13        A.   I don't recall specifically.

14   BY MR. MOLINA:

15        Q.   So when you were at -- when you were

16   ultimately tasked with this providing liquidity for

17   the INJ token, what were the reasons for your -- for

18   your -- for your being selected to perform those

19   activities?

20              MS. GILBERT:  Objection, asked and

21   answered.

22        A.   The qualifications in quantitative

23   trading.

24   BY MR. MOLINA:

25        Q.   Do you remember communicating those

1   qualifications to anyone at Injective Labs?

2              MS. GILBERT:  Same objections.

3       A.    I don't recall specifically.

4   BY MR. MOLINA:

5       Q.    When you say provide liquidity, let's

6   break that -- just how we did earlier with the

7   quantitative trading, the algorithmic trading, let's

8   break down granular level what providing liquidity

9   entails.  So can you help me -- help walk me through

10  the step by steps of how you went about providing

11  liquidity for the INJ token?

12      A.    Yes.

13             MS. GILBERT:  Objection, asked and

14  answered.

15             Go ahead.

16      A.    I don't think it's -- it's not

17  substantially different than what I described

18  earlier regarding quantitative trading.  The process

19  is the same.

20  BY MR. MOLINA:

21      Q.    So let's just break it down.  So you

22  would have to -- so for the -- asking specifically

23  now about the INJ venture.  So very specifically

24  about that.

25             You set up -- or you would need an

 1  account at the exchange through which this token was

 2  being offered, correct?

 3       A.    That's correct.

 4       Q.    And we talked earlier about scripts.  You

 5  would need to have a script that was tied to this

 6  account, correct?

 7       A.    That's correct.

 8       Q.    And this script entailed parameters that

 9  correlated with the strategy you were executing,

10  correct?

11       A.    That's correct.

12       Q.    And these parameters were inputted by

13  yourself, correct?

14       A.    I don't recall the specifics of parameter

15  selection.

16       Q.    So you -- you had other people help you

17  with the script, correct?

18               MS. GILBERT:  Objection,

19  mischaracterizes.

20               You can answer.

21       A.    Sorry.  Yeah, not necessarily.

22  BY MR. MOLINA:

23       Q.    Okay.  Back to the step by step.  So you

24  have the script, you have the parameters, those get

25  tied to the account, and then you would oversee the

1  trading that -- the algorithmic trading that would

2  occur under that account.  Yes?

3            MS. GILBERT:  Objection, vague and

4  assumes facts and mischaracterizes.

5  BY MR. MOLINA:

6       Q.    You can answer.

7       A.    I'm a little confused by the question.

8       Q.    So we're going through the step-by-step.

9  And in the past when we talked about algorithmic

10 training you told me that after the script was tied

11 to the account, that you would conduct oversight to

12 make sure that the trades were conducted in

13 accordance with your strategy.  Do you remember

14 that?

15      A.    Uh-huh.

16      Q.    Okay.  Is that a yes?

17      A.    Yes.

18      Q.    So my question is, we talked about that

19 with respect to the algorithmic trading.  My

20 question is specific to this Injective relationship.

21 When you were conducting liquidity -- or you were

22 providing liquidity for this token, would you

23 conduct similar oversight over the account that was

24 being used for the trading?

25      A.    I believe -- I believe so.  And I believe

1   that Antonio Hallak also had oversight over it.

2        Q.    All right.  You used VQR to facilitate

3   this market making that you were conducting on

4   behalf of Injective Labs, correct?

5        A.    That is correct.

6        Q.    VQR was responsible for setting up the

7   account at Binance that was used to conduct this

8   market making, correct?

9              MS. GILBERT:  Objection, assumes

10  facts --

11       A.    I believe --

12             MS. GILBERT:  -- assumes facts.

13       A.    I believe so.

14  BY MR. MOLINA:

15       Q.    And VQR was responsible for creating the

16  script that was used with respect to this market

17  making, correct?

18             MS. GILBERT:  Same objection and

19  vague.

20       A.    I don't believe necessarily that VQR was

21  responsible.

22  BY MR. MOLINA:

23       Q.    The script was written by Mr. Pandit,

24  wasn't it?

25       A.    I don't recall specifically.

1    Q.    Well, we can take a look.

2            MR. MOLINA:  Why don't we put up --

3    why don't we put up -- Ken, why don't we put up the

4    document that I think has been identified as tab 8.

5            THE VIDEOGRAPHER:  Okay.  Do you want

6    to mark this as Exhibit 1?

7            MR. MOLINA:  I do.

8            (Deposition Exhibit 1 marked for

9    identification.)

10   BY MR. MOLINA:

11   Q.    Mr. Adaya, this -- you're looking at

12   what's been marked as Exhibit 1.

13            MR. MOLINA:  And by the way, just for

14   the record, I think we should call it Adaya 1 just

15   to -- for sake of clarity.

16   BY MR. MOLINA:

17   Q.    Do you recognize this document?

18   A.    Not immediately.  Am I able to take

19   control of the document?

20   Q.    My understanding is you are.

21   A.    I believe it's lagging pretty heavily.

22   Can't seem to move it.  Okay.

23   Q.    Do these appear to be the -- what you're

24   looking at, does it appear to be chats between you

25   and Mr. Pandit?

1    A.    I believe so.  Though I don't necessarily

2  recall the conversation specifically.

3    Q.    So if you go to the very top, you'll see

4  it says -- it'll have a date, you know, the very top

5  of the page 1.  You've got to go up a little

6  further.

7         Okay.  Do you see at the top it says 19

8  October 2020?

9    A.    Yes, I see that.

10   Q.    Okay.  And then do you see that

11 there's -- underneath that there's various chats

12 with different time stamps?

13   A.    Yes, I see that.

14   Q.    Do you see that the chats are between an

15 individual identified as NA?  Do you see that?

16   A.    I see it.

17   Q.    Does NA refer to you?

18   A.    I believe it does, though I would like to

19 take a look at more of the context.

20   Q.    Sure.  You have control.

21         (Witness reviews document.)

22 BY MR. MOLINA:

23   Q.    Just for the record --

24   A.    It's a bit lengthy.

25   Q.    Yeah.  We're going to be showing you

1   specific chats and you could look at, you know,

2   before and after just to get your bearings straight.

3   We're not going to go through all 55 pages of chats,

4   otherwise I think Ms. Gilbert might miss her

5   appointment.  So we will go through this in more

6   streamlined fashion, but I just want to state, just

7   for the record, the R -- the individual that's

8   identified by an R in this chat.  Do you see that?

9        A.    Yes.

10       Q.    Is that individual -- does that refer to

11  Rohan Pandit?

12       A.    I believe it does.

13            MS. GILBERT:  Yeah, I would just like

14  to note for the record we didn't receive any

15  documents in advance, so we're limited in our

16  ability to -- or Mr. Adaya is naturally limited in

17  his ability to --

18            THE WITNESS:  Yes.

19            MS. GILBERT:  -- assess and we'll

20  rely on your characterizations.

21  BY MR. MOLINA:

22       Q.    All right.  If you could scroll to the --

23  if you go to the top -- you know, you can toggle

24  through the pages.  If you go to page 6 of 55 in the

25  PDF, please.  Okay.  If you scroll down to lower in

1  this page, in this page 6, you'll see there's some

2  text that's highlighted.

3      A.    My control is very laggy.  Would it be

4  possible for someone else to control it?

5             MR. MOLINA:  Ken, is it possible for

6  you to take over?

7             MS. GILBERT:  We also received a link

8  in advance.  It's not laggy for me through that

9  link.  So perhaps that would be an advisable

10  alternative.

11  BY MR. MOLINA:

12      Q.    Okay.  Do you see the highlighted text on

13  this page, Mr. Adaya?

14      A.    Yes, I see them.

15      Q.    Do you see that you are asking

16  Mr. Pandit:  How is the INJ script btw?

17             Do you see that?

18      A.    Yes, I see that.

19      Q.    Okay.  And then do you see that he

20  responds it's not done yet but you should have the

21  test version ready by tonight?

22      A.    I see it.

23      Q.    And then you respond:  Let's prioritize

24  this actually.  IEO is actually 20th so tomorrow.

25  Eric just updated me.

 1            And then he responded with:  Ah wow okay
 2    will focus on that.
 3            And at the end of this you say:  Yes, INJ
 4    is more important now.
 5            Do you see that?
 6        A.    Yes.
 7        Q.    So Mr. Pandit was involved in writing the
 8    script for the market making that you were providing
 9    with respect to Injective Labs, correct?
10            MS. GILBERT:  Objection, document
11    speaks for itself.
12            You can answer.
13        A.    I believe so.
14    BY MR. MOLINA:
15        Q.    Okay.  And just for the record, was
16    Mr. Pandit at that time employed by Injective Labs?
17            MS. GILBERT:  Objection, calls for a
18    legal conclusion as to employment.
19            You can answer if you -- if you
20    understand the question.
21    BY MR. MOLINA:
22        Q.    Let me rephrase.
23            As far as you know, is Mr. Pandit in any
24    way involved with Injective Labs in any professional
25    capacity?

1      A.     I don't believe so.

2      Q.     At that time Mr. Pandit worked for VQR,

3  correct?

4      A.     That is correct.  Sorry, what was that

5  date again?  October --

6      Q.     19, 2020.

7      A.     Okay.

8      Q.     If you go to page 11, there's going to be

9  another set of highlighted text.  This time you see

10  the date is October 21.  Do you see that?

11      A.     Yes.

12      Q.     Okay.  Do you see that in the -- if you

13  follow the highlighted text, it shows that

14  Mr. Pandit is providing the percent of INJ tokens,

15  then limit orders and is providing a series of

16  numbers.  Do you see that part?

17      A.     Yes, I see it.

18      Q.     Okay.  So what's -- what's -- what do

19  those numbers mean to you?

20      A.     The numbers mean the percentage of

21  injected inventory that is placed above the best bid

22  on a central limit order book.  So, for example,

23  25 percent of the tokens would be placed 1 percent

24  above the best bid on an order book.

25      Q.     And are these -- are these parameters

 1   that form part of the script?

 2        A.    I don't have the script in front of me,

 3   so it's difficult to recall.

 4        Q.    But you see that Mr. Pandit asks you:

 5   Could you explain the parameters here again?

 6              And then later you respond yes, and then

 7   you give an answer similar to what you just told us

 8   on the record?

 9              MS. GILBERT:  Objection,

10   mischaracterizes the document and his prior

11   testimony.

12              You can answer.

13        A.    Please repeat the question.

14   BY MR. MOLINA:

15        Q.    I'm just trying to -- if this -- you said

16   you couldn't recall and I'm just asking if now the

17   text that -- if you read the rest of the highlighted

18   text on this page, does that refresh your

19   recollection as to whether those series of numbers

20   are parameters that went into the script that you

21   guys were preparing for Injective Labs?

22        A.    I think I would need to study the

23   document a little bit more to be certain, just given

24   that it's new.

25        Q.    Okay.  You can read the page.  Let us

1   know when you're ready.

2                   (Witness reviews document.)

3       A.    The screen is still frozen for me when I

4   press the down button.

5   BY MR. MOLINA:

6       Q.    Okay.

7                   MR. MOLINA:  Ken, I don't -- is this

8   something that you can maybe control and --

9       A.    I -- sorry.  Please go ahead.

10  BY MR. MOLINA:

11      Q.    No, go ahead.

12                  THE VIDEOGRAPHER:  Yeah, I'm thinking

13  it's just a lag through the system.  So that's

14  what's going on here.  Whichever way you want me to

15  go, I can control -- or I see you moving the --

16                  THE WITNESS:  Oh, okay.  Yeah.  Can

17  you please -- I'm attempting to scroll down, but

18  it's -- it takes forever.

19                  (Witness reviews document.)

20      A.    Okay.  I've read a bit more.

21  BY MR. MOLINA:

22      Q.    So now does this refresh your

23  recollection as to what -- as to whether these

24  inputs that are being discussed here were parameters

25  that were used in the INJ script?

1    A.    I believe that they may have been

2  parameters.

3    Q.    Okay.  We mentioned -- we talked earlier

4  about parameters and we talked about the research

5  that went into devising those parameters.  Do you

6  remember that, Mr. Adaya?

7    A.    Yes.

8    Q.    And you mentioned that there's a variety

9  of ways to conduct this research including looking

10 at publicly available information.  Do you remember

11 that?

12   A.    I believe so, yeah.

13   Q.    Do you recall how -- what research you

14 conducted to obtain these parameters?

15                 MS. GILBERT:  Objection, assumes

16 facts.

17   A.    I don't recall specifically.

18 BY MR. MOLINA:

19   Q.    Were you the one that conducted the

20 research?

21                 MS. GILBERT:  Same objection.

22   A.    I don't recall specifically as it's many

23 years.

24 BY MR. MOLINA:

25   Q.    So it could have been someone other than

1    yourself?

2              MS. GILBERT:   Same objection.

3              You can answer.

4         A.    Potentially.

5    BY MR. MOLINA:

6         Q.    Did you tell Injective Labs that you were

7    going to be utilizing VQR to perform this market

8    making service?

9         A.    I don't remember specifically.

10        Q.    Do you have any reason to believe that

11   you wouldn't have told Injective Labs sitting here

12   today?

13        A.    I don't recall specifically.

14        Q.    Was VQR [sic] aware of your employment at

15   VQR during this time?

16             MS. GILBERT:   Objection, vague,

17   possibly just misstated.

18   BY MR. MOLINA:

19        Q.    You can answer.

20        A.    Repeat, please.

21        Q.    Was Mr. Chen aware that you worked at VQR

22   during this time?

23        A.    I believe he was.

24        Q.    Did you ever tell Mr. Chen that you were

25   going to conduct this market making activity using

1  your own infrastructure separate and apart from VQR?
2          MS. GILBERT:  Objection, assumes
3  facts and vague.
4      A.    I don't recall.
5          MR. MOLINA:  You can take down the
6  document.  Thank you.
7  BY MR. MOLINA:
8      Q.    So with respect to this particular market
9  making that you're providing for Injective Labs, we
10  talked about setting up an account to conduct the
11  trading.  This account would have been at Binance,
12  correct?
13     A.    I believe so.
14     Q.    Because the IEO for Injective Labs was
15  conducted through Binance, correct?
16     A.    That's my recollection, that it was a
17  Binance IEO.
18     Q.    Do you happen to know why Injective Labs
19  wanted to offer this token through Binance?
20     A.    I'm not sure.
21     Q.    Were you -- did you recommend Injective
22  Labs as you were providing consulting -- as part of
23  your consulting did you recommend that Injective
24  Labs use Binance?
25     A.    I don't believe I recommended

1   specifically.

2       Q.    What's your understanding of Binance's

3   reputation in the industry?

4       A.    My understanding of Binance's reputation

5   in the industry is that it has the largest user base

6   amongst centralized exchanges, and it also offers

7   the deepest amount of liquidity across spot and

8   derivative markets.

9       Q.    Other than that, what else are you --

10  what else do you understand to be part of Binance's

11  reputation?

12      A.    I believe those are the main

13  characteristics.

14      Q.    To set up an account at Binance you

15  needed Mr. Hallak's permission, correct?

16            MS. GILBERT:  Objection, vague.

17            You can answer.

18      A.    I believe so.

19  BY MR. MOLINA:

20      Q.    All right.  And I'm -- of course I'm

21  talking about when you were at VQR.  So with respect

22  to -- all these questions are going to be with

23  respect to this Injective IEO, just so we're clear,

24  so...

25            With respect to this Injective IEO, the

1    account you set up, what we established at Binance,

2    and I think your testimony was that you obtained

3    Mr. Hallak's permission to open this account,

4    correct?

5          A.    Yes.

6          Q.    What did you tell Mr. Hallak generally

7    about this entire project?

8                    MS. GILBERT:  Objection, vague.

9          A.    I don't --

10                   MS. GILBERT:  Go ahead.

11         A.    I don't recall the specific conversation.

12   BY MR. MOLINA:

13         Q.    Did you tell him this is something you

14   are doing for Injective Labs as a market maker?

15         A.    I believe I did.

16         Q.    Did you request permission to use VQR

17   infrastructure to conduct this market making?

18         A.    I believe I did.

19         Q.    And did he give you that?  Did he green

20   light this activity?

21         A.    Yes, he did.

22         Q.    Did he -- how did he -- how did he

23   communicate this -- his authorization?

24         A.    I don't recall how he communicated.

25         Q.    Was it in writing?

```
 1          A.     I don't recall.

 2                        MS. GILBERT:   Objection --

 3     BY MR. MOLINA:

 4          Q.     I'm sorry, was it in writing?

 5          A.     I don't recall.

 6          Q.     Did you do any other -- other than this

 7     Injective IEO, putting that to the side, during your

 8     employment at VQR, did you conduct any other side

 9     work for -- using VQR infrastructure?

10                        MS. GILBERT:   Asked and answered.

11          A.     Sorry, can you ask that again?

12     BY MR. MOLINA:

13          Q.     Yeah.  Other than this Injective IEO, had

14     you ever conducted work that was outside of the

15     scope of your VQR employment while using VQR

16     infrastructure?

17                        MS. GILBERT:   Same objection.

18          A.     I'm not sure what you mean by the VQR

19     scope.

20     BY MR. MOLINA:

21          Q.     Well, let me ask you.  Did you -- did you

22     believe at the time that Injective -- that this

23     Injective IEO was part of your scope of work at VQR?

24          A.     No, because I had requested separate

25     permission from Antonio.
```

1    Q.    Right.  So my question is, had --

2  other -- prior to -- other than this project, had

3  you ever requested permission from Antonio to

4  conduct work that's outside of your scope of work at

5  VQR?

6    A.    I believe that there are a variety of

7  strategies that I have tested, but it's unclear to

8  me what VQR scope means.

9    Q.    Well, let me just ask you.  Had you

10  ever -- other than this instance, had you ever

11  requested permission from Mr. Hallak to use VQR

12  infrastructure for any other project?

13    A.    I don't recall requesting permission from

14  Mr. Hallak.

15    Q.    So as far as you know, this was the first

16  and only time that you did so?

17                MS. GILBERT:  Asked and answered.

18    A.    I believe so.

19  BY MR. MOLINA:

20    Q.    Did Mr. Hallak ever ask to have a portion

21  of your proceeds go to VQR?

22    A.    He did not.

23    Q.    Did Mr. Hallak ever ask to have a portion

24  of your proceeds go to him personally?

25    A.    He did not.

1    Q.    Same questions for Mr. Pandit.

2    A.    No.

3    Q.    So why did they help you?

4    A.    Sorry?

5              MS. GILBERT:   Objection, vague.

6    BY MR. MOLINA:

7    Q.    Why did they assist you in conducting

8    this work?

9    A.    My recollection was that when I was

10   discussing with Antonio about market making INJ,

11   he -- he was thinking that it could help better

12   position VQR for market making in the future.

13   That's a conversation I believe I recall.  So if you

14   have this experience market making, then you could

15   get new opportunities in the future.

16   Q.    So Mr. Hallak viewed this as a good

17   opportunity for VQR to be involved in this type of

18   market making, correct?

19             MS. GILBERT:   Mischaracterizes.

20   A.    I think so.

21   BY MR. MOLINA:

22   Q.    And that's based on a conversation you

23   had with Mr. Hallak?

24   A.    I believe so, yes.

25   Q.    Do you remember when you had that

1    conversation?

2        A.    I don't recall specifically, but I would

3    guess that it would be prior to that date, that

4    October date of 2020.

5        Q.    So back to the actual nuts and bolts of

6    the market making.  You mentioned earlier it was

7    similar to the algorithmic trading that you had

8    performed earlier at VQR.  I just want to make sure

9    that that's accurate before we move on.

10               MS. GILBERT:  Objection,

11   mischaracterizes.

12       A.    It's difficult to generalize, so I

13   wouldn't necessarily agree.

14   BY MR. MOLINA:

15       Q.    Okay.  So we talked about, then, the --

16   setting up the account at Binance, we talked about

17   getting the script.  In this particular -- with this

18   particular project, how did you connect the script

19   to the Binance account that VQR maintained?

20       A.    I believe that Antonio would have

21   generated an API key so that we could trade on that

22   account.  And it may have been a subaccount of the

23   Binance account.  I don't recall specifically.

24       Q.    What's an API key?

25       A.    An API key allows you to programmatically

1   have access to an account.

2         Q.    So the API key allowed VQR to, for lack

3   of a better word, connect the script that was

4   generated with the Binance account.  Yes?

5         A.    I believe so.

6         Q.    Okay.  So what you -- how did you receive

7   the INJ tokens that you would have to trade as part

8   of this IEO?

9         A.    I believe that Eric Chen sent tokens to a

10  centralized wallet.  And then, after receiving

11  permission from Antonio, those tokens were then

12  transferred to a VQR Binance account or subaccount.

13  I don't recall specifically, but I would -- I

14  believe that was the process.

15        Q.    How many tokens did you receive?

16        A.    I don't recall.  I don't have that

17  information in front of me.

18        Q.    Does -- would it have been about a

19  million INJ tokens?

20              MS. GILBERT:  Asked and answered.

21        A.    I don't recall.

22  BY MR. MOLINA:

23        Q.    So once you get the tokens, get

24  permission to put them in the VQR subaccount or

25  account at Binance, what happens next?

1        MS. GILBERT:  Vague.  Objection,

2   vague.

3        A.    Can you state that one more time?

4   BY MR. MOLINA:

5        Q.    Yeah.  Just -- you just said that you

6   remember receiving tokens in a wallet, moving them

7   into the Binance account at issue.  What were the

8   next steps, then?

9        A.    I believe then the script was written and

10  then the script would be running against those

11  assets.

12       Q.    And generally here, what were you -- what

13  sort of strategy were you trying to execute with

14  respect to those assets?

15           MS. GILBERT:  Objection, vague.

16       A.    I mean, I'm not exactly sure what that

17  means.

18  BY MR. MOLINA:

19       Q.    Well, you mentioned -- you mentioned a

20  script.  We went through the exhibit where you were

21  talking about different parameters.  I'm just asking

22  at a high level, what was the objective that you

23  were trying to achieve.

24       A.    I believe the objective is to provide

25  liquidity to the asset.  I didn't have time to study

1   the entire document, so I don't necessarily have all

2   the context for that specific moment in time.

3       Q.    Can you just break down what you mean

4   when you say provide liquidity?

5               MS. GILBERT:  Asked and answered.

6               You may answer.

7       A.    Provide liquidity means to -- what I

8   described before, where you can place bids and

9   offers on the order book.

10  BY MR. MOLINA:

11      Q.    So as part of this algorithmic trading

12  that you were conducting through this Binance

13  account, it would require you to sell INJ tokens.

14  Yes?

15      A.    Yes.  By definition of what I described,

16  meaning that you would have offers and bids, so that

17  is correct.

18      Q.    Well, maybe you can just help -- explain

19  what a bid is.

20      A.    Yes.  So can you please state your

21  familiarity with a central limit order book so I can

22  provide the right context?

23      Q.    I'm sorry, say that again?

24      A.    Yeah.  Have you -- have you traded on a

25  limit order book?  So meaning the limit order book

1   is a -- is an auction where these so-called bids are

2   placed where there is a quantity of an asset or a

3   token to be bought at a certain price.  And then on

4   the other side of the limit order book and/or

5   auction there is an offer -- an auction full of

6   offers, meaning that there is a quantity of the

7   token and/or asset that is offered at a certain

8   price.  And then given this limit order book you

9   have a continuous auction process.

10       Q.    So when you sell -- when you sold these

11  tokens as part of this activity, what were you

12  selling them for?

13            MS. GILBERT:  Objection, vague.

14       A.    I don't recall specifically.

15  BY MR. MOLINA:

16       Q.    Just generally, what assets were you

17  receiving in consideration for these tokens?

18       A.    I believe it would have depended on the

19  various tickers.  So I don't have that information

20  in front of me.

21       Q.    Between -- between October 2020 when --

22  let me rephrase that.

23            When -- from -- in the weeks -- in the --

24  let's say in the month following this IEO, were you

25  conducting this algorithmic training activity that

1    we've been discussing?

2         A.    I don't recall the timeline.

3         Q.    Let me ask, would you -- do you remember

4    if you sold -- if you -- sorry -- if you purchased

5    any INJ tokens as part of this market making

6    activity?

7         A.    I don't recall specifically.

8    Occasionally initially when market making, it

9    depends on the dynamics of the order books.

10        Q.    Can you drill down on that a little bit?

11        A.    Yeah.  Just that the supply and demand of

12   an asset.

13        Q.    Can you explain what you mean by the

14   supply and demand of an asset?

15        A.    Yeah.  So for example, if you're market

16   making and you anticipate that the demand to buy an

17   asset is going to be very high, then you may skew

18   your offer so that you're selling only and then

19   later on readjust.  So it really depends on the

20   supply and demand of an asset.

21        Q.    Do you remember what the circumstances

22   were with respect to INJ at that time?

23             MS. GILBERT:  Objection, vague.

24        A.    Yeah, I don't remember specifically.  I

25   would guess that given that there's high demand for

```
1   IEO tokens, that it would have been quite skewed
2   towards selling INJ, given that that's the
3   anticipated supply/demand dynamic.
4   BY MR. MOLINA:
5       Q.   And help me understand, why is that the
6   anticipated demand -- dynamic for tokens offered
7   through an IEO?
8       A.   There's a -- something called a listing
9   effect, meaning that when a new asset is listed on
10  an exchange, there's generally a lot of demand on
11  that asset for a prolonged period of time.  Meaning
12  that there's demand on the bid side.  So if you're
13  market making, then it rationally makes sense to
14  provide a lot of liquidity on the sell side.
15      Q.   What was -- earlier we talked about that
16  there were a variety of ways that a market maker can
17  be compensated.  What -- in what way were you
18  compensated with respect to this market making
19  activity?
20      A.   You're saying specifically the market
21  making activity that I did for INJ?
22      Q.   That's correct.
23      A.   Yeah, so I received tokens for market
24  making.
25      Q.   What tokens did you receive?
```

1      A.     I received INJ tokens.

2      Q.     How many INJ tokens did you receive?

3      A.     I don't recall specifically.

4      Q.     When did you receive the INJ tokens?

5      A.     I don't recall specifically.

6      Q.     Would it have been before the IEO

7  launched?

8      A.     I don't have the transactions in front of

9  me, so it's difficult to comment.

10     Q.     So you don't have -- can you -- do you

11 remember anything about the tokens that were part of

12 your compensation here?

13     A.     I don't remember specifically.  It's been

14 years.

15     Q.     Other than these tokens, did you make --

16 did you receive, sorry, any other compensation for

17 your market making activities?

18     A.     Not for market making.

19     Q.     Can you give me an estimate of the value

20 of the tokens that you received?

21            MS. GILBERT:  Objection, vague.

22     A.     The price of crypto assets varies so

23 much, it's very difficult to state that.

24 BY MR. MOLINA:

25     Q.     Would it have been -- would it be fair to

1   say that you made millions of dollars of value with

2   respect to this market making activity?

3           MS. GILBERT:  Same objection.

4       A.    Sorry, state one -- state that one more

5   time?

6   BY MR. MOLINA:

7       Q.    I said would it be fair to say that you

8   received millions of dollars of value from these

9   tokens that were your compensation for this market

10  making activity?

11          MS. GILBERT:  Same objection.

12      A.    What timeline are you speaking about?

13  BY MR. MOLINA:

14      Q.    Speaking about from the moment you

15  received the tokens.

16      A.    Because I've had ongoing market making

17  and trading for Injective, so the question is

18  unclear.

19      Q.    From the initial tranche -- sorry, let me

20  rephrase that.

21          From the initial -- for your work on the

22  IEO, the market making that you conducted for

23  Injective Labs related to the IEO, for that, would

24  it be fair to say that you were compensated in value

25  in the millions?

1      MS. GILBERT:  Same objection.

2      A.    I don't know the value of that.  I

3  believe that it was less than that.

4  BY MR. MOLINA:

5      Q.    Did you ever keep any of the proceeds

6  generated by the trades that you were conducting on

7  behalf of Injective Labs?

8      A.    Sorry, can you repeat that?  The

9  proceeds?

10     Q.    Yeah.  We talked about the -- you said --

11  you told me you received tokens from Injective Labs

12  and you're not clear --

13     A.    Yes.

14     Q.    -- as to when or how or -- sorry -- when

15  or what -- for what value.  But my question is,

16  putting -- putting those tokens to the side, did you

17  get to keep any of the proceeds generated by the

18  trading of INJ tokens?

19     A.    Yes.  So there's an agreement for P&L

20  split for trading.

21     Q.    What is that agreement?

22     A.    The -- I believe the agreement was a

23  percentage of the P&L.

24     Q.    Okay.  What percentage?

25     A.    I believe it was 30 percent.

1      Q.    So -- and I'm just using a hypothetical

2  here just to do simple math.  If your activities

3  generated $10 profit for Injective Labs, you would

4  keep three of those dollars?

5      A.    That is correct, yeah.

6      Q.    And how was that -- is that agreement

7  memorialized?

8      A.    I believe the agreement was verbal.

9      Q.    Between -- verbally communicated between

10  yourself and Injective Labs?

11      A.    And Eric Chen.

12      Q.    Do you know why it wasn't memorialized in

13  writing?

14      A.    I'm not sure.  The agreement I have with

15  INJ is from 2021, so initially we were operating

16  informally without an agreement.

17              MR. MOLINA:  I just got a note, I

18  think we all did, from Mr. Johnson saying he needs a

19  break.  Let's take a -- let's come back at 3 p.m.

20  Pacific, please.  We're off the record.

21              THE VIDEOGRAPHER:  Okay.  Off the

22  record, 4:53 p.m.

23              (Recess taken from 4:53 p.m. to

24  5:02 p.m.)

25              THE VIDEOGRAPHER:  Back on the

1    record, 5:02 p.m.

2    BY MR. MOLINA:

3        Q.    Okay.  Mr. Adaya --

4              MR. MOLINA:  Why don't we put up

5    tab 27.  Maybe this will be an easier way of doing

6    it.  Ken, this is the document marked tab 27.

7              (Deposition Exhibit 2 marked for

8    identification.)

9    BY MR. MOLINA:

10       Q.    Mr. Adaya, I think you're being shown

11   what has now been marked as Exhibit Adaya 2.  Do you

12   recognize this document?

13       A.    Give me a moment.

14              (Witness reviews document.)

15       A.    I believe it's a discussion between

16   myself and Antonio.

17   BY MR. MOLINA:

18       Q.    Right.  And you see at the top it's dated

19   December 12th, 2020.  Yes?

20       A.    I see that.

21       Q.    If you look at the bottom of page 1 is a

22   chat --

23       A.    Sorry, you said the bottom of it?

24       Q.    Yeah, bottom of page 1.

25              Okay.  Do you see that you communicate to

1   Mr. Hallak a request to move the INJ assets off the

2   subaccount.  Do you see that?

3        A.    I see that.

4        Q.    Okay.  So could you walk us through

5   what's happening here?

6              MS. GILBERT:  Objection --

7        A.    I believe that --

8              MS. GILBERT:  -- document speaks for

9   itself.

10             Go ahead.

11       A.    Yeah.  I believe that assets are being

12  moved off the subaccount.

13  BY MR. MOLINA:

14       Q.    Off the VQR subaccount and into this

15  wallet that's referenced at the bottom of this page,

16  correct?

17       A.    I believe so.

18       Q.    So just for the record, I'm going to be

19  referencing to this wallet as the Deefa wallet,

20  because those are the last five letters in the

21  transaction -- or in the hash.

22       A.    Yes.

23       Q.    Who controls the Deefa wallet?

24       A.    I don't recall specifically since these

25  transactions were years ago, so I don't have that

1  knowledge immediately.

2      Q.    Do you know if it's a VQR controlled

3  wallet?

4      A.    I don't believe it's a VQR controlled

5  wallet.

6      Q.    And why do you not believe -- well,

7  sorry.

8            And why is that your belief?

9      A.    Sorry?

10     Q.    And why is that your belief?

11     A.    I -- my recollection was that some INJ

12  assets were moved off of the VQR account and then

13  moved -- moved off of VQR.  But it's possible that I

14  had controlled this wallet, though I -- this is the

15  first time I'm seeing this document, so I can't be

16  sure.

17     Q.    And what were the circumstances that led

18  you to request for the INJ assets to be moved off

19  the subaccount?

20     A.    I don't recall specifically, but I --

21  given this timeline, I believe that there were some

22  emergency, like, shutoff of some strategies.

23     Q.    Do you recall any about this emergency?

24     A.    I believe it had something to do with

25  the -- it could have been something to do with like

1  the fraud being reported regarding Chen.  I don't

2  recall specifically.

3       Q.    When you say the fraud being reported,

4  I'm sorry, what report are you referring to?

5       A.    I'm referring to -- it's my understanding

6  that -- it's my understanding that there was fraud

7  committed at Virgil Sigma, as we discussed earlier,

8  and that in this general time period it was

9  reported.  I don't recall the specific dates,

10 though.

11      Q.    And I -- sorry.  When you say it was

12 reported, I'm just trying to understand, was it

13 reported -- are you talking about a public report?

14      A.    I believe that I had -- in December of

15 2020 there was a -- I believe there was a public

16 report saying that the assets of Virgil had been

17 frozen and -- I believe it was a public report, but

18 I don't recall the exact timeline.  I just remember

19 it was December of 2020.

20      Q.    Okay.  But your testimony is that you

21 believe that this report was the reason that you

22 made this request to Mr. Hallak; is that right?

23           MS. GILBERT:  Objection,

24 mischaracterizes.

25      A.    My --

1          MS. GILBERT:  You can answer.

2      A.    Yeah, my understanding was this -- in

3  this month period of December 2020, that there was

4  just concern about the viability of VQR.  I don't

5  recall the specifics of the concern as it's been

6  years, but I just remember that month was very

7  hectic.

8  BY MR. MOLINA:

9      Q.    Okay.  So you see in this chat that's

10  been highlighted, it's -- the request is to move

11  USDT INJ and ETH to this Deefa wallet.  Do you see

12  that?

13      A.    I see that.

14      Q.    Okay.  So the USDT and ETH, are those

15  proceeds that were generated through the INJ trades?

16          MS. GILBERT:  Objection, assumes

17  facts.

18          You can answer.

19      A.    I don't recall specifically the -- I

20  don't recall specifically.

21  BY MR. MOLINA:

22      Q.    Right.  But these are -- these would be

23  tokens or assets that you were -- that you had in

24  the VQR subaccount that was doing the INJ trades,

25  correct?

1        A.    That's my understanding.  I -- having

2   just seen this document, I believe that's my

3   understanding.

4        Q.    Okay.  So it goes to Deefa.  What

5   happened after -- oh, let me ask, were these assets

6   sent to this Deefa wallet?

7        A.    Sorry?

8        Q.    Did -- was this request complied with?

9   Were the assets moved off the account at VQR and

10  into this Deefa wallet?

11       A.    It's difficult to recall the specifics of

12  a -- of this exact transaction just given the time.

13       Q.    What do you recall -- I'm sorry, go

14  ahead.

15       A.    No, that was it.

16       Q.    What do you recall happened after this

17  request was made?

18       A.    I don't remember specifically.  Perhaps

19  if I look at the document more closely, it'll help.

20  I'm going to scroll down.

21            (Witness reviews document.)

22       A.    Okay.  I read a little bit more context.

23  I don't think I have any substantial additional

24  comments here either.

25

 1   BY MR. MOLINA:

 2       Q.    I'm just asking you, what do you recall

 3   happened to -- and I'm asking it not specifically.

 4   I'm asking just generally.  You're conducting this

 5   trade activity through this subaccount up until this

 6   date and on this date you say let's move them off

 7   the subaccount for the reasons that you've testified

 8   to today.  My question is what happens next?

 9       A.    I would need to study the specific

10   transactions.  I don't recall.

11       Q.    Did you move -- were these assets

12   transferred to other Binance accounts that you

13   control?

14       A.    They may have been.  I would need to

15   study the transaction.

16                 MR. MOLINA:  Okay.  Let's put up --

17   BY MR. MOLINA:

18       Q.    Well, actually, before we put this --

19   let's go to, in this same document, if we go down to

20   the bottom of page 2, you see in this highlighted

21   text you're communicating that there's a -- there's

22   a BTC address for the INJ account, we can send the

23   BTC here.  And then you give some information and

24   say:  That should take care of all the INJ related

25   Binance items.

1              Do you see that?

2         A.    I see that.

3         Q.    What does BTC stand for?

4         A.    It stands for Bitcoin.

5         Q.    So are you -- so here you're requesting

6    the transfer of Bitcoin from the -- what you call

7    the INJ account to a separate wallet.  Is that

8    what's happening here?

9         A.    I believe so.

10        Q.    And do you control the wallet that you

11   identify here?

12        A.    I'm not certain.

13        Q.    What do you remember about this wallet?

14             MS. GILBERT:  Objection, vague.

15        A.    I'm not sure if I have a specific

16   recollection, just given that it was 2020 and it was

17   a while ago.

18   BY MR. MOLINA:

19        Q.    Would this have been a VQR wallet?

20        A.    I'm unsure.  Let me -- is it fine if I

21   continue to read the context --

22        Q.    Of course.  Of course.

23        A.    -- to understand a bit better?

24        Q.    Sure.  That's why you have control of the

25   document.

1           (Witness reviews document.)

2       A.      Sorry, where would you like me to go back

3   to?

4   BY MR. MOLINA:

5       Q.      Yeah.  Actually, if you just go to that

6   last page that you read -- it looks like you read

7   over that last page, the highlighted text.  I think

8   that goes to the heart of what we're getting at

9   here, which is after reading this particular

10  exchange, does that refresh your recollection as to

11  what this wallet is?

12      A.      Yeah, I -- my understanding from the text

13  is that it is a wallet.

14      Q.      It's an --

15      A.      A centralized wallet.

16      Q.      You call it an Electrum wallet, right?

17      A.      Sorry, let me scroll down.

18      Q.      Yeah.

19      A.      I believe so.

20      Q.      Okay.  What's an Electrum wallet?

21      A.      My understanding is that there are a

22  variety of wallet providers and Electrum is one of

23  these wallet providers.  There are a bunch.

24      Q.      And from having now read the full text of

25  these chats, is your understanding that you created

1    this wallet?

2        A.    It's possible I created the wallet.

3        Q.    If not you, then who else created the

4    wallet?

5        A.    I'm unsure from this context.

6        Q.    What was your intention -- or what did

7    you do with these Bitcoin after receiving them in

8    this wallet?

9              MS. GILBERT:  Objection, vague and

10   assumes facts.

11             You can answer.

12       A.    I would need to go back and study the

13   transaction histories.  I don't have those in front

14   of me.

15   BY MR. MOLINA:

16       Q.    Who's -- from your -- sitting here today

17   based on what you know and what you -- your

18   experience, who owns those Bitcoin?

19       A.    Sorry?

20       Q.    When you're transferring on October -- on

21   December 12th -- on December 12th, 2020, when you're

22   asking to have the Bitcoin transferred to this

23   wallet, who owns the Bitcoin?

24       A.    I believe that -- I believe that

25   Injective would own the Bitcoin.

1    Q.    What's your belief based on?

2    A.    I would need to fully understand the

3  context of these messages, but I believe that INJ

4  assets were removed from a Binance subaccount.

5    Q.    Okay.  So you don't -- do you have any

6  recollection as to what you did with these Bitcoin

7  after removing them from the subaccount?

8              MS. GILBERT:  Asked and answered.

9    A.    I don't have specific recollection of the

10  wallets that you provided, the one above and this

11  one below.  I would need to study the addresses more

12  substantially.

13              MR. MOLINA:  Let's put up tab 31.

14  BY MR. MOLINA:

15    Q.    Maybe this'll help refresh your memory.

16              (Deposition Exhibit 3 marked for

17  identification.)

18  BY MR. MOLINA:

19    Q.    Mr. Adaya, I think you're now being shown

20  what has been marked as Adaya -- or Exhibit Adaya 3.

21  Do you recognize this document?

22    A.    I don't recognize the document.

23    Q.    Do you see the top there's a logo for

24  Blockchair?

25    A.    I see that.

1    Q.    Okay.  What's Blockchair?

2    A.    I'm not sure.  However, I would guess

3    that it is something very similar to Etherscan, but

4    the Blockchair -- but the Bitcoin version where

5    they'll show transaction histories and so forth.

6    Q.    All right.  Do you see there's a date

7    range in the top right of this document that spans

8    from December 13, 2020, to March 1st, 2023?

9    A.    I see that.

10    Q.    Okay.  And if you scroll down, you'll see

11    that there was a starting balance in this wallet of

12    zero Bitcoin, right?

13    A.    I see that.

14    Q.    And then you'll see that on December --

15    if you scroll down a little bit more, I'm sorry.  I

16    don't know who's controlling the document.

17    A.    I'm controlling it right now.

18    Q.    Okay.

19    A.    I'll let you control it.

20    Q.    No, no, I don't -- I don't have control

21    of it.  I'd rather you have control of it.

22    A.    Oh, okay.

23    Q.    I'm just -- I just want to -- if you

24    scroll up a little bit more, just so you see the

25    line items on the -- yeah, sorry.  Just a little bit

1  lower, not all the way down.  There you go.  Right

2  there.

3          A.    Yeah.

4          Q.    Okay.  So you see that it says that on

5  December 13th, 2020, there was a receipt of .0095

6  Bitcoin?

7          A.    I see that.

8          Q.    Yeah.  And you see that the next day, on

9  December 14, 2020, there was a receipt of

10 20.02100187 Bitcoin?

11         A.    I see that.

12         Q.    Okay.  Do you remember making these

13 transactions?

14         A.    I don't recall specifically.

15         Q.    Okay.  Does this document refresh your

16 memory as to what was done with these Bitcoin after

17 they moved the sub -- they moved off the subaccount

18 at VQR?

19         A.    It doesn't necessarily refresh my memory,

20 just given that there have been a variety of

21 transactions.

22         Q.    Did you return the Bitcoin to Injective?

23               MS. GILBERT:  Objection, assumes

24 facts, and vague.

25               You can answer.

1    BY MR. MOLINA:

2         Q.    You can answer.

3         A.    Yeah, sorry.  Please ask again.

4         Q.    Did you return the Bitcoin to Injective

5    Labs?

6         A.    I'm currently unsure who owns the address

7    or who has control over it.

8         Q.    Do you have any reason to believe that

9    it's not an address you control?

10        A.    I would need to study it a bit more and

11   look at my own records.

12        Q.    You were the person providing the market

13   making service to Injective Labs, correct?

14        A.    That's correct.

15        Q.    So there was no one else that was

16   providing this market making service to Injective

17   Labs, correct?

18             MS. GILBERT:  Objection,

19   mischaracterizes --

20        A.    That's correct.

21             THE WITNESS:  Sorry, sorry.

22             MS. GILBERT:  Mischaracterizes.

23   BY MR. MOLINA:

24        Q.    Go ahead with your answer.

25        A.    Sorry, ask it one more time.

1    Q.    There was -- no one else was providing

2   the market making activity for Injective Labs

3   through this VQR subaccount, correct?

4              MS. GILBERT:   Same objection.

5    A.    I don't believe so.

6   BY MR. MOLINA:

7    Q.    All right.  So we just saw in the chats

8   that these Bitcoin came from that subaccount, right?

9    A.    Yes.

10    Q.    And now we just saw that these Bitcoin

11   the day after these chats were transferred to this

12   address.  Do you see -- is that right?

13    A.    Can we go back?  I believe so.

14    Q.    Yeah, we can go back.  You can line up

15   the address given here with the address that's

16   provided there in the chats.

17    A.    Yeah.

18    Q.    Okay.

19    A.    Yes, I see it.

20    Q.    Okay.  So my question is, were these

21   assets returned to Injective Labs?

22    A.    I need to study my own records of

23   returning assets to Injective.  So it's difficult to

24   say that.

25    Q.    When did your market making -- earlier

1  today you said that you're currently not providing

2  market making services to anyone; is that right?

3      A.    That is correct.

4      Q.    Okay.  And so your market making

5  relationship with Injective Labs expired at some

6  point; is that right?

7      A.    Yes.

8      Q.    Okay.  When did that -- when did that

9  relationship end?

10     A.    I believe it ended sometime in 2022.

11     Q.    Is -- do you -- so the assets that

12 belonged to Injective Labs that were under your

13 control as part of this market making relationship,

14 those would have been returned to Injective Labs by

15 that expiration date, correct?

16     A.    I believe so.  Because I've done market

17 making work for Injective beyond assets that had

18 ever touched VQR.

19     Q.    You're not currently holding Injective

20 Lab assets in any account that you control, correct?

21     A.    I don't believe so.

22     Q.    When you moved the -- when these --

23           MR. MOLINA:  So you can take down

24 this document.

25

1    BY MR. MOLINA:

2        Q.    When the -- when the other assets, not

3    the Bitcoin, but the other assets that we saw go

4    into this Deefa wallet, do you remember that when we

5    were looking at that earlier?

6        A.    I believe so.  There was the INJ and a

7    few other assets.

8        Q.    Yeah.  It was INJ, USDT and ETH, correct?

9        A.    Uh-huh.

10       Q.    Those assets, those were -- those were

11   moved from Deefa.  What happened after they were

12   moved to Deefa?  Were they moved to Binance accounts

13   that you control?

14       A.    I would need to study the transactions.

15   I don't have those in front of me.

16       Q.    Do you have -- where else could they have

17   gone?

18       A.    I believe that they were -- they continue

19   to be used for market making.  That's my

20   understanding.

21       Q.    And Binance was still the exchange

22   that -- through which you were produce -- providing

23   these market making services, correct?

24       A.    I believe so.

25       Q.    Do you personally hold an account at

1    Binance?

2         A.    I'm not sure.  I may have created an

3    account.

4         Q.    Under your name?

5         A.    I believe I created an account -- I may

6    have created an account under my name, but a very

7    long time ago.  I don't recall specifically.

8         Q.    Now, one of the reasons we're here today

9    is because your counsel notified us that Binance had

10   frozen accounts that your counsel represented were

11   controlled by you.  Is that -- is that a fact you're

12   aware of?

13        A.    Yes.

14        Q.    Okay.  So what accounts do you control at

15   Binance?

16        A.    So earlier Ms. Gilbert mentioned certain

17   UID accounts.  I don't have that right in front of

18   me.

19        Q.    Okay.  My question is, are those accounts

20   that are frozen, are those accounts under your name

21   personally?

22        A.    No, they're not.

23        Q.    Okay.  So whose names are they under?

24        A.    They're under my girlfriend's name.

25        Q.    Who is your girlfriend?

1    A.    Phuong Nguien.

2    Q.    Could you spell that?

3    A.    P-h-u-o-n-g, and then last name

4  N-g-u-i-e-n.

5    Q.    And why is the account under her name?

6    A.    Sorry?

7    Q.    Why is the account under her name?

8    A.    Because it gives access to the

9  international version of Binance.

10    Q.    Could you explain that to me?

11    A.    Yes.  The international version of

12  Binance allows greater -- a greater class of assets

13  to be traded.

14    Q.    And why can't you access that platform?

15    A.    I believe if you're a US citizen, you

16  cannot access the -- you can only access the Binance

17  US version.

18    Q.    And is your girlfriend a US citizen?

19    A.    She's not.

20    Q.    How long have you been linked with this

21  individual?

22    A.    A few years.

23    Q.    Would it have been before

24  December 2020 --

25    A.    I believe so.

1    Q.    -- when this relationship began?  I'm

2    sorry, let me just finish.

3    A.    Sorry.  Sorry.  Go ahead.

4    Q.    That's okay.  That's okay.

5          Did you -- were you affiliated with this

6    individual before December 2020?

7    A.    Yes.

8    Q.    Okay.  Is she involved in your -- is she

9    involved in providing market making services to

10   Injective Labs?

11   A.    She is not involved in providing market

12   making services to Injective Labs.

13   Q.    Does Binance know that you control the

14   account that's under her name?

15         MS. GILBERT:  Objection, vague,

16   assumes facts.

17   BY MR. MOLINA:

18   Q.    You can answer.

19         MS. GILBERT:  If you know, you can

20   answer.

21   A.    Yeah, I don't believe so.

22   BY MR. MOLINA:

23   Q.    Just based on your experience since you

24   clearly, you know, have used Binance for some time,

25   what would happen if Binance learned that the

1    account under her name is actually controlled by

2    you, a US citizen?

3            MS. GILBERT:  Same objection.

4        A.    What I've -- yeah, I'm unsure.

5    BY MR. MOLINA:

6        Q.    What are you unsure about?

7        A.    Yeah, I believe that there's some

8    centralized exchanges where they'll go into

9    withdraw-only mode and not allow you to trade

10   anymore.

11       Q.    So you set up the account under your

12   girlfriend's name to mitigate against that risk?

13           MS. GILBERT:  Objection,

14   mischaracterizes and argumentative.

15           You can answer that question and then

16   I'd like to take a break just for a couple minutes.

17       A.    Say that one more time?

18   BY MR. MOLINA:

19       Q.    My question is simply, when you created

20   this account under your girlfriend's name, did you

21   do that to avoid having any adverse consequences

22   happening to your ability to control the account?

23           MS. GILBERT:  Mischaracterizes his

24   testimony.  And --

25       A.    I would say it's primarily to -- having

 1   the international version allows you to trade a

 2   larger variety of assets.

 3   BY MR. MOLINA:

 4        Q.    There's also another account -- well, let

 5   me ask you.  Who is Srihari Yenamandra?

 6        A.    I believe it's someone I've met in a

 7   professional capacity.

 8        Q.    Could you be a little more specific?  How

 9   do you know this person specifically?

10        A.    Yeah, I believe that he had previously

11   worked in the oil and gas industry.

12        Q.    So this is someone you met in Texas?

13        A.    Yes.

14        Q.    Okay.  Did you set up a Binance account

15   under this person's name?

16        A.    I believe that -- I believe that I had --

17   I may have utilized the account for certain market

18   making activities in the past.  I can't recall

19   specifically.  Market making or trading.

20        Q.    So this is for Injective Labs?

21        A.    I don't recall if it was for Injective

22   specifically.

23        Q.    Is -- does this individual,

24   Mr. Yenamandra, is he aware that you opened an

25   account under his name?

1          MS. GILBERT:  Objection, assumes

2     facts --

3        A.    I believe so.

4          MS. GILBERT:  Hold on.  Assumes

5     facts.

6          THE WITNESS:  Sorry, sorry.

7          MS. GILBERT:  Assumes facts.

8     BY MR. MOLINA:

9        Q.    Go ahead with --

10          MS. GILBERT:  Go ahead.

11     BY MR. MOLINA:

12        Q.    -- your answer.

13        A.    I believe so.

14        Q.    Did he give you express permission to

15     open an account under his name?

16          MS. GILBERT:  Same objection.

17        A.    Yes.

18     BY MR. MOLINA:

19        Q.    Did your girlfriend give you express

20     permission to do the same?

21          MS. GILBERT:  Same objection.

22        A.    Yes.

23     BY MR. MOLINA:

24        Q.    And was -- is the reason that you set up

25     an account under Mr. Yenamandra's name, is it the

1  same reason as the one you gave for why you opened

2  an account under your girlfriend's name?

3          MS. GILBERT:  Same objection.

4      A.    Yes, yes.

5          MS. GILBERT:  You need to let me

6  object, Mr. Adaya.

7          THE WITNESS:  Sorry, sorry.

8  BY MR. MOLINA:

9      Q.    Okay.  Other than these -- other than the

10 Binance accounts that you created under these third

11 parties' names, is there any other Binance account

12 that you've created under a third-party name?

13         MS. GILBERT:  Assumes facts.

14     A.    I don't believe so.

15 BY MR. MOLINA:

16     Q.    Other than the Binance -- did you open an

17 account under your girlfriend's name in any other

18 exchange other than Binance?

19         MS. GILBERT:  Same objection.

20     A.    I believe that there is an FTX account.

21 BY MR. MOLINA:

22     Q.    That you opened under your girlfriend's

23 name?

24         MS. GILBERT:  Same objection.

25     A.    Yes.

1   BY MR. MOLINA:

2        Q.    I'm sorry, what was the answer?

3        A.    Yes.

4        Q.    And what was the reason for you opening

5   an FTX account under your girlfriend's name?

6                    MS. GILBERT:  Same objection.

7        A.    For -- the reason is for trading.

8   BY MR. MOLINA:

9        Q.    Why couldn't you have opened an account

10  under your name?

11       A.    I believe that the FTX US version is a

12  lot more limited.

13       Q.    Do your clients know that you're

14  operating -- or you're conducting trading activity

15  under a third party's account?

16                    MS. GILBERT:  Objection, assumes

17  facts.

18       A.    I'm unsure.

19  BY MR. MOLINA:

20       Q.    Did you ever tell Injective Labs that you

21  were trading their assets in an account held by your

22  girlfriend?

23       A.    I don't know if I did so specifically.

24       Q.    What about the account related to

25  Mr. Yenamandra, did you communicate that fact to

1    Injective Labs?

2              MS. GILBERT:  Same objection.

3         A.    I don't know specifically.

4    BY MR. MOLINA:

5         Q.    Real quick just on -- to close the loop

6    on Injective.  What were the -- what were the

7    circumstances that led to the cessation of market

8    making activities with respect to Injective Labs?

9              MS. GILBERT:  Objection, vague.

10        A.    Injective -- my understanding is that

11   Injective was building out their own internal desk

12   for trading and I believe also market making.

13   BY MR. MOLINA:

14        Q.    Ballpark, how much compensation have you

15   received from Injective Labs from the inception to

16   the end of that relationship?

17             MS. GILBERT:  Objection, vague.

18        A.    I'm unclear, just given the volatility of

19   crypto.

20   BY MR. MOLINA:

21        Q.    More than a million dollars?

22             MS. GILBERT:  Same objection.

23        A.    I believe so, but it's hard to pinpoint.

24   BY MR. MOLINA:

25        Q.    You have to file tax returns as a US

1  citizen, don't you?

2       A.    That is correct.

3       Q.    Do you know how much you reported making

4  in the last fiscal year?

5              MS. GILBERT:  Objection.  That's

6  confidential financial information.  You're not

7  entitled to ask him about his personal finances in

8  that way, his tax returns.

9              MR. MOLINA:  I'm entitled to ask

10  questions I deem to be relevant.  And if you believe

11  his answers are confidential, you can designate it

12  accordingly.

13  BY MR. MOLINA:

14       Q.    Go ahead, Mr. Adaya.

15              MS. GILBERT:  No, I'm going to

16  instruct him not to answer questions about his tax

17  returns.

18              MR. MOLINA:  So you're going to

19  instruct your client not to answer questions,

20  notwithstanding the fact that we have a litigation

21  protective order in place where you can designate

22  whatever information you believe confidential?

23              MS. GILBERT:  I'm going to instruct

24  him as I instructed him, not to answer questions

25  about his tax returns.

1   BY MR. MOLINA:

2        Q.    How much money did you make last year,

3   Mr. Adaya?

4                    MS. GILBERT:  Objection, vague.

5                    THE WITNESS:  I -- can I answer or --

6                    MS. GILBERT:  Go ahead.  You can

7   answer that.

8        A.    I haven't filed yet.  I haven't

9   calculated.

10  BY MR. MOLINA:

11       Q.    How much money did you make in the year

12  before, in the fiscal 2021 year?

13                   MS. GILBERT:  Same objection.

14       A.    I don't have that information offhand.

15  BY MR. MOLINA:

16       Q.    More than a million dollars?

17       A.    I don't have that information offhand.

18       Q.    You don't know sitting here today whether

19  or not you're a millionaire?

20                   MS. GILBERT:  Objection, harassing.

21                   You can answer.  You can answer.

22       A.    Yeah, I don't recall the exact numbers.

23                   MR. MOLINA:  Okay.  I have a few

24  more -- we have about 20 minutes left.

25                   MS. GILBERT:  Yeah, I'd like -- as I

1    mentioned, I'd like a three-minute break.

2              MR. MOLINA:  I'm happy to give you a

3    break and then we may go three minutes over, but

4    that's -- that will be fine.  Let's go on a break.

5              MS. GILBERT:  We don't agree to go

6    three minutes over, but we can take a three-minute

7    break now just as you've taken breaks in the past.

8    And we're over the noticed time.

9              THE VIDEOGRAPHER:  Off the record,

10   5:41 p.m.

11             (Recess taken from 5:41 p.m. to

12   5:46 p.m.)

13             THE VIDEOGRAPHER:  Back on the

14   record, 5:46 p.m.

15   BY MR. MOLINA:

16        Q.   Mr. Adaya, I'm going to refer to the

17   accounts that we were talking about before the break

18   as the Srihari and Phuong accounts just to -- just

19   to make it clear on the record.  Do you understand

20   what I mean when I say the Srihari and Phuong

21   accounts?

22        A.   I do.

23        Q.   Okay.  Did you ever conduct any trading

24   on behalf of VQR using either of those accounts?

25        A.   I don't believe so.

1      Q.    Do you know when you created those

2  accounts?

3      A.    Just to --

4           MS. GILBERT:  Objection, assumes

5  facts.

6           Go ahead.

7      A.    Yeah, just to -- can you guys hear me?  I

8  think my AirPods are --

9  BY MR. MOLINA:

10     Q.    We can hear you.

11          MS. GILBERT:  We can hear you.

12     A.    Okay.  Yeah.  Yeah, I was just going to

13  say, just to clarify, I'm not sure that I

14  specifically was the one who set up the accounts,

15  just to clarify.

16  BY MR. MOLINA:

17     Q.    Yeah.  But you're the one who used the

18  accounts.  Yes?

19     A.    Sure, I have used the accounts.  Yes.

20     Q.    Did you ever use the accounts on behalf

21  of VQR-related trading activity?

22     A.    I don't believe so.

23     Q.    Is it possible that you did?

24     A.    It's possible.  I don't recall

25  specifically.

1          Q.    Okay.  Do you recall when those accounts

2     were created?

3          A.    I don't recall the dates.

4          Q.    But it would have been before you left

5     VQR in the summer of 2020?

6          A.    I'm not sure specifically.

7          Q.    Do you know if you ever used either of

8     the Phuong or Srihari accounts to trade on behalf of

9     Mr. Stefan Qin?

10         A.    I don't believe I did.

11         Q.    Is it possible that you did?

12         A.    I don't think so.

13         Q.    Why do you not think so?

14         A.    I don't have specific --

15              MS. GILBERT:  Objection, vague.

16              Go ahead, you can answer.

17         A.    Yeah, I don't have a specific

18    recollection, just given the time.

19    BY MR. MOLINA:

20         Q.    Right.  Okay.  So let's get through --

21    I'm going to be showing you some transactions

22    emanating from that account, of the Srihari account,

23    and I'd like to ask you some questions.

24              MR. MOLINA:  So why don't we put up

25    first tab 39, please.

1    (Deposition Exhibit 4 marked for

2  identification.)

3  BY MR. MOLINA:

4    Q.    Mr. Adaya, you're being shown what has

5  been now marked as Exhibit Adaya 4.  Do you

6  recognize this document?

7    A.    I would need to look at it a bit more

8  closely.

9    Q.    Okay.  I believe you have access to it.

10    (Witness reviews document.)

11    A.    Well, I kind of skimmed the last two

12  pages -- or the last page.

13  BY MR. MOLINA:

14    Q.    Okay.  So if you go to the -- back to the

15  top, you see that it's a document capturing

16  conversations between different individuals between

17  March 5th, 2019, and December 16th, 2020?  If you go

18  to the very top, that's where I'm getting this

19  information.

20    A.    Yeah.

21    Q.    Okay.  And you saw from scrolling down

22  through the document that you're one of the people

23  involved in this chat communication?

24    A.    I see that.

25    Q.    Do you see that on page 2 of 4 in the PDF

1   there's a message from Mr. Stefan Qin?  I don't know

2   if you have a -- I don't know if it's lagging.

3        A.    Right now it's lagging.

4        Q.    That's okay.  That's okay.  There you go.

5             You see there on the page there's a

6   message from Mr. Stefan Qin asking the other

7   individuals to add you?

8        A.    I see that.

9        Q.    Do you remember this conversation?  Do

10  you remember the circumstances relating to this?

11             MS. GILBERT:  Objection, vague.

12       A.    It was a while ago, so I don't

13  necessarily remember the circumstances.

14  BY MR. MOLINA:

15       Q.    Okay.  If you scroll down just a little

16  bit on the -- on the same page, just a little bit --

17  sorry, to the next highlighted portion.  There's a

18  message here saying:  Just for good order, this is

19  the second trading channel for Stefan's Personal

20  account with QCP, with Authorized Trader Nasir

21  Adaya.

22             And underneath that Mr. Qin writes:  I

23  will be remitting 5 million USD for you guys to put

24  in custody.

25             Do you see that?

1      A.    I see that.

2      Q.    What is QCP?

3      A.    My understanding is that QCP is a trading

4   firm.

5      Q.    Okay.  And so based on this communication

6   that you're reading, is it your understanding that

7   Mr. Qin traded his personal assets through QCP?

8      A.    That is correct.  I believe that -- I

9   believe that this would have related to the prop

10  trading.

11     Q.    Okay.  And if you scroll down to the

12  bottom of page 3, you -- you indicate that you would

13  buy 100 BTC at best.

14          Do you see that?

15     A.    I see that.

16     Q.    Okay.  And is -- is your understanding

17  that you're indicating that you would buy 100

18  Bitcoin using the assets provided by Mr. Qin,

19  correct?

20     A.    I believe so, just -- I wanted to fully

21  understand the context, but I believe so.

22     Q.    Okay.  So now let's go to --

23          MR. MOLINA:  Ken, if you can put up

24  tab 40.

25

```
 1   BY MR. MOLINA:

 2        Q.    This is related to what we just saw here

 3   on tab -- on this document.

 4                  MR. MOLINA:  But if you put up

 5   tab 40.

 6                  (Deposition Exhibit 5 marked for

 7   identification.)

 8   BY MR. MOLINA:

 9        Q.    Okay.  Mr. Adaya, this is -- you're being

10   shown what has now been marked as Adaya No. 5.  Do

11   you recognize this document?

12        A.    I recognize the Blockchair, yes.

13        Q.    Okay.  So it's a Blockchair document.

14   And the date range at the top right indicates it's

15   between March 28th, 2019, and March 31, 2019, right?

16        A.    Yes, I see that.

17                  MR. MOLINA:  And if you -- and, I'm

18   sorry, Ken, if you could go back to Adaya No. 4 just

19   so we can keep the dates.

20   BY MR. MOLINA:

21        Q.    When you said that you would buy 100

22   Bitcoin, that was sent on March 29, 2019.  Do you

23   see that?

24        A.    Yeah.

25        Q.    Okay.  Now if you go back to No. 5, you
```

1   see that on -- if you scroll down to -- just so you

2   can see the whole -- you see that on March 28th,

3   2019, this wallet had zero Bitcoin, but on

4   March 29th there were -- there was a transaction of

5   .01 Bitcoin and then 99.99 Bitcoin on that same day.

6   Do you see that?

7        A.    I see that.

8             THE REPORTER:  Counsel, you broke up

9   in the question.  I need that again.

10             MR. MOLINA:  Okay.  I'm sorry.

11  BY MR. MOLINA:

12        Q.   I'm just saying that if you see on this

13  document it shows that there were two transactions

14  on March 29, 2019, one for .01 and one for 99.99

15  Bitcoin.

16             So, Mr. Adaya, my question I guess is do

17  you recognize the -- well, sorry.  If you scroll

18  down -- I'm sorry, if you scroll a little more,

19  you'll see the -- what happens then.  You see that

20  there is -- that these -- that these same assets are

21  then sent to another account.  Do you see that?

22        A.    Are you referring to the third

23  transaction?

24        Q.    I'm referring to the -- line items 3

25  and 4 of the history of transactions.  Do you see

 1  that at the bottom?

 2       A.    Yeah.  Sorry, the clicker is still

 3  lagging.  It's very tough to --

 4       Q.    Yeah.  So just -- I guess the question

 5  is, do you -- do you remember the -- do you remember

 6  where these assets ultimately went?

 7       A.    I'm unsure.

 8       Q.    Do you know if these assets ultimately

 9  went to the Srihari or Phuong accounts that we

10  described earlier?

11       A.    I'm unsure without studying a bit more.

12  Is it okay if I read a bit more of the history?

13  Before I had skimmed it kind of fast.

14       Q.    Yeah, you can read.

15             (Witness reviews document.)

16       A.    Okay.

17  BY MR. MOLINA:

18       Q.    Okay.

19       A.    I just wanted to understand the context a

20  bit better.

21       Q.    Sure.  I guess just to -- the overall

22  question here, Mr. Adaya, is do you have any reason

23  to believe that these assets -- let me rephrase

24  that.

25             Is it possible that you sent these assets

1    to either the Srihari or Phuong accounts?

2        A.    I would need to study the transaction.  I

3    don't recall offhand.

4        Q.    So sitting here today, you can't rule out

5    that that -- that that's what happened?

6              MS. GILBERT:  Asked and answered.

7    BY MR. MOLINA:

8        Q.    You can answer.

9        A.    That's correct.

10             MR. MOLINA:  Okay.  I'm going to ask

11   Ms. Amanda Straub from the SEC, I've done a lot of

12   the talking and I know she said earlier at the

13   beginning she might have a question or two.  So

14   before I -- I wanted to make sure she had an

15   opportunity.  So I'm going to cede the floor to her.

16             MS. STRAUB:  Thanks, I appreciate

17   that, but I'm good.  No questions.

18             MR. MOLINA:  Okay.  I think -- I

19   think I've gone through what I wanted to cover.

20             MS. GILBERT:  Okay.

21             THE VIDEOGRAPHER:  Anybody else have

22   anything for the record?

23             MS. GILBERT:  Just, Mr. Johnson, that

24   we'd like a transcript.

25             MR. MOLINA:  I would also want a

 1   transcript.  Thank you.

 2                 THE VIDEOGRAPHER:  Okay.  This now

 3   concludes the deposition of Nasir Adaya.  We're

 4   going off the record, 6 p.m.

 5                 (Deposition concluded at 6:00 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    REPORTER'S CERTIFICATION

2            I, Micheal A. Johnson, Registered Diplomate

3    Reporter and Certified Realtime Reporter, certify

4    that on the 7th day of March, 2023 I reported the

5    Remote Videotaped Deposition of NASIR ADAYA, after

6    the witness had first been duly cautioned and sworn

7    to testify under oath; said deposition was

8    subsequently transcribed by me and under my

9    supervision and contains a full, true and complete

10   transcription of the proceedings had at said time

11   and place; and that reading and signing was not

12   requested.

13           I further certify that I am neither counsel

14   for nor related to any party in this cause and am

15   not financially interested in its outcome.

16           GIVEN UNDER MY HAND AND SEAL of office on

17   this 8th day of March, 2023.

18

19           _____
             MICHEAL A. JOHNSON, RDR, CRR
20           NCRA Registered Diplomate Reporter
             NCRA Certified Realtime Reporter
21

22

23

24

25
```

## WORD INDEX

< $ >
**$10**  121:*3*

< § >
**§**  1:*1, 3, 4, 5, 6, 7*

< 0 >
**0095**  134:*5*
**01**  157:*5, 14*

< 1 >
**1**  6:*2, 9*  95:*6, 8, 12,
14*  96:*5*  100:*23*
122:*21, 24*
**1:40**  1:*17*  2:*4*  7:*4*
**10**  66:*9*
**100**  74:*3*  155:*13, 17*
156:*21*
**10111-0100**  3:*18*
**1050**  3:*13*
**11**  100:*8*
**1100**  3:*13*
**12/16/2020**  6:*9*
**122**  6:*7*
**12th**  122:*19*  131:*21*
**13**  6:*7*  133:*8*
**132**  6:*7*
**13th**  134:*5*
**14**  134:*9*
**153**  6:*9*
**156**  6:*12*
**161**  5:*2*
**16th**  153:*17*
**17th**  4:*4*
**18**  41:*12, 13, 19*
**18625**  1:*25*
**19**  96:*7*  100:*6*
**1st**  133:*8*

< 2 >
**2**  6:*7*  122:*7, 11*
128:*20*  153:*25*
**2:33**  44:*17, 18*
**2:41**  44:*19, 21*
**20**  149:*24*
**20.02100187**  134:*10*
**20036**  3:*14*

**2014**  18:*16*  19:*17*
88:*3*
**2018**  25:*6, 7, 22*
27:*14*  31:*12*  32:*25*
33:*20*  42:*20*  79:*20*
80:*2*  81:*15, 24*
**2018-2019**  81:*19*
**2019**  6:*12*  81:*24*
153:*17*  156:*15, 22*
157:*3, 14*
**202**  3:*14*
**2020**  6:*2, 7*  42:*22*
43:*1, 5, 10*  55:*1, 24*
56:*4, 8*  57:*1, 3*  58:*3,
6, 20*  61:*22*  81:*13, 15,
16*  82:*2, 8, 10, 19, 21*
83:*3, 4, 25*  84:*15*
85:*21*  96:*8*  100:*6*
111:*4*  115:*21*  122:*19*
125:*15, 19*  126:*3*
129:*16*  131:*21*  133:*8*
134:*5, 9*  140:*24*
141:*6*  152:*5*  153:*17*
**2021**  58:*2*  59:*14*
121:*15*  149:*12*
**2022**  69:*1*  137:*10*
**2023**  1:*16*  2:*4*  5:*2*
6:*2, 9*  7:*3*  133:*8*
161:*4, 17*
**20-cv-10849**  1:*5*  7:*9*
**20th**  98:*24*
**21**  100:*10*
**212**  3:*19*
**235**  4:*4*
**24/7**  46:*17*
**25**  100:*23*
**27**  122:*5, 6*
**28**  6:*12*
**2800**  3:*4*
**28th**  156:*15*  157:*2*
**29**  156:*22*  157:*14*
**29th**  157:*4*

< 3 >
**3**  5:*2*  6:*7*  121:*19*
132:*16, 20*  155:*12*
157:*24*
**3/5/2019**  6:*9*
**3:22**  70:*25*  71:*1*

**3:37**  71:*2, 4*
**30**  120:*25*
**30-second**  11:*22*
**31**  6:*12*  132:*13*
156:*15*
**39**  152:*25*

< 4 >
**4**  6:*9*  153:*1, 5, 25*
156:*18*  157:*25*
**4:53**  121:*22, 23*
**40**  155:*24*  156:*5*
**415**  3:*5*  4:*5*
**44**  3:*4*
**45**  3:*18*

< 5 >
**5**  6:*12*  154:*23*  156:*6,
10, 25*
**5:02**  121:*24*  122:*1*
**5:41**  150:*10, 11*
**5:46**  150:*12, 14*
**55**  97:*3, 24*
**589-4200**  3:*19*
**5th**  153:*17*

< 6 >
**6**  97:*24*  98:*1*  160:*4*
**6:00**  160:*5*
**600**  3:*10*

< 7 >
**7**  1:*16*  5:*2*  6:*2*
**705-8111**  3:*5*
**714**  3:*11*
**7th**  2:*3*  7:*3*  161:*4*

< 8 >
**8**  95:*4*
**861-1630**  3:*14*
**8th**  161:*17*

< 9 >
**900**  3:*10*
**92626**  3:*10*
**94104**  3:*5*  4:*4*
**95**  6:*2*
**954-4478**  4:*5*
**966-8833**  3:*11*

**99.99**  157:*5, 14*

< A >
**abilities**  8:*14*
**ability**  15:*25*  97:*16,
17*  142:*22*
**able**  48:*6, 7*  60:*5, 6*
95:*18*
**above-styled**  2:*3*
**access**  10:*21*  50:*5, 12*
112:*1*  140:*8, 14, 16*
153:*9*
**accessible**  50:*21*
**accommodate**  9:*18*
**account**  24:*12, 14*
47:*23*  48:*22*  49:*5*
53:*25*  92:*1, 6, 25*
93:*2, 11, 23*  94:*7*
105:*10, 11*  106:*14*
107:*1, 3*  111:*16, 19,
22, 23*  112:*1, 4, 12, 25*
113:*7*  114:*13*  124:*12*
127:*9*  128:*22*  129:*7*
137:*20*  138:*25*  139:*3,
5, 6*  140:*5, 7*  141:*14*
142:*1, 11, 20, 22*
143:*4, 14, 17, 25*
144:*15, 25*  145:*2, 11,
17, 20*  146:*5, 9, 15, 21,
24*  152:*22*  154:*20*
157:*21*
**accounts**  39:*11*
53:*11, 19*  54:*2, 3, 15,
23*  128:*12*  138:*12*
139:*10, 14, 17, 19, 20*
145:*10*  150:*17, 18, 21,
24*  151:*2, 14, 18, 19,
20*  152:*1, 8*  158:*9*
159:*1*
**accurate**  111:*9*
**accused**  62:*11, 21, 25*
**achieve**  113:*23*
**ACTION**  1:*4*  7:*9*
8:*3*  52:*19*
**actions**  77:*2, 23*
**activities**  19:*20*
38:*13*  49:*19*  90:*19*
118:*17*  121:*2*  143:*18*
147:*8*

**activity** 29:*15* 51:*22,
23* 52:*2* 53:*2* 65:*21*
67:*12* 88:*20* 89:*16*
104:*25* 107:*20*
115:*11, 25* 116:*6*
117:*19, 21* 119:*2, 10*
128:*5* 136:*2* 146:*14*
151:*21*

**actual** 111:*5*

**ADAYA** 1:*14* 2:*1*
5:*1, 2* 6:*1* 7:*5, 17, 22*
9:*24* 14:*5, 15* 15:*3, 5*
16:*2* 18:*11* 24:*11, 18*
27:*18* 28:*22* 29:*3*
41:*10* 44:*23* 62:*3, 17*
69:*6* 71:*6* 78:*15*
95:*11, 14* 97:*16*
98:*13* 103:*6* 122:*3,
10, 11* 132:*19, 20*
145:*6* 148:*14* 149:*3*
150:*16* 153:*4, 5*
154:*21* 156:*9, 10, 18*
157:*16* 158:*22* 160:*3*
161:*5*

**Adaya's** 28:*25*

**add** 154:*7*

**adding** 33:*23*

**addition** 84:*4* 85:*25*

**additional** 127:*23*

**address** 128:*22*
135:*6, 9* 136:*12, 15*

**addresses** 132:*11*

**advance** 16:*20* 97:*15*
98:*8*

**adverse** 142:*21*

**advice** 14:*10* 56:*17*

**advisable** 98:*9*

**advising** 56:*12, 13, 20*
61:*8*

**advisor** 58:*6*

**advisory** 56:*1, 10*
57:*4, 6* 58:*1, 2, 10, 24*
60:*15, 17, 18, 20* 61:*5*
83:*13*

**affiliated** 23:*19*
32:*15* 33:*19* 41:*9*
42:*13* 80:*5, 8, 14*
141:*5*

**affiliation** 80:*24*

**afternoon** 7:*22*

**agilbert@fbm.com**
4:*5*

**ago** 27:*17* 47:*1*
123:*25* 129:*17* 139:*7*
154:*12*

**agree** 25:*13, 15*
111:*13* 150:*5*

**agreement** 17:*11, 12*
40:*10* 57:*12* 65:*6*
66:*7* 82:*4, 18* 120:*19,
21, 22* 121:*6, 8, 14, 16*

**Ah** 99:*1*

**ahead** 9:*13* 25:*18*
31:*2* 43:*14* 45:*13*
46:*15* 59:*25* 60:*14*
72:*17* 87:*17* 89:*7*
91:*15* 102:*9, 11*
107:*10* 123:*10*
127:*14* 135:*24* 141:*3*
144:*9, 10* 148:*14*
149:*6* 151:*6* 152:*16*

**AirPods** 151:*8*

**al** 1:*6* 7:*7*

**algorithmic** 43:*18, 23*
44:*2, 3, 24, 25* 49:*3*
51:*22* 52:*1* 67:*15*
91:*7* 93:*1, 9, 19*
111:*7* 114:*11* 115:*25*

**algorithmically** 67:*9*

**allocation** 52:*18, 21,
24*

**allow** 53:*5* 142:*9*

**allowed** 112:*2*

**allows** 46:*22* 111:*25*
140:*12* 143:*1*

**alluding** 88:*4*

**alternative** 98:*10*

**Amanda** 3:*2* 159:*11*

**amount** 57:*15* 106:*7*

**Amrhein** 4:*8* 7:*10*

**analysis** 22:*16*

**Analyst** 19:*13, 21, 25*
20:*4* 21:*2*

**analytical** 19:*11*
22:*11*

**analyze** 49:*11*

**analyzing** 22:*12, 14*
49:*15*

**and/or** 115:*4, 7*

**Andrew** 4:*11*

**answer** 8:*11, 16, 20,
25* 9:*6, 7, 13, 21*
14:*16* 15:*24* 20:*10*
24:*15* 29:*3* 37:*1*
38:*16* 40:*5* 43:*14*
45:*14* 46:*15* 47:*6*
50:*7* 52:*5* 57:*24*
62:*17* 63:*4, 15* 66:*13*
67:*5* 68:*6* 72:*24*
73:*20* 74:*18, 25*
75:*13* 76:*15* 77:*8, 19*
78:*15* 81:*6* 83:*10, 22*
86:*6* 89:*8* 90:*12*
92:*20* 93:*6* 99:*12, 19*
101:*7, 12* 104:*3, 19*
106:*17* 114:*6* 126:*1,
18* 131:*11* 134:*25*
135:*2, 24* 141:*18, 20*
142:*15* 144:*12* 146:*2*
148:*16, 19, 24* 149:*5,
7, 21* 152:*16* 159:*8*

**answered** 8:*13* 9:*20*
28:*23* 39:*19* 57:*23*
61:*25* 66:*11* 72:*14,
17* 81:*5, 18* 83:*20*
84:*6* 90:*21* 91:*14*
108:*10* 109:*17*
112:*20* 114:*5* 132:*8*
159:*6*

**answers** 148:*11*

**anticipate** 67:*11*
116:*16*

**anticipated** 117:*3, 6*

**Antifragile** 59:*12, 13*

**Anton** 3:*10*

**Antonio** 16:*22* 34:*18,
20, 21* 38:*6* 39:*11*
42:*15* 52:*17, 19, 22*
54:*17* 94:*1* 108:*25*
109:*3* 110:*10* 111:*20*
112:*11* 122:*16*

**Antonio's** 52:*19*

**anybody** 50:*5* 159:*21*

**anymore** 142:*10*

**apart** 105:*1*

**API** 111:*21, 24, 25*
112:*2*

**apologies** 12:*6*

**apologize** 11:*22*

78:*12*

**appear** 95:*23, 24*

**APPEARANCES** 3:*1*
4:*1* 5:*2*

**appearing** 7:*14*

**appears** 55:*4*

**application** 12:*11*

**applies** 67:*24*

**appointment** 97:*5*

**appreciate** 159:*16*

**approximately** 31:*24*
42:*25*

**arbitrage** 27:*21, 22,
25* 28:*4* 30:*11, 19*
63:*7*

**argumentative** 78:*13*
142:*14*

**article** 55:*7, 9, 15, 17*

**ascended** 42:*21*

**aside** 10:*20*

**asked** 13:*7* 28:*23*
42:*3* 44:*24* 57:*22*
61:*24* 65:*1* 66:*10*
72:*14, 17* 74:*19* 79:*8*
80:*13* 81:*5, 18* 83:*19*
84:*6* 86:*1, 19* 88:*7,
19* 89:*21, 22* 90:*20*
91:*13* 108:*10* 109:*17*
112:*20* 114:*5* 132:*8*
159:*6*

**asking** 8:*5* 29:*17, 20*
37:*17* 56:*22* 66:*1, 4*
84:*13* 91:*22* 98:*15*
101:*16* 113:*21* 128:*2,
3, 4* 131:*22* 154:*6*

**asks** 101:*4*

**assess** 97:*19*

**assessment** 55:*6*

**asset** 47:*15* 59:*19*
64:*2, 7* 79:*25* 113:*25*
115:*2, 7* 116:*12, 14,
17, 20* 117:*9, 11*

**assets** 20:*22* 22:*4*
25:*23* 26:*1, 6, 10, 14,
21* 28:*5* 31:*17, 19, 20*
33:*2* 34:*4, 5* 36:*12,
14, 16, 21, 23* 37:*4, 14,
18, 20, 21, 23* 39:*1, 2,
10* 42:*1, 3, 6, 7, 8*
43:*2, 6* 48:*18* 52:*1,*

Deposition of Nasir Adaya

United States Securities and Exchange Commission v. Stefan Qin, et al

---

*11* 53:2, 6  54:2, 5
63:*10*  69:*14*  75:4
113:*11*, *14*  115:16
118:22  123:*1*, *11*
124:*12*, *18*  125:16
126:23  127:5, 9
128:*11*  132:4  136:*21*,
*23*  137:*11*, *17*, 20
138:2, 3, 7, *10*  140:*12*
143:2  146:*21*  155:7,
*18*  157:20  158:6, 8,
23, 25
**assigned**  19:*24*
**assist**  110:7
**assume**  8:*12*  52:8
**assumes**  33:5, 7  52:3
63:*12*, *13*  74:*14*
77:*17*  78:*13*  82:*14*
90:*10*  93:4  94:9, *12*
103:*15*  105:2  126:*16*
131:*10*  134:23
141:*16*  144:*1*, 4, 7
145:*13*  146:*16*  151:4
**attached**  24:9
**attempting**  102:*17*
**attend**  18:*21*
**auction**  115:*1*, 5, 9
**August**  19:*16*
**authorization**  107:*23*
**Authorized**  154:*20*
**automated**  46:23
49:6
**available**  51:2, *11*, *13*
69:20  103:*10*
**Avenue**  3:*13*
**average**  64:23
**Aviva**  4:3  16:5  17:7
**Aviva's**  78:9
**avoid**  142:*21*
**aware**  62:2, 5, 6, 9
63:8, *11*, *16*  76:*16*
77:*21*  85:9  104:*14*,
*21*  139:*12*  143:*24*
**awareness**  74:*10*

**< B >**
**bachelor's**  18:*14*
**back**  11:6, *10*, *21*, *24*
12:9  25:3  42:*19*
44:20  47:*21*  48:9, 20

51:*17*  56:2  58:*15*, *19*
61:*11*  62:2  64:*12*
71:*3*  79:*11*  92:23
111:5  121:*19*, 25
130:2  131:*12*  136:*13*,
*14*  150:*13*  153:*14*
156:*18*, 25
**background**  18:*12*, *13*
**BAKER**  3:9, *13*, *17*
**BakerHostetler**  8:*1*
**balance**  133:*11*
**Ballpark**  147:*14*
**base**  40:9  106:5
**based**  21:23  24:*10*
44:5  45:2  110:22
131:*17*  132:*1*  141:23
155:5
**basically**  69:*17*
**Bass**  3:*16*
**bearings**  97:2
**began**  141:*1*
**beginning**  29:6
159:*13*
**BEHALF**  3:2, 6  4:2
33:*10*  37:*18*  94:4
120:7  150:*24*  151:20
152:8
**behavior**  47:*15*
**belief**  124:8, *10*  132:*1*
**believe**  8:*17*  11:*1*
16:8, *15*  17:5, 6, *10*,
*15*  18:*1*, 5, 9  19:*16*
21:4, *13*  22:9  23:3,
*10*  25:7  26:*15*, *17*
27:*16*, 20, *24*  28:8
29:*13*, *23*  30:*10*, *15*,
*17*  31:22  32:*10*, 20
34:*17*, *24*  35:*17*, *21*
36:4, 8, *15*, *19*  37:6,
*11*, *19*  38:2, 4, 7, *17*
39:*1*, 3, 9, *10*, *13*, *18*,
*23*  40:*13*, *16*, *19*, *21*
41:*13*, *17*, *24*  42:7, *14*,
*17*  43:*15*  47:*25*
50:20  51:*14*, *24*
52:*13*  53:*12*  54:*16*,
*24*  55:*1*, *12*, *13*, 20
56:7, *18*  58:2, 5  59:5,
*14*  61:*17*  62:22  63:5,
*17*  64:*19*  65:*13*, *17*

69:*1*, 5, *21*  73:3  75:5,
*14*, 25  76:4, 8, *12*, *15*,
20  77:25  78:4, 20
79:*15*, *19*, 20, 25  80:3,
*18*  81:7, *13*, 25  82:3,
*10*  83:*11*  85:3, 7, 9,
*11*, *19*  86:*17*  93:25
94:*11*, *13*, 20  95:*21*
96:*1*, *18*  97:*12*  99:*13*
100:*1*  103:*1*, *12*
104:*10*, 23  105:*13*, 25
106:*12*, *18*  107:*15*, *18*
108:22  109:6, *18*
110:*13*, *24*  111:20
112:5, 9, *14*  113:9, *24*
115:*18*  120:3, 22, 25
121:8  122:*15*  123:7,
*11*, *17*  124:4, 6, *21*, *24*
125:*14*, *15*, *17*, *21*
127:2  129:9  130:*19*
131:*24*  132:3  135:8
136:5, *13*  137:*10*, *16*,
*21*  138:6, *18*, *24*
139:5  140:*15*, 25
141:*21*  142:7  143:6,
*10*, *16*  144:3, *13*
145:*14*, 20  146:*11*
147:*12*, 23  148:*10*, 22
150:25  151:22
152:*10*  153:9  155:8,
9, 20, *21*  158:23
**belong**  34:4
**belonged**  33:2  54:3,
4  137:*12*
**belonging**  36:*21*  43:6
**beneficial**  36:23, 25
**benefit**  46:*10*, *16*
72:20  74:8
**benefits**  73:*17*, *21*
75:*18*  76:*13*  78:6, *24*
**best**  8:*13*  9:7  12:*19*
14:*17*  15:*24*  18:9
24:*1*, *21*  80:22
100:*21*, *24*  155:*13*
**better**  110:*11*  112:3
129:*23*  158:20
**beyond**  137:*17*
**bid**  64:*16*  100:*21*, *24*
114:*19*  117:*12*

**bids**  64:3  114:8, *16*
115:*1*
**Binance**  76:9  80:8,
*10*  94:7  105:*11*, *15*,
*17*, *19*, *24*  106:*14*
107:*1*  111:*16*, *19*, *23*
112:4, *12*, 25  113:7
114:*12*  128:*12*, 25
132:4  138:*12*, *21*
139:*1*, 9, *15*  140:9, *12*,
*16*  141:*13*, *24*, 25
143:*14*  145:*10*, *11*, *16*,
*18*
**Binance's**  106:2, 4, *10*
**bit**  96:*24*  101:*23*
102:20  116:*10*
127:22  129:23
133:*15*, *24*, 25  135:*10*
153:7  154:*16*  158:*11*,
*12*, 20
**Bitcoin**  129:4, 6
131:7, *18*, 22, 23, 25
132:6  133:4, *12*
134:6, *10*, *16*, 22
135:4  136:8, *10*
138:3  155:*18*  156:22
157:3, 5, *15*
**blockchain**  58:*13*
80:20
**Blockchair**  6:9, *12*
132:*24*  133:*1*, 4
156:*12*, *13*
**Bodoia**  42:*18*
**bolts**  111:5
**book**  22:22  45:*17*
50:*15*  64:22  100:22,
*24*  114:9, *21*, 25
115:4, 8
**books**  48:*17*  116:9
**bottom**  122:*21*, 23, *24*
123:*15*  128:20
155:*12*  158:*1*
**bought**  115:3
**Boulevard**  3:*10*
**branding**  74:6
**BRAUN**  4:3
**break**  9:*17*, *18*, 22
44:23  91:6, 8, *21*
114:3  121:*19*  142:*16*

---

Case 1:20-cv-10849-JGLC   Document 233-2   Filed 08/04/23   Page 166 of 191
Deposition of Nasir Adaya
United States Securities and Exchange Commission v. Stefan Qin, et al

150:*1*, *3*, *4*, *7*, *17*
**breaking** 11:*13*
**breaks** 150:*7*
**broader** 79:*16*
**broke** 157:*8*
**brought** 25:*1*, *10*
82:*17*, *25* 83:*4*
**BTC** 128:*22*, *23*
129:*3* 155:*13*
**btw** 98:*16*
**bucket** 64:*24*
**building** 84:*19*
147:*11*
**built** 58:*13*
**bunch** 130:*23*
**businesses** 57:*2*
**button** 102:*4*
**buy** 116:*16* 155:*13*,
*17* 156:*21*

**< C >**
**calculate** 64:*25*
**calculated** 64:*19*
149:*9*
**calculating** 64:*22*
**California** 3:*5*, *10*
4:*4*
**call** 13:*11* 36:*22*
41:*15* 95:*14* 129:*6*
130:*16*
**called** 7:*18* 80:*10*
117:*8*
**calls** 36:*24* 63:*1*
77:*5* 99:*17*
**camera** 12:*20*, *22*
**capabilities** 85:*5*
87:*23* 90:*8*
**CAPACITY** 3:*8*
26:*15* 56:*13* 80:*9*
82:*1* 99:*25* 143:*7*
**Capital** 19:*6*, *7*, *8*
21:*7*, *20*, *21* 22:*4*, *7*,
*13*, *14*, *21* 23:*1*, *6*, *7*
27:*19*, *24* 28:*7*, *13*, *17*
32:*16* 33:*13* 37:*6*, *9*,
*15* 42:*9*, *10* 60:*7*, *8*
**capturing** 153:*15*
**care** 128:*24*
**career** 26:*3*

**Carney** 3:*16*
**case** 13:*2* 49:*23* 72:*2*
**cate** 68:*17*
**categories** 48:*13*, *15*
**cause** 2:*3* 161:*14*
**cautioned** 161:*6*
**cede** 159:*15*
**cell** 10:*24* 11:*2*, *5*
**Central** 7:*4* 64:*22*
100:*22* 114:*21*
**centralized** 106:*6*
112:*10* 130:*15* 142:*8*
**certain** 44:*5* 45:*2*
47:*11*, *12* 51:*5* 54:*2*,
*3* 64:*21* 101:*23*
115:*3*, *7* 129:*12*
139:*16* 143:*17*
**certainty** 32:*5*
**CERTIFICATION**
5:*2* 161:*1*
**Certified** 161:*3*, *20*
**certify** 161:*3*, *13*
**cessation** 147:*7*
**chain** 58:*14* 69:*16*
70:*20* 76:*14* 83:*13*
84:*20*
**change** 33:*3* 34:*23*,
*24* 52:*21*
**channel** 154:*19*
**characteristics** 74:*6*
106:*13*
**characterizations**
97:*20*
**characterize** 68:*17*
70:*9*
**characterizing** 89:*14*
**charge** 22:*22* 71:*17*
**Chat** 6:*2*, *7* 97:*8*
122:*22* 126:*9* 153:*23*
**chats** 18:*2*, *5* 95:*24*
96:*11*, *14* 97:*1*, *3*
130:*25* 136:*7*, *11*, *16*
**Chen** 16:*19* 79:*12*,
*13*, *14* 80:*4*, *14*, *25*
81:*15*, *24* 85:*7*, *14*
104:*21*, *24* 112:*9*
121:*11* 125:*1*
**Chen's** 80:*24*
**choosing** 74:*12*, *22*

**circumstances** 20:*7*,
*11* 25:*1*, *10*, *21* 55:*3*,
*4* 84:*10*, *12*, *15* 85:*1*
116:*21* 124:*17* 147:*7*
154:*10*, *13*
**citizen** 140:*15*, *18*
142:*2* 148:*1*
**city** 10:*6*
**CIVIL** 1:*4* 2:*8* 7:*9*
**clarify** 16:*10* 17:*17*
19:*23* 26:*7*, *19* 29:*16*
33:*4*, *14* 34:*10* 54:*19*
56:*15* 151:*13*, *15*
**clarity** 95:*15*
**class** 140:*12*
**clear** 40:*6* 56:*3*
61:*18* 85:*16* 87:*10*
106:*23* 120:*12*
150:*19*
**clearly** 141:*24*
**clicker** 158:*2*
**client** 61:*12*, *16*
86:*21* 89:*15* 148:*19*
**clients** 57:*3*, *13*
68:*19*, *21* 69:*3*
146:*13*
**close** 11:*11* 147:*5*
**closely** 127:*19* 153:*8*
**closing** 12:*10* 28:*2*
**code** 46:*17* 48:*6*
67:*8*
**codes** 44:*4* 45:*1*, *4*
**coin** 69:*7*, *10*, *15*, *23*
70:*1* 71:*7*, *11*, *12*, *18*,
*24* 72:*6*, *11* 76:*18*, *23*
**coins** 72:*11* 75:*15*
**colleagues** 16:*17*
**come** 25:*24* 121:*19*
**comes** 66:*22*
**coming** 47:*1*
**comment** 79:*3* 118:*9*
**comments** 127:*24*
**commingled** 54:*5*
**COMMISSION** 1:*3*
3:*2*, *4* 7:*6* 77:*3*
**commissions** 65:*18*
**committed** 62:*25*
63:*18* 125:*7*
**commodities** 20:*19*,
*25* 26:*3*

**commodity** 19:*4*, *9*
20:*6*, *14*, *17* 21:*22*
**communicate** 107:*23*
122:*25* 146:*25*
**communicated**
107:*24* 121:*9*
**communicating** 13:*10*,
*13* 90:*25* 128:*21*
**communication**
153:*23* 155:*5*
**companies** 77:*22*
**company** 21:*15*
55:*18* 69:*18*, *20*
70:*13* 71:*11* 72:*8*
80:*19*
**company's** 72:*21*
**compensated** 40:*8*, *9*
64:*13*, *14* 65:*3*, *4*, *16*
117:*17*, *18* 119:*24*
**compensation** 40:*14*,
*16* 118:*12*, *16* 119:*9*
147:*14*
**complete** 161:*9*
**complied** 127:*8*
**computer** 10:*20* 11:*9*,
*19* 12:*12*
**concern** 126:*4*, *5*
**concluded** 160:*5*
**concludes** 160:*3*
**conclusion** 36:*25*
63:*2* 77:*6* 99:*18*
**conduct** 47:*15* 48:*6*
49:*14*, *15* 93:*11*, *23*
94:*7* 103:*9* 104:*25*
105:*10* 107:*17* 108:*8*
109:*4* 150:*23*
**conducted** 47:*9*, *17*
51:*18* 93:*12* 103:*14*,
*19* 105:*15* 108:*14*
119:*22*
**conducting** 30:*18*
31:*4* 59:*21* 61:*1*
63:*19* 93:*21* 94:*3*
110:*7* 114:*12* 115:*25*
120:*6* 128:*4* 146:*14*
**confidential** 148:*6*, *11*,
*22*
**confirmation** 13:*12*
**Confirmed** 13:*15*

Case 1:20-cv-10849-JGLC   Document 233-2   Filed 08/04/23   Page 167 of 191
Deposition of Nasir Adaya
United States Securities and Exchange Commission v. Stefan Qin, et al

confused 50:9 93:7
confusing 23:24
connect 47:22 49:4
  111:18 112:3
connected 48:21
Connecticut 3:13
connection 11:1
consequences 142:21
consider 9:22
consideration 115:17
considerations 74:11
consisted 63:9
consultant 56:16
consulting 58:18
  84:3, 11 85:17
  105:22, 23
CONT 4:1
contacted 90:4
contains 161:9
content 33:22
context 32:11 70:10
  96:19 114:2, 22
  127:22 129:21 131:5
  132:3 155:21 158:19
continue 10:18
  129:21 138:18
continued 33:24
continuous 115:9
contractor 57:11
control 95:19 96:20
  98:3, 4 102:8, 15
  128:13 129:10, 24
  133:19, 20, 21 135:7,
  9 137:13, 20 138:13
  139:14 141:13
  142:22
controlled 124:2, 4,
  14 139:11 142:1
controlling 133:16, 17
controls 123:23
conversation 96:2
  107:11 110:13, 22
  111:1 154:9
conversations 153:16
copy 14:1, 12
corporate 26:24
correct 8:19 10:4
  11:3 15:8, 9, 25 16:1,
  12 20:25 21:1, 17, 24
  28:5, 15 29:11, 22

31:5, 6 34:12 35:8
  37:5 42:25 43:4
  45:23, 24 46:20, 21,
  23, 24 50:2, 15, 19
  69:20 70:6 72:6
  75:4, 7, 9 77:24
  81:17 83:18 84:1, 2,
  7 85:22 86:3, 14, 17
  87:5 88:16 89:3, 25
  92:2, 3, 6, 7, 10, 11, 13,
  17 94:4, 5, 8, 17 99:9
  100:3, 4 105:12, 15
  106:15 107:4 110:18
  114:17 117:22 121:5
  123:16 126:25
  135:13, 14, 17, 20
  136:3 137:3, 15, 20
  138:8, 23 148:2
  155:8, 19 159:9
correctly 9:25 10:1
  83:12 88:10, 22
  89:24
correlated 92:9
correlations 48:18
correspondence 24:10
Cosmos 58:13, 14
  84:20
Cosmos-based 80:20
Costa 3:10
counsel 7:14 9:11
  11:12 139:9, 10
  157:8 161:13
count 62:3
couple 21:5 57:16
  142:16
course 9:14, 19
  30:21 59:9 106:20
  129:22
COURT 1:1 7:8, 11,
  12, 13, 15 8:23, 24
COURT-
APPOINTED 3:8
  8:3
courtroom 15:20
cover 159:19
covered 51:18 56:5
covering 28:24
coworkers 34:11
create 69:18

created 48:21
  130:25 131:2, 3
  139:2, 5, 6 142:19
  145:10, 12 151:1
  152:2
creating 94:15
creation 49:1
criteria 74:20, 22, 25
CRR 1:24 2:5
  161:19
crypto 79:16 118:22
  147:19
cryptocurrencies 27:5
cryptocurrency 26:5
currency 26:25
currently 10:2, 9, 10,
  23 68:21, 23 135:6
  137:1, 19
custody 154:24
cut 52:17, 23 65:20

< D >
D.C 3:14
data 45:7, 8, 17 46:3
  48:9, 10, 13, 14, 15
  50:3, 5, 12, 14, 16, 20
  51:1, 3, 8, 10, 11
date 7:3 21:4 96:4
  100:5, 10 111:3, 4
  128:6 133:6 137:15
  156:14
dated 122:18
dates 125:9 152:3
  156:19
day 2:3 20:2 134:8
  136:11 157:5 161:4,
  17
day-to-day 19:20
  38:13
December 6:7 55:8,
  24 56:4 58:19 61:22
  122:19 125:14, 19
  126:3 131:21 133:8,
  14 134:5, 9 140:24
  141:6 153:17
decentralization 70:17
decentralized 58:12
  70:16
Decibel 41:12, 13, 19

decide 71:18
decides 66:17
decision 52:24
decision's 52:23
declaration 28:25
Deefa 123:19, 23
  126:11 127:4, 6, 10
  138:4, 11, 12
deem 148:10
deepest 106:7
Defendants 1:7
definitely 58:15
definition 114:15
degree 18:15, 17
degrees 18:18, 24
demand 20:6 22:15
  116:11, 14, 16, 20, 25
  117:6, 10, 12
depended 115:18
dependent 48:2 53:9
depending 71:20
depends 48:1 64:24
  66:6 67:10, 13, 18
  68:16 69:16 71:14
  72:1 73:8 116:9, 19
deploy 47:17 59:18
deploying 35:5
deposed 15:10
DEPOSITION 1:13
  2:1 6:1 7:5 8:4
  10:21 13:8, 14 15:19
  16:3, 4, 14, 17, 20
  17:2 95:8 122:7
  132:16 153:1 156:6
  160:3, 5 161:5, 7
depth 64:21 79:10
derivative 47:11
  106:8
describe 56:19 67:6,
  20 69:9
described 38:5
  50:15 51:7 58:24
  61:6 64:9 75:18
  87:5, 11 91:17 114:8,
  15 158:10
DESCRIPTION 6:2
designate 148:11, 21
desk 147:11
details 32:21 55:13

**determined** 70:*5*
**Develop** 35:*8*
**developed** 30:*11*
**deviates** 47:*13*
**device** 10:*22*
**devices** 10:*22* 18:*3*
**devising** 103:*5*
**difference** 37:*24*
38:*2* 39:*6, 9*
**differences** 38:*22*
**different** 24:*20* 39:*1,
2, 3, 4, 10* 40:*17, 22*
68:*13* 70:*8* 71:*18, 19*
73:*9, 13* 91:*17* 96:*12*
113:*21* 153:*16*
**difficult** 9:*4* 30:*23*
32:*23* 46:*9* 51:*15*
53:*4, 8* 70:*8* 71:*21*
73:*10* 101:*3* 111:*12*
118:*9, 23* 127:*11*
136:*23*
**digital** 20:*22* 22:*4*
25:*23, 25* 26:*5, 10, 13,
21* 28:*5* 37:*14, 20, 21*
59:*19* 64:*7* 69:*14*
75:*4* 79:*25*
**Diplomate** 161:*2, 20*
**discrepancies** 28:*1, 3*
**discuss** 38:*6* 52:*22*
**discussed** 38:*7, 25*
43:*3, 7* 50:*4* 78:*21*
85:*12* 89:*20* 102:*24*
125:*7*
**discussing** 67:*16*
110:*10* 116:*1*
**discussion** 12:*14*
14:*5* 122:*15*
**discussions** 22:*19*
**distracted** 13:*2*
**distribution** 72:*3*
**DISTRICT** 1:*1* 7:*8*
**document** 95:*4, 17,
19* 96:*21* 99:*10*
101:*10, 23* 102:*2, 19*
105:*6* 114:*1* 122:*6,
12, 14* 123:*8* 124:*15*
127:*2, 19, 21* 128:*19*
129:*25* 130:*1* 132:*21,
22* 133:*7, 16* 134:*15*
137:*24* 153:*6, 10, 15,*

*22* 156:*3, 11, 13*
157:*13* 158:*15*
**documents** 13:*17*
17:*1, 4, 6, 7, 9, 13, 16,
24* 18:*10* 97:*15*
**doing** 12:*17* 13:*3*
31:*15* 33:*12, 16* 43:*9,
18* 52:*2* 56:*10* 60:*15*
62:*11, 21* 68:*1* 83:*5*
84:*3* 88:*8* 107:*14*
122:*5* 126:*24*
**dollars** 32:*2* 119:*1, 8*
121:*4* 147:*21* 149:*16*
**drill** 116:*10*
**due** 60:*4* 70:*14*
78:*22*
**duly** 7:*18* 161:*6*
**duties** 51:*24* 56:*23*
**duty** 54:*24* 57:*6*
**dynamic** 33:*3* 117:*3,
6*
**dynamics** 116:*9*

**< E >**
**earlier** 8:*19* 15:*6*
38:*25* 39:*19* 42:*15*
43:*3, 7* 50:*15* 53:*10*
72:*2* 75:*2* 86:*19*
87:*9* 89:*20* 91:*6, 18*
92:*4* 103:*3* 111:*6, 8*
117:*15* 125:*7* 136:*25*
138:*5* 139:*16* 158:*10*
159:*12*
**easier** 122:*5*
**easiest** 33:*16*
**economics** 57:*5*
60:*23*
**educational** 18:*12, 13*
**effect** 74:*1* 75:*17, 20*
117:*9*
**effects** 73:*22* 74:*5*
**efficient** 11:*10* 12:*9*
**either** 127:*24* 150:*24*
152:*7* 159:*1*
**electronic** 10:*22* 18:*3*
**Electrum** 130:*16, 20,
22*
**else's** 31:*20*
**e-mail** 12:*11*

**emanating** 152:*22*
**emergency** 124:*22, 23*
**employed** 28:*10*
85:*18* 99:*16*
**employee** 83:*18* 84:*1*
**employer** 57:*7*
**employment** 99:*18*
104:*14* 108:*8, 15*
**employs** 72:*8*
**ended** 137:*10*
**endpoint** 50:*24, 25*
51:*6*
**endpoints** 50:*21, 23*
**enforcement** 77:*2, 23*
**engaged** 27:*4, 20*
36:*9* 62:*22* 85:*6*
**engagement** 85:*1*
**engaging** 27:*25*
**ensuring** 54:*22*
**entail** 30:*2* 60:*22*
**entailed** 35:*4* 92:*8*
**entails** 30:*3* 60:*21*
91:*9*
**entire** 53:*22* 107:*7*
114:*1*
**entirely** 62:*13*
**entities** 23:*19, 25*
24:*2, 22* 27:*18* 28:*9*
30:*22* 32:*22* 33:*15,
19* 34:*19* 36:*20* 40:*2*
41:*1, 4, 5, 8* 43:*10, 16*
81:*8*
**entitled** 148:*7, 9*
**entity** 19:*21, 25*
20:*21* 21:*3* 23:*17*
24:*20* 27:*20* 28:*10*
32:*8, 13, 15, 18* 41:*14,
19, 24* 42:*13* 66:*23*
**equity** 69:*13*
**Eric** 16:*19* 79:*12, 13*
80:*25* 85:*7* 98:*25*
112:*9* 121:*11*
**escaping** 88:*4*
**especially** 26:*2*
**essentially** 65:*11*
**established** 85:*20*
107:*1*
**estimate** 118:*19*
**et** 1:*6* 7:*7*

**ETH** 126:*11, 14*
138:*8*
**Ethereum** 51:*5*
**Etherscan** 133:*3*
**events** 79:*25* 80:*1*
**Everest** 7:*10, 13*
**evolution** 33:*18*
**exact** 19:*15* 21:*4*
23:*2* 28:*24* 33:*11*
34:*17* 36:*20* 42:*24*
57:*12, 15* 59:*16* 82:*9*
125:*18* 127:*12*
149:*22*
**exactly** 22:*8* 27:*13*
28:*9* 40:*6* 55:*19*
56:*9* 80:*9* 113:*16*
**EXAMINATION** 5:*2*
7:*20*
**examined** 7:*19*
**example** 20:*1, 3, 5*
38:*3* 44:*3, 25* 45:*6*
46:*2* 47:*10* 48:*4, 5*
50:*25* 51:*3* 52:*15, 16,
19* 56:*21* 57:*4, 6*
60:*23* 61:*4, 7* 64:*2,
15* 65:*5, 8* 66:*2, 22*
67:*15* 68:*18* 74:*2*
100:*22* 116:*15*
**examples** 45:*16*
**EXCHANGE** 1:*3*
3:*2, 4* 7:*6* 46:*4*
47:*12, 23* 48:*1* 51:*1,
5* 53:*7* 69:*16* 73:*4, 5,
8, 14, 16, 18, 22* 74:*3,
12, 13, 23* 75:*6, 9*
76:*6, 9, 10, 14* 77:*3*
92:*1* 117:*10* 130:*10*
138:*21* 145:*18*
**exchanges** 28:*2* 46:*5,
7* 48:*11* 51:*11* 53:*4*
75:*3, 16* 106:*6* 142:*8*
**excuse** 28:*22*
**execute** 35:*11* 42:*1*
44:*4* 45:*1* 50:*1*
113:*13*
**executed** 38:*22* 39:*7*
**executing** 67:*8* 92:*9*
**exhaustively** 87:*9*
**Exhibit** 6:*2, 7, 9, 12*
95:*6, 8, 12* 113:*20*

122:*7, 11*  132:*16, 20*
153:*1, 5*  156:*6*
**EXHIBITS**  6:*1*
**experience**  26:*5, 8*
86:*14*  87:*3, 5*  89:*3, 9,
12, 14*  90:*1*  110:*14*
131:*18*  141:*23*
**experiencing**  87:*22*
**experiment**  47:*19*
**expertise**  60:*24*
**expiration**  137:*15*
**expired**  137:*5*
**explain**  44:*1, 24*
53:*18*  63:*24*  64:*18*
70:*11*  73:*25*  101:*5*
114:*18*  116:*13*
140:*10*
**exposure**  20:*19*  25:*25*
**express**  144:*14, 19*
**extensive**  47:*2, 7*
**extent**  14:*3, 11*  24:*13*
**externally**  37:*7, 9*
**eye**  82:*19*
**eyeballs**  74:*7, 9*

**< F >**
**face**  12:*19*
**facilitate**  64:*4*  94:*2*
**fact**  63:*13*  77:*1*
84:*18*  139:*11*  146:*25*
148:*20*
**factor**  75:*21*
**factors**  45:*18*  71:*20*
**facts**  33:*7*  52:*4*
74:*15*  77:*17*  78:*13*
82:*15*  90:*11*  93:*4*
94:*10, 12*  103:*16*
105:*3*  126:*17*  131:*10*
134:*24*  141:*16*  144:*2,
5, 7*  145:*13*  146:*17*
151:*5*
**fair**  25:*6*  42:*22*
53:*15*  71:*23*  82:*8, 21*
118:*25*  119:*7, 24*
**familiar**  23:*18*  28:*19*
30:*6*  36:*19*  53:*22*
80:*21*  85:*7*  89:*18*
**familiarity**  114:*21*

**far**  15:*2*  38:*17*
41:*19, 21*  99:*23*
109:*15*
**FARELLA**  4:*3*
**fashion**  46:*23*  49:*6*
97:*6*
**fast**  158:*13*
**favor**  12:*10*
**Federal**  2:*8*
**fee**  40:*20*  65:*12*
**field**  19:*3*
**file**  147:*25*
**filed**  149:*8*
**finalize**  58:*16*
**finance**  24:*12*  80:*11*
**finances**  148:*7*
**financial**  148:*6*
**financially**  161:*15*
**fine**  9:*2*  72:*16*
129:*20*  150:*4*
**finish**  9:*5*  46:*14*
57:*1*  141:*2*
**firm**  8:*1*  155:*4*
**first**  9:*21*  23:*16*
26:*3*  27:*12*  29:*17, 18,
23, 24*  30:*12*  31:*11*
69:*12, 17*  81:*15*
84:*13*  109:*15*  124:*15*
152:*25*  161:*6*
**fiscal**  148:*4*  149:*12*
**fits**  49:*11*
**five**  35:*23*  36:*1*
123:*20*
**flesh**  45:*5*
**Floor**  4:*4*  159:*15*
**focus**  22:*1*  99:*2*
**focused**  20:*24*  60:*16*
**focusing**  26:*2*
**follow**  100:*13*
**following**  115:*24*
**follows**  7:*19*
**forever**  102:*18*
**forget**  82:*12*
**form**  37:*16*  65:*11*
101:*1*
**formal**  40:*25*  81:*2*
87:*24*
**formally**  28:*10*
**former**  16:*16*

**forms**  65:*17*
**formula**  64:*21*
**formulas**  64:*20*
**forth**  11:*7, 11*  12:*9*
133:*5*
**founder**  79:*13*  81:*1*
**frame**  43:*1, 5, 10*
58:*22*
**framework**  67:*24*
**frameworks**  70:*8*
**Francisco**  3:*5*  4:*4*
**fraud**  55:*20, 21*  62:*4,
22, 25*  63:*18*  125:*1, 3,
6*
**front**  13:*17*  15:*20*
28:*11*  101:*2*  112:*17*
115:*20*  118:*8*  131:*13*
138:*15*  139:*17*
**froze**  11:*1*
**frozen**  102:*3*  125:*17*
139:*10, 20*
**FTX**  145:*20*  146:*5,
11*
**full**  15:*3*  44:*9*  115:*5*
130:*24*  161:*9*
**full-time**  84:*1*
**fully**  132:*2*  155:*20*
**function**  45:*8*
**functions**  58:*24*
**fund**  19:*9, 10*  20:*8*
21:*22*  30:*6*  36:*16, 17,
22*  39:*14*  40:*19*  43:*6*
53:*15*  54:*4*  55:*5, 10*
59:*13, 17, 18, 23*  60:*1,
3, 4*
**funds**  26:*24*  38:*20*
63:*8*
**further**  96:*6*  161:*13*
**future**  110:*12, 15*

**< G >**
**gain**  69:*24*
**gas**  20:*20*  143:*11*
**general**  39:*24*  88:*2*
125:*8*
**generalize**  49:*21*
51:*16*  52:*13*  53:*4, 8*
66:*15*  67:*13*  71:*21*
73:*10*  111:*12*

**generally**  69:*9*  73:*6*
107:*6*  113:*12*  115:*16*
117:*10*  128:*4*
**generate**  48:*6*
**generated**  65:*21*
111:*21*  112:*4*  120:*6,
17*  121:*3*  126:*15*
**gestures**  8:*25*
**getting**  44:*9*  111:*17*
130:*8*  153:*18*
**Gilbert**  4:*3*  9:*11*
11:*16*  13:*25*  14:*3, 8*
16:*5, 7, 13*  17:*7, 15*
20:*9*  24:*4*  25:*12, 16*
28:*21*  31:*7, 13*  33:*5*
36:*24*  38:*15*  40:*3*
43:*11, 13, 20*  45:*11,
13*  46:*12, 14*  47:*4*
50:*6*  52:*3, 12*  53:*21*
54:*10*  57:*22*  59:*6, 22,
24*  61:*24*  62:*12, 15*
63:*1, 12, 21*  64:*8*
66:*10*  67:*3*  68:*3, 8*
71:*8, 13*  72:*12, 14, 16,
23*  73:*7, 19*  74:*14*
75:*10, 24*  77:*5, 16*
78:*11*  79:*2*  81:*5, 18*
82:*11, 14*  83:*6, 8, 19*
84:*6*  86:*4, 15*  87:*14*
88:*11, 23*  89:*4, 6, 8*
90:*10, 20*  91:*2, 13*
92:*18*  93:*3*  94:*9, 12,
18*  97:*4, 13, 19*  98:*7*
99:*10, 17*  101:*9*
103:*15, 21*  104:*2, 16*
105:*2*  106:*16*  107:*8,
10*  108:*2, 10, 17*
109:*17*  110:*5, 19*
111:*10*  112:*20*  113:*1,
15*  114:*5*  115:*13*
116:*23*  118:*21*  119:*3,
11*  120:*1*  123:*6, 8*
125:*23*  126:*1, 16*
129:*14*  131:*9*  132:*8*
134:*23*  135:*18, 22*
136:*4*  139:*16*  141:*15,
19*  142:*3, 13, 23*
144:*1, 4, 7, 10, 16, 21*
145:*3, 5, 13, 19, 24*
146:*6, 16*  147:*2, 9, 17,*

*22* 148:*5, 15, 23*
149:*4, 6, 13, 20, 25*
150:*5* 151:*4, 11*
152:*15* 154:*11* 159:*6, 20, 23*
**girlfriend** 139:*25*
140:*18* 144:*19*
146:*22*
**girlfriend's** 139:*24*
142:*12, 20* 145:*2, 17, 22* 146:*5*
**give** 8:*16* 9:*7* 11:*14, 22* 14:*22* 20:*3* 45:*16*
48:*3* 52:*15* 59:*24*
61:*4* 79:*17* 82:*11*
101:*7* 107:*19* 118:*19*
122:*13* 128:*23*
144:*14, 19* 150:*2*
**given** 28:*8* 49:*22*
65:*6, 7, 15* 101:*23*
115:*8* 116:*25* 117:*2*
124:*21* 127:*12*
129:*16* 134:*20*
136:*15* 147:*18*
152:*18* 161:*16*
**gives** 140:*8*
**go** 9:*13* 21:*19, 25*
23:*14* 25:*18* 31:*2*
43:*14* 44:*12, 14*
45:*13* 46:*15* 52:*2, 10*
53:*1* 55:*24* 59:*25*
60:*14* 70:*22* 72:*17*
87:*17* 89:*7* 91:*15*
96:*3, 5* 97:*3, 5, 23, 24*
100:*8* 102:*9, 11, 15*
107:*10* 109:*21, 24*
123:*10* 127:*13*
128:*19* 130:*2, 5*
131:*12* 134:*1* 135:*24*
136:*13, 14* 138:*3*
141:*3* 142:*8* 144:*9, 10* 148:*14* 149:*6*
150:*3, 4, 5* 151:*6*
152:*16* 153:*14, 17*
154:*4* 155:*22* 156:*18, 25*
**goes** 127:*4* 130:*8*
**going** 8:*3, 5, 12, 23, 25* 9:*3, 4* 10:*15*
11:*11, 17, 21* 12:*16,*

*17* 13:*9* 14:*15* 15:*1, 23* 23:*23, 24, 25* 24:*1, 18, 19, 20* 27:*18*
28:*21* 33:*6* 41:*4*
42:*19* 45:*20* 47:*20*
48:*9, 20* 51:*17* 56:*25*
58:*19* 62:*2* 67:*11*
86:*3* 93:*8* 96:*25*
97:*3* 100:*8* 102:*14*
104:*7, 25* 106:*22*
116:*17* 123:*18*
127:*20* 148:*15, 18, 23*
150:*16* 151:*12*
152:*21* 159:*10, 15*
160:*4*
**Good** 7:*22* 24:*4*
110:*16* 154:*18*
159:*17*
**Goody** 3:*11*
**govern** 70:*20*
**governance** 70:*14*
72:*2*
**graduating** 18:*23*
19:*2*
**graduation** 19:*4*
**granular** 47:*22* 53:*1*
91:*8*
**Great** 10:*2* 12:*2*
25:*16* 31:*25* 37:*7*
**greater** 140:*12*
**green** 107:*19*
**groups** 48:*13*
**growth** 27:*1*
**guess** 20:*1* 24:*25*
27:*13* 30:*22* 32:*19*
37:*17* 64:*11* 73:*21*
79:*20* 80:*22* 88:*1*
111:*3* 116:*25* 133:*2*
157:*16* 158:*4, 21*
**Guillen** 3:*11*
**guilty** 62:*3*
**guys** 11:*15* 101:*21*
151:*7* 154:*23*

**< H >**
**half** 40:*20*
**Hallak** 16:*22* 34:*21*
42:*15* 54:*17* 94:*1*
107:*6* 109:*11, 14, 20,*

*23* 110:*16, 23* 123:*1*
125:*22*
**Hallak's** 52:*25*
106:*15* 107:*3*
**hand** 8:*24* 161:*16*
**handful** 35:*22*
**handle** 20:*4*
**happen** 105:*18*
141:*25*
**happened** 78:*4*
127:*5, 16* 128:*3*
138:*11* 159:*5*
**happening** 49:*6*
76:*18, 23* 77:*12* 78:*2, 19, 20, 22* 123:*5*
129:*8* 142:*22*
**happens** 46:*1* 112:*25*
128:*8* 157:*19*
**happy** 8:*8, 19* 9:*18*
150:*2*
**harassing** 149:*20*
**hard** 49:*21* 52:*13*
66:*14* 67:*13* 68:*17*
147:*23*
**hash** 123:*21*
**head** 8:*24* 34:*21*
52:*17*
**headlines** 77:*25*
**hear** 7:*22, 24* 8:*6*
9:*10* 11:*15, 25* 151:*7, 10, 11*
**heard** 8:*12* 12:*18*
30:*8* 32:*8*
**heart** 130:*8*
**heavily** 87:*1* 95:*21*
**hectic** 126:*7*
**hedge** 19:*9, 10* 20:*8*
21:*22* 26:*24* 36:*16, 17, 22* 40:*19* 43:*6*
53:*15* 54:*4* 59:*13*
**held** 28:*17* 39:*22*
42:*23* 58:*21* 146:*21*
**Hello** 7:*25*
**help** 37:*22* 49:*22*
50:*1* 83:*17* 91:*9*
92:*16* 110:*3, 11*
114:*18* 117:*5* 127:*19*
132:*15*
**helping** 35:*10* 57:*5*
60:*22* 61:*8*

**high** 27:*1* 67:*12*
113:*22* 116:*17, 25*
**highlighted** 98:*2, 12*
100:*9, 13* 101:*17*
126:*10* 128:*20* 130:*7*
154:*17*
**highly** 70:*16*
**hired** 56:*16* 57:*10*
**historical** 49:*13* 51:*7*
**historically** 75:*15*
85:*8*
**histories** 131:*13*
133:*5*
**history** 50:*16* 51:*4*
56:*25* 57:*2* 157:*25*
158:*12*
**hold** 39:*17* 40:*25*
56:*5* 57:*2* 138:*25*
144:*4*
**holding** 137:*19*
**home** 15:*7*
**hoped** 51:*20*
**HOSTETLER** 3:*9, 13, 17*
**house** 10:*10, 11*
**Houston** 1:*15* 2:*6*
10:*6, 10* 15:*7* 20:*18*
**hundreds** 74:*4*
**hypothetical** 121:*1*

**< I >**
**ICO** 69:*6, 7, 15, 19, 22* 70:*18* 71:*12, 14*
73:*13, 15* 75:*19, 23, 25* 76:*3* 78:*25*
**ICOs** 77:*4, 12, 23*
78:*18, 21*
**identification** 95:*9*
122:*8* 132:*17* 153:*2*
156:*7*
**identified** 38:*1* 49:*20*
95:*4* 96:*15* 97:*8*
**identifier** 39:*14*
**identify** 38:*21* 58:*6*
129:*11*
**IEO** 73:*2, 3, 12, 14*
74:*2, 23* 75:*18* 78:*6, 25* 85:*21* 98:*24*
105:*14, 17* 106:*23, 25*
108:*7, 13, 23* 112:*8*

Deposition of Nasir Adaya

United States Securities and Exchange Commission v. Stefan Qin, et al

115:24  117:1, 7
118:6  119:22, 23
**IEOs**  78:2, 20
**immediate**  74:25
**immediately**  75:22
95:18  124:1
**implicates**  9:14
**important**  99:4
**impressive**  84:19
**inaccurate**  8:17
**inception**  147:15
**include**  48:10
**includes**  45:22  87:19
**including**  17:7  20:19
42:15  67:22, 23
103:9
**incomplete**  8:18
**independent**  57:11
89:10, 12, 13, 17
**INDEX**  5:1
**indicate**  155:12
**indicates**  156:14
**indicating**  155:17
**individual**  50:5
96:15  97:7, 10
140:21  141:6  143:23
**individuals**  42:16
153:16  154:7
**industry**  65:23, 25
66:8  76:19, 24  77:13,
22  78:2, 5, 19, 20, 24
79:16, 22  106:3, 5
143:11
**informal**  22:19
**informally**  121:16
**information**  14:19
17:20  28:11  103:10
112:17  115:19
128:23  148:6, 22
149:14, 17  153:19
**informed**  55:9
**infraction**  62:8
**infrastructure**  105:1
107:17  108:9, 16
109:12
**ingest**  45:7  46:2
**inherit**  87:22
**initial**  69:7, 10  73:3,
5  74:13  75:6  76:6, 8,

10, 18, 23  84:25
119:19, 21
**initially**  33:20  69:15
116:8  121:15
**INJ**  82:4  85:21
86:8  90:17  91:11, 23
98:16  99:3  100:14
102:25  110:10  112:7,
19  114:13  116:5, 22
117:2, 21  118:1, 2, 4
120:18  121:15  123:1
124:11, 18  126:11, 15,
24  128:22, 24  129:7
132:3  138:6, 8
**injected**  100:21
**Injective**  17:8  58:10,
11, 12, 16  61:7, 10, 15
69:2, 3  76:8  79:13
80:5, 14, 15, 17, 18, 19,
24, 25  81:1, 4, 17
82:2, 7, 18  83:4, 18,
25  84:4, 11, 22  86:13,
20  90:5, 8  91:1
93:20  94:4  99:9, 16,
24  101:21  104:6, 11
105:9, 14, 18, 21, 23
106:23, 25  107:14
108:7, 13, 22, 23
119:17, 23  120:7, 11
121:3, 10  131:25
134:22  135:4, 13, 16
136:2, 21, 23  137:5,
12, 14, 17, 19  141:10,
12  143:20, 21  146:20
147:1, 6, 8, 10, 11, 15
**Injective-affiliated**
81:7
**input**  45:9
**inputs**  51:15  102:24
**inputted**  92:12
**insight**  37:8, 19
**insights**  60:25
**instance**  2:2  61:4
67:14  109:10
**instant**  70:2
**instruct**  12:16, 18
148:16, 19, 23
**instructed**  148:24
**integrity**  54:14
**intention**  60:10  131:6

**interchangeably**
43:24
**interest**  25:23, 24
47:13
**interested**  20:14, 16,
20  26:20  84:21
161:15
**internal**  147:11
**international**  140:9,
11  143:1
**Internet**  10:25
**interns**  35:17, 19
36:2
**interruption**  11:7, 22
**interruptions**  12:13
**interview**  85:2
**inventory**  100:21
**invested**  76:2
**investors**  42:9  60:9
**involve**  73:14, 15
**involved**  27:25  34:8
57:17  73:18  76:6, 11
77:22  84:23  88:19
99:7, 24  110:17
141:8, 9, 11  153:23
**IPO**  69:12
**issue**  18:4  44:11
70:23  113:7
**issued**  66:23, 24
83:2, 5
**items**  128:25  133:25
157:24
**it'll**  96:4  127:19
**its**  58:13  70:13
161:15

**< J >**
**jcarney@bakerlaw.co**
**m**  3:20
**Joanna**  3:17
**Job**  1:25  26:4, 10
30:2, 3  34:22  40:25
56:4, 7  85:2
**jobs**  43:16
**John**  3:16
**Johnson**  1:24  2:5
7:12  121:18  159:23
161:2, 19
**join**  23:15

**joined**  21:7  29:23,
24  30:12  31:11
32:25  33:20  89:18
**JR**  3:6  4:8  8:2
**judge**  15:20
**July**  19:16
**jwasick@bakerlaw.co**
**m**  3:20

**< K >**
**keep**  12:19  25:14
60:18  120:5, 17
121:4  156:19
**Ken**  4:8  7:10  95:3
98:5  102:7  122:6
155:23  156:18
**kept**  33:23
**key**  48:6  111:21, 24,
25  112:2
**kind**  22:21  32:20
70:9  153:11  158:13
**know**  8:18  9:18
10:17  11:6  12:10
13:2  17:5  23:18, 23
24:2, 22  27:6  28:12,
16, 18  29:18  32:12,
18, 22  35:19  37:1
44:7, 8, 10  59:15
60:20  66:7  69:22
75:16  80:8  96:4
97:1, 23  99:23  102:1
105:18  109:15  120:2
121:12  124:2  131:17
133:16  141:13, 19, 24
143:9  146:13, 23
147:3  148:3  149:18
151:1  152:7  154:1, 2
158:8  159:12
**knowledge**  43:12, 15
124:1

**< L >**
**Lab**  137:20
**Labs**  80:6, 8, 10, 11,
14, 15, 17, 18, 24  81:1,
4, 17  82:2, 18  83:4,
18, 25  84:4, 11, 22
86:20  91:1  94:4
99:9, 16, 24  101:21
104:6, 11  105:9, 14,

*18, 22, 24* 107:*14*
119:*23* 120:*7, 11*
121:*3, 10* 135:*5, 13,*
*17* 136:*2, 21* 137:*5,*
*12, 14* 141:*10, 12*
143:*20* 146:*20* 147:*1,*
*8, 15*
**lack** 112:*2*
**lag** 102:*13*
**lagging** 95:*21* 154:*2,*
*3* 158:*3*
**laggy** 98:*3, 8*
**largely** 14:*10*
**larger** 143:*2*
**largest** 106:*5*
**late** 82:*10, 21* 83:*2*
85:*21*
**launch** 60:*3*
**launched** 60:*1, 4*
118:*7*
**Lauren** 3:*16*
**law** 8:*1*
**laws** 77:*15*
**lbass@bakerlaw.com**
3:*19*
**learned** 141:*25*
**leave** 21:*9, 11* 23:*5,*
*12*
**leaving** 21:*6* 55:*24*
56:*3*
**led** 20:*7* 25:*21* 55:*3*
84:*10, 16* 124:*17*
147:*7*
**left** 12:*25* 21:*16*
23:*11* 56:*8* 57:*3*
61:*22* 88:*3* 149:*24*
152:*4*
**legal** 9:*15* 28:*19*
36:*25* 63:*2* 77:*6*
80:*21* 99:*18*
**length** 23:*3*
**lengthy** 96:*24*
**letters** 123:*20*
**level** 47:*22* 53:*1*
91:*8* 113:*22*
**LGS** 1:*5* 7:*9*
**light** 107:*20*
**likes** 11:*19*
**likewise** 9:*6*

**limit** 64:*22* 100:*15,*
*22* 114:*21, 25* 115:*4,*
*8*
**limited** 83:*15* 97:*15,*
*16* 146:*12*
**line** 34:*18* 133:*25*
136:*14* 157:*24*
**link** 98:*7, 9*
**linked** 140:*20*
**liquidity** 64:*2, 4*
72:*11, 22* 82:*4, 20*
83:*1* 86:*8, 11* 90:*16*
91:*5, 8, 11* 93:*21, 22*
106:*7* 113:*25* 114:*4,*
*7* 117:*14*
**listed** 24:*9* 117:*9*
**listing** 117:*8*
**litigation** 148:*20*
**little** 50:*9* 79:*22*
93:*7* 96:*5* 101:*23*
116:*10* 127:*22*
133:*15, 24, 25* 143:*8*
154:*15, 16* 157:*18*
**LLC** 32:*6*
**LLP** 3:*9, 13, 17* 4:*3*
**located** 10:*9* 15:*7*
**location** 2:*6* 10:*9*
**lodge** 24:*5*
**logo** 132:*23*
**long** 21:*2* 23:*1* 33:*9*
139:*7* 140:*20*
**longer** 76:*23* 77:*12*
78:*18*
**look** 12:*25* 44:*13*
56:*9* 95:*1* 96:*19*
97:*1* 122:*21* 127:*19*
135:*11* 153:*7*
**looking** 13:*3* 28:*1*
47:*21* 95:*11, 24*
103:*9* 138:*5*
**looks** 130:*6*
**loop** 147:*5*
**lot** 28:*9* 30:*22*
32:*22* 35:*20* 50:*20*
60:*16* 73:*23* 87:*1*
117:*10, 14* 146:*12*
159:*11*
**lower** 97:*25* 134:*1*

**< M >**
**main** 65:*17* 106:*12*
**maintained** 111:*19*
**majority** 51:*24*
**maker** 64:*7, 13, 14,*
*15* 65:*3, 4, 8, 16*
66:*23, 25* 67:*2, 17*
68:*1* 72:*9, 21* 90:*9*
107:*14* 117:*16*
**makers** 65:*18, 20*
66:*1* 72:*10*
**making** 9:*13* 17:*11,*
*12* 25:*14* 61:*9, 11, 14,*
*16* 63:*23, 25* 64:*1*
65:*15* 66:*3, 4* 67:*19,*
*22* 68:*22, 24* 69:*4*
82:*3* 83:*12, 15* 84:*12*
86:*2, 11, 14, 20, 25*
87:*12, 19, 20, 23, 24*
94:*3, 8, 17* 99:*8*
104:*8, 25* 105:*9*
107:*17* 110:*10, 12, 14,*
*18* 111:*6* 116:*5, 8, 16*
117:*13, 18, 21, 24*
118:*17, 18* 119:*2, 10,*
*16, 22* 134:*12* 135:*13,*
*16* 136:*2, 25* 137:*2, 4,*
*13, 17* 138:*19, 23*
141:*9, 12* 143:*18, 19*
147:*8, 12* 148:*3*
**Management** 19:*6, 7,*
*8* 21:*8, 20, 21* 59:*12,*
*13*
**manager** 34:*25* 35:*3,*
*7* 36:*11, 13* 39:*24*
40:*15, 24* 42:*22, 23*
46:*6, 8* 51:*21* 54:*21,*
*22*
**manifestation** 87:*20*
**manually** 46:*19*
67:*11*
**March** 1:*16* 2:*4* 5:*2*
6:*2, 9, 12* 7:*3* 133:*8*
153:*17* 156:*15, 22*
157:*2, 4, 14* 161:*4, 17*
**Marco** 3:*9* 7:*25* 24:*6*
**mark** 95:*6*
**MARKED** 6:*2* 95:*8,*
*12* 122:*6, 7, 11*

132:*16, 20* 153:*1, 5*
156:*6, 10*
**market** 17:*10, 12*
44:*6* 45:*3, 7* 46:*3*
60:*25* 61:*8, 11, 14, 16*
63:*23, 25* 64:*1, 5, 7,*
*13, 14, 15* 65:*3, 4, 8,*
*16, 18, 20* 66:*1, 3, 4,*
*22, 25* 67:*2, 12, 17, 19,*
*22* 68:*1, 22, 24* 69:*4*
70:*5* 71:*6, 12* 72:*9,*
*10, 21* 82:*3* 83:*12, 15*
84:*12* 86:*1, 11, 13, 20,*
*25* 87:*12, 19, 20, 23,*
*24* 90:*9* 94:*3, 8, 16*
99:*8* 104:*7, 25* 105:*8*
107:*14, 17* 110:*10, 12,*
*14, 18* 116:*6* 116:*5, 8,*
*15* 117:*13, 16, 18, 20,*
*23* 118:*17, 18* 119:*2,*
*9, 16, 22* 135:*12, 16*
136:*2, 25* 137:*2, 4, 13,*
*16* 138:*19, 23* 141:*9,*
*11* 143:*17, 19* 147:*7,*
*12*
**markets** 106:*8*
**MARTEL** 4:*3*
**match** 49:*13*
**materials** 85:*5*
**math** 121:*2*
**matter** 7:*5* 13:*22, 23*
18:*4* 24:*9*
**matters** 38:*4, 6*
**Max** 42:*17*
**mean** 17:*17* 26:*7*
27:*22* 29:*10* 34:*1, 3*
37:*13* 40:*7* 45:*5*
47:*13, 14* 53:*25*
56:*11* 65:*7* 66:*20*
68:*11* 70:*15* 73:*25*
79:*23* 85:*13* 100:*19,*
*20* 108:*18* 113:*16*
114:*3* 116:*13* 150:*20*
**meaning** 27:*25* 28:*1*
39:*11* 57:*4* 64:*3*
68:*12* 74:*6* 79:*24*
89:*17* 114:*16, 25*
115:*6* 117:*9, 11*

means 2:6 37:10
71:9 109:8 113:17
114:7

meant 22:23

meet 27:9, 12 79:14

members 50:1

memorialized 22:16
121:7, 12

memory 32:19
132:15 134:16, 19

mentioned 18:8
42:14, 19 46:25 49:2,
3 53:10 63:23 69:2
75:2 82:25 103:3, 8
111:6 113:19 139:16
150:1

Mesa 3:10

Message 6:11 154:1,
6, 18

Messages 6:5, 7
132:3

met 79:15, 18, 21, 25
80:4, 13 81:15 143:6,
12

Micheal 1:24 2:4
7:12 44:8 161:2, 19

million 112:19
147:21 149:16
154:23

millionaire 149:19

Millions 32:2 119:1,
8, 25

mine 52:20

minute 47:1 82:12

minutes 27:17 49:20
142:16 149:24 150:3,
6

Mirarc 19:6, 8 20:4
21:6, 9, 10, 13, 19
22:23, 24 88:3, 8
89:21

Mis 87:14

mischaracterizes
68:4 75:11 83:9
86:5, 16 87:15 88:12
89:6 92:19 93:4
101:10 110:19
111:11 125:24
135:19, 22 142:14, 23

misheard 74:15

misrepresentation
62:23 63:6

misrepresenting 75:7

misstated 104:17

MIT 18:14, 19, 23
19:2 56:25 88:3

mitigate 142:12

mmolina@bakerlaw.co
m 3:11

mode 142:9

modeling 20:5

Molina 3:9 5:2 7:21,
25 11:14, 17, 19 12:2,
5, 7 13:25 14:6, 13,
14 20:12 24:16, 17
25:12, 15, 20 29:2
31:10, 14 33:8 37:3
38:19 40:4 43:17, 25
44:7, 14, 22 45:19
46:18 47:5 50:10
52:7, 14 53:24 54:12
58:4 59:11 60:2
62:1, 14, 16 63:3, 14,
22 64:10 66:12 67:4
68:5, 10 70:22 71:5,
10, 15 72:19 73:1, 11,
24 74:17, 21 75:12
76:1 77:7, 18 78:14
79:5 81:9, 20 82:16
83:16, 21 84:8 86:9,
18 87:16 88:15 89:1,
11 90:14, 24 91:4, 20
92:22 93:5 94:14, 22
95:2, 7, 10, 13, 16
96:22 97:21 98:5, 11
99:14, 21 101:14
102:5, 7, 10, 21
103:18, 24 104:5, 18
105:5, 7 106:19
107:12 108:3, 12, 20
109:19 110:6, 21
111:14 112:22 113:4,
18 114:10 115:15
117:4 118:24 119:6,
13 120:4 121:17
122:2, 4, 9, 17 123:13
126:8, 21 128:1, 16,
17 129:18 130:4
131:15 132:13, 14, 18
135:1, 23 136:6

137:23 138:1 141:17,
22 142:5, 18 143:3
144:8, 11, 18, 23
145:8, 15, 21 146:1, 8,
19 147:4, 13, 20, 24
148:9, 13, 18 149:1,
10, 15, 23 150:2, 15
151:9, 16 152:19, 24
153:3, 13 154:14
155:23 156:1, 4, 8, 17,
20 157:10, 11 158:17
159:7, 10, 18, 25

moment 14:22 71:7
81:14 114:2 119:14
122:13

momentum 67:23

money 26:13 37:11,
13 40:1 64:16 65:15
149:2, 11

Montgomery 3:4 4:4
32:6

month 25:8, 9 59:15,
16 115:24 126:3, 6

months 24:11

morning 87:9

Motion 19:7 21:7,
20, 21 22:4, 6, 12, 14,
21 23:1, 5, 7 88:6, 7,
18, 21 89:22

move 95:22 111:9
123:1 126:10 128:6,
11

moved 123:12
124:12, 13, 18 127:9
134:17 137:22
138:11, 12

moving 102:15 113:6

multiple 75:16

Multistrategy 36:18
38:5

MUSIALA 3:6 4:8
8:2

muted 78:10, 12

< N >

name 7:10, 25 9:25
15:4 17:5 30:8, 23
35:19 41:13 46:9
81:2 139:4, 6, 20, 24
140:3, 5, 7 141:14

142:1, 12, 20 143:15,
25 144:15, 25 145:2,
12, 17, 23 146:5, 10

named 41:14

names 24:20 35:21
42:14 139:23 145:11

naming 27:18

NASIR 1:14 2:1
5:1, 2 6:1 7:5, 17
15:5 20:10 28:22
154:20 160:3 161:5

natural 20:20

naturally 97:16

NCRA 161:20

necessarily 30:19
49:22, 23 68:9, 11
70:4, 18 72:4 73:15
79:9 80:20 83:14
84:17 87:6, 23 92:21
94:20 96:1 111:13
114:1 134:19 154:13

need 9:17 25:14
67:2 73:15 82:11
91:25 92:5 101:22
128:9, 14 131:12
132:2, 11 135:10
136:22 138:14 145:5
153:7 157:9 159:2

needed 106:15

needs 121:18

negotiate 65:8 66:24

negotiated 66:19

neither 161:13

network 73:22 74:1,
5 75:17, 20

never 60:1, 3, 4

NEW 1:1 3:18 7:8
101:24 110:15 117:9

Nguien 140:1

N-g-u-i-e-n 140:4

Nicholas 42:18

nods 8:24

note 10:17 97:14
121:17

noted 7:15 9:12

notes 13:16, 18, 19,
20 14:2, 16, 18, 24

noticed 47:11 150:8

notified 139:9

**notwithstanding**
148:*20*
**NUMBER** 6:*2* 59:*10*
**numbered** 2:*3*
**numbers** 100:*16, 19,
20* 101:*19* 149:*22*
**nuts** 111:*5*
**NW** 3:*13*

**< O >**
**oath** 15:*12, 15* 161:*7*
**object** 24:*14* 28:*21,
22* 33:*6* 59:*6* 71:*24*
145:*6*
**objecting** 78:*12*
**objection** 9:*11, 13*
20:*9* 24:*5, 7* 25:*13*
31:*7* 33:*5, 7* 36:*24*
38:*15* 40:*3* 43:*11, 21*
45:*11* 46:*12, 15* 47:*4*
50:*6* 52:*3, 12* 53:*21*
54:*10* 57:*22* 59:*22,
25* 61:*24* 62:*12, 14*
63:*1, 12* 64:*8* 66:*10*
67:*3* 68:*3, 8* 71:*8, 13*
72:*12, 23* 73:*7, 19*
74:*14* 75:*10, 24* 77:*5,
16* 82:*12, 14* 83:*6, 19*
86:*4, 15* 87:*14* 88:*11,
23* 89:*4* 90:*10, 20*
91:*13* 92:*18* 93:*3*
94:*9, 18* 99:*10, 17*
101:*9* 103:*15, 21*
104:*2, 16* 105:*2*
106:*16* 107:*8* 108:*2,
17* 110:*5* 111:*10*
113:*1, 15* 115:*13*
116:*23* 118:*21* 119:*3,
11* 120:*1* 123:*6*
125:*23* 126:*16*
129:*14* 131:*9* 134:*23*
135:*18* 136:*4* 141:*15*
142:*3, 13* 144:*1, 16,
21* 145:*3, 19, 24*
146:*6, 16* 147:*2, 9, 17,
22* 148:*5* 149:*4, 13,
20* 151:*4* 152:*15*
154:*11*
**objections** 63:*13*

79:*2* 91:*2*
**objective** 113:*22, 24*
**objectives** 72:*5, 25*
**observe** 49:*10*
**obtain** 18:*15, 23*
103:*14*
**obtained** 18:*17, 19*
107:*2*
**Occasionally** 61:*3*
116:*8*
**occur** 93:*2*
**occurring** 49:*8*
**October** 6:*2* 82:*8*
96:*8* 100:*5, 10* 111:*4*
115:*21* 131:*20*
**offer** 69:*19* 70:*13*
72:*11* 105:*19* 115:*5*
116:*18*
**offered** 69:*15* 70:*1, 2*
71:*7* 76:*3, 14* 82:*7,
21* 86:*3* 92:*2* 115:*7*
117:*6*
**offering** 69:*8, 10, 23*
70:*12, 19* 71:*24* 73:*4,
5, 18* 74:*13* 75:*6*
76:*7, 9, 11*
**offerings** 76:*18, 23*
77:*14*
**offers** 64:*3* 71:*11*
106:*6* 114:*9, 16*
115:*6*
**offhand** 28:*9* 149:*14,
17* 159:*3*
**office** 161:*16*
**oftentimes** 22:*18*
43:*22*
**Oh** 31:*2* 80:*15*
82:*13* 102:*16* 127:*5*
133:*22*
**oil** 20:*19* 22:*2, 15*
143:*11*
**Okay** 7:*2* 8:*9, 11, 14,
15, 21* 9:*1, 8* 10:*18,
20, 25* 11:*4, 14, 17, 24*
12:*5, 16, 21, 22* 13:*4,
6, 19, 21, 24* 14:*13, 19,
21, 25* 15:*3, 23* 18:*11*
21:*15* 23:*5, 16* 24:*16,
23, 25* 25:*16* 30:*1*
33:*20* 34:*1* 37:*22*

41:*6, 22* 44:*16, 20, 23*
45:*25* 48:*3, 20* 51:*25*
52:*23* 53:*18* 55:*21,
23* 56:*19* 57:*4, 10, 25*
58:*5, 15* 59:*12* 60:*1*
64:*18* 70:*24* 79:*21*
80:*15, 17* 81:*10, 23*
82:*6, 17* 85:*20* 86:*10*
89:*2* 90:*2* 92:*23*
93:*16* 95:*5, 22* 96:*7,
10* 97:*25* 98:*12, 19*
99:*1, 15* 100:*7, 12, 18*
101:*25* 102:*6, 16, 20*
103:*3* 111:*15* 112:*6*
120:*24* 121:*21* 122:*3,
25* 123:*4* 125:*20*
126:*9, 14* 127:*4, 22*
128:*16* 130:*20* 132:*5*
133:*1, 10, 18, 22*
134:*4, 12, 15* 136:*18,
20* 137:*4, 8* 139:*14,
19, 23* 141:*4, 8*
143:*14* 145:*9* 149:*23*
150:*23* 151:*12* 152:*1,
20* 153:*9, 14, 21*
154:*4, 15* 155:*5, 11,
16, 22* 156:*9, 13, 25*
157:*10* 158:*12, 16, 18*
159:*10, 18, 20* 160:*2*
**once** 47:*16* 49:*7*
52:*23* 112:*23*
**ones** 14:*9* 59:*20*
**one's** 88:*4*
**ongoing** 13:*14* 46:*3*
119:*16*
**open** 47:*13* 107:*3*
144:*15* 145:*16*
**opened** 143:*24* 145:*1,
22* 146:*9*
**opening** 146:*4*
**operating** 121:*15*
146:*14*
**opportunities** 110:*15*
**opportunity** 22:*1*
26:*25* 110:*17* 159:*15*
**option** 69:*20*
**order** 45:*17* 48:*17*
50:*15* 64:*4, 22* 65:*9*
100:*22, 24* 114:*9, 21,*

25* 115:*4, 8* 116:*9*
148:*21* 154:*18*
**orders** 100:*15*
**organization** 39:*25*
**originally** 20:*18*
**outcome** 161:*15*
**outputs** 49:*16*
**outside** 14:*18* 24:*7,
14* 42:*9* 62:*12*
108:*14* 109:*4*
**outstanding** 24:*19*
**overall** 40:*22* 158:*21*
**overlapped** 87:*1*
**oversaw** 54:*9, 14*
**oversee** 92:*25*
**oversight** 49:*14*
51:*18* 93:*11, 23* 94:*1*
**owners** 36:*23*
**ownership** 36:*25*
**owns** 131:*18, 23*
135:*6*

**< P >**
**P&L** 40:*10* 120:*19,
23*
**p.m** 1:*17* 2:*4* 7:*4*
44:*17, 18, 19, 21*
70:*25* 71:*1, 2, 4*
121:*19, 22, 23, 24*
122:*1* 150:*10, 11, 12,
14* 160:*4, 5*
**Pacific** 121:*20*
**page** 96:*5* 97:*24*
98:*1, 13* 100:*8*
101:*18, 25* 122:*21, 24*
123:*15* 128:*20* 130:*6,
7* 153:*12, 25* 154:*5,
16* 155:*12*
**pages** 97:*3, 24*
153:*12*
**paid** 89:*15*
**Pandit** 16:*24* 35:*15*
36:*2* 42:*15* 94:*23*
95:*25* 97:*11* 98:*16*
99:*7, 16, 23* 100:*2, 14*
101:*4* 110:*1*
**Pandit_Baker_2527**
6:*5*
**Pandit_Baker_2581**

6:6
Pandit's 36:6
paper 13:18
parallel 69:11, 14
parameter 75:21
92:14
parameters 44:5
45:2, 9, 15, 23 46:25
47:2 50:14 92:8, 12,
24 100:25 101:5, 20
102:24 103:2, 4, 5, 14
113:21
parent 80:18
parse 70:9
part 26:3 29:14
34:5 47:3 48:14
61:1, 5 69:24 79:6
100:16 101:1 105:22
106:10 108:23 112:7
114:11 115:11 116:5
118:11 137:13
participants 70:20
particular 105:8
111:17, 18 130:9
parties 26:16 66:19,
20, 21 71:25 72:6
145:11
partner 8:1
party 161:14
party's 146:15
PDF 97:25 153:25
pending 9:20
people 13:8 35:10
39:4 59:9 92:16
153:22
percent 66:9 100:14,
23 120:25
percentage 40:22
64:21 65:24, 25
100:20 120:23, 24
percentages 66:15, 17
percentile 64:23
perform 20:21 22:3
89:15 90:18 104:7
performance 40:20
49:11, 13 85:8
performed 111:8
performing 21:10, 14
23:7 30:3 51:19
84:5

period 41:10 51:7
117:11 125:8 126:3
permission 106:15
107:3, 16 108:25
109:3, 11, 13 112:11,
24 144:14, 20
person 11:5 66:24
135:12 143:9
personal 26:15
31:19 148:7 154:19
155:7
personally 49:18
76:2 81:24 109:24
138:25 139:21
person's 143:15
perspective 63:24
72:21 76:17, 22
77:10 78:3, 23
phone 10:24 11:2, 5
Phuong 140:1
150:18, 20 152:8
158:9 159:1
P-h-u-o-n-g 140:3
physically 10:8, 9
pinpoint 147:23
place 11:5 45:7
46:3 49:8 75:4
114:8 148:21 161:11
placed 100:21, 23
115:2
placing 64:3
Plaintiff 1:4
platform 70:20
140:14
Plaza 3:18
pleaded 62:3
please 7:16 9:13, 21
15:3 19:22 20:3
26:7, 19 29:16 33:4
38:24 62:18 74:16
97:25 101:13 102:9,
17 104:20 114:20
121:20 135:3 152:25
point 42:21 53:13
69:22, 24 137:6
points 82:9
portfolio 22:9 31:23
32:1 33:23 34:2, 6,
25 35:3, 7 36:11, 13,
15 39:24 40:15, 24

42:21, 23 43:3 46:6,
8 51:21 54:21 63:9
portfolios 38:10, 14,
23 39:1, 5, 8
portion 109:20, 23
154:17
position 19:14 28:18,
20 110:12
positions 28:16
47:12 77:14 89:21
possible 13:25 54:7
98:4, 5 124:13 131:2
151:23, 24 152:11
158:25
possibly 104:17
post 58:19 60:20
postgraduate 18:24
potentially 19:22
104:4
predecessor 41:15
preferred 11:20
preparation 17:2
prepare 16:2
prepared 16:4 24:15
preparing 101:21
PRESENT 4:8
press 102:4
pretty 66:6 95:21
previously 143:10
price 47:15 64:23
71:6, 12, 20, 21, 22
115:3, 8 118:22
prices 28:1 71:19
primarily 20:24
29:24 58:2 60:16
142:25
primary 75:21
prior 16:17 17:16,
17 18:6 26:4, 11, 14
27:6, 9 41:6 61:14
68:4 81:14 85:5
86:11, 13, 16 87:7, 25
101:10 109:2 111:3
prioritize 98:23
prison 62:7
privilege 9:15
privileged 14:4, 10, 11
probably 14:1 67:20
Procedure 2:8

PROCEEDINGS 5:2
7:1 161:10
proceeds 109:21, 24
120:5, 9, 17 126:15
process 15:1 45:21
48:20, 23, 25 51:9, 17
53:22 54:18, 20
91:18 112:14 115:9
produce 138:22
produced 2:2 17:25
professional 58:21,
23 81:10, 16 86:14
89:3, 23, 25 90:4
99:24 143:7
profile 49:12
profit 121:3
profits 40:22 65:21
programmatically
111:25
project 58:3, 6, 7
70:17 74:10 107:7
109:2, 12 111:18
projects 56:1, 11, 12,
14, 20, 22, 23 57:5, 18
58:1 59:8 60:23
70:16
prolonged 117:11
pronouncing 9:25
10:1
prop 37:24 38:7
39:13 40:21 53:14
63:9 155:9
proprietary 33:22
34:2, 3, 9, 14 36:15
43:2 54:2 63:19
protective 148:21
protocol 58:12
provide 9:6 56:16
57:8 61:11 72:10, 22
81:3, 23 83:1 86:1
91:5 113:24 114:4, 7,
22 117:14
provided 9:19 61:15
69:4 76:5 81:16
86:12, 20 132:10
136:16 155:18
providers 130:22, 23
providing 57:14
59:4 60:24 61:14
64:1 65:9 68:22, 24

82:*1, 4, 20*   83:*24*
85:*25*   86:*7, 8, 12*
87:*12*   89:*19*   90:*16*
91:*8, 10*   93:*22*   99:*8*
100:*14, 15*   105:*9, 22*
135:*12, 16*   136:*1*
137:*1*   138:*22*   141:*9,
11*
**public**   50:*21, 22, 24,
25*   51:*6, 10*   69:*19, 23*
70:*13*   82:*7*   125:*13,
15, 17*
**publicly**   51:*2, 12*
69:*13*   103:*10*
**purchased**   116:*4*
**purpose**   30:*16*   59:*17,
18*   69:*10*
**pursuant**   2:*7*
**pursue**   26:*2*
**pursuing**   20:*14, 16*
**put**   14:*16, 24*   51:*8*
95:*2, 3*   112:*24*   122:*4*
128:*16, 18*   132:*13*
152:*24*   154:*23*
155:*23*   156:*4*
**putting**   108:*7*   120:*16*
**Python**   45:*6, 22*

< Q >
**QCP**   154:*20*   155:*2,
3, 7*
**QIN**   1:*6*   7:*7*   27:*9,
12*   29:*10*   30:*11*   33:*2,
10, 19*   34:*4, 15, 16*
38:*8*   39:*11*   41:*9*
54:*3, 16*   62:*2, 3, 10,
20*   63:*18*   152:*9*
154:*1, 6, 22*   155:*7, 18*
**Qin's**   31:*19*   37:*4*
42:*6*   43:*2*   55:*21*
**qualifications**   90:*22*
91:*1*
**quant**   39:*19, 23*
**quantify**   47:*16*
**Quantitative**   23:*22*
27:*5*   29:*4, 5, 7*   30:*2,
4*   33:*1, 10*   34:*25*
36:*10*   37:*12*   39:*20*
40:*11, 23*   41:*18, 22,
25*   42:*12, 20*   43:*23*

67:*21*   86:*24*   87:*1, 4,
19, 21, 22*   88:*8, 13*
89:*2*   90:*22*   91:*7, 18*
**quantity**   115:*2, 6*
**query**   51:*6*
**querying**   51:*3*
**question**   8:*7, 8, 11*
9:*5, 8, 14, 19, 21*
26:*21*   28:*25*   33:*3*
39:*5*   45:*14*   49:*7*
50:*8, 9*   52:*25*   53:*3*
68:*7*   77:*9*   78:*16, 23*
88:*1, 19*   93:*7, 18, 20*
99:*20*   101:*13*   109:*1*
119:*17*   120:*15*   128:*8*
136:*20*   139:*19*
142:*15, 19*   157:*9, 16*
158:*4, 22*   159:*13*
**questioning**   10:*18*
**questions**   8:*6*   9:*1*
13:*7*   14:*17, 25*   15:*2,
24*   24:*13*   106:*22*
110:*1*   148:*10, 16, 19,
24*   152:*23*   159:*17*
**question's**   24:*19*
**quick**   44:*13*   147:*5*
**quite**   32:*3*   117:*1*

< R >
**raise**   60:*5, 6*
**raised**   37:*7, 9, 12, 15*
42:*9, 10*
**raising**   60:*8*
**range**   32:*4*   133:*7*
156:*14*
**rationally**   117:*13*
**RDR**   1:*24*   2:*5*
161:*19*
**reach**   84:*22*
**read**   55:*9*   70:*21*
101:*17, 25*   102:*20*
127:*22*   129:*21*   130:*6,
24*   158:*12, 14*
**reading**   130:*9*   155:*6*
161:*11*
**readjust**   116:*19*
**ready**   98:*21*   102:*1*
**real**   44:*13*   49:*13*
70:*2*   147:*5*

**really**   32:*23*   64:*24*
66:*6*   67:*9, 12*   68:*16*
116:*19*
**realtime**   2:*5*   44:*8*
47:*18*   70:*23*   161:*3,
20*
**reason**   10:*16*   55:*17*
104:*10*   125:*21*   135:*8*
144:*24*   145:*1*   146:*4,
7*   158:*22*
**reasons**   77:*11*   78:*21*
90:*17*   128:*7*   139:*8*
**recall**   19:*15, 17*   21:*4*
22:*8*   23:*2*   25:*9*
27:*13*   28:*9*   29:*6*
32:*21*   33:*11*   34:*17*
35:*20*   36:*8*   38:*12*
41:*20, 21*   42:*24*
55:*12*   57:*15*   59:*16*
61:*13*   82:*9*   83:*11*
84:*17, 24, 25*   90:*6, 7,
13*   91:*3*   92:*14*   94:*25*
96:*2*   101:*3, 16*
103:*13, 17, 22*   104:*13*
105:*4*   107:*11, 24*
108:*1, 5*   109:*13*
110:*13*   111:*2, 23*
112:*13, 16, 21*   115:*14*
116:*2, 7*   118:*3, 5*
123:*24*   124:*20, 23*
125:*2, 9, 18*   126:*5, 19,
20*   127:*11, 13, 16*
128:*2, 10*   134:*14*
139:*7*   143:*18, 21*
149:*22*   151:*24*   152:*1,
3*   159:*3*
**recalling**   88:*9*   89:*24*
**receipt**   134:*5, 9*
**receive**   65:*10*   97:*14*
112:*6, 15*   117:*25*
118:*2, 4, 16*
**received**   24:*6, 8*   98:*7*
117:*23*   118:*1, 20*
119:*8, 15*   120:*11*
147:*15*
**Receiver**   2:*2*   3:*8*
8:*3*   17:*22*   18:*6*
28:*24*

**receiving**   45:*8*
112:*10*   113:*6*   115:*17*
131:*7*
**Recess**   44:*18*   71:*1*
121:*23*   150:*11*
**recognize**   95:*17*
122:*12*   132:*21, 22*
153:*6*   156:*11, 12*
157:*17*
**recollection**   14:*17*
18:*9*   24:*1, 22*   31:*25*
36:*5*   101:*19*   102:*23*
105:*16*   110:*9*   124:*11*
129:*16*   130:*10*   132:*6,
9*   152:*18*
**recommend**   105:*21,
23*
**recommended**   105:*25*
**record**   7:*3, 15*   8:*24*
9:*12*   15:*4*   24:*6*   41:*8*
44:*13, 15, 17, 21*   55:*2*
70:*23, 25*   71:*4*   87:*24*
95:*14*   96:*23*   97:*7, 14*
99:*15*   101:*8*   121:*20,
22*   122:*1*   123:*18*
150:*9, 14, 19*   159:*22*
160:*4*
**recorded**   7:*4*
**records**   135:*11*
136:*22*
**refer**   89:*17*   96:*17*
97:*10*   150:*16*
**referenced**   17:*13*
23:*24*   82:*19*   123:*15*
**referencing**   60:*19*
89:*13*   123:*19*
**referrals**   57:*19*
**referred**   30:*10*
**referring**   17:*21*
33:*14*   36:*18*   41:*4, 7,
8*   50:*14*   125:*4, 5*
157:*22, 24*
**refers**   69:*7*
**refine**   33:*24*
**reflect**   14:*5, 10*
**refresh**   101:*18*
102:*22*   130:*10*
132:*15*   134:*15, 19*

**regarding** 26:*24*
45:*17* 78:*1* 91:*18*
125:*1*
**regions** 22:*15*
**Registered** 161:*2, 20*
**regulatory** 78:*7, 22,
25* 79:*8*
**relate** 13:*21, 23*
24:*13*
**related** 17:*7, 10, 16*
18:*3* 26:*10* 30:*19, 22*
32:*20* 38:*4* 55:*14, 20*
58:*24* 60:*24* 63:*6, 18*
66:*2* 72:*4* 83:*13*
86:*2* 119:*23* 128:*24*
146:*24* 155:*9* 156:*2*
161:*14*
**relating** 38:*6* 154:*10*
**relationship** 58:*18*
81:*11* 90:*5* 93:*20*
137:*5, 9, 13* 141:*1*
147:*16*
**relevant** 148:*10*
**rely** 49:*25* 97:*20*
**remember** 25:*8*
32:*23* 39:*6* 53:*11*
55:*8, 19* 81:*12* 86:*19*
90:*3, 25* 93:*13* 103:*6,
10* 104:*9* 110:*25*
113:*6* 116:*3, 21, 24*
118:*11, 13* 125:*18*
126:*6* 127:*18* 129:*13*
134:*12* 138:*4* 154:*9,
10, 13* 158:*5*
**remembering** 88:*21*
**remitting** 154:*23*
**REMOTE** 1:*13* 2:*1*
3:*1* 161:*5*
**remotely** 12:*17*
**removed** 132:*4*
**removing** 132:*7*
**repeat** 8:*8* 21:*19*
25:*19* 38:*24* 77:*9*
78:*16* 101:*13* 104:*20*
120:*8*
**rephrase** 8:*7* 50:*11*
54:*13* 55:*16* 68:*20*
99:*22* 115:*22* 119:*20*
158:*23*

**Report** 6:*11* 29:*8, 9,
12* 34:*15* 125:*4, 13,
16, 17, 21*
**Reported** 1:*23* 2:*5*
34:*16, 18* 38:*21* 39:*4*
125:*1, 3, 9, 12, 13*
148:*3* 161:*4*
**reporter** 7:*12, 16*
8:*23, 24* 11:*12* 44:*12*
157:*8* 161:*3, 20*
**REPORTER'S** 5:*2*
161:*1*
**Reporting** 7:*11, 13*
38:*3*
**reports** 22:*17, 18*
**representations** 90:*7*
**represented** 139:*10*
**represents** 8:*2*
**reputation** 106:*3, 4,
11*
**request** 107:*16*
123:*1* 124:*18* 125:*22*
126:*10* 127:*8, 17*
**requested** 108:*24*
109:*3, 11* 161:*12*
**requesting** 109:*13*
129:*5*
**require** 47:*2, 7*
114:*13*
**Research** 23:*22*
26:*23* 30:*3, 17* 31:*4*
35:*18* 36:*9* 38:*18*
41:*18, 23* 42:*13* 47:*3,
7, 8* 48:*9, 14* 51:*9*
88:*13* 103:*4, 9, 13, 20*
**researcher** 36:*10*
**researching** 48:*10*
49:*12*
**respect** 28:*4* 30:*13*
37:*24* 38:*22* 39:*5, 7,
8* 43:*19* 50:*3* 51:*21*
53:*14* 58:*25* 77:*3*
86:*21* 90:*4* 93:*19*
94:*16* 99:*9* 105:*8*
106:*21, 23, 25* 113:*14*
116:*22* 117:*18* 119:*2*
147:*8*
**respond** 98:*23* 101:*6*
**responded** 99:*1*
**responds** 98:*20*

**responsibilities** 35:*2,
4* 54:*22*
**responsible** 94:*6, 15,
21*
**rest** 101:*17*
**restate** 52:*6*
**results** 47:*18* 49:*13*
**retract** 25:*2*
**return** 134:*22* 135:*4*
**returned** 136:*21*
137:*14*
**returning** 136:*23*
**returns** 147:*25*
148:*8, 17, 25*
**reverting** 47:*14*
**review** 17:*1, 4, 14*
18:*2, 7*
**reviewed** 17:*6, 15, 24*
18:*1, 5*
**reviewing** 48:*14*
51:*17*
**reviews** 96:*21* 102:*2,
19* 122:*14* 127:*21*
130:*1* 153:*10* 158:*15*
**right** 10:*8, 21* 12:*22*
13:*7* 24:*18* 25:*5*
49:*17* 52:*18, 20* 67:*1,
10, 25* 68:*19* 69:*12,
18* 70:*3* 75:*17* 81:*21*
88:*1, 16* 89:*20* 90:*2*
94:*2* 97:*22* 106:*20*
109:*1* 114:*22* 122:*18*
125:*22* 126:*22*
130:*16* 133:*6, 7, 12,
17* 134:*1* 136:*7, 8, 12*
137:*2, 6* 139:*17*
152:*20* 154:*3* 156:*14,
15*
**risk** 142:*12*
**ROBERT** 3:*6* 4:*8*
8:*2*
**Rockefeller** 3:*18*
**Rohan** 16:*24* 42:*15*
97:*11*
**role** 40:*23, 24* 42:*23*
54:*18, 19* 89:*23*
**roles** 57:*2* 58:*21, 23*
87:*7, 8, 11* 88:*2*
**room** 10:*13, 16*

**roughly** 80:*2*
**rule** 159:*4*
**Rules** 2:*8*
**run** 46:*17*
**running** 113:*10*

**< S >**
**sake** 95:*15*
**salary** 40:*9*
**San** 3:*5* 4:*4*
**saw** 136:*7, 10* 138:*3*
153:*21* 156:*2*
**saying** 12:*8* 55:*11*
81:*19* 117:*20* 121:*18*
125:*16* 154:*18*
157:*12*
**says** 13:*4* 96:*4, 7*
134:*4*
**science** 18:*14*
**scope** 22:*10* 24:*7, 14*
62:*13* 108:*15, 19, 23*
109:*4, 8*
**screen** 12:*3* 102:*3*
**script** 45:*6, 10, 22, 25*
46:*2, 11, 16, 22* 47:*22*
48:*21* 49:*4, 7* 50:*4*
92:*5, 8, 17, 24* 93:*10*
94:*16, 23* 98:*16* 99:*8*
101:*1, 2, 20* 102:*25*
111:*17, 18* 112:*3*
113:*9, 10, 20*
**scripts** 92:*4*
**scroll** 97:*22, 25*
102:*17* 127:*20*
130:*17* 133:*10, 15, 24*
154:*15* 155:*11* 157:*1,
17, 18*
**scrolling** 153:*21*
**scrutiny** 78:*7, 22*
79:*1, 9*
**SEAL** 161:*16*
**SEC** 77:*13, 24*
159:*11*
**second** 11:*2, 15, 23*
56:*3* 59:*24* 154:*19*
**SECURITIES** 1:*1*
3:*2, 4* 7:*6* 62:*4* 77:*3,
15*
**see** 8:*22* 12:*2* 13:*3*
50:*11* 96:*3, 7, 9, 10,*

*13, 14, 15, 16* 97:*8*
98:*1, 12, 14, 15, 17, 18,*
*19, 22* 99:*5* 100:*9, 10,*
*12, 16, 17* 101:*4*
102:*15* 122:*18, 20, 25*
123:*2, 3* 126:*9, 11, 13*
128:*20* 129:*1, 2*
132:*23, 25* 133:*6, 9,*
*10, 13, 14, 24* 134:*4, 7,*
*8, 11* 136:*12, 19*
153:*15, 24, 25* 154:*5,*
*8, 25* 155:*1, 14, 15*
156:*16, 23* 157:*1, 2, 6,*
*7, 12, 19, 21, 25*
**seeing** 124:*15*
**seen** 12:*25* 14:*9*
77:*25* 127:*2*
**segregated** 39:*10*
53:*11, 19, 25* 54:*15,*
*23*
**select** 35:*9*
**selected** 35:*6* 90:*18*
**selecting** 35:*4*
**selection** 92:*15*
**self-employed** 57:*9*
58:*25* 61:*19, 21*
**sell** 71:*18, 19* 114:*13*
115:*10* 117:*14*
**selling** 115:*12*
116:*18* 117:*2*
**send** 128:*22*
**sense** 9:*22* 24:*3*
41:*10, 11* 53:*6* 67:*20*
117:*13*
**sent** 18:*6* 112:*9*
127:*6* 156:*22* 157:*21*
158:*25*
**sentenced** 62:*7*
**separate** 85:*18* 105:*1*
108:*24* 129:*7*
**series** 8:*5* 100:*15*
101:*19*
**service** 57:*8, 14*
86:*11* 104:*8* 135:*13,*
*16*
**services** 59:*4* 61:*11,*
*14, 16* 65:*10* 68:*22,*
*25* 69:*4* 81:*3, 16, 23*
82:*2* 83:*25* 86:*2, 21*

87:*13* 137:*2* 138:*23*
141:*9, 12*
**set** 52:*10* 59:*14*
67:*10* 73:*9* 91:*25*
100:*9* 106:*14* 107:*1*
142:*11* 143:*14*
144:*24* 151:*14*
**setting** 94:*6* 105:*10*
111:*16*
**seven** 62:*7*
**Short** 6:*11*
**show** 133:*5*
**showing** 96:*25*
152:*21*
**shown** 122:*10*
132:*19* 153:*4* 156:*10*
**shows** 100:*13* 157:*13*
**shut** 21:*13, 15* 23:*9,*
*10, 11*
**shutoff** 124:*22*
**shutting** 55:*5, 10, 18*
**sic** 104:*14*
**side** 40:*19, 21* 108:*7,*
*8* 115:*4* 117:*12, 14*
120:*16*
**Sigma** 30:*7, 9, 10, 14*
63:*10* 125:*7*
**signals** 48:*19* 50:*18*
**significant** 87:*2*
**significantly** 47:*14*
**signing** 161:*11*
**similar** 13:*6* 22:*10*
38:*9, 13, 17* 48:*16*
49:*12* 59:*20* 67:*16*
68:*1, 14, 15* 93:*23*
101:*7* 111:*7* 133:*3*
**similarly** 67:*7*
**simple** 11:*9* 64:*20*
121:*2*
**simply** 8:*18* 142:*19*
**simultaneously** 60:*15*
64:*4* 87:*21*
**sir** 18:*13*
**sitting** 28:*12* 61:*18*
62:*19* 63:*17* 76:*17*
77:*11* 104:*11* 131:*16*
149:*18* 159:*4*
**size** 27:*1* 31:*23* 32:*1*
**skew** 116:*17*
**skewed** 117:*1*

**skimmed** 153:*11*
158:*13*
**small** 27:*1* 35:*13*
**so-called** 115:*1*
**sold** 115:*10* 116:*4*
**soon** 21:*16*
**Sorry** 12:*5* 14:*6*
16:*10* 21:*18* 25:*19*
28:*22* 31:*1, 2, 8* 33:*4,*
*6* 38:*24* 39:*2* 42:*3*
50:*23* 54:*19* 56:*15,*
*22* 62:*18* 72:*15*
74:*15* 78:*11* 80:*12,*
*15, 25* 82:*13, 22* 86:*7*
89:*7* 92:*21* 100:*4*
102:*9* 108:*4, 11*
110:*4* 114:*23* 116:*4*
118:*16* 119:*4, 19*
120:*8, 14* 122:*23*
124:*7, 9* 125:*4, 11*
127:*7, 13* 130:*2, 17*
131:*19* 133:*15, 25*
135:*3, 21, 25* 140:*6*
141:*2, 3* 144:*6* 145:*7*
146:*2* 154:*17* 156:*18*
157:*10, 17, 18* 158:*2*
**sort** 47:*21* 64:*23*
67:*1* 80:*19* 84:*25*
85:*4* 113:*13*
**Sotak** 4:*11*
**sounds** 42:*25*
**source** 37:*23* 38:*20*
39:*2*
**SOUTHERN** 1:*1* 7:*8*
**space** 26:*25* 59:*19*
64:*7*
**spans** 133:*7*
**speak** 16:*6, 13, 16, 19*
75:*11*
**speaking** 16:*4* 34:*10*
119:*12, 14*
**speaks** 99:*11* 123:*8*
**special** 50:*12* 65:*6*
**specialist** 7:*11*
**specializes** 41:*25*
**specific** 20:*6* 24:*12*
32:*21* 48:*11* 54:*24*
55:*13* 79:*22* 84:*18*
87:*10, 20* 93:*20* 97:*1*
107:*11* 114:*2* 125:*9*

128:*9* 129:*15* 132:*9*
143:*8* 152:*14, 17*
**specifically** 19:*18*
22:*2* 25:*9* 26:*22*
29:*21* 30:*24* 35:*21*
36:*8* 37:*12* 38:*12*
51:*2* 53:*14* 55:*21*
57:*20* 62:*24* 63:*5*
66:*1, 7* 81:*12* 84:*24,*
*25* 86:*1* 90:*6, 13*
91:*3, 22, 23* 94:*25*
96:*2* 103:*17, 22*
104:*9, 13* 106:*1*
111:*2, 23* 112:*13*
115:*14* 116:*7, 24*
117:*20* 118:*3, 5, 13*
123:*24* 124:*20* 125:*2*
126:*19, 20* 127:*18*
128:*3* 134:*14* 139:*7*
143:*9, 19, 22* 146:*23*
147:*3* 151:*14, 25*
152:*6*
**specifics** 32:*23* 71:*14*
92:*14* 126:*5* 127:*11*
**spell** 140:*2*
**split** 40:*10* 120:*20*
**spot** 106:*7*
**spread** 64:*16, 19*
65:*2, 15*
**spread's** 64:*19*
**Srihari** 143:*5* 150:*18,*
*20* 152:*8, 22* 158:*9*
159:*1*
**stamps** 96:*12*
**stand** 23:*20* 129:*3*
**standard** 65:*23, 25*
66:*8*
**standing** 24:*5, 7*
25:*13*
**stands** 39:*13* 73:*3*
129:*4*
**start** 19:*14* 57:*20*
84:*16*
**started** 25:*5* 27:*15*
29:*7* 42:*20* 55:*25*
56:*10* 58:*1* 83:*24*
84:*14*
**starting** 56:*25* 71:*12,*
*21* 133:*11*

Deposition of Nasir Adaya

United States Securities and Exchange Commission v. Stefan Qin, et al

state  15:*3*  97:*6*
113:*3*  114:*20*  118:*23*
119:*4*
Statement  6:*9, 13*
STATES  1:*1*  3:*4*
  7:*6, 7*
stayed  54:*23*
STEFAN  1:*6*  7:*7*
  27:*9*  29:*9, 10*  31:*18,*
  *19*  38:*8*  152:*9*  154:*1,*
  *6*
Stefan's  154:*19*
stenographic  2:*5*
  7:*15*
step  25:*3*  45:*21*
  47:*21*  48:*24, 25*
  64:*12*  91:*10*  92:*23*
step-by-step  93:*8*
steps  51:*20*  91:*10*
  113:*8*
stint  88:*20*
stop  54:*25*  55:*3*
  68:*24*
straight  97:*2*
strategies  27:*21*  30:*4,*
  *5, 19, 20, 23*  33:*21, 22,*
  *24*  35:*5, 6, 8, 11*
  37:*12*  38:*9, 11*  39:*7*
  41:*25*  42:*2*  43:*19*
  51:*15*  59:*19, 20*
  62:*23*  67:*19, 22, 23,*
  *24*  68:*12*  85:*8*  87:*2*
  89:*19*  109:*7*  124:*22*
strategist  22:*9*
strategy  27:*23*  30:*11,*
  *13*  35:*18*  44:*4*  45:*1*
  47:*17*  48:*8, 25*  49:*11,*
  *16*  51:*19*  52:*11, 18,*
  *21*  53:*8*  63:*7*  66:*2*
  67:*18*  68:*16*  92:*9*
  93:*13*  113:*13*
strategy's  52:*9*
Straub  3:*2*  159:*11,*
  *16*
strauba@sec.gov  3:*6*
streamlined  12:*14*
  97:*6*
Street  3:*4*  4:*4*
structure  28:*19*

40:*14, 16*  57:*5*  80:*21*
student  26:*1*
studied  79:*9*
study  47:*16*  101:*22*
  113:*25*  128:*9, 15*
  131:*12*  132:*11*
  135:*10*  136:*22*
  138:*14*  159:*2*
studying  158:*11*
sub  134:*17*
subaccount  111:*22*
  112:*12, 24*  123:*2, 12,*
  *14*  124:*19*  126:*24*
  128:*5, 7*  132:*4, 7*
  134:*17*  136:*3, 8*
subaccounts  53:*5*
subject  18:*4*  24:*9*
  77:*23*
submit  85:*4*
submitted  28:*23*
Subpoena  2:*7*  24:*8*
subpoenaed  17:*19*
subpoenas  17:*16, 18,*
  *21, 25*
subsectors  86:*25*
subsequently  161:*8*
substantial  127:*23*
substantially  68:*13*
  74:*5*  91:*17*  132:*12*
succeeded  41:*19*
Suite  3:*4, 10, 13*
summary  53:*15*
summer  152:*5*
super  36:*19*
superseded  52:*20*
supervision  161:*9*
supplement  8:*19*
supply  20:*5*  22:*15*
  116:*11, 14, 20*
supply/demand  117:*3*
sure  10:*25*  13:*9*
  14:*3, 8*  19:*24*  25:*4*
  32:*3, 10*  38:*25*  51:*19*
  52:*8*  57:*12*  62:*19*
  63:*5*  71:*9*  74:*24, 25*
  75:*14*  79:*7*  93:*12*
  96:*20*  105:*20*  108:*18*
  111:*8*  113:*16*  121:*14*
  124:*16*  129:*15, 24*
  133:*2*  139:*2*  151:*13,*

*19*  152:*6*  158:*21*
  159:*14*
suspect  14:*4, 9*
swear  7:*16*
switch  11:*20, 21*
sworn  7:*18*  28:*24,*
  *25*  161:*6*
system  102:*13*

< T >
tab  95:*4*  122:*5, 6*
  132:*13*  152:*25*
  155:*24*  156:*3, 5*
take  10:*17*  25:*3*
  51:*8*  64:*12*  65:*20*
  75:*4*  84:*10*  95:*1, 18*
  96:*19*  98:*6*  105:*5*
  121:*19*  128:*24*
  137:*23*  142:*16*  150:*6*
taken  44:*18*  71:*1*
  77:*14*  121:*23*  150:*7,*
  *11*
takes  102:*18*
talked  32:*24*  88:*3, 4,*
  *18*  92:*4*  93:*9, 18*
  103:*3, 4*  105:*10*
  111:*15, 16*  117:*15*
  120:*10*
talking  14:*9*  31:*10,*
  *11*  49:*3*  53:*13*  60:*19*
  106:*21*  113:*21*
  125:*13*  150:*17*
  159:*12*
task  20:*1, 4*  49:*24*
tasked  90:*16*
tasks  19:*24*  50:*1*
tax  147:*25*  148:*8, 16,*
  *25*
team  27:*1*  35:*10, 13,*
  *14, 15*  36:*3, 4*  49:*22*
  50:*1*  71:*17*
Technologies  32:*6*
technology  32:*20*
  56:*12*  83:*14*
tell  18:*11*  24:*1, 21*
  37:*10*  104:*6, 24*
  107:*6, 13*  146:*20*
ten  35:*25*  36:*1*
Teresa  3:*11*

terms  74:*5*
test  47:*17*  98:*21*
tested  109:*7*
testified  7:*19*  15:*6,*
  *12*  39:*3*  83:*2*  85:*24*
  128:*7*
testify  24:*11*  161:*7*
testimony  8:*22*
  15:*19*  28:*14, 24*
  53:*16*  68:*4*  83:*9*
  86:*16*  88:*9, 22*  89:*24*
  101:*11*  107:*2*  125:*20*
  142:*24*
Texas  1:*15*  2:*7*  10:*3*
  15:*7*  21:*23*  143:*12*
text  98:*2, 12*  100:*9,*
  *13*  101:*17, 18*  128:*21*
  130:*7, 12, 24*
tgoodyguillen@bakerl
  aw.com  3:*15*
Thank  11:*9*  14:*23*
  25:*16*  31:*13*  72:*16*
  105:*6*  160:*1*
Thanks  159:*16*
theorize  47:*12*
things  67:*10*
think  10:*5*  11:*24*
  12:*8*  14:*1*  20:*2*  24:*4*
  35:*24*  36:*1*  67:*19*
  72:*1*  73:*9*  75:*7, 22*
  78:*9*  79:*9*  80:*
  84:*18*  85:*21*  86:*23*
  91:*16*  95:*4, 14*  97:*4*
  101:*22*  107:*2*  110:*20*
  121:*18*  122:*10*
  127:*23*  130:*7*  132:*19*
  151:*8*  152:*12, 13*
  159:*18, 19*
thinking  102:*12*
  110:*11*
third  26:*16*  71:*25*
  72:*6*  145:*10*  146:*15*
  157:*22*
third-party  60:*9*
  145:*12*
this'll  132:*15*
thought  33:*2*
thousands  74:*4*
three  121:*4*  150:*3, 6*

Case 1:20-cv-10849-JGLC   Document 233-2   Filed 08/04/23   Page 180 of 191

Deposition of Nasir Adaya

United States Securities and Exchange Commission v. Stefan Qin, et al.

**three-minute** 150:*1, 6*
**tickers** 115:*19*
**tied** 92:*5, 25* 93:*10*
**till** 9:*5, 7* 83:*2*
**time** 7:*4* 8:*6, 16*
  9:*10* 10:*23* 12:*12, 24*
  13:*11, 17* 19:*15, 17*
  20:*22* 24:*5* 27:*3*
  29:*18, 19* 31:*5, 8, 9,*
  *15, 21, 24* 36:*3, 7*
  41:*9* 43:*1, 5, 10, 20,*
  *21* 44:*17* 46:*8* 48:*18*
  49:*16, 25* 51:*12* 52:*6*
  56:*20* 58:*22* 62:*18*
  69:*13, 17* 80:*4* 82:*10,*
  *22, 23* 85:*17* 96:*12*
  99:*16* 100:*2, 9*
  104:*15, 22* 108:*22*
  109:*16* 113:*3, 25*
  114:*2* 116:*22* 117:*11*
  119:*5* 124:*15* 125:*8*
  127:*12* 135:*25* 139:*7*
  141:*24* 142:*17* 150:*8*
  152:*18* 161:*10*
**timeline** 23:*2* 25:*4*
  29:*16* 31:*12* 33:*11,*
  *18* 34:*17, 23* 42:*19,*
  *25* 58:*17, 20* 62:*9*
  82:*6* 116:*2* 119:*12*
  124:*21* 125:*18*
**times** 16:*6*
**title** 19:*12* 22:*6*
  28:*18, 20* 34:*22, 24*
  36:*6* 39:*17, 18, 25*
**titles** 36:*20* 39:*22*
  40:*25* 56:*4, 7*
**today** 7:*12, 14* 8:*4,*
  *23* 14:*17* 15:*16, 19,*
  *23* 28:*12* 38:*21* 56:*6*
  61:*18* 62:*19* 63:*17*
  76:*18* 77:*11* 78:*2*
  87:*9* 89:*20* 104:*12*
  128:*8* 131:*16* 137:*1*
  139:*8* 149:*18* 159:*4*
**Today's** 7:*3*
**toggle** 97:*23*
**token** 57:*5* 60:*23*
  64:*2* 65:*11, 14* 66:*22,*
  *23, 24* 69:*17, 19, 23,*
  *24* 70:*19* 72:*3* 73:*18*

76:*3, 13* 82:*5, 7, 20*
83:*1, 2, 5* 86:*2* 90:*17*
91:*11* 92:*1* 93:*22*
105:*19* 115:*3, 7*
**tokens** 65:*6, 7, 10, 15*
  70:*7, 13* 100:*14, 23*
  112:*7, 9, 11, 15, 19, 23*
  113:*6* 114:*13* 115:*11,*
  *17* 116:*5* 117:*1, 6, 23,*
  *25* 118:*1, 2, 4, 11, 15,*
  *20* 119:*9, 15* 120:*11,*
  *16, 18* 126:*23*
**told** 15:*6* 78:*18, 19*
  86:*10, 22* 93:*10*
  101:*7* 104:*11* 120:*11*
**tomorrow** 98:*24*
**tonight** 98:*21*
**tools** 67:*1*
**top** 84:*4* 96:*3, 4, 7*
  97:*23* 122:*18* 132:*23*
  133:*7* 153:*15, 18*
  156:*14*
**topics** 24:*8*
**touched** 137:*18*
**tough** 158:*3*
**track** 87:*24*
**trade** 45:*16* 48:*7*
  50:*16* 51:*4* 69:*13*
  89:*15* 111:*21* 112:*7*
  128:*5* 142:*9* 143:*1*
  152:*8*
**traded** 61:*5* 69:*13*
  71:*25* 72:*6* 114:*24*
  140:*13* 155:*7*
**trader** 29:*4, 5, 7*
  30:*2* 33:*1* 34:*25*
  39:*19, 20, 23* 40:*12,*
  *24* 42:*21* 154:*20*
**traders** 73:*23*
**trades** 38:*22* 45:*8*
  46:*3, 20, 22* 47:*24*
  48:*7, 17, 22* 49:*5, 6*
  51:*7* 93:*12* 120:*6*
  126:*15, 24*
**trading** 19:*4* 20:*15,*
  *17, 21* 22:*4, 20, 22*
  26:*13* 27:*5* 29:*15*
  30:*18* 31:*15, 16, 17,*
  *18, 19, 20* 33:*1, 10, 21,*
  *22* 34:*2, 3, 9, 13, 14,*

*21* 36:*12, 13, 14, 15,*
*16* 37:*18, 25* 38:*7*
  40:*21* 43:*2, 6, 9, 18*
  44:*2, 3, 24, 25* 49:*2, 3,*
  *8* 51:*22* 52:*1, 17*
  53:*2, 14, 15* 60:*24*
  61:*1, 3* 63:*9, 19*
  65:*21* 67:*15, 16, 21*
  72:*4* 75:*3* 86:*24*
  87:*2, 4, 7, 19, 21, 22*
  88:*8, 16, 20* 89:*2*
  90:*23* 91:*7, 18* 93:*1,*
  *19, 24* 105:*11* 111:*7*
  114:*11* 119:*17*
  120:*18, 20* 143:*19*
  146:*7, 14, 21* 147:*12*
  150:*23* 151:*21*
  154:*19* 155:*3, 10*
**training** 22:*24* 93:*10*
  115:*25*
**tranche** 119:*19*
**tranches** 71:*18*
**transaction** 123:*21*
  127:*12* 128:*15*
  131:*13* 133:*5* 157:*4,*
  *23* 159:*2*
**transactions** 118:*8*
  123:*25* 128:*10*
  134:*13, 21* 138:*14*
  152:*21* 157:*13, 25*
**transcribed** 8:*23*
  161:*8*
**transcript** 13:*1, 3*
  159:*24* 160:*1*
**transcription** 44:*9*
  161:*10*
**transfer** 53:*5, 6*
  129:*6*
**transferred** 112:*12*
  128:*12* 131:*22*
  136:*11*
**transferring** 131:*20*
**tried** 60:*8*
**true** 161:*9*
**truthfully** 15:*24*
**try** 11:*21* 12:*18, 20*
**trying** 82:*24* 83:*3*
  101:*15* 113:*13, 23*
  125:*12*

**turn** 11:*4*
**twice** 16:*8*
**two** 23:*4* 38:*25*
  79:*17, 18* 153:*11*
  157:*13* 159:*13*
**type** 110:*17*

**< U >**
**U.S** 3:*2*
**Uh-huh** 93:*15* 138:*9*
**UID** 139:*17*
**UID     8310** 24:*12*
**ultimate** 36:*23*
**ultimately** 90:*16*
  158:*6, 8*
**umbrella** 87:*18*
**unclear** 109:*7*
  119:*18* 147:*18*
**underneath** 96:*11*
  154:*22*
**understand** 8:*7* 9:*15,*
  *16* 15:*15, 17, 18, 21,*
  *22* 23:*20* 28:*14*
  37:*23* 45:*14* 50:*7*
  56:*24* 57:*1* 62:*10*
  78:*17* 82:*24* 83:*3, 17*
  99:*20* 106:*10* 117:*5*
  125:*12* 129:*23* 132:*2*
  150:*19* 155:*21*
  158:*19*
**understanding** 24:*10*
  27:*2, 4* 28:*6* 31:*18*
  34:*7* 42:*8* 54:*1*
  62:*20, 24* 80:*7, 23*
  87:*18* 95:*20* 106:*2, 4*
  125:*5, 6* 126:*2* 127:*1,*
  *3* 130:*12, 21, 25*
  138:*20* 147:*10* 155:*3,*
  *6, 16*
**understands** 74:*18*
**understood** 8:*13*
  9:*23* 10:*19* 13:*5*
  24:*24*
**undertake** 49:*18*
  51:*21*
**undertaken** 67:*17*
**undertaking** 49:*19*
  74:*23*
**undertook** 19:*20*

**UNITED** 1:*1* 3:*4*
7:*6, 7*
**university** 18:*21*
**unsure** 32:7, *14, 17*
34:*13* 37:*2, 15* 42:*5,*
*11* 53:*3* 54:*6, 8*
63:*20* 69:*25* 76:*25*
78:*8* 79:*3* 129:*20*
131:*5* 135:*6* 142:*4, 6*
146:*18* 158:*7, 11*
**updated** 98:*25*
**USD** 154:*23*
**USDT** 51:*5* 126:*11,*
*14* 138:*8*
**use** 14:*18* 45:*21*
64:*20* 72:*8* 105:*24*
107:*16* 109:*11*
151:*20*
**user** 106:*5*
**users** 74:*3, 4*
**Usually** 57:*19*
**utilized** 30:*18* 143:*17*
**utilizing** 104:*7*

**< V >**
**vague** 20:*9* 31:*7, 8*
32:*19* 33:*7* 38:*15*
40:*3* 43:*11, 13, 20, 21*
45:*11* 46:*12* 47:*4*
50:*6* 53:*21* 54:*10*
59:*6, 22* 64:*8* 67:*3*
68:*4* 71:*8* 73:*7, 19*
74:*15* 75:*24* 93:*3*
94:*19* 104:*16* 105:*3*
106:*16* 107:*8* 110:*5*
113:*1, 2, 15* 115:*13*
116:*23* 118:*21*
129:*14* 131:*9* 134:*24*
141:*15* 147:*9, 17*
149:*4* 152:*15* 154:*11*
**value** 32:*2* 69:*24*
70:*2, 9, 17* 118:*19*
119:*1, 8, 24* 120:*2, 15*
**Value's** 70:*5*
**variables** 44:*6* 45:*3*
**variance** 67:*12*
**varied** 72:*25*
**varies** 71:*20* 118:*22*
**variety** 30:*18* 33:*21*
38:*11* 45:*15* 46:*7*

47:*25* 48:*19* 51:*14*
59:*8* 64:*15, 25* 65:*5*
75:*3* 86:*25* 103:*8*
109:*6* 117:*16* 130:*22*
134:*20* 143:*2*
**various** 22:*15* 26:*24*
28:*2* 30:*4* 36:*20*
40:*2* 41:*4, 25* 44:*6*
45:*3, 18* 48:*18* 49:*16*
58:*21* 59:*19* 64:*20*
67:*19, 22* 70:*16, 19*
79:*24* 96:*11* 115:*19*
**vary** 20:*2* 66:*14*
**venture** 91:*23*
**ventures** 59:*1*
**verbal** 121:*8*
**verbally** 9:*1* 121:*9*
**version** 98:*21* 133:*4*
140:*9, 11, 17* 143:*1*
146:*11*
**versus** 7:*7* 37:*25*
47:*18* 53:*14* 74:*3*
75:*19* 76:*14* 78:*25*
**viability** 126:*4*
**video** 7:*5, 11*
**VIDEOGRAPHER**
4:*7* 7:*2* 44:*16, 20*
70:*24* 71:*3* 95:*5*
102:*12* 121:*21, 25*
150:*9, 13* 159:*21*
160:*2*
**VIDEOTAPED** 1:*13*
2:*1* 161:*5*
**view** 12:*19*
**viewed** 110:*16*
**viewpoint** 44:*1*
**violation** 77:*15*
**Virgil** 16:*17* 23:*22*
27:*19, 24* 28:*7, 13, 17*
29:*19* 30:*6, 9, 12, 14*
31:*11* 32:*15, 21, 25*
33:*12, 15* 34:*19*
39:*13* 40:*1, 25* 41:*5,*
*18, 22* 42:*12* 43:*10*
63:*10* 125:*7, 16*
**volatility** 147:*18*
**volition** 21:*12* 23:*12*
**VPFA** 39:*12, 13, 15,*
*17, 22*

**VQR** 23:*15, 17, 19,*
*20* 25:*2, 5, 11, 22*
26:*4, 11, 14, 18, 22*
27:*3, 6, 15* 30:*21*
36:*16, 17, 18, 22*
37:*18* 41:*14, 16* 42:*7,*
*18* 43:*6* 46:*6* 50:*13*
53:*15, 19* 54:*25* 55:*3,*
*24* 56:*3, 8* 57:*1, 3*
59:*21* 60:*20* 61:*22*
63:*8, 19* 67:*16* 68:*2*
84:*1, 5* 85:*18* 87:*5, 6*
89:*3, 9, 18* 94:*2, 6, 15,*
*20* 100:*2* 104:*7, 14,*
*15, 21* 105:*1* 106:*21*
107:*16* 108:*8, 9, 15,*
*18, 23* 109:*5, 8, 11, 21*
110:*12, 17* 111:*8, 19*
112:*2, 12, 24* 123:*14*
124:*2, 4, 12, 13* 126:*4,*
*24* 127:*9* 129:*19*
134:*18* 136:*3* 137:*18*
150:*24* 152:*5*
**VQR-related** 151:*21*
**VS** 1:*5*

**< W >**
**wait** 9:*5, 7*
**walk** 10:*16* 19:*1, 19*
33:*17* 45:*20* 47:*8*
58:*20* 60:*20* 64:*6*
84:*9* 91:*9* 123:*4*
**Wallet** 6:*9, 13*
112:*10* 113:*6* 123:*15,*
*19, 23* 124:*3, 5, 14*
126:*11* 127:*6, 10*
129:*7, 10, 13, 19*
130:*11, 13, 15, 16, 20,*
*22, 23* 131:*1, 2, 4, 8,*
*23* 133:*11* 138:*4*
157:*3*
**wallets** 132:*10*
**want** 13:*9* 14:*1*
25:*4* 26:*22* 28:*13*
44:*12* 56:*24* 57:*1*
58:*16* 70:*13* 95:*5*
97:*6* 102:*14* 111:*8*
133:*23* 159:*25*
**wanted** 26:*2* 51:*4,*
*25* 52:*21* 105:*19*

155:*20* 158:*19*
159:*14, 19*
**wants** 69:*18*
**Washington** 3:*14*
**Wasick** 3:*17*
**way** 9:*24* 13:*13*
33:*16* 41:*3* 51:*19*
73:*12* 95:*13* 99:*24*
102:*14* 117:*17* 122:*5*
134:*1* 148:*8*
**ways** 48:*1* 49:*16*
64:*15, 25* 65:*5* 73:*9*
103:*9* 117:*16*
**week** 16:*11*
**weeks** 115:*23*
**weighted** 64:*23*
**well** 18:*17* 21:*10, 14*
23:*8, 20* 48:*3* 56:*2*
60:*10* 64:*11* 70:*11*
72:*9* 76:*16* 95:*1*
108:*21* 109:*9* 113:*19*
114:*18* 124:*6* 128:*18*
143:*4* 153:*11* 157:*17*
**went** 44:*23* 79:*24*
88:*2* 91:*10* 101:*20*
103:*5* 113:*20* 158:*6,*
*9*
**We're** 8:*1* 12:*17*
31:*10, 11* 41:*3* 85:*16*
93:*8* 96:*25* 97:*3, 15*
106:*23* 121:*20* 130:*8*
139:*8* 150:*8* 160:*3*
**We've** 28:*23* 49:*19*
51:*17* 56:*5, 24* 85:*11,*
*20* 87:*8, 11* 116:*1*
**Whichever** 102:*14*
**whoever's** 71:*17*
**wide** 66:*6*
**WiFi** 11:*20*
**withdraw** 52:*1*
**withdrawing** 52:*10*
53:*1*
**withdraw-only** 142:*9*
**witness** 2:*6* 4:*2*
7:*16, 18* 11:*18* 12:*1,*
*4* 57:*25* 72:*15* 74:*17*
78:*9* 82:*13* 89:*7*
96:*21* 97:*18* 102:*2,*
*16, 19* 122:*14* 127:*21*
130:*1* 135:*21* 144:*6*

145:*7*  149:*5*  153:*10*
158:*15*  161:*6*
**word**  70:*9*  112:*3*
**work**  19:*5, 11*  20:*8,*
*13*  22:*10, 11*  25:*11,*
*21*  26:*22*  28:*7*  29:*14*
30:*13*  34:*19*  36:*3*
39:*15*  40:*8*  42:*18*
53:*23*  59:*3, 6*  60:*18,*
*20, 21, 22*  61:*2, 5*
67:*25*  68:*1*  73:*6*
84:*3, 5, 11*  85:*17, 25*
108:*9, 14, 23*  109:*4*
110:*8*  119:*21*  137:*17*
**worked**  19:*3, 6*
28:*13*  29:*20, 25*  30:*1*
32:*12*  33:*1*  35:*12, 17,*
*18*  42:*12*  53:*19, 20*
59:*5*  75:*23, 25*  76:*5*
100:*2*  104:*21*  143:*11*
**working**  25:*2, 5, 11*
26:*11, 14*  27:*7, 10, 15*
29:*7, 19, 24*  30:*21*
33:*18*  40:*1*  42:*20*
54:*25*  55:*3*  57:*7*
84:*14, 16*
**wow**  99:*1*
**write**  45:*22*  48:*5*
49:*4*
**writes**  154:*22*
**writing**  44:*4*  45:*1, 4,*
*6*  99:*7*  107:*25*  108:*4*
121:*13*
**written**  45:*25*  94:*23*
113:*9*

**< Y >**
**Yeah**  20:*3, 13*  25:*15,*
*21*  44:*14*  50:*23*
56:*12*  58:*1, 23*  59:*8*
60:*22*  64:*1*  66:*14*
67:*6*  74:*22*  79:*3*
81:*22*  82:*24*  83:*7*
86:*23*  87:*12*  88:*6*
92:*21*  96:*25*  97:*13*
102:*12, 16*  103:*12*
108:*13*  113:*5*  114:*24*
116:*11, 15, 24*  117:*23*
120:*10*  121:*5*  122:*24*
123:*11*  126:*2*  130:*5,*

*12, 18*  133:*25*  134:*3,*
*8*  135:*3*  136:*14, 17*
138:*8*  141:*21*  142:*4,*
*7*  143:*10*  149:*22, 25*
151:*7, 12, 17*  152:*17*
153:*20*  156:*24*  158:*2,*
*4, 14*
**year**  23:*3, 11*  29:*1*
79:*17, 18*  148:*4*
149:*2, 11, 12*
**years**  21:*5*  33:*25*
35:*1, 12*  59:*10*  62:*7*
77:*22*  87:*25*  103:*23*
118:*14*  123:*25*  126:*6*
140:*22*
**Yenamandra**  143:*5,*
*24*  146:*25*
**Yenamandra's**  144:*25*
**Yoder**  42:*18*
**YORK**  1:*1*  3:*18*  7:*9*

**< Z >**
**zero**  66:*9*  133:*12*
157:*3*

## WORD LIST

**< $ >**
**$10**  *(1)*

**< § >**
**§**  *(10)*

**< 0 >**
**0095**  *(1)*
**01**  *(2)*

**< 1 >**
**1**  *(10)*
**1:40**  *(3)*
**10**  *(1)*
**100**  *(4)*
**10111-0100**  *(1)*
**1050**  *(1)*
**11**  *(1)*
**1100**  *(1)*
**12/16/2020**  *(1)*
**122**  *(1)*
**12th**  *(3)*
**13**  *(2)*
**132**  *(1)*
**13th**  *(1)*
**14**  *(1)*
**153**  *(1)*
**156**  *(1)*
**161**  *(1)*
**16th**  *(1)*
**17th**  *(1)*
**18**  *(3)*
**18625**  *(1)*
**19**  *(2)*
**1st**  *(1)*

**< 2 >**
**2**  *(5)*
**2:33**  *(2)*
**2:41**  *(2)*
**20**  *(1)*
**20.02100187**  *(1)*
**20036**  *(1)*
**2014**  *(3)*
**2018**  *(13)*
**2018-2019**  *(1)*
**2019**  *(9)*

**202**  *(1)*
**2020**  *(47)*
**2021**  *(4)*
**2022**  *(2)*
**2023**  *(9)*
**20-cv-10849**  *(2)*
**20th**  *(1)*
**21**  *(1)*
**212**  *(1)*
**235**  *(1)*
**24/7**  *(1)*
**25**  *(1)*
**27**  *(2)*
**28**  *(1)*
**2800**  *(1)*
**28th**  *(2)*
**29**  *(2)*
**29th**  *(1)*

**< 3 >**
**3**  *(7)*
**3/5/2019**  *(1)*
**3:22**  *(2)*
**3:37**  *(2)*
**30**  *(1)*
**30-second**  *(1)*
**31**  *(3)*
**39**  *(1)*

**< 4 >**
**4**  *(6)*
**4:53**  *(2)*
**40**  *(2)*
**415**  *(2)*
**44**  *(1)*
**45**  *(1)*

**< 5 >**
**5**  *(5)*
**5:02**  *(2)*
**5:41**  *(2)*
**5:46**  *(2)*
**55**  *(2)*
**589-4200**  *(1)*
**5th**  *(1)*

**< 6 >**
**6**  *(3)*
**6:00**  *(1)*

**600**  *(1)*

**< 7 >**
**7**  *(5)*
**705-8111**  *(1)*
**714**  *(1)*
**7th**  *(3)*

**< 8 >**
**8**  *(1)*
**861-1630**  *(1)*
**8th**  *(1)*

**< 9 >**
**900**  *(1)*
**92626**  *(1)*
**94104**  *(2)*
**95**  *(1)*
**954-4478**  *(1)*
**966-8833**  *(1)*
**99.99**  *(2)*

**< A >**
**abilities**  *(1)*
**ability**  *(4)*
**able**  *(5)*
**above-styled**  *(1)*
**access**  *(9)*
**accessible**  *(1)*
**accommodate**  *(1)*
**account**  *(63)*
**accounts**  *(28)*
**accurate**  *(1)*
**accused**  *(3)*
**achieve**  *(1)*
**ACTION**  *(4)*
**actions**  *(2)*
**activities**  *(8)*
**activity**  *(22)*
**actual**  *(1)*
**ADAYA**  *(53)*
**Adaya's**  *(1)*
**add**  *(1)*
**adding**  *(1)*
**addition**  *(2)*
**additional**  *(1)*
**address**  *(6)*
**addresses**  *(1)*
**advance**  *(3)*

**adverse**  *(1)*
**advice**  *(2)*
**advisable**  *(1)*
**advising**  *(4)*
**advisor**  *(1)*
**advisory**  *(14)*
**affiliated**  *(9)*
**affiliation**  *(1)*
**afternoon**  *(1)*
**agilbert@fbm.com**
 *(1)*
**ago**  *(6)*
**agree**  *(4)*
**agreement**  *(15)*
**Ah**  *(1)*
**ahead**  *(25)*
**AirPods**  *(1)*
**al**  *(2)*
**algorithmic**  *(17)*
**algorithmically**  *(1)*
**allocation**  *(3)*
**allow**  *(2)*
**allowed**  *(1)*
**allows**  *(4)*
**alluding**  *(1)*
**alternative**  *(1)*
**Amanda**  *(2)*
**amount**  *(2)*
**Amrhein**  *(2)*
**analysis**  *(1)*
**Analyst**  *(5)*
**analytical**  *(1)*
**analyze**  *(1)*
**analyzing**  *(3)*
**and/or**  *(2)*
**Andrew**  *(1)*
**answer**  *(74)*
**answered**  *(21)*
**answers**  *(1)*
**anticipate**  *(2)*
**anticipated**  *(2)*
**Antifragile**  *(2)*
**Anton**  *(1)*
**Antonio**  *(19)*
**Antonio's**  *(1)*
**anybody**  *(2)*
**anymore**  *(1)*
**apart**  *(1)*
**API**  *(4)*

apologies  (1)
apologize  (2)
appear  (2)
APPEARANCES  (3)
appearing  (1)
appears  (1)
application  (1)
applies  (1)
appointment  (1)
appreciate  (1)
approximately  (2)
arbitrage  (7)
argumentative  (2)
article  (4)
ascended  (1)
aside  (1)
asked  (32)
asking  (17)
asks  (1)
assess  (1)
assessment  (1)
asset  (14)
assets  (79)
assigned  (1)
assist  (1)
assume  (2)
assumes  (25)
attached  (1)
attempting  (1)
attend  (1)
auction  (4)
August  (1)
authorization  (1)
Authorized  (1)
automated  (2)
available  (5)
Avenue  (1)
average  (1)
Aviva  (3)
Aviva's  (1)
avoid  (1)
aware  (14)
awareness  (1)

< B >
bachelor's  (1)
back  (32)
background  (2)
BAKER  (3)

BakerHostetler  (1)
balance  (1)
Ballpark  (1)
base  (2)
based  (9)
basically  (1)
Bass  (1)
bearings  (1)
began  (1)
beginning  (2)
BEHALF  (10)
behavior  (1)
belief  (3)
believe  (221)
belong  (1)
belonged  (4)
belonging  (2)
beneficial  (2)
benefit  (4)
benefits  (6)
best  (12)
better  (4)
beyond  (1)
bid  (5)
bids  (4)
Binance  (38)
Binance's  (3)
bit  (16)
Bitcoin  (24)
blockchain  (2)
Blockchair  (7)
Bodoia  (1)
bolts  (1)
book  (12)
books  (2)
bottom  (7)
bought  (1)
Boulevard  (1)
branding  (1)
BRAUN  (1)
break  (15)
breaking  (1)
breaks  (1)
broader  (1)
broke  (1)
brought  (5)
BTC  (4)
btw  (1)
bucket  (1)

building  (3)
built  (1)
bunch  (1)
businesses  (1)
button  (1)
buy  (4)

< C >
calculate  (1)
calculated  (2)
calculating  (1)
California  (3)
call  (6)
called  (3)
calls  (4)
camera  (2)
capabilities  (3)
CAPACITY  (7)
Capital  (28)
capturing  (1)
care  (1)
career  (1)
Carney  (1)
case  (3)
cate  (1)
categories  (2)
cause  (2)
cautioned  (1)
cede  (1)
cell  (3)
Central  (4)
centralized  (4)
certain  (14)
certainty  (1)
CERTIFICATION
  (2)
Certified  (2)
certify  (2)
cessation  (1)
chain  (6)
change  (4)
channel  (1)
characteristics  (2)
characterizations  (1)
characterize  (2)
characterizing  (1)
charge  (2)
Chat  (6)
chats  (11)

Chen  (16)
Chen's  (1)
choosing  (2)
circumstances  (16)
citizen  (4)
city  (1)
CIVIL  (3)
clarify  (13)
clarity  (1)
class  (1)
clear  (8)
clearly  (1)
clicker  (1)
client  (5)
clients  (6)
close  (2)
closely  (2)
closing  (3)
code  (3)
codes  (3)
coin  (15)
coins  (2)
colleagues  (1)
come  (2)
comes  (1)
coming  (1)
comment  (2)
comments  (1)
commingled  (1)
COMMISSION  (5)
commissions  (1)
committed  (3)
commodities  (3)
commodity  (6)
communicate  (3)
communicated  (2)
communicating  (4)
communication  (2)
companies  (1)
company  (8)
company's  (1)
compensated  (10)
compensation  (6)
complete  (1)
complied  (1)
computer  (4)
concern  (2)
concluded  (1)
concludes  (1)

Deposition of Nasir Adaya

United States Securities and Exchange Commission v. Stefan Qin, et al

conclusion  (4)
conduct  (14)
conducted  (9)
conducting  (13)
confidential  (3)
confirmation  (1)
Confirmed  (1)
confused  (2)
confusing  (1)
connect  (4)
connected  (1)
Connecticut  (1)
connection  (1)
consequences  (1)
consider  (1)
consideration  (1)
considerations  (1)
consisted  (1)
consultant  (1)
consulting  (6)
CONT  (1)
contacted  (1)
contains  (1)
content  (1)
context  (11)
continue  (3)
continued  (1)
continuous  (1)
contractor  (1)
control  (20)
controlled  (5)
controlling  (2)
controls  (1)
conversation  (6)
conversations  (1)
copy  (2)
corporate  (1)
correct  (91)
correctly  (6)
correlated  (1)
correlations  (1)
correspondence  (1)
Cosmos  (3)
Cosmos-based  (1)
Costa  (1)
counsel  (7)
count  (1)
couple  (3)
course  (7)
COURT  (8)

COURT-
APPOINTED  (2)
courtroom  (1)
cover  (1)
covered  (2)
covering  (1)
coworkers  (1)
create  (1)
created  (12)
creating  (1)
creation  (1)
criteria  (3)
CRR  (3)
crypto  (3)
cryptocurrencies  (1)
cryptocurrency  (1)
currency  (1)
currently  (9)
custody  (1)
cut  (3)

< D >
D.C  (1)
data  (22)
date  (12)
dated  (1)
dates  (3)
day  (8)
day-to-day  (2)
December  (20)
decentralization  (1)
decentralized  (2)
Decibel  (3)
decide  (1)
decides  (1)
decision  (1)
decision's  (1)
declaration  (1)
Deefa  (9)
deem  (1)
deepest  (1)
Defendants  (1)
definitely  (1)
definition  (1)
degree  (2)
degrees  (2)
demand  (10)
depended  (1)
dependent  (2)

depending  (1)
depends  (14)
deploy  (2)
deploying  (1)
deposed  (1)
DEPOSITION  (24)
depth  (2)
derivative  (2)
describe  (4)
described  (13)
DESCRIPTION  (1)
designate  (2)
desk  (1)
details  (2)
determined  (1)
Develop  (1)
developed  (1)
deviates  (1)
device  (1)
devices  (2)
devising  (1)
difference  (4)
differences  (1)
different  (18)
difficult  (16)
digital  (17)
Diplomate  (1)
discrepancies  (2)
discuss  (2)
discussed  (10)
discussing  (3)
discussion  (3)
discussions  (1)
distracted  (1)
distribution  (2)
DISTRICT  (4)
document  (37)
documents  (11)
doing  (19)
dollars  (6)
drill  (1)
due  (3)
duly  (2)
duties  (2)
duty  (2)
dynamic  (3)
dynamics  (1)

< E >

earlier  (27)
easier  (1)
easiest  (1)
economics  (2)
educational  (2)
effect  (4)
effects  (2)
efficient  (2)
either  (4)
electronic  (2)
Electrum  (3)
else's  (1)
e-mail  (1)
emanating  (1)
emergency  (2)
employed  (3)
employee  (2)
employer  (1)
employment  (4)
employs  (1)
ended  (1)
endpoint  (3)
endpoints  (2)
enforcement  (2)
engaged  (5)
engagement  (1)
engaging  (1)
ensuring  (1)
entail  (2)
entailed  (2)
entails  (3)
entire  (1)
entirely  (1)
entities  (20)
entitled  (2)
entity  (17)
equity  (1)
Eric  (8)
escaping  (1)
especially  (1)
essentially  (1)
established  (2)
estimate  (1)
et  (2)
ETH  (3)
Ethereum  (1)
Etherscan  (1)
events  (2)
Everest  (2)

evolution  (1)
exact  (15)
exactly  (8)
EXAMINATION  (2)
examined  (1)
example  (34)
examples  (1)
EXCHANGE  (37)
exchanges  (10)
excuse  (1)
execute  (6)
executed  (2)
executing  (2)
exhaustively  (1)
Exhibit  (16)
EXHIBITS  (1)
experience  (14)
experiencing  (1)
experiment  (1)
expertise  (1)
expiration  (1)
expired  (1)
explain  (11)
exposure  (2)
express  (2)
extensive  (2)
extent  (3)
externally  (2)
eye  (1)
eyeballs  (2)

< F >
face  (1)
facilitate  (2)
fact  (7)
factor  (1)
factors  (2)
facts  (22)
fair  (9)
familiar  (8)
familiarity  (1)
far  (6)
FARELLA  (1)
fashion  (3)
fast  (1)
favor  (1)
Federal  (1)
fee  (2)
field  (1)

file  (1)
filed  (1)
finalize  (1)
finance  (2)
finances  (1)
financial  (1)
financially  (1)
fine  (4)
finish  (4)
firm  (2)
first  (20)
fiscal  (2)
fits  (1)
five  (3)
flesh  (1)
Floor  (2)
focus  (2)
focused  (2)
focusing  (1)
follow  (1)
following  (1)
follows  (1)
forever  (1)
forget  (1)
form  (3)
formal  (3)
formally  (1)
former  (1)
forms  (1)
formula  (1)
formulas  (1)
forth  (4)
founder  (2)
frame  (4)
framework  (1)
frameworks  (1)
Francisco  (2)
fraud  (9)
front  (10)
froze  (1)
frozen  (4)
FTX  (3)
full  (5)
full-time  (1)
fully  (2)
function  (1)
functions  (1)
fund  (22)
funds  (3)

further  (2)
future  (2)

< G >
gain  (1)
gas  (2)
general  (3)
generalize  (10)
generally  (7)
generate  (1)
generated  (7)
gestures  (1)
getting  (4)
Gilbert  (173)
girlfriend  (4)
girlfriend's  (7)
give  (21)
given  (17)
gives  (1)
go  (64)
goes  (2)
going  (60)
Good  (5)
Goody  (1)
govern  (1)
governance  (2)
graduating  (2)
graduation  (1)
granular  (3)
Great  (5)
greater  (1)
green  (1)
groups  (1)
growth  (1)
guess  (17)
Guillen  (1)
guilty  (1)
guys  (4)

< H >
half  (1)
Hallak  (14)
Hallak's  (3)
hand  (2)
handful  (1)
handle  (1)
happen  (2)
happened  (6)
happening  (11)

happens  (4)
happy  (4)
harassing  (1)
hard  (6)
hash  (1)
head  (3)
headlines  (1)
hear  (9)
heard  (4)
heart  (1)
heavily  (2)
hectic  (1)
hedge  (13)
held  (5)
Hello  (1)
help  (13)
helping  (4)
high  (5)
highlighted  (9)
highly  (1)
hired  (2)
historical  (2)
historically  (2)
histories  (2)
history  (6)
hold  (6)
holding  (1)
home  (1)
hoped  (1)
HOSTETLER  (3)
house  (2)
Houston  (6)
hundreds  (1)
hypothetical  (1)

< I >
ICO  (16)
ICOs  (5)
identification  (5)
identified  (5)
identifier  (1)
identify  (3)
IEO  (25)
IEOs  (2)
immediate  (1)
immediately  (3)
implicates  (1)
important  (1)
impressive  (1)

inaccurate *(1)*
inception *(1)*
include *(1)*
includes *(2)*
including *(7)*
incomplete *(1)*
independent *(5)*
INDEX *(1)*
indicate *(1)*
indicates *(1)*
indicating *(1)*
individual *(7)*
individuals *(3)*
industry *(18)*
informal *(1)*
informally *(1)*
information *(12)*
informed *(1)*
infraction *(1)*
infrastructure *(5)*
ingest *(2)*
inherit *(1)*
initial *(14)*
initially *(4)*
INJ *(35)*
injected *(1)*
Injective *(88)*
Injective-affiliated *(1)*
input *(1)*
inputs *(2)*
inputted *(1)*
insight *(2)*
insights *(1)*
instance *(4)*
instant *(1)*
instruct *(5)*
instructed *(1)*
integrity *(1)*
intention *(2)*
interchangeably *(1)*
interest *(3)*
interested *(6)*
internal *(1)*
international *(3)*
Internet *(1)*
interns *(3)*
interruption *(2)*
interruptions *(1)*
interview *(1)*

inventory *(1)*
invested *(1)*
investors *(2)*
involve *(2)*
involved *(16)*
IPO *(1)*
issue *(4)*
issued *(4)*
items *(3)*
it'll *(2)*
its *(3)*

< J >
jcarney@bakerlaw.co
m *(1)*
Joanna *(1)*
Job *(10)*
jobs *(1)*
John *(1)*
Johnson *(7)*
join *(1)*
joined *(9)*
JR *(3)*
judge *(1)*
July *(1)*
jwasick@bakerlaw.co
m *(1)*

< K >
keep *(7)*
Ken *(8)*
kept *(1)*
key *(5)*
kind *(5)*
know *(57)*
knowledge *(3)*

< L >
Lab *(1)*
Labs *(55)*
lack *(1)*
lag *(1)*
lagging *(4)*
laggy *(2)*
largely *(1)*
larger *(1)*
largest *(1)*
late *(4)*
launch *(1)*

launched *(3)*
Lauren *(1)*
law *(1)*
laws *(1)*
lbass@bakerlaw.com
*(1)*
learned *(1)*
leave *(4)*
leaving *(3)*
led *(7)*
left *(9)*
legal *(7)*
length *(1)*
lengthy *(1)*
letters *(1)*
level *(4)*
LGS *(2)*
light *(1)*
likes *(1)*
likewise *(1)*
limit *(8)*
limited *(4)*
line *(4)*
link *(2)*
linked *(1)*
liquidity *(20)*
listed *(2)*
listing *(1)*
litigation *(1)*
little *(14)*
LLC *(1)*
LLP *(4)*
located *(2)*
location *(2)*
lodge *(1)*
logo *(1)*
long *(6)*
longer *(3)*
look *(10)*
looking *(7)*
looks *(1)*
loop *(1)*
lot *(12)*
lower *(2)*

< M >
main *(2)*
maintained *(1)*
majority *(1)*

maker *(18)*
makers *(5)*
making *(78)*
Management *(8)*
manager *(15)*
manifestation *(1)*
manually *(2)*
March *(18)*
Marco *(3)*
mark *(1)*
MARKED *(12)*
market *(106)*
markets *(1)*
MARTEL *(1)*
match *(1)*
materials *(1)*
math *(1)*
matter *(5)*
matters *(2)*
Max *(1)*
mean *(28)*
meaning *(14)*
means *(6)*
meant *(2)*
meet *(3)*
members *(1)*
memorialized *(3)*
memory *(4)*
mentioned *(18)*
Mesa *(1)*
Message *(4)*
Messages *(3)*
met *(9)*
Micheal *(6)*
million *(4)*
millionaire *(1)*
Millions *(4)*
mine *(1)*
minute *(2)*
minutes *(6)*
Mirarc *(13)*
Mis *(1)*
mischaracterizes *(18)*
misheard *(1)*
misrepresentation *(2)*
misrepresenting *(1)*
misstated *(1)*
MIT *(6)*
mitigate *(1)*

Deposition of Nasir Adaya

United States Securities and Exchange Commission v. Stefan Qin, et al

mmolina@bakerlaw.com *(1)*
mode *(1)*
modeling *(1)*
Molina *(201)*
moment *(6)*
momentum *(1)*
money *(8)*
Montgomery *(3)*
month *(7)*
months *(1)*
morning *(1)*
Motion *(17)*
move *(6)*
moved *(12)*
moving *(2)*
multiple *(1)*
Multistrategy *(2)*
MUSIALA *(3)*
muted *(2)*

< N >
name *(32)*
named *(1)*
names *(5)*
naming *(1)*
NASIR *(13)*
natural *(1)*
naturally *(1)*
NCRA *(2)*
necessarily *(22)*
need *(21)*
needed *(1)*
needs *(1)*
negotiate *(2)*
negotiated *(1)*
neither *(1)*
network *(5)*
never *(3)*
NEW *(7)*
Nguien *(1)*
N-g-u-i-e-n *(1)*
Nicholas *(1)*
nods *(1)*
note *(3)*
noted *(2)*
notes *(8)*
noticed *(2)*
notified *(1)*

notwithstanding *(1)*
NUMBER *(2)*
numbered *(1)*
numbers *(5)*
nuts *(1)*
NW *(1)*

< O >
oath *(3)*
object *(7)*
objecting *(1)*
objection *(116)*
objections *(3)*
objective *(2)*
objectives *(2)*
observe *(1)*
obtain *(3)*
obtained *(3)*
Occasionally *(2)*
occur *(1)*
occurring *(1)*
October *(8)*
offer *(6)*
offered *(12)*
offering *(14)*
offerings *(3)*
offers *(6)*
offhand *(4)*
office *(1)*
oftentimes *(2)*
Oh *(6)*
oil *(4)*
Okay *(155)*
once *(4)*
ones *(2)*
one's *(1)*
ongoing *(3)*
open *(4)*
opened *(4)*
opening *(1)*
operating *(2)*
opportunities *(1)*
opportunity *(4)*
option *(1)*
order *(17)*
orders *(1)*
organization *(1)*
originally *(1)*
outcome *(1)*

outputs *(1)*
outside *(7)*
outstanding *(1)*
overall *(2)*
overlapped *(1)*
oversaw *(2)*
oversee *(1)*
oversight *(5)*
owners *(1)*
ownership *(1)*
owns *(3)*

< P >
P&L *(3)*
p.m *(22)*
Pacific *(1)*
page *(19)*
pages *(3)*
paid *(1)*
Pandit *(15)*
Pandit_Baker_2527 *(1)*
Pandit_Baker_2581 *(1)*
Pandit's *(1)*
paper *(1)*
parallel *(2)*
parameter *(2)*
parameters *(22)*
parent *(1)*
parse *(1)*
part *(21)*
participants *(1)*
particular *(4)*
parties *(7)*
partner *(1)*
party *(1)*
party's *(1)*
PDF *(2)*
pending *(1)*
people *(6)*
percent *(5)*
percentage *(7)*
percentages *(2)*
percentile *(1)*
perform *(5)*
performance *(4)*
performed *(1)*
performing *(6)*

period *(5)*
permission *(11)*
person *(4)*
personal *(5)*
personally *(6)*
person's *(1)*
perspective *(7)*
phone *(3)*
Phuong *(6)*
P-h-u-o-n-g *(1)*
physically *(2)*
pinpoint *(1)*
place *(8)*
placed *(3)*
placing *(1)*
Plaintiff *(1)*
platform *(2)*
Plaza *(1)*
pleaded *(1)*
please *(22)*
point *(5)*
points *(1)*
portfolio *(24)*
portfolios *(6)*
portion *(3)*
position *(4)*
positions *(4)*
possible *(10)*
possibly *(1)*
post *(2)*
postgraduate *(1)*
potentially *(2)*
predecessor *(1)*
preferred *(1)*
preparation *(1)*
prepare *(1)*
prepared *(2)*
preparing *(1)*
PRESENT *(1)*
press *(1)*
pretty *(2)*
previously *(1)*
price *(10)*
prices *(2)*
primarily *(5)*
primary *(2)*
prior *(23)*
prioritize *(1)*
prison *(1)*

privilege *(1)*
privileged *(3)*
probably *(2)*
Procedure *(1)*
PROCEEDINGS *(3)*
proceeds *(6)*
process *(13)*
produce *(1)*
produced *(2)*
professional *(11)*
profile *(1)*
profit *(1)*
profits *(2)*
programmatically *(1)*
project *(9)*
projects *(13)*
prolonged *(1)*
pronouncing *(2)*
prop *(7)*
proprietary *(9)*
protective *(1)*
protocol *(1)*
provide *(16)*
provided *(10)*
providers *(2)*
providing *(34)*
public *(13)*
publicly *(4)*
purchased *(1)*
purpose *(4)*
pursuant *(1)*
pursue *(1)*
pursuing *(2)*
put *(15)*
putting *(3)*
Python *(2)*

< Q >
QCP *(4)*
QIN *(29)*
Qin's *(5)*
qualifications *(2)*
quant *(2)*
quantify *(1)*
Quantitative *(34)*
quantity *(2)*
query *(1)*
querying *(1)*
question *(43)*

questioning *(1)*
questions *(16)*
question's *(1)*
quick *(2)*
quite *(2)*

< R >
raise *(2)*
raised *(6)*
raising *(1)*
range *(3)*
rationally *(1)*
RDR *(3)*
reach *(1)*
read *(12)*
reading *(3)*
readjust *(1)*
ready *(2)*
real *(4)*
really *(7)*
realtime *(6)*
reason *(10)*
reasons *(5)*
recall *(80)*
recalling *(2)*
receipt *(2)*
receive *(8)*
received *(10)*
Receiver *(6)*
receiving *(5)*
Recess *(4)*
recognize *(8)*
recollection *(16)*
recommend *(2)*
recommended *(1)*
record *(31)*
recorded *(1)*
records *(2)*
refer *(1)*
referenced *(4)*
referencing *(3)*
referrals *(1)*
referred *(1)*
referring *(11)*
refers *(1)*
refine *(1)*
reflect *(2)*
refresh *(6)*
regarding *(5)*

regions *(1)*
Registered *(2)*
regulatory *(4)*
relate *(3)*
related *(25)*
relating *(2)*
relationship *(9)*
relevant *(1)*
rely *(2)*
remember *(32)*
remembering *(1)*
remitting *(1)*
REMOTE *(4)*
remotely *(1)*
removed *(1)*
removing *(1)*
repeat *(9)*
rephrase *(9)*
Report *(10)*
Reported *(13)*
reporter *(11)*
REPORTER'S *(2)*
Reporting *(3)*
reports *(2)*
representations *(1)*
represented *(1)*
represents *(1)*
reputation *(3)*
request *(7)*
requested *(4)*
requesting *(2)*
require *(3)*
Research *(22)*
researcher *(1)*
researching *(2)*
respect *(27)*
respond *(2)*
responded *(1)*
responds *(2)*
responsibilities *(3)*
responsible *(3)*
rest *(1)*
restate *(1)*
results *(2)*
retract *(1)*
return *(2)*
returned *(2)*
returning *(1)*
returns *(4)*

reverting *(1)*
review *(5)*
reviewed *(5)*
reviewing *(2)*
reviews *(8)*
right *(46)*
risk *(1)*
ROBERT *(3)*
Rockefeller *(1)*
Rohan *(3)*
role *(6)*
roles *(7)*
room *(2)*
roughly *(1)*
rule *(1)*
Rules *(1)*
run *(1)*
running *(1)*

< S >
sake *(1)*
salary *(1)*
San *(2)*
saw *(5)*
saying *(8)*
says *(4)*
science *(1)*
scope *(9)*
screen *(2)*
script *(32)*
scripts *(1)*
scroll *(13)*
scrolling *(1)*
scrutiny *(4)*
SEAL *(1)*
SEC *(3)*
second *(6)*
SECURITIES *(7)*
see *(75)*
seeing *(1)*
seen *(4)*
segregated *(7)*
select *(1)*
selected *(2)*
selecting *(1)*
selection *(1)*
self-employed *(4)*
sell *(5)*
selling *(3)*

send  *(1)*
sense  *(7)*
sent  *(6)*
sentenced  *(1)*
separate  *(4)*
series  *(3)*
service  *(6)*
services  *(20)*
set  *(12)*
setting  *(3)*
seven  *(1)*
Short  *(1)*
show  *(1)*
showing  *(2)*
shown  *(4)*
shows  *(2)*
shut  *(5)*
shutoff  *(1)*
shutting  *(3)*
sic  *(1)*
side  *(8)*
Sigma  *(6)*
signals  *(2)*
significant  *(1)*
significantly  *(1)*
signing  *(1)*
similar  *(16)*
similarly  *(1)*
simple  *(3)*
simply  *(2)*
simultaneously  *(3)*
sir  *(1)*
sitting  *(10)*
size  *(3)*
skew  *(1)*
skewed  *(1)*
skimmed  *(2)*
small  *(2)*
so-called  *(1)*
sold  *(2)*
soon  *(1)*
Sorry  *(76)*
sort  *(7)*
Sotak  *(1)*
sounds  *(1)*
source  *(3)*
SOUTHERN  *(2)*
space  *(3)*
spans  *(1)*

speak  *(5)*
speaking  *(4)*
speaks  *(2)*
special  *(2)*
specialist  *(1)*
specializes  *(1)*
specific  *(21)*
specifically  *(61)*
specifics  *(5)*
spell  *(1)*
split  *(2)*
spot  *(1)*
spread  *(4)*
spread's  *(1)*
Srihari  *(7)*
stamps  *(1)*
stand  *(2)*
standard  *(3)*
standing  *(3)*
stands  *(3)*
start  *(3)*
started  *(9)*
starting  *(4)*
state  *(7)*
Statement  *(2)*
STATES  *(5)*
stayed  *(1)*
STEFAN  *(11)*
Stefan's  *(1)*
stenographic  *(2)*
step  *(11)*
step-by-step  *(1)*
steps  *(3)*
stint  *(1)*
stop  *(3)*
straight  *(1)*
strategies  *(35)*
strategist  *(1)*
strategy  *(23)*
strategy's  *(1)*
Straub  *(3)*
strauba@sec.gov  *(1)*
streamlined  *(2)*
Street  *(2)*
structure  *(5)*
student  *(1)*
studied  *(1)*
study  *(12)*
studying  *(1)*

sub  *(1)*
subaccount  *(15)*
subaccounts  *(1)*
subject  *(3)*
submit  *(1)*
submitted  *(1)*
Subpoena  *(2)*
subpoenaed  *(1)*
subpoenas  *(4)*
subsectors  *(1)*
subsequently  *(1)*
substantial  *(1)*
substantially  *(4)*
succeeded  *(1)*
Suite  *(3)*
summary  *(1)*
summer  *(1)*
super  *(1)*
superseded  *(1)*
supervision  *(1)*
supplement  *(1)*
supply  *(5)*
supply/demand  *(1)*
sure  *(36)*
suspect  *(2)*
swear  *(1)*
switch  *(2)*
sworn  *(4)*
system  *(1)*

< T >
tab  *(8)*
take  *(17)*
taken  *(6)*
takes  *(1)*
talked  *(14)*
talking  *(11)*
task  *(3)*
tasked  *(1)*
tasks  *(2)*
tax  *(4)*
team  *(10)*
Technologies  *(1)*
technology  *(3)*
tell  *(9)*
ten  *(2)*
Teresa  *(1)*
terms  *(1)*
test  *(2)*

tested  *(1)*
testified  *(7)*
testify  *(2)*
testimony  *(15)*
Texas  *(6)*
text  *(10)*
tgoodyguillen@bakerl
aw.com  *(1)*
Thank  *(7)*
Thanks  *(1)*
theorize  *(1)*
things  *(1)*
think  *(36)*
thinking  *(2)*
third  *(6)*
third-party  *(2)*
this'll  *(1)*
thought  *(1)*
thousands  *(1)*
three  *(3)*
three-minute  *(2)*
tickers  *(1)*
tied  *(3)*
till  *(3)*
time  *(74)*
timeline  *(18)*
times  *(1)*
title  *(10)*
titles  *(5)*
today  *(26)*
Today's  *(1)*
toggle  *(1)*
token  *(31)*
tokens  *(35)*
told  *(9)*
tomorrow  *(1)*
tonight  *(1)*
tools  *(1)*
top  *(11)*
topics  *(1)*
touched  *(1)*
tough  *(1)*
track  *(1)*
trade  *(12)*
traded  *(7)*
trader  *(13)*
traders  *(1)*
trades  *(16)*
trading  *(102)*

**training**  *(3)*
**tranche**  *(1)*
**tranches**  *(1)*
**transaction**  *(8)*
**transactions**  *(9)*
**transcribed**  *(2)*
**transcript**  *(4)*
**transcription**  *(2)*
**transfer**  *(3)*
**transferred**  *(4)*
**transferring**  *(1)*
**tried**  *(1)*
**true**  *(1)*
**truthfully**  *(1)*
**try**  *(3)*
**trying**  *(6)*
**turn**  *(1)*
**twice**  *(1)*
**two**  *(7)*
**type**  *(1)*

**< U >**
**U.S**  *(1)*
**Uh-huh**  *(2)*
**UID**  *(1)*
**UID▇▇▇8310**  *(1)*
**ultimate**  *(1)*
**ultimately**  *(3)*
**umbrella**  *(1)*
**unclear**  *(3)*
**underneath**  *(2)*
**understand**  *(29)*
**understanding**  *(29)*
**understands**  *(1)*
**understood**  *(5)*
**undertake**  *(2)*
**undertaken**  *(1)*
**undertaking**  *(2)*
**undertook**  *(1)*
**UNITED**  *(5)*
**university**  *(1)*
**unsure**  *(25)*
**updated**  *(1)*
**USD**  *(1)*
**USDT**  *(4)*
**use**  *(8)*
**user**  *(1)*
**users**  *(2)*
**Usually**  *(1)*

**utilized**  *(2)*
**utilizing**  *(1)*

**< V >**
**vague**  *(49)*
**value**  *(11)*
**Value's**  *(1)*
**variables**  *(2)*
**variance**  *(1)*
**varied**  *(1)*
**varies**  *(2)*
**variety**  *(21)*
**various**  *(24)*
**vary**  *(2)*
**venture**  *(1)*
**ventures**  *(1)*
**verbal**  *(1)*
**verbally**  *(2)*
**version**  *(7)*
**versus**  *(8)*
**viability**  *(1)*
**video**  *(2)*
**VIDEOGRAPHER**
  *(14)*
**VIDEOTAPED**  *(3)*
**view**  *(1)*
**viewed**  *(1)*
**viewpoint**  *(1)*
**violation**  *(1)*
**Virgil**  *(30)*
**volatility**  *(1)*
**volition**  *(2)*
**VPFA**  *(5)*
**VQR**  *(98)*
**VQR-related**  *(1)*
**VS**  *(1)*

**< W >**
**wait**  *(2)*
**walk**  *(12)*
**Wallet**  *(33)*
**wallets**  *(1)*
**want**  *(16)*
**wanted**  *(9)*
**wants**  *(1)*
**Washington**  *(1)*
**Wasick**  *(1)*
**way**  *(13)*
**ways**  *(8)*

**week**  *(1)*
**weeks**  *(1)*
**weighted**  *(1)*
**well**  *(22)*
**went**  *(9)*
**We're**  *(16)*
**We've**  *(10)*
**Whichever**  *(1)*
**whoever's**  *(1)*
**wide**  *(1)*
**WiFi**  *(2)*
**withdraw**  *(1)*
**withdrawing**  *(2)*
**withdraw-only**  *(1)*
**witness**  *(28)*
**word**  *(2)*
**work**  *(42)*
**worked**  *(22)*
**working**  *(20)*
**wow**  *(1)*
**write**  *(3)*
**writes**  *(1)*
**writing**  *(8)*
**written**  *(3)*

**< Y >**
**Yeah**  *(66)*
**year**  *(9)*
**years**  *(13)*
**Yenamandra**  *(3)*
**Yenamandra's**  *(1)*
**Yoder**  *(1)*
**YORK**  *(4)*

**< Z >**
**zero**  *(3)*