# Exhibit 05

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION<br><br>        Plaintiff,<br><br>vs.<br><br>STEFAN QIN, VIRGIL TECHNOLOGIES LLC, MONTGOMERY TECHNOLOGIES LLC, VIRGIL QUANTITATIVE RESEARCH LLC, VIRGIL CAPITAL LLC, and VQR PARTNERS LLC,<br><br>        Defendants. | Case No. 20 Civ. 10849 (LGS) |

**DECLARATION OF ERIC CHEN**

I, Eric Chen, declare as follows:

1. I am the CEO and co-founder of Injective Labs Inc. ("Injective Labs"), a technology and research company. Injective Labs is headquartered in New York, New York. I currently reside in New York, New York. I have personal knowledge of the facts stated in this declaration.

2. Injective Labs was founded in 2018. Injective Labs provides services to the Open DeFi Foundation ("ODF"), an independent foundation which supports the Injective ecosystem, pursuant to a services agreement.

3. INJ is the native token of the Injective ecosystem. The INJ token enables holders to participate in decentralized ecosystem governance by voting on proposed changes to the

Injective protocol. The INJ token was "launched" in or about October 2020 on Binance Launchpad, a program through which new tokens are sold by third parties on Binance to users of the exchange. The October 2020 launch was the culmination of several years of development of a decentralized finance protocol and the first opportunity for the broader virtual assets community to engage with such protocol. The protocol's success required the development of a trading market to establish a market price for INJ in relation to other digital assets and provide a way for purchasers to obtain the INJ token to facilitate community engagement in protocol governance.

4. I met Nasir Adaya in approximately 2018 or 2019. Pursuant to a consulting agreement entered into as of April 26, 2020, Mr. Adaya has performed various consulting and advisory services for Injective Labs, including, but not limited to, assistance with hiring and code development. Mr. Adaya was engaged to provide these services to Injective Labs because of his background in and knowledge of the cryptocurrency industry.

5. In Fall 2020 and in anticipation of the launch, Mr. Adaya and ODF, assisted by Injective Labs and me, came to an understanding that Mr. Adaya would perform market making services for the INJ token. By market making, I mean the process of ensuring, through the trading of INJ tokens, that there was an efficient, liquid market and price discovery for the INJ token when it became available for trading. To enable Mr. Adaya to perform market making services, ODF issued him approximately one million INJ tokens, with the express understanding that he would trade those tokens for other digital assets.

6. At the time Mr. Adaya agreed to perform market making services, it was my business judgment that Mr. Adaya was capable of performing such market making with respect to the INJ tokens. I believed Mr. Adaya was knowledgeable and intelligent about

cryptocurrency markets and was well-versed in quantitative trading and the software and scripts that were used in such trading. This belief was based on my knowledge of Mr. Adaya's reputation in the cryptocurrency industry and his experience with quantitative trading, including through his work trading cryptocurrencies as a project manager for Virgil Quantitative Research ("VQR"). I understood that Mr. Adaya was associated with VQR before and at the time of the launch of the INJ token. It was also my understanding that Mr. Adaya had access to the trading infrastructure that successful market making would require. I believed, based on my discussions with him at the time, that Mr. Adaya had access to an account at Binance with high transaction limits and low trading fees and the ability to generate sub-accounts at Binance where he could deploy algorithmic trading scripts.

7. I also believed, based on my discussions with him at the time, that Mr. Adaya had the time and availability to perform market making functions for the INJ token. This would include writing and deploying algorithmic trading scripts, as necessary, and monitoring and adjusting these algorithmic trading scripts as necessary based on his understanding of market changes and fluctuations.

8. It was my general understanding at the time of the launch of the INJ token that Mr. Adaya would not rely on resources that belonged to or were controlled by a third party to perform market making for the INJ token, except that Mr. Adaya told me he might use a managed sub-account subject to a Binance master account that Mr. Adaya had used for VQR activities, because the managed sub-account had a favorable fee structure. Mr. Adaya did not otherwise represent to me that VQR resources would be used for INJ market making. Documents shown to me by Receiver's counsel, however, suggest that Mr. Adaya used VQR

3

resources for INJ market making in a manner that I did not expect when Mr. Adaya was engaged.

9. During the period when Mr. Adaya was performing market making for INJ tokens, I was in regular contact with Mr. Adaya, both about his market making for INJ tokens and about other matters related to INJ tokens and Injective Labs. I did not have direct visibility into the account(s) that Mr. Adaya used to carry out his market making. Based on my personal experience with Mr. Adaya, his understanding of the cryptocurrency industry and quantitative trading, and publicly available information regarding the market for INJ, I accepted representations Mr. Adaya made about his market making, including regarding market demand, trading volume, and the value of the INJ token.

10. With respect to market-making activities which Mr. Adaya began conducting for ODF prior to the various Virgil entities being placed into receivership, Mr. Adaya was compensated for these market-making activities by being permitted to keep the gross proceeds of his market making, less a dollar amount that represented Mr. Adaya's payment for (and thus effectively his retrospective purchase of) the INJ tokens that ODF had issued him in October 2020. It is my understanding that the purchase price of the token sale was based on a formula predicated on information supplied by Mr. Adaya that purported to reflect the market trading price of the tokens over a certain period of trading prior to payment (the "Purchase Amount"). It is generally my understanding that Mr. Adaya profited by keeping market marking proceeds in excess of the Purchase Amount.

11. This compensation arrangement was reduced to writing in a Token Purchase Agreement ("TPA") between Antifragile Management LLC ("Antifragile") and ODF that was executed on or about July 21, 2021. Mr. Adaya signed the TPA on behalf of Antifragile as its

founder. To my knowledge, other than through the compensation arrangement formalized under the TPA, as referenced above, Mr. Adaya did not receive any additional compensation – *e.g.*, commissions – for his market making of the INJ token.

12. Each of the following wallet addresses and Binance accounts was identified to me by Receiver's counsel as being relevant to the Receiver's investigation into Mr. Adaya's compensation for his market making activities related to the INJ tokens. To the best of my knowledge, at no time did I, Injective Labs, or ODF control, create, own, or otherwise operate any of the wallets or accounts listed below:

a. ███████████████████████████████6dd0
b. ███████████████████████████████92Fe
c. ███████████████████████████████3090
d. ███████████████████████████████2402
e. ███████████████████████████████8409
f. ███████████████████████████████327e
g. ███████████████████████████████1632
h. ███████████████████████████████94b4
i. ███████████████████████████████e68d
j. ███████████████████████████████f564
k. ███████████████████████████████Deefa
l. ███████████████████████████████1b5b
m. ███████████████████████████████vwca
n. Binance UID ███ 5275

5

      o.  Binance UID ■ 8310

      p.  Binance UID ■ 9897

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York on May 23, 2023.

By: *Zhonghan Chen*
Eric Chen
CEO and Co-Founder, Injective Labs Inc.