# Exhibit 12

# EMPLOYMENT AGREEMENT

This Employment Agreement between Montgomery Technologies LLC ("Company") and Nasir Adaya (the "Employee") is made on 21 November 2018 (this or the "Agreement").

In consideration of Employee's employment with Company, Company and the Employee hereby agree to the employment of the Employee by Company on the following terms and conditions:

## 1    Entire Agreement and Effective Date

1.1    Whereas Employee accepted an offer letter presented by Virgil Capital LLC on May 21st, 2018 ("Offer Letter"); and

1.2    Whereas Employee has previously been operating as a consultant to Virgil Capital LLC prior to this agreement; and

1.3    Whereas Company has assumed any responsibilities, interests, rights, and obligations of Virgil Capital LLC that may exist in respect to the Offer Letter and Employee; and

1.4    Whereas Company intends to convert Employee from a contractor to an employee of Company that services Virgil Capital LLC and others; and

1.5    Whereas this agreement is intended to fully set forth the agreement between Employee and Company;

1.6    Therefore: The Employee and Company hereby agree that this Agreement constitutes the entire agreement and understanding between Company and the Employee and supersedes any other agreements, whether oral or written, with respect to the subject matter of this Agreement, including, without limitation the Offer Letter.  Employee and the Company acknowledge that no representations, inducements, promises or agreements, whether oral or written, express or implied, have been made by Employee or anyone acting on behalf of the Company that are not incorporated in this letter and that no other agreement or promise not contained in this letter shall be valid or binding.  Notwithstanding the foregoing, however, if the Employee is a member of the Company and any terms of the Company's Limited Liability Company Agreement conflict with the terms of this Agreement, the terms of the Limited Liability Company Agreement shall govern.

1.7    In consideration of employment with Company, Employee further agrees to all obligations by Employee as set forth in this Agreement are effective as of May 21st, 2018, and agrees that all obligations under this Agreement owed by Employee to Company were also owed to Company during Employee's period as a contractor, as though Employee had been an employee of Company since May 21st, 2018 under this agreement.  Therefore, the term of employment under this Agreement shall be treated as starting on May 21st, 2018.

## 2    Commencement of Employment; At-Will Employment

2.1    The Employee shall convert from a contractor of Company to an employee of Company effective as of 21 August 2018.

2.2    Employee and the Company acknowledge and agree that Employee's employment is at-will and that either the Company or Employee may, at any time, with or without cause and with or without notice, terminate the employment relationship, including all compensation and benefits.  Employee and the Company agree that it is the express intent of each party that Employee's employment shall be at-will.  Nothing in this letter or the relationship between Employee and the Company now or in the future may be construed or interpreted to create an employment relationship for a specific length of time or any right to continued employment, or any limit on the discretion of the Company to modify terms and conditions of employment.

## 3    Duties

3.1    The Employee shall serve Company in the capacity of Quantitative Trader and shall report to the Managing Partner of Company or to such other person as identified by the Managing Partner. The Employee's duties shall include, but not be limited to:

    I.    development, testing, and deployment of quantitative trading strategies;

    II.    creating and institutionalizing a framework for development and evaluating strategies;

    III.    acting as a direct manager for others, as determined by Company;

    IV.    supporting fundraising and other projects to help further the objectives of Company

and such other duties as may be required by Company from time to time consistent therewith, or where not, by agreement between the parties hereto.

3.2    The Employee shall:

    I.    at all times and in all respects conform to and comply with the lawful and reasonable directions of Company, and, to the extent applicable to the Employee, conform to and comply with all rules or codes of conduct and statements of principle in force from time to time and/or required by any regulatory body in relation to the business of Company or any of its subsidiaries or other corporate affiliates with Company (collectively, the "Company Entities");

    II.    unless prevented by sickness or other incapacity, or otherwise as directed by Company, devote the whole of his time, attention, and abilities during hours of work (which shall be normal business hours and such additional hours as may be necessary for the proper performance of his duties) to the business and affairs of the Company Entities;

    III.    work at Company's offices in New York, New York or such other place of business of Company in the New York City greater metropolitan area as Company may

reasonably require for the proper performance of the Employee's duties; provided that the Employee shall be required to travel from time to time on reasonable notice for reasonable periods of time for business purposes; and

IV.  not, without the prior written consent of Company, directly or indirectly carry on or be engaged, concerned, or interested in any other business, trade, or occupation that is in competition with the business of any Company Entity, other than as a holder directly or through nominees of not more than three percent (3%) in the aggregate of any class of shares, debentures, or other securities in issue from time to time of any company that is publicly-traded on any recognized stock exchange.

V.  not, without the prior consent of the Managing Partner, utilize leverage in trading or take any action contrary to Company risk-control policies.

3.3  The Employee shall not, without the prior consent of Company, either directly or indirectly, publish any opinion, fact, or material, or deliver any lecture or address, or participate in the making of any film, radio broadcast, or television transmission, or communicate with any representative of the media or any third party (a) relating to the business or affairs of the Company Entities, or relating to any of their officers, employees, members, partners, clients, suppliers, distributors, agents, or shareholders, or (b) relating to the development or exploitation of Intellectual Property (as defined in the "Intellectual Property" section herein). For the purpose of this clause, "media" shall include television (terrestrial, satellite, and cable), internet, radio, newspapers, and other journalistic publications. This clause will not apply to communications made by the Employee to any attorney, accountant, investment banker, other professional and advisor of any Company Entity, or any other person to the extent such communication is reasonably consistent with the Employee's duties to Company.

## 4    Policies and Procedures

Employee agrees to adhere to Company policies and procedures as they may from time to time be adopted or amended by the Company and called to Employee's attention.  Employee agrees that it is Employee's duty to review the Company's policies and procedures, in advance of any action and in case of doubt as to Employee's conduct, rights or obligations.  Employee further acknowledges that as an Investment Adviser, the Company may adopt a Compliance Manual and Code of Ethics, among other policies, that may prohibit personal trading by Employee or any of Employee's immediate family members sharing the same household.

## 5    Benefits

Employee shall be entitled to (i) health and other benefits as generally afforded to full-time employees of the Company and (ii) unlimited vacation days.

## 6    Salary

During the Term, Company will pay the Employee a salary in cash at a rate equal to a gross amount of $100,000 per annum, from which tax and other withholdings will be deducted. This amount will be paid to the Employee in accordance with Company's normal payroll policies and withholding schedule.

## 7    Additional Compensation

7.1     Company will pay the Employee additional compensation in the form of a profit share from trading activities undertaken by Employee on behalf of Company, as set forth herein. Company may allot funds for Employee to utilize in trading operations on behalf of Company known as a direct proprietary allocation ("Proprietary Funds"). The Company may, in its sole discretion, reallocate assets by contributing to or withdrawing amounts from the Employee at any time.

7.2     **PROPRIETARY FUNDS**:  Proprietary Funds consist of monies and assets allocated to Employee for management on behalf of Company. The value of proprietary funds forms the basis for calculating a Proprietary Incentive Fee to be paid to Employee for trading activities involving Proprietary Funds to Employee.

7.2.1     Upon calculation each quarter at a regular date ("Proprietary Incentive Fee Calculation Date"), Company will pay to Employee a Proprietary Incentive Fee of ten percent (10%) of any New Proprietary Trading Profit from Proprietary Funds recognized by Company as of such Proprietary Incentive Fee Calculation Date.

7.2.2     Subject to the adjustments contemplated below, New Proprietary Trading Profit equals any increase in the Net Asset Value of the Proprietary Funds as of the current Proprietary Incentive Fee Calculation Date over the High Water Mark attributable to the Proprietary Funds. The Net Asset Value of the Proprietary Funds is the value of the Proprietary Funds total assets less its liabilities according to procedures adopted by Company, and further reduced by any Employee-Borne Expenses. New Proprietary Trading Profit will be calculated for the Proprietary Funds prior to reduction for any accrued Proprietary Incentive Fees.

7.2.3     The High Water Mark attributable to Proprietary Funds shall be equal to the highest Net Asset Value of the Proprietary Funds (for avoidance of doubt, after reduction for the Proprietary Incentive Fee then paid), as of any preceding Proprietary Incentive Fee Calculation Date. The High Water Mark shall be increased dollar-for-dollar by any capital allocated to the Proprietary Funds and decreased proportionately when capital is reallocated away from the Proprietary Funds (other than to pay expenses). The proportionate reduction made as a result of a reallocation shall be calculated by multiplying the High-Water Mark in effect immediately prior to such reallocation by the fraction the numerator of which is the Net Asset Value of the Proprietary Funds immediately following such reallocation and the denominator of which is the Net Asset Value of the Proprietary Funds immediately before such reallocation.

4

7.2.4   If a Proprietary Incentive Fee is paid from Proprietary Funds as of a Proprietary Incentive Fee Calculation Date, the High Water Mark is reset to the Net Asset Value of the Proprietary Funds immediately following such payment.

7.2.5   When there is an accrued Proprietary Incentive Fee at the time any reallocation from the Proprietary Funds is made, the Proprietary Incentive Fee attributable to such reallocation will be paid.  Such Proprietary Incentive Fee shall be determined by multiplying the Proprietary Incentive Fee that would have been paid had the date of the reallocation been a Proprietary Incentive Fee Calculation Date by the fraction the numerator of which is the amount of the reallocation and the denominator of which is the Net Asset Value of the Proprietary Funds immediately prior to the reallocation, in each case prior to reduction for the accrued Proprietary Incentive Fee.  Such Proprietary Incentive Fee will be paid from and reduce the amount of the reallocation.

7.3   **EMPLOYEE-BORNE EXPENSES**:  "Employee-Borne Expenses" are expenses incurred by Employee relating to Employee's trading strategies.  Employee-Borne Expenses shall be borne by Employee according to the terms set forth above.  Such expenses should only be incurred with prior approval of Company, and Company has the discretion to apportion to Employee, as an Employee-Borne Expense, a share of any expense intended to benefit Employee even if the expense is incurred by another party.

7.4   **INCENTIVE FEE SHARING:**  Whereas Employee wishes to utilize the service of another individual in implementing and operating Employee's trading strategies, Employee may designate another individual to receive a specified portion of Employee's Proprietary Incentive Fee.  Such designation must be in writing.  If such designation is approved by Company, Company will pay the designated individual the specified portion of the Employee's Proprietary Incentive Fee.

7.5   **EXCLUSIVE MONETARY COMPENSATION:**  Employee agrees that Employees compensation under "Salary" and "Additional Compensation" sections of this agreement constitutes the full and exclusive monetary consideration and compensation for all services rendered by Employee under this agreement.

## 8   Termination

8.1   For this "Termination" section, the "Cause" shall be deemed to exist if the Employee shall at any time:

   I.   be guilty of gross misconduct, or commit a material breach of any provision of the Agreement including Employee's agreement to follow Company's policies and procedures; or

   II.   where Virgil reasonably determines the Employee to be in material breach of regulatory requirements, including, but not limited to, all applicable United States securities laws either in conjunction or not in relation to the Company, or internal compliance rules of any Company Entity consistent therewith that are applicable to the Employee.

8.2 If Employee is terminated without Cause, Employee shall be paid Employee's Proprietary Incentive Fee if, Company, at its sole discretion, continues to use "Trading Intellectual Property" created by Employee, as defined in later in this Agreement.  Following termination without cause, the Proprietary Incentive Fee will continue to accrue against any funds invested according to the Trading Intellectual Property for a period of sixty (60) months, subject to the remaining terms of this agreement and contingent upon Employee's continued adherence, beyond the end of the competition Restriction Period, to the covenants agreed to in the "Competition Restrictions" section of this agreement.

8.3 The previous paragraph shall have no effect if Employee is terminated with Cause, and if Employee is terminated with Cause, Employee will be subject to disgorgement and must return to Company any and all Proprietary Incentive Fees paid to the Employee accruing during or after the misconduct giving rise to termination for Cause.  Employee must additionally return to Company any and all Proprietary Incentive Fees paid to the Employee accruing six (6) months prior to the misconduct giving rise to termination for Cause.  The date of misconduct shall be determined by Company at Company's sole discretion.  This paragraph shall not be interpreted to extinguish or limit in any way any claim that Company may have against Employee arising from their misconduct.

8.4 Nothing in this Agreement shall be interpreted to impair or otherwise affect the right and power of the Company to terminate its employment of the Employee.

## 9   Confidentiality

9.1 **<u>RECITALS:</u>**

I. All present and future investment advisory clients of the Company or any Affiliate, including, but not limited to, Virgil Capital LLC, Virgil Sigma Fund, LP and any other investment fund for which the Company or any of its Affiliates may act as investment adviser (each a "Fund"), and any member, partner, shareholder or other beneficial owner of any Fund, are herein called "Clients."  Any individual or entity with whom the Company has had or shall have contact or discussions regarding becoming a Client is herein called a "Potential Client."

II. The Company has developed materials for its business, which include, among other things, methods, strategies, processes and computer software regarding securities investment decisions and lists of and information regarding Clients and Potential Clients.  The Company uses all reasonable means to maintain these materials in confidence.  As a result of the Employee's previous or current employment by the Company, the Employee has had or will have access to and has or will become acquainted with various trade secrets and other proprietary and confidential information and property of the Company, the disclosure or use of which, for any purposes other than in the Company's business, would unreasonably and unfairly impair the Company's ability to conduct its business profitably.

III.   THEREFORE, as a condition of and in consideration of the Company's employment or continued employment of the Employee and the Company's granting or continued granting to the Employee access or possible access to trade secrets and other proprietary and confidential information of the Company, the Employee covenants and agrees with the Company as follows:

9.2   "Confidential Information and Materials" means and includes the following:

I.   the identity of investments owned, whether currently or in the past, or being considered for purchase by or for any Client or Potential Client and the methods and strategies that the Company uses to decide how or when to purchase and sell investments;

II.   Clients' and Potential Clients' identities;

III.   names, marketing methods, operating practices and related information regarding Clients and Potential Clients, Affiliates, joint venture partners, licensees, licensors, vendors, suppliers and distributors;

IV.   prices and fee structures that the Company obtains or has obtained or at which it sells, has sold or intends to sell its products or services;

V.   lists or other written records used in the Company's business;

VI.   information regarding the financial condition of the Company, any Fund, any other Client or Potential Client or any Affiliate;

VII.   fee structures applied to and compensation paid to the Company's consultants, members and employees and other terms of employment;

VIII.   financial and operating data, lists or other written records used in the Company's business, marketing data, equipment, documents, files, electronically recordable data or concepts, algorithms, computer software and hardware (including, but not limited to, software and hardware and all modifications thereof that the Company and its employees and independent contractors (including the Employee) have developed to determine, implement or otherwise assist with trading strategies and investment decisions), inventions, improvements, books, papers, compilations of information, records and specifications;

IX.   trading and order execution strategies and computing systems (for example, algorithms) developed, investigated, acquired, evaluated, modified, tested or employed by the Company or any information related to, or that might reasonably be expected to lead to, the development of such strategies;

X.   information related to the positions, trading volume, capital deployment or transaction costs associated with the Company's trading strategies;

XI.   research about specific companies and investments;

XII.   information relating to the performance of any Fund or other Client;

XIII.   non-public information relating to legal and professional dealings, real property, tangible property, finances, business and investment activities, and other personal affairs of the Company or any of its Affiliates, employees or members;

7

XIV. information regarding the identity or background of former, current or prospective partners, Employees and consultants of the Company;

XV. any intellectual property rights acquired or developed by the Company or any of its Affiliates, whether or not patentable or copyrightable, including all business plans, projects, know-how, technical information, inventions, designs, configurations, ideas, concepts, processes, procedures, operations, research and development plans, pricing information, business, operational and marketing plans;

XVI. any non-public information obtained in the course of the Employee's employment that could reasonably be expected to prove harmful to the Company, if disclosed to third parties, including without limitation, any information that could be reasonably expected to aid a competitor or potential competitor of the Company; and

XVII. any of the foregoing that may have been or may be conceived, originated, discovered or developed by the Company, any Affiliate, the Employee or any other employees or consultants of the Company or any Affiliate while employed or engaged by the Company or any Affiliate on the basis of or using any Confidential Information and Materials.

9.3 An "Affiliate" means and includes any of the Company's subsidiaries (whenever formed or acquired), any of the Company's partners, any proprietorship, corporation, limited liability company, partnership, joint venture, association or other entity in which the Company or its partners own or come to own more than twenty percent of the voting stock or other ownership interest or which owns or comes to own twenty percent or more of the Company's outstanding common stock, membership interests or other equity interests, and any of the Company's Clients.

9.4 All of the Confidential Information and Materials are owned and held in strict confidence by the Company or by one or more Affiliates to which the Company has a duty of confidentiality and include any Confidential Information and Materials that the Employee may have obtained in a prior engagement or employment with the Company or any Affiliate. Nevertheless, "Confidential Information and Materials" excludes any of the foregoing that has entered the public domain through no fault of the Employee, that an authorized executive officer of the Company (other than the Employee) has authorized for public dissemination, that the Employee knew or possessed before the Employee's employment by the Company and other than through disclosure or delivery by the Company, or that the Employee learned or obtained from sources having no duty of confidentiality to the Company that were or are unconnected to the Employee's employment by the Company.

9.5 **NONDISCLOSURE**: The Employee acknowledges and agrees that the Employee has had and will have access to and has and will become acquainted with Confidential Information and Materials, all of which the Employee will regard and protect as confidential and proprietary to the Company and as trade secrets owned by the Company and all of which are used or contemplated to be used in the Company's business. The Employee represents, warrants and agrees that the Employee will not at any time, while employed by the Company or

DocuSign Envelope ID: AF8B86B3-ED0A-4985-BAB5-B25701B3A49

following the termination of such employment, directly or indirectly use or permit others to use, or disclose or communicate to any person or entity, any of the Confidential Information and Materials, without the prior written consent of an authorized executive officer of the Company (other than the Employee) in the particular case; provided that the Employee may use the Confidential Information and Materials only for the Company's benefit and only in the course of the Employee's employment by the Company.  In particular, but without limiting the foregoing, the Employee may not trade for the Employee's own account based on, or inform any person (including, without limitation, any friend, family member or contact) regarding the identity of, securities owned or being considered for purchase or sale by or for any Client or Potential Client, except in compliance with the Company's employee trading policy then in effect.

9.6   **PROPERTY:**  The Employee agrees that the Employee will not make or retain any originals, copies or reproductions of or excerpts from any of the Confidential Information and Materials for the Employee's use or the use of others, except for the Employee's use of the Confidential Information and Materials for the Company's benefit in the course of the Employee's exercising Employee's duties to the Company.  On the Company's request or on termination of the Employee's employment with the Company, the Employee will immediately deliver to the Company all tangible property that is or embodies any of the Confidential Information and Materials, whether prepared or developed by or with the assistance of the Employee or otherwise coming into the Employee's possession.  On the Company's request or on termination of the Employee's employment with the Company, Employee shall also provide a confirmation in writing that any and all electronic copies of Confidential Information and Materials in Employee's possession have been irretrievably and permanently deleted.  Employee also agrees to follow any procedures identified by Company for deleting Confidential Information and Materials in Employee's possession.

9.7   **CONFIDENTIAL INFORMATION OF THIRD PARTIES:**  The Employee acknowledges and understands that, in dealing with Clients, Potential Clients, existing and potential Affiliates, suppliers, contracting parties and other third parties with which the Company has business relations or potential business relations, the Company may receive confidential and proprietary information and materials from such third parties subject to the Company's agreement to maintain the confidentiality thereof and to require the Company's employees and consultants to do so.  The Employee agrees to treat all such information and materials as Confidential Information and Materials subject to this Agreement.

9.8   **CONFIDENTIAL AND PROPRIETARY INFORMATION NOT TO BE DISCLOSED TO COMPANY:**
It is the Company's policy to honor the confidentiality of other entities' confidential and proprietary information.  Employee represents and warrants that the Employee has not disclosed and will not disclose to the Company or any Affiliate any trade secrets or other confidential or proprietary information that may not lawfully be so disclosed by the Employee, by virtue of the ownership of the same by another person or entity or otherwise.  Accordingly, Employee shall not disclose to the Company, or use or induce the Company to use, any confidential and proprietary information of any third party.  Furthermore, Employee shall not use any customer lists belonging to third parties unless such customer lists are readily ascertainable from nonconfidential sources.  Employee also

DocuSign Envelope ID: AE8B86B3-ED0A-4935-BA55-B257011B3A49

represents and warrants that Employee has returned all property and confidential and proprietary information belonging to all prior employers and all third parties, including customer lists or other such trade secrets.  Employee agrees to indemnify Company on demand for any and all damages (including, without limitation, legal fees) that Company, its subsidiaries, or other corporate affiliates, incurs as a result of the Employee's breach of this paragraph of the Agreement.

## 10   Non-Solicitation

### 10.1   **CLIENTS OR POTENTIAL CLIENTS**

10.1.1   <u>During Employment</u>.  The Employee will not at any time during the Employee's employment by the Company solicit a Client or Potential Client (including, but not limited to, any Client or Potential Client that the Employee introduced to the Company) in connection with any investment advisory or management services provided by anyone whatsoever, including, but not limited to, solicitation to purchase or subscribe for any interest in an investment partnership, mutual fund or other type of investment fund, unless approved by the Company, in its exclusive discretion.

10.1.2   <u>After Termination of Employment</u>.  Following termination (voluntary or involuntary, whether or not for cause, or otherwise) of the Employee's employment by the Company, Employee will not use any of the Confidential Information and Materials to solicit a Client or Potential Client (including, but not limited to, any Client or Potential Client that the Employee introduced to the Company) in connection with any investment advisory or management services provided by anyone whatsoever, including, but not limited to, solicitation to purchase or subscribe for any interest in an investment partnership, mutual fund or other type of investment fund, unless approved by the Company, in its exclusive discretion.  Solicitation shall include, without limitation, any contact that the Employee initiates, including, without limitation, any oral or telephone communication or any dissemination of any announcement or advertisement. Employee shall further not solicit, whether directly or indirectly, Clients of Company for a period of twelve (12) months following termination of employment.

### 10.2   **EMPLOYEES**

10.2.1   <u>During Employment</u>.  The Employee will not, at any time during the Employee's employment by the Company, directly or indirectly or on behalf of any third party, and whether or not for compensation, solicit any employee of the Company or any Affiliate to leave the employ of the Company or any Affiliate or solicit any consultant or other independent contractor for the Company or any Affiliate to change or terminate any relationship between that person and the Company or any Affiliate.

10.2.2   <u>After Termination of Employment</u>.  Following termination (voluntary or involuntary, whether or not for cause, or otherwise) of the Employee's

employment by the Company, the Employee will not, directly or indirectly or on behalf of any third party, and whether or not for compensation, use any of the Confidential Information and Materials to solicit any employee of the Company or any Affiliate to leave the employ of the Company or any Affiliate or solicit any consultant or other independent contractor for the Company or any Affiliate to change or terminate any relationship between that person and the Company or any Affiliate.

10.3     **Conflicts of Interest:**  The Employee acknowledges and agrees that the Employee will not, at any time during the Employee's employment by the Company, directly or indirectly, own an interest in, join, operate, control or participate in, or be connected as an officer, employee, agent, independent contractor, consultant, partner, member, manager, shareholder or principal with, any corporation, partnership, limited liability company, proprietorship, association or other entity or person engaged in developing, producing, designing, providing, soliciting orders for, selling, distributing or marketing services that directly or indirectly compete with the services or business of the Company or any Affiliate.

## 11   Competition Restrictions

11.1     For the purpose of this "Competition Restrictions" section, the following expressions shall have the following respective meanings:

11.1.1     "Business" means the management, investment management, and investment advisory businesses, and the business of structuring, establishing, marketing, distributing, and managing investment funds, as carried on by any Company Entity on the Employee's termination date or other demonstrably anticipated business of the Company as of Employee's termination date.

11.1.2     "Restricted Area" means the United States and any other country in which the Employee has undertaken his duties to a material extent at any time during the period of twelve (12) months immediately preceding the Employee's employment termination date.

11.1.3     "Restriction Period" means the period of the Employee's employment with Company.

11.2     The Employee acknowledges that, during the course of his employment with Company, Employee has had and will have (a) access to Confidential Information and Materials, and/or (b) influence over or connection with clients, employees, and other service providers of the Company and its Affiliates, and accordingly, having had the opportunity to take legal advice or voluntarily having waived such opportunity, is willing to enter into the covenants described in this "Competition Restrictions" section in order to provide the Company Entities with reasonable protection for those interests.

11.3     The Employee hereby covenants with Company that Employee will not, for the Restriction Period, without the prior written consent of Company in its sole and absolute discretion, either alone or jointly with or on behalf of any person, directly or indirectly, carry on or set up, or be employed or engaged by or in, or otherwise assist or be interested in, in any

capacity (except as a shareholder or other equity owner of not more than three percent (3%) of the shares of any company whose shares are publicly traded on any recognized stock exchange), a business that is carried on in competition with the Business anywhere within the Restricted Area.

11.4    The use of any Confidential Information and Materials—whether developed by Employee or otherwise—in the operation of any other fund, whether directly or indirectly, or in providing any Confidential Information and Materials to any other fund whatsoever shall be considered a competition with Business and a breach of this "Competition Restrictions" section.

11.5    Employee shall not, and shall not induce others to, Disparage the Company or its subsidiaries or affiliates or their past and present officers, directors, employees or products.  "Disparage" shall mean making comments or statements to the press, the Company's or its subsidiaries' or affiliates' employees or any individual or entity with whom the Company or its subsidiaries or affiliates has a business relationship which would adversely affect in any manner (1) the business of the Company or its subsidiaries or affiliates (including any products or business plans or prospects), or (2) the business reputation of the Company or its subsidiaries or affiliates, or any of their products, or their past or present officers, directors or employees.

11.6    The covenants contained in this "Competition Restrictions" section are intended to be separate and severable and enforceable as such, and to be enforceable to the fullest extent permissible under the laws of each jurisdiction in which enforcement is sought. If any restriction contained in this Agreement is for any reason held by a court to be excessively broad as to duration, activity, geographical scope, or subject, then such restriction will be construed, judicially modified, or "blue penciled" in such jurisdiction so as to thereafter be limited or reduced to the extent required to be enforceable in such jurisdiction in accordance with applicable law. If any restriction contained in this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law in any jurisdiction, then such invalidity, illegality, or unenforceability will not affect any other provision of this Agreement or any other jurisdiction, but such restriction will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable restriction had never been contained in this Agreement.

11.7    The Employee acknowledges that the remedy at law for his breach of this "Competition Restrictions" section will be inadequate, and that the damages flowing from such breach will not be readily susceptible to being measured in monetary terms. Accordingly, upon a breach or threatened breach of this "Competition Restrictions" section, Company will be entitled to immediate injunctive relief (or other equitable relief) and may obtain a temporary order restraining any breach or further breach. No bond or other security will be required to obtain such relief, and the Employee consents to the issuance of such equitable relief. Nothing in this paragraph will be deemed to limit Company's remedies at law or in equity that may be pursued or availed of by Company for any breach or threatened breach by the Employee of any part of this "Competition Restrictions" section.

DocuSign Envelope ID: AF8B386B8FD0A-4995-BAB5-B25701B8A49

11.8      The covenants contained in this "Competition Restrictions" section have been agreed by the parties hereto to be reasonable. The business of the Company Entities is highly competitive, the terms of this "Competition Restrictions" section are material to the parties' willingness to enter into this Agreement, and the terms and conditions of this "Competition Restrictions" section are not more restrictive than is necessary to protect the legitimate interests of the Company Entities.

## 12   Intellectual Property

12.1      "Intellectual Property" means any rights in or to intellectual property including, without limitation, patents, trademarks, service marks, design rights, copyrights, utility models, inventions, drawings, rights in computer programs (including both object code and source code), trade secrets, and whether registered or unregistered, applications for registration of any of the foregoing and the right to apply for them in any part of the world, and rights of like nature arising or subsisting anywhere in the world in relation to all of the foregoing.

12.2      Employee agrees that all Intellectual Property that the Employee creates or discovers during the course of or as a result of his employment with Company and that relates to or is capable of being used in the business of any Company Entity shall vest automatically in and belong exclusively to Company or its nominee, and the Employee shall not have any rights or licenses in such Intellectual Property except as explicitly granted in writing to him by Company.

12.3      If, at any time in the course of the Employee's employment, the Employee makes or discovers or participates in the making or discovery of any Intellectual Property relating to or capable of being used in the business of any Company Entity, then the Employee shall immediately disclose full details of such Intellectual Property to Company, and at the expense of Company the Employee shall do all things necessary or desirable for obtaining appropriate forms of protection for the Intellectual Property in such parts of the world as may be specified by Company and for vesting all rights in the same in Company or its nominee.

12.4      The Employee hereby irrevocably appoints Company or its nominee to be the Employee's agent to sign any instrument, or to execute or do any act, on the Employee's behalf in order to give Company or its nominee the full benefit of this "Intellectual Property" section, and in favor of any third party.  A certificate in writing signed by an officer of Company that any instrument or act falls within the authority of Company conferred by this "Intellectual Property" section shall be conclusive evidence that such is the case.

12.5      The Employee hereby waives all of the Employee's moral rights, if any, in respect of any acts of any Company Entity or any party acting on its authority, in relation to any Intellectual Property that is the property of or licensed to Company, its nominee, or any Company Entity by virtue of this "Intellectual Property" section.

12.6      The Employee agrees that Employee has disclosed in writing on the attached Intellectual Property Disclosure Form all Intellectual Property that was made or discovered by the Employee prior to the commencement of his employment with Company, or that belongs

to the Employee either solely or jointly with others (each such item referred to as a "Prior Invention" and collectively as "Prior Inventions"). Other than as so disclosed, the Employee agrees and acknowledges that there are no Prior Inventions. If, in the course of the Employee's employment with Company, the Employee incorporates a Prior Invention into any product, software, business material, process, service, or machine of any Company Entity, then the Company Entities are hereby granted a non-exclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, copy, modify, make derivative works of, use, sell, and otherwise distribute such Prior Invention as part of or in connection with such product, software, business material, process, service, or machine.

12.7    The Employee shall keep and maintain adequate and up to date written records of all Intellectual Property made or discovered by the Employee (either solely or jointly with others) during his employment with Company. The records may be in the form of notes, sketches, drawings, flow charts, electronic data or recordings, laboratory notebooks, or any similar format appropriate to the relevant Intellectual Property and/or required from time to time by Company. The records will be available to and remain the sole property of Company at all times, and the Employee shall not perform any action with such records (other than to maintain them in an up to date state) without the express permission of Company, such permission to be at the sole discretion of Company.

12.8    Whereas the parties anticipate that Employee will develop trading strategies pursuant to his duties to Company:  subject to the terms and conditions of this Agreement, Company hereby grants to Employee, a worldwide, exclusive, nontransferable, sublicensable license to use any Trading Intellectual Property.  "Trading Intellectual Property" means Intellectual Property is both (1) created by Employee in development or operation of Employee's trading strategies and also (2) documented pursuant to Employee's obligation to document all Intellectual Property in a manner sufficient for Company to effectively operate Employee's trading strategies in Employee's absence.  This license is subject to the remaining terms of this Agreement, and nothing in this section is intended to limit or modify any other section of this Agreement, including but not limited to sections relating to "Competition Restrictions" and "Confidentiality."

12.9    Employee represents and warrants that the Employee's implementation of its trading strategies on behalf of the Company will not infringe any other person's copyrights, trademark or other property rights.  Employee agrees to indemnify Company on demand for any and all damages (including, without limitation, legal fees) that Company, its subsidiaries, or other corporate affiliates, incurs as a result of the Employee's breach of this paragraph of the Agreement.

12.10   All rights and obligations of the Employee under this "Intellectual Property" section shall continue in full force and effect after the termination of his employment and shall be binding upon the Employee's heirs, assigns, and personal representatives.

DocuSign Envelope ID: AF8B86B8-ED0A-4985-BA85-B2577011B3A49

## 13   Prior Commitments and Indemnification

Employee represents and warrants that Employee is free to enter into this Agreement and is not bound by any employment agreement, non-disclosure agreement, non-competition agreement or any other agreement, document or obligation, that may infringe on or limit his or her ability or in any manner prevent Employee from performing any of the obligations under this Agreement, or that may result in liability to the Company in any manner, action, suit or other proceeding concerning Employee's former employment with any former employer or the termination thereof. Employee knows of no other agreements, relationships, or commitments to any other person or entity that conflict with Employee's obligations to the Company under this Agreement.  The Employee further represents that Employee shall not violate any prior agreement with a former employer or third party, including any prior non-solicitation agreements to which the Employee may be bound.  Employee further represents and warrants that the execution and delivery of this Agreement, the incurrence of the obligations herein set forth and the consummation of the transactions contemplated herein will not constitute a breach of, or default under, any instrument by which the Employee is bound or any order, rule or regulation application to the Employee of any court or any governmental body or administrative agency having jurisdiction over the Employee. Employee shall indemnify and hold the Company harmless against any and all costs, attorney's fees, losses, liabilities and expenses resulting from claims, demands, suits, actions or judgments arising out of or in any way related to Employee's representations, warranties, covenants, agreements, acknowledgments or assignments as set forth in this Agreement.

## 14   Miscellaneous Provisions

14.1   **Background and Reference Check**.  This agreement is contingent upon a satisfactory background and reference check of Employee, which may be conducted in whole or in part by a consumer reporting agency; including, but not limited to, education and employment verification.  Employee must review and complete Exhibit B and Exhibit C attached to this agreement setting forth Employee's rights under the Fair Credit Reporting Act and authorizing the release of a consumer and/or investigative consumer report to the Company.

14.2   **Modification**.  The terms of this agreement between Employee and the Company may be amended only by an agreement in writing signed by Employee and a Managing Member of the Company.

14.3   **Survival**.  All agreements, representations, warranties and acknowledgments herein shall survive any termination of the Employee's employment with the Company for any reason.

14.4   **Severability**.  The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision hereof.

14.5   **Governing Law**.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York, without regard to that state's conflict of laws principles.  The Employee consents to the jurisdiction of the courts of the State of New York in all actions arising out of and related to this Agreement.

14.6 **Successors**.  This Agreement shall inure to the benefit of and bind the Company and the Employee, and their respective successors, assigns, heirs, legatees, devisees and personal representatives.

14.7 **Injunctive Relief**.  The Employee acknowledges and agrees that the Employee's failure to perform or abide by any of the Employee's covenants in this Agreement would cause irreparable injury to the Company and cause damages to the Company that would be difficult or impossible to ascertain or quantify.  Accordingly, without limiting any remedies that may be available with respect to any breach of this Agreement, the Employee consents to the entry of an injunction to restrain any breach of this Agreement.

14.8 **Attorneys' Fees**.  If suit is brought to enforce or interpret this Agreement, the prevailing party shall be entitled to recover as an element of costs of suit, and not as damages, reasonable attorneys' fees and expenses and all expert witnesses' fees and expenses that the prevailing party incurs.  In such event, the "prevailing party" shall be the party that is entitled to recover costs of suit, whether or not the suit proceeds to final judgment.  The party not entitled to recover costs shall not recover attorneys' or expert witnesses' fees or expenses.  No sum for attorneys' and expert witnesses' fees and expenses shall be counted in calculating the amount of judgment for purposes of determining whether a party is entitled to recover costs or attorneys' or expert witnesses' fees or expenses.

14.9 **Good Faith and Duty to Cooperate**.  The parties acknowledge that there is implied by law and expressly made a part of this Agreement a covenant of good faith and fair dealing which obligates each of them to perform its obligations under the Agreement and also obligates each of them not to engage in any conduct which prevents or impairs any other party from enjoying its rights under this Agreement. Both parties agree each party has a duty to cooperate with the other party as relates to fulfilling each party's obligations, as provided in this Agreement, to the other party.

14.10 **Notices**.  Any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by facsimile transmission or electronic mail, one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service or three days after being mailed by first class mail, charges or postage prepaid, properly addressed, if to Company, at its principal office, or if to the Employee, at the address of the Employee provided by the Employee to the Company.

## 15  Arbitration

Except as provided in the last sentence of this paragraph, the Employee waives the right to seek remedies in court, including any right to a jury trial.  The Employee agrees that any dispute between the Employee or the Employee's affiliates with the Company, arising out of, relating to or in connection with this Agreement or the Company or its formation, organization, capitalization, business or management, shall be resolved exclusively through binding arbitration conducted under the auspices of JAMS pursuant to its Arbitration Rules and Procedures.  The arbitration hearing shall be held in New York, NY.  Disputes shall not be resolved in any other forum or venue.

The arbitration shall be conducted by a retired judge who is experienced in resolving disputes regarding the securities business. The Employee agrees that limited discovery shall be conducted in accordance with JAMS' Arbitration Rules and Procedures, and that the arbitrator may not award punitive or exemplary damages, unless (but only to the extent that) such damages are required by statute to be an available remedy for the specific claim(s) asserted. In accordance with JAMS' Arbitration Rules and Procedures, the arbitrator's award shall consist of a written statement as to the disposition of each claim and the relief, if any, awarded on each claim. The award shall not include or be accompanied by any findings of fact, conclusions of law or other written explanation of the reasons for the award. The Employee understands that the right to appeal or to seek modification of any ruling or award by the arbitrator is severely limited under state and federal law. Any award rendered by the arbitrator shall be final and binding, and judgment may be entered thereon in any court of competent jurisdiction at the time the award is rendered or as otherwise provided by law. Nothing contained in the Agreement shall restrict the Company from obtaining injunctive or other equitable relief

16  **Voluntary Agreement**

By signing below, Employee agrees that Employee has reviewed carefully all aspects of the terms set forth in this letter, understand all of its provisions, has had the opportunity to review all of its aspects with legal, tax or other advisors of Employee's choice, and is voluntarily entering into this agreement with the Company.

COMPANY:                                          EMPLOYEE:

Montgomery Technologies LLC                       NASIR ADAYA

_____                    _____
(Signature)                                      (Signature)

                                                 Nasir Adaya

Print Name: __Stefan He Qin__                    Print Name: _____

Title: __Managing Member__                       Date: __11/26/2018_____

Date: __21 November 2018__                        Address: ████████████_____

                                                 New York, NY 10011

# <u>INTELLECTUAL PROPERTY DISCLOSURE FORM</u>

List of Employee's Prior Inventions, Pursuant to Section 12.6

February 28, 2019

Re:     Assignment of Agreements

Dear   Nasir Adaya

      As we have informed you, effective March 1, 2019, you will be employed with Decibel18 LLC ("Decibel").

      In that regard, any written employment agreement, offer letter, Confidentiality and Non-Solicitation Agreement, Data Protection Policy or any other written agreement between you on the one hand, and Montgomery Technologies LLC or Virgil Capital or any of their affiliated or related entities on the other hand, is hereby assigned to Decibel, and Decibel hereby assumes all rights and obligations under such agreements as of March 1, 2019.

      We wish you continued success as an employee of Decibel.

              Very truly yours,

              DECIBEL18 LLC

By: _____
           _Stefan Qin_
           F105BD8C3FAF4F4...
           NAME: Stefan Qin
           TITLE: Managing Member

              MONTGOMERY TECHNOLOGIES, LLC

By: _____
           _Stefan Qin_
           8D37449770A46B...
           NAME: Stefan Qin
           TITLE: Managing Member

ACKNOWLEDGED AND AGREED TO:

_Nasir Adaya_
72F2314EC106416...
Nasir Adaya

SK 30042 0001 8205107 v2