**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| vs. | Case No.: 20-cv-10849 (JGLC) |
| STEFAN QIN, VIRGIL TECHNOLOGIES LLC, MONTGOMERY TECHNOLOGIES LLC, VIRGIL QUANTITATIVE RESEARCH, LLC, VIRGIL CAPITAL LLC, and VQR PARTNERS LLC, | |
| Defendants. | |

**RESPONDENTS' OPPOSITION TO**
**RECEIVER'S MOTION TO COMPEL TURNOVER OF ASSETS**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND AND ASSET OWNERSHIP ..................................2

    A. The Receivership Order's Broad Definition of "Receivership Property" Excludes the "Proceeds" the Receiver Seeks. ..........................................3

    B. Mr. Adaya's Work at the Entities Now in Receivership ..............................4

        1. VQR Never Performed Market Making Work. ...............................4

        2. VQR Employees Regularly Undertook Side Projects with Third Parties Separate From their Work at VQR With VQR's Full Knowledge. ......................................................................................5

        3. VQR Formally Documented Trading Agreements It Entered into With Other Parties. ......................................................................6

    C. Open DeFi Foundation Engages Mr. Adaya to Market Make the INJ Token..............6

        1. VQR Did Not Perform the INJ Market Making Work and No VQR Resources Were Used to Market Make for the INJ Token. ............8

        2. The Market Making Concluded in 2021 and Mr. Adaya Returned the Principal to ODF Pursuant to the Parties' Agreement. .................9

    D. Respondents Have Cooperated with the Receiver at Every Turn............................11

        1. Adaya's Testimony Has Been Credible Throughout and Consistent with Corroborating Testimony from Other Witnesses....................12

        2. The Receiver's Forensic Accountant—Admittedly Not an Expert— Gave Incomplete Testimony.........................................................14

III. THE RECEIVER BEARS THE BURDEN OF PROOF.........................................14

IV. ARGUMENT ......................................................................................................15

    A. The Receiver Fails to Distinguish the Components of the Proceeds He Seeks, and the Disputed Assets Are Not Receivership Property as Defined by the Receiver Order, Which Excludes Proceeds, Unlike Comparable Orders. .................15

    B. The Receiver Has Failed to Meet His Burden to Demonstrate that the Disputed Assets are Receivership Property. ..............................................17

        1. The Receiver's Documentary Evidence Does Not Support His Assertion that VQR Undertook the INJ Token Market Making Work and Thus That the Proceeds of Such Work are Receivership Property. ........17

            a. The Disputed Assets' Temporary Presence in a VQR-Affiliated Segregated Subaccount on the Binance Exchange Does Not Convert Them Into Receivership Property. .....................19

            b. Mr. Adaya's Employment Agreement Did Not Prohibit His Market Making Project, and Even if it Did, That Would Not Convert the Disputed Assets into Receivership Property.................20

       2.      The Forensic Accountant's Testimony Does Not Support the Argument that the Disputed Assets are Receivership Property. ...................21

C.     Respondents Offer Countervailing Evidence that Shows the Disputed Assets Are Not Receivership Property. .............................................................................22

       1.      Mr. Adaya and ODF Had an Oral and then Written Contract and the Receiver Cannot Insert Himself into that Agreement Retroactively and Obtain its Benefits for the Receivership. ...............................................23

       2.      Respondents' Evidence Disproves the Receiver's Theory and Shows that VQR Resources Were Not Used for Market Making. ...........................24

       3.      Respondents Have Offered the Only Evidence of Disputed Asset Valuation Because the Receiver Has Offered None. ...................................25

V.     CONCLUSION ...................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## FEDERAL CASES

*Astraea NYC LLC v. Rivada Networks, Inc.*,
No. 21 CIV. 10493 (LLS), 2023 WL 3862671 (S.D.N.Y. June 7, 2023).................................15

*Blake v. Fiit Int'l, Inc.*,
No. 05 CIV. 6150 (HBP), 2007 WL 980362 (S.D.N.Y. Mar. 30, 2007)...............................23

*Ciaramella v. Reader's Dig. Ass'n, Inc.*,
131 F.3d 320 (2d Cir. 1997)..............................................................................................23

*Citizens Bank v. JES Global Capital, L.P.*,
No. 9:21-cv-080815-AMC, ECF No. 28 (S.D. Fla. May 14, 2021) ...................................16,17

*Fenton v. Ives*,
634 N.Y.S.2d 833 (N.Y. App. Div. 1995) ..........................................................................20

*Holtzbrinck Pub. Holdings, L.P. v. Vyne Commc'ns, Inc.*,
No. 97 CIV. 1082 (KTD), 2000 WL 502860 (S.D.N.Y. Apr. 26, 2000)...............................21

*In re Lehman Bros. Holdings Inc.*,
439 B.R. 811 (Bankr. S.D.N.Y. 2010)................................................................................20

*Merrill Lynch Mortg. Cap., Inc. v. F.D.I.C.*,
293 F. Supp. 2d 98 (D. D.C. 2003)....................................................................................20

*Miller v. Wells Fargo Bank Int'l Corp.*,
540 F.2d 548 (2d Cir. 1976)...............................................................................................20

*Playboy Enterprises, Inc. v. Dumas*,
53 F.3d 549 (2d Cir. 1995).................................................................................................23

*SEC v. Global Online Direct, Inc.*,
No. 1:07-CV-0767-WSD, ECF No. 12 (N.D. Ga. June 4, 2007) ..........................................16

*Union Cap. LLC v. Vape Holdings Inc.*,
No. 16 CIV. 1343 (RJS), 2017 WL 1406278 (S.D.N.Y. Mar. 31, 2017) ..............................21

*In re Vebeliunas*,
252 B.R. 878 (Bankr. S.D.N.Y. 2000) ...............................................................................14

*In re Weiss-Wolf, Inc.*,
60 B.R. 969 (Bankr. S.D.N.Y. 1986)..................................................................................14

Third-parties Nasir Adaya and Phuong Nguyen ("Respondents"), by and through their counsel, respectfully submit this opposition to receiver Robert A. Musiala Jr.'s ("Receiver") Motion to Compel Turnover of Assets and supporting papers (collectively, the "Motion") (ECF 231 to 234). The Receiver has failed to carry his burden and Respondents can demonstrate that the disputed assets are not receivership property. The Motion should thus be denied.

## I.      **INTRODUCTION**

Respondents Mr. Adaya and Ms. Nguyen, spouses, have suffered tremendously as a result of Mr. Adaya's former employer Stefan Qin's fraud. Mr. Adaya had the rug pulled out from under him professionally and has had to rebuild and rehabilitate his career. Mr. Adaya was never paid the commissions in excess of $1.3 million that he earned in 2020, shortly before this receivership commenced; as a result, he is a receivership estate creditor who may never be compensated for that work. Mr. Adaya has been further victimized, both reputationally and financially, by the Receiver's overzealous and wasteful litigation tactics. The Receiver is not a prosecutor and Mr. Adaya—who had no involvement in the Qin criminal case—is a creditor, not a thief, irrespective of the Receiver's inappropriate accusations. The Receiver used alarmist language to argue that the assets are at risk of dissipation and that Mr. Adaya behaved dishonestly but has offered not a scintilla of evidence that Respondents have tried to abscond with or hide the disputed assets. They have not. Mr. Adaya—not the Receiver—first raised the issues contested in the Motion nearly a year ago and Respondents suggested escrowing the disputed assets in their letter to this Court several few months ago. While Respondents have tried to resolve this matter amicably and get on with their lives, the Receiver has continued with his "scorched earth" litigation tactics.

The Receiver's Motion mischaracterizes Mr. Adaya's and other witness' statements, ignores evidence inconvenient to the Receiver's arguments, and omits key information because he failed to make appropriate inquiries of the authors of the very materials he offers to support his position. Further, the forensic accountant's tracing analysis on which Receiver heavily relies is—by the accountant's own admission—incomplete, because he stopped tracing on an arbitrary date and acknowledged his choice not to further trace due to perceived complexity. The accountant also failed to include any transfers out of the subject account in his analysis; had he done so the Receiver would have had to

reckon with the fact that the great majority of the disputed assets were long ago transferred back to their owner, the Open DeFi Foundation ("ODF"), which disproves his argument. Despite his "scorched earth" tactics and selective use of information, the Receiver has not carried his burden. Indeed, his conclusory statements are not supported by any evidence that the disputed assets ever belonged to any of the receivership entities. By contrast, Respondents offer evidentiary support for their position that defeats the Receiver's conclusions and highlights that he has not carried his burden.

Even if any of the disputed assets were property of a receivership entity at one time, the Receiver does not allege that Respondents presently have that property. Instead, he argues that they "likely" have the proceeds of such property, proceeds which he acknowledges have been inextricably commingled with assets that indisputably do not belong to any receivership entity. Supposition, however, is insufficient to meet the Receiver's burden, nor has he even attempted, let alone succeeded, in separating the disputed assets from commingled property which admittedly is not receivership estate property. In any event, "proceeds" are not receivership property under the express terms of the governing receivership order. The Receiver's position would require the Court to read allegedly missing words into the receivership order. There is no basis in precedent or fact to do so.

This opposition details why the disputed assets are not property of the receivership estate and demonstrates that the disputed assets were never property of the entities now in receivership, supported by incontrovertible evidence from the people who owned, touched, and managed the subject assets. For example, Respondents submit sworn declarations from participants in the very chats on which the Receiver relies, which refute his positions regarding ownership of and involvement in trading the subject assets. The Receiver has ignored or failed to submit this cogent evidence, which contradicts his position. Respondents also highlight the defects in the forensic accountant's analysis and provide evidence that controverts the Receiver's arguments and refutes the Motion's premises. The Receiver has utterly failed to meet his burden, and the Motion should be denied.

## II.     FACTUAL BACKGROUND AND ASSET OWNERSHIP

The Receiver's purported recitation of the facts is replete with argument and selectively presents the history of this dispute, ignoring facts that are inconvenient or disprove his contentions regarding asset ownership. The most fundamental example is his decision to ignore the millions in

disputed asset transfers back to ODF, the entity that loaned Mr. Adaya the disputed assets in the first place. This omission renders the Receiver's entire argument and tracing exercise incomplete at best and non-sensical at worst.[1] Respondents agree that the Receiver's mandate is to identify, preserve, and marshal receivership property for distribution to Mr. Qin's victims like Mr. Adaya, but disagree that the disputed assets legally or factually are receivership property. Mr. Adaya and his former colleagues' work with and testimony regarding the receivership entities, however, as detailed below, make clear that the disputed assets were never receivership entity property, and nor are the proceeds therefrom.

### A. The Receivership Order's Broad Definition of "Receivership Property" Excludes the "Proceeds" the Receiver Seeks.

On December 22, 2020, the Securities and Exchange Commission commenced this action against Mr. Qin and the entities he controlled, alleging that he perpetrated a scheme that lured investors into investing in funds he controlled (now the receivership entities) and then misappropriated the invested assets. On January 21, 2021, the Court entered the Receiver Order, which appointed the Receiver and set forth his mandate. ECF 31.

The "Receivership Property" subject to the Receiver's authority is a defined term in the Receiver Order, which includes a long list of items ("monies, funds . . . leases . . .profits, dividends . . .which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly."). ECF 31 at §I.7.A. The definition is not without limit, however, and, unlike receivership orders in comparable cases (*see* Request for Judicial Notice ("RJN"), filed herewith, Exhibits A-C), does *not* include "proceeds," which is precisely what the Receiver is pursuing in his Motion. Memorandum of Law in Support of Receiver's Motion to Compel Turnover of Assets ("MPA"), ECF 232. Even if the Court elected to read "proceeds" into the Receiver Order (which axiomatic contract construction principles dictate it should not), only proceeds of assets originally belonging to a receivership entity could be included. The disputed "VQR Assets" at the heart of the Motion[2] never belonged to the receivership entities; rather, they were comprised of loan principal which belonged to

---

[1] As another example, the Receiver refers to the "last-known value" of certain disputed assets but declines to explain that it is only the "last-known" because he arbitrarily elected to stop tracing – not because of any alleged conduct by Respondents.

[2] As to the other disputed assets, referred to as the "Sigma Assets," while they may have been receivership entity property at one time, the Receiver has not carried his burden to comprehensively trace such assets and establish that Respondents now have them, as explained in section IV(A) and IV(B)(2).

and has been returned to ODF, and profits belonging to and retained by Mr. Adaya. Declaration of Nasir Adaya, filed herewith ("Adaya Decl.") ¶¶25, 35-36; Second Declaration of Eric Chen, filed herewith ("Chen 2nd Decl.") ¶¶7-8, 14-17. This Opposition focuses on those assets because the Receiver's evidence (materials attached to the Declaration of Marco Molina in support of the Motion ("Molina Decl."), ECF 233) does, though the Receiver has also failed to carry his burden with regard to the "Sigma Assets." *See* Sections IV(A), IV(B)(2), infra.

> **B.**      **Mr. Adaya's Work at the Entities Now in Receivership**

Mr. Adaya, a quantitative trader and consultant by profession, began working at receivership entities Montgomery Technologies and Virgil Capital ("Virgil") in 2018, pursuant to an employment agreement setting forth his job responsibilities as an Algorithmic and Quantitative Trader. Adaya Decl. ¶4; ECF 234-12. He then transitioned to a new role as Quantitative Trader and Portfolio Manager at Virgil Quantitative Research ("VQR"), where he worked in 2019 through the discovery of Mr. Qin's fraud and the VQR's collapse in December 2020. Adaya Decl. ¶4. Antonio Hallak was his supervisor at VQR, where he supervised all the traders and portfolio managers. Adaya Decl. ¶7; Declaration of Max Bodoia, filed herewith ("Bodoia Decl.") ¶2. Mr. Adaya also worked independently as a consultant; he had done so for Virgil before being hired and continued to do consulting work sporadically during his time there and since the receivership entities ceased operating. Adaya Decl. ¶¶3, 5. Mr. Adaya also had experience as a market maker, though market making was not part of his role at VQR and is not referenced in his employment agreement with Virgil. Adaya Decl. ¶10; Chen 2nd Decl. ¶3; ECF 233-12. He, like other traders, received salaries, but the majority of their compensation was commission-based and derived from the profits they made from their trading strategies. Adaya Decl. ¶11; Bodoia Decl. ¶3.

> **1.**      **VQR Never Performed Market Making Work.**

Market making is a niche field within the broader universe of asset trading, applicable to digital and non-digital assets alike and typically undertaken when an asset or currency is newly available for trade. Adaya Decl. ¶10; Declaration of Rohan Pandit, filed herewith ("Pandit Decl.") ¶5; Chen 2nd Decl. ¶3; Bodoia Decl. ¶13. Market makers are also referred to as "liquidity providers" because they engage as both purchasers and sellers of a particular asset in order to provide liquidity in an emerging

market and to help establish a new asset's value. Adaya Decl. ¶10; Bodoia Decl. ¶13; Chen 2nd Decl. ¶6; Pandit Decl. ¶6. The receivership entities, including VQR, did not engage in market making and were never retained by anyone to undertake a market making project.[3] Adaya Decl. ¶9; Bodoia Decl. ¶13; Pandit Decl. ¶6. They conducted algorithmic and quantitative asset trading of investor funds entrusted to the receivership entities, and some managed account work to try and generate profits for investors. Adaya Decl. ¶8; Pandit Decl. ¶2; Bodoia Decl. ¶2. Market making work is distinct and highly specialized. Adaya Decl. ¶10; Pandit Decl. ¶5; Bodoia Decl. ¶13; Chen 2nd Decl. ¶3.

### 2.     VQR Employees Regularly Undertook Side Projects with Third Parties Separate From their Work at VQR With VQR's Full Knowledge.

In an environment like VQR where compensation was primarily commission-based, it was the norm for employees to engage in side projects or independent investments separate from their VQR work. Bodoia Decl. ¶11; Adaya Decl. ¶14. Such practices are also common in the asset trading industry, irrespective of whether an individual is trading or analyzing digital or more conventional assets. Adaya Decl. ¶14. Traders and analysts alike would frequently work on side projects to boost their income. Bodoia Decl. ¶11; Adaya Decl. ¶14. VQR would, of course, not compensate them for these projects. Bodoia Decl. ¶11. Mr. Hallak, VQR Head Trader, worked on a famed Coinbase-backed trading game called Gods Unchained. Adaya Decl. ¶14. Max Bodoia, Mr. Adaya's peer, had his own separate investment activities, including a small cryptocurrency index fund of his own. Bodoia Decl. ¶11; Adaya Decl. ¶14. All these activities were undertaken with VQR's full knowledge. *Id*. Mr. Adaya's most significant side project was a market making effort he was hired by ODF to undertake in Autumn of 2020 and into 2021. Adaya Decl. ¶¶24-25; Pandit Decl. ¶7; Chen 2nd Decl. ¶¶5, 12. The Receiver is now inappropriately trying to take proceeds from this independent, non-VQR project into the receivership estate.

---

[3] The Motion contains *no* evidence that VQR was ever engaged or retained to engage in market making work, and Respondents did not locate any documents in the Receiver's production demonstrating any market making work for which VQR was retained or compensated by a third party. VQR was retained by a third party for asset management work of the type VQR conducted generally, but not market making, as described in section II.B.3 below. Declaration of Aviva Gilbert, filed herewith ("Gilbert Decl.") ¶13. Mr. Adaya was engaged by ODF to engage in market making work for the INJ token—not VQR. Chen 2nd Decl. ¶5.

3.    **VQR Formally Documented Trading Agreements It Entered into With Other Parties.**

VQR also had agreements with third parties in the relevant time period (2020) for which VQR was retained and paid for the services it provided. Adaya Decl. ¶¶20-21. One example of this was a September 2020 agreement with Bixin Ventures Company ("Bixin"), in which VQR was tasked with executing a trading strategy for a managed account holding Bixin's assets. Adaya Decl. ¶21; Gilbert Decl. ¶¶5, 6, Exs. C, D. In exchange, Bixin agreed to compensate VQR with a share of any profits generated above the principal balance that Bixin transferred. *Id.* The agreement was documented in a contract signed by Bixin and VQR. *Id.* Mr. Adaya was one of the traders who worked on the Bixin project and was to be paid commissions out of VQR's compensation, as was standard practice for VQR projects. Adaya Decl. ¶22. Mr. Qin and Mr. Hallak, as VQR's management, were heavily involved in and managed the Bixin project, including dictating payment terms, corresponding with Bixin, and negotiating the agreement that Qin signed. Adaya Decl. ¶21; Gilbert Decl. Exs. C, D. They also tracked performance of Bixin trading strategies and communicated with Mr. Adaya (and presumably others) about those strategies. Adaya Decl. ¶¶22-23. VQR hired a consultant to source the deal, and then VQR negotiated and effectuated the work it agreed to undertake pursuant to the terms of the Bixin agreement. Adaya Decl. ¶¶20-23. The Bixin arrangement reflects that when VQR had an agreement with a third party, it was extensively negotiated, documented, and signed by VQR leadership, wholly unlike the ODF/Adaya agreement, to which VQR was not a party.

C.    **Open DeFi Foundation Engages Mr. Adaya to Market Make the INJ Token**

Mr. Adaya performed various consulting services for ODF/Injective Labs ("Injective"), its affiliated technology and research company, beginning in early 2020. Adaya Decl. ¶¶24-25; Chen 2nd Decl. ¶4. In anticipation of ODF launching its native token, INJ, in October 2020, ODF, assisted by Injective and its CEO Eric Chen, engaged Mr. Adaya—not VQR—to perform market making services for the token. Adaya Decl. ¶25; Chen 2nd Decl. ¶¶5, 10. The market making work was intended to provide liquidity and help develop the token's value within digital asset trading exchanges. *Id.* The INJ token was first publicly listed that month and had no public market value prior to that time. Adaya Decl. ¶25; Chen 2nd Decl. ¶6. Pursuant to the agreement between ODF/Injective and Mr. Adaya, ODF

issued Mr. Adaya one million INJ tokens to enable him to engage in the market making. Adaya Decl. ¶25; Chen 2nd Decl. ¶7. Those tokens were effectively loan principal. Adaya Decl. ¶35; Chen 2nd Decl. ¶7. Mr. Adaya was obligated by the terms of the agreement to return the principal to ODF—the tokens' owner—once the market making work was complete and the tokens were capable of being fairly valued. Adaya Decl. ¶33; Chen 2nd Decl. ¶7. Mr. Adaya's agreed compensation was retention of the profit—any amount above the principal one million INJ tokens—that he developed as a market maker for the token. Adaya Decl. ¶25; Chen 2nd Decl. ¶8. ODF and Mr. Adaya agreed to memorialize their agreement (principal return and profit retention as payment for services rendered satisfactorily) once INJ had an established value that would enable the parties to calculate the applicable amounts to be returned to ODF and retained by Mr. Adaya, respectively. Adaya Decl. ¶25; Chen 2nd Decl. ¶14. ODF never agreed to pay, and never paid, VQR anything for this project, nor did VQR ever pay or promise to pay Mr. Adaya (or any other VQR employee) for this work. Adaya Decl. ¶26; Chen 2nd Decl. ¶¶8, 17.

Neither Mr. Chen, the Injective CEO with whom Mr. Adaya communicated about the project, nor ODF, mandated that Mr. Adaya perform the market making in a specific way or store the tokens or trade them using specific accounts. Adaya Decl. ¶29; Chen 2nd Decl. ¶¶9, 12. In October 2020, Mr. Adaya obtained permission from his boss, Mr. Hallak, to use a segregated subaccount within VQR's main account on the Binance exchange to store and trade the INJ tokens he had received from ODF/Injective. Adaya Decl. ¶27; Pandit Decl. ¶¶12-13. Mr. Adaya could not have established, used, or accessed that account without Mr. Hallak's permission, because Mr. Hallak controlled access to the account. Adaya Decl. ¶28; Pandit Decl. ¶13; Bodoia Decl. ¶¶7, 10. Mr. Adaya chose to use the segregated subaccount because of a favorable fee structure, though he could have used a different option pursuant to the terms of his agreement with ODF. Adaya Decl. ¶29; Chen 2nd Decl. ¶9. Mr. Adaya reimbursed VQR for Binance's fees associated with usage of the account because it was not a VQR project. Adaya Decl. ¶29. After Mr. Adaya received the INJ tokens from ODF, he transferred them to the referenced account to engage in the market making work. Adaya Decl. ¶27. The parties to the market making agreement did not intend to confer, nor do they view themselves as having ever conferred, ownership, control, or management of the INJ tokens or their proceeds to a third party. Chen

2nd Decl. ¶10. The Receiver, by his Motion, is trying to retroactively obtain the benefit of an agreement to which neither he nor any receivership entity was ever a party.

> 1.     **VQR Did Not Perform the INJ Market Making Work and No VQR Resources Were Used to Market Make for the INJ Token.**

The INJ market making was a project undertaken by Mr. Adaya, pursuant to an agreement between him and ODF/Injective. Adaya Decl. ¶25; Chen 2nd Decl. ¶¶5-17. Mr. Adaya—not VQR—received the initial tranche of INJ tokens issued by ODF and transferred to him directly. Adaya Decl. ¶25; Chen 2nd Decl. ¶7. VQR had no mandate to do anything related to INJ, and Mr. Chen's declarations do not state otherwise. Adaya Decl. ¶26; ECF 233-5; Chen 2nd Decl. ¶¶10-12. Mr. Hallak permitted Mr. Adaya to utilize a segregated subaccount for trading the INJ tokens, but Mr. Adaya reimbursed VQR for the associated transaction fees. Adaya Decl. ¶¶27-29; Pandit Decl. ¶¶12-13. VQR did not pay any employee for the purported work on the INJ market making project. Declaration of Raymond Li filed herewith ("Li Decl.") ¶4; Bodoia Decl. ¶15; Pandit Decl**.** ¶11. The Receiver has submitted ***no*** document showing that Mr. Hallak or Mr. Qin (or anyone else at VQR) was tracking the INJ market making work so VQR (or its employees) could be compensated for it, and Respondents did not locate any such document in the Receiver's productions. Adaya Decl. ¶30; Gilbert Decl. ¶13. The Receiver did not submit, nor has he produced, any document showing any VQR financial interest in the project or intent to compensate anyone at VQR for the work, because VQR had no such interest or intent. Adaya Decl. ¶¶25-26, 30; Chen 2nd Decl. ¶¶7, 10. Nor has the Receiver offered any authority for the proposition that permitting a party to use an account for a limited purpose results in transfer of ownership in the funds used for such limited purpose.

The Receiver relies on various communications between VQR employees that he argues evidence VQR's, and not Mr. Adaya's, entitlement to the INJ market making proceeds. *See* MPA at 12-13. The Receiver does not, however, include any testimony from those individuals about such communications, and omits the evidence that rebuts his assertions. Exhibits 6 and 10 to the Molina Decl. are VQR Slack messages about incorporating data related to the newly launched INJ token into VQR's ongoing trading strategies and analytical models, as their participants state. Li Decl. ¶¶5-7; Adaya Decl. ¶19. However, these communications are not about the INJ market making work. *Id.*

Exhibit 7 to the Molina Decl. is an excerpt from a long-running Telegram chat between Mr. Adaya and Rohan Pandit about topics related and unrelated to VQR, hence the usage of their own private messaging system rather than VQR's Slack instance. Adaya Decl. ¶16; Pandit Decl. ¶¶8, 14. Mr. Pandit assisted Mr. Adaya for a few hours on the market making effort, unrelated to VQR, and was not compensated by VQR for that work, which he viewed as a favor to his friend, and for which he expected no compensation. Pandit Decl. ¶¶9-11. Mr. Pandit continued to engage with Mr. Adaya on the project long after VQR ceased operating, demonstrating that it was not an effort undertaken by Mr. Pandit in his role at VQR, nor a VQR project at all. Pandit Decl. ¶¶9, 14; Adaya Decl. ¶30. Neither Mr. Adaya nor Mr. Pandit expected to be paid by VQR for this work. Adaya Decl. ¶26; Pandit Decl. ¶11. Finally, exhibits 9 and 11 to the Molina Decl. relate not to the INJ market making effort, but to a long-running project the chat participants were working on to build data models to support VQR's trading analytics and strategy. Adaya Decl. ¶¶17-19. Mr. Pfeffer and others started building the models, including scraping and writing scripts to pull and feed in data from various digital asset trading pairs, beginning in 2019, as the documents the Receiver produced last month demonstrate. *Id.* Including data from newly launched tokens was part of this effort and their normal course of work. *Id.* It had nothing to do with the market making effort Mr. Adaya was engaged to perform for ODF. Adaya Decl. ¶19. Had the Receiver asked the participants in the various chats what they were actually discussing, he would have learned as much. He did not. *See*, *e.g.* Li Decl**.** ¶6; Adaya Decl. ¶¶17-19.

### 2.    The Market Making Concluded in 2021 and Mr. Adaya Returned the Principal to ODF Pursuant to the Parties' Agreement.

As the rumors about Mr. Qin started to swirl in late 2020, Mr. Adaya and others became concerned about the viability of their employer. Adaya Decl. ¶31. Mr. Adaya thus moved—with Mr. Hallak's cooperation because he controlled all account access—the INJ tokens and associated proceeds out of the VQR subaccount to other, non-VQR-affiliated accounts. Adaya Decl. ¶31; Chen 2nd Decl. ¶11; Bodoia ¶10. This was because the market making work was ongoing, the assets needed to be moved to keep them safe, and the parties to the agreement accordingly expected that this would occur. *Id.* Such transfer was relatively straightforward, because the INJ tokens and proceeds had been separately maintained in a segregated account, and thus required no disentangling. Adaya Decl. ¶29;

Pandit Decl. ¶12. Mr. Adaya then continued the market making work into 2021, consistent with the parties' understanding and expectation. Adaya Decl. ¶25; Chen 2nd Decl. ¶12. Mr. Adaya had been providing, and continued to provide, updates to Mr. Chen and other Injective employees regarding the liquidity and value of the INJ token as it changed and developed. Adaya Decl. ¶32; Chen 2nd Decl. ¶¶12-13.

Mr. Adaya and ODF, as planned, deferred documenting their 2020 agreement until such time as the consideration could be valued. Adaya Decl. ¶33; Chen 2nd Decl. ¶14. Once the INJ token had developed sufficient liquidity and a calculable market value, the parties memorialized their prior agreement and executed a contract providing for the principal return and profit retention they had agreed to months before, as described above. Adaya Decl. ¶25; Chen 2nd Decl. ¶14-17. The 2021 Token Purchasing Agreement ("TPA") and a related consulting agreement were executed by ODF and Mr. Adaya, who signed for his company, Antifragile Management LLC ("Antifragile"), which he formed in early 2021.[4] Adaya Decl. ¶34; Chen 2nd Decl. ¶14; TPA at 1. VQR and its management did not sign, were not involved in, and had nothing to do with either of these written agreements given that they were not parties to them. Adaya Decl. ¶26; Chen 2nd Decl. ¶¶10, 14, 19. The TPA assigned a value of $10 per INJ token, which was lower than the median value of the token over its lifetime of normal asset value fluctuation. Adaya Decl. ¶33; Chen 2nd Decl. ¶15. This was discussed and agreed to by the parties to the agreement. *Id*. At the time the parties assigned value to the assets, the loan principal Mr. Adaya received was valued at just under $10 million, and his compensation for the work—the profit made from the trading above the principal—was approximately $1 million. Adaya Decl. ¶36; Chen 2nd Decl. ¶¶16-17. In the subsequent months Mr. Adaya returned the $10 million principal, via transfers of digital assets of approximately equivalent value, to ODF. Adaya Decl. ¶35; Chen 2nd Decl. ¶16. He has submitted records showing some of the large transactions and concurrent messages with ODF/Injective-affiliated individuals reflecting them. Adaya Decl. Exs. J, K and L; Chen 2nd Decl. ¶16. These transactions are inexplicably missing entirely from the tracing analysis on which

---

[4] The TPA documented the number of tokens (990,855.8) that Mr. Adaya received for his INJ token market making work, and the consulting agreement provides for the liquidity provisioning work Mr. Adaya was engaged to perform. Mr. Adaya and Injective also discussed these amounts as they drafted the TPA. Chen 2nd Decl. Ex. D.

the Receiver relies. Gilbert Decl. Ex. I at 133:17-134:3. Respondents no longer have any of the loan principal and are not currently retaining any assets belonging to ODF or Injective. Adaya Decl. ¶¶35-36; Chen 2nd Decl. ¶18.

**D.** **Respondents Have Cooperated with the Receiver at Every Turn.**

Mr. Adaya is a creditor and a victim—not a co-conspirator or thief—despite the implication in the Receiver's Motion. Throughout the Receiver's investigation, Mr. Adaya (and Ms. Nguyen) have cooperated at every turn, submitting to interviews and responding to subpoenas from the Receiver. Adaya Decl. ¶¶37-39; Gilbert Decl. ¶14. By joint agreement, the disputed assets now reside in an escrow account, which Respondents initially suggested, to assuage the Receiver's unfounded claims of potential dissipation. *See* ECF 214, 237 at 2. The Receiver, on the other hand, stonewalled Respondents and refused to provide any information when they sought to resolve these issues (Adaya Decl. ¶¶38-39), instead choosing to litigate aggressively and forcing Respondents to incur huge legal expenses. Adaya Decl. ¶40.

The Receiver's Motion suggests that Respondents have been taking "untenable positions" and have not been credible with respect to this matter. MPA at 15. That is untrue. The positions Respondents have taken are consistent with the facts described above—all of which are supported by documentary evidence and testimony, as cited *supra*. Further, Respondents have complied with every request the Receiver made (short of handing over millions of dollars to which the Receivership is not entitled): Mr. Adaya voluntarily submitted to an interview, submitted detailed financial forms and signed a sworn declaration in 2022, all at the Receiver's request. Adaya Decl. ¶37. He also responded to an initial document subpoena in 2022. *Id*. In late 2022, he raised the very issues contested in the Motion, of his own accord, and sought to understand and hopefully resolve any dispute. ECF 233-14; Adaya Decl. ¶38. He then submitted to an unduly aggressive deposition, after receiving a subpoena which did not identify a single topic nor specify the scope for such examination. Adaya Decl. ¶39. Ms. Nguyen also submitted to an interview at the Receiver's request, in Spring 2023. Gilbert Decl. ¶14. Responding to the Receiver's aggressive strategy has cost Respondents dearly in the form of significant legal fees and distress. Adaya Decl. ¶40. The couple has been forced to bear these expenses personally, unlike the Receiver's counsel who has received millions of dollars in compensation from the

receivership estate. Adaya Decl. ¶40; ECF 245. They also suggested escrowing the disputed amounts so they could regain withdrawal access to their account frozen at the Receiver's direction, which included substantial assets belonging to Respondents that are not in dispute at all. ECF 214; 234-14. Assertions that they have obscured information or been uncooperative is not supported by a shred of evidence.

### 1.   Adaya's Testimony Has Been Credible Throughout and Consistent with Corroborating Testimony from Other Witnesses.

The Receiver confuses Mr. Adaya's opposition to the Receiver's flawed arguments—and his commitment to the above supported facts—with his credibility. MPA at 15. The Receiver writes that he has "not found Adaya to be credible" simply because he contests, or in the Receiver's words, "misrepresented," the Receiver's selective and misleading recitation of the facts. *Id.* For example, the Receiver cites to paragraph 8 of an earlier Chen declaration in support of his assertion that Mr. Adaya "misrepresented to Chen that VQR was not involved in the post-IEO trading," MPA at 15, but that is not what that declaration says; rather, the referenced passage merely says that Mr. Chen generally understood that Mr. Adaya would not rely on third-party resources to engage in INJ market making, save the use of the Binance subaccount. *See* ECF 233-5 at 3. As explained above, Mr. Chen's actual statement is precisely accurate and consistent with Mr. Adaya's testimony and the other evidence offered in support of this Opposition, including Mr. Chen's second declaration clarifying his first. *Id.*; Chen 2nd Decl. ¶19. In attempting to attack Mr. Adaya's credibility, the Receiver presumes his disputable conclusions are objective truths and works backward from there. He likewise presents an incomplete selection of materials—having failed to ask the authors of correspondence on which he relies what they meant or the context—then argues that those materials demonstrate incontrovertible facts, and baselessly alleges that Mr. Adaya is not credible because he disagrees or controverts the Receiver's chosen version of events.[5]

---

[5] The Receiver cites the same paragraph of the first Chen declaration for the assertion that it was a "documented fact that VQR had conducted all the trading activity in the months following the IEO." MPA at 19. That is not what the cited paragraph says at all. ECF 233-5, ¶8. The Receiver simply showed Mr. Chen the documents attached to the Molina Declaration, without the context and explanation provided above, and Mr. Chen declared that he did not necessarily expect Mr. Adaya to have certain conversations, given that Mr. Chen naturally did not have visibility into conversations to which he was not a party. Chen 2nd Decl. ¶19. Respondents have provided the Second Chen Declaration, in part, to clarify the Receiver's misleading assertion. *Id.*

Further, the Receiver's assertions demonstrate a commitment to excluding relevant facts that are inconvenient to his argument. For example, the Receiver takes issue with the fact that Mr. Adaya's firm, Antifragile, signed the TPA that documented the 2020 market making, calling it "false since VQR acquired the tokens" and "impossible given that Antifragile [was founded several months after the IEO]." MPA at 15-16. As explained above—and consistent with the testimony of the parties to the agreement—VQR did not acquire any tokens, and the market making work was not documented until 2021 when the consideration was capable of being valued. Adaya Decl. ¶¶25, 33; Chen 2nd Decl. ¶14. Mr. Adaya signed for his company because he had set it up in the months between when he was engaged by ODF and when the written agreement memorializing the parties' engagement was executed. Adaya Decl. ¶34; TPA at 1. That is not nefarious nor reflective of any dishonesty, despite the Receiver's inappropriate barbs contending as much.

Finally, Mr. Adaya's testimony and assertions herein are all consistent with corroborating witness testimony, as set forth above, and with respect to other issues as well. The Receiver argues that Mr. Adaya is not credible "because his employment agreement with VQR precluded him from competing with VQR without prior written consent and there is no evidence" of such consent. MPA at 14. First, Mr. Adaya's employment agreement was not with VQR, it was with Montgomery Technologies and Virgil Capital. ECF 233-12. Second, the INJ market making work did not compete with VQR; VQR (and the other receivership entities) did not engage in market making work at all, as multiple witnesses have testified. Adaya Decl. ¶9; Bodoia Decl. ¶13; Pandit Decl. ¶6. Third, even if it was competitive, which it was not, Mr. Adaya did receive written consent to use a segregated subaccount within VQR's Binance account. Adaya Decl. ¶27; Pandit Decl. ¶13; Bodoia Decl. ¶10. Mr. Hallak's permission was required to set up, access, use, and withdraw from the subaccount and there are Slack messages, as well as testimony, stating as much. *Id*. Finally, if the Receiver and Mr. Adaya have differing interpretations of the employment agreement, those would be resolved in litigating an employment agreement breach claim. The differing interpretations are not facts demonstrating a lack of credibility, as the Receiver asserts.

2.      **The Receiver's Forensic Accountant—Admittedly Not an Expert—Gave Incomplete Testimony.**

Respondents took the deposition of Mark Porter, the forensic accountant on whose analysis the Receiver heavily relies, on October 12, 2023. Mr. Porter acknowledged his lack of expertise (Gilbert Decl. Ex. I at 128:19-128:21) and admitted to making various arbitrary decisions and unwarranted assumptions in conducting his analysis. Gilbert Decl. Ex. I at 78:18-79:8, 66:6-69:10 Mr. Porter was paid $350 per hour for his 90 hours of work but stated that a layperson could perform the same analysis that he conducted. Gilbert Decl. Ex. I at 34:11-36:10, 42:17-42:25. He testified that he has only approximately 18 months of experience as a Director at Ankura. Gilbert Decl. Ex. I at 18:15-18:19. He admitted that he arbitrarily stopped tracing because it would be "overly burdensome" to trace further, and because he only received records through a certain date and did not request later records. Gilbert Decl. Ex. I at 78:18-79:8, 66:6-69:10, 143:20-144:17. Mr. Porter agreed that some of the steps he took in performing his tracing work and drawing his conclusions were supposition. Gilbert Decl. Ex. I at 29:5-32:22; 145:22-148:6. He also admitted that he did not explain or support his valuation methodology in his declaration. Gilbert Decl. Ex. I at 91:8-11. He further acknowledged that his tracing analysis failed to separate the principal from the profits of the sale proceeds from the INJ tokens. Gilbert Decl. Ex. I at 133:7-134:16.

Respondents are concurrently moving to strike substantial portions of the Porter Declaration submitted in support of the Motion based on its fatal defects. In any event, its significant deficiencies do not support the Receiver's sweeping conclusions in the Motion based on the Porter Declaration.

III.    **THE RECEIVER BEARS THE BURDEN OF PROOF.**

Mr. Adaya does not dispute the Receiver's power to recover property belonging to the receivership entities. The Receiver's authority, however, is defined and limited by the Receiver Order, and the relief sought by the Motion goes well beyond that.

The Receiver has the burden of demonstrating that disputed assets are receivership property and must establish such claims through competent evidence. In the similar bankruptcy context, "[t]he burden of proof in a turnover proceeding . . . is at all times on the party seeking turnover." *In re Weiss-Wolf, Inc.*, 60 B.R. 969, 975 (Bankr. S.D.N.Y. 1986); *In re Vebeliunas*, 252 B.R. 878, 885-86 n.9

(Bankr. S.D.N.Y. 2000) (trustee plaintiff has burden to show by a preponderance of the evidence that they are entitled to a turnover); *accord Astraea NYC LLC v. Rivada Networks, Inc.*, No. 21 CIV. 10493 (LLS), 2023 WL 3862671, at *2 (S.D.N.Y. June 7, 2023). The Receiver has failed to carry his burden of establishing that the disputed assets are receivership property.

## IV.    ARGUMENT

The Receiver is not entitled to compel turnover of the disputed assets because they are not receivership property, and he has not met his burden to demonstrate otherwise. First, although the Motion is premised on recovering alleged proceeds of assets that purportedly emanated from the receivership entities, the lengthy definition of "receivership property" in the Receiver Order does not include "proceeds." Second, even if the Receiver Order is read to include proceeds, the Receiver has not carried his burden to prove that the disputed assets constitute receivership property. The voluminous evidence on which the Receiver relies does not support, let alone establish, that the disputed assets ever belonged to a receivership entity such that they would now be deemed receivership property. Finally, Respondents offer countervailing evidence supporting the facts as described above, which militates in favor of a finding that the disputed assets never were and are not now receivership property.

### A.    The Receiver Fails to Distinguish the Components of the Proceeds He Seeks, and the Disputed Assets Are Not Receivership Property as Defined by the Receiver Order, Which Excludes Proceeds, Unlike Comparable Orders.

As an initial matter, the Motion fails to distinguish between the two categories of value comprising the sale proceeds of the INJ token market making project: the loan principal, which belonged to and was ultimately returned to ODF, and the profit, which Mr. Adaya retained as compensation for such market making. Adaya Decl. ¶¶25, 35; Chen 2nd Decl. ¶7-8, 16-17. The Receiver instead argues that *all* of the sale proceeds are receivership property. MPA at 21. This failure ignores the Receiver's own evidence,[6] and is fatal to his argument. Even assuming, *arguendo,* the Receiver persuades the Court that compensation for the market making work performed by Mr. Adaya should instead be credited to VQR, such credit would logically only apply to the profits from the

---

[6] This distinction is absent from the Motion despite the fact that even the evidence the Receiver submitted in support makes this distinction clear. *See* ECF 233-5 ¶¶10, 11. The second Chen declaration filed herewith further clarifies the financial arrangement. Chen 2nd Decl.

marketing making efforts, (i.e., the amount Mr. Adaya was compensated). The principal portion of the proceeds (comprising over 90% of the sale proceeds) rightfully belongs to ODF, as the lender and issuer, and Mr. Adaya accordingly returned such funds to ODF in pursuant to the parties' agreement. Adaya Decl. ¶¶25, 35; Chen 2nd Decl. ¶7-8, 16-17. The Receiver inexplicably fails to discuss this critical distinction, and Mr. Porter purported not to understand it. Gilbert Decl. Ex. I at 128:23-129:8, 132:23-133:5. Even under the Receiver's strained underwriting analogy, the distinction between principal and profit is clear. MPA at 21-22.

Furthermore, even if the INJ tokens were initially deemed to be property of VQR, the Receiver does not claim that Respondents hold the actual proceeds from the sale of those tokens. MPA at 11, 13. He instead argues they "likely" have proceeds, through several transformations, of what was once VQR property, based on the opinions of Mr. Porter.[7] Such supposition is an insufficient basis to prove that the disputed assets constitute receivership property. Moreover, the Receiver Order does not include "proceeds" in its expansive definition of Receivership Property. Rather, § I.7.A of the Receiver Order limits Receivership Property to "property interests" of the receivership entities and "profits, dividends, interest, or other income" attributable to such property interests that the receivership entities "own, possess, or have a beneficial interest in, or control directly or indirectly." *Id.* The Receiver does not contend that the disputed assets are property interests that the receivership entities own, but instead argues they are "profits, dividends, interest, or other income" attributable to ***former*** property interests of the receivership entities because they "likely" are proceeds derived from "original assets" that once belonged to investors in VQR or VQR itself. MPA at 19. But "proceeds" are not "profits, dividends, interest, or other income" of property interests of the Receivership Entities. Indeed, other courts' federal receivership orders have reflected this distinction. *See*, e.g., *SEC v. Global Online Direct, Inc.*, No. 1:07-CV-0767-WSD, ECF No. 12, at 6, 16-17 (N.D. Ga. June 4, 2007) (directing receiver to take control of all "income, earnings, rents and profits of the Receiver Estate," separately from the receiver also taking control of "proceeds" of property interests of Receivership Estate); *Citizens Bank v. JES*

---

[7] *See, e.g.*, Porter Declaration, ¶101 (". . . I have reason to believe that commingled proceeds derived from the Sigma Assets were transferred to and remain in the Nguyen Account."); ¶118 (". . . I have reason to believe that commingled proceeds derived from the Sigma and VQR Assets were transferred from the Yenamandra Account to, and remain in, the Nguyen Account.")

*Global Capital, L.P.*, No. 9:21-cv-080815-AMC, ECF No. 28, at 3–4, 10 (S.D. Fla. May 14, 2021) (separate directions to take control of all "profits, dividends, interest, or other income" of the receivership entities, in addition to taking over control of "proceeds" from sale of receivership estate property); *see also CFTC v. Peregrine Finan. Grp., Inc.*, No. 1:12-cv-05383, ECF No. 28, at 4 (N.D. Ill. Jul. 17, 2012) (directing receiver to take control of "proceeds" of receivership estate property), Exs. to RJN A-C. If the Receiver in this case was intended to also have the right to "proceeds," then the Receiver Order would have so provided, particularly given that "proceeds" is a separate, defined term of art. There is no basis for the Court to now read such language into the Receiver Order, and thereby confer broader powers on the Receiver than those expressly set forth in the Court's Order.

### B.   The Receiver Has Failed to Meet His Burden to Demonstrate that the Disputed Assets are Receivership Property.[8]

There is no evidentiary support underlying the Motion's veneer of aggressive claims that the disputed VQR Assets are receivership property because VQR allegedly performed the market making work. This is the case despite the Receiver's access to VQR's documents as well as relevant documents from Injective. Gilbert Decl. ¶¶13-14. The evidence submitted with the Molina Declaration does not support the Receiver's argument, and in many instances, he failed to obtain context and explanation from the very authors of the communications on which he relies. The Receiver has also seemingly confused quantity for quality with the Porter Declaration, submitting voluminous exhibits and a lengthy tracing exercise, none of which supports the Receiver's answer to the twin, central questions of ownership of and control over the disputed assets. Finally, Respondents' proffered evidence supports their contentions that the disputed assets are *not* receivership property. The foregoing, explained in more detail below, demonstrates that the Receiver has not met his burden.

#### 1.   The Receiver's Documentary Evidence Does Not Support His Assertion that VQR Undertook the INJ Token Market Making Work and Thus That the Proceeds of Such Work are Receivership Property.

The Receiver's argument that the proceeds of the INJ token market making are receivership property is premised on his assertion that VQR—not Mr. Adaya—performed the market making work,

---

[8] Although this section focuses on the "VQR Assets," which are the heart of the Motion, the arguments herein—including the fatal deficiencies in the forensic accountant's analysis and opinions--apply with equal force to the "Sigma Assets."

but the Receiver's own proffered evidence runs contrary to this assertion. The Receiver claims that "VQR obtained the newly launched tokens" and "VQR traded these assets," citing the earlier Chen Declaration as evidence. MPA at 21. The Receiver is miscasting the evidence on which he relies. The first Chen declaration conversely states that ODF engaged "*Mr. Adaya* [to] perform market making services for the INJ token;" it never mentions VQR doing so. ECF 233-5 ¶5 (emphasis added). The Receiver's evidence expressly demonstrates that ODF issued and transferred the INJ tokens to Mr. Adaya with the understanding that *he*, not VQR, would trade them. *Id.* VQR never "obtained" them, and their owner did not transfer ownership or control to VQR. Chen 2nd Decl. ¶10. Nothing in the first Chen declaration supports this assertion, and the second confirms as much. Chen 2nd Decl. ¶¶5, 7, 10.

The Receiver next obscures the roles of the individuals involved in market making for the INJ token in service of his argument. The Receiver claims that "VQR conducted market research on the INJ token" and "VQR wrote the trading scripts" but only cites to evidence that, when scrutinized, demonstrates that Mr. Adaya—with minor assistance from Mr. Pandit—did the work separately from VQR, and discussed it on a messaging application separate from VQR's Slack instance accordingly. MPA at 12; Pandit Decl. ¶¶8-11; ECF 233-7; Adaya Decl. ¶30. The Receiver has not submitted evidence that VQR ever paid or directed its employees to perform such market making work, because they did not. And even if a small amount of VQR employee time was used to support Mr. Adaya's efforts, the Receiver provides no legal support for his argument that that somehow converts the disputed assets from the property of ODF (as to the principal) and Mr. Adaya (as to the profits) into property of VQR. The fact that Mr. Adaya (and to a very limited extent, Mr. Pandit) continued to perform the market making work in the months and year after the receivership entities ceased operating further demonstrates that the engagement was not a VQR project, such that the profits should be transferred to the receivership estate. Adaya Decl. ¶30.

The Receiver also misleads the Court by citing to evidence that, when contextualized, has nothing to do with the market making effort that generated the disputed assets. *See* ECF 233-6, 9, 10. The Receiver failed to ask the participants in the subject chats what they were talking about and whether they were involved in INJ token market making. Li Decl. ¶8; Adaya Decl. ¶¶17-19. The Receiver omitted evidence demonstrating that the VQR Slack messages he cites were about routine

tracking and scraping to feed internal models and trading algorithms. Li Decl. ¶6. The Receiver also fails to explain that newly launched tokens were *routinely* analyzed, and the resulting data fed into such models. Li Decl. ¶7. Instead, he argues that such evidence was part of VQR's alleged work for ODF/Injective. MPA at 14-15. It was not. Li Decl. ¶4. This evidence is a red herring and does not support the Receiver's argument or aid him in meeting his burden of proof.

Finally, the Receiver argues—without a single citation to evidence—that it was not possible for Mr. Adaya to undertake the market making project without VQR's technology and personnel, and thus that the profits of his work are due the receivership. MPA at 22. This is false and belied by both the Receiver's evidence and Respondents' evidence. There was no VQR technology used for such market making, nor does the Receiver identify any. Adaya Decl. ¶29; Pandit Decl. ¶11-12. There was no VQR infrastructure used for the work, and the Receiver does not identify any. *Id*. Mr. Adaya sought and obtained permission to use a VQR subaccount on the Binance exchange and did so only because of a favorable fee structure. Adaya Decl. ¶29; ECF 233-5, ¶8. Binance's infrastructure is not VQR's; the work could have easily been done elsewhere, and in fact was, for many months after VQR was shuttered. Chen 2nd Decl. ¶12; Adaya Decl. ¶31. Thus, the Receiver's argument that it was not possible for Mr. Adaya to undertake the market making project without VQR's technology and personnel is baseless, and in any event that would not support the Receiver's contention that the sale proceeds are receivership property.

### a. The Disputed Assets' Temporary Presence in a VQR-Affiliated Segregated Subaccount on the Binance Exchange Does Not Convert Them Into Receivership Property.

The Receiver argues that the fact that the disputed assets were deposited into and briefly held and traded within a bespoke subaccount within the VQR main Binance account is evidence that their proceeds are receivership property. MPA at 14. Temporary presence of assets in a Binance account affiliated with VQR does not somehow convert assets owned by ODF (principal) and Mr. Adaya (profits)_to VQR's without the owners' consent. Chen 2nd Decl. ¶¶7-10. The Receiver has offered no law supporting his novel and illogical view in this regard.

Moreover, the documentary evidence shows that all involved understood that the subaccount was specifically to be used for Mr. Adaya's market making work for ODF/Injective. Adaya Decl**. ¶¶27-

29; Pandit Decl. ¶12. Further, these assets were in fact intentionally kept separate from the other VQR funds during their short tenure in the subaccount. *Id.*[9] Both of these factors further demonstrate that VQR never obtained ownership of the INJ tokens or proceeds.

> ### b.  Mr. Adaya's Employment Agreement Did Not Prohibit His Market Making Project, and Even if it Did, That Would Not Convert the Disputed Assets into Receivership Property.

The Receiver argues that Mr. Adaya cannot "keep proceeds of VQR Assets" because his employment agreement prohibits him from doing so. MPA at 14. It does not, and, in any event, could not be grounds for converting the disputed assets into receivership property.

As an initial matter, the work Mr. Adaya did for Injective/ODF was not in breach of his employment agreement's non-compete term, which prohibits engaging in "a business that is carried on in competition with [Virgil] anywhere within the Restricted Area" without prior written consent. Molina Decl. Ex 12 §11.3. Elsewhere in that agreement "Business" is defined as investment management and managing investment funds, but not market making. *Id.* §11.1.1. Mr. Adaya's work for Injective/ODF was not competitive, as Virgil did not engage in market making work and had never been retained to do so. Adaya Decl. ¶9; Bodoia Decl. ¶13; Pandit Decl. ¶6. Rather, the investment management business in which Virgil engaged was fundamentally different than market making. Thus, there was no breach of the employment agreement by Mr. Adaya's market making work.

Even if his market making work was somehow deemed competitive under the employment agreement, Mr. Adaya had received written consent to do so when his supervisor assisted him in accessing the relevant Binance account and also messaged with him about such efforts. Adaya Decl. ¶¶27-28; Bodoia Decl. ¶¶7-8. And even assuming, *arguendo,* that the work Mr. Adaya performed was competitive and Mr. Adaya had not received prior written consent to do so, that would not somehow

---

[9] The fact pattern here is akin to that of a bank holding a special bank deposit. With a special deposit, the depositor retains title of the property deposited, which the bank must hold separate and distinct from the general assets of the bank. *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 561 (2d Cir. 1976). Because special deposits are not bank property "if a bank fails, special deposits do not become part of that receivership estate." *Merrill Lynch Mortg. Cap., Inc. v. F.D.I.C.*, 293 F. Supp. 2d 98, 103 (D. D.C. 2003). "Whether a deposit in a bank is general or special depends upon the mutual understanding and intention of the parties at the time such deposit is made." *Id.*; *see also In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 832-33 (Bankr. S.D.N.Y. 2010) (fact that the funds were to be kept separate indicative of a special deposit); *compare with Fenton v. Ives*, 634 N.Y.S.2d 833, 834 (N.Y. App. Div. 1995) (wire transfer was general deposit where no instructions concerning segregation of funds).

transform the disputed assets into receivership property. Rather, the remedy for such a hypothetical violation of the employment agreement would be damages for breach of contract, rather than forfeiture of the compensation Mr. Adaya received from ODF to the Receiver. *See Union Cap. LLC v. Vape Holdings Inc.*, No. 16 CIV. 1343 (RJS), 2017 WL 1406278, at *3 (S.D.N.Y. Mar. 31, 2017) ("It is settled, however, that a claim of conversion cannot be predicated on a mere breach of contract. Thus, where a plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." (internal quotation marks, citations, and alterations omitted)). The Receiver offers no authority to the contrary.

Finally, nothing in the employment agreement suggests that Virgil (or any receivership entity) should be entitled to the compensation for Mr. Adaya's work for ODF, nor is such an argument supported by law. *See Holtzbrinck Pub. Holdings, L.P. v. Vyne Commc'ns, Inc.*, No. 97 CIV. 1082 (KTD), 2000 WL 502860, at *10 (S.D.N.Y. Apr. 26, 2000) (company could not prove copyright ownership where company employed freelancers and there was no written agreement showing that work was to be owned solely by the company). The Receiver has not demonstrated that the market making performed by Mr. Adaya involved any of VQR's propriety information or intellectual property, nor has the Receiver shown that it was part of Mr. Adaya's work for VQR. Accordingly, the Receiver has failed to meet his evidentiary burden or legally support his argument that the employment agreement converts the disputed assets into receivership property.

### 2.    The Forensic Accountant's Testimony Does Not Support the Argument that the Disputed Assets are Receivership Property.

The Receiver relies extensively on the Porter Declaration to support his arguments that the disputed assets constitute receivership property. As noted above, Respondents are concurrently moving to strike substantial portions of the Porter Declaration based on its fatal defects, which, if granted, would gut the Receiver's primary arguments. Regardless, even if not stricken, its significant deficiencies preclude its purported support for the Receiver's contentions.

As a threshold matter, Mr. Porter admittedly lacks particular expertise for the opinions he offers and acknowledged that a layperson could readily replicate his work. Gilbert Decl. Ex. I at 34:11-35:1. Critically, he arbitrarily stopped tracing on a particular date solely because he received records only

through that date and could not explain why he failed to request additional information. Gilbert Decl. Ex. I at 66:6-68:9. Mr. Porter admittedly failed to perform further tracing because the deemed it "overly burdensome" based on the "high volume of trading" and "extensive commingling" of assets.[10] He also acknowledged that the assets purportedly traceable from VQR were commingled with assets that were indisputably not property of the receivership entities. Gilbert Decl. Ex. I at 138:25-139:10; ECF 234 at ¶45.

Furthermore, Mr. Porter admitted that his assigned valuation of the (commingled) property in Respondents' account on the date he stopped tracing was not supported by the voluminous exhibits attached to his declaration, but instead was purportedly based on information he reviewed but failed to share. Gilbert Decl. Ex. I at 73:18-75:23. Moreover, Mr. Porter admittedly *failed to value the INJ tokens on the dates they were transferred from the subaccount controlled by VQR to wallets purportedly controlled by Respondents*, although such valuation would be critical in determining the value that the Receiver contends should be recoverable by the receivership estate. Gilbert Decl. Ex. I at 100:2-18. Mr. Porter additionally acknowledged that his tracing analysis failed to separate principal from profits with respect to the sale proceeds from the INJ tokens. Gilbert Decl. Ex. I at 133:7-134:16. He also admitted that he never traced funds flowing out of Respondents' account to Injective, including to determine the extent to which principal was returned to ODF/Injective. Gilbert Decl. Ex. I at 133:17-134:3. Finally, Mr. Porter acknowledged that some of his conclusions were based on supposition or assumption, not evidence. Gilbert Decl. Ex. I at 29:5-32:22, 145:22-148:6. In view of the foregoing, the Porter Declaration does not support the Receiver's sweeping conclusions made in reliance upon it.

### C.   <u>Respondents Offer Countervailing Evidence that Shows the Disputed Assets Are Not Receivership Property.</u>

Endorsing the Receiver's position that the proceeds of the INJ tokens transferred to Mr. Adaya in October 2020 are receivership property would require ignoring the intent, conduct, and sworn testimony of the parties to the market making agreement, as well as that of the people involved in the precise conversations the Receiver cites in support of his position. It would also require ignoring the

---

[10] *See* Porter Decl. ¶118 ("Due to the extensive commingling of crypto assets, coupled with the high volume of trading that occurred in both the Yenamandra and Nguyen Accounts, further tracing of the specific Sigma Assets or VQR Assets and their proceeds would be overly burdensome for the Receiver to undertake. . .").

evidence documenting the $10 million of transfers back to ODF/Injective, the INJ tokens' owner, which Receiver and his forensic accountant inexplicably failed to consider in their incomplete analysis. Finally, Respondents have offered substantial evidence that contradicts, contextualizes, and clarifies that the Receiver's argument that the disputed assets belong to the receivership is wrong.

> **1. Mr. Adaya and ODF Had an Oral and then Written Contract and the Receiver Cannot Insert Himself into that Agreement Retroactively and Obtain its Benefits for the Receivership.**

There were two parties to the agreement to undertake INJ token market making: ODF and Mr. Adaya. Those two parties have offered entirely consistent testimony regarding the agreement, its purpose, and the consideration for the services Mr. Adaya provided. Chen 2nd Decl. ¶¶5, 7-10; Adaya Decl. ¶25-35. The Receiver has offered no evidence to support his theory that it was VQR, and not Mr. Adaya, that had the agreement, did the work, and was entitled to the compensation for same. Respondents, on the other hand, have offered substantial evidence showing that such outside projects were standard operating procedure for VQR traders, that Mr. Adaya undertook the work, it was contracted for, and that the work continued long after VQR ceased operations, further demonstrating that the engagement was not a VQR project. Bodoia Decl. ¶11; Adaya Decl. ¶¶25-35; Chen 2 Decl. ¶12-14, Pandit Decl. ¶¶7-14.

Respondents have also submitted the written contracts that memorialize the agreement, which the Receiver argues—without citing legal authority—are invalid because they were signed after the INJ tokens were transferred and by an entity that did not exist in 2020. Adaya Decl. Exs. H and I. This argument fails. The fact that a contract is executed later in time and memorializes a prior agreement does not render the agreement invalid. *See Blake v. Fiit Int'l, Inc.*, No. 05 CIV. 6150 (HBP), 2007 WL 980362, at *6 (S.D.N.Y. Mar. 30, 2007); *see also Ciaramella v. Reader's Dig. Ass'n, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997); *Playboy Enterprises, Inc. v. Dumas*, 53 F.3d 549, 559 (2d Cir. 1995) (finding that a valid contract recognizing and reaffirming work for hire status may be signed after the work is produced). Further, the fact that the named party to the agreement was Mr. Adaya's company, and not Mr. Adaya personally, does not change the ownership analysis. Respondents' evidence demonstrates the agreement's terms, from the view of both parties to it, and shows that they both acted in complete accordance with such terms. Chen 2nd Decl. ¶¶5, 7-16; Adaya Decl. ¶25-35. Most critically, the loan

principal forming the overwhelming majority of the disputed assets' value was already returned to ODF. Adaya Decl. ¶35; Chen 2nd Decl. ¶¶14-16. It is not in Respondents' account nor control; it has been returned to its rightful owner. Adaya Decl. ¶35 Chen 2nd Decl. ¶¶16-18. VQR was never a party to the agreement and the Receiver should not be permitted to now retroactively insert himself into it to changes its terms or obtain its benefit.

### 2. Respondents' Evidence Disproves the Receiver's Theory and Shows that VQR Resources Were Not Used for Market Making.

In addition to attacking the Receiver's proffered evidence, Respondents have submitted countervailing evidence demonstrating the degree to which the Receiver has misinterpreted the facts and thus failed to meet his burden. In addition to the evidence showing the oral and then written terms of the market making agreement, Respondents have offered evidence showing that: side projects were standard; Mr. Adaya undertook the market making project with VQR's full knowledge; VQR employees understood it to be his personal project, just as they had their own projects; VQR did not engage in market making work; the conversations the Receiver argues show VQR's involvement are actually about other, internal VQR projects; VQR's resources were not used for the work nor was its account required to do the work; the project survived VQR given that it was a separate undertaking; and, critically, no VQR employee was paid for the work and there is no evidence that it was tracked on the company's internal performance tracker. Adaya Decl. ¶26; Bodoia Decl. ¶15; Pandit Decl. ¶11. All of these facts show that the proceeds of the market making—including both principal and profit— never belonged to VQR and are thus not receivership property.

Finally, Respondents were able to locate and submit evidence demonstrating the existence of an actual agreement VQR entered into with a third party, Bixin. Adaya Decl. ¶21; Gilbert Decl. Exs. C, D. When that occurred, it was documented in a written agreement with clear terms, VQR was of course compensated for the work, and its employees who worked on it were entitled to profit splits. Adaya Decl. ¶¶21-22; Gilbert Decl. Ex. D at 3. The VQR management was deeply involved and directing the activity. Adaya Decl. ¶¶21-23. That stands in contrast to the ODF/Adaya market making agreement, where VQR is nowhere to be found and its management was not involved. Adaya Decl. ¶¶25, 29; Chen 2nd Decl. ¶13. This contrast shows the degree to which the Receiver's argument is

unsupported by evidence and is an inappropriate effort to obtain money to which the estate is neither entitled to factually nor under the terms of the Receiver Order.

### 3. Respondents Have Offered the Only Evidence of Disputed Asset Valuation Because the Receiver Has Offered None.

The Receiver's Motion must also fail because the Receiver has submitted no evidence demonstrating any calculations or the way he determined the amount he seeks to recover from Respondents. Where, as here, digital assets, whose value fluctuates, are at issue, evidence must be provided to support the basis for the valuations underlying the Motion. The Receiver has admitted that the INJ tokens were worth nothing or near nothing at the time they were transferred into the segregated subaccount within the VQR main Binance account. MPA at 21. He has not even alleged (let alone supported) their value at the time they were transferred to accounts purportedly under Respondents' control. MPA at 10, 13; Gilbert Decl. Ex. I at 100:2-18. Nor has the Receiver offered any support or explanation for his valuation of the total assets in Respondent's account (admittedly including non-receivership estate property) on the date that the Receiver's tracing analysis arbitrarily stopped. Gilbert Decl. Ex. I at 73:24-74:20. By contrast, the evidence Respondents have submitted explains that the disputed assets consist of principal and profit, how they were mutually valued by ODF and Mr. Adaya, and—critically—where the principal and profit are now. The Porter Declaration, which goes through an elaborate, costly and ultimately superfluous tracing exercise, does nothing to explain the crux of the dispute here: the assets' ownership, value and disposition of the principal and profits. Respondents have submitted evidence with the answers to all of these questions, and in doing so demonstrated the fatal flaws in the Receiver's arguments and failure to meet his evidentiary burden.

## V.   <u>CONCLUSION</u>

Based on the above, Mr. Adaya and Ms. Nguyen respectfully request that this Court deny the Receiver's Motion.

Dated:  October 27, 2023                    Respectfully submitted,

_____
Gary M. Kaplan (Cal. Bar No. 155530)
*Admitted Pro Hac Vice*
Aviva J.B. Gilbert (Cal. Bar No. 300091)
*Admitted Pro Hac Vice*
Farella Braun + Martel LLP
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480
Email:  gkaplan@fbm.com
             agilbert@fbm.com