# EXHIBIT I

```
1              UNITED STATES DISTRICT COURT
2             SOUTHERN DISTRICT OF NEW YORK
3
4   UNITED STATES SECURITIES AND    )
    EXCHANGE COMMISSION,            )
5                                   )
         Plaintiff,                 )
6                                   )
         vs.                        ) Case No.
7                                   ) 20-cv-10849 (JGLC)
    STEFAN QIN, VIRGIL TECHNOLOGIES )
8   LLC, MONTGOMERY TECHNOLOGIES    )
    LLC, VIRGIL QUANTITATIVE        )
9   RESEARCH, LLC, VIRGIL CAPITAL   )
    LLC, and VQR PARTNERS LLC,,     )
10                                  )
         Defendants.                )
11  _____ )
12
13
14        VIRTUAL VIDEOCONFERENCE DEPOSITION OF
15                   MARK PORTER
16
17           Thursday, October 12, 2023
18      Remotely Testifying from New York, New York
19
20
21
22
23  Stenographically Reported By:
24  Hanna Kim, CLR, CSR No. 13083
25  Job No. 6134965
```

Page 1

**Page 2**

```
1        UNITED STATES DISTRICT COURT
2        SOUTHERN DISTRICT OF NEW YORK
3
4  UNITED STATES SECURITIES AND   )
   EXCHANGE COMMISSION,         )
5                                )
         Plaintiff,             )
6                                )
      vs.           ) Case No.
7                   ) 20-cv-10849 (JGLC)
   STEFAN QIN, VIRGIL TECHNOLOGIES )
8  LLC, MONTGOMERY TECHNOLOGIES   )
   LLC, VIRGIL QUANTITATIVE      )
9  RESEARCH, LLC, VIRGIL CAPITAL  )
   LLC, and VQR PARTNERS LLC,,   )
10                               )
         Defendants.       )
11  _____ )
12
13
14      Virtual videoconference deposition of Mark
15  Porter, taken on behalf of the Defendants, remotely
16  testifying from New York, New York, upon the
17  stipulation of counsel thereof, on Thursday,
18  October 12, 2023, before Hanna Kim, CLR, Certified
19  Shorthand Reporter, No. 13083.
20
21
22
23
24
25
```

**Page 3**

```
1     REMOTE VIDEO APPEARANCES OF COUNSEL:
2
3  For Plaintiff:
4        BAKER & HOSTETLER LLP
5        BY:  JIMMY FOKAS, ESQ.
6        BY:  LAUREN BASS, ESQ.
7        BY:  JOHN CARNEY, ESQ.
8        600 Anton Boulevard, Suite 900
9        Costa Mesa, California 92626
10       jfokas@bakerlaw.com
11       lbass@bakerlaw.com
12       jcarney@bakerlaw.com
13
14
15  For Defendants:
16       FARELLA BRAUN & MARTEL LLP
17       BY:  GARY M. KAPLAN, ESQ.
18       One Bush Street, Suite 900
19       San Francisco, California 94104
20       gkaplan@fbm.com
21
22
23
24
25
```

**Page 4**

```
1              INDEX OF EXAMINATION
2
3  WITNESS:  MARK PORTER
4  EXAMINATION                          PAGE
5     BY MR. KAPLAN:                     7
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1              INDEX OF EXHIBITS
2
3  PORTER DEPOSITION EXHIBITS            PAGE
4  Exhibit 1   Declaration Mark Porter In    13
5       Support of Receiver's Motion to
6       Compel Turnover of Assets; 46
7       pages
8  Exhibit 2   "Exhibit 01" cover pages,    21
9       curriculum vitae of Mark
10      Porter; 3 pages
11  Exhibit 3   E-mail from Lauren Bass,     41
12      September 22, 2023, Subject:
13      "RE: SEC v Qin - Updated
14      Discovery + Joint Letter"; 2
15      pages
16  Exhibit 4   Porter Declaration Exhibit 57; 3   56
17      pages
18  Exhibit 5   "Tracing Chart from Paragraph   84
19      103," Porter Declaration Exhibit
20      60; 1 page
21  Exhibit 6   Porter Declaration Exhibit 03;   93
22      16 pages
23
24
25
```

2 (Pages 2 - 5)

INDEX OF EXHIBITS (CONTINUED)

PORTER DEPOSITION EXHIBITS            PAGE
Exhibit 7   Memorandum of Law In Support of    102
            Receiver's Motion to Compel
            Turnover of Compel Turnover of
            Assets; 29 pages
Exhibit 8   Document; Bates nos.            114
            SECvQ_NA_000179
Exhibit 9   Document; Bates nos.            116
            SECvQ_NA_000182 through '184
            --o0o--

Page 6

---

1       New York, New York, California

2   Thursday, October 12, 2023; 12:13 p.m., EDT

3           --o0o--

4           MARK PORTER,

5   having been duly administered an oath over

6   videoconference as stipulated by all counsel, was

7       examined and testified as follows:

8

9           EXAMINATION

10  BY MR. KAPLAN:

11      Q.  Can you state and spell your name for the

12  record, please.

13      A.  My name's Mark Porter.  It's spelled

14  M-A-R-K, P-O-R-T-E-R.

15      Q.  Thank you.                12:13:27

16          Mr. Porter, my name is Gary Kaplan.  I'm

17  an attorney with the Farella Braun & Martel law

18  firm.  We are the attorneys for the Respondents in a

19  lawsuit that's known as United States Securities and

20  Exchange Commission versus Stefan Qin, and then a   12:13:45

21  bunch of other parties, that's pending in the United

22  States District Court, for the Southern District of

23  New York.  And it's pending as Case Number

24  20-cv-10849.

25          And, in particular, we are Respondents to   12:14:02

Page 7

---

1   a motion filed by the Receiver appointed in that

2   case, whose name is Robert Musiala, M-U-S-I-A-L-A,

3   Junior.

4           And just to avoid -- try to get some

5   efficiency here, I'm going to refer to him in        12:14:21

6   shorthand as "the Receiver" in this case when --

7   when I ask you questions.

8           Is that understood?

9       A.  Understood.

10      Q.  Okay.  Have you ever had your deposition    12:14:29

11  taken before?

12      A.  No.

13      Q.  Okay.  So I'm going to go over some of the

14  ground rules just so this proceeds efficiently and

15  appropriately.                  12:14:40

16          So first and most importantly, I want you

17  to understand that because you've just been

18  administered an oath, your testimony is subject to

19  the penalty of perjury.  It's just as if you were

20  sitting in a courtroom testifying in front of a      12:14:50

21  judge.

22          Do you understand that?

23      A.  Yes.

24      Q.  Okay.  And also I want to make clear that

25  because the court reporter is transcribing the words  12:14:57

Page 8

---

1   that we say, she can only transcribe actual verbal

2   responses and not, for example, head gestures,

3   nodding, or things like uh-huh or huh-uh.  It's got

4   to be full words that are spoken in order for the

5   reporter to transcribe the record.          12:15:19

6           Is that understood?

7       A.  Yes.

8       Q.  Okay.  And, also, to get a complete

9   record.  It's important that you let me finish

10  speaking before you respond, and I will endeavor to   12:15:28

11  do the same when you speak.

12          Even if you think you know exactly what

13  I'm going to ask, please let me finish completely

14  before you answer; and, likewise, I will do the same

15  for you.                    12:15:41

16          If for any reason you don't understand a

17  question, please ask for clarification.  I will do

18  my best to clarify a question, because I want to

19  make sure that you understand what I'm asking you.

20          You might also note that during the        12:15:52

21  proceedings the attorneys for the Receiver may raise

22  legal objections after I ask a question.  And,

23  generally speaking, those are really just for the

24  record with -- with some exceptions, like, for

25  example, if they tell you "Don't answer."  You are   12:16:10

Page 9

1 supposed to still answer the question. The -- the
2 purpose of those legal objections is to -- is to get
3 the -- those -- those legal objections on the record
4 so the court can deal with them later as
5 appropriate.                          12:16:24
6        Is that understood?
7    A.  Yes.
8    Q.  Okay.  And you also have a duty to respond
9 to the best of your knowledge and recollection.
10 Even if you don't remember the precise details of a   12:16:31
11 conversation, for example, if you remember the gist
12 of it, you're supposed to provide me with -- with
13 what you remember to the best of your recollection.
14        Likewise, as to a fact, if you don't know
15 the precise number, let's say to the penny, you're   12:16:46
16 required to provide me the best estimate that you
17 can provide me.
18        Do you understand that?
19    A.  Yes.
20    Q.  Okay.  Is there any reason that you could   12:16:55
21 not test-- -- testify fully and truthfully today, for
22 example, because of a medical condition or because
23 you are under the influence of medication or drugs
24 or alcohol?
25    A.  No.                          12:17:11
                                        Page 10

1    Q.  Did you prepare at all for this deposition
2 today?
3    A.  Yes.
4    Q.  Okay.  And -- can you please describe
5 how you prepared.                      12:17:17
6    A.  I reviewed my declaration and the
7 associated exhibits, and I met with Baker.
8    Q.  Okay.  And when you say you met -- say you
9 met with Baker, you -- you met with attorneys with
10 the Baker McKenzie firm; is that correct?   12:17:31
11    A.  No, with Baker & Hostetler.
12    Q.  I'm sorry, the Baker & Hostetler firm.  My
13 apologies.
14        And did they advise you what to say or not
15 to say at this deposition?              12:17:45
16    A.  No.
17    Q.  Other than reviewing your declaration and
18 the exhibits attached to your declaration, did you
19 review any other documents in preparation for this
20 deposition?                          12:17:54
21    A.  I reviewed documents that I would consider
22 to be background documents, anything that I felt was
23 relied upon in my declaration, I believe cited in
24 the -- in the declaration.
25    Q.  Okay.  So you believe that there's   12:18:10
                                        Page 11

1 documents -- background documents that you relied
2 upon in your declaration which themselves are not
3 attached as exhibits in the declaration; is that
4 what you're saying?
5    A.  That's not what I'm saying.  The documents   12:18:24
6 that I relied on are cited as exhibits in my
7 declaration.
8    Q.  Okay.  Let me try again.
9        Other than reviewing your declaration and
10 reviewing the exhibits attached to your declaration,   12:18:32
11 did you review any other documents in preparing for
12 your deposition today?
13    A.  Yes.
14    Q.  Okay.  And which documents were those?
15    A.  I reviewed subscription documents for   12:18:45
16 investors in the Virgil Sigma fund.  I reviewed full
17 account statements, I believe; the documents cited
18 in my declaration are in -- in a handful of cases,
19 subsets of the relevant transactions; and public,
20 you know, blockchain records, I believe.   12:19:09
21    Q.  Okay.  And going to the first item, you
22 mentioned the sub-- -- subscription documents
23 regarding the Virgil Sigma funds.
24        Which particular documents did you review
25 in that regard?                        12:19:23
                                        Page 12

1    A.  I'm sorry, can you repeat the question?
2        MR. KAPLAN:  Can you read it back to him,
3 please.
4        (Record read back by the reporter.)
5        THE WITNESS:  I reviewed documents that   12:19:48
6 identified the depositors that I cite as investors.
7 I reviewed documents identifying them as subscribing
8 to those funds.
9 BY MR. KAPLAN:
10    Q.  And did you -- those so-called   12:20:09
11 subscription documents, did you rely on any of those
12 in creating the statements that are in your
13 declaration?
14    A.  I'm not sure I would say relied on.  I --
15 I think they supported the statement that -- that   12:20:31
16 the depositors were investors.
17    Q.  Okay.  Let's -- let's take a look at the
18 first exhibit.  We've marked it Exhibit 1.  Let me
19 know when you have it handy.
20        (Porter Deposition Exhibit 1 was marked   12:20:55
21 electronically.)
22        THE WITNESS:  Okay.  Can I open the
23 document?
24 BY MR. KAPLAN:
25    Q.  Yes.                          12:20:58
                                        Page 13

4 (Pages 10 - 13)

1  A.  Okay.  I see it.
2  Q.  Okay.  Have you ever seen Exhibit 1
3 before?
4  A.  Yes.
5  Q.  Okay.  Is this the declaration we've been    12:21:11
6 referring to that you filed or caused to be filed in
7 the court case that I referenced earlier?
8  A.  It is.
9  Q.  Okay.  And I just want to confirm, on the
10 last page of the document, is that your signature?    12:21:26
11  A.  Yes.
12  Q.  Okay.  Before we delve into the contents
13 of the declaration, I wanted to just go over some of
14 your background biographical information, some of
15 which is referenced in Exhibit 1 to your    12:21:50
16 declaration.
17     The -- fir- -- first, the -- what -- what
18 degrees of higher learning have you attained, if
19 any?
20  A.  I have a bachelor's degree in finance and    12:21:59
21 accounting from the University of South Carolina.
22  Q.  Okay.  And when did you graduate there?
23  A.  2017.
24  Q.  Okay.  And did you graduate with any sort
25 of honors?    12:22:12

Page 14

1  A.  I graduated magna cum laude.
2  Q.  Have you received any other degrees from a
3 [verbatim] in- -- institute of higher -- of higher
4 education?
5  A.  I have not.    12:22:23
6  Q.  And are you licensed in any profession?
7  A.  Yes.  I'm a certified public accountant.
8  Q.  Okay.  And how long have you been
9 certified as a public accountant?
10  A.  Since early 2018, I believe.    12:22:37
11  Q.  Okay.  Do you have any other licenses --
12 professional licenses?
13  A.  Yes.  I'm a certified fraud examiner, and
14 I'm also a -- a certified cryptocurrency forensic
15 investigator.    12:22:52
16     And I apologize, I believe that second
17 certifications not listed on my -- my CV in
18 Exhibit 1.
19  Q.  And the -- first going to the certified
20 fraud examiner, how long have you been certified as    12:23:06
21 that?
22  A.  I believe I re- -- received that
23 certification sometime in 2018 as well.
24  Q.  Okay.  I think your LinkedIn profile says
25 2020.    12:23:21

Page 15

1     Are -- are you sure it's 2018?
2  A.  I thought it was 2018 based on my
3 recollection.  If you say that that's what it says
4 in my LinkedIn profile, then I'm sure that's
5 accurate.    12:23:33
6  Q.  Okay.  And when were you certified as a
7 cryptocurrency foren- -- forensic investigator?
8  A.  I believe that was November of 2022.
9  Q.  Okay.  Other than the three you just
10 mentioned, do you hold any other professional    12:23:45
11 licenses or certifications?
12  A.  I do not.
13  Q.  Have you ever been convicted of a felony?
14  A.  No.
15  Q.  Have -- have you ever been convicted of    12:23:53
16 any crime?
17  A.  No.
18  Q.  Who is your current employer?
19  A.  Ankura Consulting.
20  Q.  Okay.  And how long have you been employed    12:24:02
21 there?
22  A.  I've been employed there since they
23 acquired Navigant in, I believe, 2020.  I've never
24 left the company that I've been a part of.  It was
25 originally Navigant.  Our operating segment was    12:24:15

Page 16

1 fired by Ankura.  And I've been in that -- that role
2 since June of 2017.
3  Q.  Okay.  And, again, I be- -- I think your
4 LinkedIn profile says you've been employed at Ankura
5 since 2017.    12:24:30
6     Is that accurate, or is what you just told
7 me is accurate?
8  A.  I've been employed since June of 2017
9 at -- at Navigant Con- -- at Ankura Consulting,
10 previously Navigant Consulting.    12:24:39
11  Q.  Okay.  I -- I want to try and separate the
12 two.
13     So just at Ankura, did your employment
14 start there in 2020, as I believe you indicated
15 earlier, or in 2018, as I believe your LinkedIn    12:24:50
16 profile states?
17  A.  I --
18     MR. FOKAS:  Objection.
19     THE WITNESS:  I believe my LinkedIn
20 profile is referring to when it -- when our    12:24:56
21 operating segment became part of Ankura.
22     THE COURT REPORTER:  I'm going to ask both
23 of you to slow down, please.
24     MR. KAPLAN:  Okay.
25 BY MR. KAPLAN:    12:25:11

Page 17

5 (Pages 14 - 17)

1    Q.  And -- so if I understand it, your prior
2  employer before Ankura was Navigant; is that right?
3    A.  Yes.
4    Q.  Okay.  And how long were you employed at
5  Navigant?                        12:25:23
6    A.  I started working at Navigant full-time in
7  the summer of 2017, June 2017.
8    Q.  Okay.  And when did you stop working at
9  Navigant?
10    A.  Navigant was acquired by Ankura in, I    12:25:34
11  believe, the summer of 2018.
12    Q.  And what is your current position at
13  Ankura?
14    A.  I'm a director.
15    Q.  And how long have you held that position?  12:25:58
16    A.  Since March of 2020 -- I'm sorry, March of
17  2022.
18    Q.  So about a year and a half; right?
19    A.  I believe that's correct, yes.
20    Q.  Okay.  And before that, you were an      12:26:20
21  associate there; is that right?
22    A.  I was a senior associate.
23    Q.  So turning your attention back to
24  Exhibit 1, and -- and particularly the first page,
25  first sentence, it says in -- "I am a Director in  12:26:40

Page 18

1  the Risk, Forensics & Compliance group at Ankura
2  Consulting Group, LLC," referred to in the
3  parenthetical as "Ankura," "which provides forensic
4  accounting and analysis services to the Receiver,
5  Robert Musiala, Jr." [as read] -- it refers to the  12:27:00
6  defined term "Receiver" in the parentheses -- "in
7  the above-captioned matter."
8       Is that an accurate statement?
9    A.  Yes.
10    Q.  Okay.  And then the next sentence says,   12:27:13
11  "Since February 4th, 2021, Ankura has been engaged
12  by the Receiver to assist with its investigation."
13  [As read]
14       Is that a correct statement -- or an
15  accurate statement?                 12:27:22
16    A.  Yes.
17    Q.  Okay.  When did you begin --
18    A.  To the best of my knowledge.
19       (Interruption in audio/video.)
20       THE COURT REPORTER:  I'm sorry, I can't   12:27:30
21  hear.  I didn't hear the last part.
22       THE WITNESS:  Yeah, to the best of my
23  knowledge, that is correct.
24  BY MR. KAPLAN:
25    Q.  How did you come up with that date?      12:27:39

Page 19

1    A.  I -- I believe that that was the date
2  that -- that we were retained.
3    Q.  Okay.  And the next sentence says, "I
4  submit this Declaration in support of the Receiver's
5  Motion to Compel Turnover" -- "Turnover of Assets."  12:28:02
6       Is that an accurate statement?
7    A.  Yes.
8    Q.  Okay.  Approximately when did you begin
9  your work in connection with this referenced
10  turnover motion?                   12:28:10
11    A.  I believe May of 2023.
12    Q.  The next -- I'm sorry, switch to the --
13  the third paragraph that starts on the bottom of
14  page 1 and continues on to the top of page 2.  It
15  says, "I am a seasoned forensic accountant with more  12:28:36
16  than six years of experience in fraud and accounting
17  irregularity investigations, forensic accounting,
18  asset tracing, and oth" -- "and other related
19  services for both traditional and digital financial
20  instruments.  I am also well-versed in conducting   12:28:53
21  tracing analyses involving cryptocurrencies."  And
22  it cites to your attached CV as -- as Exhibit 1.
23       Are those accurate statements that I've
24  just read?
25    A.  Yes.                    12:29:06

Page 20

1    Q.  Okay.
2       MR. KAPLAN:  I've just marked Exhibit 2.
3       (Porter Deposition Exhibit 2 was marked
4       electronically.)
5  BY MR. KAPLAN:                    12:29:41
6    Q.  Please let me know when you have it handy.
7    A.  Okay.
8    Q.  Okay.  Do you -- have you ever seen
9  Exhibit 2 before?
10       MR. FOKAS:  He's -- he's still opening the  12:30:00
11  document.
12       THE WITNESS:  Yeah, I -- this appears to
13  be my CV.
14  BY MR. KAPLAN:
15    Q.  Okay.  So this is the CV that's referenced  12:30:10
16  as being attached as Exhibit 1 to your declaration;
17  correct?
18    A.  I believe that's correct.
19    Q.  Okay.  Sir, turning your attention to the
20  first page, and there's a bullet point near the     12:30:22
21  bottom, that's headed "Consulting and Asset Tracing
22  Services - Digital Asset and Decentralized Fi-" --
23  Finance Reviews," do you see that?
24    A.  Yes.
25    Q.  Okay.  So that paragraph discusses various  12:30:36

Page 21

6 (Pages 18 - 21)

1 work you've done, and it says, including
2 assisting -- "assist relevant parties with the
3 tracing of those digital assets through various
4 blockchains, smart contracts, and platforms."
5      Do you see that?           12:30:57
6 A. Yes.
7 Q. Okay. Does -- does the current engagement
8 in which you're working for the Receiver, is that
9 one of the engagements referenced in this paragraph
10 or not?                        12:31:10
11 A. It is not.
12 Q. Okay. Then turning to the next page and
13 near the -- it's the third-to-last bullet point
14 that's labeled "Consulting Services - Asset Tracing
15 and Flow of Funds Analyses," then in parentheses     12:31:28
16 "Various."
17      Do you see that?
18 A. Yes.
19 Q. Okay. It -- there it says, "Supported the
20 US DOJ, SEC, and other clients in a wide variety of  12:31:35
21 engagements in a forensic accounting and consulting
22 capacity, including providing them with asset
23 tracing and flow of funds analyses," and it goes on.
24      Is -- is that a reference to any of the
25 work you've been retained to do in this case?        12:31:52
                                              Page 22

1 A. It is not.
2 Q. Okay. Is there anything on your CV that
3 references the work that you've been retained to do
4 in this case?
5 A. No.                          12:32:05
6 Q. Have you been retained in this case to
7 conduct a forensic accounting and analysis with
8 respect to the transactions discussed in your
9 declaration?
10 A. I have not.                   12:32:17
11 Q. Okay. So then what -- what were you asked
12 to do, then, in terms of the -- the work you did
13 that's described in your declaration?
14 A. I was asked to trace certain assets back
15 to their source, to the best of my ability, and as   12:32:40
16 far sort of downstream, as I could.
17 Q. Anything else?
18 A. No.
19 Q. So your role was limited to just tracing
20 assets and not performing any related analysis with  12:33:08
21 respect to that tracing; is that correct?
22 A. Yes.
23 Q. And were you tasked -- tasked with forming
24 any opinions or conclusions regarding the results of
25 the tracing that you did?      12:33:30
                                              Page 23

1 A. I would say that the tracing is itself a
2 conclusion. I wasn't asked to give any opinions.
3      (Interruption in audio/video.)
4      THE COURT REPORTER: Could you please
5 repeat the last sentence.        12:33:46
6      THE WITNESS: I wasn't asked to give any
7 opinions.
8 BY MR. KAPLAN:
9 Q. Okay. And regardless of whether you were
10 asked or not, did you actually give any opinions of   12:33:53
11 that sort? And I -- what I mean is opinions
12 regarding the results of your tracing in -- in your
13 declaration?
14      MR. FOKAS: Objection.
15      THE WITNESS: I don't believe I gave any   12:34:06
16 opinions.
17 BY MR. KAPLAN:
18 Q. Okay. Please turn to Paragraph 101 of
19 your declaration on page 37, and let me know when
20 you're there.                  12:34:18
21 A. Okay.
22 Q. Okay. So this is -- there's a heading
23 that's labeled "Conclusions Regarding Yenamandra and
24 Nguyen Accounts."
25      MR. KAPLAN: And for the reporter, I'll   12:34:58
                                              Page 24

1 just spell those names, Y-E- -- Y-E-N-A-M-A-N-D-R-A
2 and then N-G-U-Y-E-N.
3 BY MR. KAPLAN:
4 Q. And Paragraph 101 says, "Based on (a) my
5 tracing of the Sigma Assets to the Yenamandra        12:35:17
6 Account, coupled with (b) the fact that I have not
7 been able to identify the return by Adaya of any
8 Sigma Assets to Qin or the Receivership Entities,
9 (c) the extensive trading and commingling of the
10 Sigma Assets within the Yenamandra Account, and the  12:35:44
11 (d) final transfers of the Yenamandra Account
12 balance to the Nguyen Account, I have reason to
13 believe that commingled proceeds derived from the
14 Sigma Assets were transferred to and remain in the
15 Nguyen Account."                12:36:08
16      First, let me ask you, are those accurate
17 statements?
18 A. Yes.
19 Q. Okay. And do you agree that your
20 statement "I have reason to believe," which follows  12:36:17
21 the various root -- reasons why you have the belief,
22 reflects an opinion that you've drawn regarding your
23 tracing analysis?
24      MR. FOKAS: Objection.
25      THE WITNESS: I would not agree with that. 12:36:36
                                              Page 25

7 (Pages 22 - 25)

1 BY MR. KAPLAN:

2    Q.  Okay.

3        Okay.  So what does the "I have reason to

4 believe" mean then?

5    A.  I think that's a logical conclusion based    12:36:43

6 on the facts that I outlined in my declaration.

7    Q.  Okay.  So it's a conclusion you drew after

8 the tracing analysis you undertook and your belief

9 as to the results of that tracing analysis; correct?

10       MR. FOKAS:  Objection.                    12:37:02

11       THE WITNESS:  I think it's a reasonable

12 conclusion that -- that I reached based on the facts

13 that I outlined.

14 BY MR. KAPLAN:

15    Q.  Were you asked to draw conclusions from    12:37:13

16 the tracing analysis you undertook?

17    A.  I was asked to, as I said, trace certain

18 assets to their source and as far as I felt that I

19 could reasonably trace them to a -- a final

20 destination.                                     12:37:32

21    Q.  Let me try again because I don't

22 think you answered my question.  I understand you

23 were engaged to perform a tracing.

24       My question was whether you were also

25 asked to provide conclusions regarding the tracing    12:37:44

Page 26

1 you had done.

2       MR. FOKAS:  Objection.  Asked and

3 answered.

4       THE WITNESS:  I -- I believe the tracing

5 is itself a conclusion.                           12:37:53

6 BY MR. KAPLAN:

7    Q.  Okay.  And where in the tracing, then,

8 is -- is this -- is the statement -- or, I'm sorry,

9 is -- is the evidence for your reason to believe,

10 and that is "reason to believe that commingled    12:38:12

11 proceeds derived from the Sigma Assets were

12 transferred to and remain in the Nguyen Account"?

13       MR. FOKAS:  Objection.

14       THE WITNESS:  I think we'd need to walk

15 through the -- the transfer of the VQR assets to the    12:38:28

16 Yenamandra account and then to the Nguyen account

17 to -- to answer that clearly.

18 BY MR. KAPLAN:

19    Q.  Okay.  I just want to be clear.  The --

20 the "reason to believe" statement is because you    12:38:44

21 don't know for a fact; is that right?

22    A.  That is not right.

23       MR. FOKAS:  Objection.

24 BY MR. KAPLAN:

25    Q.  Okay.  So you know for a fact that    12:38:52

Page 27

1 commingled proceeds derived from the Sigma assets

2 were transferred to and remain in the Nguyen

3 account; is that correct?

4    A.  That is not correct.

5    Q.  Okay.                                12:39:04

6    A.  I -- I reached that conclusion based on

7 the facts outlined in my declaration.

8    Q.  Okay.  So you don't know it for a fact.

9 It's -- it's -- it's a conclusion you reached, but

10 you don't know for certain; right?             12:39:15

11       MR. FOKAS:  Objection.  Asked and

12 answered.  Mischaracterizes his testimony.

13       THE WITNESS:  That's not correct.

14 BY MR. KAPLAN:

15    Q.  Okay.  Do you understand the difference    12:39:23

16 between a fact and an opinion?

17    A.  Yes.

18    Q.  Okay.  So, like, for example, two plus two

19 equals four is a fact; right?

20       MR. FOKAS:  Objection.                12:39:33

21       THE WITNESS:  Yes.

22 BY MR. KAPLAN:

23    Q.  Okay.  And whether extraterrestrial life

24 exists in other -- on other planets is -- is not a

25 fact, it's an -- what your -- someone's view on that    12:39:43

Page 28

1 is an opinion rather than a -- a fact; correct?

2       MR. FOKAS:  Objection.

3       THE WITNESS:  Sure.  Yes.

4 BY MR. KAPLAN:

5    Q.  Okay.  So when you -- do you agree that    12:39:52

6 you don't -- do not know for certain that commingled

7 proceeds derived from the Sigma -- Sigma assets were

8 transferred to and remain in the Nguyen account?

9       MR. FOKAS:  Objection.  Asked and

10 answered.                                       12:40:10

11       THE WITNESS:  I believe that that is a

12 conclusion, a reasonable conclusion based on the

13 facts that I've outlined.

14 BY MR. KAPLAN:

15    Q.  Okay.  But you don't know for a certainty;    12:40:18

16 correct?

17       MR. FOKAS:  Objection.  Asked and answered

18 four times now.

19       THE WITNESS:  That's not correct.

20 BY MR. KAPLAN:                                 12:40:24

21    Q.  Okay.  You -- you -- so you know for a

22 certainty that commingled proceeds derived from the

23 Sigma assets were transferred to and remain in the

24 Nguyen account?

25       MR. FOKAS:  Objection.  Counsel, that's    12:40:34

Page 29

8 (Pages 26 - 29)

1 five times now.  Asked and answered.
2        THE WITNESS:  It's a conclusion that I
3 reached based on the facts outlined in my
4 declaration.
5 BY MR. KAPLAN:                    12:40:42
6    Q.  Let me ask you to turn to Paragraph 118 of
7 your declaration, which is on page 45.  And let me
8 know when you're there.
9        MR. FOKAS:  And just to interrupt for a
10 second, I apologize.  Hanna, you're able to hear me;  12:41:02
11 right?  You're able hear my objections?
12      THE COURT REPORTER:  Yes.
13        MR. FOKAS:  Okay.  Thank you.  Sorry,
14 Gary.
15        THE WITNESS:  Okay.              12:41:16
16 BY MR. KAPLAN:
17    Q.  So this is under the heading "ACTIVITY IN
18 YENAMANDRA AND NGUYEN ACCOUNTS."  [As written]
19        And I'm going to ask you to look at the
20 last five lines of that Paragraph 118.        12:41:29
21        (Interruption in audio/video.)
22        THE COURT REPORTER:  Excuse me, one
23 second.
24        MR. FOKAS:  John, you're -- you're --
25 you're not muted.  Please mute.          12:41:39
                                         Page 30

1        Sorry about that.
2 BY MR. KAPLAN:
3    Q.  And asking you to look to the last five
4 lines of Paragraph 118, it says, "Based on my review
5 of the transactional records related to the      12:41:53
6 Yenamandra and Nguyen Accounts, coupled with the
7 fact that none of the Sigma or VQR Assets were
8 returned to Qin or the Receivership Entities, I have
9 reason to believe that commingled proceeds derived
10 from the Sigma and VQR Assets were transferred from  12:42:15
11 the Yenamandra account to, and remain in, the Nguyen
12 Account."  [As written]
13        First, let me ask you if that's an
14 accurate statement?
15    A.  Yes.                    12:42:28
16    Q.  Okay.  And the "I have reason to believe"
17 language, is that also a reflection that you were
18 not able to determine for a certainty, whether
19 commingled proceeds derived from the Sigma and VQR
20 assets were actually transferred from the Yenamandra  12:42:43
21 account to and remained in the Nguyen account?
22    A.  It -- it is similarly, I think, a
23 reasonable conclusion that I came to based on the
24 facts outlined in my declaration.
25    Q.  Okay.  So, again, it's a -- a -- a      12:43:05
                                         Page 31

1 conclusion you drew, but it's not a clear absolute
2 factual certainty; is that right?
3        MR. FOKAS:  Objection.
4        THE WITNESS:  It's a reasonable conclusion
5 that I think any reasonable accountant would      12:43:18
6 similarly come to.
7 BY MR. KAPLAN:
8    Q.  And have you discussed this issue with any
9 other reasonable accountants?
10    A.  This tracing is entirely my own.      12:43:32
11    Q.  Okay.  So what's your basis for believing
12 that any other reasonable accountant would come to
13 the same conclusion?
14    A.  I'd be happy to walk you through the
15 exhibits and -- and why I have that opinion, but I   12:43:47
16 think it's -- I think it's an entirely reasonable
17 conclu- -- conclusion.
18    Q.  Okay.  Other than you thinking it's
19 reasonable, though, do you have any other basis to
20 believe that other accountants, any other reasonable  12:43:58
21 accountants would agree with your conclusion?
22    A.  It's a logical conclusion.
23    Q.  Okay.  So these two conclusions that we've
24 just discussed, the one from Paragraph 101 and now
25 the one from Paragraph 118 of your declaration,     12:44:12
                                         Page 32

1 would you say these are based on your particular --
2 particular specialized knowledge that you are
3 providing in order to try to help the -- the reader,
4 which is in this case, the Court, understand the --
5 the evidence that you've presented here, including   12:44:31
6 the transaction records that are attached as
7 exhibits to your declaration?
8        MR. FOKAS:  Objection.  Compound question.
9        THE WITNESS:  I'm not sure I understand
10 the question.                    12:44:41
11 BY MR. KAPLAN:
12    Q.  Okay.  Did -- when you just referred to a
13 moment ago "any reasonable accountant would draw the
14 same conclusions," is that because your conclusions
15 are based on a combination of you looking at the    12:44:50
16 transaction records and your own specialized
17 knowledge, including your expertise as a certified
18 public accountant and certified fraud examiner and
19 certified cryptocurrency forensic investigator?
20        MR. FOKAS:  Objection.          12:45:15
21        THE WITNESS:  I'm not sure I understand
22 the question.  Could you please repeat that?
23 BY MR. KAPLAN:
24    Q.  I'm trying to understand why a reader
25 should believe your particular conclusions.  And I   12:45:30
                                         Page 33

9 (Pages 30 - 33)

1 believe you were explaining that because of your
2 expertise as an accountant, you drew certain
3 conclusions; correct?
4        MR. FOKAS:  Objection.
5        THE WITNESS:  That's not correct.        12:45:42
6 BY MR. KAPLAN:
7    Q.  Okay.  So let me ask you, was your
8 specialized knowledge and training at all useful or
9 used in your analysis here?
10   A.  I don't believe it's necessary.        12:46:00
11   Q.  So would you say a layperson, in other
12 words, somebody that doesn't have training as a CPA
13 or a certified fraud examiner -- fraud examiner or a
14 certified cryptocurrency forensic investigator,
15 could do the same thing you did, do the same tracing   12:46:20
16 and come to the same conclusions that you did,
17 without any specialized knowledge or expertise?
18 Is -- is that what you're saying?
19   A.  I think somebody who understood how to
20 apply a LIFO methodology could clearly trace assets   12:46:36
21 under that methodology, as I have to the Yenamandra
22 account.  At which point, I think the tracing of
23 funds from the Yenamandra account to the Nguyen
24 account, as I've laid it out, is a logical
25 conclusion based on the transaction records in those   12:46:52
                                                    Page 34

1 accounts.
2    Q.  Okay.  So if your expertise and
3 specialized knowledge does not matter, what's the
4 purpose of Paragraph 6 of your declaration that we
5 read earlier?                                12:47:08
6        MR. FOKAS:  Objection.
7 BY MR. KAPLAN:
8    Q.  Oh, I'm sorry, Paragraph 3 of your
9 declaration.  I apologize.
10   A.  I felt it was useful to the reader to      12:47:21
11 understand my background.
12   Q.  Okay.  But this background was not
13 relevant to the analysis or tracing you did;
14 correct?
15   A.  I think given my background, I have an     12:47:35
16 understanding of the LIFO methodology, I think, as I
17 stated, that would be necessary to conduct the
18 tracing.
19   Q.  And LIFO just means "last in, first out";
20 is that correct?                              12:47:48
21   A.  That's correct.
22   Q.  Okay.  So as long as you told someone to
23 use that methodology, meaning, for all transactions
24 assume last in, first out, they could do -- do the
25 same thing you did without any specialized knowledge  12:48:02
                                                    Page 35

1 or experience; is that correct?
2        MR. FOKAS:  Objection.
3        THE WITNESS:  They could follow the LIFO
4 tracing to the Yenamandra account; that's correct.
5 BY MR. KAPLAN:                                12:48:12
6    Q.  So if anyone could do it, why -- why are
7 they paying you $350 an hour to do it?
8        MR. FOKAS:  Objection.  Calls for
9 speculation.
10       THE WITNESS:  I'm -- I'm not sure.        12:48:30
11 BY MR. KAPLAN:
12   Q.  Are all the opinions or conclusions you
13 express in your declaration and the reasons for
14 those opinions and conclusions all reflected by the
15 exhibits that are attached to your declaration or    12:49:18
16 the contents of the declaration itself?
17       MR. FOKAS:  Objection.
18       THE WITNESS:  Yes, I believe so.
19 BY MR. KAPLAN:
20   Q.  And are all the facts and data that you    12:49:33
21 considered in forming your opinions and conclusions
22 in your declaration either in the declaration itself
23 or attached as exhibits to the declaration?
24   A.  As I mentioned, I considered background
25 documents including, in some cases, subsets of these  12:49:55
                                                    Page 36

1 account records, which were hundreds of pages long.
2 But I -- anything that would be needed to conduct
3 this tracing, I believe is cited as an exhibit.
4    Q.  Let me try again because I -- I think
5 you've already acknowledged that your -- that the    12:50:26
6 contents of your declaration is not limited to
7 tracing.  You actually also drew some conclusions
8 from the tracing; correct?
9        MR. FOKAS:  Objection.  Mischaracterizes
10 his testimony.                               12:50:38
11       THE WITNESS:  That's not correct.
12 BY MR. KAPLAN:
13   Q.  Okay.  So are you saying that every word
14 in your declaration is just tracing and nothing
15 else?                                        12:50:45
16   A.  My declaration is a tracing of the assets
17 that are included in there as far as I can take
18 them.
19   Q.  Okay.  And also, as we just talked about
20 in both Paragraphs 101 and 118, you drew some       12:51:06
21 conclusions from the tracing you did; correct?
22   A.  Again, I think the -- the entire -- the
23 entire tracing exercise is a conclusion.
24   Q.  So each time you trace one transaction, in
25 your mind, that's a conclusion?              12:51:30
                                                    Page 37

                                          10 (Pages 34 - 37)

1    A.  Following a LIFO methodology, yes.
2    Q.  Okay.  When you say you have reason to
3  believe that certain money is still in a particular
4  account, and that's because of a combination of
5  things that you observed have happened, in other        12:51:49
6  words, transfers within that account and things that
7  you say have not happened, which is money coming out
8  of that account, that's something that goes beyond
9  just tracing.  And that's -- that's an actual
10  conclusion of yours; correct?                            12:52:04
11      MR. FOKAS:  Objection.  I'm not sure there
12  was a question.
13      THE WITNESS:  I'm -- I'm not sure what the
14  question is.
15  BY MR. KAPLAN:                                           12:52:11
16    Q.  Okay.  So in both Paragraph 101 and 118,
17  you drew a conclusion that you have reason to
18  believe that certain proceeds from particular assets
19  remain in a particular account; correct?
20    A.  I drew a logical conclusion as to where        12:52:25
21  the assets could be traced to.
22    Q.  Okay.  And isn't -- part of your
23  conclusion is because it says none of the assets
24  were returned to Qin or the receivership estate
25  [verbatim]; right?                                       12:52:48

Page 38

1      MR. FOKAS:  Objection.
2      THE WITNESS:  Is the question that I -- I
3  see that sentence.  I'm not sure I understand the
4  question.
5  BY MR. KAPLAN:                                           12:52:53
6    Q.  Okay.  So -- so that's not -- that's not
7  tracing; that's something -- that is something else.
8  That is your statement that something was not done;
9  correct?
10    A.  I -- it's my understanding that that was      12:53:02
11  not done.
12    Q.  Okay.  Right.
13      And that's not -- that's not tracing;
14  that's just your understanding of what did or did
15  not happen; correct?                                    12:53:16
16    A.  I see no documents that suggest that that
17  was the case, and I would consider that part of the
18  tracing if there were documents that suggested that.
19    Q.  Okay.  Is there any other -- other than
20  what is actually in your declaration and the          12:53:30
21  exhibits that are attached to your declaration, are
22  there any facts or data that you used to -- to
23  conclude that none of the assets were returned to
24  Qin or the receivership entities?
25      MR. FOKAS:  Objection.                            12:53:51

Page 39

1      THE WITNESS:  I -- I'm not sure how there
2  would be a -- a -- a document to rely on.  I would
3  be proving a negative.  Right?  I've seen no
4  document that -- that -- that happened.
5  BY MR. KAPLAN:                                           12:54:03
6    Q.  Have you ever testified as an expert
7  before, either in a trial or at -- at a deposition?
8    A.  No.
9    Q.  Have you ever published anything
10  professionally?                                         12:54:59
11    A.  No.
12    Q.  Are you being compensated for your work
13  for the Receiver?
14    A.  I'm being paid by Ankura regardless of
15  any -- any work that I do on this matter.              12:55:12
16    Q.  And what's your billing rate in this
17  matter?
18    A.  I -- to be clear, I don't get paid for --
19  for the rate that's charged on this matter.  Ankura
20  does.                                                   12:55:26
21    Q.  I understand.
22      And for that engagement what is the
23  billing rate used for you for this matter?
24    A.  I believe it was $350.
25    Q.  And to date, how many hours of work have      12:55:36

Page 40

1  you worked on this particular matter?
2    A.  I believe somewhere between 80 and 100.
3    Q.  Okay.
4      MR. KAPLAN:  I've just marked another
5  exhibit as Number 3.                                    12:56:11
6      (Porter Deposition Exhibit 3 was marked
7      electronically.)
8  BY MR. KAPLAN:
9    Q.  Please let me know when you have it
10  available.                                              12:56:18
11    A.  Okay.
12    Q.  Have you ever seen Exhibit 3 before?
13    A.  I have not.
14    Q.  Okay.  So I will represent to you, this is
15  an e-mail that I received from Lauren Bass from the   12:57:15
16  Baker firm, who's counsel to the Receiver here, on
17  February -- I'm sorry, on September 22nd, 2023.
18      Do you have any reason to believe it's
19  what I've just said it is, Exhibit 3?
20    A.  No.                                              12:57:36
21    Q.  Okay.  I'm going to turn your attention to
22  the -- near the bottom of the first page under
23  Romanette vi.  Do you see where it says, first in
24  black ink, "a statement of the compensation paid or
25  to be paid to Porter for his work and testimony in   12:57:50

Page 41

11 (Pages 38 - 41)

1 the case."
2       Then it says in blue ink, "Mr. Porter,
3 Director at Ankura Consulting, provided services in
4 preparation of his declaration and incurred a total
5 of 90.4 hours at a rate of $350 per hour for a total   12:58:07
6 of $31,640."
7       First, do you see that?
8    A.  Yes.
9    Q.  Okay.  And second, just to orient you, if
10 you look at the top of the e-mail, right where it   12:58:22
11 says, after "Aviva/Gary."  And, again, this is an
12 e-mail from Ms. Bass.  It says, "Please see below in
13 blue for information perturning" -- sorry --
14 "pertaining to the revised RFP 12."  [As read]
15       So as you can see, the -- the blue ink is   12:58:37
16 Ms. Bass's responses to inquiries we've made.
17       With that as context, is that an accurate
18 statement that you provided services in preparation
19 of your declaration and incurred a total of about
20 90 hours at a rate of about -- at a rate of $350 an   12:59:00
21 hour, for a total of 31 -- 31,640?
22       MR. FOKAS:  Objection.
23       THE WITNESS:  I -- I have no reason to
24 think that that's not the case.  I'm not involved
25 with billing at Ankura.                          12:59:15

Page 42

1 BY MR. KAPLAN:
2    Q.  Okay.  And are you being additionally
3 compensated -- or strike that.
4       Is Ankura being additionally compensated
5 for your work in connection with this deposition,   12:59:26
6 including the preparation and your appearance today?
7    A.  Ankura is being paid for my time billed on
8 this matter.
9    Q.  Okay.  And does that include your -- the
10 time you're spending today on this deposition?   12:59:36
11   A.  Yeah, I believe so.
12   Q.  Does -- does it include the time you've
13 spent preparing for this deposition?
14   A.  So to be clear, I believe that -- that
15 90 hours is as of September 22nd, so that would not   12:59:53
16 be inclusive of any time that I've spent preparing
17 for this deposition after that date.  But yes,
18 they would be -- they would be compensated for that
19 time.
20   Q.  Okay.  And since September 22nd,   13:00:09
21 approximately how much time have you spent with
22 respect to this matter?
23   A.  I -- I haven't looked at it.
24       MR. FOKAS:  Don't -- don't guess.
25       THE WITNESS:  Okay.   13:00:23

Page 43

1       Yeah, I don't want to speculate.
2 BY MR. KAPLAN:
3    Q.  Okay.  To the -- to the -- to the closest
4 100 hours, how many hours have you spent since
5 September 22nd?                           13:00:33
6    A.  Probably 100 hours to the closest hundred.
7    Q.  Okay.
8       MR. FOKAS:  Just to -- just to be clear,
9 you're talking from 90 -- from the 90 hours that was
10 in the e-mail, or are you talking about 100 hours on   13:00:43
11 top of the 90 hours that was in the e-mail?
12       MR. KAPLAN:  Well, his testimony would be
13 as of -- was as of September 22nd, it's about
14 90 hours.  We're talking about the period since
15 then.                                     13:00:58
16       THE WITNESS:  Yeah, I mean, you're asking
17 me to round with -- within 100 hours.  That's a --
18 it's less than 100 hours.
19 BY MR. KAPLAN:
20   Q.  Okay.  Is it -- is it closer to 50 hours   13:01:06
21 or 100 hours, the time you've spent since
22 September 22nd?
23   A.  It's probably closer to 50.
24       MR. FOKAS:  Yeah, I'm going to object to
25 that line.  I think that's misleading.   13:01:19

Page 44

1 BY MR. KAPLAN:
2    Q.  Is Ankura being paid on -- solely based on
3 the hours that you spend in this matter, or is there
4 any other compensation it's receiving from the
5 Receiver in this matter?                  13:01:41
6    A.  I -- I have no idea the collections that
7 we have on this matter.
8    Q.  Do you have any idea of the agreement
9 between Ankura and the Receiver regarding
10 compensation of Ankura in this matter?   13:01:51
11   A.  No.
12   Q.  So you don't know, for example, whether
13 Ankura is also being paid any sort of success fee or
14 additional amounts based on the results of this
15 matter; is that correct?                  13:02:09
16       MR. FOKAS:  Objection.
17       THE WITNESS:  I haven't -- I have -- I'm
18 not sure.  That is not consistent with how we
19 typically operate.  So I would be surprised if that
20 was the case, but I don't know.   13:02:24
21 BY MR. KAPLAN:
22   Q.  Okay.  And has Ankura ever operated that
23 way, in other words, rather than being paid solely
24 based on a -- on an hourly basis, being paid any
25 sort of additional amounts based on the results of   13:02:37

Page 45

12 (Pages 42 - 45)

1 the particular engagement?

2   A.  Not to my knowledge.

3   Q.  I'm going to ask you to turn your

4 attention back to Exhibit 1, which is your

5 declaration, and in particular, Paragraph 118 that    13:02:59

6 appears on page 45.  And please let me know when

7 you're there.

8   A.  Okay.

9   Q.  Do you agree that based on the first two

10 sentences of this paragraph, your tracing analysis    13:03:24

11 was limited to the period March 11th, 2019, until

12 January 17th, 2023?

13   A.  I would not agree with that.

14   Q.  Okay.  Okay.  What is the period for which

15 you've done a tracing analysis, if not that period?    13:03:42

16   A.  Based on my conclusions from the facts

17 outlined in the declaration, the tracing would go to

18 today.

19   Q.  So you've performed tracing in the

20 Yenamandra accounts and Nguyen accounts through    13:04:10

21 today; is that correct?

22   A.  That's not correct.  That's not what I

23 said.

24   Q.  Okay.  Let's start again then.

25       The -- your declaration describes the    13:04:20

Page 46

1 tracing analysis you performed with respect to the

2 Yenamandra accounts and the Nguyen accounts; right?

3   A.  That's not correct.  It traces additional

4 assets not included in the Yenamandra and Nguyen

5 account.    13:04:38

6   Q.  Okay.  I -- I think we're missing each

7 other.  I'm going to try again.

8       Did you perform tracing involving the

9 Yenamandra account?

10   A.  Yes.    13:04:53

11   Q.  And the tracing that you performed for the

12 Yenamandra account, was that for the period

13 March 11th, 2019, through January 3rd, 2021, or some

14 other period?

15   A.  The LIFO tracing that I conducted clearly    13:05:08

16 traced VQR and Sigma assets to the Yenamandra

17 account in that time period.

18   Q.  Okay.  That's not the question I asked

19 you.  So I ask you to please just pay attention to

20 the question I asked you.  I didn't ask you about    13:05:27

21 particular assets.  I asked --

22       MR. FOKAS:  Object --

23       (Interruption in audio/video.)

24       THE COURT REPORTER:  Could you please

25 repeat -- there was some talking over.  Could you    13:05:37

Page 47

1 please repeat.

2       MR. FOKAS:  I'm going to object.  I don't

3 know if that was a question, but I believe he

4 answered your question, but you can continue and try

5 again.    13:05:45

6       MR. KAPLAN:  Thank you.

7       MR. FOKAS:  You're welcome.

8       MR. KAPLAN:  By the way, I don't need your

9 permission to ask questions.  So that's just going

10 to slow down the record if you purport to give me    13:05:54

11 permission to ask questions.

12       MR. FOKAS:  I wasn't giving you

13 permission.  I was just stating my objection.

14       Continue.

15 BY MR. KAPLAN:    13:06:03

16   Q.  The -- let's try this again.

17       The -- for what period of time did you

18 trace transactions in the Yenamandra account?

19   A.  I traced assets to the Yenamandra account

20 within that period.    13:06:19

21   Q.  Okay.  Okay.  And the "that period" is

22 March 11th, 2019, through January 3rd, 2021; is that

23 correct?

24   A.  Yes.

25   Q.  Okay.  Did you trace transactions in the    13:06:29

Page 48

1 Yenamandra account for any other period other than

2 the period between March 11th, 2019, and

3 January 3rd, 2021?

4   A.  I reached the conclusion after

5 January 3rd, 2021, that funds were effectively    13:06:48

6 emptied from the Yenamandra amount and moved

7 elsewhere.

8   Q.  And you reached that conclusion as to the

9 date of January 6th, 2021; is that correct?

10   A.  I don't recall the specific dates of the    13:07:08

11 transactions.  I'd be -- I'd be happy to go back to

12 the -- the exhibits and -- and talk through it.

13   Q.  Okay.  Okay.  Let's -- well, let's look at

14 Paragraph 118 again.  It says, "Between March 11,

15 2019 and January 3, 2021."  And then it says in    13:07:32

16 parentheses "(the day before the assets in the

17 Yenamandra account were transferred to the Adaya

18 Unhosted Wallets)."  [As read]

19       Do you see that?

20   A.  I do.    13:07:47

21   Q.  Okay.  So does that imply that the day

22 that the assets in the Yenamandra account were

23 transferred to the Adaya Unhosted Wallets was

24 January 4th, 2021?

25       MR. FOKAS:  Objection.    13:08:00

Page 49

13 (Pages 46 - 49)

1      THE WITNESS:  I'm not sure there's any
2  implication there.  That -- that seems, to me, to be
3  a fact.
4  BY MR. KAPLAN:
5      Q.  Okay.  So other than the period      13:08:07
6  March 11th, 2019, through January 4th, 2021, did you
7  engage in any tracing with respect to transactions
8  in the Yenamandra account?
9      MR. FOKAS:  Objection.  Asked and
10  answered.                                   13:08:26
11      THE WITNESS:  I reached a logical
12  conclusion that funds were moved out of the
13  Yenamandra account after that date.
14  BY MR. KAPLAN:
15      Q.  Okay.  We may be missing each other again.  13:08:39
16      That conclusion that funds were moved out
17  of the Yenamandra account is ba- -- is that -- your
18  belief that occurred on January 4th, 2021; correct?
19      MR. FOKAS:  Objection.
20      THE WITNESS:  I -- I don't understand the  13:08:53
21  question.
22  BY MR. KAPLAN:
23      Q.  What day do you contend funds were
24  transferred out of the Yenamandra account in their
25  entirety to somewhere else?              13:09:01

Page 50

1      A.  I believe those transfers began on
2  January 4th, 2021.  I don't recall the date of the
3  last transfer.
4      If you want to take a look at the
5  transaction records, I'd be happy to do that.  13:09:13
6      Q.  So let me just understand.  When you say
7  in the parenthetical right after January 3rd, 2021,
8  "the day before the assets in the Yenamandra Account
9  were transferred to the Adaya Unhosted Wallets," are
10  you referring to only some rather than all of the  13:09:47
11  assets that were then in the Yenamandra account?
12      MR. FOKAS:  Objection.
13      THE WITNESS:  Can you repeat the question?
14      MR. KAPLAN:  Read it back, please.
15      (Record read back by the reporter.)  13:10:35
16      MR. FOKAS:  Same objection.
17      THE WITNESS:  I'm -- I'm just outlining
18  the period before funds were moved out of the
19  Yenamandra account.  That -- that's the point of the
20  parenthetical.                              13:10:50
21  BY MR. KAPLAN:
22      Q.  Yeah, I -- I still don't think you
23  understand my question.
24      Maybe we'll take this in steps.
25      Is it correct that the parenthetical  13:11:01

Page 51

1  indicates that on January 4th, 2021, there were
2  assets transferred from the Yenamandra account to
3  the Adaya unhosted wallets?
4      A.  Yes.
5      Q.  Okay.  And my question is, when we talk  13:11:15
6  about the assets that were transferred on
7  January 4th, 2021, from the Yenamandra account to
8  the Adaya unhosted wallets, were they either all of
9  the assets that were in the Yenamandra account at
10  that time or not all the assets that were then in  13:11:30
11  the Yen-- Yenamandra account at that time?
12      MR. FOKAS:  Objection.
13      THE WITNESS:  There were other assets that
14  were transferred out of the Yenamandra account that
15  do not go to the Adaya unhosted wallets that I've  13:11:46
16  referenced.
17  BY MR. KAPLAN:
18      Q.  Okay.  And on what day or days do you
19  contend that the other assets in the Yenamandra
20  account were transferred elsewhere, in other words,  13:12:01
21  not to the Adaya unhosted wallets?
22      A.  I -- I don't recall.  I'd be happy to look
23  at the transaction records and -- and show you the
24  dates.
25      Q.  Is -- is that -- is this in your  13:12:13

Page 52

1  declaration anywhere?
2      A.  It's in an exhibit.
3      Q.  Okay.  Why don't you take as much time as
4  you need to answer that question.  Then let me know
5  when you have an answer.                    13:12:27
6      MR. FOKAS:  Objection.  I'm not sure --
7  what's your question?  He just answered the
8  question, so do you have another question?  Do you
9  want to repeat the question?
10      I'm not sure there was a question there.  13:12:33
11      MR. KAPLAN:  The question was, "On what
12  day or days do you contend that the other assets in
13  the Yenamandra account were transferred elsewhere,
14  in other words, not to the Adaya wallets?"
15      And he says, "I don't recall.  I'd be  13:12:47
16  happy to" -- "I'd be happy to look at the
17  transactions."
18      So that's what I'm asking him to do.  If
19  he doesn't recall offhand and -- but he says it's in
20  this declaration or the exhibits, I'd like the  13:12:58
21  under- -- to understand the answer to that
22  question.
23      MR. FOKAS:  And he answered the question.
24  He said it's in the exhibits.
25      Do you want him to look -- are you asking  13:13:06

Page 53

1 him to find the exhibits? Is that -- rephrase that
2 question, because it's not clear.
3 BY MR. KAPLAN:
4    Q.  Yeah, that's why said, take as much time
5 as you need to look at your declaration and        13:13:16
6 exhibits, so you can answer that question.
7    A.  I -- I don't have access to those exhibits
8 in front of me.
9        MR. FOKAS:  Gary, we've been going about
10 an hour.  Can we -- can we cut for a break here?        13:13:34
11       MR. KAPLAN:  Sure.  Let's -- let's --
12 let's go off the record and we can talk about the
13 length of the break.
14       THE COURT REPORTER:  We're off the record.
15       (Short recess taken.)        13:13:57
16       MR. KAPLAN:  On the record, please.
17 BY MR. KAPLAN:
18    Q.  Mr. Porter, you still understand you're
19 testifying under oath; correct?
20    A.  I do.        13:34:16
21    Q.  Okay.  I'm going to ask you to turn your
22 attention back to your declaration that we've marked
23 Exhibit 1, and, in particular, to look at Paragraph
24 114 -- I'm sorry, 116 that appears on page 44.  And
25 let me know when you're there.        13:34:30

Page 54

1    A.  Okay.
2    Q.  Okay.  So the first sentence of that
3 paragraph says, "Between January 4th and January 6,
4 2021, substantially all of the assets contained in
5 the Yenamandra account," then dash saying "assets        13:35:01
6 denominated" and listing certain denominations, and
7 then it continues, "were transferred from the
8 Yenamandra Account to wallets ending in," and it
9 gives certain prefixes, and says "unhosted wallets
10 believed to be owned and/or controlled by Adaya."        13:35:25
11       Do you see that?
12    A.  I do.
13    Q.  Is that an accurate statement?
14    A.  Yes.
15    Q.  Okay.  And how did you determine that be-        13:35:31
16 -- in -- in the interval mentioned between
17 January 4th and January 6, 2021, substantially all
18 the assets in the Yenamandra account were
19 transferred elsewhere?
20    A.  Based on the current account balance of        13:35:49
21 the Yenamandra account and the withdrawal history.
22    Q.  Okay.  And that's all reflected in
23 Exhibit 57 to your declaration that is referenced
24 later in that same paragraph; correct?
25    A.  Yeah, I believe Exhibit 57 is the        13:36:06

Page 55

1 withdrawal history.
2    Q.  Okay.  So let's --
3        MR. KAPLAN:  I've marked that Exhibit 57
4 as the next one in order in this deposition, Exhibit
5 Number 4.        13:36:18
6        (Porter Deposition Exhibit 4 was marked
7        electronically.)
8 BY MR. KAPLAN:
9    Q.  Please let me know when you have it ready.
10    A.  Okay.        13:36:34
11    Q.  Okay.  Have you ever seen what we've
12 marked Exhibit 4 before?
13    A.  Yes, I believe so.
14    Q.  Okay.  And this, in fact, Exhibit 57 to        13:36:44
15 your declaration that we've marked Exhibit 1?
16    A.  It appears to be.
17    Q.  And can you specifically point to where
18 you believe the balance in the Yenamandra account
19 was at or close to zero at January 6th, 2021?
20    A.  Yeah, af- -- after the -- the        13:37:17
21 second-to-last withdrawal.
22    Q.  Okay.  So -- so, first, what page of
23 Exhibit 57 are you on?
24    A.  Page 1.
25    Q.  Okay.  And I'm assuming you mean --        13:37:29

Page 56

1    A.  Yes, I apologize.  Yeah, "Page" -- "Page 2
2 of 3" is marked at the top.
3    Q.  Okay.  And at -- at -- at the very bottom
4 of the declaration, it says "Page" -- or, I'm sorry,
5 of the document, it says in black ink "Page 76 of        13:37:41
6 77"; is that correct?
7    A.  That is correct.
8    Q.  Okay.  Okay.
9        And where specifically, what line or lines
10 are you looking at in referencing your determination        13:37:50
11 that as of January 6th, 2021, the balance in the
12 Yenamandra account was at or near zero?
13    A.  Following the -- the last withdrawal,
14 there is substantially no assets left in -- in that
15 account.        13:38:14
16    Q.  Okay.  When you say "the last withdrawal,"
17 which line are you referring to?  Why -- why don't
18 you let us know either by the numbering, you know,
19 the first line on the page, second line on the page,
20 or some other way to identify which line you're        13:38:30
21 talking about?
22    A.  So following -- it's the third line, if
23 you include the -- the title line, that is the last
24 substantial withdrawal out of the account.
25    Q.  Okay.  And just so I'm clear, that is the        13:38:48

Page 57

15 (Pages 54 - 57)

1 one that says -- under "Currency" it says "INJ"; is
2 that correct?
3     A.  That is correct.
4     Q.  And then under "Amount," it -- it says
5 "58998.919"; is that correct?                    13:39:03
6     A.  That's -- that's correct.  That's the line
7 that I'm looking at.
8     Q.  Okay.  And then how did you determine
9 that -- that at that point the balance in the
10 account was at or near zero from looking at this?   13:39:24
11 Where -- where do you see that?
12     A.  I believe, as I mentioned in -- in the
13 background documents, I had the full record for this
14 account that I believe showed that the current
15 account balance is zero.  But I believe that that   13:39:39
16 current account balance can likely be recreated from
17 the -- the deposit and withdrawal history, as well
18 as the trading history.
19     Q.  Okay.  Let's back up.
20        When you say "current account balance," do  13:39:59
21 you mean current as of today or current as of
22 January 6, 2021, or something else?
23     A.  As -- as of the -- the date that they were
24 produced.
25     Q.  Okay.  So let me ask you again because I'm  13:40:10

Page 58

1 could be reconstructed, yes.
2 BY MR. KAPLAN:
3     Q.  Okay.  Okay.  But the -- I just want to
4 make clear, in other words, if the -- if the judge
5 says, "Show me on your exhibits where it shows the   13:41:35
6 balance was zero on -- in the -- in the Yenamandra
7 account on January 6, 2021," there's -- there's
8 nothing you could point to and say, "Oh, it's right
9 here, Exhibit X, Line Y"; correct?
10     A.  The --                                       13:41:51
11     MR. FOKAS:  Objection.
12     THE WITNESS:  The -- the current amount --
13 the current account balances in the account history
14 that I was provided are not cited in the exhibit --
15 in the exhibits.                                      13:42:01
16 BY MR. KAPLAN:
17     Q.  Okay.  So where is that information, then?
18 Is it on some other document?
19     A.  Yeah, it -- it's in the -- as I mentioned,
20 you know, I -- I had the full account records for    13:42:15
21 these accounts.  I provided a subset that -- that I
22 felt were relevant.  And so it's -- the -- the
23 current account balance would be included in those
24 records.
25     Q.  Okay.  So that -- now I'm confused now      13:42:30

Page 60

1 not sure I understood your answer.
2        Is there anything on this document, in
3 other words, Exhibit 57, that shows the balance in
4 the Yenamandra account was at or very close to zero
5 on January 6th, 2021?                                13:40:22
6     A.  I don't believe that's reflected in this
7 document.
8     Q.  Okay.  Is there some other exhibit to your
9 declaration that reflects that information; that is,
10 that on January 6th, 2021, the balance in the       13:40:39
11 Yenamandra account was at zero or very, very close
12 to zero?
13     A.  Yes, I -- I believe that a combination of
14 the deposit history, the withdrawal history, and the
15 trading history has been provided, and -- and that   13:40:55
16 could be used to reconstruct the account balance.
17     Q.  Okay.  So just to be clear, to get to
18 zero, there's nothing I can point to in any of
19 your -- in any -- any of the exhibits attached to
20 your declaration that would show balance of zero on  13:41:12
21 that date?  It would require some sort of
22 reconstruction -- reconstruction of different
23 documents; is that right?
24     MR. FOKAS:  Objection.
25     THE WITNESS:  I -- I -- I believe that it      13:41:25

Page 59

1 based on something you said earlier.
2        Do you recall when I asked you whether any
3 of the conclusions you drew were based on any
4 documents that were not attached to your
5 declaration, and you said no?                        13:42:48
6     MR. FOKAS:  Objection.
7     THE WITNESS:  Again, I think you can reach
8 that conclusion with the documents that are
9 provided.
10 BY MR. KAPLAN:                                       13:43:00
11     Q.  Okay.  But the -- but the full account
12 records that show that the balance in the -- the
13 Yenamandra account was at zero on January 6, 2021,
14 those full account records are not in your -- not
15 attached to your declaration; correct?              13:43:14
16     A.  They -- they show the same thing that
17 would be found through a combination of deposit,
18 withdrawal, and trading records.  But, yes, that --
19 that current account page is not provided as an --
20 as an exhibit.                                        13:43:31
21     Q.  Okay.  And is there some reason why you
22 did not provide the current account page for the
23 Yenamandra account as of January '21 with the dozens
24 of exhibits to your declaration?
25     A.  It was unintentional.                        13:43:51

Page 61

16 (Pages 58 - 61)

1    Q.   Okay.  So now going back to the earlier
2  discussion we had, is it accurate to say that after
3  January 6th, 2021, you did not trace any
4  transactions in the Yenamandra account?
5        MR. FOKAS:  Objection.  Asked and          13:44:12
6  answered.
7        THE WITNESS:  I don't believe that's
8  correct.
9  BY MR. KAPLAN:
10    Q.   Okay.  So what is the last date for which   13:44:15
11  you traced transactions in the Yenamandra account?
12    A.   January 6th --
13    Q.   Okay.
14    A.   -- 2021, to be clear.
15    Q.   Okay.  I -- I'm not sure why you answered   13:44:37
16  that, to my prior question, it's not correct.  Let
17  me try again because I think I've just heard two
18  different things.
19        Is it correct to say that the last date
20  for which you traced transactions in the Yenamandra   13:44:52
21  account was January 6th, 2021?
22    A.   I traced assets to the Yenamandra
23  account -- into the Yenamandra account to
24  January 4th of 2021.  I traced assets out of the
25  Yenamandra account up until January 6, 2021.  And   13:45:12

Page 62

1  that -- that does not follow the LIFO methodology.
2    Q.   Wait.
3        What does not follow a LIFO methodology?
4    A.   So you can trace the -- the funds into the
5  Yenamandra account clearly following a LIFO        13:45:36
6  methodology, at which point they become commingled
7  and extensively traded, as I lay out in my report.
8  And I think it's a reasonable conclusion that the
9  funds that were traced into the Yenamandra account
10  can be traced to the Nguyen account, just not under   13:45:54
11  a -- a LIFO -- a strict LIFO methodology.
12    Q.   Okay.  And we're going to -- we're going to
13  get to that I expect a little bit later, but I'm
14  just focusing on what you looked at and what you
15  didn't look at.                                    13:46:13
16        So I believe you just said in terms of
17  inflows into the Yenamandra account, you did not do
18  any tracing for any date after January 4th, 2021,
19  regarding inflows into Yenamandra account; correct?
20    A.   I don't believe there are any other         13:46:28
21  inflows after that date.
22    Q.   Okay.  Regardless of whether there were or
23  were not, you didn't look; correct?
24    A.   No, I -- there --
25        MR. FOKAS:  Objection.  That's not what he   13:46:39

Page 63

1  said.
2  BY MR. KAPLAN:
3    Q.   Okay.  Can -- is -- did you trace any
4  inflows into the Yenamandra account for any date
5  after January 4th, 2021?                           13:46:46
6    A.   There would be no deposits to trace after
7  January 4th, 2021, to my knowledge.
8    Q.   Okay.  And, therefore, you didn't trace
9  any; correct?
10    A.   Correct.                                    13:46:56
11    Q.   Okay.  And then in terms of outflows from
12  the Yenamandra account, is it accurate that you did
13  not trace any outflows after January 6th, 2021, from
14  the Yenamandra account?
15    A.   Yes.                                        13:47:07
16    Q.   Very good.
17        As to the Nguyen -- Nguyen -- I'm sorry,
18  Nguyen account, is it accurate to say that you did
19  not trace any transactions either into or out of
20  that account after January 17th, 2023?            13:47:28
21    A.   I -- I don't recall the -- the transaction
22  dates for the -- the deposits in the Nguyen account.
23    Q.   Let's take a look again at Paragraph 118
24  of your declaration on page 45.
25        Let me know when you're there.              13:47:48

Page 64

1    A.   Okay.
2    Q.   Okay.  Looking at the sentence beginning
3  on the fourth line of that paragraph that says,
4  "Between January 6th, 2021," then in parentheses,
5  "the day the Nguyen Account was opened) until       13:48:23
6  January 17th, 2023, (the date Binance produced
7  transactional records to the Receiver), there were
8  approximately 7,000 trades, 100 withdrawals, and 100
9  deposits within the Nguyen Account, resulting in
10  total assets valued at approximately $6,061,700."   13:48:49
11        Do you see that?
12    A.   I do.
13    Q.   Is that an accurate statement?
14    A.   Yes.
15    Q.   Does this reflect that you did not trace    13:49:01
16  any transactions in the Nguyen account after
17  January 17th, 2023?
18    A.   Yes, I wouldn't have any records beyond
19  that.
20    Q.   Where did you get the records you did have  13:49:20
21  to do the tracing you say you did?
22    A.   The documents I have were provided by
23  counsel.
24    Q.   And did you ask counsel to provide any
25  documents for transactions after January 17, 2023?  13:49:47

Page 65

17 (Pages 62 - 65)

1   A.  I did not.
2   Q.  Why not?
3   A.  To my knowledge, in my prior experience,
4   it's -- I felt that that was sufficiently close to
5   the date that I was doing the tracing.       13:50:12
6   Q.  Okay.  Did someone tell you to stop your
7   tracing as of January 17, 2023?
8   A.  No.
9   Q.  Okay.  How did you come up with that date,
10   then?                           13:50:29
11   A.  That was the -- the last date that I have
12   of the records.
13   Q.  Okay.  And the records you're talking
14   about, were those records you requested to review in
15   order to perform your tracing analysis?       13:50:48
16   A.  Can you repeat the question?
17       MR. KAPLAN:  Read it back, please.
18       (Record read back by the reporter.)
19       THE WITNESS:  Which -- which records?
20   BY MR. KAPLAN:                    13:51:12
21   Q.  The ones you referred to in your prior
22   answer.
23   A.  Can you -- can you remind me of what the
24   prior answer was?
25   Q.  I said, "How did you" -- "How did you come   13:51:28

Page 66

1   up with that date, then?"
2       And you said, "That was the last date that
3   I have of the records."
4   A.  And, I'm sorry, what is the question?
5   Q.  For the third time, and the records you're   13:51:43
6   talking about, were those records you requested to
7   review in order to perform your tracing analysis?
8       MR. FOKAS:  Objection.
9       THE WITNESS:  I -- I felt that I had the
10   necessary records to take the tracing as far as I   13:51:57
11   could take it.
12   BY MR. KAPLAN:
13   Q.  And how did you determine that
14   January 17th was the magic date to end the tracing?
15       MR. FOKAS:  Objection.            13:52:09
16       THE WITNESS:  If -- if I felt that Binance
17   could have gotten me records for October 12th, 2023,
18   and done the tracing in a day, I would have -- I
19   would have requested that date.
20       There's a logical cutoff point for when   13:52:21
21   the -- the records are produced to give you time
22   to -- to do the analysis.
23   BY MR. KAPLAN:
24   Q.  Okay.  But you began your analysis in May
25   of 2023; correct?                    13:52:35

Page 67

1   A.  That's correct.
2   Q.  And you finished your analysis in
3   August of 2023; correct?
4   A.  That's correct.
5   Q.  Okay.  And never during that time did you   13:52:42
6   ask for a -- any records for the period after
7   January 17th, 2023; correct?
8   A.  I -- I don't recall if I asked for them or
9   not.
10   Q.  I'm -- I'm still trying to understand why   13:52:58
11   you settled on that date; in other words, why you
12   thought January 17th, 2023, was the last date for
13   which you needed records in order to perform your
14   tracing analysis.
15       Why not some other date?             13:53:18
16   A.  It -- it's the date that the records were
17   provided.  I -- I -- I don't understand the
18   question.
19   Q.  Okay.  So let -- let me just understand
20   what I think you just said.              13:53:37
21       Binance produced certain records to the
22   Receiver on January 17, 2023, that reflected
23   transactions through January 17, 2023; correct?
24   A.  Yes.
25   Q.  Okay.  And after that date, it's -- is it   13:53:48

Page 68

1   your understanding that Binance did not produce any
2   other records for periods after January 17th, 2023;
3   right?
4   A.  I'm -- I'm not sure.
5   Q.  Okay.  Did you ever ask for more current   13:54:01
6   records to perform your tracing analysis for periods
7   that run after January 17th, 2023?
8       MR. FOKAS:  Objection.  Asked and
9   answered.
10       THE WITNESS:  I -- I don't recall.       13:54:14
11   BY MR. KAPLAN:
12   Q.  Would that have made your analysis more
13   accurate?  In other words, if you had records up to
14   the -- right before -- a few days before you
15   finished your analysis, would that have informed   13:54:27
16   your analysis, your tracing analysis?
17       MR. FOKAS:  Objection.
18       THE WITNESS:  I don't know.
19   BY MR. KAPLAN:
20   Q.  And the -- this figure that is referred to   13:54:41
21   in Paragraph 118 where you say at -- at the very end
22   of that sec-- -- second sentence that there were
23   "total assets valued" -- "valued at approximately
24   6,061,700" -- "700 dollars," how -- first of all,
25   how did you arrive at that figure?           13:55:01

Page 69

18 (Pages 66 - 69)

1   A.   I believe it's the -- the USD equivalent
2   of the assets on January 17th, 2023.
3   Q.   And by "USD," you mean U.S. dollars; is
4   that right?
5   A.   That's correct.                    13:55:19
6   Q.   Okay.  And when you say "the assets," you
7   mean the assets that are in the -- what you refer to
8   as the Nguyen account on January 17th, 2023; is that
9   right?
10  A.   That's correct.                    13:55:30
11  Q.   Okay.  Is -- so is there some exhibit to
12  your declaration that reflects that figure?
13  A.   I believe that it could be reconstructed
14  again similar to the Yenamandra account based on
15  withdrawals, deposits, and trades.       13:55:48
16       MR. FOKAS:  That are exhibits to your
17  declaration?
18       THE WITNESS:  I'm not sure if the Nguyen
19  account -- I -- I'm not sure if they're attached as
20  exhibits.                               13:56:05
21  BY MR. KAPLAN:
22  Q.   So that figure, the 6,061,700, is that a
23  figure reflected -- actually, in other words, that
24  number is shown on some account record you reviewed,
25  or is that some figure you determined yourself by   13:56:24

Page 70

1   looking at other information?
2   A.   That's a figure that I believe can be
3   summed from the account balance of the Nguyen
4   account as provided.
5   Q.   And you're the one that summed to get to   13:56:40
6   that figure; correct?
7   A.   Yes.
8   Q.   Okay.  Do you show your calculations
9   anywhere?  In other words, is there any -- either in
10  your declaration itself or in any exhibits to your   13:56:54
11  declaration, do you show how you came up with that
12  figure?
13  A.   I don't believe so.
14  Q.   Okay.  So now I'm going to take you back
15  to the earlier discussion we had.  I believe you    13:57:08
16  testified when I asked you whether any of the
17  opinions or conclusions you drew were from anything
18  else other than the words in your declaration and
19  the exhibits to your declaration, and you answered,
20  no, there was nothing else.             13:57:26
21       Now I believe you're saying that actually
22  that number, the 6,061,700, was derived from
23  information that is neither in the declaration
24  itself or in the exhibits to your declaration;
25  correct?                                13:57:41

Page 71

1       MR. FOKAS:  Objection.  Mischaracterizes
2   prior testimony.  Asked and answered.
3       THE WITNESS:  Yeah, I -- I -- I would want
4   to hear my -- my response read back to me.  I --
5   if -- you know, I don't believe that that number    13:57:55
6   is -- is cited in an exhibit.
7   BY MR. KAPLAN:
8   Q.   And I believe you testified a moment ago
9   that the $6,061,700 figure is the U.S. dollar value
10  of various assets that were in the Nguyen account on  13:58:22
11  January 17th, 2023; correct?
12  A.   I believe so.
13  Q.   Okay.  And the assets include various
14  digital assets; is that correct?
15  A.   That's correct.                     13:58:37
16  Q.   Okay.  And, for example, among the assets
17  that we're talking about, they include certain
18  Bitcoin; is that correct?
19  A.   That is correct.
20  Q.   And do you show either on -- in your       13:59:05
21  declaration or anywhere else in the exhibits to your
22  declaration the particular values you used for
23  assets in the Nguyen account on this date,
24  January 17th, 2023, for assets that were something
25  other than U.S. dollar currency?        13:59:25

Page 72

1       MR. FOKAS:  Objection.
2       THE WITNESS:  Can you repeat the question?
3       MR. KAPLAN:  Read it back, please.
4       (Record read back by the reporter.)
5       MR. FOKAS:  Same objection.          14:00:06
6       THE WITNESS:  Yeah, I'm -- I'm not
7   entirely sure what the question is asking.
8   BY MR. KAPLAN:
9   Q.   Okay.  Well, let's -- let's maybe take it
10  step by step.                           14:00:15
11       On that date, January 17, 2023, among the
12  assets in the Nguyen account was Bitcoin; right?
13  A.   I believe so, yes.
14  Q.   Okay.  And you determined what the value
15  of that Bitcoin was on that date; correct?   14:00:26
16  A.   I believe that -- that number was provided
17  in the records.
18  Q.   Okay.  It -- when you say "provided in the
19  records," do you mean the records that are attached
20  to your declaration or something else?  14:00:40
21  A.   I -- I believe that those are included in
22  the current account balance of the Nguyen account in
23  the records provided.
24  Q.   Okay.  When you say "records provided," do
25  you mean the records provided to you that you used   14:00:54

Page 73

19 (Pages 70 - 73)

1  to do your analysis, or do you mean the records
2  attached to your declaration as exhibits?
3      A.   The records provided to me.
4      Q.   Okay. Is there some reason those records
5  were not attached as exhibits to your declaration?     14:01:14
6      A.   I -- I didn't think that it was -- look,
7  I -- it could've been an oversight to not cite the
8  support for that. I -- I didn't feel that it was a
9  necessary document I relied on.
10     Q.   So let me just understand this. If,      14:01:48
11 again, we're in court and the judge says I see this
12 number that you valued the assets in the Nguyen
13 account on January 17th, 2023, is a little bit over
14 $6 million. Show me where, either in the
15 declaration or in the exhibits, show me where I can     14:02:19
16 look to to reach to that number. Is there anything
17 you could point to -- to -- that would -- that would
18 allow the court and the other parties to say, oh,
19 now I see where you got that number?
20     A.   I don't believe so.      14:02:31
21     Q.   Would you say the majority of the value of
22 assets in the Nguyen account on that date, again,
23 January 17th, 2023, that -- that you value at more
24 than $6 million, would you say the majority of
25 the -- of that valuation or that value was something     14:02:59

Page 74

1  other than fiat currency, in other words, U.S.
2  dollars?
3      MR. FOKAS:   Objection.
4      THE WITNESS:   I don't understand your
5  question.      14:03:12
6  BY MR. KAPLAN:
7      Q.   There was 6 million and change in the
8  Nguyen account on January 17th, 2023, by your
9  valuation; correct?
10     A.   Yes.      14:03:21
11     Q.   Okay. And some of that was comprised of
12 just plain old cash, U.S. dollars; right?
13     A.   I don't recall.
14     Q.   Okay. Was -- was -- was all of it digital
15 assets?      14:03:30
16     A.   I -- I don't recall.
17     Q.   Was most of it digital assets?
18     MR. FOKAS:   Objection. I mean, if you
19 want to show him a document, show him a document.
20 But don't him when he's told you he doesn't recall     14:03:42
21 three times now.
22     MR. KAPLAN:   Well -- well, I can't show
23 him a document because he says he doesn't have any.
24     MR. FOKAS:   I'm going to object to that
25 because that's not what he said. And, you know,     14:03:51

Page 75

1  it's not necessary to make, you know, non sequiturs
2  here, Gary. Just -- that's not what he said, so
3  please don't mischaracterize his testimony.
4  BY MR. KAPLAN:
5      Q.   Was the majority of the value of the      14:04:00
6  assets in the Nguyen account on January 17th, 2023,
7  comprised of digital assets?
8      A.   I don't recall.
9      Q.   Does the value of digital assets
10 fluctuate?      14:04:17
11     A.   Yes.
12     Q.   What is the value today of the assets that
13 you say were in the Nguyen account on January 17th,
14 2023?
15     MR. FOKAS:   Objection.      14:04:38
16     THE WITNESS:   I don't believe that's
17 relevant to the tracing I outlined in this report --
18 in this declaration.
19 BY MR. KAPLAN:
20     Q.   I'm not asking you what you think is      14:04:45
21 relevant. I'm asking if -- if you have any
22 knowledge or idea what the value is.
23     MR. FOKAS:   Objection. That's not what
24 you -- that's not what your prior question was.
25     You can answer.      14:05:00

Page 76

1      THE WITNESS:   I'm not sure what the value
2  is.
3  BY MR. KAPLAN:
4      Q.   Do you know what it is to the closest
5  10 million?      14:05:05
6      MR. FOKAS:   Objection. Calls for
7  speculation.
8      THE WITNESS:   I'm not sure.
9  BY MR. KAPLAN:
10     Q.   Okay. Do you know what it is to the      14:05:08
11 closest 100 million?
12     MR. FOKAS:   Same objection. Asked and
13 answered. Calls for speculation.
14     THE WITNESS:   I'm not sure.
15 BY MR. KAPLAN:      14:05:19
16     Q.   Based on your knowledge and experience,
17 including as a certified cryptocurrency forensic
18 investigator, have the -- has the value of digital
19 assets generally increased or decreased since
20 January 17th, 2023?      14:05:49
21     MR. FOKAS:   Objection.
22     THE WITNESS:   I don't know what the price
23 was on January 17th, 2023.
24 BY MR. KAPLAN:
25     Q.   You have no idea whether crypto assets     14:06:02

Page 77

20 (Pages 74 - 77)

1 have generally gone up or down in the last nine
2 months?
3        MR. FOKAS:  Objection.  Calls for
4 speculation.  Crypto assets.
5        THE WITNESS:  It's a wide variety of        14:06:14
6 assets.
7 BY MR. KAPLAN:
8    Q.  Okay.  In terms of the assets that were in
9 the Nguyen account on January 17th, 2023, have those
10 increased or decreased in value between that date      14:06:22
11 and today?
12        MR. FOKAS:  Objection.  Calls for
13 speculation.
14        THE WITNESS:  It was a wide variety of
15 assets.  I don't know exactly how those assets        14:06:33
16 moved.
17 BY MR. KAPLAN:
18    Q.  Turning you back to this Paragraph 118 of
19 your declaration and looking at the next sentence
20 after the one we most previously read, it says, "Due  14:06:52
21 to the extensive of commingling of crypto assets,
22 coupled with the high volume of trading that
23 occurred in both the Yenamandra and Nguyen Accounts,
24 further tracing of the specific Sigma Assets or VQR
25 Assets and their proceeds would be overly burdensome  14:07:16

Page 78

1 for the Receiver to undertake without further
2 information."
3        First, let me ask you what you mean by
4 "overly burdensome"?
5    A.  Given the commingling of funds and the      14:07:32
6 extensive trading, I think it would be a [verbatim]
7 incredibly extensive exercise to trace the assets
8 further.
9    Q.  Okay.  When you say "incredibly
10 extensive," do you mean in terms of time or in terms  14:07:51
11 of how much it would cost?
12    A.  I mean in terms of time, and I'm not sure
13 that you could come to a -- a practical conclusion.
14    Q.  So in your view, approximately how much
15 time would be -- would it take that -- that you say   14:08:13
16 would be incredibly extensive?
17        MR. FOKAS:  Objection.  Calls for
18 speculation.
19        THE WITNESS:  Yeah, I don't know.  I don't
20 know if there is a -- a number of hours that it       14:08:23
21 would take.  I'm not sure it is -- it is feasible.
22 BY MR. KAPLAN:
23    Q.  So you don't even know if it's feasible
24 regardless of how many hours one would have;
25 correct?                                              14:08:39

Page 79

1        MR. FOKAS:  Objection.
2        THE WITNESS:  I don't know.  I haven't
3 undertaken that exercise.
4 BY MR. KAPLAN:
5    Q.  Okay.  And then that same sentence talks    14:08:49
6 about "without further information."
7        What sort of further information would you
8 need in order to undertake that additional analysis?
9    A.  I -- it would depend once you got into the
10 analysis.  That would -- you would start analyzing    14:09:05
11 the records and that would inform what further
12 information you might need.
13    Q.  I'm not sure I understand that.  So let
14 me -- let me just ask you for -- maybe you can
15 explain it through this hypothetical.                 14:09:28
16        If you were told you have unlimited hours
17 to perform further tracing, and you can have
18 unlimited information, whatever you want, you will
19 be given, what first -- what further information
20 would you want in order to undertake the additional   14:09:44
21 tracing?
22        MR. FOKAS:  Objection.  Calls for
23 speculation.  It's a hypothetical.
24        THE WITNESS:  Yeah, I -- I can't answer
25 that until I -- you would start doing that analysis.  14:09:54

Page 80

1 BY MR. KAPLAN:
2    Q.  So the -- the -- the extensive commingling
3 and the high volume of trading that you referred to
4 in that sentence, did that occur right after
5 January 17th, 2023?                                   14:10:19
6    A.  There was a high volume of trading in both
7 of those accounts throughout the period in question.
8    Q.  Okay.  So let me just understand that
9 you -- what -- the reason you say you stopped
10 tracing was because it was going to be overly         14:10:49
11 burdensome, and you would need further information.
12 And I'm trying to understand whether that occurred,
13 was that as -- as of January 17th, 2023, you
14 determined that, or is there some other date that
15 you determined it would be overly burdensome to       14:11:05
16 trace after?
17        MR. FOKAS:  Objection.
18        THE WITNESS:  I -- that's -- that's based
19 on the totality of the activity in the Nguyen
20 account.  I don't think that that's a decision based  14:11:20
21 on a date.
22 BY MR. KAPLAN:
23    Q.  Well, your sentence -- or your words, the
24 sentence I just read, says, "further tracing."  Does
25 the "further" refer to after January 17th, 2023?      14:11:36

Page 81

21 (Pages 78 - 81)

1    A.  No, it refers to -- further as in
2    subsequent accounts.
3    Q.  Okay.  Which subsequent accounts are you
4    referring to?
5    A.  I'm not referring to any.          14:12:07
6    Q.  You just said it refers to further, as to
7    subsequent accounts.
8        And I'm asking you, which subsequent
9    accounts you're talking about?
10   A.  That would be dependent on further       14:12:29
11   tracing.
12   Q.  So you don't know whether or not there are
13   subsequent or other accounts; correct?
14       MR. FOKAS:  Objection.
15       THE WITNESS:  I don't believe that's what   14:12:49
16   I said.
17   BY MR. KAPLAN:
18   Q.  You stopped your tracing with respect to
19   transactions in the Nguyen account as of
20   January 17th, 2023; correct?          14:13:00
21   A.  Again, I -- I wouldn't define the tracing
22   as having stopped in the Nguyen account on that
23   date.
24   Q.  Okay.  So what's the last date as to which
25   you traced transactions in or out of the Nguyen   14:13:21

Page 82

1    account?
2        MR. FOKAS:  Objection.  Asked and
3    answered.
4        THE WITNESS:  Yeah, I -- I -- I wouldn't
5    define the tracing as being bounded by date.     14:13:36
6    BY MR. KAPLAN:
7    Q.  Have you traced any transactions in or out
8    of the Nguyen account that occurred after
9    January 17th, 2023?
10   A.  No.                    14:13:55
11   Q.  Have you made any attempt to determine the
12   valuation of any assets in the Nguyen account for
13   any date after January 17th, 2023?
14       MR. FOKAS:  Objection.  Asked and
15   answered.  This is the third time now.        14:14:31
16       THE WITNESS:  I -- I don't have those
17   records.
18   BY MR. KAPLAN:
19   Q.  So my -- just to be clear, my question was
20   not whether you have particular records or not.   14:14:48
21   It's whether you've made any effort at all to
22   determine the value of any assets in the Nguyen
23   account after January 17th, 2023?
24       MR. FOKAS:  Objection.  Same objection.
25       THE WITNESS:  No.             14:14:59

Page 83

1        MR. KAPLAN:  I've just marked another
2    exhibit as Exhibit 5.
3        (Porter Deposition Exhibit 5 was marked
4        electronically.)
5    BY MR. KAPLAN:                   14:15:50
6    Q.  Let me know when you have it available.
7    A.  Okay.
8    Q.  Have you ever seen Exhibit 5 before?
9    A.  Yes.
10   Q.  Is this one of the attachments to your    14:16:15
11   declaration, which is part of Exhibit 60?
12   A.  I believe so.
13   Q.  And it indicates this is the "Tracing
14   Chart from Paragraph 103" at the top.
15       Do you see that?              14:16:32
16   A.  I do see that.
17   Q.  Okay.  And is that, in fact, a
18   reproduction of the chart that appears next to
19   Paragraph 103 in your declaration that we've marked
20   Exhibit 1?                     14:16:45
21   A.  I believe so.
22       MR. FOKAS:  Just for the record, it's a --
23   it's an excerpt of the exhibit.  It's an exhibit
24   removed from the actual declaration that's been
25   marked as Exhibit 1.              14:17:05

Page 84

1    BY MR. KAPLAN:
2    Q.  The -- do you see on the -- all the way on
3    the left side of -- strike that.
4        So am I correct in interpreting or
5    understanding this tracing chart that it's read from   14:17:17
6    left to right?  In other words, the transactions
7    start all the way on the left side and continue step
8    by step toward the right side of the -- of the
9    document?
10   A.  Yes.                     14:17:30
11   Q.  Okay.  And so, the first step is the -- it
12   says "INJ Token Issuer" on the left.
13       Do you see that?
14   A.  Yes.
15   Q.  Okay.  And the INJ refers to the Injective   14:17:37
16   tokens; correct?
17   A.  Yes.
18   Q.  Okay.  And then just to the right of that,
19   there's two arrows, and the bottom arrow says
20   "1,000,000 INJ" and then below it, "10/21/20."   14:17:49
21   [As read]
22       Do you see that?
23   A.  Yes.
24   Q.  Okay.  Does that reflect 1 million
25   Injective tokens going from the issuer into the   14:17:58

Page 85

22 (Pages 82 - 85)

1 referenced wallet, which is labeled x1632?
2    A.   Yes.
3    Q.   Okay.  On that date, October 21st, 2020,
4 what was the value of those 1 million Injective
5 tokens?                               14:18:19
6    A.   I don't know.  I -- I mean, it's not
7 relevant to my tracing.
8    Q.   Okay.  So just -- just to be clear, when I
9 ask you a question, you're required to answer to the
10 best of your knowledge and understanding.  What I   14:18:31
11 don't want to hear and I -- and is not appropriate
12 is whether you think my question is relevant.
13        MR. FOKAS:  I'm going to object to that.
14 I'm going to object to you lecturing the witness.
15 You asked a question, and he answered it.  You can   14:18:45
16 ask another question if that's not the answer you
17 were looking for, but I'm going to object.  Don't --
18 please do not lecture the witness.
19        MR. KAPLAN:  I will tell the witness what
20 I think is appropriate to how -- how it is   14:18:57
21 appropriate to act in this deposition and how not
22 to.  If you have a problem with that, you can
23 certainly object.
24        MR. FOKAS:  You are expected --
25        (Simultaneous speaking.)   14:19:16

Page 86

1    Q.   Have you ever determined the value of the
2 Injective tokens in any discussion in your
3 declaration?
4    A.   I believe so.
5    Q.   And how were you able to determine the   14:20:19
6 value that you thought the Injective tokens had on
7 any particular date?
8    A.   I -- I believe it's cited in an exhibit,
9 the -- that support.
10    Q.   Okay.  So let's look at Paragraph 102 of   14:20:36
11 your declaration, which is on page 37.
12        Let me know when you're there.
13    A.   Paragraph 102?
14    Q.   Yes.
15    A.   Okay.                               14:21:59
16    Q.   Okay.  Do you see where it says, beginning
17 of that paragraph, "The VQR Assets refer to
18 approximately $3 million dollars' worth of digital
19 assets derived from 990,726.23 Injective Tokens that
20 were transferred from the Receivership Estate to   14:22:23
21 Adaya."  [As written]
22        Do you see that?
23    A.   I see that.
24    Q.   Where did you get the valuation of
25 approximately $3 million for the approximately   14:22:32

Page 88

1 991,000 Injective tokens that are referenced in that
2 sentence?
3    A.   I believe that's cited elsewhere in the
4 report, in the declaration.
5    Q.   Okay.  Where -- where would that be?   14:22:48
6    A.   Each of those sub-headers would be cited
7 in different locations.  I'd -- I'd be happy to --
8 to find the paragraphs for you.
9    Q.   Very good, yes, if you can point me to the
10 paragraphs that get you to the $3 million   14:23:06
11 approximate figure from the $991,000 -- I'm sorry --
12 991,000 approx- -- approximate figure for the
13 tokens, that would be helpful.
14    A.   (Witness reviews.)
15        Some of those dollar values are cited in   14:23:48
16 Paragraph 114 and refer back to Exhibit 3.
17    Q.   Did you say 114?
18    A.   Yes.  Paragraph 114.
19    Q.   Okay.  I'm looking at Paragraph 114.  Can
20 you point me to the particular portion of the   14:24:04
21 paragraph you're referring to?
22    A.   Yeah.  The -- the final two sentences
23 outline the U.S. dollar value for those three
24 transfers of Injective tokens to the Nguyen account.
25    Q.   So if I'm understanding you correctly,   14:24:27

Page 89

1    (Interruption in audio/video.)
2        THE COURT REPORTER:  Excuse me, one
3 second.  Wait, wait, hold on.  I couldn't hear you
4 because there was some speaking over.
5        Mr. Fokas, if you can start over.  "You   14:19:16
6 are expected" --
7        MR. FOKAS:  You're expected to comply with
8 the rules of the Southern District of New York,
9 which govern the conduct of this deposition.  And
10 so, you can be guided accordingly, and please do not   14:19:24
11 lecture the witness.
12        MR. KAPLAN:  Yeah.  Oh, I'm complying with
13 those rules.  And if you think I'm not, you can take
14 appropriate relief -- or seek appropriate relief.
15        MR. FOKAS:  Well, I'm objecting for the   14:19:39
16 record and we'll reserve on that if we seek -- if
17 you continue.
18        MR. KAPLAN:  Very good.
19        MR. FOKAS:  Thank you.
20 BY MR. KAPLAN:                           14:19:45
21    Q.   The -- have you ever formed an opinion
22 regarding the value of the Injective tokens that are
23 discussed in your declaration?
24    A.   I'm not sure the value would be an
25 opinion.                               14:20:00

Page 87

23 (Pages 86 - 89)

---

**Page 90**

1 the -- the references to the pricing data from
2 Yahoo! Finance for the period January 12th through
3 15 of 2021; is that right?
4     A.  For those transfers, yes.
5     Q.  And is there anywhere else, other than     14:24:38
6 Paragraph 114 in your declaration, that provides the
7 support or basis for the valuation of the Injective
8 tokens that's in Paragraph 102 that we read earlier?
9     A.  (Witness reviews.)
10        Paragraph -- the end of Paragraph 113     14:26:06
11 contains that the -- the value of the transfers
12 listed in the chart also in that paragraph.
13     Q.  Okay.  And I -- it looks like that's based
14 on Yahoo! Finance pricing data for the periods
15 December 22nd and 23rd of 2020; is that correct?     14:26:57
16     A.  Yes.
17     Q.  And then other than that, anything else in
18 your declaration that supports the $3 million
19 approximate valuation for the 900 -- 991,000
20 approximate Injective tokens that we just read from?     14:27:26
21     A.  Those are the -- the value of the proceeds
22 of those tokens, as well as the -- the 20 BTC.
23     Q.  Did -- did you look at the -- at any data
24 to value the Injective tokens for any periods other
25 than December 22nd and 23rd of 2020, and     14:27:51

Page 90

**Page 91**

1 January 13th through 15th of 2021?
2     A.  I -- I looked at various values for the --
3 and various dates for the value of Injective tokens.
4     Q.  Is that anywhere in your declaration?
5     A.  These were the dates that I felt were     14:28:12
6 relevant for the U.S. dollar value based on my
7 tracing.
8     Q.  Are any other dates in your declaration
9 regarding values for the Injective tokens?
10     A.  I don't believe it's cited in the     14:28:29
11 declaration.  I know that there's INJ pricing data
12 included in the exhibits.
13     Q.  So is there INJ pricing data for the first
14 period I asked you about, October 21st, 2020?
15     A.  I -- I don't recall.  I don't have the     14:28:48
16 exhibit in front of me.
17     Q.  So is -- are you aware of anything that is
18 in your declaration or in the exhibits to your
19 declaration that would reflect the value of the
20 Injective tokens on October 21st, 2020?     14:29:16
21        MR. FOKAS:  Objection.  Asked and
22 answered.
23        THE WITNESS:  I -- I don't have the
24 exhibit in front of me.
25 BY MR. KAPLAN:     14:29:30

Page 91

**Page 92**

1     Q.  Okay.  To be clear, I didn't ask you about
2 any particular exhibit.  I asked you whether you are
3 aware of anything in your declaration or any
4 exhibits to your declaration that -- that reflect
5 your value for the Injective tokens or any value for     14:29:43
6 the Injective tokens on October 21st, 2020?
7        MR. FOKAS:  Objection.  Asked and
8 answered.  Third time.
9        THE WITNESS:  I -- I don't recall.  I know
10 that there's INJ pricing to that -- pricing data in     14:29:56
11 my exhibits.  I don't recall the dates.
12 BY MR. KAPLAN:
13     Q.  Okay.  Other than the -- strike that.
14        The -- the Yahoo! Finance historical
15 pricing data for Injective -- I'm sorry, for the     14:30:22
16 Injective tokens that you've referenced in
17 Paragraphs 113 and 114 of your declaration,
18 that's -- those are in Exhibit 3 to your
19 declaration; that's what it says; right?
20     A.  That's what it says.     14:30:35
21     Q.  Okay.  Why don't we do this, let's --
22 let's go off the record.  We're going to take a
23 short break and talk about the length of that.
24     (Lunch recess taken.)
25        MR. KAPLAN:  We're back on the record.     15:18:24

Page 92

**Page 93**

1 BY MR. KAPLAN:
2     Q.  Mr. Porter, you understand you're still
3 testifying under oath?
4     A.  I do.
5     Q.  Okay.  Turning your attention back to the     15:18:31
6 paragraphs we were just looking at, which is 113 and
7 114, they both reference historical data from Yahoo!
8 Finance that's attached as Exhibit 3 to your
9 declaration; correct?
10     A.  Yes.     15:18:53
11     Q.  Okay.
12        MR. KAPLAN:  Okay.  I have just marked the
13 next exhibit as Exhibit 6.
14     (Porter Deposition Exhibit 6 was marked
15      electronically.)     15:19:41
16 BY MR. KAPLAN:
17     Q.  Let me know when you have that handy.
18     A.  Okay.
19     Q.  And have you ever seen the document we've
20 marked Exhibit 6 before?     15:20:05
21     A.  Yes.
22     Q.  Okay.  Is this, in fact, the document
23 attached as Exhibit 3 to your declaration that we
24 marked Exhibit 1 in today's deposition?
25     A.  I believe so.     15:20:22

Page 93

24 (Pages 90 - 93)

1  Q.  Okay.  And then looking at the pages you
2  reference with a page, you reference in Para- --
3  Paragraphs 113 and 114 of your declaration, which is
4  the 13th page of that declaration, why don't you go
5  to that page and let me know when you're there.     15:20:38
6  A.  Okay.
7  Q.  Okay.  And this indicates at the top, it
8  says, "Injective USD (INJ-USD)."
9       Do you see that?
10  A.  I do.                              15:20:56
11  Q.  Okay.  And so, is this the historical
12  Yahoo! Finance pricing data for the Injective token
13  for the period indicated on this page?
14  A.  Yes.
15  Q.  Okay.  And that period, as indicated just   15:21:12
16  below where I've read from, is -- where it says time
17  period, that's December 20 of the year 2020 and
18  January 14th of the year 2021; correct?
19  A.  That's correct.
20  Q.  Okay.  So you limited the pricing data,     15:21:29
21  historical pricing data for Injective token for the
22  period -- to the period December 20th, 2020, through
23  January 14th, 2021, as part of your declaration;
24  correct?
25  A.  Yes.                               15:21:48

Page 94

1  Q.  How did you choose that time interval?
2  First, how did you choose December 20, 2020, as the
3  starting point for the pricing data?
4  A.  I believe that they were the dates that
5  the Injective tokens were transferred to one of the   15:22:03
6  accounts in question, the Yenamandra account, the
7  Nguyen account.
8  Q.  Okay.  So let's go back and look at the
9  document we've marked Exhibit 5, which is the -- a
10  tracing chart from -- attached as part of Exhibit 60  15:22:23
11  to your declaration.  Let me know when you have that
12  handy.
13  A.  Okay.
14  Q.  Okay.  So as -- as I understand it,
15  there's essentially seven steps on your tracing       15:22:53
16  chart which starts, reading from left to right at
17  the top, "Injective Token Issuer" [as read], and
18  then it goes all the way through until the last
19  thing on the right is transfers to the "Nguyen
20  Account"; right?                       15:23:09
21  A.  Yes.
22  Q.  Okay.  And it's the fourth step that
23  occurs on December 22nd, 2020, with respect to the
24  Injective tokens under "Yena-" -- "Yenamandra
25  Account"; correct?                     15:23:29

Page 95

1  A.  Yes.
2  Q.  Okay.  So you don't -- strike that.
3       So the first pricing data you looked at
4  for the Injective tokens -- historical pricing data
5  was at the time of Step 4 on this tracing chart;      15:23:44
6  correct?  The so-called transfers to the Yenamandra
7  account; right?
8       MR. FOKAS:  Objection.  I'm not sure
9  what's Step 4.
10       THE WITNESS:  Yeah, I -- I haven't used      15:23:58
11  the -- numbered steps.  I understand that those
12  are -- the dates from the Deefa wallet to the
13  Yenamandra and the Nguyen account are -- are
14  associated with the dates that we just showed in
15  Exhibit 3.                             15:24:15
16  BY MR. KAPLAN:
17  Q.  Okay.  I'm going to ask you to go back to
18  your declaration marked Exhibit 1 and turn to page
19  38 and, in particular, paragraph 103.
20       And let me know when you're there.     15:24:42
21  A.  Okay.
22  Q.  Okay.  Do you see where it says, "As
23  explained in Paragraph 9, supra, the VQR Assets can
24  be traced from the Receivership Estate to Adaya in 4
25  steps"?  [As read]                     15:25:06

Page 96

1  A.  I see that.
2  Q.  And do you see that the remainder of that
3  paragraph lists those four steps?
4  A.  I do.
5  Q.  Okay.  And do you see that the            15:25:14
6  paragraphs -- the ten paragraphs that follow it
7  provide details of those purported steps listed as
8  Step 1, Step 2, Step 3, and Step 4?
9  A.  I do.
10  Q.  And the -- the thing listed as Step 3 is    15:25:28
11  the transfers -- is -- I'm sorry, is -- is the
12  transactions -- strike that.  Sorry.
13       The thing listed as Step 4 is transfers
14  from the Yenamandra account to the Nguyen account;
15  correct?                               15:26:09
16  A.  That's what it says.
17  Q.  Okay.  So when I say "Step 4, that's what
18  I mean.
19       Do you understand that?
20  A.  Yes.                               15:26:15
21  Q.  Okay.  So now going back again to your
22  tracing chart, the first time you used any
23  historical data for the pricing of the Injective
24  token was for your Step 4; correct?
25  A.  I believe it was also for -- for Step 3,    15:26:34

Page 97

25 (Pages 94 - 97)

1 but I'd -- I'd have to go and look at -- at the
2 report where I valued those.
3   Q.  Okay.  Well, let's take this in steps.
4       The -- you agree that the first date for
5 which you obtained pricing data for the Injective   15:27:03
6 tokens was December 21st, 2020; correct?
7   A.  Yes.
8   Q.  Okay.  And do you agree that for your
9 tracing chart that's Exhibit 5, the first time you
10 have any entry on or after December 21st, 2020, is   15:27:19
11 under the heading "Yenamandra Account" --
12   A.  Yes.
13   Q.  -- at the top?
14       Okay.
15       MR. FOKAS:  Objection.               15:27:29
16 BY MR. KAPLAN:
17   Q.  Okay.  And that -- and that box that has
18 some transactions under "Yenamandra Account" is Step
19 4 in your analysis; correct?
20   A.  I don't believe that's correct.        15:27:38
21   Q.  Okay.  What -- so what step number is it,
22 then?
23   A.  I -- I believe it's a combination of
24 Step 3 and Step 4 as the narrative outlines it in --
25 in the Yenamandra account box.               15:27:58

Page 98

1   Q.  So going back to the first step, which is
2 shown on this chart as the transfer of the
3 $1 million Injective -- I'm sorry, 1 million
4 Injective tokens from the INJ token issuer to the
5 Wallet Number 1632 that occurs on October 21st,   15:28:24
6 2020, do you see that?
7   A.  Yes.
8   Q.  Did you obtain any pricing data for the
9 Injective tokens on or about that date?
10   A.  I don't believe so.                   15:28:39
11   Q.  And in terms of the step that looks like
12 it's the third step here, in other words, from the
13 "VQR Binance Master Account" into the Adaya
14 Wallets" -- do you see that at the top?
15   A.  Yes.                                 15:29:01
16   Q.  Okay -- that -- that -- the transfer of
17 Injective tokens, according to this chart, occurred
18 on December 13th, 2020, from the VQR account to the
19 Adaya wallets; right?
20   A.  I don't believe that's correct.        15:29:15
21   Q.  Okay.  So do you see at the top -- we're
22 looking at -- you're looking at Exhibit 5; correct?
23   A.  I am looking at Exhibit 5.
24       You're -- I am looking at Exhibit 5.
25   Q.  Okay.  And do you see where Exhibit 5,   15:29:41

Page 99

1 there's the column -- I'm sorry, there's a heading
2 at the top where it says "VQR Binance Master
3 Account"?
4   A.  Yes.
5   Q.  And do you see to the right of that where   15:29:49
6 it says "Adaya Wallets"?
7   A.  Yes.
8   Q.  And do you see the arrow showing
9 418,671.75 Injective tokens going from VQR Binance
10 master account to Adaya wallet?               15:30:05
11   A.  Yes, I see it going to the box that says
12 "Deefa Wallet" under the subheading "Adaya Wallets."
13   Q.  Okay.  And that occurred on December 13th,
14 2020, according to this chart; correct?
15   A.  Correct.                            15:30:24
16   Q.  Okay.  And did you obtain pricing data for
17 the Injective tokens for -- for December 13th, 2020?
18   A.  I did not.
19   Q.  Is there any reason why you did not --
20 strike that.                                15:30:50
21       Let -- let me ask you, going back to the
22 original transfer from the issuer to the wallet
23 numbered 1632 on October 21st, 2020, of the 1
24 million Injective tokens -- do you recall discussing
25 that and see it on this chart?               15:31:08

Page 100

1   A.  Yes.
2   Q.  Okay -- is it understanding that at that
3 moment -- or at -- at -- on that day the Injective
4 tokens were first launched?
5       MR. FOKAS:  Objection.               15:31:18
6       THE WITNESS:  I don't recall what date
7 those tokens were minted.
8 BY MR. KAPLAN:
9   Q.  Okay.  So going back to the beginning of
10 your declaration, which is the first paragraph --   15:32:00
11 let me know when you're there.  It's on the first
12 page of Exhibit 1.
13   A.  Okay.
14   Q.  Okay.  And in the last sentence of the
15 first paragraph you say, "I submit this Dec-" --   15:32:20
16 "Declaration in support of the Receiver's Motion to
17 Compel Turnover of Assets"; right?
18   A.  That's what it says.
19   Q.  Okay.  And have you ever reviewed the
20 receiver's motion to compel turnover of assets?   15:32:35
21   A.  I have.
22   Q.  Okay.  And have you reviewed the
23 Memorandum of Law in Support of the Receiver's
24 Motion to Compel Turnover of Assets?
25   A.  I don't believe I have.              15:32:50

Page 101

26 (Pages 98 - 101)

1    Q.  Okay.  Let me know when you have Exhibit 7
2 handy.
3        (Porter Deposition Exhibit 7 was marked
4        electronically.)
5        THE WITNESS:  Okay.              15:33:31
6 BY MR. KAPLAN:
7    Q.  Have you ever seen Exhibit 7 before?
8    A.  I can't recall.
9    Q.  Okay.  So this states and I'll represent
10 to you it is what we have received as the        15:33:40
11 "MEMORANDUM OF LAW IN SUPPORT OF RECEIVER'S MOTION
12 TO COMPEL TURNOVER OF ASS-" -- "TURNOVER OF ASSETS"
13 that was filed in the court case we've been talking
14 about on August 4th, 2023, as indicated by the
15 legend at the top of the document.          15:33:57
16       Do you have any reason to believe that
17 this document is anything other than what I've just
18 represented it to be?
19    A.  No.
20    Q.  Do you recall -- just looking at the table  15:34:08
21 of contents, do you recall ever seeing this document
22 before?  When you said you had seen the motion, is
23 this what you were talking about?
24    A.  I -- I don't recall if I -- I don't recall
25 if I've seen this document or not.          15:34:27

Page 102

1    Q.  Okay.  I'm asking you to turn your
2 attention to page numbered 21 of this document that
3 you should -- there will be -- there's numbering at
4 the bottom in the center.  Let me know when you're
5 there.                              15:34:57
6    A.  You said page 21 at the bottom?
7    Q.  Correct.
8    A.  Okay.  I'm there.
9    Q.  Okay.  And do you see there's a heading
10 that says "The VQR Assets and Their Proceeds are     15:35:16
11 Receivership Property"?
12    A.  I see that heading.
13    Q.  Okay.  And turning your attention to the
14 second and third sentence, do you see where it says,
15 "As explained earlier, the VQR Assets consist of the  15:35:33
16 990,726.23 INJ tokens that VQR received on
17 October 21st, 2020, in connection with INJ token's
18 IEO." [As read]
19       And then the next sentence begins, "VQR
20 obtained the newly launched tokens for the purpose   15:35:58
21 of trading them for other more established digital
22 assets in order to help set a market for the INJ
23 token." [As read]
24       Do you see that?
25    A.  Yes.                         15:36:14

Page 103

1    Q.  Okay.  They -- assuming those statements
2 are accurate and based on the analysis that you've
3 done, including the chart we've marked Exhibit 5, is
4 it your understanding that the INJ tokens were first
5 launched on or about October 21st, 2020?          15:36:29
6        MR. FOKAS:  Objection.  Asked and
7 answered.  He said he doesn't recall.
8        THE WITNESS:  Yeah, I don't recall.
9 BY MR. KAPLAN:
10    Q.  I -- I understand you said you didn't     15:36:41
11 recall, and what I'm asking you to do now is, with
12 this additional information in hand, in other words,
13 reading these sentences that -- and I'm asking you
14 to assume them to be accurate, based on that, does
15 that change your understanding as to whether -- when  15:36:55
16 the INJ token was first launched?
17       MR. FOKAS:  Again, objection.  Asked and
18 answered.  He said he doesn't recall.  If you're
19 asking whether it refreshes his -- his recollection,
20 you can ask that question, if you'd like.          15:37:09
21       THE WITNESS:  I -- I don't recall the date
22 that -- that the tokens were launched.  This --
23 yeah, I don't recall.
24 BY MR. KAPLAN:
25    Q.  Yeah, so it sounds like we may be missing   15:37:18

Page 104

1 each other.  The original question was -- asked
2 about your recollection.  This question asks about
3 your understanding.
4        And the difference is, an understanding
5 can be formed not just by your memory, but by other  15:37:30
6 facts.
7        Does that make sense?
8        MR. FOKAS:  Objection.
9        THE WITNESS:  I -- I don't know who put
10 this document together, how it's put together.  I     15:37:39
11 don't know how closely they mean by "newly launched"
12 to October 21st, 2020.  I -- I don't want to
13 speculate.
14 BY MR. KAPLAN:
15    Q.  So going back to your tracing chart,        15:37:52
16 Exhibit 5, and let me know when you're there.
17    A.  Okay.
18    Q.  And it -- in the -- all the way looking to
19 the left, there's an indication that the INJ token
20 issuer transfers 1 million Injective tokens on       15:38:14
21 October 21st, 2020, to the wallet indicated as 1632.
22       Do you see that?
23    A.  I do.
24    Q.  Okay.  At that moment, is it -- is it your
25 understanding, that is on October 21st, 2020, was    15:38:29

Page 105

27 (Pages 102 - 105)

1 there already a trading market for the INJ tokens?
2     MR. FOKAS: Objection. Lacks foundation.
3     THE WITNESS: I -- I don't know.
4 BY MR. KAPLAN:
5   Q. Okay. Have you ever looked at Injective   15:38:43
6 token trading data for any date other than the dates
7 that are in the document you attach as Exhibit 3 to
8 your declaration, that is for the period
9 December 1st -- or, sorry, December 21st, 2020,
10 through January 14th, 2021?   15:39:02
11   A. Are you asking if I've looked at any
12 trading activity other than those dates?
13   Q. Any -- any trading data.
14   A. Yes.
15   Q. Okay. And what's the earliest date for   15:39:21
16 which you've ever seen any historical pricing data
17 for the Injective token?
18   A. I'm sorry, is your question about trading
19 data or price data?
20   Q. Price data.   15:39:38
21   A. Was your previous question about trade --
22 your previous question was about trading data or
23 pricing data?
24   Q. Okay. Let -- then we -- let's -- let's
25 start again. It sounds like we're missing each   15:39:51

1 other.
2     MR. FOKAS: Well, I think you asked the
3 question two different ways, so there's a little
4 confusion.
5     MR. KAPLAN: Okay.   15:39:57
6 BY MR. KAPLAN:
7   Q. Exhibit 6 contains historical pricing data
8 for the Injective token from December 20th, 2020,
9 through January 14th, 2021; correct?
10   A. Yes.   15:40:05
11   Q. Okay. Have you ever seen any historical
12 data regarding the pricing of the Injective token
13 for any period prior to December 20th, 2020?
14   A. I -- I don't recall.
15   Q. So if the -- going back to your tracing   15:40:34
16 chart, Exhibit 5 is what we've marked it --
17   A. Okay.
18   Q. Okay -- there are transactions involving
19 the Injective tokens beginning from October 20th of
20 2020; correct?   15:40:52
21   A. Correct.
22   Q. Okay. But the first time you obtained
23 pricing data at least that you attached to your
24 declaration is December 20th of 2020; correct?
25   A. That's correct.   15:41:05

1   Q. Okay. Why did you not obtain pricing data
2 for the Injective token for the period from
3 December 20th, 2020, through -- sorry, from
4 October 20th, 2020, through December 20th, 2020?
5   A. It wasn't relevant to the tracing.   15:41:20
6   Q. And is that something that you determined
7 what was relevant or not, or did someone else tell
8 you what was relevant or not?
9   A. You don't need the USD pricing to trace
10 the Injective assets. I -- I determined it was   15:41:39
11 relevant or un -- not relevant.
12   Q. Okay. So you -- you determined that the
13 only relevant pricing data was from December 20th,
14 2020, through January 14th, 2021; is that right?
15     MR. FOKAS: Objection. Mischaracterizes   15:42:00
16 testimony.
17     THE WITNESS: I -- I'm not sure I
18 understand the question.
19 BY MR. KAPLAN:
20   Q. It sounds like -- let me -- you just said   15:42:11
21 a moment ago that you determined the period of
22 relevancy for obtaining the Injective token pricing
23 data; correct?
24     MR. FOKAS: Objection.
25     THE WITNESS: That's not what I said.   15:42:24

1 BY MR. KAPLAN:
2   Q. Okay. Let's try again.
3     Who determined the relevant -- oh, sorry,
4 the -- the dates for the -- what you deem to be
5 relevant pricing data for the Injective tokens?   15:42:37
6     MR. FOKAS: Objection. Again,
7 mischaracterizes his testimony, "relevant pricing
8 data."
9     THE WITNESS: I -- I determined it was not
10 relevant to have the U.S. dollar value of the   15:42:51
11 Injective tokens in October of 2020.
12 BY MR. KAPLAN:
13   Q. Okay. Is it fair to say that you did
14 determine that it was relevant to have the U.S.
15 pricing data for the Injective tokens for some   15:43:06
16 period of time?
17   A. Yes.
18   Q. Okay. And the period of time that you
19 found it relevant to obtain the Injective pricing
20 data in U.S. dollars was December 20th, 2020,   15:43:19
21 through January 14th, 2021; is that correct?
22   A. Yes.
23   Q. Okay. So I'm asking you how you
24 determined those were the right dates. In other
25 words, why did you not get pricing data for   15:43:39

1  transactions in the Injective -- for -- for
2  transactions for the period October 20th, 2020,
3  through December 19th, 2020?
4      MR. FOKAS:  Gary, you -- you froze, your
5  Zoom froze.                          15:43:52
6      MR. KAPLAN:  Oh.
7      MR. FOKAS:  Can you repeat that question?
8  We missed part of it.
9      MR. KAPLAN:  Sorry about that.
10 BY MR. KAPLAN:                       15:43:57
11     Q.  So how did you determine not to get
12 pricing data for the period October 20th, 2020,
13 from -- through December 3rd -- sorry,
14 December 19th, 2020, for purposes of the -- the
15 tracing analysis you did?               15:44:18
16     MR. FOKAS:  Objection.
17     THE WITNESS:  It wasn't necessary to have
18 that data to do the tracing.
19 BY MR. KAPLAN:
20     Q.  So going back to Exhibit -- Exhibit 1,   15:45:02
21 which is your declaration, and looking at Paragraph
22 118 -- let me know when you're there.
23     A.  Okay.
24     Q.  So just -- going back to the second
25 sentence, which says -- or which references   15:45:43

Page 110

1  transactions in the Nguyen account from January 6th,
2  2021, through January 17th, 2023.
3      Do you see that?
4      A.  I do.
5      Q.  Okay.  Did you analyze all inflows and   15:46:06
6  outflows with respect to the Nguyen account for that
7  time period?
8      A.  I reviewed them.
9      Q.  Okay.  And are those shown on some exhibit
10 to your declaration?  Because it's not referenced   15:46:27
11 here?
12     A.  I believe so.
13     Q.  Okay.  And -- and -- and which exhibit
14 number would that be?
15     A.  I believe Exhibit 58 contains the deposits   15:46:40
16 for the Nguyen account and the associated
17 sub-accounts.  I don't -- I don't recall if the --
18 the trades are included as an exhibit or not.
19     Q.  Okay.  Is there any exhibits showing the
20 outflows from the Nguyen account for this time   15:47:06
21 period, that is January 6, 2021, through
22 January 17th, 2023?
23     A.  I don't recall.  I -- I don't believe so.
24     Q.  And what's the reason for that, that you
25 didn't include that exhibit -- or that information   15:47:27

Page 111

1  as an exhibit?
2      A.  It wasn't necessary to follow my tracing
3  to the Nguyen account.
4      Q.  Let me understand this.  So the
5  sentence -- that -- that second sentence arrives at   15:47:54
6  a valuation of $6,061,700 in the Nguyen account as
7  of January 17th, 2023; correct?
8      A.  Yes.
9      Q.  Okay.  And that reflects, among other
10 things, 100 withdrawals, according to that same   15:48:10
11 sentence; is that correct?
12     A.  I believe so.
13     Q.  Okay.  So to get to that number, you
14 looked at both the inflows and the outflows in that
15 account for that time period; correct?   15:48:25
16     A.  I don't believe that's correct.
17     Q.  Okay.  So how could you know what's still
18 in the account on a particular date if you didn't
19 look at the assets that were transferred out of the
20 account?                             15:48:44
21     A.  Can you repeat the question?
22     MR. KAPLAN:  Read it back to him, please.
23     (Record read back by the reporter.)
24     THE WITNESS:  I -- I traced the assets to
25 the Nguyen account.  That -- that's the -- the   15:49:07

Page 112

1  logical stopping point to my tracing.
2  BY MR. KAPLAN:
3      Q.  Okay.  It sounds like you may not be
4  understanding my question.  Let me try to explain it
5  a different way.                       15:49:36
6      According to that second sentence in
7  Paragraph 118, you arrived at a value for the Nguyen
8  account as of January 17th, 2023; correct?
9      A.  Yes.
10     Q.  Okay.  And that determination was after   15:49:50
11 you looked at approximately 7,000 trades, 100
12 withdrawals, and 100 deposits within that account
13 during that time period; correct?
14     A.  I believe that figure is based on the
15 account balance, the -- the -- the tokens in the   15:50:05
16 account.
17     Q.  Okay.  When you say there were, in that
18 sentence, 100 withdrawals, did you make up that
19 number, or did you look somewhere to determine that
20 number?                              15:50:25
21     A.  No, I -- I believe I -- I -- I -- that --
22 that is the number of withdrawals.
23     Q.  So you looked at something and counted
24 or -- or found -- or saw a total of withdrawals of
25 approximately 100 during that time period; is that   15:50:42

Page 113

29 (Pages 110 - 113)

1 right?
2    A.  Yes.
3    Q.  And I think you may have said this
4 already, but just to confirm, is it -- is it
5 accurate to say there is no either part of your          15:50:54
6 declaration or exhibits attached to the declaration
7 that I could look to to find those 100 withdrawals?
8       MR. FOKAS:  Objection.
9 BY MR. KAPLAN:
10   Q.  Is that right?              15:51:09
11   A.  Potentially.  I -- I don't recall the --
12 the contents of every exhibit.
13   Q.  Okay.  Let me know when you have Exhibit 8
14 handy.
15      (Porter Deposition Exhibit 8 was marked    15:51:46
16      electronically.)
17      THE WITNESS:  Okay.
18 BY MR. KAPLAN:
19   Q.  Okay.  Have you ever seen Exhibit 8
20 before?                    15:51:49
21   A.  I -- I haven't seen the specific clip.
22 It's unclear to me what -- what this record is.
23   Q.  Okay.  So I will represent to you this is
24 one of the documents we received from the Receiver
25 in connection with this matter, and there's an       15:52:05

1 indication on the bottom, on the right-hand side,
2 that has a number.
3       Do you see where it says SEC, then small
4 v, Q, and then that's soon after followed by the
5 numbers 179?                  15:52:20
6    A.  Yes.
7    Q.  Okay.  So first, do you recognize this as
8 a document reflecting transaction records in what
9 you call the Nguyen account?
10      MR. FOKAS:  Objection.         15:52:37
11      THE WITNESS:  I -- that's not obvious to
12 me from looking at it.
13      MR. FOKAS:  And just for the record, I --
14 I don't believe -- I believe that Bates number is a
15 Bates number that was produced by -- by Mr. Adaya,   15:53:11
16 not by the Receiver.
17      MR. KAPLAN:  Okay.  We can talk about that
18 off the record, but I -- that's not my
19 understanding.
20      MR. FOKAS:  I think that's your Bates    15:53:26
21 number; but, sure.
22 BY MR. KAPLAN:
23   Q.  Are you aware of any exhibits attached to
24 your declaration that reflect transactions in the
25 Nguyen account?                15:54:24

1    A.  I -- I don't recall the -- the specific
2 contents of every exhibit in my report -- in my
3 declaration.
4       (Porter Deposition Exhibit 9 was marked
5       electronically.)                15:56:13
6 BY MR. KAPLAN:
7    Q.  Let me know when you have Exhibit 9 handy,
8 please.
9    A.  Okay.
10   Q.  Have you ever seen Exhibit 9 before?     15:56:54
11   A.  I don't believe so.
12   Q.  Do -- do you recognize this as a
13 transaction -- or the record of a transaction from
14 what you get from the account that you referred to
15 as the Nguyen account in your declaration?      15:57:22
16   A.  That's not obvious to me from -- from this
17 record.
18      This refers to "FTX," which maybe is
19 incorrect.
20   Q.  I'm going to ask you to turn back to your   15:58:13
21 declaration, which we've marked Exhibit 1, and, in
22 particular, paragraph 114 on page 43.  And let me
23 know when you're there.
24   A.  Sorry, which paragraph?
25   Q.  114.                  15:58:44

1    A.  Okay.
2    Q.  Okay.  Do you see at the beginning of the
3 paragraph it references the "Nguyen Account ending
4 in 327e"?
5    A.  Yes.                  15:59:07
6    Q.  Okay.  And now going back to the Exhibit 8
7 we were just looking at -- I'm sorry, Exhibit 9, do
8 you see that same account, the '32- -- the account
9 ending in '327 referenced at the top of the first
10 page?                    15:59:27
11   A.  Under where it says "Transaction Hash"?
12   Q.  Correct.
13   A.  I think you may be --
14      MR. FOKAS:  The question is, do you see --
15      THE WITNESS:  I do see it, yes.      15:59:48
16      MR. FOKAS:  Do you see it ending in '327e,
17 I believe was the question?
18      THE WITNESS:  I see a transaction hash
19 ending in '327.
20 BY MR. KAPLAN:                  15:59:57
21   Q.  Okay.  Is it your understanding that that
22 transaction hash re- -- refers to the same account
23 as the one that you reference in paragraph 114 of
24 your declaration?
25   A.  No.                  16:00:06

1     Q.   Okay.  Are you aware that assets valued at
2   approximately $9 million were transferred to
3   [verbatim] the Nguyen account to Injective during
4   the period of November 2021 through March of 2022?
5     A.   I don't understand your question, to          16:01:21
6   Nguyen, to Injective.
7     Q.   No, I said from the Nguyen account to
8   Injective.
9     A.   No.
10    Q.   In -- going again back to Paragraph 118 of    16:01:35
11  your declaration and your reference to the 100
12  withdrawals from the Nguyen account between the
13  period January 6th, 2021, through January 17th,
14  2023, do -- do you see that?
15    A.   Yes.                                           16:02:01
16    Q.   Are you aware of those withdrawals of any
17  involving transfers to Injective?
18    A.   I didn't trace where those 100 withdrawals
19  went; so, no.
20    Q.   Did you look at where any of the              16:02:22
21  withdrawals went?
22    A.   I took my tracing to the Nguyen account
23  and reached the conclusion, through a very
24  reasonable conclusion based on the facts in my
25  declaration, that the assets were still there.       16:02:44

Page 118

1     MR. KAPLAN:  Objection.  Move to strike
2   the answer as nonresponsive.  I'm going --
3     (Simultaneous speaking.)
4     (Interruption in audio/video.)
5     THE COURT REPORTER:  Could you please             16:03:06
6   repeat.  Mr. Fokas, could you please repeat.
7     MR. FOKAS:  I'm just going to object to
8   his objection.  We'll reserve on that.
9     I think he responded to your question.
10  You can ask him another question.                    16:03:15
11  BY MR. KAPLAN:
12    Q.   Regardless of whether you think it was
13  relevant or not, did you look at where any of the
14  100 withdrawals you referenced went to?
15    A.   No.                                            16:03:25
16    MR. FOKAS:  And I'll just object to that
17  question.  It was asked and answered.  It also
18  mischaracterizes his prior testimony.
19  BY MR. KAPLAN:
20    Q.   Do you have any knowledge regarding           16:03:58
21  whether any of the withdrawals from the Nguyen
22  account between the period January 6th, 2021, and
23  January 17th, 2023, were transfers to Injective?
24    MR. FOKAS:  Objection.  Asked and
25  answered.                                             16:04:19

Page 119

1     THE WITNESS:  I haven't seen any record
2   that suggests that.
3   BY MR. KAPLAN:
4     Q.   Would it be correct to say that you also
5   made no inquiry to determine whether any of these   16:04:33
6   100 withdrawals went to Injective?
7     MR. FOKAS:  Objection.
8     THE WITNESS:  I don't believe that's --
9   can you repeat the question?
10    MR. KAPLAN:  Can you read it back to him,         16:04:48
11  please.
12    (Record read back by the reporter.)
13    MR. FOKAS:  Same objection.
14    THE WITNESS:  I don't believe that would
15  be correct.                                          16:05:08
16  BY MR. KAPLAN:
17    Q.   Okay.  So what inquiry did you make as to
18  whether any of the 100 withdrawals went to
19  Injective?
20    A.   I didn't make any specific inquiries about   16:05:30
21  whether assets went to Injective from the Nguyen
22  account.
23    Q.   Okay.  Did you make any general inquiries
24  to that effect?
25    A.   I -- I reviewed the withdrawals and the      16:05:50

Page 120

1   deposits.  I felt that the tracing reached a logical
2   conclusion at the Nguyen account.  That's where my
3   tracing stopped.
4     Q.   So I think you may be missing my question
5   again, so I'm going to try again.                    16:06:21
6     I asked you what inquiry you made as to
7   when -- whether any of the 100 withdrawals went to
8   Injective, and you answered that you didn't make any
9   specific inquiries about that.
10    So then, because you used the words --            16:06:34
11  word "specific," I asked you whether you made any
12  general inquiries to that effect.
13    And that's the question I'm looking for an
14  answer to.
15    MR. FOKAS:  I'm going to object again.            16:06:43
16  You've asked the same question four or five
17  different times here.  He's asked and answered it.
18    You can try again.
19    THE WITNESS:  I didn't ask whether these
20  withdrawals generally went to Injective Labs.       16:06:57
21  BY MR. KAPLAN:
22    Q.   Did you conduct any analysis at all or any
23  review at all to determine whether any of the 100
24  withdrawals for this period we've been looking at,
25  January 2021 through January 2023, went to          16:07:19

Page 121

31 (Pages 118 - 121)

1 Injective?
2        MR. FOKAS:  Again, Counsel, you can't keep
3 on -- it's asked and answered.  You can't keep on
4 asking the same an- -- question hoping to get a
5 different answer.  That's not proper.  This is the      16:07:34
6 last time.  He's not -- if you ask it again, I'm
7 going to direct him not to answer.
8        Go ahead.
9        THE WITNESS:  I didn't make any inquiries
10 related to these assets going to Injective Labs.      16:07:40
11 BY MR. KAPLAN:
12    Q.  Okay.  I -- just to be clear, I didn't ask
13 you about inquiries.  I asked you about analysis or
14 review.
15    A.  I reviewed the Nguyen account.  And I felt  16:07:54
16 that the tracing had reached a point where -- I felt
17 I reached the end of the tracing based on the review
18 of the trades, the withdrawals and the deposits.
19    Q.  Okay.  To be clear, I didn't ask you
20 anything about whether you reached the end of the      16:08:17
21 tracing or not reached the end of the tracing.  My
22 question was whether you performed any analysis or
23 review as to whether any of the withdrawals went
24 from the so-called Nguyen account to Injective?
25        MR. FOKAS:  Again, Counsel, it's --      16:08:36

Page 122

1 period?
2    A.  I don't believe I said I reviewed
3 withdrawals to Injective.
4    Q.  Okay.  When you -- when you just said a
5 moment ago "I reviewed the withdrawals," what      16:09:38
6 withdrawals were you referring to?
7    A.  The withdrawals from the Nguyen account.
8    Q.  Okay.  And in that review of the
9 withdrawals from the Nguyen account -- and we're
10 talking about first the period January of 2021      16:09:52
11 through January of 2023; correct?
12    A.  Yes.
13    Q.  Okay.  Of those withdrawals you reviewed,
14 did you review any that went to Injective?
15    A.  I didn't conduct a tracing of the 100      16:10:10
16 withdrawals.  I saw no evidence of any withdrawals
17 going to Injective Labs, based on my review.
18        MR. KAPLAN:  Why don't we go off the
19 record so we can take a short break.
20        (Short recess taken.)      16:10:35
21 BY MR. KAPLAN:
22    Q.  Mr. Porter, asking you to turn your
23 attention back to Exhibit 7.
24        Let me know when you're there.
25    A.  Okay.      16:28:47

Page 124

1 objection.  Asked and answered.  This is now the
2 seventh time.  I believe you can read back -- if you
3 want the reporter to read back, you've asked that
4 question about seven or eight minutes ago, and he
5 answered it.  And now you've asked him seven or      16:08:48
6 eight times.  It's -- it's inappropriate.  You're
7 trying to get a -- you're not getting the answer
8 you want, and it's not proper to keep asking it.
9        MR. KAPLAN:  Counsel, I think you're
10 incorrect.  I had asked him earlier about inquiries  16:08:57
11 he had done.  And now I'm asking him about analysis
12 or review he has done, which was different.
13        So please answer the question.
14        MR. FOKAS:  He's answered -- it's asked
15 and answered already.  But go ahead, you can try one  16:09:07
16 more time.
17        MR. KAPLAN:  I -- I just did.  If you'd
18 stop interrupting.  He can answer.
19        MR. FOKAS:  I'm talking to my client,
20 Counsel.  I'm not talking to you.  I directed him to  16:09:16
21 answer.  Thank you.
22        THE WITNESS:  I reviewed the withdrawals.
23 BY MR. KAPLAN:
24    Q.  Okay.  Which withdrawals to Injective from
25 the Nguyen account did you review during this time  16:09:23

Page 123

1    Q.  Okay.  And you'll recall this was the --
2 or this is the Memorandum of Law by the Receiver
3 with regard to this turnover -- turnover motion
4 we've been talking about.
5        Do you remember us discussing that      16:29:09
6 earlier?
7    A.  Yes.
8    Q.  And asking you to turn your attention in
9 particular to Paragraph -- I'm sorry, page Number 22
10 of the document.  And, again, the page numbering is  16:29:21
11 at the bottom, in the center.
12    A.  Okay.  I'm on the page.
13    Q.  Okay.  And -- and in particular, looking
14 at the end of the first paragraph, do you see where
15 it says -- it's a sentence that begins, "The same      16:29:55
16 rationale should apply here where" -- and then it
17 says -- "the INJ tokens were provided to VQR so that
18 it could establish a market for the tokens by
19 selling to third parties and keeping sale profits."
20 [As read]      16:30:19
21    A.  I'm sorry, I don't see that on this page.
22    Q.  Okay.
23    A.  Oh, I -- I apologize.  Yeah, I -- I do see
24 that.
25    Q.  Okay.  Okay.  Do you understand that      16:30:27

Page 125

32 (Pages 122 - 125)

1 this -- the -- the Receiver's position here is that
2 the Receiver, on behalf of VQR, is entitled to the
3 profits from the market making of the Injective
4 tokens?
5        MR. FOKAS: Objection.          16:30:45
6        THE WITNESS: I'm not a lawyer. I don't
7 want to contend what their position is.
8 BY MR. KAPLAN:
9    Q.  Okay. Okay. Do you -- do you -- let --
10 let me back up then.                    16:30:56
11       Do -- are you on -- are you familiar with
12 the concept of underwriting of securities?
13   A.  Yes.
14   Q.  Okay. And, in fact, you're studying for
15 your CFA now; right?                    16:31:05
16   A.  That's correct.
17   Q.  Okay. And so, do you -- what's -- what's
18 your understanding of what an underwriter for a
19 security does?
20   A.  An underwriter for -- I -- I -- I don't   16:31:16
21 think I can succinctly describe that.
22   Q.  Okay. Let me -- let me try and see if I
23 can do it and you can see -- and you can tell me if
24 you agree or disagree.
25   A.  Sure.                            16:31:41

Page 126

1    Q.  The -- and I'm actually going to
2 paraphrase some of the language in -- on this
3 page 22, as well as right before it. Let me just do
4 that 'cause it might be easier.
5        Okay. So I'm actually reading from -- if   16:31:59
6 you look at the -- at the bottom of page 21, the
7 last sentence, which continues on the top of
8 page 22, do you see where it says, "The Securities
9 Act of 1933 defines an underwriter" -- "underwriter
10 as 'any person who has purchased from an issuer with   16:32:15
11 a view to, or offers or sells for an issuer in
12 connection with, the distribution of any security'"?
13 [As read]
14       First, I -- I just want to ask you, do --
15 do you see that phrase -- that phrasing there?   16:32:42
16   A.  Yes.
17   Q.  Okay. Okay. So is your understanding of
18 underwriting consistent with that sentence?
19   A.  Yes.
20   Q.  Okay. And is your understanding also that   16:32:51
21 when an underwriter underwrites a security, the
22 underwriter gets to keep the profits from doing so
23 over and above the amount that the issuer gets back
24 for that sale?
25       MR. FOKAS: Objection. Calls for a legal   16:33:18

Page 127

1 conclusion.
2        THE WITNESS: I -- yeah, I'm -- I'm not
3 sure.
4 BY MR. KAPLAN:
5    Q.  Do -- based on your understanding,       16:33:42
6 including your study to be a CFP, the -- or I'm
7 sorry, CFA, do you understand that underwriters get
8 compensated for underwriting securities on behalf of
9 issuers?
10   A.  I'm sure they receive some compensation,   16:34:04
11 yes.
12   Q.  Okay. And is it your understanding that
13 the compensation is the difference between the total
14 proceeds from selling the security that are received
15 from purchasers and the amount that's remitted back   16:34:20
16 to the issuer?
17       MR. FOKAS: Objection to the extent it
18 calls for a legal conclusion.
19       THE WITNESS: That -- that's not clear to
20 me. I don't -- I don't have expertise in         16:34:32
21 underwriting.
22 BY MR. KAPLAN:
23   Q.  When you looked at the proceeds from the
24 sale of the -- of the Injective tokens that are
25 outlined in the tracing chart that we've marked   16:34:52

Page 128

1 Exhibit 5, did you look at the entire proceeds from
2 selling the Injective tokens, or did you just look
3 at the profits to which the underwriter, which is
4 claimed to be VQR, is -- was entitled to?
5        MR. FOKAS: Objection. Compound question.   16:35:19
6 Assumes facts not in evidence. Lacks foundation.
7        THE WITNESS: I -- I don't understand the
8 question.
9 BY MR. KAPLAN:
10   Q.  Okay. Okay. Let's -- let's go back and   16:35:30
11 look at your tracing chart, which we marked
12 Exhibit 5, which is -- indicates it -- it's from
13 Paragraph 10 -- 103 of your declaration.
14       Let me know when you're there.
15   A.  Okay.                            16:35:48
16   Q.  Okay. You start off with a million tokens
17 going from the Injective token issuer to the
18 specified wallet; correct?
19   A.  Correct.
20   Q.  Okay. And then you follow that with them   16:36:09
21 going from that wallet to the Binance sub-account in
22 two tranches, 500,000 in one tranche and 500,000
23 tokens in another tranche; correct?
24   A.  That's correct.
25   Q.  Okay.                            16:36:28

Page 129

33 (Pages 126 - 129)

1    MR. FOKAS:  And just for the record,
2  there's a third entry there called .5 INJ on October
3  21st, 2020, that counsel did not describe.
4    MR. KAPLAN:  Yeah, that's 'cause that
5  doesn't come from the million.  That comes from the    16:36:39
6  one token above that that I'm not asking about.
7    MR. FOKAS:  Okay.
8  BY MR. KAPLAN:
9    Q.  And then you follow that through to -- the
10 next set of transactions includes about 419,000    16:37:01
11 Injective tokens going to the VQR Binance Master
12 Account; correct?
13   A.  Yes.
14   Q.  Okay.
15     MR. FOKAS:  Again for the record, I    16:37:12
16 believe that's -- unless my eyes deceive me, I
17 believe it's 418,671.75.
18     MR. KAPLAN:  Yeah, that's why I said about
19 419,000.  I -- I was doing what we call rounding.
20     MR. FOKAS:  Yeah, but we'd -- we'd like to    16:37:26
21 be precise to the extent these numbers matter.  I'm
22 going to object to the rounding and ask that we
23 stick to the numbers that are on the document.
24     MR. KAPLAN:  Okay.  Your objection's
25 noted.                          16:37:40

Page 130

1  BY MR. KAPLAN:
2    Q.  And the -- those -- that same amount of
3  tokens slightly under 419,000, precisely 418,761.75,
4  then goes to the Adaya Wallet on December 13th,
5  2020; correct?                   16:38:03
6    A.  It goes to wallet ending in D-E-E-F-A,
7  yes.
8    Q.  Okay.  And then from there, those same
9  tokens go to the -- what you call the Yenamandra
10 account in three different tranches from    16:38:27
11 December 22nd, 2020, through January 14th, 2021;
12 correct?
13   A.  That's not correct.
14   Q.  Okay.  What am I missing?
15   A.  There's two tranches of INJ tokens.    16:38:42
16 There's a third tranche of USDT tokens.
17   Q.  Okay.  Is -- isn't there one tranche for
18 200,000 Injective tokens?
19   A.  That goes to the Nguyen account.  I
20 believe -- I believe you asked about the Yenamandra    16:38:58
21 account.
22   Q.  Okay.  Let's just stick with the two
23 tranches that go to the Yenamandra account on
24 December 22nd and December 23rd, 2020.
25     Do you see that?                16:39:13

Page 131

1    A.  Yes.
2    Q.  Okay.  And that's 218,671.75 Injective
3  tokens; correct?
4    A.  That's correct.
5    Q.  Okay.  And that's -- going back to your    16:39:24
6  declaration, Exhibit -- I'm sorry, Paragraph 102,
7  that transaction is referenced in Letter B of that
8  paragraph; right?
9    A.  Yes.
10   Q.  Okay.  And in that same paragraph, you    16:40:00
11 have a -- a dollar valuation in the beginning where
12 it says, "The VQR Assets refer to approximately
13 $3 million dollars' worth of digital assets derived
14 from 990,726.23 Injective Tokens that were
15 transferred from the Receivership Estate to Adaya as    16:40:33
16 follows." [As written]
17     Right?  That's what it says?
18   A.  I believe that's what it says, yes.
19   Q.  Okay.  Okay.  So your valuation, that
20 $3 million valuation includes the transfer we've    16:40:44
21 just looked at in December 2020; correct?
22   A.  Yes.
23   Q.  Okay.  Does that amount, the -- the value
24 you appraise for the Injective tokens, include the
25 entire amount that was received in the transfer, or    16:41:04

Page 132

1  does it only include the profits on top of what was
2  returned to the issuer for that transaction?
3    MR. FOKAS:  Objection.
4    THE WITNESS:  I'm not sure I understand
5  the question.                    16:41:19
6  BY MR. KAPLAN:
7    Q.  Were any of the dollars received from the
8  original one million Injective tokens transferred
9  from the issuer to the wallet denominated 1632
10 [verbatim], were any of the proceeds from those one    16:41:59
11 million Injective tokens ever returned to the token
12 issuer?
13     MR. FOKAS:  Objection.
14     THE WITNESS:  I haven't seen any -- any
15 evidence of that.                   16:42:12
16 BY MR. KAPLAN:
17   Q.  Okay.  So as far as you know, the issuer
18 did not receive any of the proceeds from selling the
19 Injective tokens; is that right?
20     MR. FOKAS:  Objection.             16:42:34
21     THE WITNESS:  I haven't seen any evidence
22 of -- of funds going back to Injective.
23 BY MR. KAPLAN:
24   Q.  Have you sought to determine that?  In
25 other words, determine how much, if any, of the    16:42:47

Page 133

34 (Pages 130 - 133)

1 proceeds from the sale of the one million Injective
2 tokens went back to Injective?
3      A.  No.
4      Q.  So now I'm asking you to return back to
5 Exhibit 7, which, again, is the Receiver's       16:43:19
6 Memorandum of Law in support of the turnover motion
7 and looking back at the same page we looked at a
8 moment ago, page 22.
9          Let me know when you're there.
10     A.  Okay.                      16:43:42
11     Q.  Okay.  Were -- would -- the reference to
12 the sale profits in that sentence that are supposed
13 to go to VQR, according to this sentence, have you
14 undertaken any analysis to determine the amount of
15 those sale profits?                16:44:05
16     A.  No.
17     Q.  Please turn to Paragraph 7 of your
18 declaration, and let me know when you're there.
19          It's on page 3, if that will help you.
20     A.  Okay.                      16:44:56
21     Q.  So first, just, I want to make sure
22 I understand the terminology here.  It looks like,
23 according to your declaration, the defined term
24 "Sigma Assets," and by defined term I mean it's in
25 parentheses and quotes, refers to digital -- digital  16:45:15

Page 134

1 assets that are traceable to Sigma Fund investors;
2 is that correct?
3      A.  I believe "Sigma Assets" just refers to
4 Sigma Fund investor dollars.
5      Q.  Okay.  And what -- what are Sigma Fund  16:45:37
6 investor dollars?  What does that mean?
7      A.  I'm -- I'm sorry.  I read that sentence
8 wrong.
9          You're -- you are correct.
10     Q.  Okay.  And then turning to the next  16:45:48
11 paragraph, Paragraph 8, and in particular, looking
12 at Steps 5 and 6, which are on page 4.  Do you see
13 where it says first for Step 5, which is denominated
14 letter "e," "The cryptocurrency was then transferred
15 from the Qin Exchange Accounts to a Binance account  16:46:14
16 registered in the name of Srihari Yenamandra
17 ('Yenamandra account') and controlled by Adaya."
18 [As read]
19          And I'm skipping the footnote.  And then
20 it says, Step 6, which is denominated letter "f,"  16:46:30
21 "After being traded extensively for and commingled
22 with other assets, the resultant crypto-" --
23 "cryptocurrency (and proceeds thereof) was
24 transferred from the Yenamandra Account to the
25 Nguyen Account."  [As read]         16:46:50

Page 135

1      First, do you see that?
2      A.  I do.
3      Q.  Okay.  So is this saying that assets that
4 were traceable to the Sigma investors were then
5 commingled with assets that were both included,  16:47:03
6 so-called Sigma assets and included non-Sigma
7 assets?
8      A.  I'm sorry, I'm not sure I understand the
9 question.
10     Q.  Okay.  Well, let's -- let's go -- go in  16:47:21
11 pieces.
12          You have a reference to "commingled with
13 other assets" in Step 6; right?
14     A.  That's correct.
15     Q.  Okay.  Does the "other assets" mean other  16:47:32
16 than the so-called Sigma assets?
17     A.  Not necessarily.
18     Q.  What did you mean by "other assets" then?
19     A.  They were assets where I -- I was unable
20 to determine the source.                16:47:49
21     Q.  Okay.  So, in other words, assets that you
22 don't know whether or not they were so-called Sigma
23 assets; is that right?
24     A.  Yes.
25     Q.  Okay.  Were you able to determine whether  16:48:01

Page 136

1 they are -- these so-called other assets involved
2 any of the other so-called receivership entities?
3      A.  I'm sorry, can you repeat the question?
4      MR. KAPLAN:  Can you read it back to him,
5 please.                         16:48:25
6      (Record read back by the reporter.)
7      THE WITNESS:  No.  I wasn't able to
8 determine the source of those assets.
9 BY MR. KAPLAN:
10     Q.  And just to be clear, we're talking about  16:48:59
11 the same thing, why -- why don't you turn back to
12 Exhibit 7, which is the Receiver's Memorandum of Law
13 in support of the turnover motion, and in particular
14 page 1, and let me know when you're there.
15     A.  Page 5 of 29 at the top; correct?       16:49:23
16     Q.  Correct.
17     A.  Okay.
18     Q.  Okay.  Do you see where there's in --
19 underneath the heading "PRELIMINARY STATEMENT" about
20 seven lines down, there's a definition for the  16:49:36
21 "Receivership Entities," which is in quotations and
22 bold font?
23     A.  I see that.
24     Q.  Okay.  And do you see that that refers to
25 the entities listed right before that, which are  16:49:46

Page 137

35 (Pages 134 - 137)

1 "Virgil Capital LLC, Montgomery Technologies, LLC,
2 Virgil Technologies, LLC, Virgil Quantitative
3 Research LLC, VQR Partners, LLC, Virgil Sigma" --
4 "Sigma Fund, LP, and VQR Multistrategy Fund, LP"?
5 [As read]                          16:50:14
6    A.  Yes, I see that.
7    Q.  Okay.  So what -- when -- when I'm using
8 the term "receivership entities," do you understand
9 that I'm referring to how it's defined right here
10 with those named entities that are defined as      16:50:27
11 receivership entities?
12    A.  Yes.
13    Q.  Okay.  So now, going back to my earlier
14 question and looking back at your declaration,
15 did -- when you referred in Step 6 in Paragraph 8 of  16:50:36
16 your declaration, when you referred to "other
17 assets," do you have any way of knowing whether
18 those include or don't include the property of the
19 so-called receivership entities?
20    A.  No.                       16:51:00
21    Q.  And I'm going to ask you to turn your
22 attention next to Paragraph 11 of your declaration,
23 which is on -- numbered page 5.
24    A.  Okay.
25    Q.  Okay.  Do you see where it says, "The    16:51:21
Page 138

1 Sigma" -- first, it's the beginning of the
2 paragraph.  "The Sigma Assets were then commingled
3 with, and traded extensively at a high frequency
4 for, other digital assets within the Yenamandra
5 Account."                         16:51:38
6    A.  I see that.
7    Q.  Okay.  And the -- other digital
8 assets, do they include assets that are not
9 receivership entity assets?
10    A.  Yes.                       16:51:51
11    Q.  I'm going to ask you to turn your
12 attention to Paragraph 40 of your declaration.  Let
13 me know when you're there.
14    A.  Okay.
15    Q.  Okay.  Do you see the first sentence says,  16:52:09
16 "The 1,588" -- ".88 USDT and 378.67 BCH were
17 commingled with, and traded extensively at a high
18 frequency for, other digital assets within the
19 Yenamandra Account"?  [As read]
20    A.  I do see that.              16:52:36
21    Q.  Okay.  The "other digital assets"
22 referenced, do those include assets that were not
23 part of the so-called receivership entities?
24    A.  They include assets that I was unable to
25 trace the source of, could or could not include    16:52:53
Page 139

1 assets of receivership entities.
2    Q.  Okay.  So you don't know, in other words?
3    A.  Correct.
4    Q.  Okay.  I'm going to ask you to turn your
5 attention now to Exhibit -- I'm sorry, Paragraph 50   16:53:02
6 of your declaration, which appears on Number 21 --
7 page 21.  Let me know when you're there.
8    A.  Okay.
9    Q.  Okay.  The first sentence there says, "The
10 100 BTC were commingled with, and traded extensively  16:53:13
11 at a high frequency for, other digital assets within
12 the Yenamandra Account."
13       Do you see that?
14    A.  Yes.
15    Q.  Okay.  Do any of the other digital assets   16:53:26
16 include assets that were not part of the
17 receivership entities?
18    A.  Same answer as previously.  They include
19 assets where I was unable to trace the source.
20    Q.  Okay.  And there -- therefore, unable to    16:53:40
21 determine whether or not they included receivership
22 entity property; right?
23    A.  Yes.
24    Q.  Okay.  I'm going to ask you to turn your
25 attention now to Paragraph 94 of your declaration,   16:53:49
Page 140

1 which appears on page 34 -- sorry, 35.
2       Let me know when you're there.
3    A.  Okay.
4    Q.  So that says in the first sentence, "The
5 BCH, ETC, and BTC deposited into the VPFA Coinbase   16:54:07
6 Account were then commingled with, and traded at a
7 high frequency for, other digital assets within the
8 VPFA Coinbase Account, including USDC."
9       Do you see that?
10    A.  I do.                      16:54:37
11    Q.  Okay.  Did those other digital assets
12 include assets that were not part of the
13 receivership entities?
14    A.  Again, it's -- there are assets where I
15 was unable to trace the -- the source.      16:54:50
16    Q.  Okay.  So, in other words, unable to
17 determine whether or not they were part of the
18 receivership entities; correct?
19    A.  Correct.
20    Q.  Okay.  I've got one more for you.  It's on  16:54:59
21 Paragraph 99.  And let me know when you're there.
22 This is page 20 -- 37.
23    A.  Okay.
24    Q.  This says, first sentence, "The 32,044.80
25 USDC were commingled with, and traded extensively at  16:55:16
Page 141

36 (Pages 138 - 141)

1 a high frequency for, other digital assets within
2 the Yenamandra Account."
3         Do you see that?
4     A.  I do.
5     Q.  Did the referenced "other digital assets"    16:55:27
6 include assets that were not part of -- of the
7 receivership entities?
8     A.  Again, I wouldn't say that they were
9 definitively not.  I would say that I was unable
10 to -- trace the source.                          16:55:46
11    Q.  Okay.  So, in other words, unable to
12 determine whether they included or not a property of
13 the receivership entities; correct?
14    A.  Correct.
15    Q.  Okay.  So now let's look at Paragraph 101    16:55:54
16 of your declaration.  It's on the same page.
17    A.  Mm-hmm.
18    Q.  And that says, "Based on (a) my tracing of
19 the Sigma Assets to the Yenamandra Account, coupled
20 with (b) the fact that I have not been able to      16:56:13
21 identify the return by Adaya of any Sigma Assets to
22 Qin or the Receivership Entities, (c) the extensive
23 trading and commingling of the Sigma Assets within
24 the Yenamandra Account, and the (d) final transfers
25 of the Yenamandra Account balance to the Nguyen" --   16:56:35

Page 142

1 were located?
2         MR. FOKAS:  Objection.
3         THE WITNESS:  I'm -- I'm sorry.  I -- I
4 don't think I understood the question.
5 BY MR. KAPLAN:                                     16:58:14
6     Q.  Okay.  You acknowledge you stopped your
7 tracing for the Nguyen account as of January 17th,
8 2023; correct?
9     A.  Yes.
10    Q.  Okay.  And you have a conclusion as to      16:58:23
11 where the Sigma assets were at that time with
12 respect to the Nguyen account; right?
13    A.  Yes.
14    Q.  Okay.  Question is, why did you stop the
15 tracing analysis on January 17th, 2023, to reach    16:58:41
16 that conclusion?
17    A.  It's the last date that I had records.
18    Q.  Okay.  Just to confirm, and that's
19 because you didn't request any records for any date
20 after January 17th, 2023, to perform tracing;      16:58:57
21 correct?
22        MR. FOKAS:  Objection.
23        THE WITNESS:  Correct.
24 BY MR. KAPLAN:
25    Q.  Okay.  Asking your -- I'm sorry.  Turning   16:59:18

Page 144

1 "Nguyen Account, I have reason to believe that
2 commingled proceeds derived from the Sigma Assets
3 were transferred to and remain in the Nguyen
4 Account."  [As read]
5         Do you see that?                           16:56:51
6     A.  I do.
7     Q.  Okay.  So this conclusion that you drew,
8 your reason to believe that commingled proceeds
9 derived from the Sigma assets were transferred to
10 and remain in the Nguyen account, that's based on    16:57:08
11 your tracing analysis that stopped on January 17th,
12 2023; correct?
13    A.  It's based on the tracing analysis that I
14 outline here.
15    Q.  Right.                                      16:57:23
16        And we -- and the tracing analysis you
17 outline here, you testified earlier ended for the
18 Nguyen account on January 17th, 2023; correct?
19    A.  Yes.
20    Q.  Okay.  So let me ask you the similar        16:57:34
21 question that I asked you for Paragraph 118, what
22 was the reason with respect to the conclusion in
23 Paragraph 101 that you stopped tracing on
24 January 17th, 2023, to reach your conclusion that
25 the -- of where the proceeds from the Sigma assets    16:58:05

Page 143

1 your attention to Paragraph 116 on page 44, let me
2 know when you're there.
3     A.  Okay.
4     Q.  Okay.  I'm going to paraphrase this
5 sentence to avoid some of the abbreviations that I    16:59:50
6 don't think are necessary for the question.
7         So it -- this sentence says, "Between
8 January 4th and January 6th, 2021, substantially all
9 of the assets contained in the Yenamandra
10 Account" -- and then it says "assets denominated    17:00:11
11 in," and it gives various denominations.  It then
12 goes on to say, "were transferred from the
13 Yenamandra Account to wallets ending in, 'htlu,'
14 'tez2,' '4445,' and 'b2a1,' - unhosted wallets
15 believed to be owned and/or controlled by Adaya."    17:00:40
16 [As read]
17        Do you see that?
18    A.  I do.
19    Q.  Okay.  What's the basis for your belief
20 that these were unhosted wallets owned and/or        17:00:49
21 controlled by Adaya?
22    A.  Public block chain records make it pretty
23 clear that it's an unhosted wallet.  In terms of
24 control by Adaya, my understanding is that Mr. Adaya
25 had control of -- of the Nguyen account.  And so, if  17:01:09

Page 145

37 (Pages 142 - 145)

1 the funds are flowing to certain wallets and then
2 directly to the Nguyen account, that was a
3 conclusion that I reached.
4     Q.  Okay.  Okay.  Just so I understand it,
5 your belief that the wallets were owned or          17:01:27
6 controlled by Adaya is based on your belief that the
7 referenced assets were then transferred from these
8 wallets to an account that he controlled; is that
9 right?
10        MR. FOKAS:  Objection.              17:01:41
11        THE WITNESS:  My understanding is that
12 Mr. Adaya controlled the Yenamandra account and the
13 Nguyen account.  So I reached the conclusion that
14 the intermediary wallets that those assets flowed
15 through were believed to be owned or controlled by    17:01:56
16 Adaya.  I don't believe I say that that's a fact.
17 BY MR. KAPLAN:
18     Q.  Okay.  I -- I think I understand.  Let --
19 let me just try to confirm.
20        The -- the belief to be owned or          17:02:15
21 controlled by Adaya, with reference to the unhosted
22 wallets, the basis for that belief was that the
23 assets went from the referenced wallets to an
24 account that you believe Adaya controlled; correct?
25        MR. FOKAS:  Objection.  Mischaracterizes

1 basis for my belief.
2 BY MR. KAPLAN:
3     Q.  Okay.  Other than what I've just said, do
4 you have any other basis for your belief that these
5 wallets were owned or controlled by Adaya?          17:03:49
6     A.  No.
7        MR. KAPLAN:  Okay.  All right.
8        We're going to take a short break.  Let's
9 go off the record for a moment.
10        (Short recess taken.)             17:14:54
11        MR. KAPLAN:  So we are done for today.
12 Thank you -- thank you everybody for coming.  I need
13 to get going.
14        MR. FOKAS:  This deposition is closed?
15        MR. KAPLAN:  Yes.                17:17:55
16        (Proceedings concluded, 5:17 p.m., EDT, on
17        October 12, 2023.)
18
19
20
21
22
23
24
25

1 his testimony.
2        THE WITNESS:  Yeah, I don't believe --
3 don't believe that's what I said.
4 BY MR. KAPLAN:
5     Q.  Okay.  So here's what you just said:      17:02:46
6        "My understanding is that Mr. Adaya
7 controlled the Yenamandra account, the Nguyen
8 account.  So I reached the conclusion that the
9 intermediary wallets that those assets flowed
10 through were believed to be owned or controlled by    17:03:01
11 Adaya."  [As read]
12        That's -- do you recall just saying that
13 saying a moment ago?
14     A.  Yes.
15     Q.  Okay.  So I'm trying to understand the     17:03:08
16 words you just uttered.  And are you saying that the
17 basis for your belief that the unhosted wallets were
18 owned or controlled by Adaya was because he
19 controlled the accounts that the money came from to
20 go into the wallet, the Yen- -- Yenamandra account,    17:03:31
21 and the account that it went to, from the wallets,
22 the Nguyen account?
23        MR. FOKAS:  Objection.  Asked and
24 answered.
25        THE WITNESS:  Yes.  That -- that's the     17:03:40

1                 JURAT
2
3        I, MARK PORTER, do hereby certify under
4 penalty of perjury that I have read the foregoing
5 transcript of my deposition taken remotely via
6 videoconference on Thursday, 10/12/2023; that I have
7 made such corrections as appear noted herein in ink,
8 initialed by me; that my testimony as contained
9 herein, as corrected, is true and correct.
10
11      Dated this _____ day of _____, 2023,
12 at _____.
13
14
15
16
17
18        _____
                 MARK PORTER
19
20
21
22
23
24
25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CERTIFICATE OF REPORTER

1
2       I, Hanna Kim, a Certified Shorthand
3  Reporter, do hereby certify:
4       That prior to being examined, the witness
5  in the foregoing proceedings was by me duly sworn to
6  testify to the truth, the whole truth, and nothing
7  but the truth;
8       That said proceedings were taken before me
9  at the time and place therein set forth remotely via
10  videoconference and were taken down by me in
11  shorthand and thereafter transcribed into
12  typewriting under my direction and supervision;
13      I further certify that I am neither
14  counsel for, nor related to, any party to said
15  proceedings, not in anywise interested in the
16  outcome thereof.
17      Further, that if the foregoing pertains to
18  the original transcript of a deposition in a federal
19  case, before completion of the proceedings, review
20  of the transcript was requested.
21      In witness whereof, I have hereunto
22  subscribed my name.
23  Dated: 10/
24
25      Hanna Kim
        CLR, CSR No. 13083

Page 150

---

ERRATA SHEET FOR THE TRANSCRIPT OF:

1
2  Case Name: U.S. SEC vs. STEFAN QIN, ET AL.
3  Dep. Date: OCTOBER 12, 2023
4  Deponent: MARK PORTER
5           CORRECTIONS:
6  Pg. Ln.   Now Reads   Should Read   Reason
7  ___ ___   _____   _____   _____
8  ___ ___   _____   _____   _____
9  ___ ___   _____   _____   _____
10 ___ ___   _____   _____   _____
11 ___ ___   _____   _____   _____
12 ___ ___   _____   _____   _____
13 ___ ___   _____   _____   _____
14 ___ ___   _____   _____   _____
15 ___ ___   _____   _____   _____
16 ___ ___   _____   _____   _____
17 ___ ___   _____   _____   _____
18 ___ ___   _____   _____   _____
19           _____
20           Signature of Deponent
21 SUBSCRIBED AND SWORN BEFORE ME
22 THIS____DAY OF_____, 2023.
23           _____
24 (Notary Public) MY COMMISSION
25 EXPIRES:_____

Page 151

---

1  JIMMY FOKAS, ESQ.
2  jfokas@bakerlaw.com
3              October 26, 2023
4  RE: UNITED STATES SECURITIES AND EXCHANGE COMMISSION
       vs.  STEFAN QIN
5  October 12, 2023-MARK PORTER-JOB NO.6134965
6  The above-referenced transcript has been
7  completed by Veritext Legal Solutions and
8  review of the transcript is being handled as follows:
9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10   to schedule a time to review the original transcript at
11   a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13   Transcript - The witness should review the transcript and
14   make any necessary corrections on the errata pages included
15   below, notating the page and line number of the corrections.
16   The witness should then sign and date the errata and penalty
17   of perjury pages and return the completed pages to all
18   appearing counsel within the period of time determined at
19   the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21   Counsel - Original transcript to be released for signature
22   as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24   time of the deposition.
25

Page 152

---

1  _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2   Transcript - The witness should review the transcript and
3   make any necessary corrections on the errata pages included
4   below, notating the page and line number of the corrections.
5   The witness should then sign and date the errata and penalty
6   of perjury pages and return the completed pages to all
7   appearing counsel within the period of time determined at
8   the deposition or provided by the Federal Rules.
9  __ Federal R&S Not Requested - Reading & Signature was not
10   requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 153

39 (Pages 150 - 153)

1  UNITED STATES SECURITIES AND EXCHANGE COMMISSION

   vs.  STEFAN QIN

2  MARK PORTER-JOB NO.6134965

3          E R R A T A  S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10 PAGE_____ LINE_____ CHANGE_____

11 _____

12 REASON_____

13 PAGE_____ LINE_____ CHANGE_____

14 _____

15 REASON_____

16 PAGE_____ LINE_____ CHANGE_____

17 _____

18 REASON_____

19 PAGE_____ LINE_____ CHANGE_____

20 _____

21 REASON_____

22

23 _____   _____

24 WITNESS              Date

25

                                        Page 154

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[& - 2020]**

| | |
|---|---|
| **&** | |
| **&**   3:4,16 7:17 11:11,12 19:1 152:23 153:9 | |

| **0** |
|---|
| **000179**   6:9 |
| **000182**   6:11 |
| **01**   5:8 |
| **03**   5:21 |

| **1** |
|---|
| **1**   5:4,20 13:18 13:20 14:2,15 15:18 18:24 20:14,22 21:16 46:4 54:23 56:15,24 84:20 84:25 85:24 86:4 93:24 96:18 97:8 99:3,3 100:23 101:12 105:20 110:20 116:21 137:14 153:1 |
| **1,000,000**   85:20 |
| **1,588**   139:16 |
| **10**   77:5 129:13 |
| **10/12/2023**   149:6 |
| **10/21/20**   85:20 |
| **10/26/2023**   150:23 |
| **100**   41:2 44:4,6 44:10,17,18,21 65:8,8 77:11 |

112:10 113:11 113:12,18,25 114:7 118:11 118:18 119:14 120:6,18 121:7 121:23 124:15 140:10
**101**   24:18 25:4 32:24 37:20 38:16 142:15 143:23
**102**   6:4 88:10 88:13 90:8 132:6
**103**   5:19 84:14 84:19 96:19 129:13
**10849**   1:7 2:7 7:24
**11**   49:14 138:22
**113**   90:10 92:17 93:6 94:3
**114**   6:8 54:24 89:16,17,18,19 90:6 92:17 93:7 94:3 116:22,25 117:23
**116**   6:10 54:24 145:1
**118**   30:6,20 31:4 32:25 37:20 38:16

46:5 49:14 64:23 69:21 78:18 110:22 113:7 118:10 143:21
**11th**   46:11 47:13 48:22 49:2 50:6
**12**   1:17 2:18 7:2 42:14 148:17 151:3 152:5
**12:13**   7:2
**12th**   67:17 90:2
**13**   5:4
**13083**   1:24 2:19 150:25
**13th**   91:1 94:4 99:18 100:13 100:17 131:4
**14th**   94:18,23 106:10 107:9 108:14 109:21 131:11
**15**   90:3
**15th**   91:1
**16**   5:22
**1632**   99:5 100:23 105:21 133:9
**17**   65:25 66:7 68:22,23 73:11
**179**   115:5
**17th**   46:12 64:20 65:6,17

67:14 68:7,12 69:2,7 70:2,8 72:11,24 74:13 74:23 75:8 76:6,13 77:20 77:23 78:9 81:5,13,25 82:20 83:9,13 83:23 111:2,22 112:7 113:8 118:13 119:23 143:11,18,24 144:7,15,20
**184**   6:11
**1933**   127:9
**19th**   110:3,14
**1st**   106:9

| **2** |
|---|
| **2**   5:8,14 20:14 21:2,3,9 57:1 97:8 |
| **20**   1:7 2:7 7:24 90:22 94:17 95:2 141:22 |
| **200,000**   131:18 |
| **2017**   14:23 17:2,5,8 18:7,7 |
| **2018**   15:10,23 16:1,2 17:15 18:11 |
| **2019**   46:11 47:13 48:22 49:2,15 50:6 |
| **2020**   15:25 16:23 17:14 |

**[2020 - 43]**

18:16 86:3
90:15,25 91:14
91:20 92:6
94:17,22 95:2
95:23 98:6,10
99:6,18 100:14
100:17,23
103:17 104:5
105:12,21,25
106:9 107:8,13
107:20,24
108:3,4,4,14
109:11,20
110:2,3,12,14
130:3 131:5,11
131:24 132:21
**2021**   19:11
47:13 48:22
49:3,5,9,15,24
50:6,18 51:2,7
52:1,7 55:4,17
56:19 57:11
58:22 59:5,10
60:7 61:13
62:3,14,21,24
62:25 63:18
64:5,7,13 65:4
90:3 91:1
94:18,23
106:10 107:9
108:14 109:21
111:2,21 118:4
118:13 119:22
121:25 124:10
131:11 145:8

**2022**   16:8
18:17 118:4
**2023**   1:17 2:18
5:12 7:2 20:11
41:17 46:12
64:20 65:6,17
65:25 66:7
67:17,25 68:3
68:7,12,22,23
69:2,7 70:2,8
72:11,24 73:11
74:13,23 75:8
76:6,14 77:20
77:23 78:9
81:5,13,25
82:20 83:9,13
83:23 102:14
111:2,22 112:7
113:8 118:14
119:23 121:25
124:11 143:12
143:18,24
144:8,15,20
148:17 149:11
151:3,22 152:3
152:5
**2025.520**   152:9
152:12
**20th**   94:22
107:8,13,19,24
108:3,4,4,13
109:20 110:2
110:12
**21**   5:8 61:23
103:2,6 127:6

140:6,7
**218,671.75**
132:2
**21st**   86:3 91:14
91:20 92:6
98:6,10 99:5
100:23 103:17
104:5 105:12
105:21,25
106:9 130:3
**22**   5:12 125:9
127:3,8 134:8
**22nd**   41:17
43:15,20 44:5
44:13,22 90:15
90:25 95:23
131:11,24
**23rd**   90:15,25
131:24
**26**   152:3
**29**   6:7 137:15

**3**

**3**   5:10,11,16
35:8 41:5,6,12
41:19 49:15
57:2 88:18,25
89:10,16 90:18
92:18 93:8,23
96:15 97:8,10
97:25 98:24
106:7 132:13
132:20 134:19
**30**   153:1
**31**   42:21

**31,640**   42:6,21
**32**   117:8
**32,044.80**
141:24
**327**   117:9,19
**327e**   117:4,16
**34**   141:1
**35**   141:1
**350**   36:7 40:24
42:5,20
**37**   24:19 88:11
141:22
**378.67**   139:16
**38**   96:19
**3rd**   47:13
48:22 49:3,5
51:7 110:13

**4**

**4**   5:16 56:5,6
56:12 96:5,9
96:24 97:8,13
97:17,24 98:19
98:24 135:12
**40**   139:12
**41**   5:11
**418,671.75**
100:9
**418,671.75.**
130:17
**418,761.75**
131:3
**419,000**   130:10
130:19 131:3
**43**   116:22

**[44 - account]**

**44**   54:24 145:1
**4445**   145:14
**45**   30:7 46:6
  64:24
**46**   5:6
**4th**   19:11 49:24
  50:6,18 51:2
  52:1,7 55:3,17
  62:24 63:18
  64:5,7 102:14
  145:8

**5**

**5**   5:18 84:2,3,8
  95:9 98:9
  99:22,23,24,25
  104:3 105:16
  107:16 129:1
  129:12 130:2
  135:12,13
  137:15 138:23
**50**   44:20,23
  140:5
**500,000**   129:22
  129:22
**56**   5:16
**57**   5:16 55:23
  55:25 56:3,14
  56:23 59:3
**58**   111:15
**58998.919**   58:5
**5:17**   148:16

**6**

**6**   5:21 35:4
  55:3,17 58:22

60:7 61:13
62:25 74:14,24
75:7 93:13,14
93:20 107:7
111:21 135:12
135:20 136:13
138:15
**6,061,700**   65:10
  69:24 70:22
  71:22 72:9
  112:6
**60**   5:20 84:11
  95:10
**600**   3:8
**6134965**   1:25
**6538**   150:24
**6th**   49:9 56:19
  57:11 59:5,10
  62:3,12,21
  64:13 65:4
  111:1 118:13
  119:22 145:8

**7**

**7**   4:5 6:4 102:1
  102:3,7 124:23
  134:5,17
  137:12
**7,000**   65:8
  113:11
**700**   69:24
**76**   57:5
**77**   57:6

**8**

**8**   6:8 114:13,15
  114:19 117:6
  135:11 138:15
**80**   41:2
**84**   5:18
**88**   139:16

**9**

**9**   6:10 96:23
  116:4,7,10
  117:7 118:2
**90**   42:20 43:15
  44:9,9,11,14
**90.4**   42:5
**900**   3:8,18
  90:19
**92626**   3:9
**93**   5:21
**94**   140:25
**94104**   3:19
**99**   141:21
**990,726.23**
  88:19 103:16
  132:14
**991,000**   89:1,11
  89:12 90:19

**a**

**abbreviations**
  145:5
**ability**   23:15
**able**   25:7 30:10
  30:11 31:18
  88:5 136:25
  137:7 142:20

**above**   19:7
  127:23 130:6
  152:6
**absolute**   32:1
**access**   54:7
**account**   12:17
  25:6,10,11,12
  25:15 27:12,16
  27:16 28:3
  29:8,24 31:11
  31:12,21,21
  34:22,23,24
  36:4 37:1 38:4
  38:6,8,19 47:5
  47:9,12,17
  48:18,19 49:1
  49:17,22 50:8
  50:13,17,24
  51:8,11,19
  52:2,7,9,11,14
  52:20 53:13
  55:5,8,18,20,21
  56:18 57:12,15
  57:24 58:10,14
  58:15,16,20
  59:4,11,16
  60:7,13,13,20
  60:23 61:11,13
  61:14,19,22,23
  62:4,11,21,23
  62:23,25 63:5
  63:9,10,17,19
  64:4,12,14,18
  64:20,22 65:5
  65:9,16 70:8

**[account - analysis]**

70:14,19,24
71:3,4 72:10
72:23 73:12,22
73:22 74:13,22
75:8 76:6,13
78:9 81:20
82:19,22 83:1
83:8,12,23
89:24 95:6,7
95:20,25 96:7
96:13 97:14,14
98:11,18,25
99:13,18 100:3
100:10 111:1,6
111:16,20
112:3,6,15,18
112:20,25
113:8,12,15,16
115:9,25
116:14,15
117:3,8,8,22
118:3,7,12,22
119:22 120:22
121:2 122:15
122:24 123:25
124:7,9 129:21
130:12 131:10
131:19,21,23
135:15,17,24
135:25 139:5
139:19 140:12
141:6,8 142:2
142:19,24,25
143:1,4,10,18
144:7,12

145:10,13,25
146:2,8,12,13
146:24 147:7,8
147:20,21,22
**accountant**
15:7,9 20:15
32:5,12 33:13
33:18 34:2
**accountants**
32:9,20,21
**accounting**
14:21 19:4
20:16,17 22:21
23:7
**accounts**   24:24
30:18 31:6
35:1 46:20,20
47:2,2 60:21
78:23 81:7
82:2,3,7,9,13
95:6 111:17
135:15 147:19
**accurate**   16:5
17:6,7 19:8,15
20:6,23 25:16
31:14 42:17
55:13 62:2
64:12,18 65:13
69:13 104:2,14
114:5
**acknowledge**
144:6
**acknowledged**
37:5

**acquired**   16:23
18:10
**act**   86:21 127:9
**activity**   30:17
81:19 106:12
**actual**   9:1 38:9
84:24
**actually**   24:10
31:20 37:7
39:20 70:23
71:21 127:1,5
**adaya**   25:7
49:17,23 51:9
52:3,8,15,21
53:14 55:10
88:21 96:24
99:13,19 100:6
100:10,12
115:15 131:4
132:15 135:17
142:21 145:15
145:21,24,24
146:6,12,16,21
146:24 147:6
147:11,18
148:5
**additional**
45:14,25 47:3
80:8,20 104:12
**additionally**
43:2,4
**administered**
7:5 8:18
**advise**   11:14

**af**   56:20
**ago**   33:13 72:8
108:21 123:4
124:5 134:8
147:13
**agree**   25:19,25
29:5 32:21
46:9,13 98:4,8
126:24
**agreement**   45:8
**ahead**   122:8
123:15
**al**   151:2
**alcohol**   10:24
**allow**   74:18
**amount**   49:6
58:4 60:12
127:23 128:15
131:2 132:23
132:25 134:14
**amounts**   45:14
45:25
**analyses**   20:21
22:15,23
**analysis**   19:4
23:7,20 25:23
26:8,9,16 34:9
35:13 46:10,15
47:1 66:15
67:7,22,24
68:2,14 69:6
69:12,15,16,16
74:1 80:8,10
80:25 98:19
104:2 110:15

Page 4

[analysis - assets]

121:22 122:13
122:22 123:11
134:14 143:11
143:13,16
144:15
**analyze**  111:5
**analyzing**
80:10
**ankura**  16:19
17:1,4,9,13,21
18:2,10,13
19:1,3,11
40:14,19 42:3
42:25 43:4,7
45:2,9,10,13,22
**answer**  9:14,25
10:1 27:17
53:4,5,21 54:6
59:1 66:22,24
76:25 80:24
86:9,16 119:2
121:14 122:5,7
123:7,13,18,21
140:18
**answered**
26:22 27:3
28:12 29:10,17
30:1 48:4
50:10 53:7,23
62:6,15 69:9
71:19 72:2
77:13 83:3,15
86:15 91:22
92:8 104:7,18
119:17,25

121:8,17 122:3
123:1,5,14,15
147:24
**anton**  3:8
**anywise**  150:15
**apologies**  11:13
**apologize**  15:16
30:10 35:9
57:1 125:23
**appear**  149:7
**appearance**
43:6
**appearances**
3:1
**appearing**
152:18 153:7
**appears**  21:12
46:6 54:24
56:16 84:18
140:6 141:1
**apply**  34:20
125:16
**appointed**  8:1
**apprise**  132:24
**appropriate**
10:5 86:11,20
86:21 87:14,14
**appropriately**
8:15
**approx**  89:12
**approximate**
89:11,12 90:19
90:20
**approximately**
20:8 43:21

65:8,10 69:23
79:14 88:18,25
88:25 113:11
113:25 118:2
132:12
**arrive**  69:25
**arrived**  113:7
**arrives**  112:5
**arrow**  85:19
100:8
**arrows**  85:19
**asked**  23:11,14
24:2,6,10
26:15,17,25
27:2 28:11
29:9,17 30:1
47:18,20,21
50:9 61:2 62:5
68:8 69:8
71:16 72:2
77:12 83:2,14
86:15 91:14,21
92:2,7 104:6
104:17 105:1
107:2 119:17
119:24 121:6
121:11,16,17
122:3,13 123:1
123:3,5,10,14
131:20 143:21
147:23
**asking**  9:19
31:3 44:16
53:18,25 73:7
76:20,21 82:8

103:1 104:11
104:13,19
106:11 109:23
122:4 123:8,11
124:22 125:8
130:6 134:4
144:25
**asks**  105:2
**ass**  102:12
**asset**  20:18
21:21,22 22:14
22:22
**assets**  5:6 6:7
20:5 22:3
23:14,20 25:5
25:8,10,14
26:18 27:11,15
28:1 29:7,23
31:7,10,20
34:20 37:16
38:18,21,23
39:23 47:4,16
47:21 48:19
49:16,22 51:8
51:11 52:2,6,9
52:10,13,19
53:12 55:4,5
55:18 57:14
62:22,24 65:10
69:23 70:2,6,7
72:10,13,14,16
72:23,24 73:12
74:12,22 75:15
75:17 76:6,7,9
76:12 77:19,25

Page 5

**[assets - based]**

78:4,6,8,15,15
78:21,24,25
79:7 83:12,22
88:17,19 96:23
101:17,20,24
102:12 103:10
103:15,22
108:10 112:19
112:24 118:1
118:25 120:21
122:10 132:12
132:13 134:24
135:1,3,22
136:3,5,6,7,13
136:15,16,18
136:19,21,23
137:1,8 138:17
139:2,4,8,8,9
139:18,21,22
139:24 140:1
140:11,15,16
140:19 141:7
141:11,12,14
142:1,5,6,19,21
142:23 143:2,9
143:25 144:11
145:9,10 146:7
146:14,23
147:9
**assist**   19:12
22:2
**assisting**   22:2
**associate**   18:21
18:22

**associated**   11:7
96:14 111:16
**assume**   35:24
104:14
**assumes**   129:6
**assuming**   56:25
104:1
**attach**   106:7
**attached**   11:18
12:3,10 20:22
21:16 33:6
36:15,23 39:21
59:19 61:4,15
70:19 73:19
74:2,5 93:8,23
95:10 107:23
114:6 115:23
**attachments**
84:10
**attained**   14:18
**attempt**   83:11
**attention**   18:23
21:19 41:21
46:4 47:19
54:22 93:5
103:2,13
124:23 125:8
138:22 139:12
140:5,25 145:1
**attorney**   7:17
**attorneys**   7:18
9:21 11:9
**audio**   19:19
24:3 30:21
47:23 87:1

119:4
**august**   68:3
102:14
**available**   41:10
84:6
**aviva**   42:11
**avoid**   8:4 145:5
**aware**   91:17
92:3 115:23
118:1,16

**b**

**b**   25:6 132:7
142:20 153:1
**b2a1**   145:14
**ba**   50:17
**bachelor's**
14:20
**back**   13:2,4
18:23 23:14
46:4 49:11
51:14,15 54:22
58:19 62:1
66:17,18 71:14
72:4 73:3,4
78:18 89:16
92:25 93:5
95:8 96:17
97:21 99:1
100:21 101:9
105:15 107:15
110:20,24
112:22,23
116:20 117:6
118:10 120:10
120:12 123:2,3

124:23 126:10
127:23 128:15
129:10 132:5
133:22 134:2,4
134:7 137:4,6
137:11 138:13
138:14
**background**
11:22 12:1
14:14 35:11,12
35:15 36:24
58:13
**baker**   3:4 11:7
11:9,10,11,12
41:16
**bakerlaw.com**
3:10,11,12
152:2
**balance**   25:12
55:20 56:18
57:11 58:9,15
58:16,20 59:3
59:10,16,20
60:6,23 61:12
71:3 73:22
113:15 142:25
**balances**   60:13
**based**   16:2 25:4
26:5,12 28:6
29:12 30:3
31:4,23 33:1
33:15 34:25
45:2,14,24,25
46:9,16 55:20
61:1,3 70:14

**[based - calculations]**

77:16 81:18,20
90:13 91:6
104:2,14
113:14 118:24
122:17 124:17
128:5 142:18
143:10,13
146:6
**basis**  32:11,19
45:24 90:7
145:19 146:22
147:17 148:1,4
**bass**  3:6 5:11
41:15 42:12
**bass's**  42:16
**bates**  6:8,10
115:14,15,20
**bch**  139:16
141:5
**began**  51:1
67:24
**beginning**  65:2
88:16 101:9
107:19 117:2
132:11 139:1
**begins**  103:19
125:15
**behalf**  2:15
126:2 128:8
**belief**  25:21
26:8 50:18
145:19 146:5,6
146:20,22
147:17 148:1,4

**believe**  11:23
11:25 12:17,20
15:10,16,22
16:8,23 17:14
17:15,19 18:11
18:19 20:1,11
21:18 24:15
25:13,20 26:4
27:4,9,10,20
29:11 31:9,16
32:20 33:25
34:1,10 36:18
37:3 38:3,18
40:24 41:2,18
43:11,14 48:3
51:1 55:25
56:13,18 58:12
58:14,15 59:6
59:13,25 62:7
63:16,20 70:1
70:13 71:2,13
71:15,21 72:5
72:8,12 73:13
73:16,21 74:20
76:16 82:15
84:12,21 88:4
88:8 89:3
91:10 93:25
95:4 97:25
98:20,23 99:10
99:20 101:25
102:16 111:12
111:15,23
112:12,16
113:14,21

115:14,14
116:11 117:17
120:8,14 123:2
124:2 130:16
130:17 131:20
131:20 132:18
135:3 143:1,8
146:16,24
147:2,3
**believed**  55:10
145:15 146:15
147:10
**believing**  32:11
**best**  9:18 10:9
10:13,16 19:18
19:22 23:15
86:10
**beyond**  38:8
65:18
**billed**  43:7
**billing**  40:16,23
42:25
**binance**  65:6
67:16 68:21
69:1 99:13
100:2,9 129:21
130:11 135:15
**biographical**
14:14
**bit**  63:13 74:13
**bitcoin**  72:18
73:12,15
**black**  41:24
57:5

**block**  145:22
**blockchain**
12:20
**blockchains**
22:4
**blue**  42:2,13,15
**bold**  137:22
**bottom**  20:13
21:21 41:22
57:3 85:19
103:4,6 115:1
125:11 127:6
**boulevard**  3:8
**bounded**  83:5
**box**  98:17,25
100:11
**braun**  3:16
7:17
**break**  54:10,13
92:23 124:19
148:8
**btc**  90:22
140:10 141:5
**bullet**  21:20
22:13
**bunch**  7:21
**burdensome**
78:25 79:4
81:11,15
**bush**  3:18

| c |
|---|

**c**  25:9 142:22
**ca**  152:9,12,20
**calculations**
71:8

Page 7

**[california - commingled]**

| | | | |
|---|---|---|---|
| **california**  3:9 | **certain**  23:14 | 90:12 95:10,16 | **clients**  22:20 |
| 3:19 7:1 | 26:17 28:10 | 96:5 97:22 | **clip**  114:21 |
| **call**  115:9 | 29:6 34:2 38:3 | 98:9 99:2,17 | **close**  56:19 |
| 130:19 131:9 | 38:18 55:6,9 | 100:14,25 | 59:4,11 66:4 |
| **called**  13:10 | 68:21 72:17 | 104:3 105:15 | **closed**  148:14 |
| 96:6 122:24 | 146:1 | 107:16 128:25 | **closely**  105:11 |
| 130:2 136:6,16 | **certainly**  86:23 | 129:11 | **closer**  44:20,23 |
| 136:22 137:1,2 | **certainty**  29:15 | **choose**  95:1,2 | **closest**  44:3,6 |
| 138:19 139:23 | 29:22 31:18 | **cite**  13:6 74:7 | 77:4,11 |
| **calls**  36:8 77:6 | 32:2 | **cited**  11:23 | **clr**  1:24 2:18 |
| 77:13 78:3,12 | **certificate** | 12:6,17 37:3 | 150:25 |
| 79:17 80:22 | 150:1 | 60:14 72:6 | **code**  152:9,12 |
| 127:25 128:18 | **certification** | 88:8 89:3,6,15 | 152:19,20 |
| **capacity**  22:22 | 15:23 | 91:10 | **coinbase**  141:5 |
| **capital**  1:9 2:9 | **certifications** | **cites**  20:22 | 141:8 |
| 138:1 | 15:17 16:11 | **civil**  152:19,20 | **collections**  45:6 |
| **captioned**  19:7 | **certified**  2:18 | **claimed**  129:4 | **column**  100:1 |
| **carney**  3:7 | 15:7,9,13,14,19 | **clarification** | **combination** |
| **carolina**  14:21 | 15:20 16:6 | 9:17 | 33:15 38:4 |
| **case**  1:6 2:6 | 33:17,18,19 | **clarify**  9:18 | 59:13 61:17 |
| 7:23 8:2,6 14:7 | 34:13,14 77:17 | **clear**  8:24 | 98:23 |
| 22:25 23:4,6 | 150:2 | 27:19 32:1 | **come**  19:25 |
| 33:4 39:17 | **certify**  149:3 | 40:18 43:14 | 32:6,12 34:16 |
| 42:1,24 45:20 | 150:3,13 | 44:8 54:2 | 66:9,25 79:13 |
| 102:13 150:19 | **cfa**  126:15 | 57:25 59:17 | 130:5 |
| 151:2 | 128:7 | 60:4 62:14 | **comes**  130:5 |
| **cases**  12:18 | **cfp**  128:6 | 83:19 86:8 | **coming**  38:7 |
| 36:25 | **chain**  145:22 | 92:1 122:12,19 | 148:12 |
| **cash**  75:12 | **change**  75:7 | 128:19 137:10 | **commingled** |
| **cause**  127:4 | 104:15 154:4,7 | 145:23 | 25:13 27:10 |
| 130:4 | 154:10,13,16 | **clearly**  27:17 | 28:1 29:6,22 |
| **caused**  14:6 | 154:19 | 34:20 47:15 | 31:9,19 63:6 |
| **ccp**  152:9,12 | **charged**  40:19 | 63:5 | 135:21 136:5 |
| **center**  103:4 | **chart**  5:18 | **client**  123:19 | 136:12 139:2 |
| 125:11 | 84:14,18 85:5 | | 139:17 140:10 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[commingled - correct]**

| | | | |
|---|---|---|---|
| 141:6,25 143:2 143:8 | **comprised** 75:11 76:7 | 87:9 121:22 124:15 | **contents** 14:12 36:16 37:6 |
| **commingling** 25:9 78:21 79:5 81:2 142:23 | **con** 17:9 **concept** 126:12 **conclu** 32:17 **conclude** 39:23 **concluded** | **conducted** 47:15 **conducting** 20:20 **confirm** 14:9 114:4 144:18 | 102:21 114:12 116:2 **context** 42:17 **continue** 48:4 48:14 85:7 87:17 |
| **commission** 1:4 2:4 7:20 151:24 152:4 154:1 | 148:16 **conclusion** 24:2 26:5,7,12 27:5 28:6,9 29:12 | 146:19 **confused** 60:25 **confusion** 107:4 | **continued** 6:1 **continues** 20:14 55:7 127:7 |
| **company** 16:24 **compel** 5:6 6:5 6:6 20:5 101:17,20,24 102:12 | 29:12 30:2 31:23 32:1,4 32:13,17,21,22 34:25 37:23,25 38:10,17,20,23 | **connection** 20:9 43:5 103:17 114:25 127:12 **consider** 11:21 | **contracts** 22:4 **control** 145:24 145:25 **controlled** 55:10 135:17 145:15,21 |
| **compensated** 40:12 43:3,4 43:18 128:8 | 49:4,8 50:12 50:16 61:8 63:8 79:13 | 39:17 **considered** 36:21,24 | 146:6,8,12,15 146:21,24 147:7,10,18,19 |
| **compensation** 41:24 45:4,10 128:10,13 | 118:23,24 121:2 128:1,18 143:7,22,24 | **consist** 103:15 **consistent** 45:18 127:18 | 148:5 **conversation** 10:11 |
| **complete** 9:8 **completed** 152:7,17 153:6 | 144:10,16 146:3,13 147:8 **conclusions** 23:24 24:23 | **consulting** 16:19 17:9,10 19:2 21:21 | **convicted** 16:13,15 **correct** 11:10 18:19 19:14,23 |
| **completely** 9:13 **completion** 150:19 153:10 | 26:15,25 32:23 33:14,14,25 34:3,16 36:12 | 22:14,21 42:3 **contact** 152:9 **contained** 55:4 | 21:17,18 23:21 26:9 28:3,4,13 29:1,16,19 |
| **compliance** 19:1 **comply** 87:7 **complying** 87:12 | 36:14,21 37:7 37:21 46:16 61:3 71:17 **condition** 10:22 | 145:9 149:8 **contains** 90:11 107:7 111:15 **contend** 50:23 | 34:3,5 35:14 35:20,21 36:1 36:4 37:8,11 37:21 38:10,19 |
| **compound** 33:8 129:5 | **conduct** 23:7 35:17 37:2 | 52:19 53:12 126:7 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[correct - date]**

| | | | d |
|---|---|---|---|
| 39:9,15 45:15 | 135:2,9 136:14 | 102:13 119:5 | **d** 25:1,11 131:6 |
| 46:21,22 47:3 | 137:15,16 | **courtroom** 8:20 | 142:24 |
| 48:23 49:9 | 140:3 141:18 | **cover** 5:8 | **dash** 55:5 |
| 50:18 51:25 | 141:19 142:13 | **cpa** 34:12 | **data** 36:20 |
| 54:19 55:24 | 142:14 143:12 | **creating** 13:12 | 39:22 90:1,14 |
| 57:6,7 58:2,3,5 | 143:18 144:8 | **crime** 16:16 | 90:23 91:11,13 |
| 58:6 60:9 | 144:21,23 | **crypto** 77:25 | 92:10,15 93:7 |
| 61:15 62:8,16 | 146:24 149:9 | 78:4,21 135:22 | 94:12,20,21 |
| 62:19 63:19,23 | **corrected** 149:9 | **cryptocurren...** | 95:3 96:3,4 |
| 64:9,10 67:25 | **corrections** | 20:21 | 97:23 98:5 |
| 68:1,3,4,7,23 | 149:7 151:5 | **cryptocurrency** | 99:8 100:16 |
| 70:5,10 71:6 | 152:14,15 | 15:14 16:7 | 106:6,13,16,19 |
| 71:25 72:11,14 | 153:3,4 | 33:19 34:14 | 106:19,20,22 |
| 72:15,18,19 | **correctly** 89:25 | 77:17 135:14 | 106:23 107:7 |
| 73:15 75:9 | **cost** 79:11 | 135:23 | 107:12,23 |
| 79:25 82:13,20 | **costa** 3:9 | **csr** 1:24 150:25 | 108:1,13,23 |
| 85:4,16 90:15 | **could've** 74:7 | **cum** 15:1 | 109:5,8,15,20 |
| 93:9 94:18,19 | **counsel** 2:17 | **currency** 58:1 | 109:25 110:12 |
| 94:24 95:25 | 3:1 7:6 29:25 | 72:25 75:1 | 110:18 |
| 96:6 97:15,24 | 41:16 65:23,24 | **current** 16:18 | **date** 19:25 20:1 |
| 98:6,19,20 | 122:2,25 123:9 | 18:12 22:7 | 40:25 43:17 |
| 99:20,22 | 123:20 130:3 | 55:20 58:14,16 | 49:9 50:13 |
| 100:14,15 | 150:14 152:18 | 58:20,21,21 | 51:2 58:23 |
| 103:7 107:9,20 | 152:21 153:7 | 60:12,13,23 | 59:21 62:10,19 |
| 107:21,24,25 | **counted** 113:23 | 61:19,22 69:5 | 63:18,21 64:4 |
| 108:23 109:21 | **coupled** 25:6 | 73:22 | 65:6 66:5,9,11 |
| 112:7,11,15,16 | 31:6 78:22 | **curriculum** 5:9 | 67:1,2,14,19 |
| 113:8,13 | 142:19 | **cut** 54:10 | 68:11,12,15,16 |
| 117:12 120:4 | **court** 1:1 2:1 | **cutoff** 67:20 | 68:25 72:23 |
| 120:15 124:11 | 7:22 8:25 10:4 | **cv** 1:7 2:7 7:24 | 73:11,15 74:22 |
| 126:16 129:18 | 14:7 17:22 | 15:17 20:22 | 78:10 81:14,21 |
| 129:19,23,24 | 19:20 24:4 | 21:13,15 23:2 | 82:23,24 83:5 |
| 130:12 131:5 | 30:12,22 33:4 | | 83:13 86:3 |
| 131:12,13 | 47:24 54:14 | | 88:7 98:4 99:9 |
| 132:3,4,21 | 74:11,18 87:2 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[date - deposition]**

101:6 104:21
106:6,15
112:18 144:17
144:19 151:3
152:16 153:5
154:24
**dated**   149:11
150:23
**dates**   49:10
52:24 64:22
91:3,5,8 92:11
95:4 96:12,14
106:6,12 109:4
109:24
**day**   49:16,21
50:23 51:8
52:18 53:12
65:5 67:18
101:3 149:11
151:22
**days**   52:18
53:12 69:14
**deal**   10:4
**dec**   101:15
**deceive**   130:16
**december**
90:15,25 94:17
94:22 95:2,23
98:6,10 99:18
100:13,17
106:9,9 107:8
107:13,24
108:3,4,13
109:20 110:3
110:13,14

131:4,11,24,24
132:21
**decentralized**
21:22
**decision**   81:20
**declaration**   5:4
5:16,19,21
11:6,17,18,23
11:24 12:2,3,7
12:9,10,18
13:13 14:5,13
14:16 20:4
21:16 23:9,13
24:13,19 26:6
28:7 30:4,7
31:24 32:25
33:7 35:4,9
36:13,15,16,22
36:22,23 37:6
37:14,16 39:20
39:21 42:4,19
46:5,17,25
53:1,20 54:5
54:22 55:23
56:15 57:4
59:9,20 61:5
61:15,24 64:24
70:12,17 71:10
71:11,18,19,23
71:24 72:21,22
73:20 74:2,5
74:15 76:18
78:19 84:11,19
84:24 87:23
88:3,11 89:4

90:6,18 91:4,8
91:11,18,19
92:3,4,17,19
93:9,23 94:3,4
94:23 95:11
96:18 101:10
101:16 106:8
107:24 110:21
111:10 114:6,6
115:24 116:3
116:15,21
117:24 118:11
118:25 129:13
132:6 134:18
134:23 138:14
138:16,22
139:12 140:6
140:25 142:16
**decreased**
77:19 78:10
**deefa**   96:12
100:12
**deem**   109:4
**defendants**
1:10 2:10,15
3:15
**define**   82:21
83:5
**defined**   19:6
134:23,24
138:9,10
**defines**   127:9
**definition**
137:20

**definitively**
142:9
**degree**   14:20
**degrees**   14:18
15:2
**delve**   14:12
**denominated**
55:6 133:9
135:13,20
145:10
**denominations**
55:6 145:11
**dep**   151:3
**depend**   80:9
**dependent**
82:10
**deponent**   151:4
151:20
**deposit**   58:17
59:14 61:17
**deposited**
141:5
**deposition**   1:14
2:14 5:3 6:3
8:10 11:1,15
11:20 12:12
13:20 21:3
40:7 41:6 43:5
43:10,13,17
56:4,6 84:3
86:21 87:9
93:14,24 102:3
114:15 116:4
148:14 149:5
150:18 152:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[deposition - e]**

152:22,24
153:8,10
**depositors** 13:6
13:16
**deposits** 64:6
64:22 65:9
70:15 111:15
113:12 121:1
122:18
**derived** 25:13
27:11 28:1
29:7,22 31:9
31:19 71:22
88:19 132:13
143:2,9
**describe** 11:4
126:21 130:3
**described**
23:13
**describes** 46:25
**destination**
26:20
**details** 10:10
97:7
**determination**
57:10 113:10
**determine**
31:18 55:15
58:8 67:13
83:11,22 88:5
109:14 110:11
113:19 120:5
121:23 133:24
133:25 134:14
136:20,25

137:8 140:21
141:17 142:12
**determined**
70:25 73:14
81:14,15 88:1
108:6,10,12,21
109:3,9,24
152:18,22
153:7
**difference**
28:15 105:4
128:13
**different** 59:22
62:18 89:7
107:3 113:5
121:17 122:5
123:12 131:10
**digital** 20:19
21:22 22:3
72:14 75:14,17
76:7,9 77:18
88:18 103:21
132:13 134:25
134:25 139:4,7
139:18,21
140:11,15
141:7,11 142:1
142:5
**direct** 122:7
**directed** 123:20
**direction**
150:12
**directly** 146:2
**director** 18:14
18:25 42:3

**disagree**
126:24
**discovery** 5:14
**discussed** 23:8
32:8,24 87:23
**discusses** 21:25
**discussing**
100:24 125:5
**discussion** 62:2
71:15 88:2
**distribution**
127:12
**district** 1:1,2
2:1,2 7:22,22
87:8
**document** 6:8
6:10 13:23
14:10 21:11
40:2,4 57:5
59:2,7 60:18
74:9 75:19,19
75:23 85:9
93:19,22 95:9
102:15,17,21
102:25 103:2
105:10 106:7
115:8 125:10
130:23
**documents**
11:19,21,22
12:1,1,5,11,14
12:15,17,22,24
13:5,7,11
36:25 39:16,18
58:13 59:23

61:4,8 65:22
65:25 114:24
**doing** 66:5
80:25 127:22
130:19
**doj** 22:20
**dollar** 72:9,25
89:15,23 91:6
109:10 132:11
**dollars** 69:24
70:3 75:2,12
88:18 109:20
132:13 133:7
135:4,6
**downstream**
23:16
**dozens** 61:23
**draw** 26:15
33:13
**drawn** 25:22
**drew** 26:7 32:1
34:2 37:7,20
38:17,20 61:3
71:17 143:7
**drugs** 10:23
**due** 78:20
**duly** 7:5 150:5
**duty** 10:8

| e |
| --- |

**e** 5:11 7:14 25:1
25:1,2 41:15
42:10,12 44:10
44:11 131:6,6
135:14 152:9
152:12 153:1

Page 12

**[e - exhibit]**

154:3,3,3
**earlier**  14:7
  17:15 35:5
  61:1 62:1
  71:15 90:8
  103:15 123:10
  125:6 138:13
  143:17
**earliest**  106:15
**early**  15:10
**easier**  127:4
**edt**  7:2 148:16
**education**  15:4
**effect**  120:24
  121:12
**effectively**  49:5
**efficiency**  8:5
**efficiently**  8:14
**effort**  83:21
**eight**  123:4,6
**either**  36:22
  40:7 52:8
  57:18 64:19
  71:9 72:20
  74:14 114:5
**electronically**
  13:21 21:4
  41:7 56:7 84:4
  93:15 102:4
  114:16 116:5
**employed**
  16:20,22 17:4
  17:8 18:4
**employer**  16:18
  18:2

**employment**
  17:13
**emptied**  49:6
**endeavor**  9:10
**ended**  143:17
**engage**  50:7
**engaged**  19:11
  26:23
**engagement**
  22:7 40:22
  46:1
**engagements**
  22:9,21
**entire**  37:22,23
  129:1 132:25
**entirely**  32:10
  32:16 73:7
**entirety**  50:25
**entities**  25:8
  31:8 39:24
  137:2,21,25
  138:8,10,11,19
  139:23 140:1
  140:17 141:13
  141:18 142:7
  142:13,22
**entitled**  126:2
  129:4
**entity**  139:9
  140:22
**entry**  98:10
  130:2
**equals**  28:19
**equivalent**  70:1

**errata**  151:1
  152:14,16
  153:3,5
**esq**  3:5,6,7,17
  152:1
**essentially**
  95:15
**establish**
  125:18
**established**
  103:21
**estate**  38:24
  88:20 96:24
  132:15
**estimate**  10:16
**et**  151:2
**everybody**
  148:12
**evidence**  27:9
  33:5 124:16
  129:6 133:15
  133:21
**exactly**  9:12
  78:15
**examination**
  4:1,4 7:9
**examined**  7:7
  150:4
**examiner**  15:13
  15:20 33:18
  34:13,13
**example**  9:2,25
  10:11,22 28:18
  45:12 72:16

**exceptions**  9:24
**excerpt**  84:23
**exchange**  1:4
  2:4 7:20
  135:15 152:4
  154:1
**excuse**  30:22
  87:2
**exercise**  37:23
  79:7 80:3
**exhibit**  5:4,8,8
  5:11,16,16,18
  5:19,21,21 6:4
  6:8,10 13:18
  13:18,20 14:2
  14:15 15:18
  18:24 20:22
  21:2,3,9,16
  37:3 41:5,6,12
  41:19 46:4
  53:2 54:23
  55:23,25 56:3
  56:4,6,12,14,15
  56:23 59:3,8
  60:9,14 61:20
  70:11 72:6
  84:2,2,3,8,11
  84:20,23,23,25
  88:8 89:16
  91:16,24 92:2
  92:18 93:8,13
  93:13,14,20,23
  93:24 95:9,10
  96:15,18 98:9
  99:22,23,24,25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[exhibit - first]**

101:12 102:1,3
102:7 104:3
105:16 106:7
107:7,16
110:20,20
111:9,13,15,18
111:25 112:1
114:12,13,15
114:19 116:2,4
116:7,10,21
117:6,7 124:23
129:1,12 132:6
134:5 137:12
140:5
exhibits   5:1,3
6:1,3 11:7,18
12:3,6,10
32:15 33:7
36:15,23 39:21
49:12 53:20,24
54:1,6,7 59:19
60:5,15 61:24
70:16,20 71:10
71:19,24 72:21
74:2,5,15
91:12,18 92:4
92:11 111:19
114:6 115:23
exists   28:24
expect   63:13
expected   86:24
87:6,7
experience
20:16 36:1
66:3 77:16

expert   40:6
expertise   33:17
34:2,17 35:2
128:20
expires   151:25
explain   80:15
113:4
explained
96:23 103:15
explaining   34:1
express   36:13
extensive   25:9
78:21 79:6,7
79:10,16 81:2
142:22
extensively
63:7 135:21
139:3,17
140:10 141:25
extent   128:17
130:21
extraterrestrial
28:23
eyes   130:16

**f**

f   131:6 135:20
fact   10:14 25:6
27:21,25 28:8
28:16,19,25
29:1 31:7 50:3
56:14 84:17
93:22 126:14
142:20 146:16
facts   26:6,12
28:7 29:13

30:3 31:24
36:20 39:22
46:16 105:6
118:24 129:6
factual   32:2
fair   109:13
familiar   126:11
far   23:16 26:18
37:17 67:10
133:17
farella   3:16
7:17
fbm.com   3:20
feasible   79:21
79:23
february   19:11
41:17
federal   150:18
153:1,8,9
fee   45:13
feel   74:8
felony   16:13
felt   11:22 26:18
35:10 60:22
66:4 67:9,16
91:5 121:1
122:15,16
fi   21:22
fiat   75:1
figure   69:20,25
70:12,22,23,25
71:2,6,12 72:9
89:11,12
113:14

filed   8:1 14:6,6
102:13
final   25:11
26:19 89:22
142:24
finance   14:20
21:23 90:2,14
92:14 93:8
94:12
financial   20:19
find   54:1 89:8
114:7
finish   9:9,13
finished   68:2
69:15
fir   14:17
fired   17:1
firm   7:18 11:10
11:12 41:16
first   8:16 12:21
13:18 14:17
15:19 18:24,25
21:20 25:16
31:13 35:19,24
41:22,23 42:7
46:9 55:2
56:22 57:19
69:24 79:3
80:19 85:11
91:13 95:2
96:3 97:22
98:4,9 99:1
101:4,10,11,15
104:4,16
107:22 115:7

**[first - further]**

117:9 124:10
125:14 127:14
134:21 135:13
136:1 139:1,15
140:9 141:4,24
**five** 30:1,20
31:3 121:16
**flow** 22:15,23
**flowed** 146:14
147:9
**flowing** 146:1
**fluctuate** 76:10
**focusing** 63:14
**fokas** 3:5 17:18
21:10 24:14
25:24 26:10
27:2,13,23
28:11,20 29:2
29:9,17,25
30:9,13,24
32:3 33:8,20
34:4 35:6 36:2
36:8,17 37:9
38:11 39:1,25
42:22 43:24
44:8,24 45:16
47:22 48:2,7
48:12 49:25
50:9,19 51:12
51:16 52:12
53:6,23 54:9
59:24 60:11
61:6 62:5
63:25 67:8,15
69:8,17 70:16

72:1 73:1,5
75:3,18,24
76:15,23 77:6
77:12,21 78:3
78:12 79:17
80:1,22 81:17
82:14 83:2,14
83:24 84:22
86:13,24 87:5
87:7,15,19
91:21 92:7
96:8 98:15
101:5 104:6,17
105:8 106:2
107:2 108:15
108:24 109:6
110:4,7,16
114:8 115:10
115:13,20
117:14,16
119:6,7,16,24
120:7,13
121:15 122:2
122:25 123:14
123:19 126:5
127:25 128:17
129:5 130:1,7
130:15,20
133:3,13,20
144:2,22
146:10,25
147:23 148:14
152:1
**follow** 36:3
63:1,3 97:6

112:2 129:20
130:9
**followed** 115:4
**following** 38:1
57:13,22 63:5
**follows** 7:7
25:20 132:16
152:8
**font** 137:22
**footnote** 135:19
**foregoing**
149:4 150:5,17
**foren** 16:7
**forensic** 15:14
16:7 19:3
20:15,17 22:21
23:7 33:19
34:14 77:17
**forensics** 19:1
**formed** 87:21
105:5
**forming** 23:23
36:21
**forth** 150:9
**found** 61:17
109:19 113:24
**foundation**
106:2 129:6
**four** 28:19
29:18 97:3
121:16
**fourth** 65:3
95:22
**francisco** 3:19

**fraud** 15:13,20
20:16 33:18
34:13,13
**frcp** 153:1
**frequency**
139:3,18
140:11 141:7
142:1
**front** 8:20 54:8
91:16,24
**froze** 110:4,5
**ftx** 116:18
**full** 9:4 12:16
18:6 58:13
60:20 61:11,14
**fully** 10:21
**fund** 12:16
135:1,4,5
138:4,4
**funds** 12:23
13:8 22:15,23
34:23 49:5
50:12,16,23
51:18 63:4,9
79:5 133:22
146:1
**further** 78:24
79:1,8 80:6,7
80:11,17,19
81:11,24,25
82:1,6,10
150:13,17

Page 15

**[g - hourly]**

| g | | | |
|---|---|---|---|
| **g** 25:2 | 131:19 145:12 | **graduated** 15:1 | **hear** 19:21,21 |
| **gary** 3:17 7:16 | **going** 8:5,13 | **ground** 8:14 | 30:10,11 72:4 |
| 30:14 42:11 | 9:13 12:21 | **group** 19:1,2 | 86:11 87:3 |
| 54:9 76:2 | 15:19 17:22 | **guess** 43:24 | **heard** 62:17 |
| 110:4 | 30:19 41:21 | **guided** 87:10 | **held** 18:15 |
| **general** 120:23 | 44:24 46:3 | **h** | **help** 33:3 |
| 121:12 | 47:7 48:2,9 | | 103:22 134:19 |
| **generally** 9:23 | 54:9,21 62:1 | **h** 154:3 | **helpful** 89:13 |
| 77:19 78:1 | 63:12,12 71:14 | **half** 18:18 | **hereunto** |
| 121:20 | 75:24 81:10 | **hand** 104:12 | 150:21 |
| **gestures** 9:2 | 85:25 86:13,14 | 115:1 | **high** 78:22 81:3 |
| **getting** 123:7 | 86:17 92:22 | **handful** 12:18 | 81:6 139:3,17 |
| **gist** 10:11 | 96:17 97:21 | **handled** 152:8 | 140:11 141:7 |
| **give** 24:2,6,10 | 99:1 100:9,11 | **handy** 13:19 | 142:1 |
| 48:10 67:21 | 100:21 101:9 | 21:6 93:17 | **higher** 14:18 |
| **given** 35:15 | 105:15 107:15 | 95:12 102:2 | 15:3,3 |
| 79:5 80:19 | 110:20,24 | 114:14 116:7 | **historical** 92:14 |
| **gives** 55:9 | 116:20 117:6 | **hanna** 1:24 | 93:7 94:11,21 |
| 145:11 | 118:10 119:2,7 | 2:18 30:10 | 96:4 97:23 |
| **giving** 48:12 | 121:5,15 122:7 | 150:2,24 | 106:16 107:7 |
| **gkaplan** 3:20 | 122:10 124:17 | **happen** 39:15 | 107:11 |
| **go** 8:13 14:13 | 127:1 129:17 | **happened** 38:5 | **history** 55:21 |
| 46:17 49:11 | 129:21 130:11 | 38:7 40:4 | 56:1 58:17,18 |
| 52:15 54:12 | 130:22 132:5 | **happy** 32:14 | 59:14,14,15 |
| 92:22 94:4 | 133:22 138:13 | 49:11 51:5 | 60:13 |
| 95:8 96:17 | 138:21 139:11 | 52:22 53:16,16 | **hmm** 142:17 |
| 98:1 122:8 | 140:4,24 145:4 | 89:7 | **hold** 16:10 87:3 |
| 123:15 124:18 | 148:8,13 | **hash** 117:11,18 | **honors** 14:25 |
| 129:10 131:9 | **good** 64:16 | 117:22 | **hoping** 122:4 |
| 131:23 134:13 | 87:18 89:9 | **head** 9:2 | **hostetler** 3:4 |
| 136:10,10 | **gotten** 67:17 | **headed** 21:21 | 11:11,12 |
| 147:20 148:9 | **govern** 87:9 | **headers** 89:6 | **hour** 36:7 42:5 |
| **goes** 22:23 38:8 | **graduate** 14:22 | **heading** 24:22 | 42:21 54:10 |
| 95:18 131:4,6 | 14:24 | 30:17 98:11 | **hourly** 45:24 |
| | | 100:1 103:9,12 | |
| | | 137:19 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[hours - interested]**

| | | | |
|---|---|---|---|
| **hours** 40:25 | 140:16,18 | **inflows** 63:17 | 100:24 101:3 |
| 42:5,20 43:15 | 141:12 142:6 | 63:19,21 64:4 | 105:20 106:5 |
| 44:4,4,6,9,10 | **included** 37:17 | 111:5 112:14 | 106:17 107:8 |
| 44:11,14,17,18 | 47:4 60:23 | **influence** 10:23 | 107:12,19 |
| 44:20,21 45:3 | 73:21 91:12 | **inform** 80:11 | 108:2,10,22 |
| 79:20,24 80:16 | 111:18 136:5,6 | **information** | 109:5,11,15,19 |
| **htlu** 145:13 | 140:21 142:12 | 14:14 42:13 | 110:1 118:3,6 |
| **huh** 9:3,3 | 152:14 153:3 | 59:9 60:17 | 118:8,17 |
| **hundred** 44:6 | **includes** 130:10 | 71:1,23 79:2 | 119:23 120:6 |
| **hundreds** 37:1 | 132:20 | 80:6,7,12,18,19 | 120:19,21 |
| **hypothetical** | **including** 22:1 | 81:11 104:12 | 121:8,20 122:1 |
| 80:15,23 | 22:22 33:5,17 | 111:25 | 122:10,24 |
| **i** | 36:25 43:6 | **informed** 69:15 | 123:24 124:3 |
| **idea** 45:6,8 | 77:17 104:3 | **initialed** 149:8 | 124:14,17 |
| 76:22 77:25 | 128:6 141:8 | **inj** 58:1 85:12 | 126:3 128:24 |
| **identified** 13:6 | **inclusive** 43:16 | 85:15,20 91:11 | 129:2,17 |
| **identify** 25:7 | **incorrect** | 91:13 92:10 | 130:11 131:18 |
| 57:20 142:21 | 116:19 123:10 | 94:8 99:4 | 132:2,14,24 |
| **identifying** | **increased** | 103:16,17,22 | 133:8,11,19,22 |
| 13:7 | 77:19 78:10 | 104:4,16 | 134:1,2 |
| **ieo** 103:18 | **incredibly** 79:7 | 105:19 106:1 | **ink** 41:24 42:2 |
| **implication** | 79:9,16 | 125:17 130:2 | 42:15 57:5 |
| 50:2 | **incurred** 42:4 | 131:15 | 149:7 |
| **imply** 49:21 | 42:19 | **injective** 85:15 | **inquiries** 42:16 |
| **important** 9:9 | **index** 4:1 5:1 | 85:25 86:4 | 120:20,23 |
| **importantly** | 6:1 | 87:22 88:2,6 | 121:9,12 122:9 |
| 8:16 | **indicated** 17:14 | 88:19 89:1,24 | 122:13 123:10 |
| **inappropriate** | 94:13,15 | 90:7,20,24 | **inquiry** 120:5 |
| 123:6 | 102:14 105:21 | 91:3,9,20 92:5 | 120:17 121:6 |
| **include** 43:9,12 | **indicates** 52:1 | 92:6,15,16 | **institute** 15:3 |
| 57:23 72:13,17 | 84:13 94:7 | 94:8,12,21 | **instruments** |
| 111:25 132:24 | 129:12 | 95:5,17,24 | 20:20 |
| 133:1 138:18 | **indication** | 96:4 97:23 | **interested** |
| 138:18 139:8 | 105:19 115:1 | 98:5 99:3,4,9 | 150:15 |
| 139:22,24,25 | | 99:17 100:9,17 | |

**[intermediary - kaplan]**

**intermediary**
146:14 147:9
**interpreting**
85:4
**interrupt** 30:9
**interrupting**
123:18
**interruption**
19:19 24:3
30:21 47:23
87:1 119:4
**interval** 55:16
95:1
**investigation**
19:12
**investigations**
20:17
**investigator**
15:15 16:7
33:19 34:14
77:18
**investor** 135:4
135:6
**investors** 12:16
13:6,16 135:1
136:4
**involved** 42:24
137:1
**involving** 20:21
47:8 107:18
118:17
**irregularity**
20:17
**issue** 32:8

**issuer** 85:12,25
95:17 99:4
100:22 105:20
127:10,11,23
128:16 129:17
133:2,9,12,17
**issuers** 128:9
**item** 12:21

**j**

**january** 46:12
47:13 48:22
49:3,5,9,15,24
50:6,18 51:2,7
52:1,7 55:3,3
55:17,17 56:19
57:11 58:22
59:5,10 60:7
61:13,23 62:3
62:12,21,24,25
63:18 64:5,7
64:13,20 65:4
65:6,17,25
66:7 67:14
68:7,12,22,23
69:2,7 70:2,8
72:11,24 73:11
74:13,23 75:8
76:6,13 77:20
77:23 78:9
81:5,13,25
82:20 83:9,13
83:23 90:2
91:1 94:18,23
106:10 107:9
108:14 109:21

111:1,2,21,22
112:7 113:8
118:13,13
119:22,23
121:25,25
124:10,11
131:11 143:11
143:18,24
144:7,15,20
145:8,8
**jcarney** 3:12
**jfokas** 3:10
152:2
**jglc** 1:7 2:7
**jimmy** 3:5
152:1
**job** 1:25 152:5
154:2
**john** 3:7 30:24
**joint** 5:14
**jr** 19:5
**judge** 8:21 60:4
74:11
**june** 17:2,8
18:7
**junior** 8:3
**jurat** 149:1

**k**

**k** 7:14
**kaplan** 3:17 4:5
7:10,16 13:2,9
13:24 17:24,25
19:24 21:2,5
21:14 24:8,17
24:25 25:3

26:1,14 27:6
27:18,24 28:14
28:22 29:4,14
29:20 30:5,16
31:2 32:7
33:11,23 34:6
35:7 36:5,11
36:19 37:12
38:15 39:5
40:5 41:4,8
43:1 44:2,12
44:19 45:1,21
48:6,8,15 50:4
50:14,22 51:14
51:21 52:17
53:11 54:3,11
54:16,17 56:3
56:8 60:2,16
61:10 62:9
64:2 66:17,20
67:12,23 69:11
69:19 70:21
72:7 73:3,8
75:6,22 76:4
76:19 77:3,9
77:15,24 78:7
78:17 79:22
80:4 81:1,22
82:17 83:6,18
84:1,5 85:1
86:19 87:12,18
87:20 91:25
92:12,25 93:1
93:12,16 96:16
98:16 101:8

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[kaplan - linkedin]**

102:6 104:9,24
105:14 106:4
107:5,6 108:19
109:1,12 110:6
110:9,10,19
112:22 113:2
114:9,18
115:17,22
116:6 117:20
119:1,11,19
120:3,10,16
121:21 122:11
123:9,17,23
124:18,21
126:8 128:4,22
129:9 130:4,8
130:18,24
131:1 133:6,16
133:23 137:4,9
144:5,24
146:17 147:4
148:2,7,11,15
**keep** 122:2,3
123:8 127:22
**keeping** 125:19
**kim** 1:24 2:18
150:2,24
**know** 9:12
10:14 12:20
13:19 21:6
24:19 27:21,25
28:8,10 29:6
29:15,21 30:8
41:9 45:12,20
46:6 48:3 53:4

54:25 56:9
57:18,18 60:20
64:25 69:18
72:5 75:25
76:1 77:4,10
77:22 78:15
79:19,20,23
80:2 82:12
84:6 86:6
88:12 91:11
92:9 93:17
94:5 95:11
96:20 101:11
102:1 103:4
105:9,11,16
106:3 110:22
112:17 114:13
116:7,23
124:24 129:14
133:17 134:9
134:18 136:22
137:14 139:13
140:2,7 141:2
141:21 145:2
**knowing**
138:17
**knowledge**
10:9 19:18,23
33:2,17 34:8
34:17 35:3,25
46:2 64:7 66:3
76:22 77:16
86:10 119:20
**known** 7:19

## l

**l** 8:2
**labeled** 22:14
24:23 86:1
**labs** 121:20
122:10 124:17
**lacks** 106:2
129:6
**laid** 34:24
**language** 31:17
127:2
**laude** 15:1
**launched** 101:4
103:20 104:5
104:16,22
105:11
**lauren** 3:6 5:11
41:15
**law** 6:4 7:17
101:23 102:11
125:2 134:6
137:12
**lawsuit** 7:19
**lawyer** 126:6
**lay** 63:7
**layperson**
34:11
**lbass** 3:11
**learning** 14:18
**lecture** 86:18
87:11
**lecturing** 86:14
**left** 16:24 57:14
85:3,6,7,12
95:16 105:19

**legal** 9:22 10:2
10:3 127:25
128:18 152:7
**legend** 102:15
**length** 54:13
92:23
**letter** 5:14
132:7 135:14
135:20
**licensed** 15:6
**licenses** 15:11
15:12 16:11
**life** 28:23
**lifo** 34:20 35:16
35:19 36:3
38:1 47:15
63:1,3,5,11,11
**likely** 58:16
**likewise** 9:14
10:14
**limited** 23:19
37:6 46:11
94:20
**line** 44:25 57:9
57:17,19,19,20
57:22,23 58:6
60:9 65:3
152:15 153:4
154:4,7,10,13
154:16,19
**lines** 30:20 31:4
57:9 137:20
**linkedin** 15:24
16:4 17:4,15
17:19

Page 19

**[listed - memorandum]**

**listed** 15:17
90:12 97:7,10
97:13 137:25
**listing** 55:6
**lists** 97:3
**little** 63:13
74:13 107:3
**llc** 1:8,8,9,9,9
2:8,8,9,9,9 19:2
138:1,1,2,3,3
**llp** 3:4,16
**ln** 151:6
**located** 144:1
**locations** 89:7
**locked** 152:12
153:1
**logical** 26:5
32:22 34:24
38:20 50:11
67:20 113:1
121:1
**long** 15:8,20
16:20 18:4,15
35:22 37:1
**look** 13:17
30:19 31:3
42:10 49:13
51:4 52:22
53:16,25 54:5
54:23 63:15,23
64:23 74:6,16
88:10 90:23
95:8 98:1
112:19 113:19
114:7 118:20

119:13 127:6
129:1,2,11
142:15
**looked** 43:23
63:14 91:2
96:3 106:5,11
112:14 113:11
113:23 128:23
132:21 134:7
**looking** 33:15
57:10 58:7,10
65:2 71:1
78:19 86:17
89:19 93:6
94:1 99:22,22
99:23,24
102:20 105:18
110:21 115:12
117:7 121:13
121:24 125:13
134:7 135:11
138:14
**looks** 90:13
99:11 134:22
**lp** 138:4,4
**lunch** 92:24

**m**

**m** 3:17 7:14 8:2
25:1
**made** 42:16
69:12 83:11,21
120:5 121:6,11
149:7
**magic** 67:14

**magna** 15:1
**mail** 5:11 41:15
42:10,12 44:10
44:11
**majority** 74:21
74:24 76:5
**make** 8:24 9:19
60:4 76:1
105:7 113:18
120:17,20,23
121:8 122:9
134:21 145:22
152:14 153:3
**making** 126:3
**march** 18:16,16
46:11 47:13
48:22 49:2,14
50:6 118:4
**mark** 1:15 2:14
4:3 5:4,9 7:4
7:13 149:3,18
151:4 152:5
154:2
**marked** 13:18
13:20 21:2,3
41:4,6 54:22
56:3,6,12,15
57:2 84:1,3,19
84:25 93:12,14
93:20,24 95:9
96:18 102:3
104:3 107:16
114:15 116:4
116:21 128:25
129:11

**magna** 15:1
**market** 103:22
106:1 125:18
126:3
**martel** 3:16
7:17
**master** 99:13
100:2,10
130:11
**matter** 19:7
35:3 40:15,17
40:19,23 41:1
43:8,22 45:3,5
45:7,10,15
114:25 130:21
**mckenzie** 11:10
**mean** 24:11
26:4 44:16
56:25 58:21
70:3,7 73:19
73:25 74:1
75:18 79:3,10
79:12 86:6
97:18 105:11
134:24 135:6
136:15,18
**meaning** 35:23
**means** 35:19
**medical** 10:22
**medication**
10:23
**memorandum**
6:4 101:23
102:11 125:2
134:6 137:12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[memory - nine]**

| | | | |
|---|---|---|---|
| **memory** 105:5 | **missing** 47:6 | 150:22 151:2 | **nguyen** 24:24 |
| **mentioned** | 50:15 104:25 | **name's** 7:13 | 25:12,15 27:12 |
| 12:22 16:10 | 106:25 121:4 | **named** 138:10 | 27:16 28:2 |
| 36:24 55:16 | 131:14 | **names** 25:1 | 29:8,24 30:18 |
| 58:12 60:19 | **mm** 142:17 | **narrative** 98:24 | 31:6,11,21 |
| **mesa** 3:9 | **moment** 33:13 | **navigant** 16:23 | 34:23 46:20 |
| **met** 11:7,8,9,9 | 72:8 101:3 | 16:25 17:9,10 | 47:2,4 63:10 |
| **methodology** | 105:24 108:21 | 18:2,5,6,9,10 | 64:17,17,18,22 |
| 34:20,21 35:16 | 124:5 134:8 | **near** 21:20 | 65:5,9,16 70:8 |
| 35:23 38:1 | 147:13 148:9 | 22:13 41:22 | 70:18 71:3 |
| 63:1,3,6,11 | **money** 38:3,7 | 57:12 58:10 | 72:10,23 73:12 |
| **million** 74:14 | 147:19 | **necessarily** | 73:22 74:12,22 |
| 74:24 75:7 | **montgomery** | 136:17 | 75:8 76:6,13 |
| 77:5,11 85:24 | 1:8 2:8 138:1 | **necessary** | 78:9,23 81:19 |
| 86:4 88:18,25 | **months** 78:2 | 34:10 35:17 | 82:19,22,25 |
| 89:10 90:18 | **motion** 5:5 6:5 | 67:10 74:9 | 83:8,12,22 |
| 99:3,3 100:24 | 8:1 20:5,10 | 76:1 110:17 | 89:24 95:7,19 |
| 105:20 118:2 | 101:16,20,24 | 112:2 145:6 | 96:13 97:14 |
| 129:16 130:5 | 102:11,22 | 152:14 153:3 | 111:1,6,16,20 |
| 132:13,20 | 125:3 134:6 | **need** 27:14 48:8 | 112:3,6,25 |
| 133:8,11 134:1 | 137:13 | 53:4 54:5 80:8 | 113:7 115:9,25 |
| **mind** 37:25 | **move** 119:1 | 80:12 81:11 | 116:15 117:3 |
| **minted** 101:7 | **moved** 49:6 | 108:9 148:12 | 118:3,6,7,12,22 |
| **minutes** 123:4 | 50:12,16 51:18 | **needed** 37:2 | 119:21 120:21 |
| **mischaracteri...** | 78:16 | 68:13 | 121:2 122:15 |
| 76:3 | **multistrategy** | **negative** 40:3 | 122:24 123:25 |
| **mischaracteri...** | 138:4 | **neither** 71:23 | 124:7,9 131:19 |
| 28:12 37:9 | **musiala** 8:2 | 150:13 | 135:25 142:25 |
| 72:1 108:15 | 19:5 | **never** 16:23 | 143:1,3,10,18 |
| 109:7 119:18 | **mute** 30:25 | 68:5 | 144:7,12 |
| 146:25 | **muted** 30:25 | **new** 1:2,18,18 | 145:25 146:2 |
| **misleading** | **n** | 2:2,16,16 7:1,1 | 146:13 147:7 |
| 44:25 | | 7:23 87:8 | 147:22 |
| **missed** 110:8 | **n** 25:1,1,2,2 | **newly** 103:20 | **nine** 78:1 |
| | **name** 7:11,16 | 105:11 | |
| | 8:2 135:16 | | |

**[no.6134965 - okay]**

| | | | |
|---|---|---|---|
| **no.6134965** | **o** | 82:14 83:2,14 | 100:13 |
| 152:5 154:2 | | 83:24,24 91:21 | **occurs** 95:23 |
| **nodding** 9:3 | **o** 7:14 | 92:7 96:8 | 99:5 |
| **non** 76:1 136:6 | **o0o** 6:12 7:3 | 98:15 101:5 | **october** 1:17 |
| **nonresponsive** | **oath** 7:5 8:18 | 104:6,17 105:8 | 2:18 7:2 67:17 |
| 119:2 | 54:19 93:3 | 106:2 108:15 | 86:3 91:14,20 |
| **nos** 6:8,10 | **object** 44:24 | 108:24 109:6 | 92:6 99:5 |
| **notary** 151:24 | 47:22 48:2 | 110:16 114:8 | 100:23 103:17 |
| **notating** | 75:24 86:13,14 | 115:10 119:1,8 | 104:5 105:12 |
| 152:15 153:4 | 86:17,23 119:7 | 119:24 120:7 | 105:21,25 |
| **note** 9:20 | 119:16 121:15 | 120:13 123:1 | 107:19 108:4 |
| **noted** 130:25 | 130:22 | 126:5 127:25 | 109:11 110:2 |
| 149:7 | **objecting** 87:15 | 128:17 129:5 | 110:12 130:2 |
| **november** 16:8 | **objection** 17:18 | 133:3,13,20 | 148:17 151:3 |
| 118:4 | 24:14 25:24 | 144:2,22 | 152:3,5 |
| **number** 7:23 | 26:10 27:2,13 | 146:10,25 | **offers** 127:11 |
| 10:15 41:5 | 27:23 28:11,20 | 147:23 | **offhand** 53:19 |
| 56:5 70:24 | 29:2,9,17,25 | **objection's** | **office** 152:11 |
| 71:22 72:5 | 32:3 33:8,20 | 130:24 | **oh** 35:8 60:8 |
| 73:16 74:12,16 | 34:4 35:6 36:2 | **objections** 9:22 | 74:18 87:12 |
| 74:19 79:20 | 36:8,17 37:9 | 10:2,3 30:11 | 109:3 110:6 |
| 98:21 99:5 | 38:11 39:1,25 | **observed** 38:5 | 125:23 |
| 111:14 112:13 | 42:22 45:16 | **obtain** 99:8 | **okay** 8:10,13 |
| 113:19,20,22 | 48:13 49:25 | 100:16 108:1 | 8:24 9:8 10:8 |
| 115:2,14,15,21 | 50:9,19 51:12 | 109:19 | 10:20 11:4,8 |
| 125:9 140:6 | 51:16 52:12 | **obtained** 98:5 | 11:25 12:8,14 |
| 152:15 153:4 | 53:6 59:24 | 103:20 107:22 | 12:21 13:17,22 |
| **numbered** | 60:11 61:6 | **obtaining** | 14:1,2,5,9,12 |
| 96:11 100:23 | 62:5 63:25 | 108:22 | 14:22,24 15:8 |
| 103:2 138:23 | 67:8,15 69:8 | **obvious** 115:11 | 15:11,24 16:6 |
| **numbering** | 69:17 72:1 | 116:16 | 16:9,20 17:3 |
| 57:18 103:3 | 73:1,5 75:3,18 | **occur** 81:4 | 17:11,24 18:4 |
| 125:10 | 76:15,23 77:6 | **occurred** 50:18 | 18:8,20 19:10 |
| **numbers** 115:5 | 77:12,21 78:3 | 78:23 81:12 | 19:17 20:3,8 |
| 130:21,23 | 78:12 79:17 | 83:8 99:17 | 21:1,7,8,15,19 |
| | 80:1,22 81:17 | | |

Page 22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[okay - original]**

| | | | |
|---|---|---|---|
| 21:25 22:7,12 | 64:11 65:1,2 | 108:12 109:2 | 140:20,24 |
| 22:19 23:2,11 | 66:6,9,13 | 109:13,18,23 | 141:3,11,16,20 |
| 24:9,18,21,22 | 67:24 68:5,19 | 110:23 111:5,9 | 141:23 142:11 |
| 25:19 26:2,3,7 | 68:25 69:5 | 111:13,19 | 142:15 143:7 |
| 26:21 27:7,19 | 70:6,11 71:8 | 112:9,13,17 | 143:20 144:6 |
| 27:25 28:5,8 | 71:14 72:13,16 | 113:3,10,17 | 144:10,14,18 |
| 28:15,18,23 | 73:9,14,18,24 | 114:13,17,19 | 144:25 145:3,4 |
| 29:5,15,21 | 74:4 75:11,14 | 114:23 115:7 | 145:19 146:4,4 |
| 30:13,15 31:16 | 77:10 78:8 | 115:17 116:9 | 146:18 147:5 |
| 31:25 32:11,18 | 79:9 80:5 81:8 | 117:1,2,6,21 | 147:15 148:3,7 |
| 32:23 33:12 | 82:3,24 84:7 | 118:1 120:17 | **old** 75:12 |
| 34:7 35:2,12 | 84:17 85:11,15 | 120:23 122:12 | **once** 80:9 |
| 35:22 37:13,19 | 85:18,24 86:3 | 122:19 123:24 | **ones** 66:21 |
| 38:2,16,22 | 86:8 88:10,15 | 124:4,8,13,25 | **open** 13:22 |
| 39:6,12,19 | 88:16 89:5,19 | 125:1,12,13,22 | **opened** 65:5 |
| 41:3,11,14,21 | 90:13 92:1,13 | 125:25,25 | **opening** 21:10 |
| 42:9 43:2,9,20 | 92:21 93:5,11 | 126:9,9,14,17 | **operate** 45:19 |
| 43:25 44:3,7 | 93:12,18,22 | 126:22 127:5 | **operated** 45:22 |
| 44:20 45:22 | 94:1,6,7,11,15 | 127:17,17,20 | **operating** |
| 46:8,14,14,24 | 94:20 95:8,13 | 128:12 129:10 | 16:25 17:21 |
| 47:6,18 48:21 | 95:14,22 96:2 | 129:10,15,16 | **opinion** 25:22 |
| 48:21,25 49:13 | 96:17,21,22 | 129:20,25 | 28:16 29:1 |
| 49:13,21 50:5 | 97:5,17,21 | 130:7,14,24 | 32:15 87:21,25 |
| 50:15 52:5,18 | 98:3,8,14,17,21 | 131:8,14,17,22 | **opinions** 23:24 |
| 53:3 54:21 | 99:16,21,25 | 132:2,5,10,19 | 24:2,7,10,11,16 |
| 55:1,2,15,22 | 100:13,16 | 132:19,23 | 36:12,14,21 |
| 56:2,10,11,14 | 101:2,9,13,14 | 133:17 134:10 | 71:17 |
| 56:22,25 57:3 | 101:19,22 | 134:11,20,21 | **order** 9:4 33:3 |
| 57:8,8,16,25 | 102:1,5,9 | 135:5,10 136:3 | 56:4 66:15 |
| 58:8,19,25 | 103:1,8,9,13 | 136:10,15,21 | 67:7 68:13 |
| 59:8,17 60:3,3 | 104:1 105:17 | 136:25 137:17 | 80:8,20 103:22 |
| 60:17,25 61:11 | 105:24 106:5 | 137:18,24 | **orient** 42:9 |
| 61:21 62:1,10 | 106:15,24 | 138:7,13,24,25 | **original** 100:22 |
| 62:13,15 63:12 | 107:5,11,17,18 | 139:7,14,15,21 | 105:1 133:8 |
| 63:22 64:3,8 | 107:22 108:1 | 140:2,4,8,9,15 | 150:18 152:10 |

Page 23

**[original - pdf]**

| | | | |
|---|---|---|---|
| 152:21 | 24:19 30:7 | 35:8 38:16 | **parenthetical** |
| **originally** | 41:22 46:6 | 46:5,10 49:14 | 19:3 51:7,20 |
| 16:25 | 54:24 56:22,24 | 54:23 55:3,24 | 51:25 |
| **oth** 20:18 | 57:1,1,4,5,19 | 64:23 65:3 | **part** 16:24 |
| **outcome** | 57:19 61:19,22 | 69:21 78:18 | 17:21 19:21 |
| 150:16 | 64:24 88:11 | 84:14,19 88:10 | 38:22 39:17 |
| **outflows** 64:11 | 94:2,4,5,13 | 88:13,17 89:16 | 84:11 94:23 |
| 64:13 111:6,20 | 96:18 101:12 | 89:18,19,21 | 95:10 110:8 |
| 112:14 | 103:2,6 116:22 | 90:6,8,10,10,12 | 114:5 139:23 |
| **outline** 89:23 | 117:10 125:9 | 96:19,23 97:3 | 140:16 141:12 |
| 143:14,17 | 125:10,12,21 | 101:10,15 | 141:17 142:6 |
| **outlined** 26:6 | 127:3,6,8 | 110:21 113:7 | **particular** 7:25 |
| 26:13 28:7 | 134:7,8,19 | 116:22,24 | 12:24 33:1,2 |
| 29:13 30:3 | 135:12 137:14 | 117:3,23 | 33:25 38:3,18 |
| 31:24 46:17 | 137:15 138:23 | 118:10 125:9 | 38:19 41:1 |
| 76:17 128:25 | 140:7 141:1,22 | 125:14 129:13 | 46:1,5 47:21 |
| **outlines** 98:24 | 142:16 145:1 | 132:6,8,10 | 54:23 72:22 |
| **outlining** 51:17 | 152:15 153:4 | 134:17 135:11 | 83:20 88:7 |
| **overly** 78:25 | 154:4,7,10,13 | 135:11 138:15 | 89:20 92:2 |
| 79:4 81:10,15 | 154:16,19 | 138:22 139:2 | 96:19 112:18 |
| **oversight** 74:7 | **pages** 5:7,8,10 | 139:12 140:5 | 116:22 125:9 |
| **own** 32:10 | 5:15,17,22 6:7 | 140:25 141:21 | 125:13 135:11 |
| 33:16 | 37:1 94:1 | 142:15 143:21 | 137:13 |
| **owned** 55:10 | 152:14,17,17 | 143:23 145:1 | **particularly** |
| 145:15,20 | 153:3,6,6 | **paragraphs** | 18:24 |
| 146:5,15,20 | **paid** 40:14,18 | 37:20 89:8,10 | **parties** 7:21 |
| 147:10,18 | 41:24,25 43:7 | 92:17 93:6 | 22:2 74:18 |
| 148:5 | 45:2,13,23,24 | 94:3 97:6,6 | 125:19 |
| **p** | **para** 94:2 | **paraphrase** | **partners** 1:9 |
| **p** 7:14 | **paragraph** | 127:2 145:4 | 2:9 138:3 |
| **p.m.** 7:2 148:16 | 5:18 20:13 | **parentheses** | **party** 150:14 |
| **page** 4:4 5:3,20 | 21:25 22:9 | 19:6 22:15 | **pay** 47:19 |
| 6:3 14:10 | 24:18 25:4 | 49:16 65:4 | **paying** 36:7 |
| 18:24 20:14,14 | 30:6,20 31:4 | 134:25 | **pdf** 152:12 |
| 21:20 22:12 | 32:24,25 35:4 | | 153:1 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[penalty - prior]**

penalty  8:19
149:4 152:16
153:5
pending  7:21
7:23
penny  10:15
perform  26:23
47:8 66:15
67:7 68:13
69:6 80:17
144:20
performed
46:19 47:1,11
122:22
performing
23:20
period  44:14
46:11,14,15
47:12,14,17
48:17,20,21
49:1,2 50:5
51:18 68:6
81:7 90:2
91:14 94:13,15
94:17,22,22
106:8 107:13
108:2,21
109:16,18
110:2,12 111:7
111:21 112:15
113:13,25
118:4,13
119:22 121:24
124:1,10
152:18 153:7

periods  69:2,6
90:14,24
perjury  8:19
149:4 152:17
153:6
permission
48:9,11,13
person  127:10
pertaining
42:14
pertains  150:17
perturning
42:13
pg  151:6
phrase  127:15
phrasing
127:15
pieces  136:11
place  150:9
plain  75:12
plaintiff  1:5 2:5
3:3
planets  28:24
platforms  22:4
please  7:12
9:13,17 11:4
13:3 17:23
21:6 24:4,18
30:25 33:22
41:9 42:12
46:6 47:19,24
48:1 51:14
54:16 56:9
66:17 73:3
76:3 86:18

87:10 112:22
116:8 119:5,6
120:11 123:13
134:17 137:5
plus  28:18
point  21:20
22:13 34:22
51:19 56:17
58:9 59:18
60:8 63:6
67:20 74:17
89:9,20 95:3
113:1 122:16
porter  1:15
2:15 4:3 5:3,4
5:10,16,19,21
6:3 7:4,13,16
13:20 21:3
41:6,25 42:2
54:18 56:6
84:3 93:2,14
102:3 114:15
116:4 124:22
149:3,18 151:4
152:5 154:2
portion  89:20
position  18:12
18:15 126:1,7
potentially
114:11
practical  79:13
precise  10:10
10:15 130:21
precisely  131:3

prefixes  55:9
preliminary
137:19
preparation
11:19 42:4,18
43:6
prepare  11:1
prepared  11:5
preparing
12:11 43:13,16
presented  33:5
pretty  145:22
previous
106:21,22
previously
17:10 78:20
140:18
price  77:22
106:19,20
pricing  90:1,14
91:11,13 92:10
92:10,15 94:12
94:20,21 95:3
96:3,4 97:23
98:5 99:8
100:16 106:16
106:23 107:7
107:12,23
108:1,9,13,22
109:5,7,15,19
109:25 110:12
prior  18:1
62:16 66:3,21
66:24 72:2
76:24 107:13

**[prior - reached]**

119:18 150:4
**probably** 44:6
44:23
**problem** 86:22
**procedure**
152:19,20
**proceedings**
9:21 148:16
150:5,8,15,19
**proceeds** 8:14
25:13 27:11
28:1 29:7,22
31:9,19 38:18
78:25 90:21
103:10 128:14
128:23 129:1
133:10,18
134:1 135:23
143:2,8,25
**produce** 69:1
**produced**
58:24 65:6
67:21 68:21
115:15
**profession** 15:6
**professional**
15:12 16:10
**professionally**
40:10
**profile** 15:24
16:4 17:4,16
17:20
**profits** 125:19
126:3 127:22
129:3 133:1

134:12,15
**proper** 122:5
123:8
**property**
103:11 138:18
140:22 142:12
**provide** 10:12
10:16,17 26:25
61:22 65:24
97:7
**provided** 42:3
42:18 59:15
60:14,21 61:9
61:19 65:22
68:17 71:4
73:16,18,23,24
73:25 74:3
125:17 152:19
153:8
**provides** 19:3
90:6
**providing**
22:22 33:3
**proving** 40:3
**public** 12:19
15:7,9 33:18
145:22 151:24
**published** 40:9
**purchased**
127:10
**purchasers**
128:15
**purport** 48:10
**purported** 97:7

**purpose** 10:2
35:4 103:20
**purposes**
110:14
**put** 105:9,10

**q**

**qin** 1:7 2:7 5:13
7:20 25:8 31:8
38:24 39:24
135:15 142:22
151:2 152:4
154:1
**quantitative**
1:8 2:8 138:2
**question** 9:17
9:18,22 10:1
13:1 26:22,24
33:8,10,22
38:12,14 39:2
39:4 47:18,20
48:3,4 50:21
51:13,23 52:5
53:4,7,8,8,9,10
53:11,22,23
54:2,6 62:16
66:16 67:4
68:18 73:2,7
75:5 76:24
81:7 83:19
86:9,12,15,16
95:6 104:20
105:1,2 106:18
106:21,22
107:3 108:18
110:7 112:21

113:4 117:14
117:17 118:5
119:9,10,17
120:9 121:4,13
121:16 122:4
122:22 123:4
123:13 129:5,8
133:5 136:9
137:3 138:14
143:21 144:4
144:14 145:6
**questions** 8:7
48:9,11
**quotations**
137:21
**quotes** 134:25

**r**

**r** 7:14,14,14
25:1 154:3,3
**r&s** 153:1,9
**raise** 9:21
**rate** 40:16,19
40:23 42:5,20
42:20
**rather** 29:1
45:23 51:10
**rationale**
125:16
**reach** 61:7
74:16 143:24
144:15
**reached** 26:12
28:6,9 30:3
49:4,8 50:11
118:23 121:1

Page 26

[reached - records]

122:16,17,20
122:21 146:3
146:13 147:8
**read** 13:2,4
19:5,13 20:24
35:5 42:14
49:18 51:14,15
66:17,18 72:4
73:3,4 78:20
81:24 85:5,21
90:8,20 94:16
95:17 96:25
103:18,23
112:22,23
120:10,12
123:2,3 125:20
127:13 135:7
135:18,25
137:4,6 138:5
139:19 143:4
145:16 147:11
149:4 151:6
**reader** 33:3,24
35:10
**reading** 95:16
104:13 127:5
152:23 153:9
**reads** 151:6
**ready** 56:9
**really** 9:23
**reason** 9:16
10:20 25:12,20
26:3 27:9,10
27:20 31:9,16
38:2,17 41:18

42:23 61:21
74:4 81:9
100:19 102:16
111:24 143:1,8
143:22 151:6
154:6,9,12,15
154:18,21
**reasonable**
26:11 29:12
31:23 32:4,5,9
32:12,16,19,20
33:13 63:8
118:24
**reasonably**
26:19
**reasons** 25:21
36:13
**recall** 49:10
51:2 52:22
53:15,19 61:2
64:21 68:8
69:10 75:13,16
75:20 76:8
91:15 92:9,11
100:24 101:6
102:8,20,21,24
102:24 104:7,8
104:11,18,21
104:23 107:14
111:17,23
114:11 116:1
125:1 147:12
**receive** 128:10
133:18

**received** 15:2
15:22 41:15
102:10 103:16
114:24 128:14
132:25 133:7
**receiver** 8:1,6
9:21 19:4,6,12
22:8 40:13
41:16 45:5,9
65:7 68:22
79:1 114:24
115:16 125:2
126:2
**receiver's** 5:5
6:5 20:4
101:16,20,23
102:11 126:1
134:5 137:12
**receivership**
25:8 31:8
38:24 39:24
88:20 96:24
103:11 132:15
137:2,21 138:8
138:11,19
139:9,23 140:1
140:17,21
141:13,18
142:7,13,22
**receiving** 45:4
**recess** 54:15
92:24 124:20
148:10
**recognize**
115:7 116:12

**recollection**
10:9,13 16:3
104:19 105:2
**reconstruct**
59:16
**reconstructed**
60:1 70:13
**reconstruction**
59:22,22
**record** 7:12 9:5
9:9,24 10:3
13:4 48:10
51:15 54:12,14
54:16 58:13
66:18 70:24
73:4 84:22
87:16 92:22,25
112:23 114:22
115:13,18
116:13,17
120:1,12
124:19 130:1
130:15 137:6
148:9
**records** 12:20
31:5 33:6,16
34:25 37:1
51:5 52:23
60:20,24 61:12
61:14,18 65:7
65:18,20 66:12
66:13,14,19
67:3,5,6,10,17
67:21 68:6,13
68:16,21 69:2

[records - represent]

69:6,13 73:17
73:19,19,23,24
73:25 74:1,3,4
80:11 83:17,20
115:8 144:17
144:19 145:22
**recreated** 58:16
**refer** 8:5 70:7
81:25 88:17
89:16 132:12
**reference** 22:24
93:7 94:2,2
117:23 118:11
134:11 136:12
146:21
**referenced** 14:7
14:15 20:9
21:15 22:9
52:16 55:23
86:1 89:1
92:16 111:10
117:9 119:14
132:7 139:22
142:5 146:7,23
152:6
**references** 23:3
90:1 110:25
117:3
**referencing**
57:10
**referred** 19:2
33:12 66:21
69:20 81:3
116:14 138:15
138:16

**referring** 14:6
17:20 51:10
57:17 82:4,5
89:21 124:6
138:9
**refers** 19:5 82:1
82:6 85:15
116:18 117:22
134:25 135:3
137:24
**reflect** 65:15
85:24 91:19
92:4 115:24
**reflected** 36:14
55:22 59:6
68:22 70:23
**reflecting**
115:8
**reflection**
31:17
**reflects** 25:22
59:9 70:12
112:9
**refreshes**
104:19
**regard** 12:25
125:3
**regarding**
12:23 23:24
24:12,23 25:22
26:25 45:9
63:19 87:22
91:9 107:12
119:20

**regardless** 24:9
40:14 63:22
79:24 119:12
**registered**
135:16
**related** 20:18
23:20 31:5
122:10 150:14
**released** 152:21
**relevancy**
108:22
**relevant** 12:19
22:2 35:13
60:22 76:17,21
86:7,12 91:6
108:5,7,8,11,11
108:13 109:3,5
109:7,10,14,19
119:13
**relied** 11:23
12:1,6 13:14
74:9
**relief** 87:14,14
**rely** 13:11 40:2
**remain** 25:14
27:12 28:2
29:8,23 31:11
38:19 143:3,10
**remainder** 97:2
**remained** 31:21
**remember**
10:10,11,13
125:5
**remind** 66:23

**remitted**
128:15
**remote** 3:1
**remotely** 1:18
2:15 149:5
150:9
**removed** 84:24
**repeat** 13:1
24:5 33:22
47:25 48:1
51:13 53:9
66:16 73:2
110:7 112:21
119:6,6 120:9
137:3
**rephrase** 54:1
**report** 63:7
76:17 89:4
98:2 116:2
**reported** 1:23
**reporter** 2:19
8:25 9:5 13:4
17:22 19:20
24:4,25 30:12
30:22 47:24
51:15 54:14
66:18 73:4
87:2 112:23
119:5 120:12
123:3 137:6
150:1,3
**represent**
41:14 102:9
114:23

Page 28

**[represented - says]**

| | | | s |
|---|---|---|---|
| represented | 45:14,25 | 32:2 38:25 | |
| 102:18 | retained 20:2 | 39:12 40:3 | s 8:2 154:3 |
| reproduction | 22:25 23:3,6 | 42:10 47:2 | sale 125:19 |
| 84:18 | return 25:7 | 51:7 59:23 | 127:24 128:24 |
| request 144:19 | 134:4 142:21 | 60:8 69:3,14 | 134:1,12,15 |
| requested | 152:17 153:6 | 70:4,9 73:12 | san 3:19 |
| 66:14 67:6,19 | returned 31:8 | 75:12 81:4 | saw 113:24 |
| 150:20 153:1,9 | 38:24 39:23 | 85:6,8,18 90:3 | 124:16 |
| 153:10 | 133:2,11 | 92:19 95:16,19 | saying 12:4,5 |
| require 59:21 | review 11:19 | 95:20 96:7 | 34:18 37:13 |
| required 10:16 | 12:11,24 31:4 | 99:19 100:5 | 55:5 71:21 |
| 86:9 | 66:14 67:7 | 101:17 108:14 | 136:3 147:12 |
| research 1:9 | 121:23 122:14 | 109:24 114:1 | 147:13,16 |
| 2:9 138:3 | 122:17,23 | 114:10 115:1 | says 15:24 16:3 |
| reserve 87:16 | 123:12,25 | 126:15 127:3 | 17:4 18:25 |
| 119:8 | 124:8,14,17 | 132:8,17 | 19:10 20:3,15 |
| respect 23:8,21 | 150:19 152:8 | 133:19 136:13 | 22:1,19 25:4 |
| 43:22 47:1 | 152:10,13 | 136:23 137:25 | 31:4 38:23 |
| 50:7 82:18 | 153:2 | 138:9 140:22 | 41:23 42:2,11 |
| 95:23 111:6 | reviewed 11:6 | 143:15 144:12 | 42:12 49:14,15 |
| 143:22 144:12 | 11:21 12:15,16 | 146:9 148:7 | 53:15,19 55:3 |
| respond 9:10 | 13:5,7 70:24 | risk 19:1 | 55:9 57:4,5 |
| 10:8 | 101:19,22 | robert 8:2 19:5 | 58:1,1,4 60:5 |
| responded | 111:8 120:25 | role 17:1 23:19 | 65:3 74:11 |
| 119:9 | 122:15 123:22 | romanette | 75:23 78:20 |
| respondents | 124:2,5,13 | 41:23 | 81:24 85:12,19 |
| 7:18,25 | reviewing | root 25:21 | 88:16 92:19,20 |
| response 72:4 | 11:17 12:9,10 | round 44:17 | 94:8,16 96:22 |
| responses 9:2 | reviews 21:23 | rounding | 97:16 100:2,6 |
| 42:16 | 89:14 90:9 | 130:19,22 | 100:11 101:18 |
| resultant | revised 42:14 | rules 8:14 87:8 | 103:10,14 |
| 135:22 | rfp 42:14 | 87:13 153:8 | 110:25 115:3 |
| resulting 65:9 | right 18:2,18 | run 69:7 | 117:11 125:15 |
| results 23:24 | 18:21 27:21,22 | | 125:17 127:8 |
| 24:12 26:9 | 28:10,19 30:11 | | 132:12,17,18 |

**[says - sigma]**

135:13,20
138:25 139:15
140:9 141:4,24
142:18 145:7
145:10
**schedule**
152:10
**seasoned** 20:15
**sec** 5:13 22:20
69:22 115:3
151:2
**second** 15:16
30:10,23 42:9
56:21 57:19
69:22 87:3
103:14 110:24
112:5 113:6
**securities** 1:4
2:4 7:19
126:12 127:8
128:8 152:4
154:1
**security** 126:19
127:12,21
128:14
**secvq** 6:9,11
**see** 14:1 21:23
22:5,17 39:3
39:16 41:23
42:7,12,15
49:19 55:11
58:11 65:11
74:11,19 84:15
84:16 85:2,13
85:22 88:16,22

88:23 94:9
96:22 97:1,2,5
99:6,14,21,25
100:5,8,11,25
103:9,12,14,24
105:22 111:3
115:3 117:2,8
117:14,15,16
117:18 118:14
125:14,21,23
126:22,23
127:8,15
131:25 135:12
136:1 137:18
137:23,24
138:6,25 139:6
139:15,20
140:13 141:9
142:3 143:5
145:17
**seeing** 102:21
**seek** 87:14,16
**seems** 50:2
**seen** 14:2 21:8
40:3 41:12
56:11 84:8
93:19 102:7,22
102:25 106:16
107:11 114:19
114:21 116:10
120:1 133:14
133:21
**segment** 16:25
17:21

**selling** 125:19
128:14 129:2
133:18
**sells** 127:11
**senior** 18:22
**sense** 105:7
**sentence** 18:25
19:10 20:3
24:5 39:3 55:2
65:2 69:22
78:19 80:5
81:4,23,24
89:2 101:14
103:14,19
110:25 112:5,5
112:11 113:6
113:18 125:15
127:7,18
134:12,13
135:7 139:15
140:9 141:4,24
145:5,7
**sentences** 46:10
89:22 104:13
**separate** 17:11
**september** 5:12
41:17 43:15,20
44:5,13,22
**sequiturs** 76:1
**services** 19:4
20:19 21:22
22:14 42:3,18
**set** 103:22
130:10 150:9

**settled** 68:11
**seven** 95:15
123:4,5 137:20
**seventh** 123:2
**sheet** 151:1
**short** 54:15
92:23 124:19
124:20 148:8
148:10
**shorthand** 2:19
8:6 150:2,11
**show** 52:23
59:20 60:5
61:12,16 71:8
71:11 72:20
74:14,15 75:19
75:19,22
**showed** 58:14
96:14
**showing** 100:8
111:19
**shown** 70:24
99:2 111:9
**shows** 59:3
60:5
**side** 85:3,7,8
115:1
**sigma** 12:16,23
25:5,8,10,14
27:11 28:1
29:7,7,23 31:7
31:10,19 47:16
78:24 134:24
135:1,3,4,5
136:4,6,6,16,22

Page 30

**[sigma - step]**

138:3,4 139:1
139:2 142:19
142:21,23
143:2,9,25
144:11
**sign** 152:16
153:5
**signature** 14:10
150:24 151:20
152:21,23,23
153:9
**similar** 70:14
143:20
**similarly** 31:22
32:6
**simultaneous**
86:25 119:3
**sir** 21:19
**sitting** 8:20
**six** 20:16
**skipping**
135:19
**slightly** 131:3
**slow** 17:23
48:10
**small** 115:3
**smart** 22:4
**solely** 45:2,23
**solutions** 152:7
**somebody**
34:12,19
**someone's**
28:25
**soon** 115:4

**sorry** 11:12
13:1 18:16
19:20 20:12
27:8 30:13
31:1 35:8
41:17 42:13
54:24 57:4
64:17 67:4
89:11 92:15
97:11,12 99:3
100:1 106:9,18
108:3 109:3
110:9,13
116:24 117:7
125:9,21 128:7
132:6 135:7
136:8 137:3
140:5 141:1
144:3,25
**sort** 14:24
23:16 24:11
45:13,25 59:21
80:7
**sought** 133:24
**sounds** 104:25
106:25 108:20
113:3
**source** 23:15
26:18 136:20
137:8 139:25
140:19 141:15
142:10
**south** 14:21
**southern** 1:2
2:2 7:22 87:8

**speak** 9:11
**speaking** 9:10
9:23 86:25
87:4 119:3
**specialized**
33:2,16 34:8
34:17 35:3,25
**specific** 49:10
78:24 114:21
116:1 120:20
121:9,11
**specifically**
56:17 57:9
**specified**
129:18
**speculate** 44:1
105:13
**speculation**
36:9 77:7,13
78:4,13 79:18
80:23
**spell** 7:11 25:1
**spelled** 7:13
**spend** 45:3
**spending** 43:10
**spent** 43:13,16
43:21 44:4,21
**spoken** 9:4
**srihari** 135:16
**start** 17:14
46:24 80:10,25
85:7 87:5
106:25 129:16
**started** 18:6

**starting** 95:3
**starts** 20:13
95:16
**state** 7:11
152:9,12
**stated** 35:17
**statement**
13:15 19:8,14
19:15 20:6
25:20 27:8,20
31:14 39:8
41:24 42:18
55:13 65:13
137:19
**statements**
12:17 13:12
20:23 25:17
104:1
**states** 1:1,4 2:1
2:4 7:19,22
17:16 102:9
152:4 154:1
**stating** 48:13
**stefan** 1:7 2:7
7:20 151:2
152:4 154:1
**stenographic...**
1:23
**step** 73:10,10
85:7,8,11
95:22 96:5,9
97:8,8,8,8,10
97:13,17,24,25
98:18,21,24,24
99:1,11,12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[step - terminology]**

| | | | |
|---|---|---|---|
| 135:13,20 136:13 138:15 | subscribed 150:22 151:21 | 137:13 | 71:14 73:9 |
| **steps** 51:24 95:15 96:11,25 97:3,7 98:3 135:12 | **subscribing** 13:7 | **supported** 13:15 22:19 | 79:15,21 87:13 92:22 98:3 124:19 148:8 |
| **stick** 130:23 131:22 | **subscription** 12:15,22 13:11 | **supports** 90:18 | **taken** 2:15 8:11 54:15 92:24 124:20 148:10 149:5 150:8,10 |
| **stipulated** 7:6 | **subsequent** 82:2,3,7,8,13 | **supposed** 10:1 10:12 134:12 | |
| **stipulation** 2:17 152:20 | **subset** 60:21 | **supra** 96:23 | **talk** 49:12 52:5 54:12 92:23 115:17 |
| **stop** 18:8 66:6 123:18 144:14 | **subsets** 12:19 36:25 | **sure** 9:19 13:14 16:1,4 29:3 33:9,21 36:10 38:11,13 39:3 40:1 45:18 50:1 53:6,10 54:11 59:1 62:15 69:4 70:18,19 73:7 77:1,8,14 79:12,21 80:13 87:24 96:8 108:17 115:21 126:25 128:3 128:10 133:4 134:21 136:8 | **talked** 37:19 |
| **stopped** 81:9 82:18,22 121:3 143:11,23 144:6 | **substantial** 57:24 | | **talking** 44:9,10 44:14 47:25 57:21 66:13 67:6 72:17 82:9 102:13,23 123:19,20 124:10 125:4 137:10 |
| **stopping** 113:1 | **substantially** 55:4,17 57:14 145:8 | | |
| **street** 3:18 | **success** 45:13 | | **talks** 80:5 |
| **strict** 63:11 | **succinctly** 126:21 | | **tasked** 23:23,23 |
| **strike** 43:3 85:3 92:13 96:2 97:12 100:20 119:1 | **sufficiently** 66:4 | **surprised** 45:19 | **technologies** 1:7,8 2:7,8 138:1,2 |
| | **suggest** 39:16 | **switch** 20:12 | |
| | **suggested** 39:18 | **sworn** 150:5 151:21 | **tell** 9:25 66:6 86:19 108:7 126:23 |
| **study** 128:6 | **suggests** 120:2 | | |
| **studying** 126:14 | **suite** 3:8,18 | **t** | **ten** 97:6 |
| **sub** 12:22 89:6 111:17 129:21 | **summed** 71:3,5 | **t** 7:14 154:3,3 | **term** 19:6 134:23,24 138:8 |
| | **summer** 18:7 18:11 | **table** 102:20 | |
| **subheading** 100:12 | **supervision** 150:12 | **take** 13:17 37:17 51:4,24 53:3 54:4 64:23 67:10,11 | **terminology** 134:22 |
| **subject** 5:12 8:18 | **support** 5:5 6:4 20:4 74:8 88:9 90:7 101:16,23 102:11 134:6 | | |
| **submit** 20:4 101:15 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[terms - told]**

| | | | |
|---|---|---|---|
| **terms** 23:12 | **think** 9:12 | **time** 18:6 37:24 | 97:24 99:4 |
| 63:16 64:11 | 13:15 15:24 | 43:7,10,12,16 | 103:23 104:16 |
| 78:8 79:10,10 | 17:3 26:5,11 | 43:19,21 44:21 | 105:19 106:6 |
| 79:12 99:11 | 26:22 27:14 | 47:17 48:17 | 106:17 107:8 |
| 145:23 | 31:22 32:5,16 | 52:10,11 53:3 | 107:12 108:2 |
| **test** 10:21 | 32:16 34:19,22 | 54:4 67:5,21 | 108:22 129:17 |
| **testified** 7:7 | 35:15,16 37:4 | 68:5 79:10,12 | 130:6 133:11 |
| 40:6 71:16 | 37:22 42:24 | 79:15 83:15 | **token's** 103:17 |
| 72:8 143:17 | 44:25 47:6 | 92:8 94:16 | **tokens** 85:16,25 |
| **testify** 10:21 | 51:22 61:7 | 95:1 96:5 | 86:5 87:22 |
| 150:6 | 62:17 63:8 | 97:22 98:9 | 88:2,6,19 89:1 |
| **testifying** 1:18 | 68:20 74:6 | 107:22 109:16 | 89:13,24 90:8 |
| 2:16 8:20 | 76:20 79:6 | 109:18 111:7 | 90:20,22,24 |
| 54:19 93:3 | 81:20 86:12,20 | 111:20 112:15 | 91:3,9,20 92:5 |
| **testimony** 8:18 | 87:13 107:2 | 113:13,25 | 92:6,16 95:5 |
| 28:12 37:10 | 114:3 115:20 | 122:6 123:2,16 | 95:24 96:4 |
| 41:25 44:12 | 117:13 119:9 | 123:25 144:11 | 98:6 99:4,9,17 |
| 72:2 76:3 | 119:12 121:4 | 150:9 152:10 | 100:9,17,24 |
| 108:16 109:7 | 123:9 126:21 | 152:18,24 | 101:4,7 103:16 |
| 119:18 147:1 | 144:4 145:6 | 153:7 | 103:20 104:4 |
| 149:8 | 146:18 | **times** 29:18 | 104:22 105:20 |
| **tez2** 145:14 | **thinking** 32:18 | 30:1 75:21 | 106:1 107:19 |
| **thank** 7:15 | **third** 20:13 | 121:17 123:6 | 109:5,11,15 |
| 30:13 48:6 | 22:13 57:22 | **title** 57:23 | 113:15 125:17 |
| 87:19 123:21 | 67:5 83:15 | **today** 10:21 | 125:18 126:4 |
| 148:12,12 | 92:8 99:12 | 11:2 12:12 | 128:24 129:2 |
| **thereof** 2:17 | 103:14 125:19 | 43:6,10 46:18 | 129:16,23 |
| 135:23 150:16 | 130:2 131:16 | 46:21 58:21 | 130:11 131:3,9 |
| **thing** 34:15 | **thought** 16:2 | 76:12 78:11 | 131:15,16,18 |
| 35:25 61:16 | 68:12 88:6 | 148:11 | 132:3,14,24 |
| 95:19 97:10,13 | **three** 16:9 | **today's** 93:24 | 133:8,11,19 |
| 137:11 | 75:21 89:23 | **together** | 134:2 |
| **things** 9:3 38:5 | 131:10 | 105:10,10 | **told** 17:6 35:22 |
| 38:6 62:18 | **thursday** 1:17 | **token** 85:12 | 75:20 80:16 |
| 112:10 | 2:17 7:2 149:6 | 94:12,21 95:17 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[took - transferred]**

| | | | |
|---|---|---|---|
| **took** 118:22 | **tracing** 5:18 | 143:11,13,16 | 132:7 133:2 |
| **top** 20:14 42:10 | 20:18,21 21:21 | 143:23 144:7 | **transactional** |
| 44:11 57:2 | 22:3,14,23 | 144:15,20 | 31:5 65:7 |
| 84:14 94:7 | 23:19,21,25 | **trade** 106:21 | **transactions** |
| 95:17 98:13 | 24:1,12 25:5 | **traded** 63:7 | 12:19 23:8 |
| 99:14,21 100:2 | 25:23 26:8,9 | 135:21 139:3 | 35:23 48:18,25 |
| 102:15 117:9 | 26:16,23,25 | 139:17 140:10 | 49:11 50:7 |
| 127:7 133:1 | 27:4,7 32:10 | 141:6,25 | 53:17 62:4,11 |
| 137:15 | 34:15,22 35:13 | **trades** 65:8 | 62:20 64:19 |
| **total** 42:4,5,19 | 35:18 36:4 | 70:15 111:18 | 65:16,25 68:23 |
| 42:21 65:10 | 37:3,7,8,14,16 | 113:11 122:18 | 82:19,25 83:7 |
| 69:23 113:24 | 37:21,23 38:9 | **trading** 25:9 | 85:6 97:12 |
| 128:13 | 39:7,13,18 | 58:18 59:15 | 98:18 107:18 |
| **totality** 81:19 | 46:10,15,17,19 | 61:18 78:22 | 110:1,2 111:1 |
| **toward** 85:8 | 47:1,8,11,15 | 79:6 81:3,6 | 115:24 130:10 |
| **trace** 23:14 | 50:7 63:18 | 103:21 106:1,6 | **transcribe** 9:1 |
| 26:17,19 34:20 | 65:21 66:5,7 | 106:12,13,18 | 9:5 |
| 37:24 48:18,25 | 66:15 67:7,10 | 106:22 142:23 | **transcribed** |
| 62:3 63:4 64:3 | 67:14,18 68:14 | **traditional** | 150:11 |
| 64:6,8,13,19 | 69:6,16 76:17 | 20:19 | **transcribing** |
| 65:15 79:7 | 78:24 80:17,21 | **training** 34:8 | 8:25 |
| 81:16 108:9 | 81:10,24 82:11 | 34:12 | **transcript** |
| 118:18 139:25 | 82:18,21 83:5 | **tranche** 129:22 | 149:5 150:18 |
| 140:19 141:15 | 84:13 85:5 | 129:23 131:16 | 150:20 151:1 |
| 142:10 | 86:7 91:7 | 131:17 | 152:6,8,10,13 |
| **traceable** 135:1 | 95:10,15 96:5 | **tranches** | 152:13,21 |
| 136:4 | 97:22 98:9 | 129:22 131:10 | 153:2,2 |
| **traced** 38:21 | 105:15 107:15 | 131:15,23 | **transfer** 27:15 |
| 47:16 48:19 | 108:5 110:15 | **transaction** | 51:3 99:2,16 |
| 62:11,20,22,24 | 110:18 112:2 | 33:6,16 34:25 | 100:22 132:20 |
| 63:9,10 82:25 | 113:1 118:22 | 37:24 51:5 | 132:25 |
| 83:7 96:24 | 121:1,3 122:16 | 52:23 64:21 | **transferred** |
| 112:24 | 122:17,21,21 | 115:8 116:13 | 25:14 27:12 |
| **traces** 47:3 | 124:15 128:25 | 116:13 117:11 | 28:2 29:8,23 |
| | 129:11 142:18 | 117:18,22 | 31:10,20 49:17 |

Page 34

**[transferred - underwriting]**

| | | | |
|---|---|---|---|
| 49:23 50:24 | 103:1 116:20 | **unable**   136:19 | 134:22 136:8 |
| 51:9 52:2,6,14 | 124:22 125:8 | 139:24 140:19 | 138:8 146:4,18 |
| 52:20 53:13 | 134:17 137:11 | 140:20 141:15 | 147:15 |
| 55:7,19 88:20 | 138:21 139:11 | 141:16 142:9 | **understanding** |
| 95:5 112:19 | 140:4,24 | 142:11 | 35:16 39:10,14 |
| 118:2 132:15 | **turning**   18:23 | **unclear**   114:22 | 69:1 85:5 |
| 133:8 135:14 | 21:19 22:12 | **under**   10:23 | 86:10 89:25 |
| 135:24 143:3,9 | 78:18 93:5 | 30:17 34:21 | 101:2 104:4,15 |
| 145:12 146:7 | 103:13 135:10 | 41:22 53:21 | 105:3,4,25 |
| **transfers**   25:11 | 144:25 | 54:19 58:1,4 | 113:4 115:19 |
| 38:6 51:1 | **turnover**   5:6 | 63:10 93:3 | 117:21 126:18 |
| 89:24 90:4,11 | 6:6,6 20:5,5,10 | 95:24 98:11,18 | 127:17,20 |
| 95:19 96:6 | 101:17,20,24 | 100:12 117:11 | 128:5,12 |
| 97:11,13 | 102:12,12 | 131:3 149:3 | 145:24 146:11 |
| 105:20 118:17 | 125:3,3 134:6 | 150:12 | 147:6 |
| 119:23 142:24 | 137:13 | **underneath** | **understood**   8:8 |
| **trial**   40:7 | **two**   17:12 | 137:19 | 8:9 9:6 10:6 |
| **true**   149:9 | 28:18,18 32:23 | **understand** | 34:19 59:1 |
| **truth**   150:6,6,7 | 46:9 62:17 | 8:17,22 9:16 | 144:4 |
| **truthfully** | 85:19 89:22 | 9:19 10:18 | **undertake**   79:1 |
| 10:21 | 107:3 129:22 | 18:1 26:22 | 80:8,20 |
| **try**   8:4 12:8 | 131:15,22 | 28:15 33:4,9 | **undertaken** |
| 17:11 26:21 | **typewriting** | 33:21,24 35:11 | 80:3 134:14 |
| 33:3 37:4 47:7 | 150:12 | 39:3 40:21 | **undertook**   26:8 |
| 48:4,16 62:17 | **typically**   45:19 | 50:20 51:6,23 | 26:16 |
| 109:2 113:4 | | 53:21 54:18 | **underwriter** |
| 121:5,18 | **u** | 68:10,17,19 | 126:18,20 |
| 123:15 126:22 | **u**   8:2 25:2 | 74:10 75:4 | 127:9,9,21,22 |
| 146:19 | **u.s.**   70:3 72:9 | 80:13 81:8,12 | 129:3 |
| **trying**   33:24 | 72:25 75:1,12 | 93:2 95:14 | **underwriters** |
| 68:10 81:12 | 89:23 91:6 | 96:11 97:19 | 128:7 |
| 123:7 147:15 | 109:10,14,20 | 104:10 108:18 | **underwrites** |
| **turn**   24:18 30:6 | 151:2 | 112:4 118:5 | 127:21 |
| 41:21 46:3 | **uh**   9:3,3 | 125:25 128:7 | **underwriting** |
| 54:21 96:18 | **un**   108:11 | 129:7 133:4 | 126:12 127:18 |

Page 35

**[underwriting - want]**

| | | | |
|---|---|---|---|
| 128:8,21 | **v** | **veritext** 152:7,9 | **vs** 1:6 2:6 151:2 |
| **unhosted** 49:18 | | 152:11 | 152:4 154:1 |

128:8,21

**unhosted** 49:18
49:23 51:9
52:3,8,15,21
55:9 145:14,20
145:23 146:21
147:17

**unintentional**
61:25

**united** 1:1,4 2:1
2:4 7:19,21
152:4 154:1

**university**
14:21

**unlimited**
80:16,18

**updated** 5:13

**usd** 70:1,3 94:8
94:8 108:9

**usdc** 141:8,25

**usdt** 131:16
139:16

**use** 35:23

**used** 34:9 39:22
40:23 59:16
72:22 73:25
96:10 97:22
121:10

**useful** 34:8
35:10

**using** 138:7

**uttered** 147:16

**v**

**v** 5:13 115:4

**valuation** 74:25
75:9 83:12
88:24 90:7,19
112:6 132:11
132:19,20

**value** 72:9
73:14 74:21,23
74:25 76:5,9
76:12,22 77:1
77:18 78:10
83:22 86:4
87:22,24 88:1
88:6 89:23
90:11,21,24
91:3,6,19 92:5
92:5 109:10
113:7 132:23

**valued** 65:10
69:23,23 74:12
98:2 118:1

**values** 72:22
89:15 91:2,9

**variety** 22:20
78:5,14

**various** 21:25
22:3,16 25:21
72:10,13 91:2
91:3 145:11

**verbal** 9:1

**verbatim** 15:3
38:25 79:6
118:3 133:10

**veritext** 152:7,9
152:11

**versed** 20:20

**versus** 7:20

**vi** 41:23

**video** 3:1 19:19
24:3 30:21
47:23 87:1
119:4

**videoconfere...**
1:14 2:14 7:6
149:6 150:10

**view** 28:25
79:14 127:11

**virgil** 1:7,8,9
2:7,8,9 12:16
12:23 138:1,2
138:2,3

**virtual** 1:14
2:14

**vitae** 5:9

**volume** 78:22
81:3,6

**vpfa** 141:5,8

**vqr** 1:9 2:9
27:15 31:7,10
31:19 47:16
78:24 88:17
96:23 99:13,18
100:2,9 103:10
103:15,16,19
125:17 126:2
129:4 130:11
132:12 134:13
138:3,4

**vs** 1:6 2:6 151:2
152:4 154:1

**w**

**wait** 63:2 87:3
87:3

**waived** 152:23
152:23

**waiving** 152:20

**walk** 27:14
32:14

**wallet** 86:1
96:12 99:5
100:10,12,22
105:21 129:18
129:21 131:4,6
133:9 145:23
147:20

**wallets** 49:18
49:23 51:9
52:3,8,15,21
53:14 55:8,9
99:14,19 100:6
100:12 145:13
145:14,20
146:1,5,8,14,22
146:23 147:9
147:17,21
148:5

**want** 8:16,24
9:18 14:9
17:11 27:19
44:1 51:4 53:9
53:25 60:3
72:3 75:19
80:18,20 86:11

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[want - yeah]**

| | | | |
|---|---|---|---|
| 105:12 123:3,8 | **withdrawals** | 77:1,8,14,22 | 71:9,18 75:1 |
| 126:7 127:14 | 65:8 70:15 | 78:5,14 79:19 | 81:23 85:6 |
| 134:21 | 112:10 113:12 | 80:2,24 81:18 | 99:12 104:12 |
| **wanted**  14:13 | 113:18,22,24 | 82:15 83:4,16 | 109:25 121:10 |
| **way**  45:23 48:8 | 114:7 118:12 | 83:25 86:14,18 | 133:25 136:21 |
| 57:20 85:2,7 | 118:16,18,21 | 86:19 87:11 | 140:2 141:16 |
| 95:18 105:18 | 119:14,21 | 89:14 90:9 | 142:11 147:16 |
| 113:5 138:17 | 120:6,18,25 | 91:23 92:9 | **work**  20:9 22:1 |
| **ways**  107:3 | 121:7,20,24 | 96:10 101:6 | 22:25 23:3,12 |
| **we've**  13:18 | 122:18,23 | 102:5 104:8,21 | 40:12,15,25 |
| 14:5 32:23 | 123:22,24 | 105:9 106:3 | 41:25 43:5 |
| 42:16 54:9,22 | 124:3,5,6,7,9 | 108:17,25 | **worked**  41:1 |
| 56:11,15 84:19 | 124:13,16,16 | 109:9 110:17 | **working**  18:6,8 |
| 93:19 95:9 | **witness**  4:3 | 112:24 114:17 | 22:8 |
| 102:13 104:3 | 13:5,22 17:19 | 115:11 117:15 | **worth**  88:18 |
| 107:16 116:21 | 19:22 21:12 | 117:18 120:1,8 | 132:13 |
| 121:24 125:4 | 24:6,15 25:25 | 120:14 121:19 | **written**  30:18 |
| 128:25 132:20 | 26:11 27:4,14 | 122:9 123:22 | 31:12 88:21 |
| **welcome**  48:7 | 28:13,21 29:3 | 126:6 128:2,19 | 132:16 |
| **went**  118:19,21 | 29:11,19 30:2 | 129:7 133:4,14 | **wrong**  135:8 |
| 119:14 120:6 | 30:15 32:4 | 133:21 137:7 | **x** |
| 120:18,21 | 33:9,21 34:5 | 144:3,23 | **x**  60:9 150:20 |
| 121:7,20,25 | 36:3,10,18 | 146:11 147:2 | 153:1 |
| 122:23 124:14 | 37:11 38:13 | 147:25 150:4 | **x1632**  86:1 |
| 134:2 146:23 | 39:2 40:1 | 150:21 152:13 | **y** |
| 147:21 | 42:23 43:25 | 152:16 153:2,5 | **y**  25:1,1,2 60:9 |
| **whereof**  150:21 | 44:16 45:17 | 154:24 | **yahoo**  90:2,14 |
| **wide**  22:20 | 50:1,11,20 | **word**  37:13 | 92:14 93:7 |
| 78:5,14 | 51:13,17 52:13 | 121:11 | 94:12 |
| **withdrawal** | 59:25 60:12 | **words**  8:25 9:4 | **yeah**  19:22 |
| 55:21 56:1,21 | 61:7 62:7 | 34:12 38:6 | 21:12 43:11 |
| 57:13,16,24 | 66:19 67:9,16 | 45:23 52:20 | 44:1,16,24 |
| 58:17 59:14 | 69:10,18 70:18 | 53:14 59:3 | 51:22 54:4 |
| 61:18 | 72:3 73:2,6 | 60:4 68:11 | 55:25 56:20 |
| | 75:4 76:16 | 69:13 70:23 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[yeah - zoom]**

57:1 60:19
72:3 73:6
79:19 80:24
83:4 87:12
89:22 96:10
104:8,23,25
125:23 128:2
130:4,18,20
147:2
**year** 18:18
94:17,18
**years** 20:16
**yen** 52:11
147:20
**yena** 95:24
**yenamandra**
24:23 25:5,10
25:11 27:16
30:18 31:6,11
31:20 34:21,23
36:4 46:20
47:2,4,9,12,16
48:18,19 49:1
49:6,17,22
50:8,13,17,24
51:8,11,19
52:2,7,9,11,14
52:19 53:13
55:5,8,18,21
56:18 57:12
59:4,11 60:6
61:13,23 62:4
62:11,20,22,23
62:25 63:5,9
63:17,19 64:4

64:12,14 70:14
78:23 95:6,24
96:6,13 97:14
98:11,18,25
131:9,20,23
135:16,17,24
139:4,19
140:12 142:2
142:19,24,25
145:9,13
146:12 147:7
147:20
**york** 1:2,18,18
2:2,16,16 7:1,1
7:23 87:8

**z**

**zero** 56:19
57:12 58:10,15
59:4,11,12,18
59:20 60:6
61:13
**zoom** 110:5

Page 38

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.