**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>STEFAN QIN, VIRGIL TECHNOLOGIES LLC, MONTGOMERY TECHNOLOGIES LLC, VIRGIL QUANTITATIVE RESEARCH, LLC, VIRGIL CAPITAL LLC, and VQR PARTNERS LLC,<br><br>　　　　　Defendants. | Case No.: 20-cv-10849 (JGLC) |

## DECLARATION OF NASIR ADAYA

I, Nasir Adaya, declare as follows:

1.　　　I currently reside in Sugar Land, Texas. I have personal knowledge of the facts stated herein and could testify competently to them if called to do so. I understand this declaration will be filed in support of Respondents' (me and my wife Phuong Nguyen) Opposition to the Receiver in the above-captioned action's filed Motion to Compel Turnover of Assets (the "Turnover Motion" at ECF 231).

2.　　　I am a quantitative trader and analytics advisor, currently specializing in digital assets and cryptocurrency markets. I have a bachelor's degree from the Massachusetts Institute of Technology and have worked as an analyst and trader since graduating college, first at a series of commodities trading firms unrelated to this matter and then at the digital asset trading firms that are among the defendants in the above-captioned matter.

3.      Over the past five years, on and off, I have also been self-employed as a consultant, in addition to my employment with various firms.

4.      I was first employed by Montgomery Technologies LLC, one of the defendants in this case, in 2018. My role was as an Algorithmic and Quantitative Trader with Virgil Capital LLC ("Virgil") between 2018 and early 2019. The employment agreement governing this work was attached as Exhibit 12 to the Declaration of Marco Molina submitted in support of the Turnover Motion ("Molina Decl."), filed as ECF 233-12 in the above-captioned case. From March 2019 through December 2020, I worked as a Quantitative Trader and Portfolio Manager at Virgil Quantitative Research LLC ("VQR"). I understand all of these entities referenced in this paragraph to be affiliated and to now be in receivership in this matter (collectively referred to herein as the "Receivership Entities").

5.      When I first started working at Virgil in 2018, as a consultant and then as an employee, I reported to Stefan Qin, a defendant in this case who I understand was indicted and ultimately convicted and sentenced to 90 months in prison and ordered to forfeit $54,793,532.

6.      I was never paid substantial portions of my compensation owed by VQR in 2020, as to which I filed a claim with the receivership estate in November 2022 in the amount of $1,316,194. To date, I have received no payment on this claim or any indication of when payment will be made or the amount thereof. In addition, I have suffered tremendously as a result of Mr. Qin's conduct; I have had to rehabilitate my professional reputation after being associated with Mr. Qin's firms, despite knowing nothing of his misconduct when it was occurring and having no involvement in the criminal case against him.

DocuSign Envelope ID: D40BB5CB-FB20-4569-A329-68EB4EBAA8D8

7.     When I transitioned to VQR, my boss became Antonio Hallak, who supervised all VQR traders. My consulting work was known to my supervisors because, as noted above, I had first been retained as a consultant to Virgil, rather than as an employee.

8.     Virgil Capital and VQR were arbitrage and quantitative trading firms, respectively. I do not know the formal legal relationship between them nor between them and any of the other Receivership Entities.

9.     During my work experience through December 2020 noted above, none of the Receivership Entities engaged in market making work, nor were they ever retained to do so. My employment agreement referenced above accordingly does not reference market making or liquidity providing, but instead reflects and describes my role and duties as a quantitative trader.

10.     Market making is highly specialized work primarily done when an asset is new to a market or newly available for trading. Market makers participate as both buyers and sellers of a particular asset in order to provide liquidity; thus, they are also sometimes referred to as "liquidity providers." I have experience as a market maker and am able to do that work for new or emergent digital assets.

11.     Although I was paid a base salary by VQR, the vast majority of my compensation was commission-based, calculated as a percentage of the profits made on the trading strategies I developed and ran on VQR assets. Such profits were equal to the amounts above the principal that an investor had invested. Being paid a percentage of profits of a trading strategy is a standard means of compensating asset traders, in my experience. That profit-based compensation was referred to as "bonus" or "commissions" or, less frequently, "PnL."

12.    VQR traders such as I worked with analysts who engaged in research and analysis to support trading strategies that traders ran. Traders paid those analysts from the profit percentage due to the trader on the particular strategy, as discussed above.

13.    VQR trader performance by algorithmic strategy was tracked in a spreadsheet which tracked the running profits and losses for each strategy. My commissions, and those of my trader colleagues, were calculated and compensated based on the profits and losses reflected in such tracker, which was sometimes referred to among employees as the "Tracker" or the "Returns" spreadsheet.

14.    As noted above, I maintained my outside consulting business while working for VQR, which was common among VQR employees. It is also common in the asset trading industry in which I have worked for a decade, regardless of whether an individual is working in the digital or conventional asset trading space. For example, my VQR colleague, Max Bodoia, had various side projects, including a cryptocurrency index fund, as did Mr. Hallak. Mr. Hallak was particularly involved in a gaming initiative separate from VQR, a Coinbase-backed trading card game known as "Gods Unchained." I spoke with them frequently about these projects.

15.    Mr. Hallak, as all traders' supervisor and VQR Head Trader, controlled the digital asset exchange accounts that traders used to run their strategies. These accounts were generally maintained on the Binance exchange. Mr. Hallak controlled access to these accounts for both trading in, and withdrawals from, the accounts. Attached hereto as **Exhibit A** is a true and correct copy of a Slack message exchange between me and Mr. Hallak reflecting that I had to request that he make a transfer in a trading account when I needed one made.

16.    Rohan Pandit was an analyst at VQR, and I worked with him as described in paragraph 12 above—i.e., he was on my team and assisted me in executing my trading strategies

at VQR. Mr. Pandit and I have a close friendship and we also have worked together on various projects over the years unrelated to VQR. We often communicate via the Telegram messaging app.

17.     Warren Pfeffer was another colleague of mine at VQR who worked on the research and analysis that supported my (and other traders') VQR trading strategies, as discussed above. One of his projects was to build systems that automatically pulled data from and monitored activity on public social media and messaging application channels related to cryptocurrency trading, including Telegram. That data assisted the analysts and traders in their trading strategy development. Attached hereto as **Exhibit B** is a true and correct copy of a Slack conversation from April 2020 discussing this project, which I refer to as the "telegram collector" in the document. Attached hereto as **Exhibit C** is a true and correct copy of a February 2020 Slack conversation in which Mr. Pfeffer discusses his plans to work with another VQR colleague, Xiao Ren, on this project. Attached hereto as **Exhibit D** is a true and correct copy of a November 2019 Slack conversation in which Mr. Pfeffer and I discuss the origin of this project. Attached hereto as **Exhibit E** is a list of public channels from which his model pulled data.

18.     When new tokens or currencies were introduced via Initial Exchange Offering ("IEO") or Initial Coin Offering, it would be standard operating procedure for Mr. Pfeffer to add the token or currency into his model and to work with Mr. Ren to do so, as described above.

19.     I have reviewed the documents attached as Exhibits 6 and 9 to the Molina Decl. (filed as ECF 233-6 and 233-9), and both relate to the above-described project on which Mr. Pfeffer and Mr. Ren were working. The INJ token referenced in the documents had just had its IEO and thus needed to be added to the existing models that were used to inform VQR projects and trading strategies. The documents do not refer to work on market making for the INJ token. The reference to the "Discord scraper" in Exhibit 9 to the Molina Decl. relates to the portion of Mr. Pfeffer's

system that pulled data from the Discord application. The instructions I gave to Mr. Ren in Exhibit 6 to the Molina Decl. relate to certain data (5s snapshots of trading pairs) that was also input into Mr. Pfeffer's system that we used to conduct quantitative analyses for VQR.

20.     Another of my colleagues associated with VQR was a consultant named Ren Jianxin. Mr. Jianxin's role in 2020 was to source partnerships and deals with third-party entities for which VQR would run trading strategies on those entities' managed accounts. One deal he sourced and on which I worked as the VQR quantitative trader was with an entity named Bixin Ventures Company ("BIXIN").

21.     The deal between VQR and BIXIN was documented in a written agreement. Under the terms of the VQR/BIXIN agreement, VQR executed an agreed-upon trading strategy on BIXIN's assets once received. Pursuant to that agreement, VQR was to be compensated by sharing with BIXIN in the profits of trading (above the principal balance transferred to VQR), if any. I was to be paid commissions out of those profits, as was standard practice for VQR projects, as described above. Attached hereto as **Exhibit F** is a true and correct copy of a Slack conversation between me and Mr. Hallak in which we discussed, on the first page, my involvement in and compensation for the BIXIN work, among other topics.

22.     Attached hereto as **Exhibit G** is a true and correct copy of a Slack channel communication in which Mr. Qin messaged me to discuss my commissions in November 2020, including for the Bixin project discussed above.  The Bixin work and associated performance appeared in the VQR Tracker. Mr. Qin determined how to allocate the profits from the trading VQR undertook of BIXIN assets, though VQR ceased operating before I was paid my earnings on that work.

23.     Mr. Qin and Mr. Hallak, VQR's management, paid very close attention to and directed my BIXIN work, including shutting it down in late October 2020.

24.     One of the outside consulting clients I had, unrelated to my VQR work, was an entity named Injective Labs ("Injective"), a company affiliated with and providing services to an internationally based foundation named Open DeFi Foundation ("ODF"). The Injective blockchain's native token is referred to as INJ.

25.     I was first retained as a consultant to Injective in April 2020, and worked as a consultant for them over the course of the next few months. In October 2020, ODF engaged me specifically to perform market making services for the INJ token, which was set to launch (and did ultimately launch) in late October 2020. Such engagement involved Injective initially issuing and loaning to me one million INJ tokens for purposes of market making and providing liquidity for the INJ tokens. Pursuant to our agreement, once the token's value had been established by market forces and the market making work was complete, I would return the principal (i.e., the one million INJ tokens or digital assets having an approximately equivalent value), to ODF. My compensation for such market making work would be retention of any profits that I generated above such principal amount. This engagement, which continued through the end of 2021, was documented in two 2021 contracts, which were memorialized after the INJ token had developed sufficiently to be valued (at $10/token), the "Token Purchase Agreement" ("TPA") and an accompanying consulting agreement. True and correct copies of each are attached hereto as **Exhibits H** and **I**.

26.     I was never compensated by VQR for the INJ market making work, and VQR never funded it as it was my own separate project, as noted above. My trading associated with that work accordingly did not appear on any VQR Tracker or "Returns" spreadsheet that I saw.

27.     I obtained permission from VQR (through Mr. Hallak) to transfer the initial one million INJ tokens that I received to a Binance subaccount within VQR's main Binance account, and to use that segregated subaccount to engage in the market making work discussed above. It would have been impossible to use the account without his permission because, as described above, Mr. Hallak controlled access to the account.

28.     I have reviewed the document attached as Exhibit 8 to the Molina Decl. (ECF No. 233-8), and it demonstrates that I required Mr. Hallak's approval both to access the segregated subaccount to be used to trade the INJ tokens, and to transfer the INJ tokens into the subaccount.

29.     I was not required to use the subaccount, or any particular account, by the terms of my agreement with Injective, nor did ODF tell me precisely how to do the work. I planned and obtained approval to use the VQR Binance subaccount because it had a favorable fee structure. I personally paid for the related Binance account fees from the market making proceeds so that VQR would not be paying for a project unrelated to VQR, as reflected in the first messages on the first page of **Exhibit A**. The segregated subaccount was established so that the INJ-related tokens and their proceeds would not be confused or commingled with assets that belonged to or were being traded by VQR. I did not use any of VQR's technology or infrastructure for the work.

30.     Mr. Pandit helped me with the market making for the INJ token by writing a basic script in October 2020. I continued to occasionally discuss this market making project with him into 2021, and we continued to work together long after VQR ceased operating. Neither Mr. Hallak, Mr. Qin, nor anyone else at VQR directed the INJ token market making.

31.     In late 2020 I arranged for the funds associated with the INJ market making project to be moved from the VQR Binance subaccount, given that my work for Injective was ongoing, and my colleagues and I were concerned about and discussing rumors we heard regarding Mr. Qin

and VQR's stability. Those assets were moved in January 2021 into my wife's Binance account, where I again used a Binance subaccount to conduct the ongoing market making work throughout 2021, as well as other trading work unrelated to the INJ token market making.

32.     I frequently updated Injective regarding my market making efforts for the INJ token on their behalf, and other trading and consulting work I undertook for them in 2021.

33.     As noted above, market making project for the INJ token was documented in the TPA and consulting agreement once the INJ token was capable of being fairly valued and the principal amount was ready to return to ODF.  Pursuant to the TPA (Exhibit H), the approximately one million INJ tokens were valued at $10 per token.

34.     I signed the TPA as a representative of my own business entity, Antifragile Management LLC, which I had established earlier in 2021.

35.     In accordance with the TPA, I subsequently transferred digital assets collectively worth approximately $10 million to ODF, the amount of the loan principal noted above, in a few different transactions in 2021 and early 2022. These transfers were made from my wife's Binance account and went to ODF-controlled wallet addresses. True and correct copies of transaction records of certain of those transactions are attached hereto as **Exhibits J, K** and **L**.

36.     As agreed, I retained the profit associated with my market making work with respect to the INJ tokens, i.e., the amounts above the returned principal, as compensation. That amount totaled approximately $1 million USD, valued at the time the TPA was executed.

37.     I have cooperated with all legal process received from the Receiver, including providing a sworn declaration and responding to a lengthy document subpoena in 2022.

38.     I reached out to the Receiver, via my counsel, in late 2022 to seek information and to inquire if the Receiver was involved in freezing withdrawals from my wife's Binance account,

DocuSign Envelope ID: D40BB5CB-FD39-4569-A329-C8EB4EBAA858

which was impeding my ability to work. I initiated the correspondence on this issue, as reflected by Exhibit 14 to the Molina Decl. (ECF 234-14), and repeatedly sought informal and efficient information exchange.

39.     The deposition subpoena which the Receiver served on me in February 2023 did not specify any topics for testimony or inquiry. The Receiver did not direct me to any documents or topics in advance such that I could effectively prepare for such deposition. A true and correct copy of the deposition subpoena is attached hereto as **Exhibit M**.

40.     I have already incurred substantial attorneys' fees and legal expenses in defending myself and my wife in connection with the Receiver's actions in this case, which have been extremely financially burdensome, in addition to stressful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Sugar Land, Texas, on this 27th day of October 2023.

_Nasir Adaya_
72F2314EC106416

Nasir Adaya