# EXHIBIT C

DocuSign Envelope ID: B35BC655-E477-4D74-B3A0-84F5488022D4

THE INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF, EXCEPT AS EXPRESSLY PERMITTED HEREIN. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

## OPEN DEFI FOUNDATION

### TOKEN PURCHASE AGREEMENT

| | |
|---|---|
| Price per Token (USD): | $10.09198032709723 |
| Number of Tokens Purchased: | 990,885.8 |
| Total Purchase Price: | $10,000,000 |
| Lockup: | See Section 3.1 |
| Effective Date: | Date of execution of this Token Purchase Agreement |

THIS CERTIFIES THAT in exchange for the payment by Antifragile Management LLC, a New York limited liability company (the "*Market Maker*"), of the Total Purchase Price on or about the Effective Date, Open Defi Foundation, a Panamanian foundation (the "*Company*", and with the Market Maker, each a "*Party*", and collectively, the "*Parties*"), the Company hereby issues to the Market Maker the right (the "*Future Token Interest*" and, collectively with any securities received in substitution or fulfillment of the Future Token Interest, or in replacement of the Future Token Interest, as may be applicable, the "*Interests*") to receive, automatically and without requiring any future payment, a number of Tokens (as defined below) equal to the Number of Tokens Purchased set forth above, on the conditions and subject to the terms set forth hereunder.

OFFERING

1.1. This Token Purchase Agreement ("*TPA*") is issued by the Company in connection with that certain Consulting Agreement by and between the Company and the Market Maker dated as of July 21, 2021 (the "*Consulting Agreement*"). By purchasing the Interests herein, the Market Maker agrees to be bound by this TPA. If the Market Maker is purchasing the Interests on behalf of an entity (such as its employer), the Market Maker represents and warrants that it has the authority to bind such entity to this TPA. In that case, "Market Maker" will refer to that company or other legal entity.

1.2. THE MARKET MAKER ACKNOWLEDGES, AGREES AND UNDERSTANDS THAT THE INTERESTS PURCHASED HEREUNDER ARE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN THIS TPA AND THE DOCUMENTS REFERENCED HEREIN. THE MARKET MAKER AGREES TO BE BOUND BY THIS TPA IN ALL RESPECTS.

1.3. IMPORTANT NOTICE REGARDING ARBITRATION: WHEN THE MARKET MAKER AGREES TO THIS TPA, THE MARKET MAKER IS AGREEING TO RESOLVE ANY DISPUTE BETWEEN THE MARKET MAKER AND THE COMPANY THROUGH BINDING, INDIVIDUAL ARBITRATION RATHER THAN IN COURT. PLEASE REVIEW CAREFULLY SECTION 7.6 "DISPUTE RESOLUTION" BELOW FOR DETAILS.

OFFER AND SALE

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

SECvQ_NA_000207

    **2.1**    <u>Purchase and Sale</u>. The Market Maker hereby agrees to purchase that Number of Tokens Purchased for an aggregate purchase price equal to the Total Purchase Price, each as set forth above.

    **2.2**    <u>Market Maker Qualification</u>. The Market Maker acknowledges and agrees that it is required to meet certain requirements in order to participate in this offering, including the Market Maker's investor accreditation requirements, as well as compliance with this TPA. The Market Maker acknowledges and agrees that, in the event the Company determines that the Market Maker does not meet the Company's requirements for the Market Maker hereunder (as determined by the Company in its sole discretion), the Company may immediately and without notice rescind or terminate, as applicable, this TPA, the Future Token Interests, the Tokens and the Consulting Agreement, notwithstanding the Market Maker's compliance with this TPA, delivery of the Total Purchase Price to the Company, that the Company may have previously accepted this TPA, or that the Company may have entered into the Consulting Agreement.

    **2.3**    <u>Payment</u>. The Market Maker covenants and agrees to pay the Total Purchase Price to the Company on or promptly following the Effective Date. The Market Maker acknowledges and agrees that the Company may, in its sole discretion and without notice, rescind or terminate, as applicable, this TPA, the Future Token Interests and the Tokens in the event that Market Maker does not deliver to the Company its signature page to this TPA or the Total Purchase Price, in each case within two (2) business days of the Effective Date.

    **2.4**    <u>Form of Payment</u>. The Company agrees to accept payment for the Total Purchase Price in USDT (as defined below).

## LOCKUP

    **3.1**    <u>Lockup</u>. In addition to any other restrictions set forth herein and required under applicable law, the Market Maker hereby agrees that it will not, at any time, directly or indirectly, Transfer any Tokens that have not been delivered to the Market Maker in accordance with this <u>Section 3.1</u> hereto (collectively, such Tokens, the "*Undelivered Tokens*"), any options to purchase any Undelivered Tokens, or any instruments convertible into, exchangeable for, or that represent the right to receive Undelivered Tokens, including this TPA and the Future Token Interests hereunder. To ensure compliance with the restrictions in this <u>Section 3.1</u>, the Market Maker acknowledges that the Company may impose technological lockups or other restrictions on the Tokens.

## DEFINITIONS

    **4.1**    "*Governmental Authority*" means any nation or government, any state or other political subdivision thereof, any entity exercising legislative, judicial or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission or instrumentality, and any court, tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization.

    **4.2**    "*Money Laundering Laws*" means the applicable laws, rules and regulations of all jurisdictions in which the Market Maker is located, resident, organized or operates concerning or related to anti-money laundering, including but not limited to those contained in the Bank Secrecy Act of 1970 and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "*Patriot Act*"), each as amended and including the rules and regulations thereunder, and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Authority.

    **4.3**    "*Injective Network*" means the decentralized sidechain relayer network which serves as a layer-2 derivatives platform, trade execution coordinator and decentralized orderbook which supports generalized smart contract execution through a modular implementation of the Ethereum Virtual Machine on top of the Cosmos-SDK.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    SECvQ_NA_000208

DocuSign Envelope ID: B35BC655-E477-4D74-B3A0-84F5488022D4

4.4   *"**Tokens**"* means the INJ token, the native unit of value on the Injective Protocol as described in the that certain document titled *"Injective Protocol: A Collision Resistant Decentralized Exchange Protocol"* found at https://docs.injectiveprotocol.com/#introduction, as may be amended from time to time.

4.5   *"**Person**"* means any individual or legal entity, including a government or political subdivision or an agency or instrumentality thereof.

4.6   *"**Transfer**"* means, with respect to any instrument, the direct or indirect assignment, sale, transfer, tender, pledge, hypothecation, or the grant, creation or suffrage of a lien or encumbrance in or upon, or the gift, placement in trust, or other disposition of such instrument or any right, title or interest therein, or the record or beneficial ownership thereof, the offer to make such a sale, transfer or other disposition, and each agreement, arrangement or understanding, whether or not in writing, to effect any of the foregoing.

4.7   *"**USDT**"* means the USDT Tether token, a stablecoin that is pegged to the value of the U.S. dollar on a 1:1 basis, as described in that document titled *"Tether: Fiat currencies on the Bitcoin blockchain"* found at https://tether.to/wp-content/uploads/2016/06/TetherWhitePaper.pdf, as may be amended from time to time.

**MARKET MAKER REPRESENTATIONS**

5.1   **Authorization**. The Market Maker has full power and authority to enter into this TPA. This TPA, when executed and delivered by the Market Maker, will constitute valid and legally binding obligations of the Market Maker, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

5.2   **Purchase Entirely for Own Account**. This TPA is made with the Market Maker in reliance upon the Market Maker's representation to the Company, which by the Market Maker's execution of this TPA, the Market Maker hereby confirms, that the Interests to be acquired by the Market Maker will be acquired for investment for the Market Maker's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Market Maker has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this TPA, the Market Maker further represents that the Market Maker does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, Transfer or grant participations to such Person or to any third Person, with respect to any of the Interests. The Market Maker has not been formed for the specific purpose of acquiring the Interests.

5.3   **Disclosure of Information**. The Market Maker has sufficient knowledge of and experience in business and financial matters to be able to evaluate the risks and merits of its entry into this TPA and purchase of the Interests and is able to bear the risks thereof. The Market Maker has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Interests with the Company's representatives. The Market Maker has not relied on any representations or warranties made by the Company outside of this instrument, including, but not limited to, conversations of any kind, whether through oral or electronic communication, or any white paper.

5.4   **Compliance with Securities Laws**. The Market Maker understands that the Interests have not been, and will not be, registered under the Securities Act of 1933, as amended (*"**Securities Act**"*) or any applicable state securities laws, by reason of a specific exemption from the registration provisions of the Securities Act and other applicable state securities laws which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Market Maker's representations as expressed herein. The Market Maker understands that the Interests may be deemed "restricted securities" under applicable United States federal and state securities laws and that, pursuant to these laws, the Market Maker must hold the Interests indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Market Maker acknowledges that the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                                                        SECvQ_NA_000209

Company does not have any obligation to register or qualify the Interests for resale, and exemptions from registration and qualification may not be available or may not permit the Market Maker to transfer all or any of the Interests in the amounts or at the times proposed by the Market Maker. The Market Maker further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Interests, and on requirements relating to the Company which are outside of the Market Maker's control, and which the Company is under no obligation and may not be able to satisfy.

5.5  **Qualifications**. Market Maker has a preexisting personal or business relationship with the Foundation of a nature and duration sufficient to make Market Maker aware of the character, business acumen and general business and financial circumstances of the Foundation. Market Maker is capable of evaluating the merits and risks of this purchase, has the ability to protect Market Maker's own interests in this transaction and is financially capable of bearing a total loss of the value of this transaction.

5.6  **Accredited Investor**. Market Maker is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act (i.e., (a) a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his or her purchase exceeds $1,000,000, (b) a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those two years and has a reasonable expectation of reaching the same income level in the current year, (c) a corporation, limited liability company or partnership having total assets in excess of $5,000,000 that was not formed for the purpose of acquiring the Interests, or (d) otherwise meets the requirements for an "accredited investor" under Regulation D promulgated by the Securities and Exchange Commission under the Securities Act). Market Maker has accurately and completely completed the accredited investor verification process required by the Foundation.

5.7  **No Public Market**. The Market Maker understands that no public market now exists for the Interests, and that neither the Company nor its affiliates has made any assurances that a public market will ever exist for the Interests and neither the Company nor its affiliates is under any obligation to register or qualify the Interests under the laws of any Governmental Authority.

5.8  **Legends**. The Market Maker understands that the Interests may be deemed to bear any one or more of the following legends: (a) any legend required by the securities laws of any state to the extent such laws are applicable to the Interests represented by the certificate so legended, and (b): the following legend (and even without such legend the following restrictions apply):

THE INTERESTS PURCHASED HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED TO HOLD FOR THE LONG TERM AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO UNLESS SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

In connection with any proposed transfer, the Company may require an opinion of counsel in form and substance satisfactory to the Company to the effect that any such proposed transfer or resale of the Interests is in compliance with the Securities Act and any applicable state or foreign securities laws. The Market Maker hereby agrees that, to enforce the restrictions set forth in this TPA, the Company may impose reasonable technological and other restrictions on the wallet and the Tokens deliverable hereunder.

5.9  **Other Applicable Law**. The Market Maker represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with the purchase of the Interests, including (a) the legal requirements within the Market Maker's jurisdiction for the purchase of the Interests, (b) any foreign exchange restrictions applicable to such purchase, (c) any governmental or other consents that may need to be obtained, and

4

(d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Interests. The Market Maker's purchase and payment for and continued beneficial ownership of the Interests will not violate any applicable laws of the Market Maker's jurisdiction.

5.10    **Rule 144**. In addition, Market Maker has been advised that, to the extent applicable, SEC Rule 144 promulgated under the 1933 Act, which permits certain limited sales of unregistered securities, is not presently available with respect to the Injective Tokens and, in any event, to the extent applicable, requires that the Interests generally be held for a minimum of one year after they have been purchased and paid for (within the meaning of Rule 144), before they may be resold under Rule 144.

5.11    **Taxes.** THE MARKET MAKER ACKNOWLEDGES AND AGREES THAT IT MAY SUFFER ADVERSE TAX CONSEQUENCES AS A RESULT OF PURCHASING, HOLDING, EXCHANGING, SELLING, STAKING, TRANSFERRING OR OTHERWISE USING THE TOKENS IN ANY WAY. THE MARKET MAKER HEREBY REPRESENTS THAT (A) IT HAS CONSULTED WITH A TAX ADVISER THAT IT DEEMS ADVISABLE IN CONNECTION WITH ANY USE OF THE TOKENS, OR THAT IT HAS HAD THE OPPORTUNITY TO OBTAIN TAX ADVICE BUT HAVE CHOSEN NOT TO DO SO, (B) THE COMPANY HAS NOT PROVIDED THE MARKET MAKER WITH ANY TAX ADVICE, AND (C) THE MARKET MAKER AGREES TO BE FULLY RESPONSIBLE FOR ANY TAXES RESULTING FROM ANY PURCHASE, HOLDING, EXCHANGE, SALE, STAKING, TRANSFER OR OTHER USE OF THE TOKENS.

DISCLAIMERS

6.1    **Wallet**. The Market Maker assumes full responsibility and liability for any losses resulting from any intentional or unintentional misuse of the Market Maker's wallet including, without limitation, any loss resulting from designating a wallet that is non-compliant with the Injective Network for the receipt of the Tokens, or depositing one type of digital asset to a wallet intended for another type of digital asset. The Company assumes no responsibility or liability in connection with any such misuse.

6.2    **Indemnity**. NEITHER THE COMPANY NOR ITS AFFILIATES SHALL BE LIABLE TO THE MARKET MAKER, AND THE MARKET MAKER WILL INDEMNIFY, DEFEND AND HOLD HARMLESS THE COMPANY, ITS AFFILIATES AND THEIR AGENTS AND ADVISORS, AND THE SUCCESSORS AND ASSIGNS OF THE FOREGOING, FROM AND AGAINST, ALL OR ANY PART OF ANY THIRD PARTY CAUSES OF ACTION, CLAIMS, LIABILITIES, LOSSES, COSTS, DAMAGES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES) (COLLECTIVELY "CLAIMS") FOR DAMAGES TO OR LOSS OF PROPERTY ARISING OUT OF OR RESULTING FROM THE TRANSACTIONS CONTEMPLATED HEREIN, EXCEPT TO THE EXTENT SUCH CLAIMS ARISE FROM THE BAD FAITH OR INTENTIONAL MISCONDUCT OF THE COMPANY OR ITS AFFILIATES.

6.3    **Limitation of Liability**. NEITHER THE COMPANY, ITS AFFILIATES NOR ANY OTHER PARTY INVOLVED IN THE OFFERING WILL BE LIABLE FOR ANY INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS, LOST REVENUES, LOST SAVINGS, LOST BUSINESS OPPORTUNITY, LOSS OF DATA OR GOODWILL, SERVICE INTERRUPTION, COMPUTER DAMAGE OR SYSTEM FAILURE OR THE COST OF SUBSTITUTE ACTIVITIES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS TPA OR THE MARKET MAKER'S PARTICIPATION IN, OR INABILITY TO PARTICIPATE IN, THIS OFFERING, WHETHER BASED ON WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE COMPANY OR ANY OTHER PARTY HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGE, EVEN IF A LIMITED REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY. IN NO EVENT WILL THE COMPANY AND ITS AFFILIATES' TOTAL LIABILITY TO THE MARKET MAKER

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                                SECvQ_NA_000211

DocuSign Envelope ID: B35BC655-E477-4D74-B3A0-84F5488022D4

ARISING OUT OF OR IN CONNECTION WITH THIS TPA OR FROM THE MARKET MAKER'S PARTICIPATION IN, OR INABILITY TO PARTICIPATE IN, THE OFFERING EXCEED THE TOTAL PURCHASE PRICE (AS DENOMINATED IN USD). THE EXCLUSIONS AND LIMITATIONS OF DAMAGES SET FORTH ABOVE ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE COMPANY AND THE MARKET MAKER.

7. **MISCELLANEOUS**

    7.1 **Entire Agreement**. This TPA sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous disclosures, discussions, understandings and agreements, whether oral of written, between them. This TPA is one of a series of similar agreements entered into by the Company from time to time. Any provision of this TPA may be amended, waived or modified only upon the written consent of the Company and (a) the Market Maker, or (b) the holders of a majority, in the aggregate, of the Total Purchase Price paid to the Company with respect to all TPAs outstanding at the time of such amendment, waiver or modification, and any amendment, waiver or modification made in accordance with clause (b) shall be binding upon all Market Makers.

    7.2 **Notices**. Any notice required or permitted by this TPA will be deemed sufficient when sent by email to the relevant address listed on the signature page hereto, as subsequently modified by written notice received by the appropriate party.

    7.3 **No Rights as Stockholder**. The Market Maker is not entitled, as a holder of this TPA, the Future Token Interests or the Tokens, to vote or receive dividends or be deemed an equityholder of the Company for any purpose, nor will anything contained herein be construed to confer on the Market Maker, as such, any of the rights of an equityholder or any right to vote for the election of directors or upon any matter submitted to the board of directors at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

    7.4 **Transfers and Assigns**. Neither this TPA nor the rights contained herein may be Transferred, by operation of law or otherwise, by the Market Maker without the prior written consent of the Company. The Company may assign this TPA without the consent of the Market Maker.

    7.5 **Severability**. In the event any one or more of the provisions of this TPA is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this TPA operate or would prospectively operate to invalidate this TPA, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this TPA and the remaining provisions of this TPA will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

    7.6 **Dispute Resolution**. This TPA and the performance of the Parties hereunder shall be construed in accordance with the laws of Panama, without giving effect to any conflict-of-laws principles that may provide for the application of the law of another jurisdiction. Any dispute or controversy arising from or relating to this TPA or the enforcement of any provision of this TPA must be arbitrated in New York, New York before a single arbitrator experienced in the software industry who is jointly selected and mutually approved by the Parties or, if the Parties are unable to or fail to agree on the selection of the arbitrator within fifteen (15) days of the demand for arbitration being served, who is appointed by Judicial Arbitration and Mediation Services (JAMS) in accordance with its rules. The arbitration will be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures (and in accordance with the expedited procedures in those rules). The arbitrator will require the non-prevailing Party to pay for the costs of arbitration, including reasonable attorneys' fees incurred by the prevailing Party in connection with the arbitration. The results of the arbitration procedure will be considered confidential information of both Parties. Any arbitration decision rendered will be final and binding, and judgment thereon may be entered in any court of competent jurisdiction. The Parties agree that any proceeding to resolve or litigate any dispute hereunder, whether in arbitration or in court, will be conducted solely on an individual basis, and neither

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                            SECvQ_NA_000212

Party will seek to have any dispute heard as a class action, a representative action, a collective action, a private attorney-general action, or in any proceeding in which either Party acts or proposes to act in a representative capacity. The Parties further agree that no arbitration or proceeding will be joined, consolidated, or combined with another arbitration or proceeding without the prior written consent of all parties to such other arbitration or proceeding.

    7.7 **Additional Assurances**. The Market Maker shall, and shall cause its affiliates to, from time to time, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested by Company or are necessary for the Company, upon the advice of counsel, to carry out the provisions of this TPA and give effect to the transactions contemplated hereby, including, without limitation, to enable the Company to register the Interests, to enable the Interests to qualify for or maintain an exemption from registration (to the extent any such exemptions are available), to comply with Money Laundering Laws, or to otherwise complete the transactions contemplated hereby and to comply with applicable laws as then in effect.

    7.8 **Force Majeure**. Without limitation of anything else in this TPA, the Company shall not be liable or responsible to the Market Maker, nor be deemed to have defaulted under or breached this TPA, for any failure or delay in fulfilling or performing any term of this instrument, including without limitation, performing its obligations under the Consulting Agreement and delivering the Tokens, when and to the extent such failure or delay is caused by or results from acts beyond the affected party's reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest or instability; (d) changes to applicable law; or (e) action by any Governmental Authority.

[signature page follows]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER    SECvQ_NA_000213

DocuSign Envelope ID: B35BC655-E477-4D74-B3A0-84F5488022D4

IN WITNESS WHEREOF, the Parties hereto have caused to be executed or executed this Token Purchase Agreement as of July 21, 2021.

**OPEN DEFI FOUNDATION**

By: *Gestany Aguilar*
Name: Gestany Aguilar
Title: Director

**ANTIFRAGILE MANAGEMENT LLC**

By: *Nasir Adaya*
Name: Nasir Adaya
Title: Founder

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

SECvQ_NA_000214