UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>STEFAN QIN, VIRGIL TECHNOLOGIES LLC, MONTGOMERY TECHNOLOGIES LLC, VIRGIL QUANTITATIVE RESEARCH, LLC, VIRGIL CAPITAL LLC, and VQR PARTNERS LLC,<br><br>Defendants. | Case No.: 20-cv-10849 (JGLC) |

## DECLARATION OF MAX BODOIA

I, Max Bodoia, declare as follows:

1. I currently reside in Puerto Rico. I have personal knowledge of the facts stated herein and could testify competently thereto if called to do so. I understand this declaration will be filed in support of Respondents Nasir Adaya and Phuong Nguyen's Opposition to the Receiver in the above-captioned action's filed Motion to Compel Turnover of Assets.

2. Before Virgil Capital LLC/Virgil Quantitative Research LLC (collectively, "VQR") shut down, I worked there as a quantitative trader and strategist. My role was to run algorithmic and quantitative strategies on the assets that investors had entrusted to VQR. My supervisor while I was at VQR was Antonio Hallak. Mr. Hallak supervised the traders during my time at VQR. Nasir Adaya was another employee of VQR with the same job, a fellow quantitative trader, who also reported to Mr. Hallak. In my view Mr. Adaya and I were peers.

3. According to my employment agreement with VQR, I was to be compensated primarily through receiving a performance-based bonus. This bonus would be calculated as a percentage of the profits generated on the firm's assets under management using the trading strategies I developed. This is a standard means of compensating traders in digital asset trading, as well as in conventional asset trading.

4. At VQR my performance, and that of other traders, was tracked by Mr. Hallak in order to enable the calculation of our performance-based bonus. Mr. Hallak maintained programmatic access to the trading accounts in which my strategies were running so that he could monitor and record their performance on a day-to-day basis. It was my understanding that his records of my strategies' profits and losses would be used to calculate the performance-based bonus I would receive for my portfolio of strategies.

5. On occasion, Mr. Hallak would ask me for my own records of the performance of my strategies in order to supplement the data that he pulled. I provided him these records when he requested them, and it was my understanding that maintained a current record of the performance of all of my strategies. An example of such a conversation is attached hereto as **Exhibit A**.

6. At VQR, traders like me worked closely with and directed the activities of analysts whose research and work supported the trading strategies we ran. The analysts did not receive bonuses or commissions from VQR. Rather, my understanding was that any bonuses that an analyst might receive would have been paid by the trader for whom the analyst worked, at the trader's discretion, and paid from profit percentage that the trader was allocated based on their trading success.

7. Access to VQR-affiliated accounts and wallets used for trading and holding digital assets was controlled by Mr. Hallak. Those accounts and wallets could not be accessed nor used

for trading without Mr. Hallak's approval and involvement. Mr. Hallak personally approved withdrawals from such accounts and wallets as well.

8. A true and correct copy of a Slack conversation between me and Mr. Hallak in which he was transmitting an API key to me so that I could access such a VQR-affiliated account for trading purposes is attached hereto as **Exhibit B.**

9. A true and correct copy of a Slack conversation in which Mr. Hallak aided me in accessing, and then controlled the transfer of assets out of a VQR-affiliated account, is attached hereto as **Exhibit C**.

10. During my time at VQR, any trader's usage of a VQR-affiliated Binance account or subaccount had to be approved by Mr. Hallak, and any transfer out of such an account was controlled and had to be approved by Mr. Hallak.

11. It was common for traders to work on side projects and/or pursue independent investments and investment activities that we sourced or developed, in addition to the work that we did trading for VQR and its assets under management. For example, I operated a small fund called Cryptoindex Capital Management while employed at VQR with the full knowledge of Mr. Qin and Mr. Hallak. VQR never compensated me for a side project or independent investment activity, nor would I have expected that it would.

12. I occasionally chatted and exchanged messages with my former coworkers in the VQR Slack channel and in other channels regarding our side projects or independent investment activities.

13. I did not engage in market making work for newly launched cryptocurrency projects or tokens while at VQR. Token market-making is a highly specialized skill set that involves working directly with a project sponsor to provide liquidity for a newly launched token,

often using a pool of tokens and/or capital provided by the project for this purpose. To my knowledge, VQR did not engage in any token market making work and was never retained by any investor or third party to engage in such work.

14.     I never engaged in market making work for the Injective ("INJ") token. To my knowledge, any such work would have been unrelated to VQR because VQR did not engage in token market-making projects.

15.     I never saw any INJ token market-making profits or proceeds from such a project in any of the company-wide performance records that I encountered during my time at VQR.

16.     I have never been subpoenaed by the Receiver in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in  Humacao, PR   on this  23  day of October 2023.

_____
Max Bodoia