UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                                        Plaintiff,

                    -against-

STEFAN QIN, et al.,

                                        Defendants.

20-CV-10849 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Before the Court are three motions: (1) a motion by the Court-appointed receiver (the

"Receiver") to compel Nasir Adaya ("Adaya") and Phuong Nguyen ("Nguyen," together with

Adaya, "Respondents") to turnover assets, ECF No. 231; (2) the Respondents' motion to strike

portions of a declaration in support of the Receiver's motion, ECF No. 249; and (3) the

Respondents' motion to seal certain exhibits, ECF No. 253. For the reasons stated herein, the

motion to compel is GRANTED in part and DENIED in part, the motion to strike is GRANTED

in part and DENIED in part and the motion to seal is DENIED.

## BACKGROUND

### I.      The Receivership

On December 22, 2020, the Securities and Exchange Commission ("SEC") commenced

this action against Stefan Qin and entities that he owned or controlled – Virgil Technologies

LLC, Montgomery Technologies LLC, Virgil Quantitative Research, LLC, Virgil Capital LLC

and VQR Partners LLC (collectively, the "Entity Defendants" or the "Receivership Entities") –

alleging that Qin used the Entity Defendants to lure investors into investing in the Virgil Sigma

Fund LP (the "Sigma Fund") and the VQR Multistrategy Fund LP (the "VQR Fund"), which

funds Qin then misappropriated. ECF No. 1.

On January 21, 2021, upon stipulation, the Court appointed a receiver over the Entity

Defendants in order to marshal and preserve all assets of the Entity Defendants that:

> (a) are attributable to funds derived from investors, including without limitation any assets associated with either Virgil Sigma Fund, LP or VQR Multistrategy Fund LP; (b) are held in constructive trust for the Entity Defendants; (c) were fraudulently transferred by the Entity Defendants, or by any of their owned or controlled subsidiaries, or by any person acting on behalf of, or who controlled any of, the Entity Defendants; and/or (d) may otherwise be includable as assets of the estates of the Entity Defendants (collectively, the "Recoverable Assets").

ECF No. 31 ("Receiver Order") at 1–2. Pursuant to the Receiver Order, the Receiver has the

power to "use reasonable efforts to determine the nature, location, and value" of all Receivership

Property. *Id*. § I(7)(A). Receivership Property is defined as "monies, funds, securities, digital

assets, credits, effects, goods, chattels, lands, premises, leases, claims, rights, and other assets,

together with all rents, profits, dividends, interest, or other income attributable thereto, of

whatever kind, which the Receivership Entities own, possess, have a beneficial interest in, or

control directly or indirectly." *Id*.

The Receiver has the power "to sue for and collect, recover, receive, and take into

possession from third parties all Receivership Property." *Id*. § I(7)(B). If the Receivership

Property is in the custody of a third party, the Receiver Order directs that party not to "liquidate,

transfer, sell, convey, or otherwise transfer" that property except upon instructions from the

Receiver. *Id*. § III(13)(A). The Receiver Order further requires that party to "[c]ooperate

expeditiously in providing information and transferring funds, assets, and accounts to the

Receiver or at the direction of the Receiver." *Id*. § III(13)(D). If the third party does not turn over

Receivership Property to the Receiver, the Receiver Order authorizes the Receiver to "bring such

legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems

necessary or appropriate in discharging his duties as Receiver." *Id*. § I(7)(I).

II.     **The Disputed Assets**

The Receiver alleges that Adaya, a former trader at Virgil Quantitative Research LLC, improperly diverted digital assets worth approximately $3.5 million (the "Disputed Assets") from the Receivership Entities to: (1) a cryptocurrency account at Binance Holdings, Ltd. ("Binance") and (2) an unhosted cryptocurrency wallet that Adaya created. ECF No. 232 ("Mot.") at 1. Adaya is a quantitative trader and analytics advisor, currently specializing in digital assets and cryptocurrency markets. ECF No. 252 ("Adaya Decl.") ¶ 2. He worked as an Algorithmic and Quantitative Trader with Virgil Capital LLC ("Virgil") from 2018 to early 2019 and as a Quantitative Trader and Portfolio Manager at Virgil Quantitative Research LLC ("VQR") from March 2019 through December 2020. *Id*. ¶ 4.

A.  **VQR Assets**

The Receiver seeks to compel Adaya to turn over approximately $3 million dollars' worth of digital assets that it claims are the property of VQR (the "VQR Assets"). Mot. at 1, 8.

1.  **Market Making Work for the VQR Assets**

Eric Chen is the CEO and co-founder of Injective Labs Inc. ("Injective Labs"), a technology and research company that provides services to the Open DeFi Foundation ("ODF"), an independent foundation that supports the Injective Labs ecosystem. ECF No. 233-5 ("First Chen Decl.") ¶¶ 1–2. INJ is the native token of the Injective Labs ecosystem and was launched in or about October 2020 on Binance Launchpad, a program through which new tokens are sold by third parties on Binance to users of the exchange. *Id*. ¶ 3. The success of the INJ launch required the development of a trading market to establish a market price for INJ in relation to other digital assets. *Id*.

The parties dispute whether VQR or Adaya was hired to perform these market making services for the INJ token. Mot. at 14–16; ECF No. 250 ("Opp.") at 4–5. Market making work is primarily done when an asset is new to a market or newly available for trading. Adaya Decl. ¶ 10. Market makers participate as both buyers and sellers of a particular asset in order to provide liquidity. *Id*. In this context, market making means ensuring, through the trading of INJ tokens, that there was an efficient, liquid market and price discovery for the INJ token when it became available for trading. First Chen Decl. ¶ 5; *see also* ECF No. 233-2 ("Adaya Dep.") at 64:1–5.

Injective Labs hired Adaya – either in his individual capacity or in his role as an employee of VQR – to provide market making services for the INJ token. Adaya Dep. at 82:3–5; First Chen Decl. ¶ 5. Chen understood that he was hiring Adaya individually as a consultant, not VQR. ECF No. 255 ("Second Chen Decl.") ¶¶ 5, 19. While performing this work for Injective Labs, Adaya was employed by VQR, and Adaya used VQR to facilitate the market making that he was conducting on behalf of Injective Labs. Adaya Dep. at 84:3–7, 94:2–5. This is the only time Adaya took on consulting work separate from VQR while he was employed by VQR. Adaya Dep. at 85:16–19.

To facilitate the market making work, Adaya received the approximately one million INJ tokens that he would have to trade for the initial exchange offer ("IEO") from Chen. *Id*. at 112:6–10; First Chen Decl. ¶ 5; ECF No. 234 ("Porter Decl.") ¶ 105. Adaya obtained the permission of Antonio Hallak, Head of Trading at VQR, to open an account at Binance that would be used for the Injective Labs IEO. Adaya Dep. at 34:20–21, 106:25–107:21; *see also* ECF No. 233 ("Molina Decl.") ¶ 8; Molina Ex. 7 at 5[1] (Telegram message from Adaya stating "We made a

---

[1] All references to Molina Exhibits correspond to the exhibits to the Molina Declaration at ECF No. 233.

new sub account btw just for INJ. trading1b@virgilqr.com . . . I believe Antonio has the api key on the vault.”). Hallak shared with Adaya the subaccount details for the new Binance account and sent him the API key. Adaya Dep. at 111:15–112:14; Molina Ex. 8 at 2. An API key allows a user to programmatically have access to an account, and in this case, to connect the script to the Binance account. Adaya Dep. at 111:25–112:5. After Adaya received permission from Hallak, in order to conduct the market making trades, Adaya transferred the INJ tokens to an account at Binance that VQR set up. Adaya Dep. at 94:6–13, 112:9–14. Adaya chose to use an account of VQR’s because it had a favorable fee structure; he was not required by ODF to use any particular account. Adaya Decl. ¶ 29. Adaya attested under oath, and the Receiver produced no evidence to the contrary, that Adaya personally paid for the related Binance account fees. *Id*.

VQR Quantitative Research Rohan Pandit and VQR Data Research Analyst Xiao Ren were involved with writing the script for the INJ market making. Molina Decl. ¶¶ 7–8; Molina Ex. 6 at 2–3; Molina Ex. 7 at 3–4. Scripts are used, in some instances, to ingest ongoing market data and place trades on an exchange. Adaya Dep. at 44:23–46:4. Adaya asked Hallak to forward him emails from trading1b@virgilqr.com as well as from vpfa2@virgilqr.com, a test account for Binance where Adaya was testing the script. Molina Ex. 8 at 4. After Adaya got permission to put the INJ tokens in the VQR account at Binance, the script would have been run against the INJ tokens. Adaya Dep. at 113:4–11. Pandit states that helping Adaya with the script took fewer than four hours of his time and that he viewed the assistance he provided as a favor for a friend as opposed to compensated work for VQR. ECF No. 258 (“Pandit Decl.”) ¶¶ 10–11.

VQR employees were involved in additional ways with work relating to Injective Labs. On October 20, 2020, Adaya asked Ren to assist with collecting historical data from Binance for certain pairings of INJ with other cryptocurrencies. Molina Ex. 6 at 2–3. Adaya avers that this

work was not related to market making for the INJ token, but rather that INJ tokens needed to be added to existing models to inform VQR projects and trading strategies. Adaya Decl. ¶ 19. On October 23, 2020, VQR Quantitative Research Intern Richard Zhang assisted in setting up tracking for INJ trading, prices and more, noting that Adaya wanted it "ASAP." Molina Decl. ¶ 10; Molina Ex. 9 at 2. On November 10, 2020, VQR Software Engineering Intern Raymond Li asked Ren for the INJ/USDT[2] order book data because Adaya wanted him to analyze it. Molina Ex. 10 at 2. Li states that he did not work on or provide any analysis for the INJ token market making work and that the aforementioned messages relate to analysis to feed other trading strategies that VQR traders were running. ECF No. 257 ("Li Decl.") ¶¶ 4–6. He avers that it would be typical for interns to analyze newly launched tokens in order to incorporate new data associated with those tokens into their analysis of VQR trading strategies. *Id.* ¶ 7. Adaya continued the market making work into 2021. Adaya Decl. ¶ 32; Second Chen Decl. ¶ 12. The Receiver has not proffered any evidence regarding the timeline of the market making work to the contrary.

For the INJ market making work, Chen believed that Adaya would not rely on resources that belonged to or were controlled by a third party, except that Adaya might use a managed sub-account subject to a Binance master account that Adaya had used for VQR activities, because the managed sub-account had a favorable fee structure. First Chen Decl. ¶ 8.

### 2. The Agreement with Injective Labs

Adaya kept some of the proceeds generated by the trading of the INJ tokens, pursuant to an agreement with Injective Labs to split the trading profits and losses. Adaya Dep. at 120:15–25. Specifically, Adaya was compensated for the INJ market making work by being permitted to

---

[2] USDT refers to Tether, a different cryptocurrency. *See* Mot. at 8.

keep the gross proceeds of his market making, less a dollar amount that represented Adaya's payment for (and thus effectively his retrospective purchase of) the INJ tokens that ODF had issued to him in October 2020. Adaya Decl. ¶ 25; First Chen Decl. ¶ 10; Second Chen Decl. ¶ 8. Adaya was obligated to return to ODF digital assets in an approximately equivalent value to the then-existing valuation of the initial INJ tokens, after Adaya's market making work was essentially done and INJ was an established token capable of being fairly valued by market forces. Second Chen Decl. ¶ 7.

Adaya testified that the agreement was communicated verbally between himself and Chen. Adaya Dep. at 121:6–16. Subsequently, the compensation agreement was written down in a Token Purchase Agreement ("TPA") between Antifragile Management LLC ("Antifragile") and ODF that was executed on or about July 21, 2021, along with a consulting agreement, executed on or about August 2, 2021. First Chen Decl. ¶ 11; Adaya Decl. ¶ 25; Adaya Ex. H; Adaya Ex. I.[3] Adaya signed the TPA on behalf of Antifragile as its founder. First Chen Decl. ¶ 11. Chen declared under oath that "ODF's agreement was with Mr. Adaya, not VQR or any other entity or individual." Second Chen Decl. ¶ 19. Adaya states that the agreements were signed months after the October 2020 IEO because that was when the INJ token was capable of being fairly valued. Adaya Decl. ¶¶ 25, 33; *see also* Second Chen Decl. ¶ 14. In drafting the TPA, Adaya and Chen agreed on assigning value to the INJ tokens by their effective price. Chen Ex. D at 2–3.[4] At the time the parties assigned value to the assets, the loan principal Adaya received was valued just under $10 million and his compensation for the work – the profit made from the trading above

---

[3] All references to Adaya Exhibits correspond to the exhibits to the Adaya Declaration at ECF No. 252.

[4] All references to Chen Exhibits correspond to the exhibits to the Second Chen Declaration at ECF Nos. 254 and 255.

the principal – was approximately $1 million. Adaya Decl. ¶ 36; Second Chen Decl. ¶ 17; Chen Ex. D at 2–4.

### 3. Deefa and Adaya BTC Wallets

On October 20 and 21, 2020, an unhosted wallet controlled by Adaya ending in "1632" ("Wallet 1632") received 1,000,001 INJ tokens. Porter Decl. ¶ 105; Porter Ex. 47.[5] Thereafter, the 1,000,001 INJ tokens were transferred from Wallet 1632 to a deposit address ending in e68d belonging to an account with a User ID ending in 5275 (the "VQR Binance Sub-Account"). Porter Decl. ¶¶ 9, 106; Porter Ex. 48; Porter Ex. 49 (confirmation emails sent from Binance to trading1b@virgilqr.com regarding the transfer of the INJ tokens). Between October 21 and December 11, 2020, 581,326.09 INJ tokens were traded and sold through the VQR Binance Sub-Account at a high-volume and frequency for other digital assets, including Bitcoin ("BTC") and USDT. Porter Decl. ¶ 107. This activity resulted in an unsold balance of 418,673.91 INJ as well as trading proceeds equaling 323,547.70 USDT and 20.03 BTC. *Id*.; Porter Ex. 50. There were also 9,274.37 INJ returned to Injective Labs between October and November 2020. Porter Decl. ¶ 107 n.18.

On December 12, 2020, Adaya requested that the assets in the VQR Binance Sub-Account be transferred to two other accounts: (1) a wallet ending in Deefa (the "Deefa Wallet") and (2) an unhosted BTC wallet address ending in vwca (the "Adaya BTC Wallet," together with the Deefa Wallet, the "Adaya Wallets"). *Id*. ¶¶ 6, 9, 109; Porter Ex. 51 at 2–3. Specifically, Adaya asked Hallak to send the INJ and USDT to the Deefa Wallet and the BTC to the Adaya BTC Wallet. Porter Decl. ¶ 109; Porter Ex. 51 at 2–3. Adaya testified that he did not recall who

---

[5] All references to Porter Exhibits correspond to the exhibits to the Porter Declaration at ECF No. 234.

controlled the Deefa Wallet, but that he did not believe VQR controlled the Deefa Wallet and it was possible that Adaya himself controlled the Deefa Wallet. Adaya Dep. at 123:23–124:16. Adaya also testified that he was not certain who controlled the Adaya BTC Wallet and that it was possible he created the wallet. *Id*. at 129:5–12, 130:24–131:2. The assets in the VQR Binance Sub-Account were first transferred internally from the VQR Binance Sub-Account to a master account with User ID ending in 4083 (the "VQR Binance Master Account"). Porter Decl. ¶¶ 9, 110. The assets – 418,671.75 INJ, 323,544.70 USDT and 20.03 BTC – were then transferred externally from the VQR Binance Master Account to the Adaya Wallets. *Id.* ¶ 110; Porter Ex. 52.

### B. Sigma Assets

The Receiver also seeks to compel Adaya to turn over assets with a last-known value of approximately $500,000 that have been traced to Sigma Fund investor dollars Qin stole (the "Sigma Assets"). Mot. at 8. The Sigma Assets consists of 100 BTC, 378.67 Bitcoin Cash ("BCH"), 1,588.88 USDT and 32,044.80 USD Coin ("USDC"). *Id*.; Porter Decl. ¶ 10.

#### 1. 100 BTC

On March 11, 2019, Qin transferred $3 million from a Chase Private Client Account ending in 7059 to QCP Capital Pte Ltd. ("QCP Capital"), an over-the-counter trading desk. Porter Decl. ¶¶ 8, 46; Porter Ex. 6 at 8; Porter Ex. 8 at 3. On March 29, 2019, Adaya purchased 100 BTC through QCP Capital. Porter Decl. ¶ 47; Porter Ex. 8 at 4; Porter Ex. 25.[6] The same day, Adaya instructed QCP Capital to transfer the 100 BTC to a BTC deposit address ending in

---

[6] The Porter Declaration states that Adaya purchased 100 BTC using $409,922.29 from the QCP Capital account. Porter Decl. ¶ 47. The Receiver claims that Adaya purchased 100 BTC using $409,270.62 from the QCP Capital account. Mot. at 9. WhatsApp messages indicate that the price of the 100 BTC was $409,922.25. Porter Ex. 25 at 4. The QCP Capital account statement itself shows two purchases of 100 BTC on March 30, 2019, one for $409,922.29 (Transaction Reference Number T0001958) and one for $409,270.63 (Transaction Reference Number T0001959). Porter Ex. 8 at 4.

"dUxq," a BTC deposit address for a Binance account with User ID ending in 9897 and all related subaccounts, registered in the name of Srihari Yenamandra ("Yenamandra Account"). Porter Decl. ¶¶ 8, 49; Porter Ex. 23 at 3; Porter Ex. 25 at 4. Yenamandra is someone that Adaya knows through a professional capacity and gave Adaya permission to open an account in his name. Adaya Dep. at 143:4–7, 144:14–17. Subsequently, the 100 BTC were commingled with, and traded extensively at a high frequency for, other digital assets within the Yenamandra Account. Porter Decl. ¶ 50; Porter Ex. 24.

### 2.  378.67 BCH

On April 1, 2020, 378.67 BCH were transferred from Qin's Binance account, with User ID ending in 3517 and any related subaccounts (the "Qin Binance Account"), to a deposit address for the Yenamandra Account, a wallet address ending in "dUxq." Porter Decl. ¶¶ 8, 39; Porter Ex. 22; Porter Ex. 23 at 3. The 378.67 BCH were commingled with, and traded extensively at a high frequency for, other digital assets within the Yenamandra Account. Porter Decl. ¶ 40; Porter Ex. 24.

### 3.  1,588.88 USDT

In August 2019, 1,588.88 USDT were transferred from the Qin Binance Account to a deposit address for the Yenamandra Account, a wallet address ending in "92d0." Porter Decl. ¶ 38; Porter Ex. 22; Porter Ex. 23. The 1,588.88 USDT were commingled with, and traded extensively at a high frequency for, other digital assets within the Yenamandra Account. Porter Decl. ¶ 40; Porter Ex. 24.

### 4.  32,044.80 USDC

On June 15, 2020, 32,544.16 USDC were transferred from a Coinbase exchange account registered in the name of VPFA Ltd., a British Virgin Islands entity wholly owned by Qin and

whose portfolio was managed by VQR, to an unhosted wallet ending in "688b" ("Wallet 688b"). Porter Decl. ¶¶ 10, 95; Porter Ex. 45; Porter Ex. 46. Porter avers that Wallet 688b is believed to be owned and/or controlled by Adaya because "the type of activity conducted in the wallet – high frequency trading in decentralized finance – [] matches certain strategies Adaya was working on at the time for VQR." Porter Decl. ¶ 95 n.16.

On June 16, 2020, 32,544.16 USDC from Wallet 688b were transferred to a Compound USDC smart contract ("Compound Contract"), where the USDC were held as collateral. *Id*. ¶ 96; Porter Ex. 46 at 3. In exchange for the 32,544.16 USDC, the Compound Contract minted and transferred to Wallet 688b 1,545,356.02 cUSDC, evidencing Wallet 688b's claim to the 32,544.16 USDC held in the Compound Contract. *Id*. On June 21, 2020, 1,521,582.78 cUSDC were transferred from Wallet 688b to the Compound Contract and redeemed for 32,044.80 USDC. Porter Decl. ¶ 97; Porter Ex. 46 at 4. The same day, the 32,044.80 USDC were transferred from Wallet 688b to a deposit address for the Yenamandra Account, a wallet address ending in "92d0." Porter Decl. ¶ 98; Porter Ex. 46 at 5. The 32,044.80 USDC were commingled with, and traded extensively at a high frequency for, other digital assets within the Yenamandra Account. Porter Decl. ¶ 99; Porter Ex. 24.

### C.  Transfer of the VQR and Sigma Assets

Of the VQR Assets, as of June 2023, the BTC transferred from the VQR Binance Sub-Account to the Adya BTC Wallet remained in the Adya BTC Wallet. Porter Decl. ¶ 111; Porter Ex. 53. Between December 22, 2020 and January 3, 2021, 218,671.75 INJ and 323,544.70 USDT were transferred from the Deefa Wallet to a deposit address for the Yenamandra Account ending in 8409. Porter Decl. ¶ 113; Porter Ex. 54; Porter Ex. 55. Between January 13 and 14,

2021, 200,000 INJ were transferred from the Deefa Wallet to a deposit address ending in 327e. Porter Decl. ¶ 114; Porter Ex. 58 at 6; Porter Ex. 59.

The deposit address ending in 327e is one of the deposit addresses for the Nguyen account, a Binance account with User ID ending in 8310 and its related subaccounts, registered to Nguyen (the "Nguyen Account"). Porter Decl. ¶¶ 6, 114. Nguyen was Adaya's girlfriend and is now Adaya's wife. Adaya Dep. at 139:25–140:4; Opp. at 1. The Nguyen Account was opened under her name on January 6, 2021. Molina Ex. 1. Nguyen gave Adaya permission to open an account under her name. Adaya Dep. at 144:14–22. Adaya's deposition testimony suggests that Adaya controls the Nguyen Account. *Id.* at 139:8–143:2.

Adaya states that he transferred digital assets collectively worth approximately $10 million from his wife's Binance account to ODF, the amount of the loan principal, in a few different transactions in 2021 and early 2022. Adaya Decl. ¶ 35; Adaya Ex. J; Adaya Ex. K; Adaya Ex. L; Second Chen Decl. ¶ 16; Chen Ex. E. He declares that he retained the profit associated with his market making work with respect to the INJ tokens as compensation, totaling approximately $1 million. Adaya Decl. ¶ 36.

In January 2021, substantially all of the Sigma Assets from the Yenamandra Account were transferred to wallets ending in "htlu," "tez2," "4445" and "b2a1." Porter Decl. ¶ 116; Porter Ex. 57. These assets were denominated in BTC, USDT, Ether ("ETH"), INJ, Yearn.Finance ("YFI"), Airswap ("AST"), Uniswap ("UNI") and Ren ("REN"). *Id.* Porter claims that these are unhosted wallets believed to be owned and/or controlled by Adaya (collectively, the "Adaya Unhosted Transfer Wallets"). Porter Decl. ¶ 116. Between January 6, 2021 and February 2, 2021, virtually identical amounts of BTC, USDT, ETH, INJ, YFI, AST, UNI and

REN were transferred from the Adaya Unhosted Transfer Wallets to the Nguyen Account. Porter Decl. ¶ 117; Porter Ex. 58.

### III.    Employment Agreement at VQR

Adaya signed an employment agreement ("Agreement") with Montgomery Technologies LLC, one of the Entity Defendants, in November 2018. Molina Ex. 12. The Agreement provides that Adaya would not work as an officer, employee, agent, independent contractor or consultant with any entity or person that directly or indirectly competes with the services or business of Montgomery Technologies LLC. *Id*. § 10.3. The Agreement further provides that Adaya would not "be employed or engaged by or in . . . a business that is carried on in competition with the Business anywhere within the Restricted Area," "without the prior written consent of Company." *Id*. § 11.3; *see also id*. § 3.2 ("The Employee shall . . . not, without the prior written consent of Company, directly or indirectly carry on or be engaged, concerned, or interested in any other business, trade, or occupation that is in competition with the business of any Company Entity . . . ."). "Business" is defined as the "management, investment management, and investment advisory businesses, and the business of structuring, establishing, marketing, distributing, and managing investment funds . . . ." *Id*. § 11.1.1.

It was common at VQR – and in the asset trading industry generally – for employees to maintain a consulting business outside of employment. Adaya Decl. ¶ 14; ECF No. 256 ("Bodoia Decl.") ¶ 11 ("It was common for traders to work on side projects and/or pursue independent investments and investment activities that we sourced or developed, in addition to the work that we did trading for VQR and its assets under management."). For example, Max Bodoia, former quantitative trader and strategist at VQR, operated a small fund called Cryptoindex Capital Management while employed at VQR. Bodoia Decl. ¶¶ 2, 11. He did so with the full knowledge

of Qin and Hallak. *Id*. ¶ 11. Similarly, Hallak was involved in a gaming initiative separate from VQR, regarding a Coinbase-backed trading card game. Adaya Decl. ¶ 14.

## IV.    Procedural History

On August 8, 2023, the Court entered the Receiver's and Respondents' stipulation that the Disputed Assets be converted to fiat U.S. Dollars and held in a third-party escrow account (the "Escrow Account") pending the Court's decision on the motion to compel. ECF No. 237. The motion to compel was filed on August 4, 2023 and was fully briefed on December 20, 2023. *See* ECF Nos. 231, 250, 263, 276.

## DISCUSSION

The Court first analyzes the Respondents' motion to strike the testimony of Mark Porter, granting it in part and denying it in part. The Court next analyzes the Receiver's motion to compel the turnover of the VQR Assets and the Sigma Assets. The Court finds that the Receiver has not shown that the VQR Assets are Receivership Property, and thus denies the Receiver's motion to compel turnover of the VQR Assets. The Court finds that the Receiver sufficiently traced the Sigma Assets, and thus grants the Receiver's motion to compel turnover of the Sigma Assets. Finally, the Court denies the Respondents' motion to seal, determining that the presumption of access outweighs the competing considerations.

## I.    The Motion to Strike is Granted in Part and Denied in Part

Respondents move to strike portions of the Porter Declaration as unqualified expert opinion testimony under Federal Rule of Evidence 702 and improper lay witness opinion testimony under Federal Rule of Evidence 701. ECF No. 249 at 3–6. The Receiver does not assert that the Porter Declaration is admissible under Federal Rule of Evidence 701 or 702;

rather, the Receiver asserts that the Porter Declaration is properly before the Court under Federal Rule of Evidence 1006, which permits summary testimony. ECF No. 265 at 1.

Federal Rule of Evidence 1006 provides that a witness "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. "[S]ummary evidence is admissible as long as the underlying documents also constitute admissible evidence and are made available to the adverse party." *New York City Transit Auth. v. Express Scripts, Inc.*, 588 F. Supp. 3d 424, 441 (S.D.N.Y. 2022) (quoting *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53 (2d Cir. 1993)) (discussing Federal Rule of Evidence 1006 in the context of summary judgment).

The party offering the summary evidence must "establish that the summary is accurate and nonprejudicial" and "great care must be taken to ensure that the proposed summary contains no annotation or suggestion, even inferential, that may be considered argumentative." *UPS Store, Inc. v. Hagan*, No. 14-CV-1210 (WHP), 2017 WL 3309721, at *5 (S.D.N.Y. Aug. 2, 2017) (internal citations and quotation marks omitted). That the summary evidence may not be argumentative, however, does not mean that the summary evidence cannot contain assumptions. *See S.E.C. v. Lek Sec. Corp.*, No. 17-CV-1789 (DLC), 2019 WL 3034888, at *3 (S.D.N.Y. July 11, 2019) ("Summary witnesses who pull together massive quantities of data customarily make assumptions. So long as they are disclosed and reasonably drawn from the data being summarized, the use of assumptions is appropriate and does not convert the summary evidence into expert testimony.").

Respondents move to strike the following paragraphs of Porter's Declaration:

Paragraph 5, sentence 2. The sentence "[c]ommonly used to trace assets, the LIFO methodology adheres to Generally Accepted Accounting Principles ("GAAP") and is widely

accepted by courts" is a statement of fact provided as an explanation of the process Porter used to summarize the data he reviewed. Federal Rule of Evidence 1006 does not preclude statements of fact. Regardless, this district has recognized that the Last In First Out ("LIFO") tracing methodology is a "basic process" that is "within the ken of the average juror." *United States v. Blakstad*, No. 19-CR-486 (ER), 2021 WL 5233417, at *5 (S.D.N.Y. Nov. 9, 2021), *aff'd*, No. 21-2859, 2023 WL 2668477 (2d Cir. Mar. 29, 2023) (further finding that the testimony involving the results of the LIFO tracing methodology "was not contingent on [the expert's] scientific, technical, or other specialized knowledge") (internal quotation marks omitted). Thus, the Court will not strike this sentence.

Paragraphs 6–9, 101–03, 118 and corresponding footnotes. Respondent moves to strike Porter's summary of the Disputed Assets. These paragraphs purport to trace the movement of the Disputed Assets to accounts that Adaya controlled. The Court will accept the portions of these paragraphs that directly summarize underlying documents, such as that an account at the Commonwealth Bank of Australia ("CBA") ending in 2114 was registered to Stefan Qin. *See* Porter Decl. ¶ 8; Porter Ex. 4. Similarly, the Court will accept summaries of the movement of assets from one account to another, such as that currency was transferred from an account ending in 2114 to a Chase Private Client Account ending in 7059 and a CBA account ending in 8375. Porter Decl. ¶ 8; Porter Ex. 4; Porter Ex. 5; Porter Ex. 6. The Court will also accept the portions of these paragraphs that are explanatory and that cite to sources, such as a description of a wallet address. Porter Decl. ¶ 6 n.3.

The Court grants Respondents' motion to strike the portions of these paragraphs that provide opinion regarding the ownership of the assets, such as that the $3.5 million dollars' worth of digital assets were Receivership Property. *See id*. ¶ 6. Although the Receiver states that

"Porter offers no opinion regarding the location or ownership of assets," the Receiver also argues that to the extent information about the location or ownership is provided, "it is provided as a conclusion logically drawn and naturally flowing from the evidence in the record." ECF No. 265 at 14. But not all information about location or ownership "naturally flow[s] from the evidence in the record." In fact, whether the $3.5 million dollars' worth of digital assets were Receivership Property is exactly the issue the parties bring before the Court.

Regardless, the Court does not rely on these paragraphs that the Respondents seek to strike, other than to identify certain accounts.

## II.    The Motion to Compel is Granted in Part and Denied in Part

Courts overseeing SEC receiverships have the authority to grant equitable remedies so that victims can obtain relief. *See S.E.C. v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984) ("[O]nce the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances."). The Receiver Order provides that the Receiver has the power "to sue for and collect, recover, receive, and take into possession from third parties all Receivership Property." Receiver Order § I(7)(B). Adaya does not dispute the Receiver's power to recover property belonging to the Receivership Entities. Opp. at 14.

The Receiver alleges that Adaya improperly diverted digital assets worth approximately $3.5 million from the Receivership entities and seeks an order directing Adaya and Nguyen to turn over these assets to the Receiver's insured institutional cryptocurrency account. Mot. at 1. To prevail on the motion to compel the turnover of assets, the Receiver must show by a preponderance of the evidence that the Receiver has the right to possess the alleged Receivership Property. *Glob. NAPS, Inc. v. Verizon New England, Inc.*, No. 02-CV-12489 (RWZ), 2015 WL

12781223, at *2 (D. Mass. Mar. 10, 2015).[7] The Court separately analyzes the VQR Assets and the Sigma Assets.

### A.  Ownership of the VQR Assets

The Receiver asserts that the VQR Assets and their proceeds belong to VQR and, thus, constitute Receivership Property. Mot. at 12, 21. However, the Receiver has not shown by a preponderance of the evidence that the VQR Assets belong to VQR. *See Glob. NAPS, Inc.*, 2015 WL 12781223, at *2.

First, the Receiver claims that VQR conducted market research on the INJ token as well as that token's potential to be traded for other digital assets. Mot. at 12. There is evidence that VQR employees – Ren, Zhang and Li – conducted work related to the INJ token. However, Li declared that his work was not related to market making for the INJ token but instead related to other trading strategies. This is consistent with Adaya's declaration, which states that Ren's work in collecting historical data was related to the need to add INJ tokens to existing models to inform VQR projects and trading strategies. Ren and Zhang did not submit declarations. Based on the foregoing, the Court is not convinced that VQR's work was related to INJ token market making rather than the impact of the INJ token on VQR trading strategies.

Second, the Receiver asserts that VQR wrote the trading scripts that enabled automated algorithmic sales of the INJ token on Binance. *Id*. However, Pandit submitted a declaration stating that he viewed this work as a favor to his friend Adaya, and not work on behalf of VQR.

---

[7] The Court notes that neither party has requested an evidentiary hearing. Moreover, the facts supporting each party's argument regarding ownership of the VQR Assets are not in dispute – it is instead the party's interpretation of the facts as well as the ultimate conclusions about ownership that the parties dispute.

Ren did not submit a declaration, nor do Respondents explain Ren's work on creating a script for the INJ token market making.

Third, the Receiver points to the VQR Binance Sub-Account in the VQR Binance Master Account that was used for the INJ token market making as evidence that the VQR Assets and their proceeds belong to VQR. *Id*. The Receiver notes that VQR sold INJ tokens to purchasers. *Id*. at 12–13. Adaya claims that he chose to use this account of VQR's because of its favorable fee structure, and that Adaya – not VQR – paid the fees for the account. He also explains that he received permission from his boss, Hallak, to use this account.

Other evidence provided by the Respondents support their argument that it was Adaya, not VQR, who was hired by ODF for the INJ market making work. The compensation agreement was memorialized in a TPA between Antifragile and ODF. Adaya signed the TPA on behalf of Antifragile as its founder. The Receiver argues that it is "false" that Antifragile acquired the INJ tokens and also "impossible" that there was an agreement with Antifragile because Antifragile was not founded until 2021, several months after the IEO. *Id*. at 15–16. However, both Adaya and Chen affirm that the agreements were signed months after the IEO because that was when the INJ token was capable of being fairly valued. Chen further declared that ODF's agreement was with Adaya, not with VQR. Additionally, Adaya continued the market making work into 2021, well after VQR ceased to function.

VQR has not pointed to any evidence showing that ODF hired them. In comparison, VQR had written agreements with other third parties. For example, in September 2020, VQR MAS Bx LLC signed an agreement with Bixin Ventures Co., Limited ("Bixin"), under which VQR MAS Bx LLC was to execute a trading strategy for a managed account holding Bixin's

assets. Adaya Decl. ¶ 21; Gilbert Ex. D.[8] VQR was to be compensated by sharing with Bixin in the profits of trading (above the principal balance transferred to VQR) and Adaya was to be paid commissions out of those profits. Adaya Decl. ¶ 21. VQR, including Qin and Hallak, tracked the Bixin work and Qin determined how to allocate the profits from VQR's trading of Bixin assets. *Id.* ¶¶ 22–23. The Receiver has not pointed to any evidence that VQR was tracking the INJ market making work so that VQR could be compensated for it.

While not addressing the lack of an agreement between VQR and ODF, the Receiver instead argues that (1) it was not possible for Adaya to trade the INJ tokens without the use of VQR, its technology, personnel and infrastructure and (2) under his Agreement with VQR, Adaya was prohibited from competing against VQR in this capacity absent VQR's prior written consent, which was never obtained. Mot. at 22. As to the first, VQR does not explain how Adaya making some use of VQR resources would result in transferring the ownership of the INJ tokens. As to the second, VQR has only presented the Agreement, which evidences an employment agreement between Adaya and Montgomery Technologies. The Court is unaware of an employment agreement between Adaya and VQR.

Even if there were an employment agreement between Adaya and VQR that prohibited Adaya from competing against VQR absent prior written consent, the Receiver would not necessarily be successful in his motion to compel turnover of assets. First, Adaya, through his messages with Hallak, may have received written consent to use the VQR Binance account. Second, such market making work may not have been in competition with VQR; the definition of "business" in the Agreement does not explicitly name market making, and it is unclear at this

---

[8] All references to Gilbert Exhibits correspond to the exhibits to the Gilbert Declaration at ECF No. 251.

juncture whether market making was part of VQR's work. And perhaps most importantly, the Receiver does not explain how a breach of the Agreement, if there was one, would result in the proceeds or profits from Adaya's work becoming Receivership Property. The Court acknowledges that this is possible, but a breach of contract action has not been brought nor has it been briefed.

The Receiver also argues that Adaya is not credible. *Id.* at 15–16. The Receiver alleges that Adaya misrepresented to Chen that VQR would not be involved in the trading of the INJ tokens, that Adaya was dishonest in causing Nguyen to open a Binance account in violation of Binance's terms of use and that Adaya falsely represented that the INJ tokens were acquired by Antifragile. These alleged misrepresentations, however, are not central to the dispute of the ownership of the VQR Assets. And though the Court acknowledges that there is an incentive for Adaya not to be truthful, Adaya's claims were corroborated by third parties, *See, e.g.*, First Chen Decl.; Second Chen Decl.; Pandit Decl.; Li Decl. The Receiver has not presented compelling evidence refuting Adaya's claims about ownership of the VQR Assets.

Because the Court concludes that the Receiver has not shown by a preponderance of the evidence that the VQR Assets are Receivership Property, the Court declines to trace the VQR Assets. The Court denies the Receiver's motion to compel the turnover of the VQR Assets.

### B.  Traceability of the Sigma Assets

There does not appear to be serious dispute as to whether the Sigma Assets once constituted Receivership Property. Opp. at 3 n.2; *see also* ECF No. 214 ("While $529,000 of the assets in question may well be receivership property . . . ."). Instead, Respondents argue that "the Receiver has not carried his burden to comprehensively trace such assets and establish that Respondents now have them." Opp. at 3 n.2.

The Receiver admits that "[b]ecause of Adaya's extensive trading and commingling of the assets in the Yenamandra and Nguyen Accounts, it is impractical – if not impossible – for the Receiver to discern exactly which assets in the Nguyen Account derive directly or indirectly from the Sigma Assets that Adaya received in the Yenamandra Account years ago." Mot. at 11. However, the Receiver argues that the Sigma Assets were deposited into the Yenamandra and then the Nguyen Account, and Adaya never transferred the Sigma Assets to Qin or to the Receivership Entities; thus, certain of the assets currently in the Nguyen Account derive directly or indirectly from the Sigma Assets. *Id*. Moreover, the Receiver claims that "[t]o the extent the trade proceeds from the Sigma Assets are not in the Nguyen Account, the only other plausible outcome at this time is that Adaya and/or Nguyen converted those assets." *Id*.

Porter traced the Sigma Assets using the LIFO methodology, which is accepted in this district. *See Blakstad*, 2021 WL 5233417, at *5; *In re Wiltsie*, 463 B.R. 223, 227 (Bankr. N.D.N.Y. 2011) (noting that courts have adopted several approaches to tracing funds in a commingled account, including the LIFO approach). Thus, the Court accepts Porter's determinations through the LIFO approach that the Sigma Assets that were transferred to Adaya can each be traced back to the initial deposits of Sigma Fund investor dollars. *See* Porter Decl. ¶ 12. The Court further notes that Respondents did not move to strike significant portions of the Porter Declaration relating to the tracing of the Sigma Assets. *See* ECF No. 249; Porter Decl. ¶¶ 10–101.

Accordingly, the Court grants the Receiver's motion to compel turnover of the Sigma Assets. Respondents are ordered to turn over to the Receiver assets in the Nguyen Account with a corresponding value of $529,202.16, which was the value of the Sigma Assets when they were taken from the Receivership Entities and deposited into accounts controlled by Adaya.

### III.     The Motion to Seal is Denied

Respondents seek to file exhibits A, B, D and E to the Second Declaration of Eric Chen (ECF Nos. 255-1–4, the "Chen Exhibits"), personal communications between Chen, Adaya and others, under seal. ECF No. 253. The Respondents have provided little briefing and no supporting law. In support of their position, Respondents only note that these exhibits were produced by another third party (the "Producing Party") and that the Producing Party has designated the materials confidential and requested that they be filed under seal. *Id*.

"The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "The presumption of access is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Id*. (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). "[M]otions to seal documents must be 'carefully and skeptically reviewed to ensure that there really is an extraordinary circumstance or compelling need' to seal the documents from public inspection." *Bernsten v. O'Reilly*, 307 F. Supp. 3d 161, 165 (S.D.N.Y. 2018) (quoting *Video Software Dealers Ass'n v. Orion Pictures*, 21 F.3d 24, 27 (2d Cir. 1994)) (cleaned up). "The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

The Second Circuit has articulated a three-part test for determining whether the common law right of public access attaches. *Lugosch*, 435 F.3d at 119–20. First, a court must determine whether the documents at issue are "judicial documents" to which a presumption of access attaches. *Id*. at 119. Second, if the documents are judicial documents, a court must determine the

weight of the presumption of access. *Id*. Third, a court must balance "competing considerations" against the weight of the presumption of access. *Id*. at 120.

The exhibits in connection with the opposition to the motion to compel are judicial documents, because they are relevant to the performance of the judicial function. *See Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (internal citation and quotation marks omitted) ("A document is thus relevant to the performance of the judicial function if it would reasonably have the *tendency* to influence a district court's ruling on a motion or in the exercise of its supervisory powers, without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision.").

"[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Amodeo*, 71 F.3d at 1049. A motion to compel turnover of assets calls upon the court to exercise its Article III powers and is "therefore of value to those monitoring the federal courts." *See Brown*, 929 F.3d at 50 (internal citation and quotation marks omitted). However, this exercise of judicial power is not central to the Court's role in this matter, and so the presumption of public access for the Chen Exhibits is "somewhat lower than the presumption applied to material introduced at trial, or in connection with dispositive motions such as motions for dismissal or summary judgment." *Id*. (internal citation omitted). Nonetheless, the Court must "articulate specific and substantial reasons for sealing" the Chen Exhibits. *See id*.

The Court next balances the "competing considerations" against the weight of the presumption of access. *Lugosch*, 435 F.3d at 120. Established "competing considerations" include "the privacy interests of those resisting disclosure," *id*., and "the privacy interests of

innocent third parties[, which] should weigh heavily in a court's balancing equation." *Amodeo*, 71 F.2d at 1050–51 (cleaned up). Courts should consider various factors, including "the degree to which the subject matter is traditionally considered private rather than public" and "the nature and degree of the injury to which the party resisting disclosure would be subjected were the privacy interest not protected." *Mirlis v. Greer*, 952 F.3d 51, 61 (2d Cir. 2020) (internal citation and quotation marks omitted).

Respondents have articulated no competing considerations weighing against the presumption of access, other than that the Producing Party designated the materials as confidential. However, the application of a protective order to discovery documents does not necessarily mean that the presumption of access is outweighed by competing considerations. *See Newsday LLC v. Cnty. of Nassau*, 730 F.3d 156, 166 (2d Cir. 2013). And Respondents have not articulated any privacy interests implicated. The Court thus denies their motion to file the Chen Exhibits under seal. *See Kewazinga Corp. v. Microsoft Corp.*, No. 18-CV-4500 (GHW), 2021 WL 1222122, at *8 (S.D.N.Y. Mar. 31, 2021). However, as with other documents in this case, *see, e.g.*, Porter Ex. 2, the Respondents may redact all but the last four digits of the wallet addresses.

## CONCLUSION

For the foregoing reasons, the motion to compel turnover of assets is GRANTED in part and DENIED in part, the motion to strike is GRANTED in part and DENIED in part and the motion to seal is DENIED. Within five (5) business days following the entry of this Order, $529,202.16 from the Escrow Account shall be turned over to the Receiver. The remaining funds in the Escrow Account shall be returned to Respondents. Respondents are directed to publicly

file versions of the Chen Exhibits that conform to section III of this Order no later than April 5,

2024. The Clerk of Court is directed to terminate ECF Nos. 231, 249 and 253.

Dated:  March 29, 2024
        New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge