UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                         Plaintiff,

              -against-

STEFAN QIN, et al.,

                         Defendants.

20-CV-10849 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Before the Court is the Receiver's[1] Motion to Establish Claims Administration and

Determination Procedures ("Motion," "Mot.," or the "Claim Procedures Motion"). ECF No. 302.

To resolve the Motion, the Court must determine: (1) whether Stefan Qin ran and operated a

Ponzi scheme using investment funds; (2) whether those funds commingled assets, and, if so, to

what degree; (3) whether the proposed claims and determination procedures are equitable and

reasonable; and (4) whether any objections to the Receiver's proposed procedures have merit.

For the reasons discussed below, the Court finds that Qin perpetuated a Ponzi scheme using two

investment funds, and commingled money from both in furtherance of the scheme. The Court

also accepts the Receiver's proposed procedures as fair and equitable, and overrules the limited

objection raised by claimant Nasir Adaya (ECF No. 313). Accordingly, the Court GRANTS the

Receiver's Motion.

---

[1] Robert A. Musiala, Jr. Esq. of Baker & Hostetler LLP was designated as Court-appointed
receiver ("Receiver") on January 21, 2021. *See* ECF No. 31.

# BACKGROUND

The Court summarizes the investment scheme by Stefan Qin giving rise to this action, the creation and status of the Receivership, and the Receiver's proposed claims procedures which are the subject of this Motion.

## I.    Stefan Qin's Investment Fund Scheme

Stefan Qin orchestrated a fraudulent scheme utilizing two funds: Virgil Sigma Fund, LP ("Sigma Fund") and VQR Multistrategy Fund, LP ("VQR Fund," and together with Sigma Fund, the "Investment Funds").

In 2017, Qin launched Virgil Capital Crypto-Fund, LP ("Virgil Crypto Fund"), the predecessor to Sigma Fund. ECF No. 305 ("Flemmons Decl.") ¶¶ 17–19. Virgil Capital Pty Ltd. ("Virgil Pty") served as its General Partner. *Id.* Qin controlled the operations, accounts, and assets of Virgil Pty and Virgil Crypto Fund, and marketed Virgil Crypto Fund as a "highly profitable, low-risk" investment opportunity. *Id.* ¶¶ 19–20. While Qin solicited millions of dollars from investors, *id.* ¶ 21, he did not use the money for legitimate business purposes. Instead, Qin misappropriated the money, diverting funds to accounts registered in his personal name which, among other things, he used to pay for rebate and redemption payments to *other* Virgil Crypto Fund investors. *Id.* ¶¶ 15, 22. To maintain the ruse, Qin issued false monthly account statements to investors leading them to believe they were earning significant profits in their accounts. *Id.* ¶¶ 29–30. These statements gave the appearance of profitability and led investors to believe they were earning returns.

Virgil Crypto Fund was then transitioned into Sigma Fund in April 2018. *Id.* ¶ 33. Qin operated Sigma Fund in a similar manner. He solicited millions in funds from investors and misappropriated them for personal use instead of legitimate trading activity. *Id.* ¶¶ 41–44. Qin

likewise continued to issue false account statements showing profits purportedly earned by investors. *Id.,* ¶¶ 45–48. Qin's failure to engage in legitimate business activity, combined with his misappropriation of investor funds, created substantial liabilities for Sigma Fund, *id.* ¶¶ 166–170.

In early 2019, to combat the financial hardships Sigma Fund faced, Qin created VQR Fund, in part, to solicit additional investor funds to perpetuate the scheme. Sentencing Tr. at 14:9-11, *U.S. v. Qin.,* No. 21-CR-75 (S.D.N.Y. Sept. 29, 2021), ECF No. 36 ("Sentencing Tr."). VQR Fund, unlike Sigma Fund, *did* actually engage in legitimate trading activity. Flemmons Decl. ¶ 172. However, there was significant investor overlap between the two Funds, and Qin routinely diverted Sigma Fund investor assets to pay VQR Fund operating expenses. *Id.* ¶¶ 264–271. Qin also used VQR Fund to perpetuate the scheme such that money also flowed from VQR Fund to Sigma Fund. For example, when Sigma Fund faced liquidity issues, Qin diverted investor dollars from VQR Fund to bridge the gap. *Id.* ¶ 179.

In short, Qin used the Investment Funds to facilitate his scheme by: (1) soliciting money from investors based on misrepresentations; (2) using cash from the Investment Funds to cover and address personal expenses (as well as investor rebates from each other); and (3) maintaining a false picture of profitability by distributing fake account statements to investors. The Investment Funds were also never audited by a third-party. *Id.* ¶ 12.

On February 4, 2021, Qin pleaded guilty to one count of securities fraud in connection with this scheme. On September 15, 2021, he was sentenced to 90 months in prison. Judgment, *U.S. v. Qin.,* No. 21-CR-75 (S.D.N.Y. Sept. 29, 2021), ECF No. 35. At Qin's sentencing, he admitted that he operated Sigma Fund as a "fraud" where he (i) took money from investors; (ii) failed to invest the money as advertised; (iii) diverted the investor assets; (iv) lied to investors

about their returns; and (v) lied about where their money went. Sentencing Tr. at 13:20-23; 23:30

14:3-4. Qin's counsel further acknowledged that "[Qin] set up VQR [Fund] . . . to try to earn his

way out of the [Sigma Fund] problem," that he "commingl[ed]" assets, and took "money that

came from investors for the [Sigma] Fund . . . to pay for expenses for the [VQR Fund]." *Id.* at

14:9-11; 17:1-5.

## II.    The Receivership

On December 22, 2020, the SEC commenced this action against Stefan Qin and certain

entities he owned and controlled alleging violations of federal securities laws. ECF No. 1. On

January 21, 2021, upon stipulation of the parties (ECF No. 29), the Court entered an order

appointing the Receiver. ECF No. 31. The order tasked the Receiver with marshalling and

preserving all potentially recoverable assets for eventual distribution to defrauded investors,

employees, and creditors of the Receivership Estate. *Id.* at 3–4. Further, due to the unreliable

financial records of the Investment Funds, the Receiver has been cross-referencing

documentation submitted by claimants against other records to determine legitimacy. ECF No.

303 ("Mem.") at 2. In performing this work, the Receiver periodically seeks reimbursement for

costs and fees incurred in discharging his duties by filing quarterly fee applications.[2]

On July 8, 2022, the Receiver filed a motion requesting the Court set a deadline for

Claims submissions ("Bar Date") and approving the Receiver's proposed Claim form and notice

procedures. ECF Nos. 161–162. On August 8, 2022, the Court entered an order ("Bar Date

Order") (i) establishing a Bar Date of 11:59 p.m., prevailing Eastern Time, on December 6,

2022; (ii) requiring identified stakeholders with potential claims against, or asserted equity

---

[2] The Court most recently granted the Thirteenth Fee Application on September 26, 2024. ECF
No. 328. The Fourteenth Fee Application (ECF No. 327) is currently pending and will be
resolved before the end of Q4 2024.

interests in, the Receivership Estate ("Claimants") be notified of the Bar Date via email, or, if necessary, U.S. First Class Mail ("Notice"), and (iii) requiring unknown potential Claimants be notified via a five-day digital publication of a press release issued on PR Newswire ("Publication Notice"). ECF Nos. 161, 168. The Receiver sent email Notice to all identified Claimants on August 26, 2022, and distributed the Publication Notice August 26, 2022 through August 30, 2022. Mem. at 4. Notice of the Bar Date was also posted electronically to https://www.bakerlaw.com/qinreceivership ("Receiver's Website"). *Id.*

### III.    Summary of Receiver's Proposed Plan

The Receiver filed the instant Claims Procedures Motion on April 8, 2024. ECF No. 302. Under the Plan, the Receiver would: (1) classify all timely submitted claims from investors into one of seven categories (investor, employee, administrative, secured, trade/general unsecured, tax, and denied) (Mem. at 25); (2) employ the "Net Investment Method"—which captures the difference between the amount an investor deposited and the amount they received or withdrew from the Investment Funds (Mem. at 26)— to determine and calculate claims; and (3) resolve any objections to the Receiver's claim determinations. Mem. at 28–29.

Except for a limited objection from Claimant Nasir Adaya dated April 29, 2024 (ECF No. 313), the Claims Procedures Motion has not faced any opposition or objection. Moreover, Plaintiff SEC has indicated they support the proposed procedure outlined in the Motion. Mem. at 1. Several claimant investors have also expressed their hope that the Receiver's proposed procedures be adopted and the funds promptly disbursed. ECF No. 338-3.

### LEGAL STANDARD

"District courts possess broad equitable discretion to craft remedies" for violations of the federal securities laws. *Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.*, 467

F.3d 73, 81 (2d Cir. 2006). Within that broad authority lies the power to approve a plan of

distribution proposed by a federal receiver. *See S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 82–

83 (2d Cir. 2002) (affirming approval of distribution plan as "within the equitable discretion of

the District Court"). The Court has the authority to approve any plan provided it is "fair and

reasonable." *S.E.C. v. Wang*, 944 F.2d 80, 81 (2d Cir. 1991) (distribution plan should be

"reviewed under [the District Court's] general equitable powers to ensure that it is fair and

reasonable"). There are no bright line rules governing this decision: the standard is whether a

distribution is equitable and fair in the eyes of a reasonable judge. *S.E.C. v. Byers*, 637 F. Supp.

2d 166, 174 (S.D.N.Y. 2009), *aff'd sub nom. S.E.C. v. Malek*, 397 F. App'x 711 (2d Cir. 2010),

and *aff'd sub nom. S.E.C. v. Orgel*, 407 F. App'x 504 (2d Cir. 2010).

## DISCUSSION

The Receiver asks this Court to find that Qin used VQR Fund and Sigma Fund to

facilitate a Ponzi scheme, meaning the Receiver would treat both funds as one for the purpose of

valuing and determining claims. Mem. at 3. The Receiver also asks this Court to approve its

proposed procedures regarding the classification, calculation, and objection to any claim

determinations. *Id.* As set forth below, the Court first holds Qin use of the Investment Funds can

properly be characterized as a Ponzi scheme, then finds the Receiver's proposed procedures to be

fair and equitable. Finally, the Court concludes Adaya's limited objections lack merit.

### I.    Qin Operated a Ponzi Scheme and Commingled Assets from the Investment Funds

"[T]here is no single, precise definition of a Ponzi scheme." *In re Diamond Finance Co.,

Inc.*, 658 B.R. 748, 767 (Bankr. E.D.N.Y. 2024). However, courts in the Second Circuit have set

forth at least two standards for determining whether a Ponzi scheme exists: (a) satisfaction of a

four-factor test in which (i) deposits were made by investors; (ii) the defendant conducted little

or no legitimate business operations; and (iii) produced little or no profits; such that (iv) any payments made to investors were sourced from cash infused by after-acquired investors; or (b) identification of "badges" of fraud, the presence of one or more of which weighs in favor of finding a Ponzi scheme. *Id.* at 766–67 (internal citations omitted) (identifying these two standards by which courts identify existence or establishment of Ponzi schemes).

The Court concludes that Qin operated a Ponzi scheme using the Investment Funds applying either of these standards. Considering the above four factors, Qin solicited millions of dollars in investor funds, and utilized them for improper or other personal means rather than legitimate trading activity or business operations. Flemmons Decl. ¶¶ 14–15, 21–22. Investor profits were diverted not only to cover Qin's personal expenses (including lavish purchases), *id.* ¶¶ 25–26; 145–146, but also his self-interested and unrelated investment activities. *Id.* ¶¶ 79–80. Sigma Fund did not generate profit. *Id.* ¶¶ 29, 47. Indeed, by December 2020, it had less than $8,000 in the bank, despite Qin's representations that investor held $111 million. *Id.* ¶ 169. VQR Fund fared no better: it generated only $39,000 in performance fees and approximately $111,000 in profit, yet incurred operating expenses of at least $4 million. *Id.* ¶¶ 280–281, 284. And Qin used after-acquired investor money to make payments to prior investors to dupe them into believing they were earning legitimate returns. For instance, in October 2019, a Sigma Fund investor deposited $1 million into a Sigma Fund deposit account. *Id.* ¶ 69. The following day, Qin then wired that money to another Sigma Fund investor to satisfy their redemption request. *Id.* Similarly, in October 2020, a Sigma Fund investor deposited $150,000 into an associated deposit account. *Id.* ¶ 75. The next day, Qin again executed a wire transfer (in the amount of $149,000) to another Sigma Fund investor to satisfy an outstanding redemption payment. *Id.* ¶ 76. Qin's fraud thus has all the hallmarks of a Ponzi scheme.

The scheme also reflects clear "badges of fraud." For instance, a "key factor is that the Ponzi schemer requires—and secures—new investors to keep the sham arrangement afloat." *In re Manhattan Inv. Fund Ltd*., 397 B.R. 1, 12 (S.D.N.Y. 2007). "Another factor is that new monies are used to pay off earlier investors." *Id.* Both exist here: as described during Qin's sentencing, he "set up VQR [Fund] . . . to try to earn his way out of the [Sigma Fund] problem," that he "commingl[ed]" assets, and he took "money that came from investors for the [Sigma] Fund . . . to pay for expenses for the [VQR Fund]." Sentencing, *U.S. v. Qin*, ECF No. 36 at 14:9-11; 17:1-5.

Based on the foregoing, the Court concludes Qin operated a Ponzi scheme using the Investment Funds and commingled assets between them. The fact that VQR Fund conducted *some* legitimate business does not alter this conclusion: "[t]he presence of a legitimate business will not defeat the finding of a Ponzi scheme." *In re Diamond*, 658 B.R. at 768 (collecting cases). Accordingly, both the Investment Funds shall be treated as one for the purposes of implementing the Receiver's procedures.

## II.    The Proposed Procedures are Reasonable and Equitable

The Court has carefully considered the Receiver's proposed claims procedures and concludes they are fair and equitable. The Court reaches this conclusion for three main reasons.

First, this Court has broad authority to craft remedies for violations of the securities laws, which includes approving a receiver's proposed plan. *See S.E.C. v. Credit Bancorp, Ltd*., 290 F.3d 80, 82–83 (2d Cir. 2002) (affirming approval of distribution plan as "within the equitable discretion of the District Court"); *S.E.C. v. Wang*, 944 F.2d 80, 88 (2d Cir. 1991) (similar). The Court need only conclude the proposed plain is fair and reasonable. *Wang*, 944 F.2d at 81. Here, the plan provides adequate notice and opportunity for claimants to be heard and balances this

with the need to avoid piecemeal and inefficient claim determinations. As such, the proposed

plan comports with elementary notions of due process. *See Cleveland Bd. of Educ. V.*

*Loudermill*, 470 U.S. 532, 538 (1985); *see also S.E.C. v. Callahan*, 193 F. Supp. 3d 177, 204–05

(E.D.N.Y. 2016) ("[The] Due Process clause requires non-party claimants . . . be afforded notice

and an opportunity to be heard before Receiver or Court resolves claims."); *S.E.C. v. Credit*

*Bancorp, Ltd.*, No. 99-CV-11395 (RWS), 2000 WL 1752979, at *33 (S.D.N.Y. Nov. 29, 2000),

*aff'd*, 290 F.3d 80 (2d Cir. 2002) (finding that summary procedures used in a receivership

satisfied Due Process because they afforded claimants an opportunity to be heard regarding the

validity of their interest in the receivership estate).

       Second, the proposed plan has the support of both the Receiver and the SEC. Mem. at 1.

The judgment of both the SEC and a federal receiver may be given weight in crafting a remedy.

*Byers*, 637 F.Supp.2d at 174 ("The SEC's judgment is entitled to deference . . . and the Court

may give weight to the Receiver's judgment.") (internal citations omitted). Affording weight to

the recommendations of the SEC—the entity that brought this action and has an interest in its

resolution—and the Receiver—who has analyzed, reviewed, and developed a complex

understanding of the assets at issue—makes sense here. *See S.E.C. v. AR Cap., LLC*, No. 19-CV-

6603 (AT), 2021 WL 1988084, at *1 (S.D.N.Y. May 18, 2021) (internal citation and quotation

omitted) (stating that a court may defer to the receiver's choices for the plan's details and should

give substantial weight to the SEC's views regarding a plan's merits).

       Third, this Circuit has accepted and endorsed the Net Distribution Method proposed here

in similar cases. *See Byers*, 637 F. Supp. 2d at 175, *aff'd sub nom. S.E.C. v. Malek*, 397 F. App'x

711 (2d Cir. 2010), and *aff'd sub nom. S.E.C. v. Orgel*, 407 F. App'x 504 (2d Cir.

2010) (approving plan calling for liquidation of assets under the control of a federal receiver,

with the understanding that when the receiver assumes control over additional assets, they too will be distributed); *Credit Bancorp*, 290 F.3d at 89 (affirming net investment method plan of the district court). "Courts have favored pro rata distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." *Id.* at 88–89. It has been deemed "especially appropriate" for fraud victims of a Ponzi scheme, because whether at any given moment a particular customer's assets are traceable is "a result of the merely fortuitous fact that the defrauders spent the money of the other victims first." *Id.* at 89 (internal quotation marks omitted).

Accordingly, the Court finds the Receiver's proposed procedures to be reasonable and equitable.

### III.    Claimant Adaya's Limited Objection Lacks Merit

None of the arguments raised by Claimant Nasir Adaya in his limited objection have any merit. ECF No. 313 ("Limited Obj."). Adaya objects to the proposed procedures by arguing (1) each step of the plan would be "unduly long" (Limited Obj. at 3–4); (2) the procedures improperly put the burden for disputed claims on the claimant rather than the Receiver (*id.* at 5); and (3) the procedures "unfairly" provide the Receiver "sole discretion" in submitting disputed claims to the Court for resolution. *Id.* Adaya also objected to the Receiver's supposed failure to specify a structure for claim superiority. *Id.* But as the Receiver noted, he will propose a priority of claims in a forthcoming and separate motion, and so the Court need not consider this argument further. ECF No. 314 ("Reply") at 7.

The procedures reasonably, and naturally, place the burden on claimants to show their entitlement to a portion of the Receivership assets when a claim is disputed. While Adaya asserts the burden should rest with the Receiver to "be consistent with applicable law," he cites no

authority elucidating this point. Limited Obj. at 5. In contrast, his position is belied by case law and would relieve a party seeking relief of the burden of proving their claim. *See* Mot. to Establish Claim Admin. Proc., *S.E.C. v. Illarramendi*, No. 11-CV-078 (JBA) (D. Conn. June 11, 2013), ECF No. 709-1 (placing burden on claimant as to disputed claims), *procedures approved*, *S.E.C. v. v. Illarramendi*, No. 11-CV-078 (JBA), 2013 WL 6385036, at *5 (D. Conn. Dec. 6, 2013); *S.E.C. v. Callahan*, 2016 WL 3256934, at *4 (E.D.N.Y. June 11, 2016) (concluding that claimant failed to show entitlement to payment from receivership estate where, under the claims procedure order, it was claimant's burden to provide supporting documentation for their claims); *cf. In re St. Johnsbury Trucking Co.*, 206 B.R. 318, 323 (Bankr. S.D.N.Y. 1997) ("The claimant must prove the claim, not sit back while the objector attempts to disprove it").

Adaya's other objections are likewise overruled. The time periods specified by the Receiver do not produce an undue delay or otherwise prejudice claimants. For example, as the Receiver notes, claimants risk serious consequences should objections not be timely filed, and the vast majority do not have counsel to advise them through the process. Reply at 4. And while Adaya complains of the Receiver having "sole discretion" to submit disputed claims, that arrangement, along with the rest of the proposed procedures, promote judicial economy by ensuring, e.g., a single Claims Schedule will be filed. *Id.* Ultimately, the Receiver has provided a reasonable basis for the proposed schedule, and this Court is entitled to defer to it.

In short, none of Adaya's objections highlight any unfairness or unreasonableness of the Receiver's proposed plan, and he cites no authority to support his position. His personal dissatisfaction alone does not prevent the Court from adopting the Receiver's proposed procedures as reasonable.

## CONCLUSION

Based on the foregoing, the Claims Procedures Motion is GRANTED. The Clerk of

Court is respectfully directed to terminate ECF No. 302.

Dated:  December 20, 2024
        New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge